# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA      :
                              :

          v.                 :       Case No. 21-CR-175 (TJK)

                               :

CHARLES DONOHOE,           :

                               :

      Defendants.       :

### ORDER

Having considered the government's unopposed motion for an order to transport the defendant, and for good cause shown, it is hereby

ORDERED that, pending any appeal to this Court of Defendant Charles Donohoe's pretrial detention, the U.S. Marshals Service transport Defendant back to a detention facility in the Middle District of North Carolina, the federal jurisdiction of Defendant's arrest. If possible, and if resources so allow, the Court requests that Defendant be detained in the Alamance County Detention Center in Graham, North Carolina, which is near his counsel and where he was detained immediately after his arrest and prior to his transfer to Oklahoma.

SO ORDERED this 30th day of April, 2021.

THE HONORABLE TIMOTHY J. KELLY
District Judge, United States District Court
For the District of Columbia

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | CASE NO. 21-CR-175-3 |
| V. | : | |
| | : | |
| ZACHARY REHL, DEFENDANT | : | |
| | : | |

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO DETENTION

Defendant, Zachary Rehl, by and through his counsel, Shaka M. Johnson, Esquire respectfully submits the following Memorandum in Opposition for Detention. The Government cannot establish by clear and convincing evidence that there is no condition or combination of conditions that will reasonably assure the safety of other persons and the community if the defendant is released pending trial. See 18 U.S.C. § 3142(e). Therefore, this Court must enter an order releasing the Defendant on appropriate conditions that will assure the appearance of the Defendant as required and th4 safety of any other person and the community.

Under 18 U.S.C. 3142(e)(3), a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the person as required and safety of the community if the Court finds that there is probable cause to believe that the person committed an offense as outlined in the subsection. Here, the Defendant has been charged with 18 U.S.C. § 371—conspiracy, 18 U.S.C. §§ 1512(c)(2),2—obstruction of an official proceeding and aiding and abetting, 18 U.S.C. §§ 231(a)(3), 2—obstruction of law enforcement during civil disorder and

aiding and abetting, 18 U.S.C. §§ 1361, 2—destruction of government property and aiding and abetting, 18 U.S.C. § 1752(a)(1)—entering and remaining in a restricted building or grounds, 18 U.S.C. § 1752(a)(2)—disorderly conduct in a restricted building or grounds.  As indicated in the Government's Motion for Detention, the Defendant has been charged with destruction of government property, which is specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B) and carries a maximum sentence of ten years in prison and is a crime of violence under 18 U.S.C. § 3156.

In determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, the court shall take into account the available information concerning: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. *See* 18 U.S.C. § 3142(g).

## <u>DISCUSSION</u>

1. **Nature and circumstances of the offense charged**. Admittedly, the crimes for which the Defendant has been charged are very serious; however, detention is not warranted in this case.  As proffered by the Government, Mr. Rehl is not alleged to have acted as a principal in the destruction of government property, but instead is culpable because of the actions of his co-conspirators.

2. **Weight of the evidence against the Defendant**. The Government proffers and provides a photograph of Mr. Rehl at the Capitol on January 6, 2021; however, as indicated above, the Government does not allege that Mr. Rehl acted as a principal in any destruction of government property. Moreover, the Government is relying on statements that Mr. Rehl made after the incident in a private chat celebrating what occurred on January 6, 2021. Mr. Rehl although stating that the officers should be tarred and feathered for attempting to keep them out of the Capitol, his actions on January 6, 2021 supports that those were merely words. He did not injure anyone or try to cause injury to any officer that was present protecting the Capitol. Had Mr. Rehl had the desire to cause injury to anyone, he could have been among the group of people who did those things, but instead he only marched and breached the Capitol with the flow of the group but did nothing more. There was no destruction or tampering done inside the Capitol by Mr. Rehl. His words following the incident were not words of incitement or words to encourage more actions, nor does those words implicate a lack of remorse. Therefore, the weight of the evidence against him does not favor detention.

3. **History and Characteristics of the Defendant.** Mr. Rehl stands before the Court today as a 35-year-old man. He was born and raised in Philadelphia, PA, where he was raised by his mother,                    , and father,          Rehl, until he was approximately 8 years old. It was at this time his parents got a divorce. Mr. Rehl subsequently lost his father by means of suicide on his 12th birthday. His mother later married Mr.                    , whom he maintained a positive

relationship with.  He still maintains a close relationship with his mother and stepfather, who both reside in the District of Columbia.

Mr. Rehl is married to _____ Rehl, a woman he has built a life with here in Philadelphia for the last 10 years.  Mr. Rehl and _____ entered into the bonds of matrimony on May 5, 2018.  Mrs. Rehl expresses her intentions to support Mr. Rehl throughout these criminal proceedings and would ensure his compliance with the rules and regulations imposed by the court if he is ordered released. Mr. Rehl has a 16-year-old daughter, _____ Rehl, whom he spends time with; however, his visits have been lessened since the onset of the COVID-19 pandemic.  He is expecting the birth of the newest member of the Rehl family on June 30, 2021. He is looking forward to the many experiences associated with being a parent of a newborn.  Mr. Rehl is very close and dedicated to his family. His strong family ties and ties to this community supports that he will appear for court.

**Military Service:** Mr. Rehl has a strong background of service to his country. On October 15, 2008, Mr. Rehl, inspired by the vision of service they provided, joined the United States Marine Corps. He joined knowing that the country was still in violent conflict, and that, at any time, he could be deployed to Iraq or Afghanistan as his brother had been. He was stationed far from his East Coast roots in Yuma, Arizona. Joining the Corps provided, for the first time, a stable life for Mr. Rehl. The discipline of the Corps gave him needed structure and support, and the brothers he met gave him a new family. Mr. Rehl threw himself full-heartedly into the service, and was promoted to the rank of Corporal E4, a position

of responsibility and authority. The USMC acknowledged his service in multiple ways. He earned the Marine Corps Good Conduct Medal after 3 years of "honorable and faithful" service without any infractions. He was recognized with both the Global War on Terrorism Service Medal and the National Defense Service Medal for serving during a time of war and for combatting global terrorism. Like a true Marine, Mr. Rehl also volunteered his time above and beyond the minimum. He worked extra hours recruiting new Marines and soldiers, for which he was given the Navy Unit Commendation. His volunteer work in organizing and fundraising for the Yuma Airshow (a recruiting event) was so valuable a rare Letter of Appreciation was written on his behalf. Mr. Rehl's Commanding Officer would also write a Letter of Appreciation describing his excellent service upon his separation from the USMC. Mr. Rehl provided a vital service to our nation as a Traffic Management Specialist. He completed, and later oversaw, the shipment of materials to Marines overseas. The contents of those packages ranged from family letters to rifles and other critical supplies. Without his skills, the Marines serving overseas would not have the physical or emotional equipment needed to complete their incredibly important jobs. *See* **Attachment A**—Zachary Rehl's Certificate of Release or Discharge.

