**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA <br><br>                  Complainant, <br>     v. <br><br> ZACHARY REHL <br><br><br> (Styled as <u>USA v. NORDEAN</u> incorporating cases against four Defendants collectively) <br><br><br>                  Accused | Criminal Case No. <br><br> 1:21-cr-00175-TJK-3 |

<u>**ZACHARY REHL'S MEMORANDUM OF LAW IN SUPPORT OF HIS
RENEWED MOTION FOR RELEASE OF ACCUSED
ZACHARY REHL FROM PRE-TRIAL DETENTION
AND MOTION TO RE-OPEN DETENTION HEARING**</u>

Comes now the Accused ZACHARY REHL, by counsel, and hereby files this renewed motion for release on bail from pre-trial detention, and moves to reopen his detention hearing, pursuant to 18 U.S.C. § 3142(f), and for his grounds states as follows:

I. **INTRODUCTION**

1. ZACHARY REHL remains in detention out of speculation that REHL might do again what he never did, that Defendants might boldly go where they have never gone before.

2. In the bail hearing for release of the Accused ZACHARY REHL, from pre-trial detention hearing in the U.S. District Court for the Eastern District of Pennsylvania, the prosecution conceded in proper candor:

> **To be sure, the indictment does not allege that Mr. Rehl
> engaged directly in violence against officers or
> destruction of property but there is, nonetheless, a**

**presumption in favor of detention based on his liability
for his co-conspirators destruction of property.**

Assistant U.S. Attorney Luke M. Jones, Esq., Page 3, Transcript of Detention/Rule 5
Hearing Before Honorable Richard A. Lloret, United States Magistrate Judge, U.S. District
Court for the Eastern District of Pennsylvania, March 26, 2021, Case No. 2:21-mj-526-1,
filed publicly as ECF Docket # 9 in that Court.

3.       Thus, the only question has always been whether REHL aided and abetted or

conspired to get others to do what the Government conceded REHL himself did not do.

4.       REHL has been indicted by "an inkblot test" indictment which creates the

appearance of alleging six (6) counts of crimes, but which in fact fails to allege any crime.  (The

facts could support State law misdemeanor trespass if *mens rea* is proven, which commonly

requires that someone is asked to leave and refused to leave, but trespass has not been alleged.)

5.       There are no facts and no evidence and no allegation that REHL ever agreed to or

contemplated any attack on the Capitol or on police.  Quite the contrary, the Government

grudgingly admits that REHL was surprised by what happened that day:

6.       On the top of page 6, the Government's Motion For Revocation Of Release Order

And For Pretrial Detention at ECF Dkt. #37 recites:

> **"In a Telegram message following the attack, the
> defendant stated,**
>
> **"That was NOT what I expected to happen today. * * *"**

7.       It is a funny leader conspiring to attack the Capitol to not know that was what was

going to happen.  **"That was NOT what I expected to happen today."** [1]

---

[1]       By contrast, Donald Trump promoted a "wild" protest to occur on January 6, 2021,
to his roughly 83 million followers on Twitter and millions on Facebook.  Jonathan Landay
and Steve Holland, Jeff Mason, "Trump summoned supporters to "wild" protest, and told
them to fight. They did." Reuters, January 6, 2021.  Do not expect REHL or counsel to
criticize Trump committing the same distortions and Salem Witch Trial hyperbole used

8.      Indeed, this arises amidst the total absence of any evidence that attacks on the U.S. Capitol, attacks on police, or even entering the building were what REHL ever planned, proposed, discussed, agreed to, expected or mentioned by any of these Defendants.

9.      Clearly, as the Government must concede, REHL had no plan to attack anything or anyone on January 6.  REHL was surprised that any of that happened.

10.     Indeed, the First Superseding Indictment alleges that:

> **36. On December 23, 2020, REHL posted on social media describing January 6, 2021, "as the day Congress gets to argue the legitimacy of the [E]lectoral [C]ollege votes, and yes, there will be a big rally on that day."**

11.     The Government admits and confesses within the four corners of the indictment that REHL's goal was to "rally" to get Congress "**to argue the legitimacy of the [E]lectoral [C]ollege votes**" and – for THAT  purpose " **yes, there will be a big rally on that day.**"

12.     The Government admits and confesses within the four corners of the indictment that REHL's goal *was not to* stop, obstruct, delay or hinder the Electoral College certification.

13.     The grand jury has alleged – which is now subject to judicial estoppel and is the law of the case – that REHL's plans, agreement, and intent were to

> a.   Attend a "rally"
> b.   That rally being for the purpose of
> c.   Encouraging Congress
>> "**to argue the legitimacy of the [E]lectoral [C]ollege votes**"  and
> d.   That REHL wanted and intended Congress to meet and conduct its Joint Session because otherwise Congress could not Congress "**argue the legitimacy of the [E]lectoral [C]ollege votes**" if it were not meeting, and
> e.   That REHL did not want to obstruct, stop, delay or hinder the Joint Session of Congress because REHL wanted – *and this is in the grand jury indictment, not just in supporting documentation* – Congress "**to argue**

---

against REHL.  But to overlook the impact of messages to Trump's 83 million followers and try to compare that with ZACHARY REHL is a dramatic failure of perspective.

**the legitimacy of the [E]lectoral [C]ollege votes,**" and

f. That REHL intended to attend "the Stop the Steal protest" which – being undefined – must be presumed to be the First Amendment protected, 100% peaceful rally held at the Ellipse, [2]

g. That REHL's arrival point in the District of Columbia was near the Ellipse demonstration next to the Washington Monument, not at the Capitol, See Government's Motion, page 4 ("On the morning of January 6, the defendant led the Proud Boys members [3] from their pre-arranged meeting spot at the Washington Monument to the U.S. Capitol, as depicted below"), and thus

h. Based on the Government's claims and allegations "the Stop the Steal protest" was the peaceful rally at the Ellipse, because the Government admits and confesses that that (the Washington Monument near the Ellipse) is where REHL was headed on January 6, 2021, and where in fact he went upon arriving in the District of Columbia from his hotel.

14.     Of course, after spending time at the Ellipse, REHL later walked over to the U.S. Capitol, and ate at food trucks near the Labor Department and then returned to the U.S. Capitol.

15.      But the question is here a conspiracy agreeing on a plan or for criminal actions. The only facts alleged as to a plan or conspiracy were to go to the Washington Monument.

16.     But based on the Government's own allegations and claims subject now to judicial estoppel, considering only the four corners of the First Superseding Indictment, as

---

[2]     The Ellipse is the informal name of a large area of park on the Southern edge of the White House grounds, which is open to the public and often the site of many public events such as the ceremonial lighting of the Christmas tree in December.  It is subject to the jurisdiction of the U.S. Park Police.  There is a large area of park area which includes a very large nearly-circular area within a patchwork of paths and minor roads.  The common name loosely refers to the entire park area between the White House and Constitution Ave.

