The Wayback Machine - http://web.archive.org/web/20150205032609/http://www.dcbar.org:80/bar-resources/publications/washington-law

## A Cautionary Tale: The Ted Stevens Prosecution

*From Washington Lawyer, October 2009*

By Anna Stolley Persky



On April 7, 2009, Judge Emmet G. Sullivan of the United States District Court for the District of Columbia unleashed his fury be he scolded. He chastised. He fumed. "In nearly 25 years on the bench," he said, "I've never seen anything approaching the mis this case."

It was the culmination of a disastrous prosecution: the public corruption case against former U.S. Senator Ted Stevens (R-AK).

Stevens was convicted in October 2008 of violating federal ethics laws by failing to report thousands of dollars in gifts he receiv from the U.S. Department of Justice is accused of failing to hand over key exculpatory evidence and knowingly presenting false

The Stevens case is a cautionary tale. It reminds lawyers and nonlawyers alike of the power and failures of our legal system ar of law. At the center of the story are real people: an old and powerful politician, a crack defense team, determined prosecutors,

"This is a fascinating case study for all lawyers," says criminal defense lawyer Stanley M. Brand, a partner at Brand Law Group, P.C. "In these high-sta aggressive and push the envelope. It's great to be aggressive—it's great to push, but this case reminds people that they have to observe the limits and

For months Judge Sullivan had warned U.S. prosecutors about their repeated failure to turn over evidence. Then, after the jury convicted Stevens, the unrevealed evidence. Meanwhile, a prosecution witness and an agent from the Federal Bureau of Investigation (FBI) came forward alleging prosecuto U.S. Attorney General Eric H. Holder Jr. announced that he had had enough and recommended that the seven-count conviction against the former Ala

On April 7, Judge Sullivan did just that. But he was far from done.

In an extraordinarily rare move, he ordered an inquiry into the prosecutors' handling of the case. Judge Sullivan insisted that the misconduct allegation be left to an internal Justice Department investigation. He appointed Washington lawyer Henry F. Schuelke III of Janis, Schuelke & Wechsler to investi should be prosecuted for criminal contempt.

"It's obviously a serious and not-everyday occurrence for a judge to sic an independent counsel on prosecutors," Brand says. "It's an auger for the Jus was pushed to the limit, and prosecutors are not going to just go on their merry way. When judges do things like this, it tends to rattle the system a bit.

With two investigations pending—one court-appointed, the other conducted by the Justice Department's Office of Professional Responsibility—Justice reviewing current discovery practices and retraining lawyers on their discovery obligations. It remains to be seen what consequences, if any, the prose

"If all of our lives and careers were defined by our mistakes, nobody would have a job, so you hate to think that one mistake—even if it happens to be someone's career," says Michael E. O'Neill, an associate professor who specializes in criminal law, criminal procedure, and constitutional law at Georg said, prosecutors have to be absolutely fair and above board to ensure that justice is done."

Brendan V. Sullivan Jr., Stevens' defense lawyer and a senior partner at Williams & Connolly LLP, described the misconduct of prosecutors as "stunnir warning to everyone that any citizen can be convicted "if prosecutors are hell-bent on ignoring the Constitution and willing to present false evidence."

But Assistant U.S. Attorney General Lanny A. Breuer, head of the Justice Department's Criminal Division, says in a statement, "As we move forward ir corruption, it is essential that the Criminal Division learns from the Stevens prosecution and its aftermath."

**Balance of Power**
It is a common occurrence, especially in criminal cases: Lawyers who are battling it out in court push for every procedural advantage; they overstep th the judge. There often are accusations that one side or the other is failing to produce evidence. But in the Stevens case, transcripts of multiple hearing reprimanding prosecutors for withholding discovery evidence.

Over the past few years, a series of high-profile scandals have rocked the Justice Department. For example, the department faced public outrage ove former Attorney General Alberto Gonzales, the revelation of the Justice Department's role in the so-called "torture memos," and ongoing questions abc some, the Stevens case represents a government entity that had developed a "total indifference to ethics."

"This has built up over the years—the people at [the Justice Department] have come to believe that they are immune, that nobody can touch them, an misconduct," says Joseph E. diGenova, former U.S. Attorney for the District of Columbia and a founding partner and criminal defense attorney at diGe

Concerns also have been expressed about the timing of the Stevens case, with the indictment coming just months before Stevens was up for reelectic against Stevens came eight days before Election Day. Subsequently, he lost to Democrat Mark Begich in an extraordinarily close contest, the effects o 60 members in the Senate's Democratic Caucus, giving the party a firewall against bill-derailing filibusters. Had Stevens been able to keep his seat, D short of the key 60-member vote.

