IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA                CR No. 1:21-cr-00175-TJK-3

v.                                      Washington, D.C.
                                        Tuesday, November 2, 2021
ZACHARY REHL,                           10:00 a.m.

              Defendant.
- - - - - - - - - - - - - - - - x
_____

         TRANSCRIPT OF MOTION HEARING/STATUS CONFERENCE
           HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
                UNITED STATES DISTRICT JUDGE
_____

APPEARANCES VIA VIDEOCONFERENCE:

For the United States:      Luke M. Jones, Esq.
                            Erik M. Kenerson, Esq.
                            U.S. ATTORNEY'S OFFICE
                            555 4th Street, NW
                            Washington, DC 20530
                            (202) 252-7233

For the Defendant:          Jonathon A. Moseley, Esq.
                            JONATHAN MOSELEY ATTORNEY AT LAW
                            5765-F Burke Centre Parkway
                            #337
                            Burke, VA 22015
                            (703) 656-1230

Court Reporter:             Timothy R. Miller, RPR, CRR, NJ-CCR
                            Official Court Reporter
                            U.S. Courthouse, Room 6722
                            333 Constitution Avenue, NW
                            Washington, DC 20001
                            (202) 354-3111

Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1                        **P R O C E E D I N G S**

2              THE DEPUTY CLERK:  We are on the record in

3      criminal matter 21-175, United States of America v. Zachary

4      Rehl, Defendant 3.

5              Present for the Government are Luke Jones and Erik

6      Kenerson; present for the defendant is Jonathon Moseley;

7      also present is the defendant, Mr. Rehl.

8              And, Judge Kelly, I'd just like to add, if you're

9      unable to see everyone on your screen, just hover your mouse

10     and do star 8 and it should pull everyone up.

11             THE COURT:  All right.  Thank you.  I am able to

12     see everyone.  So -- but thank you for that anyway,

13     Ms. Harris.

14             THE DEPUTY CLERK:  You're welcome.

15             THE COURT:  All right.  Well, good morning to

16     everyone.

17             I thought we could use today's conference, which I

18     thought would be helpful to separate out from the

19     co-defendants who are all -- who will all be before me

20     tomorrow, to at least hear you all on the motion for release

21     or to reopen the detention decision, because I want to --

22     that, obviously -- although I'm -- I want to consider all

23     the evidence against all the defendants in that motion, we

24     don't necessarily need to have the other defendants present

25     to hear -- for me to hear argument on that.  So I want to --

1    what I hoped to accomplish today was to hear from you,

2    Mr. Moseley -- and, obviously, from the Government -- on

3    that motion and then clarify the state of the other motions

4    that Mr. Rehl has filed and whether there are still, sort

5    of, open questions on them.  For some of them, I'll explain

6    why.  It wasn't clear to me whether there still is a dispute

7    between the parties at least for some of those things.  For

8    example, putting aside the motion for the bill of

9    particulars, the motion for a subpoena and the motion to

10   compel struck me as relating to items that I would expect

11   the Government to have -- be producing one way or the other.

12   And so I wanted to get some clarify -- clarity on that and

13   then we'll talk about tomorrow.

14          Mr. Moseley, what I had hoped to do -- I mean, I

15   do think it's helpful to try to have all the defendants come

16   back on a given date just for scheduling purposes.  So

17   you've had the chance to be able to talk to Mr. Rehl.  My

18   thought is, obviously, I'm going to hear -- I'll --

19   tomorrow, we'll have everyone, but we won't have Mr. Rehl

20   here, and perhaps -- I wanted to inquire of you whether

21   you've talked to him and whether you'll waive his appearance

22   for tomorrow just for scheduling purposes and then -- and be

23   able to make representations about what he'd like to do in

24   terms of either waiving the speedy trial or not or however

25   we proceed from tomorrow.

1          That's my thought on -- and then, of course, if

2     there's anything else either side thinks they want to raise

3     with me, they can do so, but -- so without further ado, if

4     that makes sense to the parties, Mr. Moseley, let me hear

5     you on the motion to reopen the detention hearing for

6     Mr. Rehl.

7          MR. MOSELEY:  Okay.  I wasn't sure if you want to

8     deal with the scheduling, because my feeling is that the

9     short things tend to get lost at the end of a long thing,

10    but I'd be happy to begin with the detention if that's what

11    you want to do.

12         Unfortunately, you know -- these cases, it's

13    typically, (inaudible) -- to say that they're unusual, but

14    the more you get into them, they are, and --

15         THE DEPUTY CLERK:  Excuse me, Mr. Moseley.

16         Judge Kelly, I'm sorry.  The court reporter is

17    having trouble hearing Mr. Moseley.  I think there's some

18    type of feedback going on in the background.  If everyone

19    can please mute and we can see if that will help when

20    hearing.

