## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA      \*

                       \*

         **vs.**            \*      **Case No. 21-cr-0175-3 (TJK)**

                       \*

**ZACHARY REHL**          \*

        **Defendant**        \*

                       \*

**ooOoo**

## ZACHARY REHL'S MOTION TO REOPEN
## DETENTION HEARING AND REQUEST FOR A HEARING

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."

The Bail Reform Act of 1984 authorizes one of those carefully limited exceptions by providing that the court "shall order" a defendant detained before trial if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). . . . Thus, a defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety.

*United States v. Munchel,* 991 F.3d 1273, 1279-80 (D.C. Cir. 2021), quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987).

In this case, Mr. Rehl's detention does not accord with due process. Mr. Rehl is a married family man, with extensive ties to the community, who honorably served his country in the Marine Corps and has no prior convictions for violent or serious conduct. On January 6, Mr. Rehl did not engage in any violence, did not destroy any property, did not battle law enforcement officers, did not remove barriers, did not possess any weapons and did not encourage or assist any one else to do any

of those things. Thus, neither his background nor his alleged criminal conduct "make[s] clear that he poses a concrete prospective threat to public safety" as *Munchel* requires. *See also United States v. Klein*, 533 F. Supp.3d 1 (D. D.C. 2021)( Bates, J.) (releasing defendant who engaged in actual violence based on defendant's history and characteristics and not finding a prospective risk).

The indictment and other records in this case show that Mr. Rehl

- did not force his way into the Capitol;

- did not tear down any fencing;

- did not steal or vandalize any property;

- did not toss water bottles at or battle law enforcement;

- did not physically harm any person;

- did not discuss a plan to attack the Capitol with any defendant;

- was not privy to any plan to attack the Capitol on January 6;

- entered the Capitol after the proceedings had been suspended and VP Pence had left the premises; and

- did not "call the shots" on January 6;

*See* Third Superseding Indictment ("TSI") (ECF 380 at ¶¶ 61, 65, 81, 86, 87, 93, 105); Donohoe Statement of Offense (ECF 336); other discovery as set out below.

In ruling on the initial motion by the government to detain Mr. Rehl, the Court determined that Mr. Rehl was a "lieutenant" rather than a leader (ECF 147 at ¶ 49); that he did not lay hands on anyone or fought with anyone, including law enforcement (¶ 50) and that he expressed surprise at how things turned out on January 6 (¶ 51). Nonetheless, the Court detained Mr. Rehl because it found that he played a leadership role in the events of January 6. Significantly for purposes of this

motion, however, recent information has come to light which refutes the government's allegation that Mr. Rehl's alleged leadership role in the Proud Boys' Ministry of Self-Defense ("MOSD") meets its burden to show that he presents a concrete prospective threat to public safety. The new information includes:

(a)     **Ministry of Self-Defense ("MOSD") Virtual Conference video.** The video shows that the MOSD was created to avoid the chaos and violence that had occurred after a rally on December 12, 2020 when several Proud Boys were stabbed and badly injured after a rally in DC. To accomplish that goal MOSD sought to impose more structure on national rallies, prohibit members from getting intoxicated during rallies and select members who would behave "properly." The video shows that no plan for a violent attack on the Capitol was discussed by the MOSD.

(b)     **Third party video.** The video shows Mr. Nordean, with Mr. Rehl present, stating that the Proud Boys "are not going inside" the Capitol. The statement was made in response to a woman who approached Nordean asking to enter the Capitol with his group.

(c)     **Various plea agreements and statements by persons present on the Capitol Grounds.** These documents show that Mr. Rehl was not involved in any plan to attack the Capitol and was not "calling the shots" on January 6.

(d)     **1776 Returns**. The 9-page document (TSI at ¶ 41) that was allegedly sent to Mr. Tarrio was not a plan to attack the Capitol and in any event, Tarrio did not share or discuss the document with Mr. Rehl or the other defendants.

### Seditious Conspiracy Charged in the Third Superseding Indictment

The TSI, which adds a charge of seditious conspiracy in violation of 18 U.S.C. § 2384 alleges no new facts against Mr. Rehl. Significantly, it does not include a single new fact alleging that Mr. Rehl used force on January 6, nor advocated it, nor agreed to put in motion the use of "force" for any reason, much less to oppose by force the authority of the United States or impede the execution of its laws, as would be required to prove a seditious conspiracy. Two new paragraphs are found in the TSI. One paragraph alleges just more rhetorical bluster, exchanged after-the-fact between Tarrio and

3

another person who is not charged in this case, neither of whom were in DC on January 6 (ECF 380 at ¶107).  The second new paragraph alleges that Mr. Tarrio posted a cartoonish image on social media.  *Id.* at ¶108. This information has been known to the government for months.

There clearly are less restrictive conditions that will reasonably assure the safety of the community.  For example, six of the 11 defendants in the Oath Keepers case, the only other case where seditious conspiracy charges are pending in the United States, are released pretrial.  *See United States v. Rhodes,* No. 22-cr-15 (APM).[1]  Unlike the instant case, the seditious conspiracy charges in *Rhodes* include allegations that some of the defendants including ones who are released pretrial brought AR-15s and other weapons to a location in Northern Virginia for what is alleged to have been a "Quick Reaction Force."  *Rhodes* Indictment at ¶ 4 ("Some coconspirators also amassed firearms on the outskirts of Washington, D.C., distributed them among "quick reaction force" ("QRF") teams, and planned to use the firearms in support of their plot to stop the lawful transfer of presidential power.").  Some of the released *Rhodes* defendants are also charged with obstruction for tampering with documents and other media on or after January 6.  *Id.*  (Counts 12-17, charging violations of 18  U.S.C. § 1512(c)(1)).

Of particular importance, in seeking to detain *Rhodes*, the government did not argue that the seditious conspiracy charge qualified as one of the enumerated offenses that authorizes detention under18  U.S.C. § 3142(f)(1).  *See Rhodes,* Gov Opp to Reconsideration of Detention (ECF 40 at 12-14).  A number of defendants in other January 6 cases, who are alleged to have engaged in violent or destructive conduct have also been released pretrial.  These cases provide ample evidence that Mr.

---

[1] Defendants James, Minuta, Hackett, Moerschel, Caldwell, Ulrich and Vallejo all have been released on personal recognizance under high intensity supervision.  *See Rhodes*, Minute Order, 5/7/22.

Rehl's pretrial detention is unwarranted.

For these reasons, Mr. Rehl respectfully moves to reopen his detention hearing pursuant to 18 U.S.C. § 3142(f)(2) on the basis that information not previously known to him or presented to the Court shows that Mr. Rehl did not function as a leader in any plan to attack the Capitol, rebutting the primary basis for the Court's decision to detain him. Mr. Rehl also seeks a new hearing based on flaws in the original hearing that affected the Court's determination. Mr. Rehl's detention has not previously been reviewed by the Court of Appeals as the Court's initial detention order was not appealed.

## FACTUAL BACKGROUND

Without any evidence that Mr. Rehl actually engaged in or promoted any violent conduct, the government has argued that Mr. Rehl presents a concrete prospective risk of danger on the basis of his alleged leadership role in the Proud Boys' Ministry of Self-Defense ("MOSD") and a handful of statements, which are nothing more than "rhetorical bravado" protected by the First Amendment.[2]

**I.** **Under the Facts in this Case, the First Amendment Prohibits Use of Mr. Rehl's Membership in the *Proud Boys* as a Basis for Detaining Him**

The *Proud Boys* is a lawful fraternal organization. Mr. Rehl has a right protected by the First Amendment to associate with other members of the *Proud Boys*, as a leader, a "trusted lieutenant" or otherwise.

> The First Amendment prohibits government from "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." This Court has "long understood as implicit in the

---

[2] "Rhetorical bravado" when measured against a defendant's lack of actual violence does not amount to an "identified and articulable threat to an individual or the community" as would support pretrial detention. *Munchel*, 991 F.3d at 1287.

> right to engage in activities protected by the First Amendment a corresponding right to associate with others." Protected association furthers "a wide variety of political, social, economic, educational, religious, and cultural ends," and "is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority." Government infringement of this freedom "can take a number of forms." We have held, for example, that the freedom of association may be violated where a group is required to take in members it does not want, where individuals are punished for their political affiliation, or where members of an organization are denied benefits based on the organization's message.

*Americans for Prosperity Foundation v. Bonta*, 141 S.Ct. 2373, 2382 (2021) (internal citations omitted).

