# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | **No. 1:21-cr-175-3 (TJK)** |
| **v.** | : | |
| | : | |
| | : | |
| **ZACHARY REHL,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO REOPEN DETENTION HEARING AND REQUEST FOR A HEARING

Zachary Rehl was one of the leaders and organizers of a group that attacked the U.S. Capitol on January 6, 2021, seeking to oppose the lawful transfer of presidential power by force and to obstruct Congress's certification of the 2020 U.S. presidential election. The group succeeded, overwhelming law enforcement and breaking into the building, and, at least temporarily, halting the certification. The defendant has shown no remorse for the violence that he helped to unleash on the Capitol on January 6. To the contrary, he has celebrated it. In a private message to co-conspirators on the day after the attack, the defendant declared, "I'm proud as fuck what we accomplished yesterday . . . ." In public messages, he celebrated the attack, stating, "THIS is what patriotism looks like," and he condemned the law enforcement officers who sought to defend the Capitol and those inside, stating, "They deserve to be tarred and feathered. These cops turning on us are also what they call 'turncoats.' Just saying."

On June 30, 2021, after conducting a thorough detention hearing and considering the parties' written submissions and oral arguments, which included substantially all arguments retread by the defendant in his current motion, this Court ordered defendant Rehl detained pending trial pursuant to 18 U.S.C. § 3142, finding that there is clear and convincing evidence that no

conditions or combination of conditions of release can assure the safety of the community.  *See* ECF No. 104; June 30, 2021, Hr'g Tr, at 59:25-60:7.

On September 30, 2021, the defendant filed a motion to reopen that detention hearing, along with three supplements, ECF Nos. 190, 191, 198, 200, 203 (collectively, "First Motion to Reopen"). The Court denied that motion on December 14, 2021, reiterating its findings from the June 30 hearing, adding others, including an assessment that "the defendants [including Rehl] will [not] comply with the conditions and refrain from doing things that pose a danger to the community." Dec. 14, 2021, Hr'g Tr. 23:18-23:21.  Since the Court denied that motion, the grand jury has returned two superseding indictments, the most recent on June 6, 2022 (Third Superseding Indictment, or TSI), which additionally charged Rehl with seditious conspiracy, in violation of 18 U.S.C. § 2384 and conspiracy to prevent by force, intimidation, and threat any person from discarding any duties of any office, trust, or place of confidence under the laws of the United States to leave the place where their duties were to be performed, in violation of 18 U.S.C. § 372.

On June 15, 2022, the defendant filed this motion for reconsideration.  Nothing in the motion is both new and material to the Court's consideration of the Bail Reform Act factors, as required to reopen the detention hearing.  The Court should accordingly deny the motion.

## LEGAL AUTHORITY

The Court can reconsider pretrial detention at any time before trial if the judicial officer finds that "information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f)(2); *United States v. Bikundi*, 73 F. Supp. 3d 51, 54 (D.D.C.

2014).  In other words, the statute requires that a movant provide information that is both "new" and "material."  *See United States v. Lee*, 451 F. Supp. 3d 1, 5 (D.D.C. 2020).

Previously available information—even if "material"—is not grounds to reopen a detention hearing.  *See Lee*, 451 F. Supp. 3d at 5. And any "new" information is only "material" if it is "essential to, or capable of significantly affecting, the detention decision."  *United States v. Worrell*, 2021 WL 2366934 at *9 (D.D.C. June 9, 2021); *see also Lee*, 451 F. Supp. 3d at 5 (stating that, for purposes of reopening a detention hearing, information has a "material bearing" on detention if it "casts different light on any of [the Bail Reform Act] factors," and citing Black's Law Dictionary (11th ed. 2019), which defines "material" as "[h]aving some logical connection with the consequential facts" or "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential.")).

