```
            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,        )
                                 )
        Plaintiff,               )
                                 )    CR No. 22-15
                                 )    Washington, D.C.
     vs.                         )    September 27, 2022
                                 )    9:30 a.m.
ELMER STEWART RHODES III, ET AL.,)
                                 )    Day 1
        Defendants.              )    Morning Session
_____)

         TRANSCRIPT OF JURY SELECTION PROCEEDINGS
            BEFORE THE HONORABLE AMIT P. MEHTA
               UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

For the Government:         Kathryn L. Rakoczy
                            Jeffrey S. Nestler
                            Troy Edwards
                            Alexandra Hughes
                            Justin Sher
                            U.S. ATTORNEY'S OFFICE
                            601 D Street, NW
                            Washington, D.C. 20579
                            (202) 252-7277
                            Email:
                            kathryn.rakoczy@usdoj.gov
                            Email:
                            jeffrey.nestler@usdoj.gov

1  prep is evolving, but, you know, just be mindful that if
2  something comes in at the eleventh hour, there's no
3  guarantee that either the witness to whom the document is
4  related to or the particular information will be admitted if
5  it does prejudice the defense.
6              MS. RAKOCZY:  Yes, Your Honor, we understand.
7              THE COURT:  All right.
8              Anything else from either side before we move
9  forward?
10             Okay.  Let me just begin, there was a motion or a
11 supplement filed, I guess, a follow-on motion filed by the
12 defense to transfer venue.  This was filed on the 23rd of
13 September, document 339.
14             Among other things, the motion contends that, "the
15 majority of witness -- excuse me -- jurors hold pre-judgment
16 bias" based on questionnaires.  It estimates that 51 percent
17 have some pre-judgment bias.
18             The motion also asserts, "If you removed everyone
19 who answered under oath that they were biased, plus everyone
20 who reported knowing of the Oath Keepers, that would leave
21 about 41 arguably eligible jurors out of the 150 based on
22 sworn responses."
23             They've also suggested that people who answered
24 affirmatively to Questions 11, 17, and 22 necessarily are
25 biased against the defendants.  And they've also identified

1  Questions 45, 47, 49, and 48 as questions that might reveal
2  bias.
3          First and foremost, the questions that the
4  defendants say necessarily show bias, pre-judgment bias,
5  just aren't so.  In particular, Question 22, whether asks
6  somebody was concerned about someone on January 6th or about
7  safety is not an indicator of pre-judgment bias, certainly
8  not without further questioning of the witness that answered
9  that question affirmatively.
10         Nor is Question 11 necessarily an indication of
11 pre-judgment bias.  There were some people who simply
12 responded with information that they thought might be
13 relevant but didn't necessarily show pre-judgment bias.
14         Nor is Question 17, which is a question about
15 firearms and beliefs about firearms, necessarily showing
16 pre-judgment bias.  If any witness who has answered that
17 question, they will become -- they will be brought in and
18 they'll be asked what their potential views it.  And,
19 frankly, they also will be told that there's no allegation
20 in this case that anybody unlawfully possessed a firearm,
21 which is true.  So we'll just see how all that plays out.
22         It is true that Questions 45, 47, and 49 are more
23 directly tailored or were more directly tailored to identify
24 bias.  Question 48 certainly was not, and that is simply a
25 question that asks whether anybody had heard about the

1  Oath Keepers.  And merely hearing about the Oath Keepers
2  certainly does not suggest any pre-judgment bias by itself.
3         Since the motion was filed, we did some work.  And
4  here are the actual numbers that are resulted from our jury
5  questionnaire.  As everybody knows, we had 150 jurors come
6  in and complete their questions.
7         Here are the numbers.  Of the 150 jurors who came
8  in, only 11 -- excuse me.  As to Question 11, 31 answered
9  yes.  That's 21 percent.  Of the 150 who answered 22 yes,
10 only 55; that is 37 percent.
11        Question 44, 82 answered yes; that's 55 percent.
12 And that was the question about whether anybody has watched
13 the January 6th hearings.  So 45 percent of people who were
14 in this jury pool said that they had not watched the
15 January 6th hearings.
16        45 of 150 answered Question 45.  That was the
17 question about bias with respect to January 6th.  That was
18 30 percent.  Question 46, that is the question concerning --
19        MS. HALLER:  The Oath Keepers.
20        THE COURT:  -- acknowledgment of the Oath Keepers;
21 89 people answered yes.  That's 59 percent.  So 40 percent
22 had not even heard of the Oath Keepers.