As a member of the Traffic Management team, Mr. Rehl suffered a lower back injury caused by repetitive lifting of boxes. This injury requires daily use of heavy-duty painkillers, and created a situation where Mr. Rehl was at risk of developing a dependency simply by continuing the proper course of treatment. In addition, during a routine training exercise, Mr. Rehl suffered a severe shoulder injury along an obstacle course. Micro-fractures spread throughout his shoulder where they rubbed against his AC joint, slowly

and painfully grinding it away. The injury grew worse and worse over time, eventually requiring a surgery that still was unsuccessful in treating the problem or in relieving Mr. Rehl's significant pain. The lower back pain caused by his work ensuring the delivery of critical supplies also led to a hernia which occurred suddenly as Mr. Rehl opened a car door. The injury was so serious that he had to be physically carried to the hospital. Mr. Rehl's combination of injuries and unsuccessful surgery led to his Honorable Medical Discharge in May of 2012. The extent of his medical issues is documented in medical records in the possession of Veteran's Affairs. A review of his records would show that he suffers from lumbar degenerative disc disease, complications from his right shoulder resulting in pain, weakness, and loss of movement, post-traumatic symptoms, generalized anxiety disorder, a hernia, and gastroesophageal disease (GERD) caused by his stress.

**Education:** Since his disabilities prevent him from doing the type of work he loved doing as a Marine, Mr. Rehl had to choose a new career plan. Mr. Rehl decided to lean on his experience in sales and his talent for operations management and decided to pursue a business degree in marketing. He obtained a B.A. in Business from Temple University in 2016. **See Attachment B**—Copy of Temple University Degree awarded to Zachary Rehl.

**4. Nature and seriousness of the danger to any person or the community that would be posed by the person's release.** Mr. Rehl does not pose a danger to any person or the community. His service to our country supports this position. He joined the Corps during a time of war and constant terrorism; willing to put his body on the line for the U.S. His actions in service were vital in keeping our troops supplied and emotionally healthy. He was deemed trustworthy enough to merit a role of major responsibility in the USMC—a

military branch that believes strongly in honor and service. Despite the physical and psychological scars left by his time as a Marine, Mr. Rehl has reintegrated well into society, especially considering the path that disability and inability to continue to serve has had on many veterans who return home from serving our country abroad. Prior to this incident, Mr. Rehl had some infractions with the law; however, nothing about those previous incidents suggests that if this Court was to release him now, he would pose a danger. Moreover, although present, Mr. Rehl did not engage in any activity that were violent or destructive.

## CONCLUSION

As a veteran, father, and community member, Mr. Rehl has assuredly rebutted the presumption in favor of detention. Moreover, the Government has not shown through clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of the community if he is released. Although violence occurred on that day, Mr. Rehl was not involved and should not have to wear the full freight of a situation that spiraled out of control. Moreover,                      , his in-laws, have stated that they will act as third-party custodians for Mr. Rehl. Mr.            has worked for the City of Philadelphia for over 30 years. He is prepared to state under oath that he will be responsible for ensuring that Mr. Rehl meets all of his release conditions. Additionally, the Government posits that pre-trial release would allow the defendant to remain in the same circumstances in which he and others planned and launched the attack on January 6; however, Mr. Rehl is willing to stipulate that he will refrain from all internet access and that all mobile and electronic devices in the house are subject to search.

**WHEREFORE**, the Defendant respectfully request the Court enter an order releasing Mr. Rehl pending trial on such conditions that would assure appearance of the Defendant as required and the safety of any other person and the community of detention in this matter.

DATED: May 17, 2021                    Respectfully submitted,


/s/ Shaka M. Johnson
Shaka M. Johnson, Esquire

**Law Offices of Shaka Johnson, LLC**
1333 Christian Street
Philadelphia, PA 19147
(215) 732-7900
Shaka@shakajohnsonlaw.com

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | CASE NO. 21-CR-175-3 |
| V. | : | |
| | : | |
| ZACHARY REHL, DEFENDANT | : | |
| | : | |

## CERTIFICATE OF SERVICE

I, Shaka M. Johnson, Esquire through Michelle Peterson, Esquire, hereby certify that on this 17th day of May 2021, I caused a true and correct copy of the instant Memorandum to be served via the Court's electronic notification system upon:

Luke Jones, Esquire
Assistant United States Attorney
District of Columbia
Luke.Jones@usdoj.gov

DATED: May 17, 2021                Respectfully submitted,


/s/ Shaka M. Johnson
Shaka M. Johnson, Esquire

**Law Offices of Shaka Johnson, LLC**
1333 Christian Street
Philadelphia, PA 19147
(215) 732-7900
Shaka@shakajohnsonlaw.com

# EXHIBIT 3

Case 1:21-cr-00175-TJK Document 178-1 Filed 09/13/21 Page 14 of 38



# CONAN Daily

STORIES FROM 6 CONTINENTS

SEPTEMBER 13, 2021 9:16 AM

ADVOCACY

# Zach Rehl biography: 13 things about Proud Boys member from Philadelphia, Pennsylvania

BY MARKY O'BRIEN ON MARCH 17, 2021 • ( 2 COMMENTS )



*Zachary Rehl* (https://www.linkedin.com/in/zacharyrehl/detail/photo/)

**Zachary "Zach" Rehl** is a white man from **Pennsylvania, United States**. Here are 13 more things about him:

1. He lives in **Port Richmond, Philadelphia, Pennsylvania**. *(a)*
2. His parents are police officers in Philadelphia. *(a)*
3. He worked as a telemarketing representative at Spectrum Marketing Services in Philadelphia from February 2002 to June 2003 and as a sales manager at T-Mobile in Philadelphia from