[3]     Tragically, just as all brands of face tissue are incorrectly called Kleenex ™ to the annoyance of the Kleenex-producing  company, bald-faced lies by the news media, politicians, and apparently even in some references by the prosecution have labelled as "Proud Boys" thousands of rioters on January 6 who had absolutely nothing to do with the Proud Boys.  One person who is entirely unknown to REHL is claimed to be a Proud Boy member who broke a window, but has no knowledge of who he is and has never communicated with Dominic Pezzola much less conspired with him.  Calling random rioters "Proud Boys" has become a dishonest hoax.  Nearly everyone called a Proud Boy in the news media and by politicians never had anything to do with the Proud Boys.

amplified by the Government's own clarifications and assertions, without even considering

contrary or disputing evidence from REHL, REHL planned and "conspired" to attend a 100%

peaceful rally at the Ellipse to which no criminal intent or purpose can be ascribed

       17.     REHL discussed a "rally" *not an attack on the U.S. Capitol.*

       18.     If REHL encouraged anyone to attend "the Stop the Steal protest" it meant where

REHL actually went on arrival in D.C. – the Washington Monument and the 100% peaceful

demonstration at the Ellipse.  That's where REHL headed, as the Government concedes.

       19.     The Government cannot walk away from these grand jury allegations now.  Even

a Bill of Particulars could clarify, but not contradict, the grand jury's clear allegations.

       20.     The Government admits and confesses within the four corners of the indictment

that the goal of the alleged "conspiracy" was a "rally" to encourage Congress to do its job.

       21.     What the Government admits and confesses is that REHL's plan was to petition

the government for redress of grievances, exercise free speech, and (as it was planned) peaceably

assemble in a "rally" – all actions protected by the First Amendment to the U.S. Constitution.

       22.     It may surprise the Government that sometimes people come to Washington, D.C.

for innocent reasons.   And visitors actually do plan for and organize their innocent visit.

       23.     Of course, it is painfully obvious that others had different plans that day and/or

spontaneously degenerated into acting as hooligans, battling with U.S. Capitol Police officers,

breaking windows, and rioting inside and outside of the U.S. Capitol building.

       24.     It has become more and more clear that there actually were people who planned in

advance and conspired to "storm" the U.S. Capitol, but there is no evidence that any of these

Defendants had or were included in any such advance plans or agreed upon any such plan.

       25.     Moreover, members of the Proud Boys focus on defending First Amendment

protestors against the violent attacks of Lefitst thugs like ANTIFA.  The Proud Boys' planning and preparation was to be ready to block the heirs of Mussolini's Black Shirts today from preying upon the vulnerable Trump supporters like wolves on a huge flock of sheep.

26.     Not even crime-minded prosecutors could actually believe that planning to defend against Left-wing counter-protestors is the same as planning to attack the U.S. Capitol.

27.     However, the question in front of us is a potential conspiracy or aiding and abetting of what REHL himself did not personally do.

28.     If there was no agreement by REHL or even the other Defendants to knowingly and intentionally or purposefully jointly commit a criminal act, everything else fails.

29.     Stirring claims of the importance of the U.S. Capitol to our democracy cannot overlook the similar importance in the nation's courthouses of the careful application of due process and impartial justice driven on sound facts as to each Accused.

30.     The application of impartial justice, with no peeking by Lady Justice, under due process based upon the proof of sound evidence is no less important than debates and votes in the U.S. Congress.  We cannot profess to care about democracy there any more than here.


## II.     SUMMARY OF THE CASE

31.     The Magistrate Judge of the U.S. District Court for the Eastern District of Pennsylvania, where ZACHARY REHL was arrested, ordered ZACHARY REHL to be released on bail pending trial on March 26, 2021.  See *United States of America v. Zachary Rehl*, Case No. 2:2021mj00526.  Bond was ordered of $50,000 with home confinement, internet monitoring

equipment and other, various commonplace restrictions.  See Transcript, attached as Exhibit 1. [4]

32.     The Government then requested that this Court revoke bail.  See Motion ECF

Dkt. #37.  This Court issued a form order, entered on July 1, 2021, attached as Exhibit 2.

33.     Now, ZACHARY REHL, by counsel, moves for the vacation of this Court's order

revoking bail, thus reinstating many terms and conditions ordered by the Magistrate Judge in

Philadelphia, possibly with the addition of additional restrictions.

34.     Defendant Ethan Nordean, by counsel, in seeking release on bail offered to set up

video cameras around his house to allow anyone to remotely monitor the house including in real

time and make sure that no one was sneaking a computer into the house.

35.     REHL already has cameras installed around his house and would offer to allow

the Government access to monitor their views.

36.     His wife was also advised that they could install a monitoring line to allow any

access to the internet to be monitored.

37.     It would of course be normal to include a "no contact" restriction.

## III.     SUMMARY AND PERTINENT FACTS

38.     The deprivation of the liberty of a person not convicted of any crime is such a

serious matter that the Framers of the Constitution, including the first session of Congress which

added the Bill of Rights:

> **The Eighth Amendment to the United States Constitution states:**
>
> **"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."**

---

[4]     There does not seem to have been a written order to memorialize the verbal order in the Transcript, although the Magistrate directed one to be prepared, apparently because the Government' asked for a stay pending review by this Court.

39.     Note that the constitution does _not_ say "Excessive _amounts_ of bail…" but its

interpretation has been complicated and combined with Due Process:

> The Due Process Clause foresees eligibility for bail as part of
> "due process." See _Salerno_, supra, at 748–751, 107 S.Ct.
> 2095 ; _Schilb v. Kuebel_, 404 U.S. 357, 365, 92 S.Ct. 479, 30
> L.Ed.2d 502 (1971) ; _Stack v. Boyle_, 342 U.S. 1, 4, 72 S.Ct.
> 1, 96 L.Ed. 3 (1951).  Bail is "basic to our system of law."
> _Schilb, supra_, at 365, 92 S.Ct. 479. It not only "permits the
> unhampered preparation of a defense," but also "prevent[s]
> the infliction of punishment prior to conviction." Stack,
> _supra_, at 4, 72 S.Ct. 1. It consequently limits the
> Government's ability to deprive a person of his physical
> liberty where doing so is not needed to protect the public, see
> Salerno, supra, at 750–751, 107 S.Ct. 2095 or to assure his
> appearance at, say, a trial or the equivalent, see Stack, supra,
> at 4–5, 72 S.Ct. 1. Why would this constitutional language
> and its bail-related purposes not apply to members of the
> classes of detained persons at issue here?
>
> The Eighth Amendment reinforces the view that the Fifth
> Amendment's Due Process Clause does apply. The Eighth
> Amendment forbids "[e]xcessive bail." It does so in order to
> prevent bail being set so high that the level itself (rather than
> the reasons that might properly forbid release on bail)
> prevents provisional release. See _Carlson v. Landon_, 342
> U.S. 524, 545, 72 S.Ct. 525, 96 L.Ed. 547 (1952) (explaining
> that the English clause from which the Eighth Amendment
> was copied was understood "to provide that bail shall not be
> excessive in those cases where it is proper to grant bail").
> That rationale applies a fortiori to a refusal to hold any bail
> hearing at all. Thus, it is not surprising that this Court has
> held that both the Fifth Amendment's Due Process Clause
> and the Eighth Amendment's Excessive Bail Clause apply in
> cases challenging bail procedures. See, e.g., _Salerno, supra_,
> at 746–755, 107 S.Ct. 2095 ; _Carlson_, supra, at 537–546, 72
> S.Ct. 525.