DiGenova says that the "consequences of what the prosecutors did are remarkable" and the harm incalculable. "Had things been different, Stevens wo actually determined the outcome of the balance of power in the U.S. Senate by their misconduct. They affected politics in the United States," he adds.

**The Prosecutors**
The Justice Department probe into Stevens and other Alaskan officials, known as Operation Polar Pen, lasted several years. Lawyers from Washingto to handle the case and whether to bring charges in Alaska or the District of Columbia.

Some observers blame the subsequent problems in part on the lawyers' personal conflicts and poor management. Others suggest that the Justice De stars that formed the defense team—they knew it and felt pressure to find any advantage they could.

But in actuality, some of the Justice Department's finest lawyers handled the case. The trial team was part of an elite group of prosecutors in the Publi pursuing high-profile and complex cases.

The PIN Section, which comprises about 30 lawyers, investigates and prosecutes corruption in all levels of government. Between 2001 and 2007, it br 416 individuals, winning 371 convictions. And just recently, the section was praised for its investigation of Washington lobbyist and convicted felon Jac

Seasoned litigator Brenda K. Morris, principal deputy chief of the PIN Section, was not assigned to the prosecution team until late into the investigatio her juris doctor from Howard University and trained as a prosecutor in the New York County District Attorney's Office. She moved back to Washington Promoted in 2004, Morris supervised high-profile cases, including the Abramoff probe and a series of cases involving the theft of funds meant for the I law professor at the Georgetown University Law Center.

Brand, who has opposed her in cases, describes Morris as "fair, forthright, and sensitive to the facts."

Chuck Rosenberg, Morris' lawyer and a partner at Hogan & Hartson LLP, declined comment.

The rest of the prosecution team included Nicholas A. Marsh and Edward P. Sullivan, Washington, D.C.-based trial lawyers. And then there were the A Attorneys Joseph W. Bottini and James A. Goeke.

Overseeing the case as supervisory attorney was William M. Welch II, chief of the PIN Section. Welch grew up in Massachusetts, the son of a local juc Northwestern University School of Law and worked in several parts of the Justice Department, including the U.S. Attorney's Office in Springfield, Mass prosecuting a serial killer nurse and Springfield City administrators for corruption. In 2006 Welch was recruited to Washington, D.C., and has been the Stevens meltdown, Welch allegedly was angling to be the U.S. Attorney in Massachusetts.

"Bill is the hardest working prosecutor I've ever worked with," says Kevin J. Cloherty, a former supervisory attorney at the U.S. Attorney's Office in Mas standards and is dedicated to public service and doing the right thing."

**The Defense**
Stevens was represented by Brendan Sullivan and Robert M. Cary, along with a team of nine other lawyers, two paralegals, and an information techno finesse and trial skills, Brendan Sullivan is at ease in the public spotlight. His legal career includes defending Lieutenant Colonel Oliver North and form Secretary Henry Cisneros. Sullivan is famous for uttering the lines, "I'm not a potted plant. I'm here as the lawyer. That's my job," during a congressior

Brendan Sullivan has "a sort of quiet presence, but he has strength in his voice and can modulate—raise it for a very important point," says Michael M Herrington & Sutcliffe LLP and a former federal prosecutor. "He's one of the best lawyers in the country."

The younger Cary, also a partner at Williams & Connolly, has represented his share of prominent clients and teaches a trial advocacy class at George previously had worked with Brendan Sullivan on several cases, including the defense of former Cendant Corporation chair Walter Forbes in a fraud ca

In negotiations before trial, Stevens and his defense team refused a plea agreement. Instead, they opted for their right to a speedy trial in the hopes S him to return to Alaska and win reelection. There were only 56 days between indictment and trial.

"For us, it was simple," Cary says. "We thought we owed it to him to try to resolve the case before the election. It may be the only time we've ever aske

That made preparing for trial a relentless project. The trial team worked on the case day and night, meeting twice a day over lunch and dinner.

Stevens, 84 when indicted, had been in Alaska politics since before its statehood. As the longest-serving Republican in Congress, Stevens wielded ex
Stevens earned his law degree at Harvard Law School. He served as U.S. Attorney in Fairbanks, Alaska, before moving on first to the Alaska House o
U.S. Senate in 1968.