21         MR. MOSELEY:  Let me see if I can turn me down.

22    How -- is that any better?

23         THE DEPUTY CLERK:  Yes, it is.  Thank you so much.

24         MR. MOSELEY:  Okay.  And the volume's all right?

25         Okay.  So --

```
 1                    THE DEPUTY CLERK:  Yes.

 2                    MR. MOSELEY:  -- anyway, the -- unfortunately, I

 3       wish it were possible to take some of these things in

 4       isolation.  The issue for Zachary Rehl is at some level of

 5       abstraction because the Government, of course, as you recall

 6       --

 7                    THE COURT:  (Indicating.)

 8                    MR. MOSELEY:  I can't hear you.

 9                    THE DEPUTY CLERK:  You're on mute, Judge Kelly.

10                    (Brief pause.)

11                    MR. MOSELEY:  Maybe we lost his connection.  I

12       can't hear anything.

13                    THE DEPUTY CLERK:  No, he's still connected, but

14       he's muted.

15                    (Brief pause.)

16                    You should be able to hover your mouse --

17                    (Brief pause.)

18                    MR. MOSELEY:  It's difficult to have so many

19       different systems to get familiar with.

20                    (Brief pause.)

21                    THE DEPUTY CLERK:  Still can't hear you, Judge.

22                    (Brief pause.)

23                    MR. MOSELEY:  I'm usually the one with the

24       obstacle.  Do we -- how do we do that on this system?

25                    (Brief pause.)
```

```
 1              THE DEPUTY CLERK:  Mr. Jones, what did you use to
 2     unmute yourself when you accidentally muted yourself before?
 3              MR. JONES:  If you hover on the screen above the
 4     red "end call" button --
 5              THE DEPUTY CLERK:  Uh-huh.
 6              MR. JONES:  -- a row of --
 7              THE DEPUTY CLERK:  Right.
 8              MR. JONES:  -- buttons pop up and there's a
 9     microphone.
10              THE DEPUTY CLERK:  You see the microphone, Judge
11     Kelly?
12              MR. JONES:  You have to put the mouse over the
13     screen.
14              (Brief pause.)
15              THE DEPUTY CLERK:  Judge Kelly, when you hover
16     over the "end call" button and the keypad comes up and the
17     video -- you see all that?
18              THE COURT:  (Indicates affirmatively.)
19              THE DEPUTY CLERK:  And when you click on the
20     microphone --
21              (Brief pause.)
22              MR. MOSELEY:  I have it.  You need to hover over
23     the bottom of the photo -- of the video's --
24              (Brief pause.)
25              THE COURT:  All right.  Can everyone hear me?
```

```
1              MR. MOSELEY:  Yes.

2              THE DEPUTY CLERK:  Yes.

3              THE COURT:  Okay.  Before, for whatever reason, I

4    wasn't able -- you weren't able to hear me, but when I

5    hovered my button, it did not show me being muted.  So I

6    don't know what the problem was.

7              But in any event, Mr. Moseley, I -- just before we

8    begin, obviously, for -- I need to confirm that your client

9    will consent to my hearing your argument on this remotely as

10   required by the CARES Act which allows us to have this

11   proceeding remotely.  So I assume he does consent to that;

12   is that correct?

13             MR. MOSELEY:  I believe -- are you asking him to

14   say so?  But --

15             THE COURT:  Well, I don't know if you've talked

16   with him, but I'll explain it to him if you haven't.

17             Mr. Rehl, just so you understand, when the

18   pandemic hit, Congress passed a law that allows us to have

19   proceedings like this remotely like we are: you where you

20   are; your attorney in one place; the Government in another

21   place; me in another place.  If we didn't have that law, we

22   would all -- we would have had to transport you here to have

23   this proceeding.  Your attorney would have to have been here

24   physically in the courthouse and all the rest.  So I need to

25   hear that you consent to have this proceeding remotely like
```

1    we're doing here today under the law that allows that.

2                THE DEFENDANT:  Yes, Your Honor.

3                THE COURT:  Okay.  All right.  Mr. Moseley, you

4    may proceed.

5                MR. MOSELEY:  All right.

6                I wish that these things were not as complicated

7    and interrelated as they are.  As -- but as the Court is

8    aware at -- first of all, there was a March 26th hearing

9    before the magistrate where Zachary Rehl was ordered

10   released.  The court asked -- the prosecution immediately

11   asked for a stay in that -- orally in that argument.  I

12   don't think there was an order of the conditions of the

13   release, but there was an order of stay from the

14   Pennsylvania magistrate, and then this Court heard, I guess

15   it was, June 30th and issued an order July 1 changing that

16   result even though, as I pointed out, really -- I understand

17   the legal statutes, but we also point out that nothing had

18   actually changed.  The order for -- to revoke did not mean

19   that Zachary Rehl had done anything or even been out between

20   the time.  It's just a -- more of an appeal.

21               Subsequently to that, the Court received a letter

22   from Zachary Rehl about his dissatisfaction with his

23   counsel.  The -- and I want to make clear, you know, this --

24   I just want for the record that I was not involved in any of

25   that decision.  I got involved after the problem arose.  So

 1    Zachary Rehl identified that his counsel was not conferring

 2    with him.  The Government makes much in the opposition of

 3    what Zachary Rehl knew, but it appears in the circumstances

 4    that his prior counsel didn't know many of the things that

 5    they talk about because he wasn't meeting with Zachary Rehl

 6    to confer about that.  I think on the normal, traditional

 7    issue of, will an attorney -- will a defendant return for

 8    trial, Shaka Johnson did a, you know, good job as far as I

 9    can tell.  He got biologic -- biographical information,

10    probably the family, did all of those things, and I thought

11    his presentation, written and orally, was pretty good, but

12    what he didn't do is what -- is -- concerned about -- is

13    talk about the more unusual aspects of this case in terms of

14    the threat of future danger and the weight of the evidence

15    which, I think, as you look at the record, he really

16    couldn't do without conferring with his client.  We wouldn't

17    know what Zachary Rehl agrees or disagrees with about the

18    facts and about his circumstances without being able to do

19    that conferring that Zachary Rehl complained about.  And I

20    think that's where the record was, sort of, silent.  Now,

21    there's a little bit of a reference, but -- and even what's

22    there, Mr. Rehl thinks is inaccurate.

23            So as I say, on your traditional, garden-variety

24    detention hearing, it was addressed whether he would return

25    for court.  I'm not even sure the Government disputed that,

1   but the court found -- well, both courts found that he's

2   likely to return for trial.  He has a -- has tremendous

3   connection to the community.  The issue that's remaining

4   that the Court disagreed with the magistrate about is the

5   question about whether he might pose a future danger to the

6   community and whether -- now, co-counsel, you know, is --

7   feels that the Court was more emphasizing of that, but

8   technically, looking at the order, the Court also referenced

9   the -- as the Bail Reform Act does, is that the evidence is

10  strong against him, and the Court also referenced the extent

11  of the sentencing of the case -- the charges -- potential

12  sentencing with which he is charged and, of course, that he

13  is wondering what may happen with, you know -- practically

14  all of the judges in these cases are considering whether 18

15  U.S.C. 1512(c)(2) applies which is the largest potential

16  sentence and we're all, you know, wondering -- we all think

17  that may make a big difference at some point.

18           The -- so that's where the issue is.  Of course,

19  the Court will recall, just putting it all together, that

20  the Government admits that Zachary Rehl did not commit any

21  violence; did not damage any property, (inaudible) -- and

22  apparently, I think, in the middle of that, did not interact

23  with law enforcement.  They also say -- the way they say

24  that in the prior orders [sic] is that he's not charged with

25  any violence or destroying property, but they do claim that

1    he -- that his level of involvement is as a conspirator or

2    aider and abettor.  And so this makes it more abstract than

3    the usual case.  If somebody were accused of, you know,

4    beating up their girlfriend or something, it would be, you

5    know -- the issue of violence -- potential future violence

6    would be a much simpler discussion.