Indeed, when activity that falls within the shadow of the First Amendment is alleged to be criminal, courts are required to apply the strictest standards of judgment in ensuring that only intentional criminal activity is prosecuted and not constitutionally protected actions, beliefs or associations. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 918-19 (1982) (boycott activity, which was not itself violent, that resulted in the loss of business profits was constitutionally protected); *Noto v. United States*, 367 U.S. 290, 297 (1961) ("Throughout our decisions there has recurred a distinction between the statement of an idea which may prompt its hearers to take unlawful action, and advocacy that such action be taken.")

*Noto*, which involved a prosecution under the Alien Registration Act (popularly known as the "Smith Act"), that made it illegal to advocate the violent overthrow of the government, and required non-citizens to register with the federal government is particularly pertinent to the allegations against Mr. Rehl in this case.  In reversing the conviction, the Court held that the strictest interpretation of the law must be applied when considering "offhand remarks" of hostility as evidence of criminal intent:

> [T]his element of the membership crime, like its others, must be
> judged *strictissimi juris*, for otherwise there is a danger that one in
> sympathy with the legitimate aims of such an organization, but not
> specifically intending to accomplish them by resort to violence, might
> be punished for his adherence to lawful and constitutionally protected
> purposes, because of other and unprotected purposes which he does
> not necessarily share.

*Noto*, 367 U.S. at 299-300.

When individuals associate together to advance a shared political objective, this activity is presumptively protected by the First Amendment to the United States Constitution even when others around them commit breaches of the peace. *See Texas v. Johnson,* 491 U.S. 397, 408-09 (1989) (a principal "function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger"). In reversing a conviction for flag-burning as "expressive conduct" protected by the First Amendment, the Supreme Court considered that the incident took place during a demonstration "to protest the policies of the Reagan administration" at as President Reagan was being re-nominated at the Republican National Convention held in Dallas in 1984. *Id.* at 399. Notably, the Supreme Court rejected the argument propounded by Texas that the breaches of the peace by other demonstrators nullified the flag burner's First Amendment rights. *Id.* at 408.

Similarly, in vacating the detention order in *Munchel*, the D.C. Circuit rejected the notion that statements made to the media or others in support of the events of January 6 indicated that defendants' posed "a clear danger" to society reasoning that the defendants' "actual conduct belied their rhetorical bravado."

> In evaluating the "nature and seriousness" of any danger, the district court highlighted statements that Munchel and Eisenhart made to the media on January 7. Munchel said that "[t]he point of getting inside the building is to show them that we can, and we will," *Munchel*, 521 F.Supp. 3d 54, 62 (D. D.C. 2021), while Eisenhart, invoking the American Revolution, said that she would "rather die and would rather fight" than "live under oppression," *Id.* at 64. To the district court, these statements indicated that the defendants pose "a clear danger to our republic" and that Eisenhart is a "would-be martyr." *Id.* at 62. But the defendants' actual conduct belied their rhetorical bravado. During the chaos of the Capitol riot, Munchel and Eisenhart had ample opportunity to fight, yet neither of them did. . . .

> Moreover, even if their comments indicate some willingness to engage in future protests or disruption, the Bail Reform Act permits detention only to prevent an "identified and articulable threat to an individual or the community."

*Munchel,* 991 F.3d at 1287.

Here there is no evidence that Mr Rehl resorted to violence under any standard of proof. There is certainly insufficient evidence to meet the *strictissimi juris* quantum of evidence necessary to turn his "offhand remarks" and "rhetorical bravado" into proof that he presents a concrete and prospective risk of danger. Mr. Rehl's membership in the Proud Boys or in the MOSD, whether in a leadership capacity or otherwise cannot therefore serve as the basis for detaining him pretrial. Indeed, if the strictest standard of evidence is required for a conviction when First Amenment activities are in play, it follows that the same strictest standard must be required before a person may be detained before conviction based on his associational activities.

## II.    Mr. Rehl Did Not Use Force or Agree with Anyone to Use Force

Notwithstanding the unprecedented charges and rhetorical flourishes found in the Third Superseding Indictment, discovery and public source materials show that Mr. Rehl did not use force or agree to use force on January 6. He did not possess or use any weapons, mace or other irritants.

He did not possess or use zip ties or other restraints.  He did not damage, loot, take away or vandalize any property.   He did not move barriers.  He did not throw things or battle with police. He did not physically injure anyone.  And he did not direct or help anyone to do any of those things.

In contrast to what is alleged against other January 6 defendants, Mr. Rehl did not "forcibly" enter or "force" his way into the Capitol.  TSI at ¶ 104 (Rehl allegedly "entered the Capitol at approximately 2:53 p.m.").  Twenty to thirty minutes after the other defendants had entered the Capitol, Mr. Rehl is alleged to have entered through an open door at the same time as hundreds of other persons.[3]  None of the hundreds of other persons shown entering through the same door, have been charged with seditious conspiracy; most have only been charged with misdemeanor offenses. *See* Video, 0102 USCS 01 Senate Wing Door near S139-2021-01-06_14h47min00s000ms.  While inside the Capitol, Mr.  Rehl is not alleged to have met up with the other defendants.

### A.   Mr.  Rehl's Conduct Does Not Support a Finding that He Intended To Disrupt the Congress

At the time that Mr. Rehl is alleged to have entered, the proceedings had already been suspended by both Houses.  Vice President Pence had reportedly already left the premises.[4]  While in the Capitol, Mr.  Rehl did not battle police, throw things, or damage property. In a recent bench trial, Judge McFadden held that such conduct does not support a finding that a defendant acted with the intent to impede or disrupt the orderly conduct of government business.  *See, e.g., United States*

---

[3]  Pezzola entered at 2:13 pm (ECF 380, ¶ 94); Biggs at 2:14 pm (¶95); Nordean at 2:37 pm (¶ 98).

[4]  These facts come from the recent guilty plea in *United States v. Finley*, 21-cr-00526, Statement of Offense (ECF 38, 4/6/22), who is alleged to have entered the Capitol with Mr.  Rehl.  At approximately 2:20 p.m. all the proceedings in Congress had been suspended.  *Id*. at ¶ 6; *see also Finley* Complaint (ECF 1-1) at 3 ("A voice can be heard saying, "I heard Pence got evacuated.").

*v. Griffin,* 21-cr-92.[5]

### B.    Mr. Rehl Did Not "Call the Shots"

Mr. Rehl was "not calling the shots" on January 6. Bates #176-PH-3422014; *see also* Donohoe Statement of Offense (ECF 336, ¶¶ 28-30, 34-35). Significantly, four other defendants who are alleged to have entered the Capitol with Mr. Rehl have only been charged with misdemeanor offenses and been released pretrial. One of these defendants traveled to DC with Mr. Rehl, stayed at the same hotel as Mr. Rehl and marched with Mr. Rehl and other Proud Boys on January 6. He has told the government that on January 6, Mr. Rehl was "not calling the shots." He identified another person as being the leader and said that other person "made the calls."[6]

Of entering the Capitol, this defendant stated that

> After the initial breach, [defendant] was with Zach [and two others]. [They] wanted to "go in and take a peek" and that they made the decision to enter the Capitol Building as a group. [Defendant] was curious as to what was going on inside the Capitol Building. . . . They left the building as a group."

*Id.*

### C.    Others Involved in Similar Conduct Have Been Released Pretrial

Another one of the persons who is alleged to have entered the Capitol with Mr. Rehl, Jeffery Finley, pleaded guilty on April 22, 2022. Like Mr. Rehl, Finley is the president of a chapter of the Proud Boys. Finley is shown in various videos and photographs filed by the government marching with the Proud Boys and at times standing next to Mr. Rehl.[7] By his own admission, on January 6,

---

[5]  Oral Judgment, Transcript of Bench Trial held on March 21-22, 2022 (ECF 106) at 335-338.

[6]  These statements are from a voluntary proffer made to FBI special agents. (176-PH-3422014).

[7]  *Finley*, 21-cr-00526, Information (ECF 25); Statement of Offense (ECF 38 at ¶¶ 7-23).

Finley marched with the Proud Boys from the start and participated and posted on the *Boots on the Ground* telegram chat.  *Id.* (ECF 38) *at* ¶ 8. Finley watched as the barricades were torn down; after the crowd overran law enforcement, he followed the crowd onto the west terrace of the Capitol; and also invited other members of his chapter to join him at the Capitol.[8]  During these events, Finley posed for a photograph with Mr. Rehl and three other Philadelphia Proud Boys "on the Upper West Terrace of the U.S. Capitol during the breach."[9]

After entering the Capitol and observing barricades torn down and the crowd overrunning law enforcement, Finley posted a video message, which among other things celebrated the events of the day and congratulated Mr.  Rehl ("Yo, [Zach Rehl], proud of your (sic) fucking boy").  *Finley* (ECF 38) at ¶ 23.  Finley deleted social media posts and photographs of himself and other Proud Boys at the Capitol and directed members of his chapter to do the same.[10]  *Id*.  Despite almost identical conduct by Finley and notwithstanding the allegations that Finley obstructed justice by deleting and directing members of his chapter to delete posts, the government did not consider Finley a risk of danger and did not seek his detention pretrial.  *See Finley,* Initial Appearance, 3/29/21.