Under the Bail Reform Act, courts consider the following factors in determining whether some condition, or combination of conditions, will reasonably assure community safety or the defendant's appearance at trial and pre-trial proceedings:  (1) the nature and circumstances of the charged offenses; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g); *see Bikundi*, 47 F. Supp. 3d at 133; *United States v. Hong Vo*, 978 F. Supp. 2d 41, 43 & n.1 (D.D.C. 2013).

## **ARGUMENT**

The defendant has not proffered, let alone established, that the vast majority of factual allegations in his motion were unknown to him at either the initial detention hearing on when the Court denied his first motion to reopen that hearing in December 2021.  But even if the Court

assumes *arguendo* that all the allegations in the defendant's current motion were unknown to him during the litigation of both of his previous motions regarding his detention status, he has not established that the information he proffered "has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community," as required to reopen the detention hearing.  *See* 18 U.S.C. § 3142(f)(1).   The defendant has also failed to establish that he engaged in First Amendment protected activities or that his initial hearing was flawed.   Finally, even if the Court does decide to reopen the detention hearing, it should deny the defendant's motion on the merits.

I.      Rehl Has Proffered No New and Material Information.

**a.  The December 30 Virtual Meeting is Neither New nor Material.**

The defendant relies heavily on a videotaped meeting for prospective Ministry Of Self Defense (MOSD) members, which was held on December 30, 2021.  ECF No. 401 at 12-17.  That video was known to Rehl at both the detention hearing on June 30, 2021, and during the litigation of his first motion to reopen that hearing.  Not only was the defendant present for and a participant in the meeting, but the video was also publicly available on the internet, and the government provided a copy of it in discovery to the defendant on June 2, 2021.  The cover letter sent with the video specifically describes, "1:38:03 video from December 30, 2020, featuring Enrique Tarrio, Joe Biggs, Zach Rehl, and others describe the Ministry of Self Defense."  A copy of that letter is attached hereto as Exhibit 1.  *See* p.5, description for "CAPVID_00019."[1]  Accordingly, the video

---

[1]      The government's provision of this video to the defendant defeats his claim that the government "chose[] to keep such material evidence from . . . this Court at the earlier detention hearing."  ECF No. 401 at 27.  Rehl could have presented the entire video or any portion thereof to the Court at the June 30 hearing, or at any point during the litigation of his first motion to reopen the detention hearing.  The Court should be similarly unpersuaded by defendant's unsupported

was known to the movant at all prior litigation on the defendant's detention and it cannot now provide a basis to reopen the hearing.

Even if the Court assumes *arguendo* that the video was unknown to Rehl at the time of his two previous motions, it is not material to the Court's detention analysis. The defendant's cherry-picked quotes from a nearly-100-minute-long video do not meaningfully detract from the video's overall message: the MOSD would have an objective at any rally it went to; that objective would be determined by the Marketing Council (which consisted of Tarrio, Nordean, and Biggs); and members would be expected to follow the commands of leadership on the ground. Some additional quotes from the video are below, which illustrate this, along with the fact that MOSD leadership, which included Rehl, understood that the "normies" would follow their lead:

- Person-2: "Each rally needs to have a strategic objective. We don't just show up somewhere just for no reason, you know. When we do a public event, we're going into the public space. We have a goal in mind. That's what the marketing team is starting out with. The marketing team is going to start with a strategic objective that they want the Proud Boys to accomplish."

- Person-3: "There was some concern about who directions were coming from. And they could come from and single person that you see on your screen right now, as well as about seven or eight more people that you don't see yet, because they're not obviously on the screen. But the one thing that everyone has to understand is yes, you might be getting told things from different people, but it's all information from the same plan. Biggs isn't going to tell you anything different than I'm going to tell you. Enrique isn't going to tell you anything different than Zach [Rehl] is going to tell you. It's

---

allegation that the government did not present material evidence to the Grand Jury. *See* ECF No. 401 at 27-28.