23        Question 47, 36 people answered yes; that's 24
24 percent.  So less than 25 percent of people said that they
25 had any pre-judgment bias against Oath Keepers based on what

1  they knew.
2          Question 48, only 18 people answered yes.  That
3  was the question that asked whether they had heard of any of
4  these defendants.  That's 12 percent.
5          Only seven people answered Question 49
6  affirmatively.  That is the question that asked whether they
7  had any pre-judgment bias against these defendants based
8  upon what they knew.  Only seven people answered that
9  question.  That is 5 percent of the jury pool, of the 150.
10         Those numbers go down once we remove those who
11 have already been stricken.  So with our remaining jury
12 pool, which is 131 people, after we struck 29, only 12
13 percent have answered Question 11 affirmatively.
14         32 percent have answered Question 22
15 affirmatively.
16         Question 44, 51 percent have answered that
17 affirmatively.
18         Question 45, 21 percent have answered it
19 affirmatively.
20         Question 46, 56 percent have answered it
21 affirmatively.
22         Question 47, 17 percent have answered it
23 affirmatively.
24         48, 13 percent have answered it affirmatively.
25         And Question 49, 5 percent have answered it

1   affirmatively.
2          I'll just note the following:  That of the 150
3   people in the initial pool, 49 jurors -- that is a third --
4   answered yes to either Question 45, 47, or 49.
5          So this notion that somehow 70 percent of the
6   people in the District of Columbia have prejudgment bias
7   against these defendants is simply not borne out by the
8   numbers as they're reflected in this jury questionnaire.
9          Of the current 121 people in the pool, only 30
10  jurors answered yes to either Question 45, 47, or 49; in
11  other words, of the 29 jurors we struck last week, 19 of
12  them answered yes to one of those three questions.
13         And to be more precise, of the 29 jurors that were
14  struck last week, either -- of the 29 jurors we struck last
15  week, 10 were either wholly or in part due to bias.  The
16  remaining 19 jurors were struck for a variety of reasons.
17  Ten of them were struck because of unavailability.
18         And even among those who we've struck for bias,
19  two were because of employment-related situation -- you
20  know, matters.  One was a U.S. Capitol Hill police officer.
21  This was Juror 0322.  And another juror, 0455, was employed
22  on the Hill at the time, I believe, on January the 6th.
23         But even among those we struck last week, it was
24  only a third that were struck for bias-related reasons.  The
25  remainder, or at least the other third, were struck for

1  unavailability.  And the other third were struck for a
2  variety of different reasons.
3           So I just do not believe that the actual numbers
4  as they are reflected in the juror questionnaire bear out
5  the statements that are made in the motion suggesting that
6  large percentages of people have pre-judgment bias, both in
7  the District of Columbia and in this particular jury pool.
8           The motion also notes that there have been no
9  acquittals by juries in the District of Columbia in any
10 January 6th case.  That is true as a matter of fact, but
11 that doesn't tell me anything about bias or inherent -- bias
12 by jurors in the District of Columbia.
13          It very well may be that that is simply a function
14 of the strength of the government's cases.  And as you all
15 know, there's a very high conviction rate in federal
16 criminal trials as a general matter, and most federal
17 criminal trials do not have the amount of video and social
18 media that has been introduced in the January 6th cases.
19          The motion further complains about targeting of
20 this case in the news.  I couldn't disagree with that
21 characterization any more.  There are three -- only really
22 two sets of stories that have been identified by the
23 defense.  The first is a set of stories that came out in the
24 second week of July that related to or was in association
25 with the Court's rulings on motions in limine.  There was

20

1   essentially a 24-hour news cycle about some of the Court's
2   rulings about some of the 404(b) evidence that the
3   defendants had challenged.  And I actually excluded some of
4   the evidence that has raised concerns about -- by the
5   defense, in particular, evidence relating to Mr. Caldwell
6   and evidence relating to Ms. Watkins, which were identified
7   in this motion.
8           There also was recent press concerning the Court's
9   rulings on the Zello recording.  But, of course, that came
10  after the questionnaires were completed and these jurors had
11  received an instruction not to read or watch news.