7. He worked as an agent at **New York Life Insurance Company** from June 2018 to August 2018. In September 2018, he joined **Winchester Financial Services** in Philadelphia as an independent insurance agent. *(b)*

8. He is the leader of the Philadelphia chapter of the right-wing extremist group called the **Proud Boys**. He was one of the organizers of the We the People rally outside the Independence Hall in Philadelphia in 2018, which supported Donald Trump. *(a)(d)*

9. In July 2020, he attended the Back the Blue rally outside the Fraternal Order of Police lodge in Philadelphia where the Proud Boys members mingled with police officers. *(c)*

10. "Just FYI, WE'RE HERE with you in DC now! Love you all!" he wrote on **Parler** on the evening of January 5, 2021. He had raised more than $5,500 via the Christian website **GiveSendGo** to fund his travel from Philadelphia to Washington, D.C., USA. *(d)*

11. Wearing a camouflage cap while carrying a Temple University backpack, he went to the U.S. Capitol building in Washington, D.C. on January 6, 2021. That day, Trump's supporters breached the building while a joint session of Congress was certifying the vote of the Electoral College and affirming Joe Biden's victory in the 2020 presidential election. During the riot, he assisted Proud Boys leaders **Ethan Nordean** and **Joseph Biggs**. *(a) (c)*

12. He was 35 years old when he participated in the U.S. Capitol riot on January 6, 2021. *(c)*

13. On March 17, 2021, Federal Bureau of Investigation agents arrested him at his home in Port Richmond. *(a)*

*(This is a developing story. More details are being added.)*

*SOURCES:*

- *a.* WHYY
- *b.* Zach Rehl
- *c.* The Philadelphia Inquirer

Patrick Howley Interviews Zach Rehl

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**FILED**

AUG 2 5 2021

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

IN RE: UPDATED STATUS OF COURT
OPERATIONS, INCLUDING JURY
TRIALS, AND EXTENSION OF CARES
ACT AUTHORIZATION FOR REMOTE
PROCEEDINGS IN LIGHT OF CURRENT
CIRCUMSTANCES RELATING TO THE
COVID-19 PANDEMIC

Standing Order No. 21-47 (BAH)

Chief Judge Beryl A. Howell

## ORDER

Since the national emergency relating to the COVID-19 pandemic was first declared on March

13, 2020, over 17 months ago, this Court has remained open and operating, with adjustments based on

local health and safety conditions relating to the pandemic.  Notwithstanding the challenges that

necessary health and safety protocols have created, with concomitant limitations on the numbers of jury

trials, the business of this Court has otherwise continued unabated.  Indeed, during the first 17 months of

the pandemic, this Court held over 4,500 criminal proceedings and 1,200 civil proceedings, mostly

remotely using videoconferencing and teleconferencing technologies, with audio call-in lines providing

public access. Since criminal and civil trials resumed on March 15, 2021 and June 1, 2021, respectively,

after being suspended on March 17, 2020, the Court has held six criminal trials and seven civil trials,

including bench trials.  The number of civil cases resolved in the first 17 months of the pandemic

markedly exceeds the number terminated in each of the two preceding 17-month periods.[1]  Criminal

cases have also continued to be resolved on as expeditious basis as possible, with the number of criminal

---

[1]       The number of civil cases terminated during the first 17 months of the pandemic, from March 13, 2020 to August
13, 2021, was 5,146, as compared to the number of civil cases terminated in the two preceding 17-month periods, with 4,773
civil cases terminated from October 12, 2018 to March 12, 2020, and 3,810 civil cases terminated from May 11, 2017 to
October 11, 2018.

1

defendants sentenced in the first 17 months of the pandemic only slightly less than in the preceding 17-month period but more than the number sentenced in the 17-month period before that.[2]  The number of criminal cases filed increased notably during the pandemic, due largely to the number of criminal cases arising out of the events on January 6, 2021 at the United States Capitol.[3]  The number of sealed criminal investigative applications requiring judicial consideration and decision has also increased during the first 17 months of the pandemic, with this Court resolving over 8,670 such applications, as compared to 6,460 and 5,510 in the two preceding 17-month periods, respectively.

As this overview of the ongoing work makes clear, this Court has remained open, operating and busy after March 13, 2020, when public access to the E. Barrett Prettyman United States Courthouse and the William B. Bryant Annex (the "Courthouse") was restricted to judges, staff, and those with official business before the courts.[4]  Proceedings before the criminal duty Magistrate Judges have continued uninterrupted throughout the pandemic.[5]  Although the public counters of the Clerk's Office have remained closed, the Clerk's Office has continued to manage the work of the Court throughout the pandemic.[6]  Grand jury sessions were initially suspended in March 2020, but resumed in June 2020 and have continued on a regular basis since then, with nine new grand juries impaneled during the

---

[2]        During the first 17 months of the pandemic, from March 13, 2020 to August 13, 2021, this Court conducted 368 sentencing hearings, which was fewer than those conducted in the 17 months immediately preceding the pandemic, with 569 sentencing hearings held from October 12, 2018 to March 12, 2020, but greater than the number conducted during the 17 month period before that, with 342 sentencing hearings held from May 11, 2017 to October 11, 2018.  Similarly, the number of plea hearings conducted in the first 17 months of the pandemic was 300, which was fewer than the 427 in the preceding 17 months, but greater than the 269 in the 17-month period before that.

[3]        During the first 17 months of the pandemic, from March 13, 2020 to August 13, 2021, 731 criminal cases were filed, as compared to 585 and 465 in the two preceding 17-month periods, respectively.

[4]        *See In Re: Restrictions on Courthouse Visitors*, Standing Order No. 20-8 (BAH) (Mar. 13, 2020).

[5]        *See In Re: Court Operations in Exigent Circumstances Created by the COVID-19 Pandemic*, Standing Order No. 20-9 (BAH) (Mar. 16, 2020) [hereinafter Standing Order 20-9].