_Jennings v. Rodriguez_, 138 S. Ct. 830, 862, 200 L. Ed. 2d 122 (2018).

40.     Release from pre-trial detention for one not convicted of any crime is not just a

matter of statutory application and interpretation.

41.     Release from pre-trial detention on bail is overshadowed and dominated by a

Constitutional mandate which demands release from detention when possible before trial.

42.      Of course, it is a rule of statutory interpretation to construe any statute consistently with the U.S. Constitution rather than to provoke a confrontation with the terms of the U.S. Constitution.  *See Ohio v. Akron Ctr. for Reproductive Health*, 497 U.S. 502, 514, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990) ('Where fairly possible, courts should construe a statute to avoid a danger of unconstitutionality' (internal quotations omitted).)

43.      Here, this Court is similarly obliged to interpret and apply the relevant statutes consistently with the Eighth Amendment to the U.S. Constitution, not to relegate the Constitutional command to a mere backdrop.

## IV.      NEWLY-DISCOVERED MATERIAL INFORMATION

44.      There are no facts or evidence that REHL ever planned, conspired, considered, organized or encouraged any attacks on anyone or any place, including the U.S. Capitol.

45.      On the contrary, the First Superseding Indictment alleges that:

> **36. On December 23, 2020, REHL posted on social media describing January 6, 2021, "as the day Congress gets to argue the legitimacy of the [E]lectoral [C]ollege votes, and yes, there will be a big rally on that day."**

46.      And on the top of page 6, the Government's Motion For Revocation Of Release Order And For Pretrial Detention recites:

> **"In a Telegram message following the attack, the defendant stated,**
>
> **"That was NOT what I expected to happen today. * * *"**

47.      As Nordean's attorney Nicholas Smith argues in Nordean's Sur-Reply # Dkt. 189, p. 6 "it is black letter law that it is 'essential to determine what kind of agreement or understanding existed *as to each defendant*.'" *United States v. Tabron*, 437 F.3d 63, 66 (D.C. Cir. 2006) (*emphasis added*) (citing *United States v. Borelli*, 336 F.2d 376, 385 (2d Cir. 1964) (Friendly, J.)).

48.     The defect of alleging no facts and offering only conclusory statements tracking the statute results in us not knowing what REHL supposedly agreed to with others.

49.     All of the grand jury charges require allegation, probable cause, and proof at trial of the *mens rea* that every element of the charged crime was performed "knowingly and intentionally" or in some conspiracy precedents "purposefully."

50.     And the object of any conspiracy or aiding and abetting must be unlawful.

51.     After this Court considered and decided the Government's revocation of bail motion on July 1, 2021, a great deal of information "that was not known to [him] at the time of the [detention hearing]" has been obtained. 18. U.S.C. § 3142(f).

52.     Only through litigation by BUZZFEED the U.S. Capitol Police finally released on September 9, 2021, six (6) different permits for simultaneous demonstrations on the U.S. Capitol grounds to be held on January 6, 2021.  See Exhibit 3, attached.[5]

53.     These permits were released September 9, 2021, long after this Court decided to revoke REHL's bail on July 1, 2021.[6]

54.     Notably, the grand jury found no facts and made no allegations other than an ineffective conclusory statement that REHL ever entered into any agreement knowingly and intentionally or purposefully for the pursuit of any criminal act.

55.     Now, exploding the prosecution's narrative that REHL entered into a conspiracy to knowingly and intentionally or purposefully further a criminal goal or aided and abetted any

---

[5]     One Defendant's lawyer reports getting notice of this July 22, 2021, through Brady disclosures, but it was still not available on July 1, 2021, when this Court revoked bail.

[6]     Note that counsel acting then for the news website "NATIONAL FILE" demanded this information on February 4, 2021, by letter, and the U.S. Capitol Police steadfastly ignored the media inquiry in sharp contrast to the U.S. Park Police who promptly provided copies of the permits for the January 6, 2021, rally at the Ellipse.  Counsel also requested this information from the prosecution here on September 11, 2021, but did not get a response.

crime, gathering at the U.S. Capitol was specifically authorized by the U.S. Capitol Police.

56.     Although undeniably the sheer number of demonstrators January 6, 2021 was many orders of magnitude more than anticipated, some of those demonstrators engaged in violent confrontations with police, and some broke windows and damaged other property, the average citizen knows (accurately) that the U.S. Capitol is a public building normally open to the public and hears that the U.S. Capitol Police have authorized demonstrations on the grounds of the U.S. Capitol cannot – thereby alone without additional facts/evidence– have the *mens rea* to commit a criminal act by joining one of those demonstrations authorized by permit.

57.     The issuance of not one but nine (9) permits for demonstrations that day on the Capitol grounds destroys the *mens rea* element of conspiring to encourage or organize anyone to an _unlawful_ event on the U.S. Capitol grounds on January 6, 2021.  (There were permits at the Ellipse, at the Russell Senate Office Building and elsewhere for a giant Constitution.  It is likely that the anti-Chinese Communist Party demonstration also required a 10th permit.)

58.     To be sure, spontaneous and wrongful actions vastly exceeded the bounds of those permits, including ignoring the spots on the Capitol grounds specified and immeasurably exceeding the 50 person limit in each permit for the 6 different locations,  as things unfolded. And obviously the permits did not authorize the violent actions and confrontations with police by some or rushing the U.S. Capitol building.

59.     However,  REHL allegedly encouraging people ahead of time to attend demonstrations for which permits had been issued, where demonstrations were authorized,  is a different intent and *mens rea*, and lack of agreement to commit any crime, from the perspective not of hind sight but seen at the time the statements, decisions, and actions were made.

60.     Even if one were muddled in their understanding of the permits, their intention

and *mens rea* would be innocent.

61.     Indeed, exploding the prosecution's narrative that everyone visiting January 6, 2021, was monolithically all following the same plan, see a Twitter post in which a demonstrator is pleading with U.S. Capitol Police to "***Why haven't you called for back up?***" and excoriating the few U.S. Capitol Police officers for standing around doing nothing and not calling for support (back up).  ***"We need some help down here!"***

https://twitter.com/FiveTimesAugust/status/1439251762221834240

62.     This post of the video was posted on September 18, 2021, and was not previously known to REHL when his previous attorney argued against pre-trial detention.