Stevens' clout in the Senate came from his longevity and his position as chair of the Appropriations Committee until 2005. His home sits at the base o
modest, the chalet had been expanded and remodeled to encompass 10 rooms and three bathrooms.

**A Friendly Letter**
The crux of the prosecution case was that Stevens had failed to list on Senate disclosure forms about $250,000 in goods and services he had receive
from oil services company VECO Corporation. For years VECO executives have been known to be top contributors to Alaska politicians. Ultimately, th
the senator's personal friend pal—and cofounder and former chief executive officer of VECO—who spearheaded the remodeling project by hiring worl
testified at trial that he never billed his friend for work on his house, and that Stevens knew he was getting special treatment.

Stevens was on the witness stand for three days. He said his wife paid their bills, and that, living in Washington, he could not possibly monitor the proj

Both sides fought over the meaning of an October 2002 letter from Stevens to Allen asking for a bill.

The letter read:

> When I think of the many ways in which you make my life easier and more enjoyable, I lose count! Thanks for all the work on the Chalet. You owe me a bill—remember Tor
> compliance with the ethics rules entirely different. I asked Bob P to talk to you about this, so don't get PO'd at him–it's [sic] just has to be done right.

Torricelli was a reference to Robert Torricelli, the former Democratic U.S. congressman and senator from New Jersey who was accused of receiving ill

Allen testified at trial that the note was Stevens' effort of "covering his ass." Allen said on the stand that he had been told by Stevens' friend Bob Perso
had written it to provide a false record to protect himself.

"That was a devastating piece of testimony delivered right before a break, as skillful lawyers do," Cary says. "As bad luck would have it, a juror got sicl
testimony was left to resonate with the jury for several days."

**Brady Battles**
As any law student knows, prosecutors must disclose any potentially exculpatory evidence to the defendant in a case. The so-called Brady Rule stems
decision in *Brady v. Maryland*.[1] (#n1)

Throughout the trial, government and defense lawyers battled over the Justice Department's production of evidence. Judge Sullivan considered declar
several occasions, the judge admonished the prosecution and even struck the use of certain evidence.

Prosecutors, Cary says, purposely produced discovery information late, "in the middle of trial, when we had little time to incorporate it into our strategy

Cary says the defense team was "incredibly distracted by the demands of briefing all of the issues that came up due to the prosecutors' failure to prov

According to court documents, prosecutors told defense counsel before trial that Allen had said he believed Stevens would not pay the invoice. Howev
contained contradictory statements from Allen, in which he said he believed Stevens *would* have paid the invoice. The defense did not initially receive
turn over all Brady evidence. In fact, one of Allen's statements was actually redacted from a report by an FBI agent before it was given to defense law

Finally, October 1, 2008, on the eve of Allen's cross-examination at around 11 p.m., prosecutors produced the 302s showing that Allen had twice told
paid the invoice, which was in direct conflict with his testimony at trial.

During a hearing the next day, Judge Sullivan scolded prosecutors for failing to produce the evidence prior to trial and then stalling, despite court orde
strikes me that this was probably intentional. I find it unbelievable that this was just an error."

Then came evidence that the government knowingly submitted false VECO accounting records to establish the proposition that employee David Ande
renovations. The records had been used by the prosecution to show the amount of time and money spent on renovations to Stevens' chalet—an impo
received a benefit.

At yet another hearing, Judge Sullivan said, "It's very troubling that the government would utilize records that the government knows were false."

According to court hearings, the judge also was angry over evidence that the prosecution sent a witness back to Alaska without informing the judge or

**Conviction and Fallout**
The case took a strange turn when a juror disappeared, delaying deliberations after weeks of trial testimony. The juror had said she needed to fly to C
Sullivan was unable to reach her to determine when she would return. An alternate juror took her place. (In later proceedings, the juror admitted she h
disappeared to go to the horse races.)

On October 27, 2008, the jury found Stevens guilty of seven felonies. Stevens did not talk to reporters, but he issued a defiant news release accusing
"I will fight this unjust verdict with every ounce of energy I have."

The jurors left the courtroom without commenting to the media.

A day later, Brendan Sullivan wrote to then-U.S. Attorney General Michael Mukasey, asking the Justice Department to "commence a formal investigati
prosecutors in connection with this case."

In November, Judge Sullivan received a letter from prosecution witness Anderson, who had worked on Stevens' chalet. Anderson wrote that he falsely
immunity deal with prosecutors in exchange for his testimony. He also claimed prosecutors left him in a room filled with confidential documents in an e
Allen had a contract to have him murdered.