7             And that's why I think that, unfortunately, some

8    of these other motions -- maybe, I'm not understanding, but

9    I don't see how to deal with them separately because most of

10   the evidence that the Government used and is using has to do

11   with things he is alleged to have said and a photograph that

12   I assume the photographer just thought it was cool to zero

13   in on Zachary Rehl and I guess it was Nordean next to him

14   with a bullhorn, but when we saw the video that came out

15   from Nick's iPhone in the discovery in September, it shows a

16   wider view.  And so the claim that he -- the claim that

17   Zachary Rehl is a leader, which I assume is connected to the

18   main question of whether or not he's a danger of future

19   dangerousness -- future -- causing future danger to the

20   community, that they -- that evidence we now see is -- does

21   not support him being a leader.  The grand jury did not

22   allege him to be a leader; they alleged him to be a

23   conspirator or aider and abettor, but there's nothing in the

24   grand jury indictment, even in terms of conclusory

25   statements, that he's a leader.  The Government has added

1    that in its motion but has not added any basis for it other

2    than the statements and the photograph showing him, you know

3    -- it appears that he's at the head of a column, but when

4    you see the wider view, he's not.

5              THE COURT:  Well, Mr. Moseley, I -- it seems to me

6    their argument that he's a leader is based on far more than

7    just one photograph; right?  It's based on all the

8    allegations that the grand jury did return in terms of

9    laying out, you know -- and we've -- I don't -- we've --

10   I've discussed them many times.  But isn't it a fair

11   characterization of what is in the indictment -- isn't it

12   fair to characterize that as leadership?  I mean, put aside

13   one photo.  I agree with you.  That's neither here nor

14   there.  But doesn't the indictment paint a picture -- again,

15   allegations at this point, for sure, only -- but doesn't --

16   isn't it fair to characterize those allegations as

17   illustrating leadership to some degree?

18             MR. MOSELEY:  Well, to some degree.  I don't know

19   what conspiracy or aiding and abetting means in that, you

20   know -- I think the -- the sense in which they're saying

21   that is that if he were let out on bail, he could, you know,

22   create from scratch some new event or some new disturbance

23   as opposed to the allegations that, you know, he raised

24   money for travel -- for multiple events for travel and hotel

25   and safety equipment and, you know, so giving a conspiracy

1     allegedly a little push and being a self-contained leader

2     able to create, you know -- create something -- some new

3     disturbance all on his own, I think, is a big difference of

4     extent.  I think that the sense in which they're arguing it

5     is that he was the leader, you know -- a -- one of the

6     leaders of something where 500,000 people showed up and I

7     think, you know -- I guess that's semantics, but I think the

8     meaning that he poses a threat of, you know, buying some

9     radios or something and that's going to create a danger,

10    again, in a level of abstraction here which is he's not

11    accused of personally, (inaudible) -- but if he -- that he

12    might be able to get a huge army to show up, I don't think

13    the grand jury alleges that or alleges any facts of it.  It

14    alleges it in terms of he may be -- in fact, the opposition,

15    I think, here zeros in on the idea that he may be guilty

16    because Dominic Pezzola broke a window.

17            And so I think that's what we've mostly got.

18    Other than the quotes which I'm getting to the fact that we

19    need -- I believe, for exculpatory information, I need those

20    quotes.  And I would be very, you know -- I think Zachary

21    will be very unhappy if the -- if we don't get a decision

22    quickly, but I think the right decision might be that I need

23    those documents first, and I'll explain.  And I've been

24    dealing with some technical problems with discovery about,

25    oh, the prior lawyer and things like that, and I don't -- I

1    want to be correct and fair.  But I think that his actions

2    -- I don't think, you know -- maybe, if they were,

3    (inaudible) -- would say that he, (inaudible) -- a push or

4    he, maybe, gave some people a push, but I don't think it's

5    fair to characterize it in terms of him being able to go out

6    from scratch under home confinement and recreate a new

7    disturbance.

8              And as I put in -- like I say, if I were -- if we

9    were in person, I'd hand -- I might hand up documents if the

10   Court would consider it.  So I noticed Judge Lamberth's --

11   which emphasizes in -- to some extent -- in some ways, a

12   much worse case -- that the threat has to be future and it

13   has to be particularized, not just generic in the air.  And

14   like I say, the normal case is easier where, you know,

15   someone beat up his girlfriend.  We'd say, Well, he might

16   beat her up again.  That's pretty specific.  Here, it's a,

17   you know -- when people say these cases are unusual, I

18   resist that, but more -- the more I get into it, they

19   really, kind of, are.  So I think, you know -- I don't know

20   what -- I mean, the threat that the Court would have to

21   particularize would be, I think, that they -- that he would

22   do something that would harm the community.  I don't see

23   anything that would suggest that he would personally -- I

24   mean, it's possible that he didn't personally commit,

25   (inaudible) -- last time but he might this time, but I don't

1   see anything to support that, you know?  He, (inaudible) --

2   the possibility to, (inaudible) -- but I don't see him

3   personally doing anything.

4          The other thing, too, is one of the quotes, you

5   know, suggests not only that he's proud about what happened,

6   but then he talks about preparing for a Biden presidency --

7          THE COURT:  Yes.

8          MR. MOSELEY:  -- and, you know --

9          THE COURT:  I'm glad you raised that --

10         MR. MOSELEY:  -- suggesting --

11         THE COURT:  I'm glad you raised that, because if

12  you hadn't, I would have.  Go ahead.

13         MR. MOSELEY:  Yeah.

14         Now, I -- all of us should look at that in

15  context, you know?  But I think in, you know -- if we see

16  the whole context, you know, it might say that, I'm mad; I

17  think we did a good job, whatever, but Joe Biden is

18  President, you know?  Am I out a little bit on a limb

19  arguing that?  Just as everybody is.  I think I want to see

20  the whole conversations.  So I think that some of this comes

21  back to my other motion, which is why I filed so many

22  motions, is because I really couldn't see how to separate

23  them.  Obviously, the priority for Zachary Rehl is he, you

24  know, would like to be, (inaudible) -- I could do a better

25  job, (inaudible) -- but I don't see how to separate these

1    issues.