---

[8]  "While standing on the upper west terrace of the Capitol, Finley exchanged at least one message with a member of his chapter in which Finley advised the member to join him at the Capitol."  (ECF 38 at ¶ 18); *see also* Finley Complaint (ECF 1-1).

[9]  Complaint, Case No. 21-mj-00689 (ECF 1-1 at 8).

[10]  "Following the events at the Capitol on January 6, 2021, Finley took measures to obstruct the government's investigation into criminal conduct at the Capitol. Among other things, Finley deleted his social media accounts and deleted photos and videos of himself and other Proud Boys at the Capitol. Finley also directed members of his chapter to delete their photographs and advised the presidents of other Proud Boys chapters of his actions, writing in an encrypted message, "Deleted all photos I may have had, advised my boys to as well. No talks about dc on telegram whatsoever and gathering #s as we speak." *Finley* (ECF 38) at ¶ 24.

11

In detaining Mr. Rehl, this court considered various factors to "differentiate the severity of the conduct for many of the Capitol breach defendants."  Court's Opinion (ECF 147) at 48.  At the time, it did not have before it Mr. Finley's case, whose conduct cannot be differentiated in any material fashion from that alleged against Mr. Rehl to warrant such radically different treatment, including Mr. Rehl's lengthy period of pretrial detention. While Finley was not a member of the MOSD, that is not a material distinction as the recently produced MOSD video shows that Mr. Rehl did not plan an attack on the Capitol while a member of the MOSD.  Thousands of text messages, and Mr. Rehl's nonviolent conduct on January 6 also show that no material distinction exists between Finley and Mr. Rehl.

## III.   New Information About the MOSD Refutes Argument that Mr. Rehl Had a Leadership Role in Planning an Attack on the Capitol

### A.   MOSD Was Created to Prevent Violence Not Promote It

The Ministry of Self Defense ("MOSD") is at the heart of the government's argument that Mr. Rehl held a leadership role in a conspiracy to attack the Capitol, which persuaded the Court to order the pretrial detention of Mr. Rehl.[11]  The foundational meeting of the MOSD was held virtually on December 30, 2020.  A video of that meeting refutes the notion that the MOSD was formed to plan a violent attack on the Capitol and that as a member of the MOSD, Mr. Rehl conspired to plan such an attack.[12]  Nothing in that video, which lasted 1 hour and 38 minutes supports that claim.

The video clearly shows that the MOSD was created to avoid the chaos and violence that had occurred on December 12, 2020, when several Proud Boys were stabbed and badly injured after a

---

[11]  *See* Court's Oral Opinion (ECF 147) at 38-42; Gov Reply in Support of its Motion for Revocation of Release Order and for Pretrial Detention (ECF 91, 5/24/21) at 1-2.

[12]  *See* Third Superseding Indictment ("TSI") at ¶ 42.

rally held in DC.[13]  (While Mr. Rehl participated in the rally on December 12, he was not involved in the post-rally fight when several Proud Boys were stabbed).

At the start of the MOSD virtual meeting, co-defendant Donohoe states:

> Basically this specific chapter is going to have a code of conduct stricter than other chapters when it comes to these national public events.  For one, the biggest one is no intoxication. . . .We're bringing in guys that we . . . expect . . . to behave properly and be a good molding cement for this chapter.[14]

Following Donohoe's statement, Mr. Tarrio was even more clear that the purpose of the MOSD was to prevent a repeat of the drinking and chaos that had resulted in injuries weeks earlier:

> MR. TARRIO:  Okay, so let me, I'm going to break those down a little bit. So number one, OPSEC, obviously as you guys know, like don't fuckin' share screen shots. That's pretty fuckin' basic. I don't have to go over that.
>
> As far as, like people know that this exists, so the statement is we need a way to do rallies better.  We fucked up on the 12th. I'm not going to say that we fucked up royally because a lot of good things happened on the 12th, right, except whatever, Jeremy [who had been stabbed on 12/12] is in here.  Fuck that dude.  But there is, there is things that we need to fix. And it wasn't because of the 12th. It's because moving forward, we can't continue to have that issue.  It will bury the entire club if one huge incident happens and we're at fault. I saw a lot of people going on the  offense. We're not used to going on the offense. That's why it's called self-defense. Self-defense should always come first. You should always defend yourself. We shouldn't put ourselves in harm's way, right? We've been known to defend people. I get it, right, but it doesn't mean that we have to go out and look for it.  Touching on the subject, what was the second thing, Yut?[15]

---

[13]  "While in Washington, D.C. on December 12, 2020, several Proud Boys were involved in an altercation in which Proud Boys members were injured, including a knife wound suffered by PERSON-1."  TSI at ¶ 16.

[14]  MOSD Zoom (Tr. at 7-8).

[15]  Defendant Donohoe is sometimes referred to by his nickname "Yut."

. . .

Yeah, the no intoxication thing, it just, it just applies to the rallies, right? You guys can get as trashed as you want after the rally or before the rally, not right before the rally, but don't get trashed. I saw a lot of people fuckin' drinking, a lot of people fuckin' fighting. Okay, I had to fuckin' slap somebody at that fuckin' event because they were trying to push the entire crowd in one direction and I'm trying to fuckin' push the crowd in another direction.

Now that goes with the whole thing. I don't want this – this isn't a foke (phonetic) thing. This isn't a fuckin', a thing where it's going to be a fuckin' super militant fuckin' thing, but we do need to organize better and in order to do that, we need to have a top down structure, right.[16]

. . .

Throughout the meeting, the MOSD leaders focused on ways to make sure that rally members would behave properly and avoid violence. There is zero discussion about a violent attack on the Capitol. Indeed, Mr. Tarrio reiterates the Proud Boys' history of working with, not against, law enforcement: "we're never going to be the ones to cross the police barrier or cross something in order to get to somebody."

MR. TARRIO:  Yeah, I mean every situation calls for something different, you know.  Like we're – I think on the verbal sense and the media sense, me and Biggs has got in on lock, where we know exactly what we're going to say that will piss off the media. And you can translate that to on the grounds.  Now I'm not saying, now I'm not saying to go ahead and fuckin' talk shit. Go ahead and talk shit, as long as it, you know, keep it fuckin' professional. ***But we're never going to be the ones to cross the police barrier or cross something in order to get to somebody***. We're always going to be the ones standing back, right, and we're always going to be the ones to fuckin' defend.

And we've been really good at it. We've been – let's be honest. We've been really good at that.  But what I saw on Saturday was like a fuckin' pool of fuckin' unchained pit bulls, just running into every

---

[16]  MOSD Zoom (Tr. at 9-11).

situation, right. If we don't run into the situation and we just chill, we'll be there. We're – dude, there was enough of us to take – listen, there was enough of us to fuckin' go ahead and do whatever we wanted to do in DC. Nobody was going to be able to stop it.[17]

Others expressed the same sense of trying to avoid chaos and violence:

MR. BERTINO: But yeah, touching on what you were saying, what I noticed was just everyone was like hyper on edge at that last rally. And you know, ***what we're trying to avoid by doing this is like that cowboy shit, where people are running off***, you know. Like when we were leaving the Freedom Plaza, I saw the dudes in the fuckin' skirts running off fuckin' down – we had to fuckin' chase them down. It breaks us up, and that's what we're trying to avoid with what we're doing here.[18]

They discussed using protective gear to defend themselves from attacks by counter demonstrators wielding knives. It was not a strategy for protecting themselves from law enforcement. They wanted to avoid more stabbings. Police do not use knives; stabbing cannot refer to them.

MR. REHL: Anybody who is in the chat and everything, like if anybody has any – a link to like proper equipment that would be actually effective, maybe **a stab-proof** vest or something and it's not overly expensive, like. Not all of us are rich. So you know, we're not, basically if you can find maybe something that is not $800 that would prevent, you know, being ***stabbed***.[19]

Bertino, who had been stabbed after the December rally also weighed in:

MR. BERTINO: Well, listen, even if you can't, man, get some fuckin', pull like a fuckin' Omar from The Wire and fuckin' duct tape goddamn phone books around your fuckin' – around yourself. Trust me, you don't want to get stabbed. If you've never been stabbed, you

---

[17]   *Id.* at 33-34 (emphasis added).

[18]   *Id.* at 35-36 (emphasis added).