█████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████

Regardless, the MOSD video is not new, and thus not reason to reopen the detention hearing, for the reasons stated above.

all one operational plan.  So don't get hung up on the delivery.  The information is all the same."

- Rehl: "There's this structure here and everything like that but you guys gotta understand, like everybody who is in here and everybody who is listening now, like you guys are part of this entire thing here, you know like we're hoping you guys are going to be here to be able to help us out and execute these plans and, you know, get these guys on the same page as the mission plan that we're all trying to put together and everything like that.

- Person-1, in response to another speaker discussing having issues controlling "normies": "Unfortunately there's no way with the notoriety that we have that people are not going to start fucking following us. You know they're going to follow us now because, you know, we're the tip of the spear. So they're gonna follow us."

- Rehl: While we're in DC and everything, I mean, it's not going to be the same thing.  We're not going to be doing a Proud Boy fucking 8 o'clock at night march and flexing our guns and shit.  So you guys gotta understand that we're not doing that this time.  You know we're doing a completely different operation and there's gonna be a lot of contingencies and plans laid out for what we're actually going to do, and there's going to be teams that are gonna be put together to, you know, where they're going to be going and what they're going to do.

Tarrio's statements around the time of the creation of MOSD highlight the command-and-control structure of the MOSD, including a message from Tarrio to the MOSD prospect group, telling members to "Fit in [] or fuck off."  TSI ¶ 33.  On the day before the meeting that became the MOSD video, Tarrio advised prospective members that MOSD, "will have a top down structure" and advised prospects that, "if that's something you're not comfortable with" they should not bother attending the live session. TSI ¶ 38.

As discussed at length in prior detention litigation, Rehl both was held out and acted as a leader on the ground on January 6th.  These actions follow from the MOSD video, where Rehl is cited as a leader from whom instructions may flow.  Whatever the intent of the MOSD leaders were upon that group's creation in the hours following an announcement regarding a "stop the

steal" protest, its leaders unquestionably took charge of the Proud Boys and those associated with them on the ground on January 6, and the actions that group took speak for themselves. Additionally, the Court now has the benefit of Donohoe's Statement of Offense, in which he admits under oath that that MOSD leadership's goal was "stopping the government from carrying out the transfer of presidential power." Donohoe Statement of Offense, ECF No. 336, ¶ 17.

Rehl also claims that the video establishes that MOSD was trying to prevent violence because Tarrio stated that they were never going to be the ones to cross the police barrier, and because there was discussion of stab-proof armor. ECF No. 401 at 14-16. Rehl ignores that on the same day the MOSD video was filmed, other MOSD leaders were hoping for violence in response to learning that Tarrio would be arrested. Person-3 stated, "Do you have any idea how our guys will respond if they don't expect it? . . . We could have a fucking riot." Tarrio replied that it would be calm and "They're not gonna punch cops." After Person-3 stated that he was not so sure, Person-1 stated, "Gay. Just let it happen . . . Maybe it's the shot heard round the world and the normies will fuck up the cops."

Rehl similarly ignores that two days after the video he claims proves Proud Boys would not charge through police lines was filmed, MOSD leaders discussed the need to change how they interact with the police, leading to the following exchange:

> Person-2: Our disposition towards the police needs to be reevaluated
>
> Person-3: Not sure what to do about it thought [sic] because it would be an escalation that we would never be able to back away from.
>
> Person-2: I see it as an inevitability.
>
> Person-3: Very true: I'm ready for the escalation but i [sic] worry about some of our guys.

Person-2: We can/should start adopting black bloc style tactics. Not necessarily all black like Antifa, but we should make an effort to hide our identities when in public

Person-3: We could have ran them the fuck over in DC and they wouldn't have been able to do shit

Person-2: We absolutely could have

Tarrio: I had a plan for it… But someone talked me out of it.

Person-2: Masks, standardized attire, etc. Same thing black bloc does to make individual identification as difficult as possible.