12          And as part of the questioning that will happen
13  over the next few days, I will be asking jurors whether they
14  have recently, since their questionnaire was completed,
15  watched or received news or heard news, and before any juror
16  is sworn in, I will again ask them whether they have watched
17  any media or listened -- heard any media about this case.
18          And then there was the tweet about the House
19  Select Committee and certain news around that.  They had
20  tweeted about the Zello recording.  It was essentially all
21  part of the same news coverage.
22          So we're not talking about anything that comes
23  close to the kind of level of saturation of media coverage
24  that the Supreme Court has ever been concerned about.  These
25  were, at most, three news stories that lasted at most a

1   24-hour news cycle.  And that given all else that is
2   happening in the world, I would hardly characterize any of
3   these stories as something that has taken prominence either
4   nationally or locally.  Certainly none of them would have
5   appeared above the fold in any local newspaper.
6           The purpose of voir dire is, of course, to
7   determine how the media has impacted jurors.  Much of our
8   questionnaire or number of questions were elicited or
9   designed to elicit how much jurors have been exposed to the
10  media, and that will be a subject of questioning when they
11  all come in here to discuss their questionnaires.
12          And, of course, there remains the fundamental
13  problem with the defendants' motion, which is that the
14  request is to move the case to the Northern District of
15  Virginia in the Alexandria division.  That is the exact same
16  media market as the District of Columbia:  same newspapers,
17  same television stations, same radio stations.  And, of
18  course, online news is available everywhere and does not
19  discriminate with respect to geography.
20          There's also the concern about the January 6th
21  Committee hearing, which is scheduled tomorrow, as
22  I understand it, at 1:00.  It is a one-day hearing that, at
23  this point, it's not clear to me what the content of that
24  hearing will be.  But rest assured, these jurors will be
25  instructed in no uncertain terms not to watch that hearing,

Case 1:21-cr-00175-TJK   Document 502-1   Filed 10/21/22   Page 10 of 11

22

1   if it takes place tomorrow, or read any news about that
2   hearing.
3   　　　　　And, again, before any juror is finally seated in
4   this case, they will be asked whether they, in fact, watched
5   that hearing and/or watched any news about the hearing. And
6   they will all, of course, be under oath and, therefore, will
7   have to testify truthfully as to that question.
8   　　　　　Defendants have also attached a new survey which
9   they suggest shows pre-judgment bias by jurors. But
10  *Haldeman*, the D.C. Circuit's decision is clear, that the
11  Court does not abuse its discretion by actually relying on
12  voir dire over these types of surveys. And as I said, the
13  actual questionnaire doesn't bear out what the survey itself
14  seems to suggest.
15  　　　　　And as for the survey itself, you know, I don't
16  know what it means to ask whether somebody has a favorable
17  or unfavorable view about a particular group, in this case,
18  the Oath Keepers. In my opinion, it doesn't necessarily
19  correlate to the bigger question and the more important
20  question, which is whether a juror can be fair or not to the
21  defendants in this case.
22  　　　　　Again, as the Circuit and the -- Circuit and
23  perhaps even the Supreme Court has said, the baseline here
24  is not a juror who has not -- knows nothing about the case
25  and perhaps has no opinion about the case; but, rather, it

1  is whether a juror can attest to being fair and impartial,
2  notwithstanding what else they may have learned about the
3  case before they became a juror, and that's the main reason
4  for the voir dire.
5          And then, finally, the defense refers back to the
6  old survey numbers, which I've already addressed in my prior
7  decision and found those to be unresponsive -- excuse me,
8  unpersuasive.  And I also continue to believe those surveys
9  to be unpersuasive and certainly do not require me to change
10 venue in this case in light of the decision in *Haldeman*.
11 Okay?
12         MS. HALLER:  Your Honor, may I understand?
13         THE COURT:  No, no.  We're done.
14         So -- and the record has been made, Ms. Haller.
15 You've made your arguments in writing.  I don't know that I
16 need to hear anything more.
17         All right.  Before we get started with jury
18 selection, just a couple of issues concerning specific
19 jurors.
20         I think Mr. Douyon notified all of you yesterday
21 about Juror 0708, who was on line 59.  That juror wrote us
22 and asked to be excused for certain personal health reasons.
23         And our response to that juror is we wanted to
24 talk to the parties before we formally agreed to relieve
25 that person of duty.