[6]        *See id.*; *In Re: Extension of Postponed Court Proceedings in Standing Order 20-9 and Limiting Court Operations in Exigent Circumstances Created by the COVID-19 Pandemic*, Standing Order No. 20-19 (BAH) (Apr. 2, 2020) [hereinafter Standing Order 20-19]; *In Re: Further Extension of Postponed Court Proceedings in Standing Order 20-9 and Limiting Court Operations in Exigent Circumstances Created by the COVID-19 Pandemic*, Standing Order No. 20-29 (BAH) (May 26, 2020) [hereinafter Standing Order 20-29]; *In Re: Third Further Extension of Postponed Court Proceedings Due to Ongoing Exigent Circumstances Caused by COVID-19 Pandemic*, Standing Order No. 20-62 (BAH) (July 9, 2020) [hereinafter Standing Order 20-62].

pandemic.[7]  Both in-person proceedings and jury trials were generally suspended at the outset of the pandemic,[8] but in-person proceedings resumed as necessary in September 2020,[9] criminal trials in March 2021 and civil trials in June 2021.[10]  Though public access to the Courthouse continues to be restricted, such access has been expanded gradually in recent months to allow increased opportunities for the public to view on-site video streams of trials and proceedings.[11]

The Court has continued to monitor the circumstances in this district relating to the COVID-19 pandemic, as detailed in the following **FINDINGS**:

(a) On March 13, 2020, the President of the United States declared a national emergency under the National Emergencies Act, 50 U.S.C. §§ 1601 *et seq.*, with respect to the Coronavirus Disease 2019 ("COVID-19") global pandemic,[12] which national emergency remains in effect.

(b) On March 29, 2020, the Judicial Conference of the United States found "that emergency conditions due to the national emergency declared by the President" with respect to COVID-19 "have materially affected and will materially affect the functioning of the federal courts generally,"[13] which finding remains in effect. The United States District Court for the District of Columbia is a district court covered by the Judicial Conference finding.

---

[7]     *See* Standing Order 20-9, *supra* note 5; *In Re: Partial Sequestration of Grand Juries 19-1, 19-5 and 20-1 for Purposes of Providing Lunch and Minimize Risk of Exposure to and Community Transmission of COVID-19*, Standing Order No. 20-55 (BAH) (June 30, 2020).

[8]     *See* Standing Order 20-9, *supra* note 5; Standing Order 20-19, *supra* note 6; Standing Order 20-29, *supra* note 6; Standing Order 20-62, *supra* note 6; *In Re: Fourth Further Extension of Postponed Court Proceedings Due to Ongoing Exigent Circumstances Caused by COVID-19 Pandemic*, Standing Order No. 20-68 (BAH) (Aug. 10, 2020) [hereinafter Standing Order 20-68].

[9]     *See* Standing Order 20-68, *supra* note 8.

[10]     *See In Re: Limited Resumption of Criminal Jury Trials in Light of Current Circumstances Relating to the COVID-19 Pandemic*, Standing Order No. 21-10 (BAH) (Apr. 2, 2021).

[11]     *See In Re: Modified Restrictions on Access to Courthouse During the COVID-19 Pandemic*, Standing Order No. 21-20 (BAH) (Apr. 2, 2021); *In Re: Updated Access Restrictions and Masking Protocols During the COVID-19 Pandemic*, Standing Order No. 21-42 (BAH) (July 15, 2021).

[12]     *A Letter on the Continuation of the National Emergency Concerning the Coronavirus Disease 2019 (COVID-19) Pandemic*, OFFICE OF THE PRESIDENT OF THE UNITED STATES (Feb. 24, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/02/24/a-letter-on-the-continuation-of-the-national-emergency-concerning-the-coronavirus-disease-2019-covid-19-pandemic/.

[13]     Memorandum, dated March 29, 2020, from Jim Duff, Director of the Administrative Office of the Courts, Re: Update on CARES Act Provisions for Criminal Proceedings at 1; *see also* CARES Act, Div. B, Title V, §§ 15002(b)(1)–(2).

(c) The District of Columbia remains under a public emergency due to the COVID-19 pandemic.[14]

(d) This Court remains in Phase Two of its Continuity of Operations Plan during the COVID-19 Pandemic ("COOP Plan"), issued July 15, 2020.[15]  Phase Two of the COOP Plan permits "urgent" criminal trials with appropriate precautions and "necessary" in-person proceedings.

(e) Over the course of the ongoing pandemic, COVID-19 case counts in the District of Columbia have fluctuated, with rates dropping significantly in the late summer of 2020, only to rise precipitously in November and December 2020.  In the early summer of 2021, daily case rates reached the lowest number in over a year, only to rise significantly in recent weeks due to widespread circulation of the Delta variant of the virus.[16]  On August 23, 2021, the 7-day average of new cases was 160, up dramatically from the 7-day average of new cases on July 13, 2021, which was 17.[17]  Over the last two weeks in the District, the average number of new cases has risen 28%.[18]

(f) On July 27, 2021, the Centers for Disease Control and Prevention (CDC) issued updated public health recommendations for fully vaccinated individuals in light of the increased circulation of the Delta variant of the coronavirus within the United States.[19]  The CDC

---

[14]    *See* Mayor's Order 2021-096, End of Public Health Emergency and Extension of Public Emergency (July 24, 2021), https://coronavirus.dc.gov/sites/default/files/dc/sites/coronavirus/page_content/attachments/Mayors-Order-2021-096.pdf.

[15]    The Court's COOP Plan is available at U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA, *Continuity of Operations Plan during the COVID-19 Pandemic (with appendices), July 15, 2020*, https://www.dcd.uscourts.gov/sites/dcd/files/Continuity%20of%20Operations%20Plan%20with%20Appendix%208%20for%20External.pdf.

[16]    GOVERNMENT OF THE DISTRICT OF COLUMBIA, *Coronavirus (COVID-19) Situational Update* 4–5 (Aug. 16, 2021), https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachments/COVID-Situational-Update-Presentation_08-16-21.pdf.

[17]    *Tracking Coronavirus in Washington, D.C.*, N.Y. TIMES (last updated Aug. 24, 2021), https://www.nytimes.com/interactive/2021/us/washington-district-of-columbia-covid-cases.html; *see also COVID-19 Surveillance*, GOVERNMENT OF THE DISTRICT OF COLUMBIA, https://coronavirus.dc.gov/data (last visited Aug. 24, 2021).

[18]    *Tracking Coronavirus in Washington, D.C.*, *supra* note 17.