63.     Also, one of the factors that this Court considered as arguing for pre-trial detention was that "Weight of evidence against the defendant is strong."

64.     However, it is now clear that the weight of the evidence is weak or non-existent.

65.     Exploding the prosecution's narrative that the U.S. Capitol grounds were closed, the U.S. Capitol Police authorized by permit six (6) different demonstrations at the Capitol.[7]

66.     Exploding the prosecution's narrative that REHL encouraged anyone to attend "the Stop the Steal protest" – which is undefined by the indictment – there were six (6) different demonstrations that received permission by official permits around the U.S. Capitol, not to mention the event at the Ellipse and other events also occurring around the District of Columbia.

67.     The weight of evidence against REHL, other than possibly for misdemeanor trespassing, is very thin.  See, "Woman gets probation for 'minimal' role in Capitol riot," WTOP (from The Associated Press), September 17, 2021, accessible at:

---

[7]     The U.S. Capitol grounds consist of 126 acres according to the U.S. Capitol Police, but the apparent erection of barriers with signs saying "AREA closed" would appear to encompass only a very small area immediately adjacent to the U.S. Capitol building.  "Our History," U.S. Capitol Police, https://www.uscp.gov/the-department/our-history

https://wtop.com/local/2021/09/woman-gets-probation-for-minimal-role-in-capitol-riot , attached as Exhibit 4.

68.     Also, a newly-obtained video was posted on Twitter by a critic of the Proud Boys, hoping to incriminate REHL, at https://twitter.com/nine_niall/status/1354536116960059392

69.     The video was not known to counsel for REHL until after July 1, 2021.

70.     A still image of this video was used in the FBI Statement of Facts within the case of *USA v. JEFFREY FINLEY*, but Zachary Rehl was not mentioned there and that is a separate case.  Therefore, there was no indication that the video included REHL until it was found by his wife or brought to her attention.  Counsel then had to try to identify the man in the clown like smile on a COVID-19 mask before finding the criminal case against FINLEY.

71.     This shows that there was no advance planning involving REHL to enter the U.S. Capitol.  It shows indecision and uncertainty of a spur-of-the moment idea.

72.     In the video, REHL and the man next to him, JEFFREY FINLEY, require a lot of effort to get the others to walk over and have a conversation.  They gesture.  The others don't respond immediately to their gestures.  This is not the behavior of people with a pre-existing plan of anything.  The Proud Boys are milling about aimlessly without any plan. [8]

73.     AVSL Systems captured the video:  https://youtu.be/HH0AZLHl3K4

74.     AVSL Systems at counsel's request then optimized the audio to screen out background noise and make the words spoken easier to hear, and added captions of what is being said.  That adjusted video is visible at:  https://youtu.be/rQDwsyFXYhg

> Crowd chanting repeatedly "Our house!"
> Come on let's go.
> Millions and millions of Americans are gonna see this.
> You think?

---

[8]     Which is consistent with their mission of patrolling against ANTIFA violence.  *Infra.*

You want to go?
I heard Pence and [unintelligible] were evacuated.
Hey, You wanna go in?
I think it's a terrible idea but I'm not going to let you guys go alone.

75.    Note that at the time that ZACHARY REHL and others were debating whether to
go into the U.S. Capitol building, they understood that the Congressional session had recessed.

76.    Someone off-camera then says "**I think it's a terrible idea, but I'm not going to
let you go in alone.**"  This further establishes that there was no advance plan.

77.    It shows that Zachary Rehl FOLLOWED hundreds of people already inside.

78.    The Heindrick Block  documentary video recently acquired by Defendants'
attorneys is described as showing that REHL went to a peaceful demonstration at the Ellipse,
then had a leisurely lunch for half-an-hour next to food trucks near the U.S. Labor Department
building, and then wandered to follow the crowds heading towards the U.S. Capitol.

79.    See videos taken for "NationalFile.com" of the 100% peaceful protests at the
Ellipse posted at https://www.youtube.com/watch?v=0SsHKU_52X4,

https://www.youtube.com/watch?v=rnn0t_sKBGA,

https://www.youtube.com/watch?v=GJGOpIrPPYI  and

https://www.youtube.com/watch?v=q8MJpMeoCHw.

80.    As even the Anti-Defamation League grudgingly admits, the Proud Boys are a
fraternity primarily organized to watch sports on TV or live and consume adult beverages. [9]

81.    Their mission is to protect the Western values of free speech by blocking violence

---

[9]    Although couched within an extremely slanted and false hit piece by the Anti-Defamation
League ("ADL") even the ADL had to admit that *(clarification added in brackets)*:
          In [co-founder] McInnes' own words, the Proud Boys are a "pro-western
          fraternity," essentially a drinking club dedicated to male bonding,
          socializing and the celebration all things related to western culture.
"Bigotry: Proud Boys,"   https://www.adl.org/resources/backgrounders/proud-boys-0

from left-wing violent thugs.  Their most frequent messages are yelling profanities at ANTIFA.

82.     Also, leaks of FBI reports in Reuters and The New York Times after July 1, 2021, quote to unnamed sources that the FBI has found little evidence of any advanced planning of the attacks that broke out at the U.S. Capitol on January 6, 2021.

83.     The article in Reuters on August 20, 2021, is well after this Court considered and decided the motion to revoke bail.  See, Mark Hosenball and Sarah N. Lynch, "Exclusive: FBI finds scant evidence U.S. Capitol attack was coordinated - sources," Reuters, August 20, 2021, accessible at:  https://www.reuters.com/world/us/exclusive-fbi-finds-scant-evidence-us-capitol-attack-was-coordinated-sources-2021-08-20/ , attached as Exhibit 5.

## V.     ARGUMENT IN BRIEF:  SUMMARY OF 6 KEY ISSUES

84.     There are six (6) key issues regarding pre-trial detention of ZACHARY REHL:

85.     **First**, according to the prior pleadings, argument, and decision of the Court, the only reason that the Accused ZACHARY REHL – presumed innocent -- is still held in pre-trial detention is the argument that REHL might do again what he never did in the first place.

86.     Even taking the grand jury indictment on its own terms and the clarifications and evidence presented by the prosecution, the claim that REHL was a leader or organizer of any criminal or violent act must be found to be false and even sanctionable.

87.     In fact the Government's Motion at ECF Dkt. #37 admits and confesses that

> **In a Telegram message following the attack, the defendant stated, "That was NOT what I expected to happen today. All from us showing up and starting some chants and getting the normies all riled up."**

88.     REHL did have a plan to come to D.C. and participate in a First Amendment protected demonstration while patrolling to block left-wing violence from ANTIFA or BLM.

89.   **Second**, this Court revoked bail on the grounds – applying the presumption against bail – that no condition or combination of conditions could be imposed upon REHL on pre-trial release that will reasonably assure the safety of the community.

90.   REHL, by counsel, contends that whether a combination of conditions could reasonably assure the safety of the community requires an *objective* evaluation not a *subjective* feeling on the part of the Magistrate or District Judge.