The Justice Department has vehemently opposed Anderson's allegations.

Then came the kicker. On December 2, 2008, FBI Special Agent Chad Joy filed a whistleblower complaint stating that prosecutors tried to hide a witne
defense lawyers. Joy further accused a fellow FBI agent of having an inappropriate relationship with Allen.

"The week or so before Christmas, we had round-the-clock litigation over whether Joy's complaint would be made public or not," Cary says. "We took
public."

According to a transcript of a previously sealed court hearing, Morris of the PIN Section argued that Joy's name should not be revealed nor should the
ultimately released the complaint to the public with Joy's name redacted. Subsequently, the judge grew increasingly irate when the Justice Departmen
the complaint was made public, Joy's name should be revealed. After portions of the complaint were made public, the Justice Department then argued
filings if all the names were revealed. The Justice Department also said Joy had no whistleblower status, but then it changed its mind on that. In Janua
details, along with Joy's name. But Judge Sullivan was angry and wanted Mukasey to submit a declaration.

The week before President Barack Obama's inauguration, Judge Sullivan demanded that Mukasey submit a declaration addressing who knew what a
whistleblower. The postconviction scuffle continued, going as far as the U.S. Court of Appeals for the District of Columbia Circuit, which issued a temp

Judge Sullivan ordered full discovery on Joy's whistleblower status. The Justice Department then made yet another error—prosecutors only handed th

"That was a court order. That wasn't a request," Judge Sullivan said at a February 13 hearing. "I didn't ask for them out of the kindness of your hearts.
court orders seriously these days?"

Judge Sullivan then held Morris, Welch, and Patricia Stemler, chief of the Criminal Division's Appellate Section, in contempt of court for failing to follow

At this point, the Justice Department removed its prosecutors from the case and assigned a new team, which found additional evidence that had neve

**April Fools**
On April Fools' Day, U.S. Attorney General Holder announced that the Justice Department would move to dismiss the indictment "in the interest of just

"After careful review, I have concluded that certain information should have been provided to the defense for use at trial," Holder said in a statement.

On April 7, Judge Sullivan dismissed Stevens' conviction and ordered the Schuelke investigation. Schuelke, a partner at Janis, Schuelke & Wechsler,
Attorney in the District of Columbia before turning to private practice in 1979. He declined comment for this story.

"Judge Sullivan is one of the most liked judges on the bench," says Jonathan Turley, a nationally recognized legal scholar and constitutional law profes
Law School. "He is smart and courteous and even-keeled. To get Judge Sullivan that irate, it takes monumental misconduct."

The dismissal was announced, Stevens' family sobbed, and Stevens gave a raised-fist salute. The hearing ended with applause in the courtroom. Ou
pictures with his family, declaring, "I'm going to enjoy this wonderful day."

**Brady and Its Progeny**
In *Brady,* a jury convicted the defendant of murder after the state withheld a confession by a codefendant who admitted being the killer. The Supreme
violates due process when the evidence is material either to guilt or punishment.

Subsequent cases have clarified the prosecutor's duty to disclose. In *Giglio v. United States*, [2] (#n2) the Supreme Court extended the obligations of p
evidence. Additionally, the Jencks Act governs the production of statements of government witnesses.

However, defense attorneys and criminal procedure experts say that prosecutors routinely provide information late and reluctantly. But it is rare, they s
violations, especially one that goes to the core of the case.

"Many cases have small *Brady* violations, but this is something that is pretty extraordinary—an interview that directly contradicts the testimony of the le
used," Turley says. "There's no question it would have undermined the credibility of the witness."

Not surprisingly, Stevens' lawyers are convinced that the failure to disclose led to the conviction. "It's our belief that they never would have elicited that
had this evidence at the time," Cary says. "It was the heart of the government's case that there was a so-called scheme to conceal information, and th
Senator Stevens was acting in good faith.

"It was our position that the 'covering his ass' testimony was a fabrication, and the notes that were produced months after the trial proved that this was

One still-unanswered question is, Was there a deliberate intention to withhold evidence, a series of mistakes, or some combination of motives? Georg
intentional *Brady* violations as relatively rare, but says that inadvertent failure to turn over evidence is far more common "especially when you have a l
complicated fraud case."

"It's always possible that something could slip through the cracks," O'Neill says.