2          Now, where we stand, I think, on the quotes is

3    that I tried to get stuff from the previous attorney.  I

4    realize he may not be, you know, excited about doing too

5    much.  I got -- there was some talk in the discovery about

6    attorneys copying stuff off of the media and then returning

7    the media.  It looks to me, just to be fair, like, maybe,

8    Shaka Johnson copied some of the stuff off of the Blu-ray

9    discs or the external hard disks, and when he gave me them,

10   I -- it is not there.  The stuff that the -- the Government

11   has seemed to, you know -- they claim -- they argue that

12   they don't need to, but they did give a table saying that

13   for this quote, it's found in this part of the discovery.  I

14   don't have that.  That might be my fault, that might be

15   Shaka Johnson's fault, but I don't have it.  And so I think

16   that to properly address these issues, I'd like to see, what

17   did they say?  Like I argue, you know -- so that's why I

18   don't think I can separate these motions quite so -- the way

19   one would like to.

20          So the thing is I think that, you know -- for

21   example, they make much of the fact that Zachary Rehl

22   posted -- oh, and another thing, too, is, of course, Parler

23   got shut down.  So where some of these posts were, you know,

24   no longer -- didn't exist, and when they were able to go

25   back up online, they deleted -- well, they didn't delete; I

1  don't want to sound like, you know, they, (inaudible) --

2  issue here -- but they did not repost a lot of their content

3  related to these controversies or else they wouldn't have

4  gotten permission to go back up live again as an issue.

5          So -- and then -- and as that -- and on the other

6  hand, what's important is that the Government is -- has the

7  sole copies of all of these things because -- all of

8  Mr. Rehl's electronics' receipts.  So we have a situation

9  where he's not only incarcerated, but even if he were out,

10  he wouldn't have his own access to any of these original

11  conversations.  And I have reached out to other, you know --

12  to other people to see if they might have them, but in one

13  case, it's been seized, as well.

14          So -- but I'm in a situation where I think that

15  the quotes that may or may not show propensity to run out

16  and create a new riot -- I think that -- and certainly for

17  trial, I would need -- it would need, (inaudible) -- whether

18  he, (inaudible) -- say that or mean that.  Like, they -- the

19  big part about whether he -- he said, This is what

20  patriotism looks like.  The question is, well, what is

21  "this"?  And, you know, we could argue, you know -- we could

22  wage -- we could -- I'm sure that counsel could -- are

23  perfectly capable of arguing back and forth about what they

24  think it means, but ultimately, you know, regardless of our

25  ability to engage in rhetoric, the -- we need the whole --

1    we need to see the conversations.  He -- Mr. Rehl would

2    argue that it's over a picture of people -- of the crowd,

3    not -- so "this" refers to a specific picture.  Now, I can't

4    confirm that without getting -- being able to get it on

5    Parler.  So that's where, I think, the status of what he

6    actually said or didn't say is essential to whether or not

7    he poses a danger of doing something, you know -- unless

8    there's some, you know -- I know that there's other cases

9    where there's allegations of some specific threats against

10   people which are problematic, you know, but from what we

11   have here, I don't think we can think about any other -- I

12   mean, I'm not saying that the Government couldn't suggest --

13   couldn't address some other kind of violence or danger, but

14   I'm not aware of any in this case than what -- than him

15   doing again what he's alleged to have done.

16            So -- and then, of course, we go to -- now, the

17   other thing is that as far as I can tell, you know -- I'm --

18   it's amazing how you can research things and miss something,

19   but it seems to be a case of first impression about how

20   aiding and abetting plays in the presumption against bail.

21   And I, you know -- I'm -- I realize that you may require

22   some clarification, maybe, on appeal or whatever, but I do

23   -- but the big problem -- the big issue -- problem for

24   Zachary Rehl here is the statutory presumption against bail

25   when, alongside sabotaging nuclear power plants and trains,

1    destruction of, you know -- 18 U.S.C. 1361, destruction of

2    government property is included on the list, but as I said,

3    the Government concedes that he's not -- not even not guilty

4    of but not charged with destroying private [sic] property.

5    He is described -- he is charged under 18, (inaudible) --

6    with aiding and abetting the destruction of private -- of

7    government property.

8             And so does that mean, you know -- if we want to

9    get technical that we're going to put 18 U.S.C. 1361 on a

10   list of far more serious things about a presumption against

11   bail, you know, should we not get technical and say that,

12   well, really, he's charged under 18 U.S.C. 2?  This Court

13   may not be, you know -- may not have the time or inclination

14   to decide that for the whole country, but I think that I put

15   clarity on that.  What the Government argues is that it's

16   the same thing.  I -- reading 18 U.S.C. 2, it says that an

17   aider and abettor can be punished as a principal, but I

18   don't think that that -- and, again, I'm making a record

19   here, obviously -- that the Government is -- and I don't

20   think that that means that he's guilty of 18 U.S.C. 2 or

21   1361 or charged with it.  I think it merely says that if he

22   aids and abets, he can be charged -- he can be punished at

23   the same level, but I -- and the Government writes the grand

24   -- the indictment -- I assume the grand jury has some

25   assistance in drafting it -- and says, 18 -- he's guilty of

```
1     18 U.S.C. 1361, comma, 2.  And, you know, that's probably
2     the norm -- routine, but here, it's not routine that the
3     Government admits that he is not charged with the
4     description of 18 U.S.C. 1361.  So he's obviously charged
5     with 18 U.S.C. 2.  That's what I would argue in a, you
6     know -- it needs to be -- well, I guess, you know, it's
7     rather unfortunate.  Some, you know -- you always find
8     something that should be, (inaudible) -- but there's still
9     an open hole there.  So I, you know -- I think it ought to
10    be made clear.  I couldn't find clarity on that.
11            But the -- so that's -- and the other -- the
12    issue, you know, that -- and I -- like I say, the video that
13    came out in September shows -- showed after this decision,
14    you know -- shows him not leaving and just participating.
15    Now, the question is, again, the Eddie Block video, I guess
16    -- they argue that it was already out before it was
17    released, but as I've said -- and I hope the Court may have
18    been able to get the thumb drive.  I think that if it may
19    have gotten to -- the U.S. Attorney's Office front desk may
20    have gotten it working through the system.  But the worst
21    part of the Eddie Block video -- and I believe that there's
22    a segment before and a segment after, but we're talking
23    about the one from when they're at the Capitol, you know?
24    The worst part of that is that it's boring and nothing
25    happens.  And so, again, the question there is, does this
```

1    portray him as a leader?  And I, you know -- there's lots of

2    things going on, lots of issues.