[19]   *Id.* at 62-63 (emphasis added).

don't want to get stabbed. So whatever the fuck you can do to prevent that, do it. I don't give a shit if it costs fuckin' 13 cents or 1300. Do whatever you got to do to protect your fuckin' body.[20]

In sum, the MOSD video refutes the government arguments that Mr. Rehl's membership in the MOSD proves that he played a leadership role in any conspiracy to attack the Capitol or that he aided and abetted others' use of force. The MOSD sought to prevent violence, not promote it. Beyond that, there is zero evidence that Mr. Rehl had any knowledge of any other plan to attack the Capitol or to use force to do so.

As the Court found, Mr. Rehl expressed "surprise at exactly how January 6th transpired." (ECF 147 at 51). He also expressed a lack of knowledge that any Proud Boys had been involved in breaking windows. As he personally did not use force and did not know of any plan to use force, he cannot be held responsible for such conduct. *See Rosemond v. United States*, 572 U.S. 65 (2014) (defendant must have advance knowledge of an accomplice's plan to be liable as an aider and abettor).

> An active participant in a drug transaction has the intent needed to aid and abet a § 924(c) violation when he knows that one of his confederates will carry a gun. In such a case, the accomplice has decided to join in the criminal venture, and share in its benefits, with full awareness of its scope – that the plan calls not just for a drug sale, but for an armed one. In so doing, he has chosen (like the abettors in Pereira and Bozza or the driver in an armed robbery) to align himself with the illegal scheme in its entirety – including its use of a firearm. And he has determined (again like those other abettors) to do what he can to "make [that scheme] succeed." He thus becomes responsible, in the typical way of aiders and abettors, for the conduct of others. He may not have brought the gun to the drug deal himself, but because he took part in that deal knowing a confederate would do so, he intended the commission of a § 924(c) offense – *i.e.*, an armed drug sale.

---

[20] *Id.* at 64.

> For all that to be true, though, the § 924(c) defendant's knowledge of a firearm must be advance knowledge – or otherwise said, knowledge that enables him to make the relevant legal (and indeed, moral) choice. When an accomplice knows beforehand of a confederate's design to carry a gun, he can attempt to alter that plan or, if unsuccessful, withdraw from the enterprise; it is deciding instead to go ahead with his role in the venture that shows his intent to aid an armed offense. But when an accomplice knows nothing of a gun until it appears at the scene, he may already have completed his acts of assistance; or even if not, he may at that late point have no realistic opportunity to quit the crime. And when that is so, the defendant has not shown the requisite intent to assist a crime involving a gun. As even the Government concedes, an unarmed accomplice cannot aid and abet a § 924(c) violation unless he has "foreknowledge that his confederate will commit the offense with a firearm." Brief for United States 38; see also infra, at 1250 – 1252. For the reasons just given, we think that means knowledge at a time the accomplice can do something with it– most notably, opt to walk away.

*Rosemond*, 572 U.S. at 77- 78.

### B.   Other Information Contradicts Allegations of a Plan to Attack

In addition to expressing surprise, Mr. Rehl did not know Pezzola, who apparently had only recently joined the Proud Boys. Telegram messages show that Mr. Rehl was not aware of any actions allegedly taken by Pezzola on that day. He also was not aware that Donohoe had thrown water bottles at law enforcement officers. Indeed, Donohoe himself has told the government that his bottle throwing was not part of any plan to attack the Capitol or interfere with law enforcement. Rather, it was an impulsive act:



17



███████████████████████████████████████ at 5 (176-CE-3401971)[redacted per "highly sensitive" designation]

Matters considered by the Court under seal also refute the allegation that the Proud Boys and the MOSD planned a violent attack on the Capitol.

█████' August 11, 2021 interview at 26-27 [redacted].

**C.    Mr. Rehl Did Not Plan And Was Not Aware of Any Plan to Attack the Capitol**

**1.    No Plan to Attack the Capitol Was Discussed on Telegram**

In addition to the MOSD video, despite the allegations in the TSI alleging that from December 2020 through January 2021, Mr. Rehl conspired with others to "oppose by force" and "corruptly obstruct" the Congress (¶¶ 26, 110), not a single text message or social media posting by Mr. Rehl indicates that he was aware of such a plan, that he joined a conspiracy during those dates for those purposes, that he traveled to the District of Columbia to carry out such a plan, or that he aided and abetted any person in any such plan. The Boots-on-the-Ground chat, created on January 5, 2021, consists of 1,494 pages, with multiple messages on each page.[21] Thousands of other text messages were also recovered from Mr. Rehl and the other defendants. Yet, the government has failed to cite to the Court a single text from the MOSD, the "New-MOSD," Boots-on-the-Ground or any other telegram group that describes a plan to use force or attack the Capitol on January 6 by Mr. Rehl or where he joins or promotes such a plan.

Notably, while the government has obtained **thousands of pages** of telegram text messages and social media posts from the defendants, it has only presented a handful of statements consisting of "rhetorical bravado" – protected by the First Amendment. Under *Munchel,* Mr. Rehl's non-violent conduct on January 6 belies any claim that rhetorical bravado before or after January 6 supports a conclusion that he presents a risk of danger.

---

[21]    The chat is Bates stamped "USAO_NORDEAN (21-CR-175)_00000001 through USAO_NORDEAN (21-CR-175)_00001494

### 2. The Plan Was to Meet at the Washington Monument

Donohoe, a key and active participant in the MOSD, created and administered the Telegram

applications for MOSD leadership. (ECF 336 at ¶¶19-20). Yet, as of 9:21 pm on January 5, Donohoe

did not know the "plan" for January 6:  (Bates #21CR175_00006715)(messages show UTC time):



After a series of back and forth messages (Bates #21CR175_00006718), the only "plan" that

was passed on to the MOSD was to meet at the Washington Monument at 10 am:



That was the only plan communicated to the MOSD, to Boots-on-the-Ground and to Mr. Rehl. *See also* TSI at ¶¶ 63-65; Donohoe Plea (ECF 336 at ¶¶ 22-24). Note also that Mr. Rehl's understanding of the plan was, as discussed in the 12/30 MOSD meeting, to break off into smaller teams. Mr. Rehl was not with Biggs and Nordean on the evening of January 5 and Tarrio was not in DC.[22] Mr. Rehl did not speak with Tarrio by phone on January 5 or January 6. *Compare* TSI at ¶¶ 63, 105. Thus, any communications between Mr. Rehl and Biggs, Nordean, or Tarrio on January 5, would have been on telegram. No message exists where they discuss a plan to attack the Capitol.

Donohoe and Finley, who have pleaded guilty pursuant to cooperation agreements have stated that the only plan they were aware of was to meet at 10 am. No one and no message relates that Mr. Rehl was aware of any plan to attack the Capitol. *See, e.g.,* Donohoe Statement of Offense (ECF 336, ¶22-23); *Finley* Statement of Offense, 21-cr-00526 (ECF 38); telegram messages. Both Donohoe and Finley were with Mr. Rehl on January 6 and participated in the Boots-on-the-Ground telegram chat and thus were in a position to know what Mr. Rehl knew.

### 3.      Radios and Travel Expenses Are Red Herrings

The other allegations that the government has propounded are red herrings that  do not provide the requisite clear and convincing evidence to detain Mr. Rehl pretrial. First, possession of radios is not illegal. Second, there is no allegation in Mr. Donohoe's FBI proffer or his guilty plea that Mr. Rehl or the others used the radios to facilitate an attack on the Capitol. Third, photographs of Mr. Rehl shortly before he is alleged to have entered the Capitol show that he did not have a radio at that point. Fourth, undersigned counsel is prepared to submit to the Court copies of receipts that

---

[22]  Mr. Rehl and three Philadelphia Proud Boys traveled together to DC and stayed in two adjoining rooms in the same hotel on January 5. On their way to DC, they bought beer in Delaware (where the taxes are lower) and drank beer in their hotel rooms that night.

show that Mr. Rehl had purchased the radios in November 2020 for use at the December 2020 rally in DC and that the *Proud Boys* use radios at their rallies, as to which no criminal charges have been brought. Morever, bringing a couple of radios to a rally cannot possibly provide clear and convincing evidence that Mr. Rehl poses a concrete prospective threat to society. For example, if necessary, the Court could impose as a condition of pretrial release that he not attend any rallies or that if he does, he not bring radios to any rallies. The allegation that Mr. Rehl solicited a few thousand dollars to cover travel expenses to DC is perfectly legal activity and again does not meet the Government's heavy burden.

### D.    Video Shows that There Was No Plan to Enter the Capitol

On January 6, a person who has pleaded guilty to a misdemeanor offense taped a conversation she had with Mr. Nordean, whom she recognized as a Proud Boy. In pertinent part, the following exchange takes place (emphasis added):

> Woman: Are we going inside, I want to go inside. . .
> Nordean: *No we are not going inside*.
> . . .
> Woman: Tell us what you are up to, I want to record you.
> Nordean: We are out here representing America, that is basically it.