Person-3: Wasn't me. I had 150 pissed off PB that just got maced. It took all i had with Aaron's help to calm them

Biggs: Yeah. We could have

Tarrio: [Name redacted] kept telling me to give the order to push through them. Lol.

Tarrio: He was wild Lol

Biggs: I wanna fuck shit up

Person-1: I should go to BLM plaza and stab 4 people and see what happens to me

Person-1: Think I would be out on $550 bail in 26 hours?

Person-3: It's coming to it. I mean how much longer are we going to let this shit continue.

Person-1: #fucktheblue

Person-3: Agree, they chose their fucking side so let's get this done.

Tarrio: Lol I was the one that told him to

Biggs: I'm ready to just be the Zamboni

Biggs: And roll over mother fuckers

Person-1: And I was trying to get him to chill cause I figured you wouldn't want us to do that lol.

8

Both discussions took place in the small MOSD leadership chat, of which Rehl was a member and participant.

Rehl's argument that the MOSD's purpose continued to conform with Tarrio's self-serving description of it through January 6th is belied by the statements of other MOSD leaders. Those statements include Tarrio's statement to MOSD leadership that he wanted to wait until January 4 to make final plans, and Person-3's suggestion that the "main operating theater should be out in front of the house of representatives. It should be out in front of the Capitol building. That's where the vote is taking place and all of the objections. So, we can ignore the rest of these stages and all that shit and plan the operations based around the front entrance to the Capitol building." TSI ¶ 49. Rehl himself responded by asking whether Tarrio was still speaking, but continued that the Capitol was a "good start." *Id.* Rehl ignores this exchange, but he also ignores evidence that planning continued among MOSD leadership at least into the evening of January 5. *Id.* ¶ 65.

In short, the MOSD Video was known to Rehl during all previous detention litigation in this case, and even if it were not, it is not material to the Court's detention decision.

### b. Video Taken by Pamela Hemphill Would Not Affect Court's Detention Decision.

Rehl also cites to a video provided to the defense in May 2022, which he claims shows there was no plan to enter the Capitol ("Hemphill Video"). ECF No. 401 at 22. Although the Hemphill Video was not known to Rehl during the previous litigation in this case, there is no new substance in that video, and in any event, the statement cited by the defendant is but one brief clip in a 44-minute video. As the government noted in its sur-reply to Nordean's Motion for an Order Directing the Government to Identify *Brady* Materials in Produced Discovery, ECF No. 398, at 5-6,

> Approximately 20 minutes later in the same video, a member of the marching group again raised the prospect, saying, "Ethan, let's fucking do it." Nordean responded, "What?", to which the man responded, "let's go check out the Capitol." Nordean nodded in agreement, looked around, and then used his hand as if to tell the man to be patient. [Hemphill Video]. at 25:27 – 25:38. Approximately one minute later, a man near Nordean again said, "Storm the Capitol. Let's do it. Storm the Capitol." Id. at 26:55 – 27:00. A few minutes later, in a separate video that has previously been submitted to this Court, the Proud Boys member known as Milkshake cried out, "Let's take the fucking Capitol!" Against this backdrop, Nordean and Biggs then purposely and intentionally marched their men—the men they had assembled—back to a thinly guarded gate on the west side of the Capitol. They arrived at 12:50 p.m. They stormed the Capitol grounds minutes later. Nordean's purported "denial" of any plan to storm the Capitol to a random woman is belied by the entirety of the video and Nordean's words and actions on January 6.

The video, in other words, contains significant inculpatory evidence regarding the existence of a conspiracy.  In any event, the short interaction that the defendant considers exculpatory is not dissimilar to an exchange on a video filmed by Eddie Block that Nordean has claimed was exculpatory, *see* Sept. 13, 2021, Hr'g Tr. 16:20-16:25.  The Court watched that video in its entirety at Rehl's request in connection with his first motion to reopen detention, and it concluded:

> The videos are slices -- some very short snippets; other -- the Block video, quite long, that I think it was -- Defendant Rehl asked me to watch in its entirety, which I did. But they are slices of a large, complex, chaotic, and what became fast-moving event involving many people. No doubt, there are portions that the defendants can't – that the defendants can, and are, pointing to that are consistent with their defense, but there are also other portions the Government spins as favorable to what it has alleged. In the end, I don't find them material to my detention decision, again, insofar as they don't call me to – cause me to change my analysis of any BRA factor or my ultimate weighing of them.