[19]    *See Interim Public Health Recommendations for Fully Vaccinated People*, CENTERS FOR DISEASE CONTROL AND PREVENTION (last updated Aug. 19, 2021) www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html.

added a recommendation that fully vaccinated individuals wear a mask in public indoor

settings in areas with "substantial or high transmission."[20]  The CDC noted that "some

infections do occur among fully vaccinated people" and that "[f]ully vaccinated people who

do become infected with the Delta variant can transmit it to others," concluding that "fully

vaccinated people can further reduce their risk of becoming infected with the Delta variant

and transmitting it to others by wearing a mask in public indoor settings in areas of

substantial or high community transmission."[21]

(g) Currently, the rate of transmission in the District of Columbia is considered "high."[22]  On

July 29, 2021, District of Columbia Mayor Muriel Bowser reimposed an indoor mask

mandate for all persons, regardless of vaccination status, effective July 31, 2021.[23]

(h) On July 30, 2021, a mask requirement was reinstated for all individuals, regardless of

vaccination status, while in the public and non-public areas of the Courthouse.[24]

(i) Transmission of the virus within the D.C. Department of Corrections' ("DOC") D.C. Jail,

where many defendants are detained pretrial on charges pending in this Court and in other

local and federal courts in this metropolitan area, has recently been generally well contained

due to protocols adopted and refined during the pandemic.[25]  The risks of virus transmission

---

[20]    *Id.*

[21]    *Id.*

[22]    *COVID Data Tracker: COVID-19 Integrated County View*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://covid.cdc.gov/covid-data-tracker/#county-view (select "District of Columbia") (last visited Aug. 24, 2021).

[23]    Mayor's Order 2021-097, *Resumption of Mask Requirements and Delegations of Authority to the Department of Health and the Office of the State Superintendent of Education* (July 29, 2021), https://coronavirus.dc.gov/sites/default/files/dc/sites/coronavirus/page_content/attachments/Mayors-Order-2021-097.pdf.

[24]    *In Re: Reinstatement of Mask Requirement for All Individuals in Public and Non-Public Areas of Courthouse*, Standing Order No. 21-45 (BAH) (July 30, 2021).

[25]    *Public Safety Agency COVID-19 Case Data*, GOVERNMENT OF THE DISTRICT OF COLUMBIA, https://coronavirus.dc.gov/page/public-safety-agency-covid-19-case-data (compiling statistics on the prevalence of COVID-19 within DOC) (last visited Aug. 24, 2021).

and further exposure from residents entering or re-entering the facility remain real, however. In recent days, several new detainees have tested positive for COVID-19 upon intake.

(j) Local efforts to vaccinate the population against COVID-19 are proceeding. As of August 16, 2021, an estimated 56% of D.C. residents had been fully vaccinated, with an estimated 66.2% of residents being at least partially vaccinated.[26] The CDC has confirmed that "COVID-19 vaccines are effective at helping protect against severe disease and death from variants of the virus that causes COVID-19 currently circulating, including the Delta variant."[27] Accordingly, this Court has adopted a policy requiring all employees to be vaccinated, unless exempted for a medical reason or closely held religious belief.

(k) This Court has developed a comprehensive plan for conducting trials that prioritizes the health and safety of all trial participants, courthouse staff and those working in the courthouse. Details of that plan are available in Appendix 8 to the COOP Plan.[28] Courtrooms have been retrofitted with plexiglass and otherwise reconfigured in accordance with expert health and safety recommendations, and numerous other steps have been taken throughout the Courthouse to mitigate the risk of virus transmission. Since March 16, 2021, ten jury trials have been conducted safely in the Courthouse.

(l) This Court has developed and continues to maintain a master trial plan that prioritizes criminal trials with detained defendants and accounts for other factors such as length of detention, whether witnesses would be required to travel from out of town, and previously established trial dates.

---

[26] *Vaccination Data*, GOVERNMENT OF THE DISTRICT OF COLUMBIA (last updated Aug. 16, 2021), https://coronavirus.dc.gov/data/vaccination.
[27] *Key Things to Know About COVID-19 Vaccines*, CENTERS FOR DISEASE CONTROL AND PREVENTION (last updated Aug. 19, 2021), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html.
[28] *See Continuity of Operations Plan for COVID-19 Pandemic*, U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA, https://www.dcd.uscourts.gov/continuity-operations-plan-covid-19-pandemic (last visited Aug. 24, 2021).

(m) The need to conduct criminal trials in person means that the Court's ability to conduct other in-person proceedings safely is necessarily limited, both because of space constraints and because of the continuing need to limit the total numbers of people in the Courthouse to reduce the risk of transmission of the virus.

In light of the aforementioned circumstances, and in recognition of the need to continue a cautious and incremental approach toward the resumption of normal operations, with recognition of the recent worsening of the COVID-19 pandemic in this area due to the widespread circulation of the highly contagious Delta variant, it is hereby **ORDERED**:

1.     **Continuation of Limited Capacity for Jury Trials**.  This Court will continue to limit the number of jury trials that may be conducted at one time in the Courthouse until at least **October 31, 2021**. The need to maintain proper health and safety protocols, including social distancing, necessarily limits the Court's capacity to conduct trials. The Court anticipates that each criminal jury trial will require the use of multiple courtrooms, including the Ceremonial Courtroom for jury selections.  Thus, no more than one criminal jury selection will take place on a given day, and no more than three criminal trials, with an effort to segregate the trials on separate floors, will take place within the Courthouse at one time during this period. The Court will prioritize trials with detained defendants and will schedule trials according to a master trial calendar.  Criminal jury trials will take precedence over civil trials in scheduling.

2.     **Speedy Trial Act Exclusion For Postponed Criminal Trials**.  In Standing Order Nos. 20-9, 20-19, 20-29, 20-62, 20-68, 20-89, 20-93, and 21-10, this Court found that due to the exigent circumstances created by the COVID-19 pandemic, the time period from **March 17, 2020 through August 31, 2021** would be excluded in criminal cases, under the Speedy Trial Act, 18 U.S.C. §§ 3161 *et seq.*  Due to the ongoing circumstances, as detailed above and in prior Standing Orders, and because

7

conducting jury trials without the health and safety protocols and limitations described in paragraph (1) before **October 31, 2021,** would jeopardize public health and safety and pose significant risks of exposure and transmission of the virus to trial participants, which would make continuation of a trial impossible or result in a miscarriage of justice, *see* 18 U.S.C. § 3161(h)(7)(B)(i), the Court now finds that for those cases that cannot be tried consistent with those health and safety protocols and limitations, the additional time period from **August 31, 2021 through October 31, 2021** is excluded under the Speedy Trial Act as the ends of justice served by the continuances to protect public health and safety and the fair trial rights of a defendant outweigh the best interest of the public and any defendant's right to a speedy trial, pursuant to 18 U.S.C. § 3161(h)(7)(A). The presiding Judge in any criminal case for which a jury trial is postponed under this Order may make any additional findings and exclude additional time, as necessary and appropriate, regarding the scheduling of any new date for trial.