91.   Because scores of defendants are routinely ordered not to have access to a computer or the internet, especially in computer crimes, it is manifestly incorrect to argue or believe that what is routinely done in federal criminal cases cannot be done in this case or that what works in other federal criminal cases could not work in this case.

92.   REHL, by counsel, contends that the fact that it is done routinely in federal criminal cases makes it inherently unreasonable pursuant to the Eighth Amendment under Due Process to keep ZACHARY REHL in pretrial detention when methods are available to "reasonably assure" the safety of the community by disparaging techniques routinely in use.

93.   **Third**, as the first section argued above makes clear, the weight of the evidence against REHL is very weak once we confront that REHL is not alleged to have done anything himself personally, except perhaps (arguably) misdemeanor trespass, but is alleged only to have encouraged others.  Because the indictment is vague as to whom REHL aided and abetted and to what REHL encouraged people to attend, the case against REHL collapses.

94.   It cannot be missed that a spur-of-the-moment, heat-of-the-moment, last-minute decision cannot establish a conspiracy or aiding and abetting, at least not in this context.

95.   **Fourth**, the Court was misled in many respects.  For example, the grand jury did not find any evidence that REHL was a "leader" or "organizer" of any activity on or about

January 6, 2021, and did not allege that.

96.   **<u>Fifth</u>**, the government has failed to allege any conspiracy or plan or aiding and abetting by these Defendants.  To illustrate this stark omission of any conspiracy, see the government's motion regarding Nordean at ECF Dkt. 30 on pages 1-2.  Even when embellishing beyond the indictment, the government alleges no facts supporting any conspiracy.

97.   Stunningly absent is any allegation of any plan or agreement to engage in any criminal act in this "ink blot test" indictment and the prosecution's embellishment of it  *Id.*

98.   The prosecution seeks to seduce the reader with what is hinted at but not stated.

99.   ***The gaps in the indictment shout louder than the words used.***

100.   The government alleges comments by Ethan Nordean and Joseph Biggs and other unidentified people that, for example, **"Just trying to get our numbers. So we can plan accordingly for tonight and go over tomorrow's plan."**

101.   You are invited to make the error of supplying in imagination what this plan is about, seeing shapes in the clouds and shapes in the ink blot pattern.

102.   The prosecution again invites us to make the error of assuming that only one thing happened on January 6, 2021, and like a bee hive of drones everyone had only one purpose.

103.   Here, of course, the plan was to prepare to defend the crowds of defenseless Trump supporters from being attacked by ANTIFA and BLM violent thugs who had burned down entire neighborhoods and attacked police for years, back to the riots in Ferguson, Missouri,

**104.**   Prosecutors accuse these Defendants of planning … *<u>something</u>*.

**105.**   **<u>Sixth</u>**, the Court made an error of law in applying a rebuttable presumption against pre-trial release on bail by erroneously finding that ZACHARY REHL is charged with damaging or attempting to damage Government property such damage (not the property) being

more than $1,000 of damage (again, not the value of the property.

106.    The prosecution failed to brief the Court that the presumption only applies to doing more than $1,000 in damage to Government property, not to just damage of any amount. Less than $1,000 in damage is only punishable by one year in jail, and does not qualify.

107.    The presumption against bail does not specify 18 U.S.C. § 2 (aiding and abetting) as one of the statutes giving rise to a presumption against bail.

## VI.    ARGUMENT

### A.    First:  Possibility that Accused Might Organize Another Demonstration

108.    The only non-ambiguous fact alleged is that the grand jury alleges that REHL encouraged unknown people to attend an unidentified "the Stop the Steal protest."

109.    Shockingly, the indictment fails to define or identify what a "Stop the Steal protest" was.

110.    No experienced legal professional would bring such an accusation without immediately following that by a definition of what "the Stop the Steal protest" was.

111.    One is entitled to infer that  "the Stop the Steal protest" is not defined in the grand jury indictment because it refers to the 100% peaceful, First Amendment rally at the Ellipse on the Mall between the Washington Monument and the White House, where the U.S. Park Police had issued permits and many speakers were heard over loudspeakers set up on the Mall.

112.    To define "the Stop the Steal protest" as meaning "Let's go beat on police and break windows" would be lacking in candor to the Court.

113.    The possibility that REHL might organize another attack on the Capitol extends the layers of speculation even further because the Electoral College did in fact already meet and a President was in fact sworn in on January 20, 2021.

114.    In fact, the prosecution admits in its Motion at ECF Dkt #37, page 6 that REHL accepted that Biden would be President *(emphasis added)*:

> **I'm proud as fuck what we accomplished yesterday, but we need to start planning and <mark>we are starting planning, for a Biden presidency</mark>."**

115.    Thus, lacking in candor, the prosecution inadvertently admits, but won't acknowledge, that REHL ***accepted the results*** of the Electoral College certification that occurred on January 6, 2021, even though he had wanted disputes about certain states to be heard.

116.    If the supposed conspiracy was to stop the Electoral College certification, that is not going to happen again, because the certification is already concluded and Zachary Rehl accepted that Joe Biden was certified to be President even if he preferred otherwise.

117.    Thus, once again, within the four corners of the indictment as expanded by the Motion, the Government's own begrudging admission is that REHL accepted that Biden has become President and is President, preparing to engage politically with a President Biden.

118.    Indeed the Motion at ECF Dkt #37, pages 11-12, argues on "**That risk, to be sure, is based on the defendant's role as a leader, planner, and organizer.**"

119.    However, the grand jury found no facts and made no allegations that REHL was a "leader," a "planner" or an "organizer."

120.    Perhaps REHL is also a witch.

121.    This is no better than the allegations and hysteria of the Salem Witch Trials.

122.    Furthermore, the Government tacitly admits that Dominc Pezzola and Zachary Rehl are not "in the same conspiracy."

123.    In fact, the evidence will show that REHL and PEZZOLA don't know each other and have never been in contact with each other and did not knowingly and intentionally or

purposefully agree upon any plan of any kind.  REHL doesn't know who Pezolla is.

124.    The central assumption crucial to the prosecution's case is that ZACHARY REHL conspired to leave the Presidency vacant for the next four (4) years.

125.    The allegation is that REHL knowingly and intentionally or purposefully agreed upon a criminal goal of having no President at all for the years 2021 through 2025, by stopping or obstructing the Joint Session of Congress for the certification of the Electoral College votes for President.  *(This high-volume refrain throughout political Washington makes no sense.)*

126.    Donald Trump could not have been re-elected if the count and certification of the Electoral College were obstructed, which would prevent *anyone* from becoming President.

127.    Donald Trump could only potentially be re-elected if the Congress heard and resolved disputed votes in the Electoral College, being necessarily in session.

128.    Arguing the legitimacy of votes submitted by various disputed States would require the Joint Session of Congress to actually be meeting and in session.