**Blame Game**
Some outside observers question whether the prosecutors' zeal got out of hand, and Welch looked the other way or even encouraged tactics that may

"It is fundamentally unfair to criticize Bill Welch for supervision failures in connection with the Stevens discovery," says his lawyer Bill Taylor, a partner
the Public Integrity Section, even in high-profile cases, does not get involved in the management of discovery. The trial team consisted of extremely e>
involved in the Polar Pen cases from the beginning. He had no reason to believe they were not complying with their constitutional obligations to turn o

Matthew W. Friedrich, former head of the Justice Department's Criminal Division, approved Morris' addition to the team around the time of the indictm
that Morris' late arrival on the team—and questions over who was to be in charge of the case—created tension. The other four main lawyers previousl
Morris, with more trial experience and a higher position at the Justice Department, ended up taking on a larger role in the Stevens prosecution than sc
anticipated.

"A smooth, almost seamless trial team is critical to the success of any prosecution or defense," Orrick's Madigan says. "When internal bickering or wh
disaster is usually not far behind."

Friedrich, now a partner at Boies, Schiller & Flexner LLP, declined comment on the internal decision making, but says, "I have always believed that Br
with enormous experience and integrity."

**Justice Out of Control?**
As criminal defense attorneys are quick to point out, the Justice Department has in the past decade been sullied by a series of high-profile case implo:
the board, from failing to disclose evidence to using politics to choose what cases to pursue.

In the wake of the September 11 attacks, the Justice Department aggressively pursued terrorism cases, and some of them have since been entanglec
PIN Section even ended up trying to prosecute one of its own former terrorism prosecutors, Richard G. Convertino, for withholding evidence in a trial.

In 2007 U.S. District Judge Lewis A. Kaplan in New York described as "outrageous and shocking" threats by the Justice Department to indict KPMG LI
of its employees. The Justice Department's conduct pushed Kaplan to dismiss criminal tax charges against former KPMG executives accused of partic

And in January 2009, U.S. District Judge Mark L. Wolf in Boston said that Justice Department prosecutors in Boston had a "dismal history" of failing to

"The Justice Department has a certain culture," Turley says. "It is commonplace for federal prosecutors to argue that they couldn't imagine why somet
is."

Some defense counsel say that part of the problem is that in recent years the Justice Department's Office of Professional Responsibility has not provic
the department. H. Marshall Jarrett, a longtime Holder colleague, ran the Office of Professional Responsibility for 10 years. In April, however, Jarrett w
U.S. Attorneys, and Mary Patrice Brown has taken the helm.

"[The Office of Professional Responsibility] has become known as the Bermuda Triangle of complaints against prosecutors. They go in, and they neve
made a mockery of the accountability process, and every seasoned lawyer knows it's a mockery."

There are new concerns about the propriety of the PIN Section. In June the Justice Department requested the release from prison of two former Alask lawyers from the Stevens team, excluding Morris, also failed to hand over evidence in their cases. The Criminal Division is reviewing the prosecutors'

"There is a special obligation that the Public Integrity Section has to act according to the highest ethical standards because they are policing governme Group.

**Justice Continues**
In the months since Judge Sullivan dismissed the charges, Cary and Brendan Sullivan have continued with their thriving legal practices. Stevens is co in office.

The Justice Department awaits reports from both the Office of Professional Responsibility and Schuelke's investigation. In July Judge Sullivan signed subpoenas.

As of this writing, Morris and Welch remain in their same roles. Prosecutors Marsh and Edward Sullivan were transferred out of the PIN Section to the remains at the U.S. Attorney's Office in Alaska.

Some criminal defense lawyers say the case will have a lingering effect on the justice system. "Our system of justice is built upon having confidence th job," Madigan says. "If you start to lose confidence in them, it just erodes the entire system of justice. It's of enormous magnitude."

But even the staunchest critics of the Justice Department admit that it is still known for being home to skillful lawyers who take to heart their job as trus

In a July speech before the National Black Prosecutors Association, Holder said the Justice Department is reviewing how it complies with discovery ob we will see to it, once again, that justice is our primary goal," he said. "When we are wrong, we will admit our errors. When we see an affront to justice

*Anna Stolley Persky wrote about the changing legal environment surrounding stem cells in the January issue of* Washington Lawyer.

**Notes**
**[1] (#note1)** *Brady v. Maryland,* 373 U.S. 83.
**[2] (#note2)** *Giglio v. United States,* 405 U.S. 150 (1972).