3              But my point about the -- this video and the other

4    video from Nick's iPhone that we think -- that also has --

5    it shows them walking.  They're up -- three different --

6    well, many videos, but there's about three or four videos

7    where they're walking away from the Washington Monument;

8    they're -- then they stop and they're just milling about

9    drinking bottled water; and then there's another section

10   where they're taking photographs of the Washington Monument

11   behind them; and, again, it doesn't show -- the, you know,

12   (inaudible) -- historically, I guess, is that it doesn't

13   show Zachary Rehl leading anybody.  And so the question of

14   future danger being whether or not they're going to --

15   whether or not he's, you know -- he's likely to or able to

16   any more than anybody, you know -- could anybody, you

17   know -- could -- arise and be Joan of Arc?  I suppose.  But

18   is he more likely than anybody else here to, you know -- an

19   uprising or something like that?  And I don't think that

20   there's a basis for that.

21             And the other thing that this comes -- a couple

22   things that have come out is, of course, the Government

23   began -- the caption of the grand jury indictment says it

24   started on January 8th which is two days after the events on

25   January 6th.  I suppose that's both a bit of a rush, and

1    also, reflects the immediate concerns.  But this long after,

2    you know -- he's alleged to have participated in a

3    conspiracy to stop the certification of the Electoral

4    College.  Well, that's not going to happen again.  I mean,

5    that's already done.  So that's -- it's really not possible

6    for him to repeat that and, you know, we're really past all

7    of that.  The inauguration took place -- what -- 12 days

8    later after the grand jury started.  And so I don't think

9    that that repeats that.

10          So -- and also, I think that -- well, I think we

11   had the discussion when you had the argument with the other

12   defendants that the Bail Reform Act does not really directly

13   deal with the question of how long it is to the trial, but

14   we do have a flood of discovery here in the social media

15   revolution and a long time for him to be locked up until

16   trial.  So I think that that also affects, you know -- and

17   new information about where we stand and where we are.  The

18   Speedy Trial Act has been extended several times -- or time

19   excluded, I guess it is.  And so we believe that that is all

20   new information, as well.

21          And, you know, so that's where I think I stand,

22   but the -- well, let's see.  So -- but I think on the other

23   issue of -- and, again, if -- my understanding is the Court

24   did not focus on it quite so much in previous discussions,

25   but it is in the order about the extent of the -- the extent

1    of evidence against him.  And that's a bit of a, you know,

2    open-ended thing.  Nobody likes to have a mini trial.  Civil

3    cases, we don't, you know -- the -- preliminary injunctions

4    create the danger of having a mini trial to decide what we

5    think is going to happen at trial, you know?  The Court

6    doesn't want to do that.  Nobody wants to do that.  But to

7    some extent, it's got -- I argue that I think it's got to be

8    more than probable cause, because if the -- because probable

9    cause is -- if there wasn't probable cause, there wouldn't

10   be an indictment; there wouldn't be an arrest.  It has to

11   be, you know, something significantly less than a mini trial

12   but something a little bit more than just probable cause

13   alone, and that's where I raise, you know, a lot of these

14   issues, including the, you know -- why it's hard to --

15   without the bill of particulars, it's hard to know what

16   happened, and I argued that I don't think prior counsel

17   argued that very well with knowledge of working with his

18   client.

19        The indictment says -- and I, you know -- I'm

20   still thinking it through a bit, but the indictment says

21   that on January 4th, 2021, at 7:15 p.m. -- presumably after

22   Enrico [sic] Tarrio, the chairman of the Proud Boys, was

23   released from being arrested after arriving at the

24   airport -- that the statement was made, Stop everything

25   immediately.  There is no plan.  This comes from the top.

1        And, you know, I think that, you know -- I'm not an expert

2   on some of those things, but I think there's at least a

3   plausible argument that whether there was a conspiracy

4   before that time, that it was stopped at -- on January 4th.

5   And I'm -- and I think that in terms of understanding the

6   strength of the evidence, one has to consider -- and

7   these -- this is not me saying something different.  This is

8   actually in the indictment.  I've tried to focus on things

9   that don't require contrary evidence, don't require a jury

10  issue, but where the indictment itself says things and then

11  takes it back.

12        And so I think that that has, you know -- it

13  should be considered if the indictment alleges that --

14  something changed.  Let me just put it that much, you know?

15  We will have to argue about what that means.  We'll, you

16  know -- they say that they -- I think the Government has

17  included that because it says, We could be guilty of gang

18  charges, which, of course, I think, argues their case.  I

19  would say that it also argues an awareness that, maybe,

20  withdrawal from the conspiracy is necessary.  Now, they

21  clearly talk about a new plan, but we don't know what -- we

22  don't know any of -- what any of that is.  And so -- and,

23  again, we also argued that it has been overlooked and a

24  friend of mine -- a consultant pointed out that the

25  Government alleges that the congressional session recessed

1    at 2:20.  Julia Haller, an attorney, looked up in the

2    Congressional Record and it actually says 2:18 that they --

3    that the Capitol Police talked to this presiding officer,

4    (inaudible) -- the rules that allows them to immediately,

5    without a vote, recess; and then at 2:53 p.m., Zachary Rehl

6    is, you know -- is alleged to have gone inside.  And the

7    Government thinks that the video that we found on Twitter

8    may have been previously released, but it shows, you know --

9    I believe it shows him un-, you know -- equivocal.  Should

10   we go in?  Should we not go in?  Again, it does not show a

11   prior plan or leadership.  It says, you know, Everybody else

12   has gone in.  Should we go in, too?  So we think that goes

13   to the weight of the evidence, you know?