Mr. Rehl is seen in the video, agreeing with Mr. Nordean. The video will be filed separately with the Court; the government already has a copy.[23]

### E.    Mr. Rehl Was Not Aware of A Plan to Occupy Congressional Office Buildings Referenced in *1776 Returns*

---

[23]   The video was recently provided to one of the defense counsel by a third party and has been referenced in Nordean's Brady motion and related filings. A longer version of the video was produced in a discovery dump on May 12, 2022. *See* Rehl Reply re Motion to Compel Notice of Case-in-Chief discovery (ECF 364) (production of 4-TB hard drive and additional global discovery); Gov' Response to Nordean Brady Motion (ECF 374) (attaching 9-page index of discovery).

Mr. Rehl had no knowledge of the document titled *1776 Returns,* which is referenced in the"Background" and "Acts in Furtherance of the Conspiracy" (TSI at ¶ ¶14, 41) and incorporated by reference into the various counts of the TSI. Moreover, *1776 Returns* is not a plan to attack the Capitol and does not even mention the Capitol. It refers to occupying Congressional office buildings.

The document was never shared or otherwise discussed with Mr. Rehl. *1776 Returns* was sent to Mr. Tarrio by a female acquaintance. Mr. Rehl does not know the woman who sent the document and has not had any conversations with her. The government has represented that Tarrio did not forward the document to Mr. Rehl or the other defendants. And that Tarrio did not discuss the document or its contents with Mr. Rehl and the other defendants.

Moreover, a proposal to occupy office building is a time-tested protest activity. Activists occupied buildings during the 1960s while protesting racial discrimination and against the Vietnam War. There is no indication that the government has ever charged any protestors who have actually occupied buildings with the felony conspiracies charged in the instant case. There certainly is no evidence that a plan to occupy office buildings has been used to support a charge of seditious conspiracy against a person who did not use any force or violence. Much less has any person, like Mr. Rehl who was not even aware that Mr. Tarrio had received such a proposal been charged with seditious conspiracy on that basis.

The Department of Justice has not charged any of the protesters who occupied Senate office buildings or otherwise entered the Capitol and disrupted the confirmation hearings of Justice Kavanaugh with any federal charges, much less with seditious conspiracy.

Nearly 300 protesters were arrested at a US Senate building on Thursday afternoon as crowds of activists descended on Capitol Hill while lawmakers reviewed the FBI's report on the allegations against Supreme Court nominee Brett Kavanaugh.

Protesters gathered in the Hart Senate Building atrium after US Capitol Police barricaded the front of the Capitol.

In a statement, US Capitol Police communications director Eva Malecki said that at about 3:30 p.m., 293 people were arrested for unlawfully demonstrating.



Video Ad Feedback

.

24

"More than 300 protesters arrested as Kavanaugh demonstrations pack Capitol Hill."[24]

Thus, if DOJ has now determined that contemplating using tactics such as occupying Senate Office buildings to influence and impede Congress is an element of a seditious or obstruction conspiracy, notwithstanding that such a plan was not communicated to Mr. Rehl, DOJ should be reminded that the statute of limitations has not run on the Kavanaugh demonstrations. The anti-Kavanaugh demonstrators went beyond contemplating such protest activities to to actually occupying Senate office buildings, believing strongly in their cause and their right as Americans under the First Amendment to make their voices heard, loudly and forcefully. Yet, none of them have been charged with seditious conspiracy or any other felony on that basis.

In stark contrast to the charges brought against Mr. Rehl, the many protestors who attacked law enforcement and damaged the federal courthouse and other federal buildings in Portland Oregon in 2020, have not been charged with seditious conspiracy and most of the original charges have been dropped or pled down to misdemeanors. *See* DOJ Press Release "18 Arrested, Facing Federal Charges After Weeknight Protests at Federal Courthouse in Portland" at https://tinyurl.com/4wt3udev.

> According to court documents, since May 26, 2020, protests in downtown Portland have been followed by nightly criminal activity including assaults on law enforcement officers, destruction of property, looting, arson, and vandalism. The Hatfield Federal Courthouse has been a nightly target of vandalism during evening protests and riots, sustaining extensive damage.
> . . .
> **All 18 defendants have made their first appearances in federal court and were ordered released pending jury trials or other follow-up court proceedings**.

---

[24] https://www.cnn.com/2018/10/04/politics/kavanaugh-protests-us-capitol/index.html

*Id.* (emphasis added).

The below images, included in the DOJ press release show the depradation of property caused by the Portland protesters. *Id.* Yet the 18 defendants who were charged with this criminal activity were released pretrial. *Id.*



Water bottles used as projectiles piled near entrance to Hatfield Federal Courthouse

The First Amendment and the Due Process clause prohibit such content-based disparate treatment of Mr. Rehl who did not attack any person, destroy any property nor plan any such activity.

### F.    Government Did Not Present Favorable Evidence to the Grand Jury

In weighing the evidence Mr. Rehl has submitted in this Motion against the fact of an indictment, the Court should take into account that the evidence the government appears to have presented to the Grand Jury about the MOSD omitted key material evidence.  Note for example, that the TSI quotes from the MOSD video/conference (¶ 42) but omits the statements made by Mr. Rehl, Mr. Tarrio and others explaining their purpose in forming the MOSD was to prevent intoxicated Proud Boys from behaving poorly, to prevent them from going on "the offense," and to prevent anyone from getting hurt.  Indeed, the purpose of creating a hierarchical structure was not an end in itself.  It was a method to bring order to the rallies to avoid chaos and possible violence.  It also appears that the other information set out above in section III was not presented to the Grand Jury.

While the government may not have an obligation to present all the evidence to the Grand Jury, it also cannot use its decision not to present favorable evidence as a sword.  Having chosen to keep such material evidence from both the Grand Jury and this Court at the earlier detention hearing,[25] the government should not now be allowed to shield itself from this evidence by hiding behind the indictment returned by a Grand Jury that was not presented with all the facts.

---

[25]  See Government's Reply in Support of its Motion for Revocation of Release Order and for Pretrial Detention (ECF 91) at 2, which includes a quote from the Dec 30 MOSD video conference about the leadership structure for the MOSD.  Neither the memoranda submitted to the Court by the government nor the Indictment (which is drafted by the government and submitted to the grand jury for its vote) contains any reference to the quotes noted above about Mr.  Tarrio's and the MOSD reason for imposing a leadership structure was to allow the Proud Boys to hold peaceful rallies that did not devolve drunken chaos.

## ARGUMENT

**I.      The Earlier Detention Hearing Was Flawed.**

### A.      Findings Made During the Biggs and Nordean  Detention Hearings

In detaining Mr. Rehl, the Court stated that it would "refer back to, and incorporate here, the facts that I set forth in my prior ruling on April 19th , 2021, ordering Defendants Nordean and Biggs detained pretrial."  Mr. Rehl was not present at the Nordean and Biggs detention hearings and therefore did not have an opportunity to be heard.  To use the findings of their hearing against Mr. Rehl violates his rights under the Bail Reform Act as well as his rights to the assistance of counsel and to the due process of law.  18  U.S.C. § 3142(f); *United States v. Salerno,* 481 U.S. 739, 751-52 (1987) (Bail Reform Act complies with due process of law in part because the "procedures by which a judicial officer evaluates the likelihood of future dangerousness are specifically designed to further the accuracy of that determination")[26]; *United States v. Wind*, 527 F.2d 672, 676 (6th Cir. 1975) (exclusion of defendant and his counsel from an in camera proceeding deprived defendant of his right to hearing on bail and his right to counsel at detention hearing).  Accordingly, Mr.  Rehl objects to the Court's incorporation of facts as to which he had no opportunity to be heard.

---

[26] "Detainees have a right to counsel at the detention hearing. 18 U.S.C. § 3142(f). They may testify in their own behalf, present information by proffer or otherwise, and cross-examine witnesses who appear at the hearing. Ibid. The judicial officer charged with the responsibility of determining the appropriateness of detention is guided by statutorily enumerated factors, which include the nature and the circumstances of the charges, the weight of the evidence, the history and characteristics of the putative offender, and the danger to the community. § 3142(g). The Government must prove its case by clear and convincing evidence. § 3142(f)."