Dec. 14, 2021, Hr'g Tr. 19:7-19:19.  The Hemphill Video is—at best for the defendant—another piece of evidence like those the Court has found immaterial previously.  It is not a reason to now reopen detention.

**c. The "1776 Returns" Document sent to Tarrio Does Not Provide a Basis to Release Rehl.**

Rehl claims that a document sent to his co-conspirator Enrique Tarrio, which includes a plan to occupy governmental buildings in Washington, D.C. on January 6, 2021 (the "1776 Returns Document"), mandates his release because the government is presently aware of no evidence it was also sent to him.  The 1776 Returns document is immaterial to the Court's detention decision as to Rehl for precisely the reasons he states in his motion: "Mr. Rehl does not know the woman who sent the document and has not had any conversations with her. The government has represented that Tarrio did not forward the document to Mr. Rehl or the other defendants. And that Tarrio did not discuss the document or its contents with Mr. Rehl and the other defendants."  ECF No. 401 at 23.

The 1776 Returns document did not factor into either of the Court's detention decisions as to defendant Rehl.  Assuming *arguendo* that Rehl is correct that he had no knowledge of the document, that lack of knowledge is of no moment. The fact that a document that the government has not previously relied upon as to this defendant was not forwarded to or discussed with him is simply neutral as to defendant Rehl.[2]

**d.  Other Statements Cited by Rehl Is Neither New Nor Material**

Rehl argues that plea agreements and interviews by other Proud Boys members show that he should not be detained.  He is incorrect.  His comparison to the case of Jeffrey Finley is neither

---

[2]     Charging decisions related to Justice Kavanaugh's confirmation hearings and unrest in Portland have no bearing on the Bail Reform Act factors as to this defendant.  *See* ECF No. 401 at 23-27.  However, even if the Court were persuaded, the charging and release decisions related to those events were public during all previous litigation over the defendant's bond, and thus do not constitute new information as required for the Court to reopen the hearing.

new nor material.  As his motion concedes, the government made its decision not to seek pretrial detention as to Finley on March 29, 2021, some 3 months prior to Rehl's detention hearing.  *See* ECF No. 401 at 11.  Rehl has previously raised his connection to and actions with Finley on January 6th to argue that he should be released, including pointing to a video of them together on the Upper West Terrace.  *See* ECF No. 191 at 13-14.  The Court considered this video along with others and other evidence, and it declined to reopen the detention hearing.  *See generally* Dec. 14, 2021, Hr'g Tr.  But even if the Court assumes *arguendo* that the Finley material was previously unknown to the defendant, it is nonetheless immaterial to the Court's decision.  The defendant elides at least two major differences between himself and Finley: (1) Rehl has been charged with violations of 18 U.S.C. §§ 372, 1512, and 2384, while Finley has not; and (2) Rehl was a behind-the-scenes leader of MOSD in the run-up to January 6th, as well as a leader of that group on the ground on January 6th, while Finley was not.  Finley's case is thus not a useful point of comparison for the Court.[3]

Another defendant stating that Rehl was "not calling the shots" is similarly immaterial to the Court's detention decision.  ECF 401 at 10. As an initial matter, Rehl conveniently neglects to mention in his motion that the defendant in question stated that the person who "made the calls" was Rehl's co-conspirator Nordean. Nordean's role as a vocal leader on the ground is entirely consistent with the government's theory of the case and does not detract from the leadership