      3.      <u>**Extension of Videoconferencing Authorization for Certain Criminal Proceedings**</u>. A sixth extension of the Court's Standing Order 20-17, *In Re: Use of Video Teleconferencing and Teleconferencing for Certain Criminal and Juvenile Delinquency Proceedings*, Standing Order No. 20-17 (BAH) (Mar. 29, 2020), is warranted and authorized by the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281, Div. B, Title V, § 15002(b)(3)(A). The CARES Act requires that authorization for use of video teleconferencing or telephone conferencing be reviewed "on the date that is 90 days after the date on which [such] authorization . . . is issued," and every 90 days thereafter. CARES Act, Div. B, Title V § 15002(b)(3)(A)–(B). This Court's initial authorization was issued March 29, 2020, and five 90-day

extensions were issued subsequently, on June 26, 2020, September 23, 2020, December 17, 2020, March 16, 2021, and June 11, 2021.[29]

In addition to the circumstances described above, the Court finds that in-court proceedings for felony pleas under Rule 11 of the Federal Rules of Criminal Procedure and felony sentencings under Rule 32 of the Federal Rules of Criminal Procedure require close contact between criminal defendants and their counsel, government counsel, court staff, Deputy United States Marshals, Court Security Officers, and Judges, and may require the transport of detained individuals, who may be unvaccinated, from various jail facilities to the Courthouse within a confined vehicle space. Termination of the CARES Act authority for videoconferencing proceedings would require that almost all criminal proceedings, including felony pleas under Rule 11 and felony sentencings under Rule 32, be conducted in person. Such a requirement poses continued serious jeopardy to the public health and safety of in-court participants and others with whom they may have contact, given current circumstances.

Accordingly, an additional 90-day extension, from August 25, 2021 through November 23, 2021, is now authorized. The U.S. Attorney's Office for the District of Columbia and the Office of the Federal Public Defender for the District of Columbia support this extension of the authorization for use of video teleconferencing or telephone conferencing in criminal proceedings, subject, as required under the CARES Act, to consent of the defendant, after consultation with counsel.

---

[29]   *See In Re: First Extension of Authorization for Use of Video Teleconferencing and Teleconferencing for Certain Criminal and Juvenile Delinquency Proceedings*, Standing Order No. 20-54 (BAH) (June 30, 2020); *In Re: Second Extension of Authorization for Use of Video Teleconferencing and Teleconferencing for Certain Criminal and Juvenile Delinquency Proceedings*, Standing Order No. 20-75 (BAH) (Sept. 23, 2020); *In Re: Third Extension of Authorization for Use of Video Teleconferencing and Teleconferencing for Certain Criminal and Juvenile Delinquency Proceedings*, Standing Order No. 20-92 (BAH) (Dec. 17, 2020); *In Re: Fourth Extension of Authorization for Use of Video Teleconferencing and Teleconferencing for Certain Criminal and Juvenile Delinquency Proceedings*, Standing Order No. 21-14 (BAH) (Mar. 16, 2021); *In Re: Fifth Extension of Authorization for Use of Video Teleconferencing and Teleconferencing for Certain Criminal and Juvenile Delinquency Proceedings*, Standing Order No. 21-33 (BAH) (June 11, 2021).

4.    **Reopening of Public Counters of Clerk's Office**. The public counters of the District and Bankruptcy Courts' Clerk's Office currently plan to reopen on **September 27, 2021**, at which time members of the public seeking to visit the public counters of the Clerk's Office shall be permitted to enter the Courthouse, subject to all applicable health and safety protocols.  The public waiting area of the Clerk's Office has glass barriers separating the public space from the non-public areas, and masking and social distancing requirements are posted.

5.    **Further Orders**.  Further orders addressing court operations and proceedings in the exigent circumstances created by the COVID-19 pandemic will be issued as circumstances warrant.

**SO ORDERED.**

Date: August 25, 2021

_Beryl A. Howell_

**BERYL A. HOWELL**
**Chief Judge**

EXHIBIT 5

NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0154n.06

No. 20-4110

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Mar 23, 2021

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff–Appellee,** | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE NORTHERN |
| | ) | DISTRICT OF OHIO |
| HECTOR J. LEBRON, | ) | |
| | ) | **OPINION** |
| **Defendant–Appellant.** | ) | |
| | ) | |

Before: COLE, Chief Judge; MOORE and GILMAN, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** Hector Lebron appeals the district court's denial of his motion for compassionate release under 18 U.S.C. § 3582(c). Because the district court did not abuse its discretion in finding that the 18 U.S.C. § 3553(a) factors weighed against granting relief, we **AFFIRM** the district court's order denying Lebron's compassionate-release motion.

**I. BACKGROUND**

In 2018, Lebron pleaded guilty to possession with intent to distribute a controlled substance, in violation of § 21 U.S.C. 841(a)(1) and (b)(1)(A). R. 40 (Plea Agreement at 2) (Page ID #111). On April 1, 2019, the district court imposed a within-guidelines sentence of eighty-two months' imprisonment. R. 59 (Sentencing Hr'g Tr. at 18–19) (Page ID #303–04). Because Lebron has been in federal custody since December 8, 2016, he had, at the time of his sentencing, already

No. 20-4110, *United States v. Lebron*

served approximately one-third of his custodial sentence due to credit given for his pretrial detention.  To date, he has completed almost two-thirds of his sentence.

On May 1, 2020, Lebron moved for compassionate release, arguing that the COVID-19 pandemic posed a serious health risk to him during incarceration because of his underlying medical conditions.  He claimed that the confluence of these circumstances served as an extraordinary and compelling circumstance justifying his release.  Lebron's motion solely relied on his changed circumstances due to the pandemic, and Lebron did not argue that any other factor weighed in favor of his release.  The government opposed Lebron's motion.