129.    Thus, without resorting to outside or contrary evidence, the indictment itself proves that REHL had no criminal purpose to which he agreed knowingly and intentionally or purposefully or aided and abetted anyone else in.

### B.  Second:  Conditions Exist to Assure Safety of the Public

130.    This Court determined that "the Court finds that he poses an identified and articulable threat to public safety that is both concrete and prospective, and that cannot be adequately mitigated by any conditions of release short of detention." See ECF Dkt. #104.

131.    However, it is plain that there is a combination of conditions will reasonably assure the safety of the community.

132.    Initially, note that the Government argued and the Court accepted that the basis

for the threat to the safety of the community is aiding and abetting under 18 U.S.C. § 2 (not listed

as crime giving rise to the presumption) a violation by others of 18 U.S.C. §1361, destruction of

Government property with damage of more than $1,000 of damage.

133.    Thus, the assurance to the safety of the community upon which the presumption is

based is the threat of again damaging Government property under 18 U.S.C. § 1361.

134.    The other charges clearly do not give rise to the presumption against bail.

135.    Is there a combination of conditions that will reasonably assure that REHL in

home detention will not damage Government property in the future?

136.    Even though aiding and abetting is not listed as a predicate crime for the

presumption against bail, let's consider the threat of REHL aiding and abetting.

137.    Because it is fairly routine for federal courts to restrict those on bail or (more

commonly) parole after conviction of a crime from using computers, the internet, telephones (or

to do so only under restrictions imposed by a parole officer) as a matter of law the Court must

find that such common place measures will assure the safety of the community.

138.    To find otherwise is to reject the common use of these measures by the federal

courts.

139.    For example, see the following cases that restricted, in whole or in part, access of

a bailee or parolee to use of computers, the internet, telephones, etc.

> a)  *U.S.A. v. Peterson,* 248 F.3d 79 (2nd Cir. 2000)
>
> b)  *United States v. Angle*, 598 F.3d 352 (7th Cir. 2010)
>
> c)  *United States v. Dallman*, 886 F.3d 1277 (8th Cir. 2018)
>
> d)  *United States v. Ullmann,* 788 F.3d 1260 (10th Cir. 2015)

140.

### C.  Third:  Weight of the Evidence

141.    This is addressed in Section I, *supra.*

### D.  Fourth:  Misstatements by Government Misled the Court

142.    In the Government's Motion for Revocation of Release Order and for Pretrial

Detention at ECF Dkt #37, falsely induced the Court by saying:

143.    Lacking in candor, the prosecution argued to the Court in its Government's

Motion For Revocation Of Release Order And For Pretrial Detention --

> **"The defendant was one of the leaders and organizers of a group that attacked the U.S. Capitol on January 6, 2021, seeking to obstruct Congress's certification of the 2020 U.S. presidential election."**

144.    Yet the grand jury found no facts and made no such allegation that REHL was a

"leader" or "organizer" of anything relating to the many distinctly, different activities that were

undertaken in various locations on January 6, 2021, in the District of Columbia.

145.    The grand jury alleged that REHL aided and abetted unidentified people in vague

and unidentified actions, but did not allege that REHL was a "leader" or "organizer" of anything.

146.    Also, there is no evidence that REHL sought to leave the Presidency vacant.

147.    The Motion also falsely induced the Court by claiming that:

> **The group succeeded, if only temporarily, by overwhelming law enforcement and breaking into the building along with a mob of rioters.**

148.    There is no allegation by the grand jury or facts that REHL ever had any

encounters or interactions with law enforcement, overwhelmed them, or broke into the building.

149.    The Motion also falsely induced the Court by claiming that:

> **Pre-trial release would allow the defendant to remain in the same circumstances in which he and others planned and launched the attack on January 6.**

150.    The grand jury found no facts and made no allegations that REHL "planned" or "launched" any attack on January 6, but only that he "conspired" in minor ways to stop, delay, or hinder the certification vote, without alleging how, or aided and abetted it.

151.    The grand jury found no facts that REHL ever intended any attack.  On the contrary, the Motion at ECF Dkt # 37 quotes REHL as being surprised by what happened.

152.    The indictment is mystifying as to how exactly REHL was supposedly going to stop, delay, or hinder the certification vote so that there would be no President from 2021 -2025.

153.    The Motion also falsely induced the Court by claiming that:

> **For someone who commands influence over a group with a demonstrated desire for violence,**

154.    The grand jury found no facts and made no allegations that REHL commands influence over any unidentified "group" left murky.

155.    The grand jury found no facts and made no allegations that the Proud Boys has any structure or discipline to follow leadership, as opposed to its self-described mission of being a drinking club fraternity that likes to watch sports, drink adult beverages, and block left-wing thugs like ANTIFA from attacking defenseless conservative protestors.

156.    Indeed, in the context of responding to violence by ANTIFA and other Leftists, the Government has produced communication messages about the need to get organized.

157.    The grand jury found no facts and made no allegations that the Proud Boys have a demonstrated desire for violence.  In the most despicable form of argument, the prosecution joins many in the political world of arguing that (1) where the Proud Boys go, (2) there is sometimes violence, and (3) therefore the Proud Boys caused it.  This is like saying that where the police show up there is often crime, so the police cause crime. The Proud Boys intentionally go to

places that left-wing violence is expected and stand between the left-wing anarchy of thugs like ANTIFA and the Western tradition of free speech.

158.    The Motion also falsely induced the Court by claiming that:

> **As a leader, the defendant helped set the tone for the group**

159.    The grand jury found no facts and made no allegations that REHL "set the tone" for anyone.  The Motion quotes REHL as being surprised by what happened.

160.    The grand jury does not allege who "the group" is.

161.    The Motion also falsely induced the Court by claiming that:

> **Along with other leaders, the defendant called on Proud Boys members to dress "incognito" and avoid wearing the traditional Proud Boys colors on January 6.**

162.    However, this indicates that the Proud Boys was not officially involved in the January 6 event and those who happened to be members of the Proud Boys were attending on their own as individuals, not *as* Proud Boys.  Those who knew each other who were attending obviously coordinated their visit and prepared against attacks by ANTIFA thugs.

163.    The Motion also falsely induced the Court by claiming that:

> **They marched to the east side of the building before returning to the west side, where they gathered near a pedestrian entrance to the restricted Capitol grounds shortly before 1:00 p.m. Within minutes of arriving, the defendant and others in his group joined the crowd in charging police barricades and overwhelming law enforcement.**

164.    However, in Paragraph 67, the indictment alleges that REHL entered the U.S. Capitol  at 2:53 PM, not 1:00 PM.

165.    However, there is nothing sinister about having a radio to be able to keep in touch with people at a large event, at which cell phone service is typically jammed and unavailable.

166.    The Motion also falsely induced the Court by claiming that:

> **On Telegram channels that the group had established for the event, the defendant and his co-conspirators were encouraged to "storm the Capitol."**

167.    However, there is no reason to believe given that REHL ever saw this post on Telegram or who sent the post.  This is Salem Witch Trial level rumor.