14          Well, I mean, he's -- he hasn't been charged with

15   ordinary trespass, but, you know, I'm not being -- I don't

16   mean to be unreasonable, but, you know, it seems that he

17   went, you know -- the Government's evidence is that he went

18   inside and, maybe, even, you know, smoked a cigarette in a

19   federal building, but -- and the Government, you know, makes

20   much -- repeatedly in every case -- about the fact that they

21   don't have to lay all of their evidence on the table at this

22   point.  And, you know, who knows what they'll prove?  I

23   understand that.  But in terms of what we have in front of

24   us, I don't think that the danger -- danger of, you know,

25   repeating violence is that bad -- is that great.

```
 1              And I don't -- I, you know -- I'm not sure I
 2    understand the argument that there's no possible
 3    restrictions that could be placed on him that would assure
 4    it.  I think -- well, you heard the argument.  We all heard
 5    the argument with a couple other defendants about having
 6    video around their place so that nobody could sneak in --
 7    and he is -- he lives in a modest row house.  So it's not
 8    like an estate somewhere where there's multiple entries --
 9    areas to enter and exit.  But if he were not allowed to
10    access computers -- I don't know what he would do for, you
11    know, work if he can't do that, but I do think that because
12    it is something that happens routinely in the courts to --
13    especially for computer criminals -- that I don't see why --
14    again, I'm trying to make the scenario, what would the, you
15    know -- again, if he were going to, you know, kill a witness
16    or something -- if he had threatened a witness, it would be
17    clear -- simple what we're talking about.  Here, I don't
18    know what we're talking about there would be a danger of
19    that couldn't be cured by him -- they could deprive him of
20    access to the Internet, things like that.  I wish there was
21    some kind of easy halfway house or something that could
22    monitor people, but I -- other than him, you know, being
23    able to talk to other people and say, you know, We should
24    have a big nasty rally or something, it -- I mean, we have
25    to be able to come up with some way of saying -- of
```

 1    restricting that and satisfying the Court and the community

 2    that there must be some way to, you know -- to be confident

 3    that nothing is going to happen while waiting, you know, on

 4    trial other than the fact he's obviously, (inaudible) --

 5    hopefully meeting with his attorney and do a better job of,

 6    (inaudible) -- and, maybe, seeing some of these videos and

 7    things, but -- I mean, because even in jail, one could, you

 8    know, pass notes.  So again, I think it's -- the difference

 9    -- the delta between him being in -- at home is what we have

10    to consider.

11          So that's, you know -- so again, I feel like just

12    to address it further, I want to be able to show for this

13    purpose and certainly for trial what he did and didn't

14    actually say in context.

15          THE COURT:  Right.  Let me hear from the

16    Government.  We're going to circle back to that.

17          MR. MOSELEY:  Yes.

18          THE COURT:  I've heard you on that, Mr. Moseley.

19    I want to -- I mean, I think that and the other motion, I

20    certainly want to hear from the Government on, because it

21    seems to me, like you mentioned earlier, you don't have --

22    you feel like you don't have the ability to put those

23    statements in context.  I -- and really, what you said is, I

24    don't have -- the Government has given -- I don't know

25    whether it's you or prior counsel -- kind of, a roadmap of,

```
 1    Here's what the statement is; here's where that is, but you
 2    don't have the ability to do that.  It seems to me we need
 3    to get you that ability, for sure, and I don't think the
 4    Government's going to have any contrary position to that,
 5    you know?  Mr. Johnson does have an obligation to make sure
 6    he turns over to you everything he got and to make sure
 7    you're able to understand it and all the rest in connection
 8    with him turning the case over to you.  So I'm not going to
 9    cast blame right now, but the point is you need to get --
10    you need to have access to that.  I don't think the
11    Government's going to disagree with that.  So -- but that's
12    why it's not clear to me I have to order anything.  I think
13    we're all in agreement.  You -- it's very clear, right,
14    under the rules of discovery that one of the things you get
15    is evidence that reflects your client's statements, whether
16    they're laid out in an indictment or not, and I wouldn't
17    expect the Government to try to be playing hide the ball
18    and, frankly, given what you've just said, they're not doing
19    that.  So we should focus our efforts, it seems to me, to
20    make sure you get that.  But in any event, we'll -- I'll
21    circle back to that -- we'll circle back to that in a
22    minute.
23            Let me hear just on the question of detention or
24    reopening whoever -- I don't know, Mr. Jones, whether it
25    will be you or Mr. Kenerson -- whoever wants to address
```

```
 1    that.
 2            MR. JONES:  Yes, Your Honor.  Luke Jones for the
 3    Government.
 4            And just -- I can't see you.  I know everyone can
 5    see me.  I can hear you loud and clear.  But to the extent I
 6    miss any verbal [sic] cues, I apologize.  I'll be brief.  I
 7    don't know if we're going to lose Mr. Rehl in a few minutes.
 8    I know they typically book for an hour, but I'll jump in and
 9    --
10            THE COURT:  Well, Mr. Jones --
11            MR. JONES:  -- you can interrupt me --
12            THE COURT:  -- let me just -- let me interrupt
13    you.
14            Ms. Harris, do you know the answer to that
15    question?
16            THE DEPUTY CLERK:  Mr. Jones is correct.  They're
17    very strict about their hour in Philadelphia.
18            THE COURT:  All right.  Why don't I do -- why
19    don't I just, then, do this.  I was not aware that we were
20    time limited in that way.
21            Mr. Moseley, let me just -- before we lose -- let
22    me just -- because I'm --
23            Mr. Jones, I'll hear you, of course, as long as it
24    takes.
25            But, Mr. Moseley, how has your ability to -- how
```

1    has your ability been to hear from Mr. Rehl -- to be in

2    contact with him, given where he is right now?

3           MR. MOSELEY:  It's a long trip, but I've been able

4    to meet with him quite effectively in person as long as I

5    take that long trip.

6           THE COURT:  All right.  Well, you know, the long

7    trip is what it is, but I know there's -- the other

8    defendants and other defendants in the D.C. Jail have talked

9    about it being quite difficult to --

10          MR. MOSELEY:  Right.

11          THE COURT:  -- have contact with their clients

12   [sic] and to be able to describe certain -- and be able to

13   go through certain evidence.  It sounds like that is not an

14   issue, given the arrangement you have here; is that right?

15          MR. MOSELEY:  Right.  Yeah --

16          THE COURT:  All right.

17          MR. MOSELEY:  -- I feel --

18          THE COURT:  So that's --

19          MR. MOSELEY:  Yeah.

20          THE COURT:  That's good news.  I'm sure it's not

21   perfect and all the rest and I'll certainly follow up for

22   that, but while Mr. Rehl is here, I want to be clear about

23   that to make sure that that is not a separate issue.

24          And, again, before -- Mr. Moseley, if, after our

25   conference here today and before our conference tomorrow

1    that we won't have Mr. Rehl with us, you can be in contact

2    with him to be able to represent whatever his wishes are as

3    far as when we schedule things tomorrow going forward, I

4    think that would be helpful, and whether -- because, you

5    know, again, we -- I only have a limited amount of time with

6    him here and we're trying to work around that as best we

7    can.