### B.     Government Proffer Not Adequate in This Case

Mr.  Rehl respectfully requests that the Court require the government to produce evidence in support of its dangerousness argument with live testimony, not by proffer of government counsel. Particularly, in light of the discrepancies that have arisen between the allegations regarding the MOSD and any alleged plan to attack the Capitol and the actual facts, proceeding by proffer is not adequate in this case. *See, e.g., United States v. Hammond*, 44 F. Supp. 2d 743, 745 (D. Md.1999)(" The Bail Reform Act, 18 U.S.C. § 3141 et seq., does not expressly authorize the government to proceed by proffer at detention hearings. Such authority is granted to defendants. 18 U.S.C. § 3142(f)").

> In short, the case law supporting detention upon government proffers in no way requires a judicial officer to accept or accredit proffered evidence, nor does that case law assume that proffers in lieu of live testimony are appropriate in every case.  The case law certainly does not limit, and in fact supports, the discretion of the reviewing judicial officer to require the presentation of evidence. Of necessity, the propriety of a proffer as a basis for detention must be assessed on a case-by-case basis.  When the government is able to proffer evidence that reflects ample and substantial corroboration for its contention that a defendant has committed an offense and is dangerous or a flight risk, efficiency and the need to conserve scarce judicial resources justify accepting that proffer in lieu of live testimony; and such proffers that are reflective of weighty and broad evidence of guilt, when considered with other information such as criminal history and lack of ties to the community, can be entirely proper bases for orders of detention.

*Hammond*, 44 F.Supp.2d at 746.

In a case such as this, where Mr. Rehl's history and characteristics do not support detention and the government's proffer regarding his alleged participation in a plan to attack the Capitol is in such dispute, "the Court should consider the proffer with great care and accord it limited weight. Before entering any order of detention in such a case, the judicial officer should require the government to present live testimony able to withstand confrontation, long- and well-recognized as

the "greatest legal engine ever invented for the discovery of truth." *Id.* (citations omitted). As a matter of practice in this district, detention hearings often involve testimony by law enforcement officers, where defense counsel are able to cross-examine the witness, and not merely a presentation and argument by prosecutors.

## II.   The Government Has Failed to Meet Its Heavy Burden to Show by Clear and Convincing Evidence that Mr. Rehl Fits into That Small Subset of "Particularly Dangerous Defendants" Who must Be Detained Pretrial

Congress limited pretrial detention to a small subset of defendants charged with crimes that are "the most serious" compared to other federal offenses. *United States v. Salerno*, 481 U.S. at 747. "This construction is consistent with the Senate Report, which states that pretrial detention is necessary for only a "small but identifiable group of particularly dangerous defendants." *See* S.Rep. No. 98--225, at 6 (1984)." *United States v. Singleton*, 182 F.3d 7, 13 (D.C. Cir.1999). Under all the facts and circumstances now before the Court, there is not basis for finding that Mr. Rehl falls within that "group of particularly dangerous defendants."

Mr. Rehl, a man with no prior history of violence conduct who did not use or threaten violence nor damage property on January 6 simply does not fit that limited circumstance. In detaining Mr. Rehl, the Court focused its analysis on the obstruction charge, however under the Bail Reform Act, the obstruction charge (18 U.S.C. § 1512(c)(2)) is not one of the six enumerated circumstances set out in 18 U.S.C. § 3142(f) that triggers a detention hearing. "Absent one of these circumstances, detention is not an option. *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999).

The reason the government asked the Court to focus on § 1512 is because Mr. Rehl did not personal destroy property or used force, the only two charges that may arguably authorize detention. *See, e.g.*, *United States v. Byrd*, 969 F.2d 106 (5th Cir. 1992); *United States v. Ploof*, 851 F.2d 7 (1st

30

Cir. 1988); *United States v. Himler*, 797 F.2d 156 (3d Cir. 1986). Indeed, Chief Judge Howell noted that the weight of the evidence for aiding and abetting depradation of property was weak even where the defendant led marchers to the Capitol, he himself did not destroy any property and there was no evidence that he directed others to do so. *Nordean* Detention Hearing, 3/3/21 at 80-81.[27]

The D.C. Circuit has also rejected the argument that it is permissible to ignore the "carefully defined circumstances" set out § 3142(f) and focus instead on a "generalized backward-looking assessment of the rioters or the riot." *Munchel*, 991 F.3d at 1285.

> [I]nterpreting § 3142(f)(1) to exclude felon-in-possession offenses does not deprive the government of an opportunity to detain armed felons when other circumstances warrant. For example, pretrial detention is permissible in § 922(g) cases if the defendant has two prior predicate felony convictions, *see* § 3142(f)(1)(D), is likely to flee, *see* § 3142(f)(2)(A), or is likely to obstruct justice, *see* § 3142(f)(2)(B). When none of these factors is present, however, the government cannot secure detention by squeezing § 922(g) into the "specific category of extremely serious" violent offenses covered by § 3142(f). Salerno, 481 U.S. at 750, 107 S.Ct. 2095.

*Singleton*, 182 F.3d at 15.

In any event, the rebuttable presumption set out in § 3142(f)(1) and (f)(2) operates "to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985). Once the defendant, as Mr. Rehl has done here proffers "at least some evidence" to rebut the presumption, the government must prove its case for detention by clear and convincing evidence. The burden of persuasion remains with the government throughout the proceeding. *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001); *see also Alatishe*, 768 F.2d at 371 n.14.

---

[27] *US v Nordean*, No. 21-mj-00175 (ECF 24).

### III.     Factors to Consider

> In assessing whether pretrial detention is warranted for
> dangerousness, the district court considers four statutory factors: (1)
> "the nature and circumstances of the offense charged," (2) "the weight
> of the evidence against the person," (3) "the history and
> characteristics of the person," and (4) "the nature and seriousness of
> the danger to any person or the community that would be posed by
> the person's release." 18 U.S.C. § 3142(g)(1)–(4).

*Munchel*, 991 F.3d at 1279-80.

### A.     Nature and Circumstances of the Offense Charged

While the Court found that on balance this factor weighed in favor of detention, the Court's

analysis was flawed as a matter of fact and law.  As the Court already found, there is no evidence that

Mr. Rehl "himself . . .laid hands on anyone or fought with anyone, including law enforcement, or

used or carried a weapon on that day."  (ECF 147 at 50).  In light of the facts now presented to the

Court about Mr. Rehl's lack of planning for an attack on the Capitol, this factor weighs in favor of

release.  Other than the defendants in this case, other judges have not detained January 6 defendants

on the basis of the conduct alleged against Mr. Rehl.  *See, e.g., Rhodes,* No 22-cr-15; *see also Finley,*

*supra*.  Moreover, the Court should reassess its analysis based on the current evidence and in light

of the fact that a number of the factors identified in *United States v. Chrestman*, 525 F.Supp.3d 14,

26-27 (D. D.C., 2021) are inconsistent with § 3142 and *Munchel,* which the DC Circuit decided after

*Chrestman*.

For example, the first *Chrestman* factor, which looks to whether the defendant has been

charged with a felony or misdemeanor is not consistent with § 3142(f), which authorizes detention

for only six categories of felonies and for no misdemeanors, no matter the factual particulars.

*Singleton*, 182 F.3d 7, 15.  Here, the fact that Mr. Rehl was charged with a § 1512(c)(2) obstruction

offense, which was the focus of the Court's analysis simply cannot be weighed in favor of detention under *Singleton* and § 3142(f).  Opinion (ECF 147 at 48-49)

In light of all the evidence noted above, the second, third, fourth and fifth *Chrestman* factors which the Court found to be a "mixed bag" in part lose their force as a basis for detention.[28]  The Court was persuaded that Mr. Rehl engaged in "extensive involvement in planning" with others.  But as shown above, the planning by the MOSD was to prevent chaotic Proud Boys rallies.  Mr. Rehl was not involved in the type of planning that *Chrestman* found significant – planning that indicates that the defendant came to DC "with the intention of causing mayhem and disrupting the democratic process."  *Chrestman,*525 F.Supp.3d at 26.  That is not what Mr. Rehl planned nor what he did on January 6.   The coordination and leadership role that Chrestman identified focuses on whether a defendant acted deliberately to "encourag[e] other rioters' misconduct, for example, by urging rioters to advance on the Capitol or to confront law enforcement" or that "may have inspired further criminal conduct on the part of others."  525 F.Supp.3d at 26-27.  Mr. Rehl is not alleged to have done any of that.

And the discussion of tactical gear by MOSD was to be used to protect themselves from being stabbed by counter demonstrators not to protect against law enforcement.  Mr. Rehl neither brought any weapon nor acquired any items while in DC to use as a weapon. He also did not battle police nor overturn barriers.  And, shortly after the initial tumult when the bike rack was moved aside by others, Mr. Rehl left Biggs and Nordean to join Finley and his Philadelphia buddies, none of whom have been charged with felonies.  Coupled with the Court's finding that Mr. Rehl's leadership was only at a

---

[28]  "As I mentioned before, there's no evidence that Rehl himself, like Mr. Biggs and Nordean, laid his hands on anyone or fought with anyone, including law enforcement, or used or carried a weapon that day." ECF 147 at 50.

midlevel (ECF 147 at 49), a proper assessment of these factors should weigh against detention.