---

[3]     Rehl argues that "Thousands of text messages, and Mr. Rehl's nonviolent conduct on January 6 also show that no material distinction exists between Finley and Mr. Rehl."  This not only ignores Rehl's leadership position within MOSD and on the ground on January 6, but also the numerous Rehl-specific messages the Court cited in its original detention ruling.  *See* June 30, 2021, Hr'g Tr. 40:9-47:19.  The government proffered additional messages sent by Rehl in its opposition to Rehl's first motion to reopen the detention hearing.  ECF No. 210 at 8-9.

position the defendant held and played.  Indeed, the MOSD leadership structure had the "Marketing Council," which included Nordean, over the "Operational Council," which included Rehl.

The defendant's awareness (or lack thereof) of the actions of Messrs. Pezzola and Donohoe is also immaterial to the Court's detention decision.  *See* ECF No. 401 at 17. Rehl was not charged with Donohoe's water-bottle assault at the time of the initial detention hearing—neither was Donohoe, for that matter—so any lack of knowledge is at best neutral.[4]  The Court knew at the original detention hearing that the basis for the charged violation of 18 U.S.C. § 1361 was vicarious liability, and it found that "there's no evidence that Rehl himself, like Mr. Biggs or Mr. Nordean, laid his hands on anyone or fought with anyone, including law enforcement, or used or carried a weapon that day."  June 30, 2021, Hr'g Tr. 50:16-50:20.  The Court nonetheless found that the government had met its burden and ordered the defendant detained.  Nothing proffered by Rehl is both new and would materially alter that decision.[5]

### e.  No Other Information Proffered by Rehl Is Both New and Material.

---

[4]     Rehl asks the Court to place great weight in Donohoe's statement of offense, which Rehl interprets as saying that the only plan that was communicated to Donohoe was to meet at the Washington Monument at 10 a.m. *See* ECF No. 401 at 20-21.  He simultaneously, however, wants the Court to ignore that Donohoe admitted, as part of that plea agreement, that he conspired on the facts outlined in that statement of offense, with Rehl and others, to obstruct the certification of the Electoral College Vote.  He moreover ignores the fact that the Court found those facts sufficient to support Donohoe's plea of guilty to the conspiracy offense.

[5]     Rehl also cites to a matter the Court considered under seal.  ECF No. 401 at 18.  The transcript cited by Rehl was provided to him ahead of his first motion to reopen the detention hearing, and thus it was known to him in previous litigation.  That aside, the statements cited by Rehl are of no moment to the Court's analysis. ████████████████████████████████

Rehl puts forth several other facts and arguments that he contends tip the balance in favor of release.  None of these arguments are both new and material.  For example, Rehl argues that there was no plan to attack the Capitol discussed on Telegram.  ECF No. 401 at 19.  The Court has found numerous times during detention litigation for Rehl and his co-defendants that the government has present substantial evidence of the charged conspiracy.  *See*, *e.g.*, ECF No. 370 at 6 (Citing to previous findings and reiterating same as to Tarrio).  The Court has also previously found—on many of the same allegations made in the TSI that Rehl now claims are insufficient— that he joined the conspiracy and that the weight of the evidence against him specifically favors detention.  *See*, *e.g.*, June 30, 2021, Hr'g. Tr. at 51:12-52:24.  Similarly unavailing are the defendant's claims that he entered through an open door 20-30 minutes after others had entered the Capitol.  This information was all possessed by Rehl during prior detention litigation, and it is in any event immaterial to the Court's detention decision in this conspiracy case.