The same district court judge who sentenced Lebron also denied Lebron's motion for compassionate release.  *United States v. Lebron*, --- F.Supp.3d ----, No. 3:16-cr-00382-JGC-1, 2020 WL 5824399, at *1 (N.D. Ohio Oct. 1, 2020) (order).  After finding that Lebron had exhausted his applicable administrative remedies, the district court applied the standard set out in § 3582(c)(1)(A)(i), noting that it could reduce Lebron's sentence if it found that "extraordinary and compelling reasons warrant such a reduction" and if the relevant § 3553(a) factors weighed in favor of release.  The district court also relied on the criteria set out in the Sentencing Commission's policy statement under U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 1B1.13. The district court found that the combination of Lebron's underlying medical conditions and the COVID-19 pandemic could serve as an extraordinary circumstance counseling in favor of a sentence reduction.  Nonetheless, the district court's consideration of the § 3553(a) factors led it to conclude that Lebron's circumstances did not warrant relief.

No. 20-4110, *United States v. Lebron*

## II. DISCUSSION

### A. Standard of Review

We review a district court's denial of a compassionate-release motion under the abuse-of-discretion standard. *United States v. Ruffin*, 978 F.3d 1000, 1005 (6th Cir. 2020). "A district court abuses its discretion when it relies on clearly erroneous findings of fact, applies the law improperly, or uses an erroneous legal standard." *United States v. Jones*, 980 F.3d 1098, 1112 (6th Cir. 2020) (quoting *United States v. Pembrook*, 609 F.3d 381, 383 (6th Cir. 2010)). When considering motions for compassionate release, "'[a] court might abuse its discretion, for example, if it misreads the meaning of the extraordinary-reason requirement' or 'if it interprets the law to bar it from granting a reduction when, in fact, it has discretion to do so.'" *Id.* (quoting *United States v. Keefer*, 832 F. App'x 359, 363 (6th Cir. 2020)).

### B. Analysis

Pursuant to § 3582(c)(1)(A), a district court may grant a compassionate-release motion by engaging in a three-step inquiry. First, the court "must 'find' whether 'extraordinary and compelling reasons warrant' a sentence reduction." *Jones*, 980 F.3d at 1107–08 (alteration and footnote omitted) (quoting 18 U.S.C. § 3582(c)(1)(A)(i)). Second, the court "must 'find' whether 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" *Id.* at 1108 (alteration and emphasis omitted) (quoting 18 U.S.C. § 3582(c)(1)(A)). Finally, the court must "consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction . . . is warranted in whole or in part under the particular circumstances of the case." *Id.* (quoting *Dillon v. United States*, 560 U.S. 817, 827 (2010)). However, we recently clarified how courts should apply § 3582(c)(1)(A) when, as here, an imprisoned person files a

No. 20-4110, *United States v. Lebron*

motion in district court requesting compassionate release. In such cases, because the Sentencing Commission's policy statement in § 1B1.13 is not applicable, "federal judges may skip step two of the § 3582(c)(1)(A) inquiry and have full discretion to define 'extraordinary and compelling' without consulting the policy statement § 1B1.13." *Id.* at 1111 (footnote omitted); *United States v. Elias*, 984 F.3d 516, 518–19 (6th Cir. 2021).[1]

Lebron contends that the district court committed several errors that merit remand when it denied his compassionate-release motion based on its consideration of the § 3553(a) factors. "[A] district court might abuse its discretion if it engaged in a substantively unreasonable balancing of the § 3553(a) factors." *Ruffin*, 978 F.3d at 1005. "District courts should consider all relevant § 3553(a) factors before rendering a compassionate release decision." *Jones*, 980 F.3d at 1114. When reviewing the district court's decision, "we consider the entire record," *Ruffin*, 978 F.3d at 1008, "including the records from the original sentencing, records on the modification motion, and the final compassionate release decision," *Jones*, 980 F.3d at 1112; *see also Elias*, 984 F.3d at 520. A district court adequately explains its decision to deny a compassionate-release motion when "the record as a whole satisfies us that [it] 'considered the parties' arguments and ha[d] a reasoned basis for exercising [its] own legal decisionmaking authority.'" *Ruffin*, 978 F.3d at 1008 (quoting *Chavez-Meza v. United States*, 138 S. Ct. 1959, 1967 (2018)).

---

[1] The government argues that § 1B1.13 remains applicable in this case and that our decision to treat it as inapplicable in *Jones* is non-binding dicta and incorrectly decided. Appellee Br. at 22–24. The government ignores that we have followed and reaffirmed our decision in *Jones* in case after case. *See Elias*, 984 F.3d at 519, *United States v. Hampton*, 985 F.3d 530, 533 (6th Cir. 2021); *United States v. Sherwood*, 986 F.3d 951, 953–54 (6th Cir. 2021); *United States v. Rafidi*, No. 20-3749, 2021 WL 424443, at *2 (6th Cir. Feb. 08, 2021); *United States v. Pegram*, No. 20-1906, 2021 WL 499572, at *2 (6th Cir. Feb. 10, 2021); *United States v. Sorrell*, No. 20-1832, 2021 WL 807867, at *2 (6th Cir. Mar. 3, 2021). The government might not like our conclusion in *Jones*, but it is the governing law of this circuit.

No. 20-4110, *United States v. Lebron*

First, Lebron argues that the district court erred by giving "outsized weight" to Lebron's "potential danger to the community" when considering the § 3553(a) factors.  Appellant Br. at 8. The district court cited § 1B1.13 in its discussion of the legal standard for granting a compassionate-release motion.  And § 1B1.13(2) mandates that a district court must find that "[t]he defendant is not a danger to the safety of any other person or to the community" to grant relief under § 3582(c)(1)(A).  The district court's citation to § 1B1.13 as the correct legal standard was erroneous.  However, this is not a case where the district court solely relied on § 1B1.13(2)'s dangerousness requirement to deny relief.  *See United States v. Sherwood*, 986 F.3d 951, 954 (6th Cir. 2021).  Instead, the district court permissibly considered Lebron's potential dangerousness alongside several other relevant § 3553(a) factors, including "the nature and circumstances of the offense" and Lebron's "history and characteristics," as well as the need for deterrence, to protect the public, "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment."  18 U.S.C. § 3553(a)(1), (2); *see also Sherwood*, 986 F.3d at 954 (noting that district courts may consider a defendant's "propensity to be a danger to the community upon release" in their balancing of the § 3553(a) factors).  The district court detailed Lebron's criminal history, noted that Lebron previously served a ten-year sentence for a prior conviction for possession with intent to distribute that did not deter him from committing his current offense, and highlighted the severity of his current offense conduct due to the serious harm that a kilogram of fentanyl could cause to so many people.  The district court also found that Lebron demonstrated "a capacity for violence" due to his possession of a firearm in connection with his prior drug offense and a domestic violence conviction.  *Lebron*, 2020 WL 5824399, at *3.  The court determined that Lebron's repeated violations of supervised release and probation demonstrated