168.    They were "encouraged?"  By whom?  Did they agree?  Reject it?  Did these Defendants even know about it?  DoJ prosecutors know better than this.

169.    Indeed, REHL asserts that the evidence the Government has will show that on Telegram, REHL posted that he was glad nobody got in trouble that day and nobody got arrested.  Someone responded that some guy stole a riot shield and broke a window.  REHL responded with shock.  Nobody in that conversation knew who did it.  But REHL at end of the day from his hotel learned that someone had broken in by breaking a window, hours after the fact.

170.    The Motion also falsely induced the Court by claiming that:

> **The defendant celebrated the attack in a public social media post: "THIS is what patriotism looks like.**

171.    The Motion does not identify _what_ "the defendant celebrated."

172.    In fact, REHL celebrated the large turn-out at all the events all over D.C.

173.    REHL was not referring to those who beat on police, broke windows, etc., but to the peaceful demonstrators outside.

174.    This was the caption on a photograph posted on social media, apparently:

**THIS is what patriotism looks like.**



175.    In lack of candor to the Court, the prosecution changes the meaning of REHL's statement to suggest something entirely different than what REHL posted.

176.    In lack of candor to the Court, the prosecution changes the meaning of REHL's statement to suggest something entirely different than what REHL posted.

177.    The Motion also falsely induced the Court by claiming that:

> **In anticipation of the event, he posted a link to an online fundraiser that raised over $5,500 to fund his and others' travel and equipment for the event.**

178.    The grand jury found no facts and made no allegations that REHL raised money "for the event" but found REHL posted a link to raise funds "for upcoming Patriot Events" – *plural*.  Once again, the prosecution trades upon strategic ambiguity as to what is "the event."

179.    The Motion also falsely induced the Court by claiming that:

> **The defendant himself "stormed" the Capitol, equipped with a radio and goggles.**

180.    There is no evidence that REHL ever "stormed" any place and indeed the video posted at https://youtu.be/rQDwsyFXYhg shows the opposite.  REHL was as the video shows standing around calmly undecided whether or not to enter the Capitol building.

181.    Furthermore, goggles were recommended by Dr. Anthony Fauci and necessary by ANTIFA having sprayed Proud Boys in the past.

182.    The photographs and video of REHL near the U.S. Capitol does not show a radio.

183.    The Motion also falsely induced the Court by claiming that:

> **And the Government is unaware of any expression of remorse or contrition by the defendant or any attempt to distance himself from violent conduct of those in his command**

184.    Well, counsel is unaware of any evidence or facts or findings by the grand jury or any allegations that there was *ANYONE "in his command."*

185.    The Proud Boys is a drinking club, not an army unit nor the Foreign Legion.

186.    It would be hard for anyone to express an opinion about "those in his command" when there wasn't anyone "in his command."

187.    It is also very difficult to express remorse or contrition for lies people tell about you of which you are not guilty.

188.    The Motion also falsely induced the Court by claiming that:

> **Allowing the defendant to be released pending trial, even in home confinement, would leave a man who has the wherewithal to help plan and lead a large group of men in a violent attack to take similar actions in the future.**

189.    However, there have been no facts found by the grand jury or alleged that REHL "has the wherewithal to help plan and lead a large group of men in a violent attack" particularly any different than anyone else who is eligible for release on bail.  A prosecutor would have more rhetorical persuasion and skill.

190.    But no facts were found by the grand jury, offered by the prosecution, or alleged that REHL "**help[ed] plan and [led] a large group of men in a violent attack**" on January 6.

191.    The grand jury accuses REHL of encouraging unknown people to attend "the Stop the Steal protest" which obviously meant the peaceful demonstration at the Ellipse.

### E.   Fifth:  Failure to Actually Allege a Conspiracy

192.    This is briefed throughout the discussion, *supra*, however conclusory statements merely tracking the statute are inadequate.

193.    But, furthermore, the mere conclusory statements in the First Superseding Indictment such as  Paragraph 74 are defective, as they allege no facts but merely recites the statute:

> 'It is an elementary principle of criminal pleading, that where the definition of an offence, whether it be at common law or by statute, 'includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species,—it must descend to particulars." *United States v. Cruikshank*, 92 U.S. 542, 558, 23 L.Ed. 588. An indictment not framed to apprise

the defendant 'with reasonable certainty, of the nature of the accusation against him * * * is defective, although it may follow the language of the statute.' *United States v. Simmons*, 96 U.S. 360, 362, 24 L.Ed. 819. 'In an indictment upon a statute, it is not sufficient to set forth the offence in the words of the statute, unless those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished; * * *.' *United States v. Carll*, 105 U.S. 611, 612, 26 L.Ed. 1135. 'Undoubtedly, the language of the statute may be used in the general description of an offense, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged.' *United States v.* Hess, 124 U.S. 483, 487, 8 S.Ct. 571, 573, 31 L.Ed. 516. See also *Pettibone v. United States*, 148 U.S. 197, 202—204, 13 S.Ct. 542, 545, 37 L.Ed. 419; *Blitz v. United States*, 153 U.S. 308, 315, 14 S.Ct. 924, 927, 38 L.Ed. 725; *Keck v. United States*, 172 U.S. 434, 437, 19 S.Ct. 254, 255, 43 L.Ed. 505; *Morissette v. United States*, 342 U.S. 246, 270, n. 30, 72 S.Ct. 240, 253, 96 L.Ed. 288. Cf. *United States v. Petrillo*, 332 U.S. 1, 10—11, 67 S.Ct. 1538 1543, 91 L.Ed. 1877.12 That these basic principles of fundamental fairness retain their full vitality under modern concepts of pleading, and specifically under Rule 7(c) of the Federal Rules of Criminal Procedure, is illustrated by many recent federal decisions.13

*Russell v. United States Shelton v. United States Whitman v. United States Liveright v. United States Price v. United States Gojack v. United States* 8212 12, 128, 369 U.S. 749, 765-766, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962).

194.   Similarly, as decided in 1993, in similar posture to evidence being presented to a

grand jury to find probable cause of a crime:

> ... A sworn statement of an affiant that 'he has cause to suspect and does believe' that liquor illegally brought into the United States is located on certain premises will not do. *Nathanson v. United States*, 290 U.S. 41 (1933). An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause, and the wholly conclusory statement at issue in Nathanson failed to meet this requirement. An officer's statement that '[a]ffiants have received reliable information from a credible person and do

believe' that heroin is stored in a home, is likewise inadequate. *Aguilar v. Texas*, 378 U.S. 108 (1964). As in Nathanson, this is a mere conclusory statement that gives the magistrate virtually no basis at all for making a judgment regarding probable cause. 462 U.S. at 239. See also *United States v. Barrington*, 806 F.2d 529, 531-532 (5th Cir.1986) (affidavit which stated only that officer "received information from a confidential informant" who was "known to [the officer] and has provided information in the past that has led to arrest and convictions" found not to warrant application of Leon good faith exception). While the affidavit in this case is short on detail, it contains more than officer Adamson's mere conclusion that evidence of crime would be found on the Johnson property.