8              All right.  Mr. Jones, why don't you proceed.

9              MR. JONES:  Yeah.  Thanks, Your Honor.

10             The bottom line is that the motion before the

11   Court is to reopen the detention hearing which was litigated

12   and resolved by Your Honor.  There's -- was nothing new and

13   material in Mr. Moseley's filing as we explained in our

14   opposition.  There's nothing new and material that's been

15   presented today.  Mr. Moseley's declined to file any reply

16   brief in response to our opposition.  The Court made a

17   considered judgment that Mr. Rehl should be detained pending

18   trial, and there's no legal basis or factual basis to

19   disturb that decision.  I'm happy to answer specific

20   questions.

21             With respect to arguments raised by Mr. Moseley, I

22   note that he raised the issue of prior counsel's

23   effectiveness which isn't something that we saw in the

24   briefing, but to that point, again, nothing presented by

25   Mr. Moseley in his filing or today is new with respect to

1    what Mr. Johnson would have provided -- or did provide

2    during that early litigation or that the Court wasn't able

3    to consider.  We've been down all of these roads before not

4    with -- not just with Mr. Rehl but with the other defendants

5    and there's simply no basis to retread that ground.

6              THE COURT:  What is the issue --

7              MR. JONES:  Mr. Moseley --

8              THE COURT:  Go ahead.  Go ahead, Mr. Jones.

9              MR. JONES:  No, I was going to say, Mr. Moseley's,

10   you know, identified a number of issues with access to

11   discovery and the, you know -- we've done our level best and

12   will continue to do so to provide him access to everything.

13   Most of the issues, frankly, have been unique to him.  I

14   recognize he's new counsel in this case, but we have

15   reproduced discovery and offered to continue reproducing

16   discovery.  We've communicated with Mr. Moseley about his

17   provision of hard drives on which we could produce

18   discovery.  We are awaiting those.  He's indicated that

19   he'll get us those soon, you know?

20             The bottom line on the discovery front is, you

21   know, our goal is to get to this May 18th trial date.  We,

22   you know -- we want that date to hold.  We want to produce

23   discovery in a manner that allows that date to hold.  So you

24   know, as to Mr. Moseley's requests for discovery materials

25   and other information, I, you know -- there's not materials

```
 1    that Mr. Moseley's requested, to my knowledge, that we're
 2    not -- we haven't produced or are willing to produce to him
 3    as, I think, Your Honor suggested earlier.
 4            THE COURT:  So Mr. Jones, just so I nail this
 5    down, so with regard to the statement -- I mean, as I see
 6    it, big picture, his motions raised two different issues --
 7    I mean, putting aside the bill of particulars, I suppose,
 8    but the motion for a subpoena and the motion to compel, one
 9    is about, sort of, statements of Mr. Rehl that, again, the
10    Government, I assume, doesn't contest that he's entitled to
11    those and doesn't contest that he's entitled to see the
12    context surrounding those.  So the Government is prepared to
13    work with him to make sure he has access to exactly what
14    he's requesting; is that fair?
15            MR. JONES:  Yes.  Absolutely, Your Honor.  And,
16    you know, with respect to statements on Parler, how
17    we've produced --
18            THE COURT:  Well --
19            MR. JONES:  -- all of the --
20            THE COURT:  Right.
21            MR. JONES:  -- all of --
22            THE COURT:  If you don't --
23            MR. JONES:  -- all that we have --
24            THE COURT:  If you don't have the -- if you don't
25    have them, then, obviously, you can't produce them to him.
```

1           MR. JONES:  Yes.  Short answer to your question,

2     Your Honor, is yes.

3           THE COURT:  All right.  Yes.  Obviously, to the

4     extent there are statements that exist out in the world that

5     the Government doesn't have evidence of and can't produce

6     discovery relating to, then it doesn't have an obligation to

7     do that, but okay.

8           And then the second issue, it seemed to me, was

9     the issue of, sort of, permitting -- I, frankly, don't know

10     that it's terribly relevant to either my detention decision

11     or ultimately the case.  But is that something you've

12     engaged with Mr. Moseley about?  Are there materials that

13     he's requested in that category that the Government concedes

14     are relevant and discoverable and have produced to him or

15     trying to figure out how to make sure he has access to?

16           MR. JONES:  Yes.  Putting aside relevance, we have

17     produced documents we've obtained from the U.S. Capitol

18     Police in response to Mr. Moseley's request.  We've provided

19     those and he has indicated in a filing and to us that that

20     discovery mooted his request --

21           MR. MOSELEY:  Yes, Your Honor --

22           THE COURT:  All right.  I just wanted to --

23           MR. JONES:  -- or his --

24           THE COURT:  I just wanted to --

25           MR. JONES:  -- motion, rather.

```
 1                    MR. MOSELEY:  Yes --

 2                    THE COURT:  Right.  I just wanted to confirm

 3          that --

 4                    MR. JONES:  Yes.

 5                    THE COURT:  -- for the record.

 6                    All right.  Anything further, then, Mr. Jones, on

 7          the motion for -- on the motion -- on the detention motion

 8          or the motion to reopen?

 9                    MR. JONES:  No, Your Honor.  Nothing further.  I

10          would just flag if -- I don't know if we've lost Mr. Rehl

11          yet or not, but to the extent --

12                    THE COURT:  I don't think so.  I can see him.

13                    MR. JONES:  Okay.  Just to the extent we go beyond

14          his presence, I want to make sure that we have a waiver, if

15          necessary, that we could continue, but fingers crossed that

16          he can stick around.  But nothing further on that motion.

17                    THE COURT:  All right.  Well, you know, frankly,

18          the only other thing -- the only other issues -- I mean, I

19          wanted to hit this issue of access between Mr. Rehl and his

20          counsel.  It sounds like that doesn't present some of the

21          issues for other defendants.  So that's good.

22                    The only other thing that I wanted to hear from

23          the parties on -- again, we're going to be back tomorrow --

24          is whether -- Mr. Rehl, whether you'll -- you and your

25          counsel will waive your presence tomorrow for the purposes
```

1    of simply having a status conference with the other

2    defendants.  Obviously, Mr. Rehl, I've heard now these

3    arguments about your motion -- I've heard the arguments on

4    your detention motion.  I'm going to consider those and

5    resolve that motion.  Not today, but soon.  Tomorrow, it --

6    just for scheduling purposes, we're having another status

7    conference that we'll have -- that I've invited your counsel

8    to and the -- all the other defendants and the other --

9    their lawyers, too, again, to, kind of, figure out where

10   we're going to go in terms of scheduling a next date in the

11   case.  I would have had you present, but your facility

12   doesn't allow -- only allows things today, and because we

13   had this detention motion that was only, kind of, pertinent

14   to you, I thought I would use this time to hear argument on

15   that.  Tomorrow, we've got, again, another -- I've got to

16   decide, kind of, where we go from here in terms of

17   scheduling a next date, but I can't do that -- I don't have

18   all the other lawyers here.  So trying to schedule a next

19   date would be difficult.  And the question is whether you

20   would consent to me having that -- us having that scheduling

21   conference with your lawyer present but not you -- because

22   of these -- because of the limitations with your -- with

23   where you are, whether you'll consent to us going forward

24   without your presence there.