The sixth *Chrestman* factor which considers the statements made by a defendant does not survive *Munchel* when applied to Mr. Rehl's conduct. The Court found that Mr. Rehl's words weighed in favor of detention but the DC Circuit rejected this analysis when a defendant's conduct belie the "rhetorical bravado." That is exactly the situation with Mr. Rehl – his conduct, which did not include use of any violence or force against a person or property belies his "rhetorical bravado" and therefore cannot tip the scale for detention. The defendants' words in Munchel were at least as full of fire and brimstone, if not more, as Mr. Rehl's.

In evaluating the "nature and seriousness" of any danger, the district court highlighted statements that Munchel and Eisenhart made to the media on January 7. Munchel said that "[t]he point of getting inside the building is to show them that we can, and we will," while Eisenhart, invoking the American Revolution, said that she would "rather die and would rather fight" than "live under oppression." To the district court, these statements indicated that the defendants pose "a clear danger to our republic" and that Eisenhart is a "would-be martyr." **But the defendants' actual conduct belied their rhetorical bravado**. During the chaos of the Capitol riot, Munchel and Eisenhart had ample opportunity to fight, yet neither of them did. Munchel lawfully possessed several firearms in his home, but he took none into the Capitol. Indeed, before entering the Capitol, Munchel and Eisenhart stashed a knife inside a backpack that they left outside, precisely for fear of ending up in "federal prison."

Moreover, even if their comments indicate some willingness to engage in future protests or disruption, the Bail Reform Act permits detention only to prevent an "identified and articulable threat to an individual or the community." Here, the district court identified one such threat– that Munchel and Eisenhart would attempt "to stop or delay the peaceful transfer of power." But the transition has come and gone, and that threat has long passed. In the district court, the government warned of an upcoming protest scheduled for March 4. But that protest never materialized, and the government produced no evidence that Munchel and Eisenhart had been involved in its planning before their arrest. The government's gesturing towards the possibility of

their joining future protests falls well short of any "identified and articulable threat."

*Munchel*, 991 F.3d at 1287-88 (emphasis added).  While perhaps a minor point, the Court noted that Mr. Rehl was seen "smoking what might be a victory smoke."  However, that assessment ignores that Mr. Rehl is a smoker, who can be seen smoking cigarettes throughout the day.  And the protective goggles are standard gear used by Proud Boys during past rallies as they often find themselves under attack by counter protesters.  Such protective eye wear is recommended by medical associations and Amnesty International for those attending protest rallies in the 21st Century.[29]

### B.    Weight of the Evidence Against the Defendant

As all the newly produced facts show, the weight of the evidence against Mr. Rehl does not support detention. There is no evidence that he planned an attack on the Capitol, much less a violent attack.  As the Government has conceded, Mr. Rehl did not injure or attempt to injure anyone.  He did not damage or attempt to damage any property.  He is alleged to have entered the Capitol long after the Capitol was breached.  His entry was not forcible and he entered along with hundreds of other persons who have not been charged with felonies.  His alleged entry was after the proceedings had been suspended and Vice President Pence had left the Capitol.

### C.    History and Characteristics of the Defendant

The Court has already found that Mr. Rehl's history and characteristics favor release.  While

---

[29] "A guide to protecting your eyes and vision while protesting" 7/9/2020 ("In recent weeks, protests against racial injustice have spread across the country and around the world.  So has the use of rubber bullets and tear gas to control crowds. The American Academy of Ophthalmology (AAO) recommends that protesters put on protective eyewear — beyond regular eyeglasses or sunglasses — made with shatter-resistant polycarbonate lenses to shield them against threats like rubber bullets and tear gas. . . .Amnesty International recommends a number of precautions to take before you head out to protest, including a number of safety measures to protect your eyes." at https://www.allaboutvision.com/eye-safety/protest-eye-protection/

in the Marine Corps, he received a Good Conduct medal along with other commendations.  He also has a history of community service.  In further support of this factor, Mr. Rehl hereby submits letters from his wife and three friends, all fellow veterans, who speak highly of Mr. Rehl's character and their firm conviction that he does not present a danger to the community. This additional information is submitted in light of the fact that a number of judges including Judges Bates and Mehta have granted release primarily based on the history and characteristics of the defendant in cases where defendants, unlike Mr. Rehl, have engaged in acts of violence, battled police and destroyed property.

In addition, the fact that Mr. Rehl has a one-year old daughter, who was born after he was arrested should also weigh heavily in favor of his release.  Indeed, even after conviction, family circumstances including the effect of incarceration on a young child are factors that a court must take into consideration under 18 U.S.C. § 3553(a)(1).  *See, e.g. Rita v. United States,* 551 U.S. 338, 364-65 (2007) (family ties proper consideration under § 3553(a)); *In Re Sealed Case*, 292 F.3d 913 (D.C. Cir. 2002) (same).[30]  As a parent, it is heartbreaking to consider the loss being suffered by Mr. Rehl's infant daughter as a result of her separation from her father at such a significant and tender age. Medical literature reflects that infants and toddlers who are unable to form attachments with a parent suffer long-term consequences and deficits for the child.[31]

---

[30]   United States v. Johnson, 964 F.2d 124, 129 (2d Cir.1992) ("The rationale for a downward departure here is not that [the defendant's] family circumstances decrease her culpability, but that we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing."). *United States v. Schroeder,* 536 F.3d 746, 756 (7th Cir. 2008) (The defendant's responsibility for the adverse effects of his incarceration on his family is not the determinative issue. If it were, there would never be an occasion on which the court would be justified in invoking family circumstances to impose a below-guidelines sentence.)

[31]   *See, e.g., Developmental Effects of Parent–Child Separation,* Annual Review of Developmental Psychology at https://www.annualreviews.org/doi/10.1146/annurev-devpsych-121318-085142

His best friend, Sonny Sullivan writes:

> I'm a Marine Corp veteran and proud father. Zach has been my best friend for over 15 years. The only things he has wanted to do is provide for his daughters and family. From when he joined the Marines to get his act together and then again when he took on college so he could attempt to get a career worth having to be able to give his family the life he wants for them. I've watched him look out for countless friends unselfishly over the years; at times even at a high cost to himself. He no longer wants anything to do with politics or any political organizations of any kind. His character is one of honesty, trustworthiness, and kindness. I understand the allegations he faces are serious. But if your honor considers bail, I know one hundred percent, without a shadow of a doubt that he will abide by ANY and ALL restrictions to the letter. I know for a fact he wants nothing more than to just be able to be home with his wife and daughters, and there wouldn't be anything on this planet that would make him want to jeopardize that.

Another fellow Marine veteran, Henry McGill also writes of Mr. Rehl's good character:

> I served in the United States Marine Corps with Mr. Rehl, whom I met while a part of a detachment in Yuma, Arizona in 2010. I was discharged in 2012 and afterwards decided to attend Temple University in Philadelphia, PA. Mr. Rehl had made the same decision and it was a brilliant twist of fate when I reunited with him on campus. I was new to the city, and Mr. Rehl was instrumental in helping me to adjust to Philadelphia. He's been a tremendous source of inspiration and motivation throughout our time knowing each other.

> I can speak to his business acumen and community outreach. In 2014 Zach co-owned a Bar and Grill named Bada Bing which revitalized a section of Orthodox Street. He created an atmosphere that was inclusive of all the surrounding areas, and that brought many people together peacefully who would never mingle otherwise. He provided much needed jobs for the local community which cannot be understated.

> I can speak to his perseverance and dedication to education and improvement. I know that Zach completed his course of study while I was there at Temple University. I left in 2017 and Zach was continuing on to his Master's Degree - which he attained. As a veteran, I appreciate that type of work.

37

I look forward to hearing what Mr. Rehl has learned from his experience. I think he should be afforded the opportunity to post bail due to his service to this Country.

A third friend, Jonathon Nguyen, a Navy Veteran writes:

I am writing on behalf of my long time friend, Zach Rehl that he may be granted bail.

Zach has been a great Marine, friend and human being. He has always helped others when they needed him. This is the person that would give a stranger the shirt off his back. When I was having hardships in my life, Zach was there and helped me get through it.

In addition to our friendship, Zach is an outstanding citizen. He believes in the justice system and law enforcement. Zach has always done his best to have his life together. He recently became a father and it breaks my heart that he can't be there with his child, as an expecting father myself it pains me to see this.