Rehl further contends that the *Chrestman* factors identified by Chief Judge Howell are inconsistent with 18 U.S.C. § 3142 and *United States v. Munchel*, 991 F.3d 1273, 1283 (D.C. Cir. 2021), but *Munchel* was decided by the time of both the defendant's original detention hearing and his first motion to reopen that hearing.  Indeed, the Court cited *Munchel* in its ruling on June 30, 2021.  June 30, 2021, Hr'g Tr. 54:18-54:25.  Even if *Munchel* and the alleged tension with *Chrestman* were new, it is not material, as the *Chrestman* factors are solely a guide to help analyze the § 3142 factors, and the Court did indeed analyze those factors in its decision to detain Rehl. *Id.* at 52-60.  Additionally, for the reasons stated above, the Court's analysis of those factors would not be materially altered by any new evidence.

Rehl also argues that his history and characteristics favor release.  This too is not new. Indeed, the Court found that this factor favored the defendant at the initial hearing.  *See id.* at

53:10-54:13. The information Rehl proffers in support of this factor is likewise not new.  Prior counsel brought Rehl's newborn daughter to the Court's attention, and he has not proffered that the individuals from whose letters he quotes, ECF 401 at 38-39, were unavailable to him in prior detention litigation.  Even if they were, what they provide is largely duplicative of the information that the Court already found favored the defendant, but not enough to tip the scales in favor of release.   Also not new is the defendant's reliance on his prior rallies, his support for law enforcement, and his military service.  *Id.* at 39-40.  To the extent any of it is new, he has not proffered how it was unavailable to him during prior litigation, and in any event, it would not be material because the Court already found that the defendant's history and characteristics weigh in favor of release.

II.     Rehl's Activities Were Not Protected by the First Amendment

The defendant claims that his violent statements, as well as his association with the Proud Boys, is prohibited from use in detention litigation by the First Amendment. ECF No. 401 at 5-9. He is wrong on both counts, and he additionally confuses his leadership role in the charged conspiracy with his leadership role in the Proud Boys writ large.

"The First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). The defendant's statements are relevant to the nature and circumstances of the evidence, the weight of the evidence against the defendant (especially here where the defendant has challenged whether the evidence satisfies the elements of the obstruction and seditious conspiracy statutes), and his dangerousness.  The use of Rehl's statements cited by the government and relied upon by the Court is specifically the type of use of them explicitly sanctioned by *Mitchell.*

The defendant is moreover incorrect that he has been charged with some type of association crime. *See* ECF No. 401 at 7-8. The defendant is not charged with being a member or leaders of the Proud Boys, either nationally or within the Philadelphia chapter. There has been no suggestion, either in the charges with which the defendant has been charged, nor in the government's argument or the Court's findings in favor of detention, that his crime is a "membership crime," as Rehl seems to imply at 6-7, citing *Noto v. United States*, 367 U.S. 290, 297 (1961). The defendant was charged at the time of the first detention hearing with conspiring to obstruct Congress' certification of the Electoral College Vote, and he additionally charged with violations of 18 U.S.C. §§ 2384 and 372. None of these are status crimes. They all involve the agreement to do something unlawful (in the case of obstruction) or to use force or something similar against the United States (Sections 2384 and 372). This Court has already dispatched with that argument as it relates to the obstruction charges. ECF No. 263 at 28-30. Judge Mehta has recently done the same with respect to seditious conspiracy. *See United States v. Rhodes, et. al.*, No. 22-cr-15 (APM), Doc. 176 at 24 ("Defendants . . . seem to say that they are being prosecuted for exercising their First Amendment rights of expression. However, seditious conduct can always be punished") (cleaned up) (quoting *Dennis v. United States*, 341 U.S. 494, 590 (1951) (Douglas, J., dissenting)).