No. 20-4110, *United States v. Lebron*

contempt for the law, and the court was concerned that granting a reduced sentence in these circumstances would not protect the public or deter Lebron or others.  The court also concluded that granting relief so soon after sentencing would not adequately reflect the seriousness of Lebron's conduct, promote respect for the law, or constitute just punishment for Lebron's offense.  Consequently, the district court found that the § 3553(a) factors "strongly support Lebron's continued incarceration."  *Id.*  Based on this record, we cannot say that the district court's weighing of the § 3553(a) factors was an abuse of discretion.  *Jones*, 980 F.3d at 1114 ("The district court is best situated to balance the § 3553(a) factors.") (quoting *United States v. Kincaid*, 802 F. App'x 187, 189 (6th Cir. 2020)).

Lebron contends that the district court failed to consider any new facts that arose after his original sentencing hearing and that the district court failed to consider Lebron's need for medical treatment when weighing the § 3553(a) factors.  Both arguments are unavailing.  First, Lebron never presented any new facts, such as evidence related to his rehabilitation or good behavior in prison, for the district court to consider.  We cannot transform Lebron's failure to introduce new evidence into an error by the district court.  Second, the district court acknowledged Lebron's medical conditions and need for treatment during the original sentencing.  *See* R. 59 (Sentencing Hr'g Tr. at 12–14) (Page ID #297–99).  In its order denying Lebron's compassionate-release motion, the court accepted that his conditions resulted in a greater risk of serious illness if Lebron contracted COVID-19.  *Lebron*, 2020 WL 5824399, at *2.  But the court concluded that "[Lebron's] record strongly argues against release."  *Lebron*, 2020 WL 5824399, at *3.  The entire record makes clear that the district court did not abuse its discretion, but instead fully considered

6

No. 20-4110, *United States v. Lebron*

all relevant § 3553(a) factors.  *See also Jones*, 980 F.3d at 1114 (explaining that a district court need not detail "its analysis of every single § 3553(a) factor").

Finally, Lebron argues that the district court relied on three erroneous findings of fact in its consideration of the § 3553(a) factors.  First, Lebron correctly notes that the district court erroneously stated that Lebron currently is imprisoned in Federal Correctional Institution Canaan ("FCI Canaan").  *Compare Lebron*, 2020 WL 5824399, at *1 (noting that Lebron is imprisoned in FCI Canaan), *with* R. 71 (Def.'s Mot. for Ruling at 2) (Page ID #385) (noting that Lebron has been moved to Metropolitan Detention Center Brooklyn ("MDC Brooklyn") at or around September 25, 2020).  However, because the district court did not rely on the conditions of the facility in which Lebron is incarcerated to determine that the § 3553(a) factors preclude relief, this error does not merit remand.[2]

Second, Lebron contends that the district court improperly gave significant negative weight to the fact that Lebron pleaded guilty to possessing a kilogram of fentanyl.  During sentencing, the district court agreed not to infer that Lebron purposefully intended to distribute fentanyl because there was no indication that Lebron knew that the controlled substance he possessed contained fentanyl and not a different opioid.  R. 59 (Sentencing Hr'g Tr. at 15) (Page ID #300).  But the court also stressed that it was Lebron's "responsibility to find out just what was go[ing] on," *id.* at 9, 19 (Page ID #294, 304), and emphasized the seriousness of Lebron's conduct regardless of whether Lebron knew that he possessed fentanyl, *id.* at 8, 10, 18–19 (Page ID #293, 295, 303–04).

---

[2]We also take judicial notice of the fact that the number of incarcerated persons at MDC Brooklyn that have contracted COVID-19 (364) is not grossly dissimilar from the number at FCI Canaan (307).  *COVID-19 Coronavirus: COVID-19 Cases Full breakdown and additional details*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited March 9, 2021).

No. 20-4110, *United States v. Lebron*

In light of the district court's comments during sentencing, its reiteration of the seriousness of Lebron's offense conduct was not at odds with its finding that Lebron did not purposefully intend to distribute fentanyl.

Lastly, Lebron claims that the district court erroneously relied on the fact that only a year had passed since the court sentenced Lebron, which counseled against granting relief. At the time of the district court's compassionate-release decision, Lebron functionally had served more than half of his sentence due to credit for pre-trial detention. However, under the deferential standard of review that we apply to these decisions, we cannot say that it was an abuse of discretion for the district court to determine that granting relief only a year after imposing an eighty-two-month sentence would not serve the relevant factors set out in § 3553(a)(2)(A). *See United States v. Austin*, 825 F. App'x 324, 326 (6th Cir. 2020) (order).

In sum, we cannot conclude on this record that the district court abused its discretion when weighing the § 3553(a) factors.

### III. CONCLUSION

Therefore, we **AFFIRM** the district court's order denying Lebron's motion for compassionate release.

# EXHIBIT 6

 United States Department of Justice



THE UNITED STATES ATTORNEY'S OFFICE

DISTRICT *of* COLUMBIA

U.S. Attorneys » District of Columbia » Capitol Breach Cases

# REHL, Zachary

**Case Number:** 1:21-cr-175

**Charge(s):**
Conspiracy

Obstruction of an Official Proceeding and Aiding and Abetting

Destruction of Government Property and Aiding and Abetting

Entering and Remaining in a Restricted Building or Grounds

Disorderly Conduct in a Restricted Building or Grounds

**Case Status:**
Status conference set for 9/21 at 11 a.m. Defendant remains committed.

**Case Documents:**
Nordean, Biggs, Rehl, Donohoe - Indictment

Updated July 28, 2021