*U.S. v. Johnson*, 992 F.2d 1218 (6th Cir. 1993).

195.    Thus, the grand jury's conclusory statement merely reciting the statute or combination of statutes is invalid for the purpose of invoking a presumption against pre-trial release on bail from detention:

> Respondent Zydok, in case No. 136, was arrested in August 1949 under a recent warrant charging that he was subject to deportation as an alien with membership in an organization advocating the violent overthrow of the Government. Act of October 16, 1918, as amended, 8 U.S.C. (1946 ed.) § 137, 8 U.S.C.A. § 137. At that time he was released on $2,000 bail.

> This order was reversed on the ground that the Director 'must state some fact upon which a reasonable person could logically conclude that the denial of bail is required to protect the country or to secure the alleged alien's presence for deportation should an order to that effect be the result of the hearing.'12

>     On rehearing, the Director made allegation, supported by affidavits, that the Service's dossier of each petitioner contained evidence indicating to him that each was at the time of arrest a member of the Communist Party of the United States and had since 1930 participated or was then actively participating in the Party's indoctrination of others to the prejudice of the public interest.

*Carlson v. Landon Butterfield v. Zydok*, 342 U.S. 524, 530-533, 72 S.Ct. 525, 96 L.Ed.

547 (1952)

### F. Sixth:  Presumption Against Bail Should Not Apply

196.     As Nordean argues in the Sur-Reply of counsel Nicholas Smith at ECF Dkt.

"Absent one of these circumstances [in § 3142(f)], detention is not an option." *United States v.*

*Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999). *See also United States v. Salerno*, 481 U.S. 739, 747

(1987) (Congress limited pretrial detention of presumptively innocent persons to defendants charged

with crimes that are "the most serious" compared to other federal offenses).

197.     The prosecution argued to the Court in its Government's Motion For Revocation

Of Release Order And For Pretrial Detention, ECF Dkt #37 --

> The United States seeks detention pursuant to, inter alia, 18
> U.S.C.   §   3142(e)(3)(C),   which   provides   a   rebuttable
> presumption of detention if there is probable cause to believe
> that the defendant committed "an offense listed in section
> 2332b(g)(5)(B) of title 18, United States Code, for which a
> maximum term of imprisonment of 10 years or more is
> prescribed."   That   rebuttable   presumption   applies   to
> Defendant because destruction of Government property in
> violation of 18 U.S.C. § 1361, is specifically enumerated in
> 18  U.S.C.  §  2332b(g)(5)(B),  and  it  carries  a  maximum
> sentence of ten years in prison.5

198.     18 U.S.C. § 1361 carries a maximum sentence of one (1) year unless the damage

to the Government property exceeds $1,000.[10]

199.     However, the grand jury found no facts or at least states none to properly allege a

violation of 18 U.S.C. § 1361, including – but not limited to – the dollar amount of damage.

200.     The indictment offers only an invalid conclusory statement of the statute terms.

201.     Also, aiding and abetting should not give rise to a presumption against bail.

---

[10]     Note that the U.S. Attorney's office in another related case opposed a bill of
particulars concerning what Government' property was allegedly damaged by arguing that
the "property" is real estate, meaning the U.S. Capitol building itself.  18 U.S.C. § 1361
makes clear that the question is the amount of the damage, not the total value of the
property.

202.     The Government argued and the Court accepted on its form order of July 1, 2021,

see Exhibit 2 attached, that

> B.Rebuttable Presumption Arises Under 18 U.S.C. § 3142(e)(3) (narcotics, firearm, other offenses):
>
> There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community because there is probable cause to believe that the defendant committed one or more of the following offenses:
>
> * * *
>
> (3) an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;
>
> * * *

203.     However, here we are asked to take it a leap even further.

204.     Here, we are faced with allegations of aiding and abetting the destruction of

Government property under 18 U.S.C. § 2.

205.     18 U.S.C. § 2 – the actual crime charged – is not on the list of crimes that provide

for a presumption against bail.

206.     Again, this might seem like a minor point except that we are governed by the

constitutional force of the Eighth Amendment.

207.     To extend 18 U.S.C. § 3142(e)(3) to a more remote crime of aiding and abetting

that is *not* listed (18 U.S.C. 2) under 18 U.S.C. § 2332b(g)(5)(B),  which is already exceedingly

discordant among the other vastly-more-serious crimes listed in 18 U.S.C. § 2332b(g)(5)(B)

would constitute excessive bail under the Eighth  Amendment.

**CONCLUSION**

The Court should reinstate the order of the Magistrate Judge in the U.S. District Court for

the Eastern District of Pennsylvania (which was only announced verbally because it seems the preparation of a written order was interrupted pragmatically if not needfully by the motion in this Court to revoke the Magistrate's decision).  The Transcript is attached as Exhibit 1.  The Court should add such additional restrictions as no contact with pertinent persons and no use of or access to the internet, computers, and smart phones, possibly even Government inspection of postal mail, etc.   The Court should also question the falsehoods stated in the Government's Motion to revoke bail that was heard and decided on July 1, 2021, and perhaps strike the pleading and grant REHL relief by release from pre-trial detention.  The Government's motion is chronically lacking in candor.  The Government should withdraw its motion and/or substitute a motion that is based on truthful and candid assertions.

Dated:  September 30, 2021                 RESPECTFULLY SUBMITTED
                                           ZACHARY REHL, *By Counsel*

                                           Jonathon A. Moseley, Esq.

                                           USDCDC Bar No. VA005
                                           Virginia State Bar No. 41058
                                           Mailing address only:
                                           5765-F Burke Centre Parkway, PMB #337
                                           Burke, Virginia 22015
                                           Telephone:  (703) 656-1230
                                           Contact@JonMoseley.com
                                           Moseley391@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2021, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following CM/ECF participant(s), and also mailed a copy to the following by first class U.S. mail, postage prepaid, one single copy to the prosecution for distribution internally to all counsel involved for the prosecution.  From my review of the PACER / ECF docket records

for this case that the following attorneys will receive notice through the ECF system of the U.S. District Court for the District of Columbia.

**Mr. Luke Matthew Jones, Esq.**
U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA
555 Fourth Street, N.W.
Washington, DC 20530
(202) 252-7066
(202) 616-8470 (fax)
ahmed.baset@usdoj.gov

**Mr. Jason Bradley Adam McCullough, Esq.**
U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA
555 4th Street, NW
Washington, DC 20001
(202) 252-7233
jason.mccullough2@usdoj.gov

**Mr. James B. Nelson, Esq.**
U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA
555 Fourth Street NW, Room 4112
Washington, DC 20530
(202) 252-6986
james.nelson@usdoj.gov

Jonathon Moseley, Esq.