25            MR. MOSELEY:  Your Honor, could I clarify?  So

```
 1    we've --

 2              THE COURT:  Sure.

 3              MR. MOSELEY:  -- tentatively set a trial date that

 4    we hope will stick, and you're going to set another status

 5    conference, and I think that -- so I'm not, you know -- it

 6    may be that -- I'm interpreting it might be that nothing

 7    changes or gets scheduled other than the next time we get

 8    together and --

 9              THE COURT:  I don't --

10              MR. MOSELEY:  -- maybe --

11              THE COURT:  Nothing --

12              MR. MOSELEY:  So --

13              THE COURT:  -- related -- I think that's right.  I

14    think that's exactly correct.  You can --

15              MR. MOSELEY:  Okay.

16              THE COURT:  You can continue, Mr. Moseley.

17    Continue.

18              MR. MOSELEY:  No, I just wanted to understand so

19    that when Zachary Rehl responds, he understands that

20    scheduling -- there might not be anything scheduled, but

21    there might be --

22              THE COURT:  Other than a next date.  I think

23    that's --

24              MR. MOSELEY:  Yes.

25              THE COURT:  -- correct.  The other thing I'll
```

38

 1    say -- I'll just put on the record right now, one of the

 2    reasons I've picked that trial date was simply because it

 3    was the first date under the protocols that this courthouse

 4    has currently in place for scheduling multi-defendant trials

 5    with COVID being -- for public health purposes, that was the

 6    first date I could schedule.  Now, it may be -- and I don't

 7    know -- it may be that the situation is going to improve and

 8    we might be able to schedule it sooner, and if we can, I

 9    will endeavor to do so, but that -- I'm not going to be able

10    to decide that tomorrow, but I do know that there's -- well,

11    let's put it this way.  If the -- if we are able to relax

12    the ability of -- the protocols that require now that

13    multi-defendant trials be held in our ceremonial courtroom

14    the entire trial -- if that is relaxed due to changes in the

15    public health situation, we may be able to have the trial

16    sooner.  I'm not going to be able to decide that tomorrow,

17    but I just wanted you both to know, if I can -- if we can

18    have the trial sooner, we will have the trial sooner, but

19    that's something that will be decided in the future.

20              So anyway, Mr. Rehl, yes, tomorrow, the only thing

21    that's going to be decided is when we have a next status.

22    So do you -- would you -- do you consent to us proceeding

23    with you -- well, your attorney, of course, present

24    tomorrow?

25              THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  All right.  Very well.  And it sounds

2     like it's a -- you're in a good spot in terms of being able

3     to have contact with him and that's -- I'm glad,

4     (inaudible.)

5          All right.  Is there anything else, then,

6     Mr. Jones, you think I need to address here today that we

7     can't, obviously -- in terms of scheduling?  Obviously, the

8     rest of it, we'll pick up tomorrow.

9          MR. JONES:  No, nothing further today, Your Honor.

10          THE COURT:  All right.

11          MR. MOSELEY:  Your Honor, we --

12          THE COURT:  Mr. Moseley --

13          MR. MOSELEY:  -- did have the motion --

14          THE COURT:  -- yes?

15          MR. MOSELEY:  -- for bill of particulars where I

16     believe that the Government has pretty much said -- even

17     though they say they don't have to -- that, you know -- the

18     six people, including Zachary Rehl, who they believe are the

19     subject of the aiding and abetting conspiracy.  And if --

20     I've asked -- if the Government is not certain of that;

21     willing to actually say, Yes, we're committing to that, I

22     hope that they will, at some point, be able to tell us

23     before trial, These are the people -- these are -- this is

24     the group that we have in mind.  And, again, they don't have

25     to tell us all their evidence, but my argument is that I

1    need to know who the class is even if they're not telling us

2    all of our [sic] evidence.  So at some point, I hope that

3    that can be pinned down.

4              THE COURT:  Well, I haven't heard you on that

5    motion.  And, obviously, I'm going to resolve that motion

6    well before trial.  So I hear you.  I'm not trying to --

7    what I really was trying to do is just triage --

8              MR. MOSELEY:  Okay.

9              THE COURT:  -- and get at the things, I think,

10   that are most important which -- at least, number one, which

11   is, sort of, the discovery issues and Mr. -- and the

12   detention issue, for sure.

13             MR. MOSELEY:  Yes.  Thank you, Your Honor.

14             THE COURT:  But, obviously, Mr. Moseley, I'm not

15   -- I didn't mean to suggest that your motion for the bill of

16   particulars won't be addressed at a future date.

17             MR. MOSELEY:  Okay.

18             THE COURT:  All right.  Very well.  I'm glad we

19   were able to have Mr. Rehl, then, with us for the entirety

20   of our hearing here today, and then I'll just simply dismiss

21   the parties until our status tomorrow.

22             MR. MOSELEY:  Thank you, Your Honor.

23             MR. JONES:  Thank you, Your Honor.

24             THE COURT:  Very well.

25             MR. KENERSON:  Thank you, Your Honor.

1          (Proceedings concluded at 11:10 a.m.)

2               * * * * * * * * * * * *

3           CERTIFICATE OF OFFICIAL COURT REPORTER

4       I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby

5    certify that the above and foregoing constitutes a true and

6    accurate transcript of my stenographic notes and is a full,

7    true and complete transcript of the proceedings to the best

8    of my ability, dated this 11th day of January 2022.

9       Please note:  This hearing occurred during the COVID-19

10   pandemic and is, therefore, subject to the technological

11   limitations of court reporting remotely.

12                              /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                                Official Court Reporter
13                              United States Courthouse
                                Room 6722
14                              333 Constitution Avenue, NW
                                Washington, DC 20001

15

16

17

18

19

20

21

22

23

24

25