I am sincerely hoping that the court takes this letter into consideration. Zach has too many things going for him from the outside world. I don't think he would ruin any chance that he is given. Despite the circumstances, I do believe Zach Rehl is a great and honest person.

His wife, Amanda Rehl has also written of Mr. Rehl's good character.

Zachary and I have been together for over 10 years and married since May 5, 2018. Together we have a 1-year old daughter and he has a 17 year old daughter from a previous relationship, who under different circumstances lives at our home with us. Since I have known him, Zachary has prioritized being a father and, even when stationed across the country during his time in the Marine Corps, had his daughter fly out to visit him often. At this current time, he has not seen his 17 year old daughter since his arrest and has been unable to ever hold his infant daughter or be a participant in her life.

When speaking of his character, he is a friendly person with good morale who has always made a point to be there for and helpful toward others. He is a family man who has a close relationship with his mother, stepfather, his brother, and my parents. Zachary isn't a

violent or hostile person and does not seek out conflict with others. With having known him for over 10 years, with utmost certainty I can say he is one of the most genuine people I have ever met and that the allegations against him do not define who he is as a person.

. . .

The reason I am writing you is pertaining to the possibility of bail and your decision toward that. If you were to grant him bail, I, as his wife, would ensure that he would uphold any conditions for release that you see fit. At the moment, I am a full time stay at home mom who is taking online classes. Were Zachary to be released and it were under home confinement with certain stipulations, I would consistently be present in our home to ensure that those conditions were followed. I would also guarantee his attendance to all court dates. In speaking with my husband, he has expressed in having no contact with the Proud Boys which is also something that I would make sure was upheld.

If Zachary were to be granted bail, he would use his release to be a father to his daughters, to spend time with his family, and to ease the burden on me of tending to our household alone. With release, he would also be able to continue his treatment with the VA. Since his arrest, Zachary has been off medications that he has been on since 2012 because the Philadelphia detention center does not treat his medical issues.

**4.      Nature and Seriousness of the Danger to Any Person or the Community**

While the Court found this factor favors detention, the Court's analysis is difficult to square with the requirement that the government prove by clear and convincing evidence an articulable prospective risk.  The new evidence herein presented to the Court should tip the balance in favor of release.  Mr.  Rehl has no history of violence and did not use violence on January 6. He has participated in dozens of rallies throughout his life and has never been involved in any violent or disorderly conduct.  He has supported law enforcement throughout his life.  He served his country

honorably, receiving various commendations and having suffered a medical disability as a result.

Thus, the allegations brought against him are an aberration that contrast his otherwise law-abiding

and productive life.  He is not so well known as a Proud Boy that there is any risk that he would be

to foment a violent rally.  To the extent the Court noted that Mr. Rehl had shown no remorse, Mrs.

Rehl's letter indicates that he is indeed remorseful and intends to distance himself from the Proud

Boys.

Judge Bates' analysis of this factor in a recent case where the defendant's conduct was much

more egregious bears quoting:

> The government has shown by clear and convincing evidence that he employed persistent force against multiple officers, repeatedly pressing a stolen riot shield against them to gain entry into the Capitol building and stop the certification of the election.   And the government has likewise established that he chose to position himself at the front lines of the mob for over half an hour, without once appearing to reconsider the propriety or ramifications of his conduct even as officers commanded him to stop. There is no evidence, however, that he injured an officer or anyone else, or that he destroyed any federal property – or that he sought to do either. He also has not, to the government's knowledge, ever verbally threatened others or advocated political violence either before or after January 6. Indeed, Klein's life otherwise has been lawful, and the nearly two months he spent outside of jail between January 6 and his arrest on March 4, when the continued threat to our democracy loomed particularly large, apparently proceeded without incident.
> . . .
> Of course, any determination of dangerousness must rest on the specific circumstances of each defendant. "[W]hether a defendant poses a particular threat depends on the nature of the threat identified and the resources and capabilities of the defendant."). But where so much of the proffered justification for Klein's detention relies on the type of force he employed, the Court sees some relevance in the fact that several defendants who also face charges under § 111(b) for assaulting officers and did not engage in planning activities were released without objection from the government. *See* United States v. Leffingwell, 21-CR-5 (D.D.C.) (defendant repeatedly punched officer

with closed fist in attempt to push past wall of officers); Statement of Facts (Jan. 18, 2021), ECF No. 1-1 & Min. Entry (Jan. 19, 2021), United States v. Gossjankowski, 21-CR-123 (D.D.C.) (defendant activated taser within tunnel multiple times as he pushed towards the police line); Statement of Facts (Feb. 9, 2021), ECF No. 1-1 & Min. Entry (Feb. 17, 2021), United States v. Blair, No. 21-CR-186 (D.D.C.) (defendant struck an officer in the chest with a lacrosse stick).10 To be sure, these cases do not entail the same duration of force employed by Klein, but, on the other hand, they do appear to involve actions intended to injure or incapacitate officers.

The broad divisions drawn in Munchel offer some parameters for differentiating among participants at the January 6 events. But ultimately the D.C. Circuit's primary holding there is that a finding of dangerousness must be predicated on a concrete determination that the defendant poses a continued, "identified and articulable threat to the community" or to another person. As part of that analysis, the D.C. Circuit advised the district court to consider "the specific circumstances that made it possible, on January 6, for [the defendant] to threaten the peaceful transfer of power." In this respect, this Court finds that "the presence of the group" somewhat impacted Klein's "ability to obstruct the vote and to cause danger to the community." Id. His most forceful conduct was directed to advancing and maintaining the mob's position in the tunnel, not toward inflicting injury, and outside that context, the nature of his actions and the force that he employed would not have had the same effect.

Although the government emphasizes Klein's "choice to use violence as a means to his ends" as evidence that he "poses a threat regardless of the unique circumstances of January 6, 2021," it does not articulate any concrete "end[ ]" or "threat," now that "the transition [of power] has come and gone."(Katsas, J., concurring in part and dissenting in part); see id. at 1284 (Wilkins, J.) (explaining that defendants' purported "danger to 'act against Congress' " required additional justification). Indeed, while security threats around the Capitol are always present, the specific concerns in the wake of the January 6 events over future protests and violent attacks on the government—on January 20, March 4, and otherwise—have dissipated to some degree now three months later, even though troops and defenses remain present. See id. As the majority emphasized in Munchel, the threat to public safety must be continuing and prospective. Id. at 1279-80.
. . .
The law requires reasonable assurance, but does not demand absolute

certainty' that a defendant will comply with release conditions because a stricter regime 'would be only a disguised way of compelling commitment in advance of judgment.' " This decision is not an easy one, but, in the absence of a concrete, prospective threat to public safety that cannot be mitigated by strict conditions, this Court must apply "the default rule favoring liberty." "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.".

*Klein*, 533 F.Supp.3d 1, 17-20 (D. D.C. 2021) (internal citations omitted; cleaned up).

## CONDITIONS OF RELEASE

The Magistrate Judge, who first heard this case, released Mr. Rehl on conditions recommended by Pretrial Services. Those conditions and even more stringent home incarceration with electronic monitoring may be imposed by the Court. The Court also may prohibit Mr. Rehl from entering the Capitol grounds, attending any type of political protest, contacting other participants in the events of January 6, and possessing firearms or other weapons. And his compliance with these conditions can be ensured through GPS monitoring.

The Court should also take into account that Mr. Rehl's medical needs are not being adequately treated while detained.[32] In addition to medications that had been prescribed by the Veterans Administration that are not being provided to him, part of his medical disability is the result of a shoulder injury that he sustained while in the service. Needless to say, prison cots are quite detrimental to this particular medical disability.

---

[32] He was awarded a medical disability by the Veterans Administration. Any details of Mr. Rehl's medical history will be provided to the Court under seal, to the extent the Court wishes to go behind the disability rating determined by the VA.

## CONCLUSION

For all these reasons, and any that may become apparent at a hearing on this matter, Mr. Rehl respectfully submits that the Government has failed to meet its burden by clear and convincing evidence that he presents a risk of danger to society in light of all the recent additional evidence that submitted herein. Wherefor, he respectfully requests that this Honorable Court release him on high intensity supervision and conditions the Court deems necessary.

Respectfully submitted,

/s/ *Carmen D. Hernandez*

**Carmen D. Hernandez**
Bar No. MD 03366
7166 Mink Hollow Rd
Highland, MD 20777
240-472-3391
chernan7@aol.com

## REQUEST FOR HEARING

Mr. Rehl respectfully requests a hearing on this matter.

## CERTIFICATE OF SERVICE

I hereby certify that the instant notice was served on all counsel of record 15th day of June, 2022 on all counsel of record via ECF.

/s/ *Carmen D. Hernandez*

**Carmen D. Hernandez**

43