Neither the government nor the Court has relied on the defendant's membership in the Proud Boys in charging this case or in detaining the defendant. Rather, the focus has always been on the defendant's leadership role in the conspiratorial group of Proud Boys who led the attack on the Capitol. As the defendant points out, Jeffrey Finley—like Rehl—is president of his local Proud Boys chapter, and while he has been charged with his role in the events of January 6, he has not been charged with conspiracy, nor has the government sought to detain him. Finley is not alleged to have been a leader or planner of the group who led the attack; Rehl is. As the Court noted in

denying co-defendant Nordean's motion for discovery of selective prosecution, there are multiple members of the Proud Boys who have not been charged with conspiracy.  *See* ECF No. 378 at 10. Additionally, as the Court acknowledged in the context of Nordean's selective-prosecution motion, "evidence of leadership connected to the January 6 attack is relevant to whether a defendant should be detained pending trial in part because 'whether a defendant poses a particular threat depends on the nature of the threat identified and the resources and capabilities of the defendant.'"  *Id.* at 11, quoting *United States v. Munchel*, 991 F.3d 1273, 1283 (D.C. Cir. 2021).  Rehl's status as a leader of the charged conspiracy is undoubtedly relevant, and the Court properly relied upon it in detaining him.

III.   Rehl's Original Detention Hearing Was Not Flawed

a.   **The Court Properly Referenced Prior Findings.**

Rehl argues that his detention hearing was flawed because the Court referred to and incorporated some findings it had made regarding co-defendants Biggs and Nordean.  *See* ECF No. 401 at 28.  Rehl misconstrues the nature of the Court's reference and cites inapposite case law involving *in camera*, *ex parte* proceedings.  Rehl was represented by counsel at his hearing, and he was afforded a full opportunity to confront the government's evidence.  The findings the Court incorporated drew no objection from Rehl's counsel at the time, and they largely consisted of laying out allegations in the First Superseding Indictment—which Rehl was well equipped to challenge if he so chose—or government proffers of evidence.

Rehl had a chance, through counsel, to contest the government's entire proffer and evidence.  Only after that had happened did the Court refer to previous findings.  There is nothing wrong with doing so if the Court believed those findings were germane after a contested hearing. The Court's analysis as to the Rehl detention factors, as well as evidence specific to Rehl, occurred

with Rehl's counsel present.  As the Court noted, it placed more weight on statements made by Rehl himself than those of his co-defendants. June 30, 2021, Hr'g Tr. 40:7-40:8.  Even if the Court strikes from the record any references to statements outside those in the indictment or proffered as to Rehl specifically, its findings were more than sufficient to support the detention order.

      b.  **The Government Properly Proceeded by Proffer.**

The defendant has made no substantive argument in support of his claim that the Court should order the government to present a live witness at any detention hearing in this case.  He cites no in-circuit or in-district precedent requiring such testimony, nor does he provide any support for his claim that "As a matter of practice in this district, detention hearings often involve testimony by law enforcement officers, where defense counsel are able to cross-examine the witness, and not merely a presentation and argument by prosecutors."  Undersigned counsel's experience is in fact that detention hearings with testimony are exceedingly rare in this district.  In any event, proceeding by proffer is expressly permitted in this Circuit, *see United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996), and for the reasons stated above, the defendant's motion provides no basis to reopen the hearing at all, let alone to require that any reopened hearing involve live testimony.

## Conclusion

The defendant has not proffered any new facts that would materially alter this Court's decision to detain the defendant, following a thorough hearing on June 30, 2021, and a fully briefed motion to reopen that hearing from the fall of 2021.  For the foregoing reasons, and any as may be cited at a hearing on this motion, the defendant's motion should be denied.

Respectfully Submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ Erik M. Kenerson
ERIK M. KENERSON // Ohio Bar No. 82960
JASON B.A. MCCULLOUGH
   D.C. Bar No. 998006
NADIA E. MOORE // N.Y. Bar No. 4826566
   On Detail to the District of Columbia
Assistant United States Attorneys
601 D Street NW
Washington, D.C. 20530
(202) 252-7201
Erik.Kenerson@usdoj.gov

   /s/ Conor Mulroe
Conor Mulroe // N.Y. Bar No. 5289640
Trial Attorney // U.S. Department of Justice,
   Criminal Division
1301 New York Avenue, Suite 700
(202) 330-1788
conor.mulroe@usdoj.gov