1     **UNITED STATES DISTRICT COURT**
      **FOR THE DISTRICT OF COLUMBIA**

2     _____

3     United States of America,      ) Criminal Action
                                     ) No. 1:21-cr-00175-TJK
4                     Plaintiff,     )
                                     ) **Motion Hearing -**
5     vs.                            ) **\*\*\* PARTIALLY SEALED \*\*\***
                                     ) (via Zoom)
6                                    )
      Ethan Nordean, et al.,         ) Washington, D.C.
7                                    ) **October 28, 2022**
                      Defendants.    ) Time:  9:30 a.m.
8     _____

9                 Transcript of **Motion Hearing**
                  **\*\*\* PARTIALLY SEALED \*\*\***
10                      **Held Before**
            **The Honorable Timothy J. Kelly** (via Zoom)
11               **United States District Judge**

12
                   A P P E A R A N C E S
13

      For the Government:    **Jason B.A. McCullough**
14    (via Zoom)             **Erik M. Kenerson**
                             **Conor Mulroe**
15                           UNITED STATES ATTORNEY'S OFFICE
                             FOR THE DISTRICT OF COLUMBIA
16                           601 D Street, Northwest
                             Washington, D.C.
17
      For the Defendant (1) Ethan Nordean:
18    (via Zoom)             **Nicholas D. Smith**
                             DAVID B. SMITH, PLLC
19                           7 East 20th Street
                             New York, New York 10003
20
      For the Defendant (2) Joseph R. Biggs:
21    (via Zoom)             **Norman A. Pattis**
                             PATTIS & SMITH, LLC
22                           383 Orange Street, 1st Floor
                             New Haven, Connecticut 06511
23
      For the Defendant (3) Zachary Rehl:
24    (via Zoom)             **Carmen D. Hernandez**
                             7166 Mink Hollow Road
25                           Highland, Maryland 20777
      (continued on next page)

1           A P P E A R A N C E S, continued

2      For the Defendant (5) Enrique Tarrio:
       (via Zoom)              **Nayib Hassan**
3                              LAW OFFICES OF NAYIB HASSAN, P.A.
                               6175 NW 153 Street, Suite 209
4                              Miami Lakes, Florida 33014

5                              **Sabino Jauregui**
                               JAUREGUI LAW, P.A.
6                              1014 West 49 Street
                               Hialeah, Florida 33012

7
       For the Defendant (6) Dominic J. Pezzola:
8      (via Zoom)              **Steven A. Metcalf, II**
                               METCALF & METCALF, P.C.
9                              99 Park Avenue, 6th Floor
                               New York, New York 10016

10     _____

11     Stenographic Official Court Reporter:
       (via Zoom)              Nancy J. Meyer
12                             Registered Diplomate Reporter
                               Certified Realtime Reporter
13                             333 Constitution Avenue, Northwest
                               Washington, D.C. 20001
14                             202-354-3118

15

16

17

18

19

20

21

22

23

24

25

1                P R O C E E D I N G S

2          (REPORTER'S NOTE:  This hearing was held during the
   COVID-19 pandemic restrictions and is subject to the
3  limitations of technology associated with the use of
   technology, including but not limited to telephone and video
4  signal interference, static, signal interruptions, and other
   restrictions and limitations associated with remote court
5  reporting via telephone, speakerphone, and/or
   videoconferencing.)

6

7          THE COURTROOM DEPUTY:  We are on the record in

8  Criminal Matter 21-175, United States of America v. Defendant

9  1, Ethan Nordean; Defendant 2, Joseph Biggs; Defendant 3,

10 Zachary Rehl; Defendant 5, Enrique Tarrio; and Defendant 6,

11 Dominic Pezzola.

12         Present for the government are Jason McCullough,

13 Eric Kenerson, and Conor Mulroe.  Present for Defendant 1 is

14 Nicholas Smith.  Present for Defendant 2 is Norman Pattis.

15 Present for Defendant 3 is Carmen Hernandez.  Present for

16 Defendant 5 are Nayib Hassan and Sabino Jauregui.  Present for

17 Defendant 6 is Steven Metcalf.

18         Also present is Defendant 5, Mr. Tarrio.  The appearance

19 has been waived for Mr. Nordean, Mr. Biggs, Mr. Rehl, and

20 Mr. Pezzola.

21         THE COURT:  All right.  Well, good morning to

22 everyone.

23         Before -- we are here for argument on Defendant Tarrio's

24 motion to transfer.  Before we do that, let me just hit a

25 couple of housekeeping matters that -- at least most of them

1      will be housekeeping matters.  We'll see if one is more

2      involved.

3            First, I know counsel for -- I think it was Mr. Biggs --

4      filed what I think is styled as a motion to clarify, sort of,

5      the trial dates in December.  So just to give everyone notice

6      of that.  Mr. Biggs's counsel, I think, was -- accurately

7      remembered what I had told the parties before, which was we

8      won't sit on the 23rd.  We won't sit -- which is a Friday, the

9      Friday before Christmas Eve.  We won't sit on the day after

10     Christmas, which is -- in any event, is the observance of a

11     federal holiday.  So the court will be closed anyway.  And then

12     the next holiday -- again, federal holiday, which the Court

13     would be closed anyway -- is January 2nd.

14           So our first after -- beginning on -- after beginning

15     with jury selection on the 12th -- this is assuming I deny the

16     motion for -- for the moment, the moment [sic] we're going to

17     hear argument on in a second.  But assuming we proceed, we'll

18     have one full week and then, effectively, three weeks of

19     sitting only four days.  The first week, not sitting on the

20     Friday.  The second week not sitting on Monday.  The next week

21     also not sitting on Monday.  Just to clarify that.

22           And then we'll play it by ear after that, I think,

23     depending on how -- how we're moving, whether we sit every

24     single day or take Fridays off.  I'm going to just sort of

25     leave open, and we'll see how things are progressing.

1          Mr. Pezzola -- I saw counsel for Mr. Pezzola filed a

2     motion to not -- or to put off arguing his motion that was teed

3     up to argue today.  I think that was unopposed by the

4     government.  So we will -- I'll grant, and we'll -- we'll hear

5     that argument perhaps the next time we are together.

6          MR. METCALF:  Thank you, Your Honor.  I appreciate

7     that.

8          THE COURT:  All right.  Very well.

9          And speaking of the next time we're together, just to

10    let everyone know, I don't quite know where we'll be on that

11    day.  We will -- we'll reach out to everyone to let you-all

12    know what courtroom we're going to be in on -- on -- in a

13    couple of weeks, on the 14th, but it -- well, I'll just put it

14    that way.  We'll let you-all know what courtroom we're going to

15    be in on that day in advance of that day.

16         Let's see.  The one other thing I wanted to mention

17    before we get to the argument was there was a motion that was

18    filed by Mr. Nordean under seal about some materials, some

19    materials that were the subject of an order of mine, not too

20    long before that.

21         Have those -- has that issue been resolved, Mr. Smith,

22    or is it still lingering as of today?

23         MR. SMITH:  It -- it has not been resolved, Judge,

24    and thank you for raising it.

25         THE COURT:  Okay.  Let me ask the government, is -- I

1    don't want to just have a -- if we can, have a discussion about

2    this not under seal.  Is -- does the government expect to

3    produce the materials in question shortly, or what can the

4    government tell me about its plans to make the production of

5    the materials at issue there?

6            MR. MULROE:  Good morning, Your Honor.  Conor Mulroe

7    for the United States.

8            Without, you know, going into too much detail on the

9    public record, we can say that we expect this issue to be

10   resolved by early next week.  The majority of the materials in

11   question are -- are ready to move forward and could do so as

12   early as this weekend.  The complete set would be ready by

13   early next week, we expect.

14           THE COURT:  All right.  But you have something to be

15   produced as of this weekend, either today or this weekend?

16           MR. MULROE:  Produced at least here in

17   Washington, D.C.  As the Court knows, the -- the instant

18   question here involves materials that would be located in -- in

19   other places more convenient to defense counsel.  I don't know

20   that we would be able to ship those out and have them ready by

21   early next week.  But at least here in the D.C. area, this

22   weekend a binder of materials in question would be ready for

23   their review.

24           THE COURT:  All right.  Here's what I'll just do on

25   that, just for the moment, and I'm not -- this didn't -- I'm

1    not -- by -- by ordering this, I'm not -- I'm not prejudging

2    any of the requests for relief that you've made, Mr. Smith.  So

3    we'll, just for the moment, put that aside.

4         And, Mr. Mulroe, if the government will file by noon on

5    Monday something under seal that updates me as to what the

6    status of -- of the materials Mr. Smith is interested in, that

7    would be helpful in trying -- and then I will reach out to the

8    parties if -- depending on that.  And we'll see -- to try to

9    push things along.

10         And, Mr. Smith, I'll hear you -- well, let me put it

11   this way:  Depending on how I view the situation after that

12   update, I'll decide how to go from there.  But I'm not -- I'm

13   not ruling out any of the kind of requests you've made,

14   Mr. Smith.

15         MR. SMITH:  Thank you, Judge.  I'd just like to make

16   one point about what the government just said.

17         THE COURT:  Sure.

18         MR. SMITH:  So I -- we understand that -- that

19   private counsel, nongovernment attorneys, are not supposed to

20   be emailing sensitive records.  That's -- government counsel on

21   their own servers do email sensitive records to each other.  So

22   it would seem possible for the counsel -- the government

23   counsel in Washington, D.C., to simply email those documents,

24   simply scan and email to the U.S. Attorney's Office in

25   Florida or New York or the field offices there.  So I don't --

1    I guess we would be confused about why the binder would only be

2    available physically in one spot when -- when government

3    counsel can email the documents to each other.

4            THE COURT:  Well, I'm not going -- I'm not going to

5    deny -- I hear what you're saying, of course.  If they don't

6    have individuals -- let's just put it this way.  I'm not going

7    to -- I'm not going to address it further.  For now, I'm going

8    to just have the government update me on where things stand.

9    If you want to address the point Mr. Smith is making, that's

10   fine, and I'll take up that dispute once I see what the

11   government has -- has filed under seal.

12           MR. MULROE:  Thank you, Your Honor.  We'll file it by

13   noon.  Was noon the Court's --

14           THE COURT:  Yeah.  Yeah.  I think that's -- I'd like

15   to know where things stand on noon by Monday; correct.

16           MR. MULROE:  Certainly, Your Honor.  Thank you.

17           THE COURT:  All right.  That was all the housekeeping

18   matters I had.

19           Is there anything else before I hear from counsel for

20   Mr. Tarrio?  Any other -- I hesitate to say this given the

21   number of people we have here, but any- -- anything that you

22   think is in the manner of -- in the category of housekeeping

23   that -- any side wants to -- to raise?

24           MR. HASSAN:  I have one matter, Judge.  It's

25   regarding -- not regarding the motion but regarding

1   transportation of the individuals.  It's my understanding that

2   the individuals, based upon my conversation with the

3   government, that he -- Mr. Tarrio and some of the other

4   defendants, they're not housed in Washington, D.C.; that they

5   are not needed to be present for November 14th.  Is that fair

6   to say, Judge?  Or should I file something in an abundance of

7   caution so they're not moved and relocated for November 14th?

8              THE COURT:  I hadn't -- you know, obviously, at some

9   point they're going to have to -- to be here for these

10  proceedings.  And so, you know, honestly, I had not -- I had

11  not thought about it.  So you're putting on the -- you're

12  putting -- I mean, my only concern with not having them present

13  on the 14th, if they're not going to be, is simply that we --

14  we -- that -- that -- that the marshals are prepared to have

15  them here for the beginning of trial.

16             And so -- I mean, I think that's -- that's the question.

17  And, in particular, for example, some defendants -- I just

18  wanted to look now.  We've set -- on the 14th we're set for

19  9:30.  So the question is if -- you know, it seems to me that's

20  a motion hearing for pretrial motions.  Later that week, we

21  have a pretrial conference.  At that point, the tempo of us

22  meeting is -- is going to be speeding up, and it seems to me

23  you're going to want to have your client present for those --

24  for those -- for those -- for those hearings.

25             And the reality is, given the scheduling of -- given the

1    various places where defendants are, we don't know whether --

2    I -- as I sit here right now, if your client or any of the

3    other clients -- any of the other defendants aren't physically

4    present that day, I don't know whether they're going to be able

5    to be present remotely.  And it seems to me at some point it

6    makes sense for them to be present.

7         So I know that's -- that's -- you know, we're getting

8    close to trial.  You want to be -- I understand you need access

9    to your client, but we also need to make sure they're going to

10   be present for -- they're going to be present one way or the

11   other for court proceedings.  And it seems to me the only way

12   to absolutely ensure that is to make sure that they're

13   physically -- that they're physically here and can be

14   physically in court, because, again, there's no way to

15   accommodate all the different facilities involved at this

16   point.

17        So I -- I guess I'll take your point under advisement

18   because I had not thought about it until now.  I had assumed

19   that we would -- we would have all counsel present and we would

20   have all the defendants present simply because I don't --

21   cutting it any closer to them being physically here for trial,

22   I think, starts to get risky, in terms of the marshals' ability

23   to get them here.

24             MR. MCCULLOUGH:  Your Honor, if I may.  Jason

25   McCullough for the United States, for purposes of the court

1      reporter.

2            It's the government's understanding that the U.S.

3      Marshals Service, as a matter of course, plans to transport the

4      defendants to the locality two weeks prior to trial.  That is

5      their practice.  And so I think, Your Honor, in terms of

6      getting the -- getting Mr. Tarrio here, that their kind of plan

7      would be to -- to kind of begin that move at the end of

8      November, the last days of November, in order to get him here

9      for trial, and they would get him here for trial.

10            I suppose it would be up to -- I think the question

11     before Your Honor, then, is whether you believe that he should

12     be here before that so that he can be here continuously for

13     that two weeks prior, such that he would be available for, as

14     you said, the pace of hearings.  The government doesn't take a

15     position on that, but I think that's the issue; is that it

16     sounds like U.S. Marshals Service has plans in place to get him

17     for December 12th.  And then -- and then the issue would be --

18     as to Your Honor, whether it would be appropriate for him to be

19     VTC.

20            THE COURT:  And maybe we can end up -- Ms. Hernandez,

21     I know you had your hand up a second ago.  It may be then that

22     if -- if they have a plan to do that -- I'm actually going to

23     be speaking with the marshals soon about some of the logistics.

24     If they can assure me he's going to be there, then maybe,

25     Mr. Hassan, the only question is if you want to waive his

1    presence for things like the motion hearing, kind of how we've

2    been dealing with hearings like this.

3         We'll try our best to get defendants hooked in here,

4    whether it's by video.  If not by video, by audio.  But if at

5    the end of the day we can't and you're willing to make that

6    trade-off and say, look, we'd still rather -- even if he

7    can't -- even if the timing of the hearing doesn't work for

8    that facility but, still, we'd rather have him closer to you

9    for -- for those intervening few weeks, then maybe -- then I'm

10   likely to just accommodate that.  But maybe that's what you're

11   telling me.

12        MR. HASSAN:  That's correct, Judge.  And that's a

13   fair assumption.  We wanted to waive his presence, because if

14   the Court considered relocating him beforehand -- I had spoken

15   with Mr. Tarrio already, and we had already discussed

16   potentially waiving his presence for the November 14th and

17   November 18th setting, Judge.

18        THE COURT:  All right.  Well, let me reach out to the

19   marshals just to make sure I'm confident they have a plan to

20   make sure -- not just your -- not just your client, but they --

21   all are going to be here on the 12th.  And I'll be open, then,

22   to -- if you're telling me you would waive, then I'd be open to

23   managing that so he doesn't have to be here on the 14th.

24        MR. HASSAN:  Thank you, Judge.

25        THE COURT:  Mr. McCullough.

1        MR. MCCULLOUGH:  Sorry.  Just a -- my apologies.

2   Just a few other kind of housekeeping or kind of administrative

3   matters as we kind of move towards trial and turn our attention

4   there.

5        One of the issues was that the parties had contemplated

6   a jury questionnaire.

7        THE COURT:  Uh-huh.

8        MR. MCCULLOUGH:  And so just in terms of our planning

9   purposes as, you know, kind of all parties here, if there is a

10  jury panel that's been summoned, the parties would like to be

11  able to plan around the date that the panel has been summoned

12  to return so that the parties can prepare for any review of the

13  questionnaire and the like.  And so I guess -- you know, kind

14  of the threshold question for the parties is whether the jury

15  panel is coming in to fill out the questionnaire in advance of

16  December 12th or on December 12th, and just wanted to kind of

17  get Your Honor's guidance on that.

18        THE COURT:  I'm glad you raised that.  I had

19  thought -- I guess I had thought we had discussed this, but

20  maybe we didn't, I guess.  So they have been summoned a week in

21  advance, similar to what we did -- with what I believe

22  Judge Mehta did in the Oath Keepers case.

23        So putting aside what the -- for the moment what the

24  questionnaire will look like exactly -- and we do have the

25  Oath Keepers case as a -- as a potential example to look at,

1    but -- so there -- they will be here on the -- one week

2    beforehand.

3         So I haven't -- to be honest, this is another thing

4    where I wanted to reach out to see how that process

5    mechanically worked with the -- on the Oath Keepers case.  But

6    we have -- but we do have -- we do have them coming in one week

7    beforehand so we don't have to kill time on the 12th.  We will

8    be ready to move forward on questionnaire responses in hand at

9    that point, so.

10        But the question is what -- I don't know.  I'll be

11   candid, Mr. McCullough.  I don't know exactly the mechanics of

12   how the Court and defense counsel were involved in that

13   process, at least when the jury came in a week early on the

14   Oath Keepers case.  But if that worked smoothly, I imagine I

15   would follow with similar -- a similar -- a similar process,

16   but that's something -- we're still a little bit aways away.

17   And I hadn't done my investigation with the jury office here to

18   find out exactly how that worked.

19        You-all may know from talking to the prosecutors in that

20   case more than I at this point.

21        MR. MCCULLOUGH:  And, Your Honor, if Your Honor would

22   be interested in hearing about that process, the -- our

23   supervisor who is supervising both the cases, actually, is,

24   actually, present here today and would be willing to kind of

25   work through that, if that is helpful to put on the record.  Or

1    if you'd like to kind of do it elsewhere, we're happy to do it,

2    as you suggest.

3              THE COURT:  I think we can stick a pin in it for

4    another day, but -- and it may be that, again, the attorneys

5    may not have been -- on either side may not have been involved

6    at all, other than input about the questionnaire, to that

7    extent, and -- but -- but in any event, you will -- so if --

8    if, indeed, that process proceeded without the other side

9    present, you know, you would expect to receive those

10   questionnaires, again, well in advance of the following Monday

11   so we would have that jump start on picking the jurors.

12             But I think it's something for us to take up at a future

13   hearing, but I'm glad you brought up just the timing and the

14   fact that they are coming in a week early to get the

15   questionnaire.

16             MR. MCCULLOUGH:  That's excellent, Your Honor, yes.

17   In terms of whether the parties were involved in the

18   Oath Keepers process, my understanding is that the parties were

19   not involved; that the prospective jurors simply came in,

20   completed the questionnaire, and then they flowed downstream to

21   the parties, is my understanding.  So that's very helpful,

22   Your Honor, and thank you very much for the clarification.

23             I think in terms of one other -- I mean, this is kind of

24   from the, you know, ridiculous to sublime, but just a more

25   simple matter in terms of whether Your Honor has considered

1      which courtroom the parties will be in, you know.  I know that

2      Judge Mehta had moved his trial to a different courtroom and

3      just was interested to learn just so we can plan accordingly.

4              THE COURT:  Sure.  No.  And as perhaps my point to

5      you-all about the 14th suggests, I think, the -- the question

6      about where we'll be for trial is still to be determined.  It

7      is somewhat a question just for the folks in this courthouse in

8      terms of what other trials are going to go on at that point, so

9      what courtrooms do we have available.  But we're -- they're

10     working on that right now.  So I'll let you-all know well in

11     advance, but -- but that's still to be determined.

12             MR. MCCULLOUGH:  Understood.  Thank you, Your Honor.

13         And I'm just kind of going through the list.

14             THE COURT:  That's all right.  I -- Ms. Hernandez,

15     and I know your hand is up too.

16         Go ahead, Mr. McCullough.

17             MR. MCCULLOUGH:  So I think that -- one other item

18     here.  The parties are scheduled today -- well, I've got two

19     other items, one of which may be relevant to Ms. Hernandez's

20     hand up.

21         But before I get to that, the parties had contemplated a

22     joint submission today with respect to proposed jury

23     instructions, jury questionnaire, and the like.  As Your Honor

24     knows, the joint scheduling order -- the Court scheduling order

25     contemplated that we would exchange those materials on

1    October 14th.  Your Honor, that -- that process has not gone

2    according to kind of the way it was laid out in the scheduling

3    order.

4         And so I -- briefly, the government had provided its

5    materials on the 14th, not received anything from the

6    defendants.  Those materials are now coming in.  And -- and,

7    you know, kind of as early as Monday of this week, we received

8    some -- what you might call a dueling version of the -- of the

9    jury instructions from counsel for Mr. Nordean.  We received

10   some input on the jury questionnaire yesterday from counsel for

11   Mr. Tarrio.

12        I think -- my -- my fundamental question here is --

13   Your Honor, is whether Your Honor would simply like to receive,

14   you know, kind of dueling versions or whether Your Honor --

15   today or whether Your Honor would like the parties to attempt

16   to kind of harmonize these at least into a single document or

17   attempt to continue any efforts to meet and confer.  My -- my

18   sense from the -- at least with respect to the jury

19   instructions is that meet-and-confer might not be terribly

20   productive in terms of resolving, you know, kind of the

21   distance between what -- the apparent distance between the

22   parties.

23        But I wanted to get Your Honor's input on that because I

24   simply -- the government didn't want to simply kind of pitch

25   this stuff over to Your Honor and say, you know, here's one.

1    Here's the other.  What would you like us to do about it?  How

2    can we make this most helpful to you, is -- is fundamentally

3    the question.

4          THE COURT:  Well, definitely what would have been

5    most helpful to me and, frankly, most compliant with my order

6    is for all the parties to have followed what -- in fact, not

7    only I ordered, but I ordered, I believe, at the parties' joint

8    suggestion.

9          At this point, I think it does -- so it's -- it's

10   disappointing, and I hope it's not a harbinger of things to

11   come that the parties are not meeting these deadlines.

12         I think -- here's what I would suggest, Mr. McCullough.

13   Why don't you take a little bit of time -- and by that I

14   mean -- looking at the -- looking at the schedule, say by

15   Wednesday of next week to see what you can do about -- as

16   you -- the way you put it, harmonizing, coming to as much

17   agreement as you can.

18         Frankly, I'm not going to have a lot of sympathy for a

19   defendant that hasn't played in the sandbox and attempted to

20   meet and confer about these things when we get together and

21   discuss them at the -- at the future -- future conferences.

22   You know, if -- if you tell me that by Wednesday a

23   particular -- you haven't heard from a particular defendant,

24   I'm not going to hear that defendant on that particular point

25   if they haven't participated in the meet-and-confer process

1    that I've laid out.  I'm just not going to hear from them.  I'm

2    not going to hear any objection.  I'm not going to hear any,

3    well, gee, Judge, we'd like to do it a different way.

4         Because there was a process laid out.  And as far as I'm

5    concerned, if you haven't participated in that process, you

6    know, we're going to -- I'm going to move forward, hear from

7    the parties that participated in it and -- and go from there.

8         So why don't I -- why don't we just -- I'll alter the

9    schedule a little bit to give you-all a little bit of time.  So

10   the materials that were due today, we'll make them due on

11   Wednesday, November 2nd, which gives you-all a little bit of

12   time to -- to attempt to see what you can do to harmonize and

13   come to an agreement on those things that make it an agreement;

14   and I'll take the submissions on the 2nd, prepare for later

15   meetings, and we'll go from there.

16          MR. SMITH:  Since the government just made some

17   representations that might have possibly triggered argument

18   waiver, the defense would like an opportunity to respond to

19   some of the facts that the government put on the record,

20   because the Court was implying there might be an argument

21   waiver.  So we would just like to say --

22          THE COURT:  Okay.  Mr. Smith, hold on one second.

23   I'll give you an opportunity to address in a second.

24        Mr. McCullough, anything else about that point you

25   wanted to make?

1          MR. MCCULLOUGH:  Not on that point.

2          I did have one other item for the Court, but if we're

3     going to kind of stick with just the process of getting the

4     jury instructions and questionnaire to Your Honor, Mr. Smith

5     would like to address that, that's fine.  I believe that I did

6     say plainly on the record that counsel for Mr. Nordean had

7     submitted something on this prior Monday.  So, I mean, I think

8     we -- we certainly -- any suggestion that we have not, you

9     know, received some engagement from Mr. Nordean's counsel, you

10    know, was -- was certainly not intended, and I don't think it

11    was made.

12          THE COURT:  All right.  Mr. Smith, make your point

13    quickly.  I think Mr. McCullough is right.  I didn't hear

14    him -- anybody -- make your point quickly.

15          MR. SMITH:  Judge, I'd like to say when the Court

16    sets -- the Court is familiar with how certain parties -- large

17    litigation works and how if the Court sets a deadline that says

18    on day one -- sometimes litigants will submit to the other

19    parties something at 11:59 and 59 seconds because there's a

20    function on email that allows you to send documents at the last

21    possible second in advance.

22          And so, Judge, I think we have -- the issue here is a

23    matter of following the Court's orders to the letter but not

24    spirit.  So if you send something at the end of the day, where

25    there's no possible time to negotiate over it, and then the

1    parties respond the next business day, I don't think that that

2    would be the defendants not, you know, following the Court's

3    order.

4         And the other point, Judge, that we wanted to make is

5    we've -- the Court also set deadlines for the government on

6    witness disclosures.  That was a long time ago.  We've been

7    screaming bloody murder in filing, sealed and unsealed, to have

8    these disclosures made to the defense to follow the Court's

9    order.  But we can't even -- we can't get those -- those

10   documents.  So it's kind of -- what's sauce for the goose is

11   sauce for the gander here.  If the government is going to

12   complain about missed deadlines, then it should also follow the

13   deadlines that the Court sets.

14        THE COURT:  All right.  Fair points on both fronts,

15   Mr. Smith.

16        And I'll just say that I'm a reasonable person and

17   note -- if what the situation is -- but the -- let me just say

18   this:  The way Mr. McCullough presented it -- maybe it's true;

19   maybe it's not.  I'm not making any -- I'm not ruling on

20   anything today on this.

21        The point is that if a particular -- any particular

22   party -- here we are on the 28th.  This was the date for the

23   actual submissions.  So what happened on the 14th or the 17th

24   or the 21st or the 26th, okay.  But the point is if there

25   really was no -- on a particular issue, if a party doesn't want

1    to participate in that sort of process, you know, I -- I'm

2    going to take that into account when I'm trying to resolve

3    disputes between the parties if the dispute was never even

4    raised between the parties.

5         So, look, I hear your point and I'm going to get the

6    report on Monday about the other issue you're concerned about,

7    and we'll go from there on that.

8         MR. SMITH:  And, Judge, just on that point, I just

9    wanted to note for the record that one of the assistant U.S.

10   attorneys on this case Ms. Nadia Moore is actually based in

11   New York City, and so if she has access to the -- the materials

12   and records we're discussing, they're already here, they're

13   already in New York, where counsel is located.  So it would

14   just be a matter of going to the U.S. Attorney's Office in the

15   Eastern District of New York, which is -- is -- which is very

16   convenient, Judge.  So I'm just suggesting that.

17        MR. MCCULLOUGH:  So, Your -- Your Honor, if I may,

18   just two things.  Two quick things here on this.

19        One, the suggestion that the government is using some

20   sort of time delay on its sending materials across is simply

21   not the case.  As the government -- as Your Honor would know

22   from simply checking PACER, the government often does file its

23   materials later in the evening.  Someone has to be there to

24   kind of press, you know, the button to submit that.  So the

25   suggestion that, you know, the government is engaged in some

1    sort of gamesmanship is patently false.

2         Second thing, with respect to how the government

3    administratively handles both the location of its AUSAs and

4    the, you know, kind of location of its files, the advice from

5    defense counsel is -- is wholly inappropriate.  Ms. Nadia

6    Moore's location is not Mr. Smith's concern.  The government is

7    doing everything it can to get the materials into the right

8    locations.  Ms. Nadia Moore, I would note for the record --

9    since it's been addressed here, Ms. Moore is typically here in

10   Washington, D.C., with the team on a weekly basis, so.

11        THE COURT:  Move on to your next point,

12   Mr. McCullough.

13        MR. MCCULLOUGH:  Your Honor, with respect to -- I

14   just want to put the -- a recent development with respect to

15   negotiation of the parties to -- address this case and resolve

16   this case prior to trial.  The government has -- has issued a

17   plea offer to all defendants in this case.  I wanted to

18   basically outline, if Your Honor would like, the basics of that

19   plea offer that had been -- that had been made.  If Your Honor

20   would like, I can go through just the very basics of it.

21        MS. HERNANDEZ:  On behalf of Mr. Rehl, Your Honor, I

22   would object to the government addressing a proposed plea,

23   which isn't even complete.  There's no statement of offense.

24   And so I would object at this point in time for that to become

25   public.

1     MR. SMITH:  And, Judge, your colleagues on the bench

2  have shut down this colloquy every time the parties have

3  attempted to discuss the substance of offers in these cases as

4  inappropriate.  So we don't --

5     THE COURT:  There's -- I've had many, many cases in

6  which the government felt it was important to put a plea offer

7  on the record that had been communicated to the parties and

8  rejected.

9     But given -- but given the parties -- given your

10  objection to it, Mr. McCullough, let's put this off for another

11  day, and I'll -- I'll hear it at a future date.  If you want to

12  put it on the record, you can argue for it.  I'll hear why the

13  defense thinks it's inappropriate to do that, but I'm not going

14  to burn any more time on it today, given the objection from the

15  defense.

16     MR. MCCULLOUGH:  Certainly, Your Honor.  And just --

17  and just for the record, the government is not inviting

18  Your Honor into Rule 11 discussions, certainly, just simply

19  putting on the record the offer that was made --

20     THE COURT:  Sure.

21     MR. MCCULLOUGH:  -- and very happy to put that off

22  for another day.

23     THE COURT:  That's not an uncommon thing, and I don't

24  take it as you drawing me into the discussions.  And if you

25  tried to draw me into them, I wouldn't be drawn into them, but,

1    in any event, we'll save that for another day.

2              MR. MCCULLOUGH:  Thank you.  And my apologies.

3              MR. SMITH:  This is truly my last -- my last comment.

4    But, Your Honor, with respect to -- we have raised this issue

5    with respect to the government's witness and exhibit list.

6    There's a fair amount of ink that's being forwarded into

7    briefings that will be before Your Honor on both of those

8    subjects.

9         Your Honor, the -- the scheduling order at present does

10   not identify a date by which the defense will need to provide

11   its exhibit list and witness lists.  Your Honor, the

12   government -- certainly with respect to the jury questionnaire,

13   it will be important for the jurors to be able to identify any

14   potential conflicts with witnesses.  Your Honor, the government

15   would propose that the November 11th date, which is currently

16   set for the government to identify its witness and exhibit

17   lists, would be an appropriate reciprocal day for the defense

18   to identify its witness and exhibit lists as well.

19             THE COURT:  Mr. McCullough, this is not housekeeping.

20   If you want to file a motion to -- for that, I'll take it up

21   and probably have the defense respond quicker.  But I know

22   we're not going to just resolve this quickly here today.  So

23   I'll take up your motion.

24        All right.  Ms. Hernandez.

25             MS. HERNANDEZ:  Good morning, Your Honor.

1           I was going to start by saying that from my days as a

2     law clerk to a federal judge, the least favorite thing of his

3     was bickering among lawyers.  So I'll hold my peace on what I

4     was going to say.

5           THE COURT:  Bless you, Ms. Hernandez.  We're on

6     minute 46 of housekeeping matters.  So aside from the

7     bickering, go ahead.

8           MS. HERNANDEZ:  On the schedule that you started

9     with, I just -- I know at one time the parties -- all the

10     parties had hoped that maybe you wouldn't sit through some of

11     the Christmas holidays, and I think I was the problem because I

12     have an Oath Keepers trial that's supposed to start on

13     February 1st.

14           As the Court may know, I think Mr. Rhodes caught COVID

15     at the Alexandria Detention Facility, and I don't know what

16     that's going to do to transferring other defendants, but

17     that's -- I have a status conference in the Oath Keepers case

18     this afternoon.  And those schedules may be shifted, and I may

19     have a little bit more leeway at the end of this trial.  And if

20     so, I will let the Court know in case -- because I know there

21     are a lot of holidays and it's hard to get juries to show up

22     during the Christmas holidays and everything else.

23           THE COURT:  Listen -- and I hear you, Ms. Hernandez.

24     I don't love -- well, you know, if -- I don't love having a

25     trial set for the period we have this set for, but it is what

1    it is.

2              MS. HERNANDEZ:  I'll keep the Court and the parties

3    posted as to whether I have more free time and whether that

4    gives the Court more leeway to do -- to -- on the scheduling

5    front.

6         With respect to the joint submissions on the jury

7    instructions and the jury questionnaire, although the

8    government may not be aware of this, defense counsel are

9    speaking with each other.  So even though, for example, he

10   received a jury questionnaire from Mr. Tarrio's lawyer, that

11   included input from me.  And with respect to -- I know

12   Mr. Smith was submitting jury instructions.  So it's not --

13   just because he's getting it from one lawyer doesn't

14   necessarily mean that the others haven't had input or -- or

15   seen it, some discretion to the other lawyers.

16        With respect to -- Your Honor, as the Court -- I'm

17   burning the candle at four ends, not two ends.  I just finished

18   a five-week jury trial.  My jury is still out.  That keeps me

19   at the courthouse, which interrupts my ability to work.  But --

20   and this may not be housekeeping.  The government continues to

21   produce immense amounts of discovery in complying with the

22   Court's -- you know, in part, in complying with the Court's

23   instructions that they produce proposed statements and exhibits

24   and stuff like that, but we're --

25        I mean, I have a paralegal working -- I think

1   full-time -- working with government paralegals and counsel

2   because she's having trouble downloading.  And there must be

3   dozens of emails among -- among the parties, the attorneys,

4   about the productions that the government has made that we're

5   having difficulty opening and accessing.  And the government

6   responds.  I'm not -- I'm not saying that this is unresponsive.

7   There is communication.

8        But I continue to alert the Court that this is a mess,

9   and that means I have not been -- my paralegal is involved in

10  getting access to these materials.  I have not been as

11  intimately involved because I've been in trial, but I think

12  some of the other lawyers may be aware.  I think the government

13  is aware about the difficulties of downloading these materials.

14  I -- there -- I don't know whether there's a better way to do

15  it.  You know, it goes through USAfx.  It comes zipped.  It's

16  kind of difficult.  I don't know if there's a better way.

17       Maybe we need to talk to the -- defense.  I know the

18  government counsel are doing this.  I must say their paralegals

19  are extremely helpful.  Ms. Amanda Rohde, I believe she's their

20  primary paralegal.  She's extremely helpful.  But I'm just

21  telling the Court that just trying to access the materials so

22  we can respond to the motions *in limine* has been a very

23  difficult task.

24       So that -- that was the primary thing that I want to

25  tell the Court.

1          THE COURT:  Well, the one thing that, you know, I can

2    do -- the one thing I can do, if it helps you, you know, of

3    course, is approve resources for you, Ms. Hernandez.

4          MS. HERNANDEZ:  Okay.

5          THE COURT:  I know that's not a complete solution to

6    what you're saying, but it's -- it could be a partial solution.

7          MS. HERNANDEZ:  I know.  And the Court has offered

8    that, and I'm actually trying to work with my paralegal to see

9    what else she needs.

10          There was something else I wanted to bring up.  I don't

11    know what the Court is going to do with transferring the

12    defendants here.  I know the last time this issue came up with

13    the marshal, I mean, Deputy Haywood, I understood him to say

14    that they weren't housing -- they couldn't bring people into

15    CTF or -- and I don't know how Alexandria is going to -- how

16    the Alexandria situation is going to play out with the COVID

17    infection that just is running through there.

18          But if the Court -- if the marshals are planning to

19    bring our clients to Northern Neck or Central Virginia or

20    Rappahannock -- are some of the other Virginia facilities they

21    bring them to -- that is -- that's a very unworkable situation

22    for trial because Rap- -- those facilities are two or three

23    hours away from D.C.  And for us to be able -- it's just a very

24    unworkable situation.  I -- I don't know what's happening

25    with -- what the Court's going to do with all of that.  But if

1     the Court is going to be talking to the marshals about that

2     kind of scheduling, I would ask that you -- I mean, CTF or

3     Alexandria are really the best places so that we can have

4     access to them during trial.

5              THE COURT:  Okay.  I hear you.

6          All right.  Almost an hour of housekeeping, but it

7     was -- they were things -- at least -- at least some of it were

8     things we needed to do today.  So fair enough.

9          I'm not sure who from Mr. Tarrio is going to be arguing

10    the motion, but I'll hear from you.

11         Let me just offer some initial, you know, thoughts here,

12    not because I want anyone to think I prejudged the motion

13    before I even read it, but just because I want you-all -- both

14    sides to have the benefit of kind of where I'm at so you can

15    address your arguments accordingly.

16         Look, I think this is, fair to say in a variety of ways,

17    a very unusual type of case, and it's an unusual situation.

18    And for that reason alone, I closely read the motion, closely

19    read all the supporting documentation, and the polling that was

20    made a part of it.

21         I do think that, you know -- but I guess I would still

22    say, it seems to me, even in this kind of unusual situation, if

23    we're talking about before we even administer a jury -- the

24    *voir dire* process and a jury questionnaire, Mr. Hassan, you

25    still -- if it is -- I'm not sure who's arguing.  I saw you

1    pointing to --

2              MR. JAUREGUI:  Me.

3              THE COURT:  I'm looking at -- like the *Hollywood*

4    *Squares*, and you -- you were pointing to Mr. McCullough, and I

5    know he wasn't arguing.

6              MR. HASSAN:  My colleague will be handling it.

7              MR. JAUREGUI:  Yes, Judge.  Good morning.

8              THE COURT:  So I think you have a -- you know, an

9    uphill climb here.  Again, especially if we're talking about

10   before we even begin the *voir dire* process, not because of the

11   case law that seems to set a pretty high bar, but also

12   because -- I mean, even taking all the things that you've

13   presented to me, we only need 12 people.

14         And, you know, I -- I think -- I was -- you know, and

15   also since, I think, most of the briefing in this was filed,

16   I've picked a jury in a January 6th case.  Now, I get it.  Your

17   client's differently situated -- a lot of your clients are --

18   than a typical case; although -- although the case I had, the

19   person was the subject of a fair amount of -- he was one of the

20   more prominent defendants.

21         And I was amazed at -- I don't have all the statistics

22   that the government has compiled in terms of what percentage

23   the venire I qualified, but -- but how many people in D.C. just

24   simply -- they don't work near the Capitol.  They don't live

25   near the Capitol.  They've followed this the same way people

1    would follow it if they were -- if they were living in -- in

2    any other jurisdiction.  In other words, they get similar news

3    media.  They see it on TV.

4            You know, in many respects, the way things -- the way

5    the media environment today is such that a person's media

6    exposure can be almost identical if they live in the Southern

7    District of Florida or if they live in Washington.  That wasn't

8    true 50 years ago.

9            So, you know, I think -- you know, I was amazed at how

10   many folks we did have that said, yeah, I know something about

11   it.  Yeah, of course I saw it on TV the day it happened, the

12   day after, just like a lot of Americans did.  I don't work down

13   there.  I don't live down there.  The fact that there were

14   these road closures afterward didn't seem to -- there was no

15   reason to think it affected them.  And, yeah, you know, I have

16   my political views, not that we went into that in that context,

17   but I could keep an open mind about an individual defendant and

18   apply the law fairly.

19           So all we need is 12 people.  And we have over, you

20   know, 600,000 people to choose from.  So -- and given the track

21   record so far of cases, I think you have an uphill battle.  And

22   not even to say -- you know, I do think there are limits about

23   the polling, about the -- the usefulness of polling in these

24   contexts.  The way the questions are asked, the fact that

25   they're not under oath, and, ultimately, the fact they don't

1    ever hit the point of, hey, whatever you've seen and heard,

2    whatever feelings you have, the core question that our system

3    asks -- that I ask people -- is can you set whatever you feel

4    aside and judge this case only on the facts and the law?

5    Nothing else.  And, obviously, whatever these polls say, they

6    don't really get at that point.

7         But, anyway, those are my thoughts.  They're probably

8    not -- you're probably not -- probably not particularly

9    original, but I will hear from you, sir.

10        MR. JAUREGUI:  Thank you, Your Honor.  Again, Sabino

11   Jauregui on behalf of Enrique Tarrio.

12        Judge, Mr. Tarrio's case is special and unique among all

13   J6 defendants.  There are things happening in Mr. Tarrio's case

14   that did not happen in the Oath Keepers case and not happening

15   in other J6 cases.  He's the very public face of the Proud Boys

16   more than anybody else.  He's been on social media.  He's been

17   on TV.  He's been the subject of relentless media attention and

18   publicity.

19        It was the Proud Boys that were mentioned by

20   President Trump.  It's the Proud Boys that have been the focus

21   of the House Select Committee meetings over and over and over

22   again, as recently as October 13th, when they had the last --

23   the last hearing where they ended up subpoenaing the --

24   President Trump.

25        No other J6 defendant has received the media attention

1      and the negative publicity that he's received.  Only Mr. Tarrio

2      has been sued by the -- Attorney General Racine.  Only

3      Mr. Tarrio has been sued invoking a KKK law.  Only Mr. Tarrio

4      has been sued by the African Methodist church.  No other J6

5      defendant has received that level of attention.

6             THE COURT:  But -- but -- but -- Okay.  The last

7      three things.  Let me interrupt.  Those are differences.  No

8      question.

9             The percentage or the raw number of citizens of the --

10     of D.C. that know those things is incontestable; right?  I

11     mean, I -- I consider myself fairly well informed.  I actually

12     had no idea of this lawsuit until I read your papers.  So,

13     again, if -- if -- if 95 percent of the jury pool doesn't know

14     something, does it really count?

15            MR. JAUREGUI:  Well, Judge, I would argue in D.C.

16     where more than 95 percent of the people voted against

17     Donald Trump and my client Enrique Tarrio is a surrogate of,

18     basically, Donald Trump, I think that the residents of D.C.

19     know exactly who Mr. Tarrio is, and they hold an especially

20     negative opinion of him.  There is presumed prejudice

21     throughout D.C. against Mr. Tarrio.

22            I mean, even the superseding indictment -- the third

23     superseding indictment was timed coincidentally days before the

24     first House Select Committee here.  Why that happened or how it

25     happened, I don't want to speculate, but everything has been

1    timed.  Even -- even the release of -- of the plea agreements

2    of ██████████, of Bertino, they're timed right before the

3    trial that we're going to have.  It's all over the media.  It's

4    all over the internet.  Lieutenant -- Enrique Tarrio's

5    lieutenants have pled guilty to sedition.  It's all over.  It's

6    nonstop, and it's so close to the trial.

7          This is completely different to the *Skilling* case where

8    more than four years had elapsed between the publicity and the

9    actual trial.  I mean, we're going to go to trial in a few

10   weeks.  We don't know if Donald Trump is going to testify

11   before the House Select Committee hearing.  We don't know what

12   other surprises in discovery we're going to receive from the

13   government.  We keep receiving discovery way past the deadline

14   over and over and over again.

15          THE COURT:  We'll talk about the discovery, but that

16   doesn't -- I don't know what that has to do with your venue

17   motion.

18          MR. JAUREGUI:  Well, Judge, it has to do with the

19   venue motion because these plea agreements by -- by Bertino and

20   by ██████, they entered into these plea agreements back in

21   June, and they were just released right now.  It just hit the

22   media right now.  That negative publicity is affecting us right

23   now before the trial.

24          MR. MCCULLOUGH:  Your Honor --

25          MR. JAUREGUI:  And --

1          MR. MCCULLOUGH:  Your Honor -- Your Honor, I just --

2     I hate to interrupt Mr. Jauregui's argument.  Just -- just a

3     caution about the --

4          THE COURT:  Actually, Mr. McCullough, let me do this:

5     Ms. -- there is one thing that I wanted to raise about an --

6     there is one thing I wanted to raise with the parties under

7     seal.

8          Ms. Harris, can we just quickly go under seal.

9                        **\*\*\* SEALED \*\*\***





1

2

3              (Proceedings held in open court.)

4              THE COURTROOM DEPUTY:  We are now from under seal.

5              THE COURT:  Sir, you may continue.

6              MR. JAUREGUI:  Thank you, Your Honor.  As I was

7    arguing, these lawsuits by the attorney general against

8    Mr. Tarrio, the never-ending publicity about his case, have

9    taken the D.C. jury pool.  There is presumed prejudice, and the

10   case should be transferred, like it was in the case of *United*

11   *States v. McVeigh*.  In that case, Merrick Garland agreed to

12   transfer the case, and it was, in fact, transferred to

13   Colorado.  I would argue that many instances that the publicity

14   in the case and the publicity against Mr. Tarrio is much

15   greater than that in the *McVeigh* case.  There weren't

16   congressional hearings in the McVeigh case.  There weren't

17   politicians.  Pelosi wasn't talking about the case.  The

18   President of the United States wasn't talking about the case.

19   The Vice President of the United States, congressmen, senators.

20   It's never-ending, Judge.  There's no way Mr. Tarrio can find a

21   fair and impartial jury that is not prejudiced against him in

22   the District of Columbia.

23              The residents in the District of Columbia lived this

24   case.  They lived it for months.  They follow it daily, and

25   when I was there in the opening statements in the Oath Keepers

1    case in -- in front of Judge Mehta, one of the jurors had even

2    said that they were listening about the case on NPR on the

3    drive to the courtroom, and they were hearing about the Oath

4    Keepers case on the local radio.  And the same thing is going

5    to happen here in this Proud Boys case even more so.  The Proud

6    Boys was -- was and is still more famous than the Oath Keepers.

7    They are better known than the Oath Keepers, and the current

8    litigation that is still going on by the attorney general, plus

9    all the comments made by all the politicians and all the

10   disclosures that are being made in this case and continue to be

11   made, the publicity and the -- the negative and emotional

12   feelings that the residents of D.C. have against Mr. Tarrio is

13   unparalleled to any other J6 case, Your Honor.

14            THE COURT:  If -- even if I take, Mr. Jauregui, just

15   the counterpoint to that seems to me -- maybe that's right, but

16   most of what you described, it seems to me, is just -- in the

17   media environment in which we are in today is equally available

18   to someone sitting in Miami.  I mean, the -- the thing you

19   described with the Oath Keepers case, I have no idea what that

20   juror was describing, but whatever news source it was, the odds

21   are it wasn't anything local.  It was -- you know, who knows

22   what -- whatever news source it was, it's quite possible that

23   was just as -- whether they're talking about *The Washington*

24   *Post* or -- there's so many different media sources that are

25   just equally available to a person sitting in D.C. to a person

1   sitting anywhere in the United States that it's hard for me

2   to -- I just think the media environment makes this a trickier

3   question than it was back in the day, let's just say, in the

4   case against McVeigh where a lot of that media was very

5   localized in Denver or -- I'm sorry, in Oklahoma City, and

6   moving it to Denver, you would -- you would avoid that.  A

7   lot -- at had least a lot of what you're saying, it -- there's

8   no avoiding it anywhere in the United States, is there?

9         MR. JAUREGUI:  Well, Judge, I would argue that in

10  Miami, we didn't have road closures.  In Miami, we didn't have

11  a curfew.  In Miami, we didn't have a military occupation.  In

12  Miami, we didn't erect fences all around the Capitol as a daily

13  reminder of the J6 incident.  None of that.

14        THE COURT:  Those are differences.  Those are

15  differences, and if somebody -- and, you know, I think it's a

16  fair question to ask a juror, like, did you experience any of

17  that?  But the percentage of -- and with the curfew aside --

18  curfew aside, obviously, anyone who is here experienced that.

19   But the other kinds of things, I think, many, many,

20  many, many, Washingtonians would just never have -- never have

21  even encountered.

22        MR. JAUREGUI:  Well, there's also, Judge, the

23  political -- the vibe is so extreme in D.C. that it's now

24  present in Miami.  In Miami, we have pretty much a 50/50 split

25  between Republicans and Democrats.  Miami is also more

1    representative of Mr. Tarrio.  You don't have that in D.C.  In

2    D.C., the vibe is unlike any other place in the country.  So

3    that's another factor that Your Honor should consider.

4         He would most definitely get a fair, more just trial in

5    Miami without a doubt, and that's why the government is

6    fighting to keep the case in D.C.  And it's obvious by the fact

7    that every case that has gone to a jury trial in D.C. has

8    resulted in a victory by the government.

9         Meanwhile, the bench trials -- the bench trials that

10   have happened, some of the defendants have been acquitted.  But

11   every single jury trial in D.C. has resulted in a conviction.

12   The government is good, but they're not that good, Judge.

13        THE COURT:  Well, Mr. Jauregui, let me just say this:

14   I had -- in another case I had this same argument in a case --

15   I haven't resolved the motion yet.  I mean -- and I have to

16   say, I mean, okay, that's fair, but on the other side, it is --

17   look, this doesn't answer the -- the *mens rea* questions and

18   especially in a case like this.  This is not -- this is not --

19   it's not the end-all, be-all, but in many cases, you know what

20   I'm about to say.  There aren't that many cases in which a lot

21   of the conduct at issue -- and this is especially the case

22   in more -- in simpler January 6th cases, there aren't that many

23   cases, criminal cases, we have in our courthouse where, you

24   know, every aspect of the crime is captured on videotape from,

25   like, seven different angles.  So I think that is a

1  counterpoint to your point about the conviction rate.

2        Again, I think that -- the more we get into a case like

3  this, I think that gets a lot trickier and the -- the effect of

4  video one way or the other isn't so decisive, but I think that

5  explains a lot of those verdicts.

6        MR. JAUREGUI:  Judge, I hate to go back to the -- in

7  no other case -- for example, in the case against Mr. Tarrio

8  filed by the Methodist church; just yesterday they filed a

9  motion for default on that case.  This is something that's

10  constantly coming up, constantly being referenced in the media.

11  And the proximity to the trial, just a few weeks away, makes it

12  impossible, Judge.  There is definitely a prejudice.  It's a

13  prejudice that cannot be cured by *voir dire*, by a hundred

14  questions, by 200 questions, and I would submit, Your Honor,

15  that there are residents of D.C. dying to get on this jury.

16        THE COURT:  I --

17        MR. JAUREGUI:  Dying to lie, dying to say that

18  they're going to be fair and impartial, dying to seek some kind

19  of retribution against who they see as white supremacists, as

20  insurrectionists because that's what they've been told for

21  months and months by their leaders, by people they admire.

22  These jurors are going to go there.  They're going to tell

23  Your Honor they can be fair and impartial.  All the while,

24  harboring this hidden agenda, dying to convict my client, and

25  there's no way we're going to be -- Judge, there's no way we're

1   going to be able to ferret out these jurors.  Okay?

2        And those very people want to convict my client.  They

3   desire it more than anything in the world, and they're going to

4   lie to you and do anything to get on that jury.  And there's no

5   way for us to find them, Judge.  It's impossible.  We know that

6   they're prejudiced, but if they answer the questions a certain

7   way, that's it.  They're on the jury.

8        So that's my fear, Judge.

9        THE COURT:  Unless you use a peremptory, but yeah.

10       MR. JAUREGUI:  Right.  But that's my fear, Judge.  I

11  fear there's going to be that presumed prejudice.  I fear

12  there's going to be thousands of people that want on this jury,

13  thousands of people that are going to want my client to pay.

14  There's no way we can ferret out those jurors, Your Honor.

15  There's just no way.

16       THE COURT:  All right.  Who from -- who from the

17  government will argue in response?

18       MR. KENERSON:  Thank you, Your Honor.  Erik Kenerson

19  on behalf of the United States here.

20       Look, I appreciate -- I appreciate

21  Mr. Jauregui's advocacy.  I appreciate the court laying out its

22  thoughts ahead of time.  This, in the government's view, does

23  not even approach the kind of extreme case of presumptive

24  prejudice that the Supreme Court precedent in *Skilling* and

25  D.C. Circuit precedent required to transfer the case prior to

1   *voir dire*.  That result is compelled not only by *Skilling*, but

2   also by *Haldeman* in the D.C. Circuit here.  The defendant may

3   not find *Haldeman* persuasive.  He said so as much in his reply

4   brief.  He may even think it's archaic.  He argued that in his

5   reply brief as well.  But *Haldeman* is still binding precedent

6   on this Court.

7           And one of the things that *Haldeman* says is that

8   politics is not relevant to the venue question.  The same

9   arguments that were brought up by Mr. Jauregui about the

10  make-up of the D.C. electorate was brought up in regards to

11  *Haldeman*, which -- I know everyone knows but -- stemmed from

12  the Watergate investigation into the break-in, which is as

13  political of a question as it can get.

14          I would also point the Court to *Connors v. United*

15  *States*, which we cited --

16          THE COURT:  Mr. Kenerson, before we get off of

17  *Haldeman*, did I read -- I was actually fairly stunned at this.

18  Was there polling in *Haldeman*?  I thought I read somewhere --

19  it must have been in your papers, actually, that the -- there

20  was polling in *Haldeman* that said, like, 61 percent of the

21  district thought *Haldeman* was guilty?

22          MR. KENERSON:  Yes.  61 percent of the poll responses

23  that -- so the *Haldeman* majority --

24          THE COURT:  Okay.

25          MR. KENERSON:  -- found that the court should be

1  transferred.  There was one judge who filed, I think, a dissent

2  in part and concurrence in part.  That judge referenced the

3  polling numbers.

4          THE COURT:  Okay.  Okay.  But the polling numbers

5  were 61 percent of the respondents thought *Haldeman* was guilty?

6          MR. KENERSON:  Yes.  And something -- something --

7  some high percentage of that -- I don't have it in front of me.

8  It's, of course, in our brief.  Trust the brief over this.  But

9  something in the 40 percent range had a strongly held view of

10  his guilt, if I recall correctly.

11          THE COURT:  It's like -- it's an incredibly high

12  number.  Anyway, I -- I was -- I was amazed at that, but go

13  ahead.

14          MR. KENERSON:  And I think it is certainly -- it is

15  certainly relevant in the sense that it is instructive to this

16  Court, binding precedent to this Court that even numbers that

17  high do not require a transfer of venue ahead of time.

18      The other case we would point the Court to kind of on

19  this issue is *Connors v. United States*, which is an old

20  Supreme Court case from 1895, 158 --

21          THE REPORTER:  Hold on.  Mr. Kenerson, can you

22  restate that.  "An old Supreme Court case from 1895, 158."

23          MR. KENERSON:  158 U.S., 408.  I'm going to quote

24  from page 414, "The law assumes that every citizen is equally

25  interested in the enforcement of the statute enacted to guard

1    the integrity of national elections and that his political

2    opinions or affiliations will not stand in the way of an honest

3    discharge of his duty as a juror in cases arising under that

4    statute."

5         And, you know, I think Mr. Jauregui went into a lot over

6    how he believes that Mr. Tarrio is different than other

7    January 6th defendants, and I understand he's advocating on

8    behalf of his client, he's trying to make that point, but the

9    case law, the argument, the polling all cited in his papers,

10   everything Mr. Jauregui and Mr. Hassan have relied upon in

11   making that point, if the Court would -- were to believe it,

12   would tend to mean there could be no January 6th case tried in

13   the District of Columbia.

14        The -- the argument that the D.C. electorate is so

15   biased against what happened on January 6th applies equally as

16   to everyone else.  The polling questions are about January 6th,

17   in general, not Mr. Tarrio in specific, not the Proud Boys in

18   specific.

19        The issue about D.C. jurors being biased because they

20   believe -- because they voted against former President Trump in

21   such numbers applies equally to January 6th defendants.

22        And just to respond to a couple of the points

23   Mr. Jauregui raised about Mr. Tarrio specifically, the -- the

24   lawsuit that was filed by the church is not related to the

25   January 6th, of course; that is in relation to the burning of

1    the Black Lives Matter banner, for which he pled guilty.

2         The lawsuit filed by the D.C. Attorney General, if I am

3    thinking of the correct lawsuit -- I think Mr. Jauregui said

4    he's the only one charged with respect to that.  I think it's a

5    number of individual members of the Proud Boys who have been

6    charged, as well as a number of the individual members of the

7    Oath Keepers have been charged, and the Proud Boys and Oath

8    Keepers organizations.  So I think to say that Mr. Tarrio is

9    kind of uniquely situated there -- even with respect to other

10   Proud Boys and certainly with respect to the Oath Keepers is --

11   is a bit too far; that covered both of them -- both of those

12   groups.

13        If I can go through the *Skilling* factors very quickly,

14   which is what the Court on the Supreme Court precedent needs to

15   look at.  One of those is the size of the community.  Here in

16   D.C. we've got nearly 700,000 people as residents; more than

17   500,000 potential jurors; up to 600,000, as the Court noted.

18   That's more than enough to get an impartial jury in this case;

19   and the Supreme Court has said as much in *Mu'Min v. Virginia*,

20   which we cite in our brief, where they said that

21   182,000-and-change was enough.

22        And if I could just emphasize a couple of numbers here

23   that are based on that.  Even if we assume for sake of

24   argument -- I know we pled in our brief that 45 percent of the

25   potential jurors in the Oath Keepers trial responded that they

1    had not watched any of the House Select Committee hearings at

2    all.

3          Okay.  So that might not be a full sample.  Even if we

4    revise that number in the defendant's perspective and say,

5    okay, assume for the sake of argument 35 percent of D.C.

6    residents or D.C. jurors have not watched it -- and that's a

7    vague assumption -- and if you even then assume two-thirds of

8    those who watched it could not be impartial jurors -- and I

9    think that's a huge assumption because the question swept up

10    people who watched any -- like 30 seconds of it as much as the

11    entire thing -- 35 percent of 500,000 is 175,000.  So it's

12    175,000 potential jurors who watched none of the hearings at

13    all, even using numbers that are skewed from what the Oath

14    Keepers found.  And of the remaining 325,000, if two-thirds of

15    those are too biased -- again, huge assumption -- that leaves

16    another 108,000 available who watched some of the hearings and

17    would be unbiased enough.

18          That is 282,000 still remaining, if we start -- use

19    500,000 as our starting point and, as the Court notes, we only

20    need to get 12 of those.

21          The numbers of what has been borne out in real-world

22    *voir dire* just do not match up with the picture being painted

23    by the defendants.

24          The other -- the third *Skilling* factor is the nature and

25    extent of the publicity.  As I think the Court noted, the --

1    the publicity has been national in scope.  I think the anecdote

2    that Mr. Jauregui told about there being a juror who was

3    listening to NPR on her way into the courthouse -- I mean, it's

4    right there in the title, National Public Radio.  This is not a

5    local -- I mean, she was certainly here in the District of

6    Columbia listening to that radio program, but NPR puts out

7    national news.

8         And, specifically, with respect to kind of the Southern

9    District of Florida, there have been a number of articles about

10   the Proud Boys in the Southern District of Florida.

11   Mr. Tarrio's case has been of interest there as well.  There

12   have been -- and on the House Select Committee hearings,

13   they -- they have largely focused, we would argue, on the

14   political nature.  We're not denying that Proud Boys were part

15   of it, but they have largely focused on members of the prior

16   administration and what they knew and didn't know, and what

17   they said and didn't say when, certainly, Proud Boys were a

18   part of it, but the coverage of those has been national in

19   scope as well.

20        So I do want to address the polling that the defendants

21   have put out, and before I start, we note, as we said in our

22   papers, courts have strongly disfavored transfers of venue

23   prior to *voir dire*.  We -- that is 100 percent our position,

24   and if the Court has any questions on it, we're happy to ask

25   [sic] it, but I think we've laid that out.  So, basically, I'm

1    not going to spend too much time on it here.  The polling that

2    the defendants have put forth does not show that the publicity

3    in January 6th cases has received -- in D.C., specifically, has

4    merited transferring the venue.  We've covered these in our

5    papers, but just to highlight a few responses, just between

6    D.C. and the Southern District of Florida, there are similar

7    responsive rates to the negative effects of a not guilty vote

8    where nearly identical amounts said -- and, additionally, when

9    asked if they could be fair and impartial jurors, nearly

10   identical rates said that they could not be fair in D.C. and

11   Southern District of Florida, both the numbers round up to

12   21 percent.  So -- and a much higher percentage here thought

13   their neighbors could be fair.

14        Those are the closest polling questions to the point the

15   Court raised about how polling does not get to the questions

16   the Court would ask about whether the particular juror could

17   set aside their biases and be fair and impartial.  Those were

18   the closest questions to that in the polling, and there was no

19   appreciable difference between the District of Columbia and the

20   Southern District of Florida, and not really any appreciable

21   difference between the District of Columbia and any of the

22   other jurisdictions polled.

23        The third *Skilling* factor, I think, is time.  Less than

24   a month -- one other thing -- sorry -- to note on the media

25   saturation issue.

1        The pollster specifically noted that her polling does

2   not capture the type of media that is looked at.  And she,

3   actually, specifically said that more polling, more study would

4   be needed to show the effect of the media that folks look at

5   and how that affects things.  That's in the most recent

6   submission that Mr. Biggs put forth in the polling itself -- or

7   at least the -- the summary of the polling itself.

8        And even to Mr. Jauregui's point that he argues that

9   D.C. residents are so saturated by the media, there actually

10  was a higher rate in the Southern District of Florida of people

11  who had been exposed more than ten times a week than there was

12  in the District of Columbia; again, according to the poll that

13  they've put forth.

14       The third *Skilling* factor is time.  Nearly two years

15  have passed and this case will start for -- trial is currently

16  scheduled close to two years from when it happened.

17       Many of the articles have been national in nature.  To

18  the extent that there is continuing coverage, that continuing

19  coverage is national, not local; and, really, the *voir dire*, as

20  the Court alluded to, in the other January 6th cases shows that

21  impartial juries can be selected in this district.

22       In *Rhodes*, in particular, which I think is instructive

23  because of the high profile nature of that case, the high

24  profile nature of those defendants, and the fact that it is,

25  like the Court noted, somewhat different in the sense of it is

1  not motive and intent, are a bigger issue than what -- that are

2  an issue in a way that's not in other January 6th cases.

3  70 percent answered no of that *voir dire* to whether they held a

4  strong opinion about January 6th that would affect their

5  ability to be fair jurors.  45 percent had not watched the HSC

6  hearings at all.  We already talked about that.  Obviously --

7  and a full 41 percent of that *voir dire* had not heard of the

8  Oath Keepers.

9       Now, I know that doesn't tell us whether what percentage

10  of folks heard about the Proud Boys, but, of course, that's why

11  we're going to do the questionnaire ahead of time, and that

12  certainly can and will be one of the questions the Court can

13  ask is, how many people have heard of the Proud Boys, and the

14  Court can conduct an appropriate follow-up.

15       And in that particular case, again, those are different

16  named defendants, but I think only 5 percent of those who

17  responded to the questionnaire in that case said they could not

18  be fair to those particular named defendants.  Only 12 percent,

19  if I recall correctly, had heard of those particular named

20  defendants.  Yes, 12 percent had heard.  5 percent said they

21  could not be fair.

22       So before I -- about the *McVeigh* case, and I -- we cited

23  this case in our most recent response, Judge Berman Jackson's

24  opinion in the *Garcia* matter.  That's 2022 Westlaw 2904352.

25       The Court hit on a little bit about this, but

1    Judge Berman Jackson, I think, lays out very well some of the

2    differences between those -- between the *McVeigh* case and this

3    case.  And one of them is that the Oklahoma City bombing

4    involved two defendants and a singular event that took place in

5    Oklahoma City.  As a result of that singular event, 168 people

6    were killed, including infants and children who were at the day

7    care at the federal building in Oklahoma City; so, therefore,

8    that means that the personal impact, the victimhood of those in

9    Oklahoma City is of a much different character than whatever

10   differences there are between Washington, D.C., and the

11   Southern District of Florida or any -- anywhere else in the

12   country.  And that really was an event that was focused on

13   Oklahoma City.

14        Here we kind of have the reverse.  We've got hundreds of

15   people who have come from all over the country to

16   Washington, D.C. -- talking about January 6th generally here,

17   not this specific case -- and they wind up charged in an event

18   that has national implications rather than local implications

19   even though the trials are playing out here.

20        And in that particular case, while there was a lot of

21   national coverage of Oklahoma City, when it happened, that

22   national coverage dropped off kind of precipitously as they

23   moved further and further away from the events in a way that it

24   did not in Oklahoma City.  So coverage continued in Oklahoma

25   City, dropped off everywhere else in the country, and that's

1     not the case here.

2           Here we've got coverage continuing to be national in

3     scope rather than local in scope.

4           So with that, Your Honor, we would just note that none

5     of the *Skilling* factors support transfer of venue.  The polling

6     submitted by the defendants is irrelevant, but even on its face

7     doesn't support transfer of venue, and that means the Court

8     should deny the motion.

9           I don't have anything else, but, of course, would be

10    happy to answer any questions the Court might have.

11          THE COURT:  No.

12    I'll hear from you, Mr. Jauregui, in rebuttal.

13          MR. JAUREGUI:  Thank you, Judge.

14    Judge, I disagree with my friend from the government.

15          First of all, NPR -- I listen to NPR -- has local

16    stations in every city and that local programming is very

17    different depending on the city that NPR is.  They do have some

18    national programs, but they also have a lot of local

19    programming.  And that juror was listening to the local

20    programming in D.C. when they were driving to court.

21          The cases cited by the government, Judge, these are

22    cases -- one is over 127 years old.  Another one is decades

23    old.  We're talking about cases before the colored TV was

24    invented.  There was no Twitter, no internet, no social media,

25    no -- information like never before like we have now.  I keep

1    getting tweets every second.

2            THE COURT:  Mr. Jauregui, doesn't that -- I agree

3    with you; we're in a very different media environment.  It just

4    strikes me that in many ways that cuts against you, because --

5    because the coverage, the saturation -- for people who want it,

6    right?  For people who want it, it can be -- it can be -- you

7    can tune in and get -- maybe not tune in.  But you can -- you

8    can access all the media that comes out of Washington

9    anywhere -- you know, the national media anywhere in the

10   country.  I don't know how that helps you.

11           MR. JAUREGUI:  It does, Judge, and let me tell you

12   why.  Because the residents of D.C. with very liberal views and

13   their leftist views and their democratic views are more than

14   likely to tune into the social media, to the -- to the tweets,

15   to the information, to the TV channels, to the programs, to the

16   TV personalities that align with their views; and their views

17   overwhelmingly -- more than 94 percent are against Donald

18   Trump, against the Republican Party, who they've now labeled as

19   MAGA Republicans.  And it actually helps us, because in Miami

20   you don't have 94 percent of the people espousing these kind of

21   views.  So in Miami there's not 94 percent of people tuning

22   into the specific social media, to the specific tweets, to the

23   specific programs that we enforce their already preconceived

24   notions about this case, which is what's happening in D.C.,

25   which is going to continue to happen in D.C., as this case

1   marches forward to trial.

2        I don't find the -- the argument about what

3   Judge Jackson did in that case persuasive.  I think that the

4   media attention in this case is far, far, far greater than in

5   the case of McVeigh.  If Your Honor does not find that negative

6   publicity is enough to warrant transfer in this case, I don't

7   think any case in the future will ever be transferred, Judge,

8   because the amount of media publicity, negative publicity, at

9   that, in this case, is unparalleled as to any other case,

10   especially in D.C.

11        And -- and in -- in the other cases -- again, in Miami,

12   no curfew, no road closures.  That -- that didn't even happen

13   in the *McVeigh* case.  In the *McVeigh* case, there weren't road

14   closures, there weren't curfews, there wasn't a military

15   occupation, and still the Department of Justice agreed to

16   transfer the case because of that negative publicity.  This

17   case has even more negative publicity.  The potential jurors

18   were personally affected by the events of January 6th.  They

19   were personally inconvenienced by the events of January 6th.

20   They were personally in fear of the alleged events of

21   January 6th.

22        So I don't find that argument by the government

23   persuasive at all, and I think that Your Honor has the

24   individual responsibility based on the factors of this specific

25   case to determine what should happen, whether a transfer should

1    be -- I don't think Your Honor should be necessarily guided by

2    what other district judges have done in cases similar to this.

3    Mr. Tarrio's case is unique.  It's special.  It's unlike any

4    other J6 case, and -- and I think it's very important that the

5    government has not spent much time on the *McVeigh* case, because

6    the *McVeigh*, basically, does not favor them.

7           THE COURT:  Right.  Right.  I mean, like every

8    advocate, they don't want to use the case that doesn't favor

9    them, but, you know, I think their counter, I assume, to that

10   on some level would be, well, just because the government --

11   just because transfer happened in that case -- look, it's a

12   data point like all these other data points, but the point is

13   that doesn't make -- it doesn't actually mean in that

14   particular case even that transfer was required.  The

15   government just -- you know, there was a motion, and I guess

16   they represent the government didn't fight the motion and

17   agreed to the transfer.  That certainly suggests they had a

18   strong case for transfer, but it doesn't necessarily mean that

19   if the government had decided to oppose it and the judge had

20   refused that it would have been error; but, you know, we're

21   kind of dancing on the head of a pin about that, I suppose.

22   You're right, it's a case that -- that was transferred.  So,

23   look, I've got to look at it like everything else.

24          I don't think -- well, look, I don't think in a lot of

25   cases, these motions are -- are pro forma and it's sort of a

1    slam dunk for the government.  I mean, I don't think it's a

2    slam dunk for sure, and I take your point that, this is -- this

3    is a case in which this has to be, you know, really considered,

4    but I do think, you know, the -- a lot of the other case law,

5    some of which is binding on me, and just the overwhelming

6    reality that -- I mean, as much as I hear your argument that,

7    geez, Judge, if we don't get it in this case, we're not going

8    to get it in any other case, okay.

9         On the other hand, I think neither side has cited to me,

10   I guess -- other than *McVeigh* -- of any case in recent times in

11   which even before the judge had a chance to conduct *voir dire*,

12   presumptive prejudice meant that the case was transferred out.

13   So, look, by definition, it's going to be a very unusual case

14   that warrants this.

15        MR. JAUREGUI:  Judge, I'd like to give a final

16   thought then based on the scheduling that Your Honor said this

17   morning.  We're going to be in trial on basically the second

18   anniversary of January 6th.  We're going to be actually in

19   trial, and I can just imagine the media coverage while we're in

20   trial of that anniversary.  The videos being played over and

21   over again, politicians making statements on that day while

22   we're in the midst of trial.  I'd like to leave you with that

23   final thought.  I -- I think it's -- it's going to be extremely

24   prejudicial to my client, and I think Your Honor should

25   transfer this case.

1          THE COURT:  All right.  Very well.

2          Mr. Smith, I see you have your hand up.

3          MR. SMITH:  Yes.  Thank you, Judge.

4          On one last point about the new deadline for the jury

5     instructions submission.

6          THE COURT:  Yes.

7          MR. SMITH:  The Court reset the deadline for next

8     Wednesday, is that --

9          THE COURT:  Correct.

10         MR. SMITH:  Yes.

11         And so I understand -- been informed that the Court is

12    now going to proceed with oral rulings on -- rather than

13    written opinions in these January 6th cases because of

14    the cau- -- of business and everything else.

15         THE COURT:  Well, not -- hold on.  Hold on.  I don't

16    know who informed you of that but -- I mean, I take things up

17    on a case-by-case basis.  So I wouldn't assume.

18         MR. SMITH:  I just heard in a public hearing that the

19    Court was inclined to do oral rulings -- anyway, let -- the

20    point here, Judge, is that the contours of the Court's decision

21    on the motion to dismiss can inform the jury instruction.

22         THE COURT:  Yes.

23         MR. SMITH:  So, I guess, our question was if the

24    Court thinks it might be inclined to rule somehow before the

25    parties are required to submit the jury instructions.

1          THE COURT:  Well, okay.  So let me say this:  That

2     one won't be -- that will be an opinion on the motion to

3     dismiss.  So -- and on things like -- to give you-all, I guess,

4     a little bit of preview, certainly on motions *in limine*, I'm

5     going to try to do a lot of it without a written opinion just

6     because we're going to be so close at that point.  You-all just

7     need answers, and, you know, there may be an issue or two I

8     have to write on, but -- but -- but that will be an opinion.

9          I -- whether I have that opinion for you by the time

10    you-all have to be negotiating and preparing these, I mean, I

11    guess I would say -- it could affect it, and so -- that's true.

12    I -- I don't know that I can tell you I'm going to have it by

13    Wednesday, so I think you should presume -- you should proceed,

14    you know, with the notion that you would not have that ruling

15    beforehand, and if that, you know -- it may be that that makes

16    it more difficult to come to consensus, but you'll have to just

17    sort of represent, well, if something -- if A, then B in terms

18    of the jury instructions.

19          MR. SMITH:  Okay.  Thank you, Judge.

20          THE COURT:  Ms. Hernandez.

21          MS. HERNANDEZ:  Your Honor, the argument on the venue

22    motion, obviously, was made focused on Mr. Tarrio, but we've --

23    but I joined on behalf of Mr. Rehl, and I believe other

24    defendants have.

25          And I would just like to add a few other points, which I

1     don't believe Mr. Jauregui mentioned.  One is that the

2     January 6th committee is still ongoing, and my understanding is

3     they will be issuing a report -- likely, again, may coincide

4     with our -- the beginning of our trial, and I don't -- I guess

5     we're sort of predicting what may or may not happen in terms of

6     coverage, and everything else.

7          And along those lines also, a number of the -- of the

8     most prominent members of that committee -- other than

9     Liz Cheney -- is a congressman from Maryland, Jamie Raskin, who

10    is quite often on all the local and cable channels that are

11    viewed in D.C., and he's been -- I mean, in fact, I think

12    his -- he was in charge of the hearing that focused on what he

13    called the Proud Boys, Oath Keepers, and the extremist groups.

14    He's been one of the most prominent focused on these groups,

15    which I think, again, is very problematic.

16         I also think if the Court ends up admitting evidence

17    that Mr. Tarrio's -- of the allegations regarding the theft and

18    burning of the flag and of the Black church -- coming from the

19    Black church, that to me is particularly problematic in this

20    city, which -- and the -- I don't want -- and the last point on

21    that, also, I believe it's likely that the Stewart Rhodes-Oath

22    Keepers, that first seditious conspiracy trial will be just

23    about over and we may be getting a verdict in that case, which

24    presumably will also explode the -- the media attention at that

25    moment, and that -- you know, we're the second seditious

1    conspiracy case, so I'm -- those are just additional points.

2         Although I -- and I agree that Mr. Tarrio is the leader

3    and, you know, referencing -- referenced in the debates; and I

4    know there's been -- I know that the focus is on him more

5    than -- but I think the whole Proud Boys, you know, standby --

6    whatever the former President said, standby and stand back, or

7    whatever that little exchange -- and, in fact, President Biden

8    also was the first one to mention the Proud Boys, asking him to

9    renounce the Proud Boys.  And instead former President Trump

10   came back with that quote.

11        So I would just like to add, those particular -- at this

12   particular moment in time, in addition to the -- in addition to

13   the -- to the anniversary of January 6th, I think that

14   conglomeration, that combination, it's almost like a perfect

15   storm, and I understand we want the trial --

16        THE COURT:  I'm not -- I'm not even going to go

17   there, Ms. Hernandez.  I was going to say -- all right.  I'll

18   put you down for a continuance, but no.

19        MS. HERNANDEZ:  We're caught in the back and forth

20   of, you know, we wanted to go forward and we're at the worst

21   possible time to go forward, so.

22        And I think there are -- there are jurisdictions that

23   are less -- and I want to say, D.C., I guess, for all of us who

24   live in the -- in the -- at least in the area, you know, I

25   guess Detroit is the -- is the car capital of the world; D.C.

1    is the political, you know, capital of the world.  I understand

2    the Court is talking about, you know, a lot of jurors have said

3    they were watching and everything, but, you know, everybody in

4    D.C. talks about politics and about -- it's just more so

5    than -- you could go to any other liberal city and you wouldn't

6    get that kind of --

7              THE COURT:  Ms. Hernandez, I've heard this argument

8    from the others.

9              All right.  Thank you.

10             Mr. Pattis, you had your hand up.  But you are muted,

11   Mr. Pattis.

12             MR. PATTIS:  It makes it hard.  There you go.

13             Judge, Mr. -- Mr. -- Mr. Biggs joins in the argument.

14   And Mr. Hull could not be here.  He sends his apologies.

15             I wanted to ask the Court, if the Court were to deny the

16   motion, would the Court consider individual sequestered

17   *voir dire* as a means of picking the jury?  You know, I'm from

18   Connecticut.  We do so as a matter of right in every case, and

19   it's a particularly useful tool for getting at bias.  Parties

20   have the ability to question the jurors outside the presence of

21   other jurors; and it's a counsel-directed *voir dire* rather than

22   a Court-direct *voir dire*, but it's a particularly useful tool.

23             THE COURT:  I'll certainly consider the idea -- I'm

24   not going to consider having counsel direct the *voir dire*, but

25   I will consider having -- having each -- the individual jury

65

1      *voir dire* take place outside the presence of other jurors.  So

2      let me think about your request, but I'll certainly consider

3      that.

4              MR. PATTIS:  And then, in addition, the Biggs -- in

5      addition, Mr. Biggs would ask the Court to consider -- I don't

6      think it's brief.  I'm late to the case.  But the language of

7      the Sixth Amendment gives defendants the right to have a trial

8      in the state and district in which the crime occurred.  One of

9      the crimes here is conspiracy.  That conspiracy took place

10     outside the district, which is not, strictly speaking, a state.

11     And the government has chosen this forum.  And for all the

12     reasons my colleagues have advanced, it's advantageous to the

13     government to -- D.C. was created to be the house of the

14     government.

15             THE COURT:  Mr. Pattis, this is not -- this is not

16     argument on the pending motion.  That is not here for today.

17             MR. PATTIS:  All right.  Got it.

18             MS. HERNANDEZ:  Your Honor, on the *voir dire*

19     question, I'm pretty certain most -- I mean, Judge Boasberg,

20     essentially, did that kind of thing when we selected a jury

21     after the general questions when -- when you go to the

22     individual questions, you're -- you're asking either at the

23     bench --

24             THE COURT:  Right.

25             MS. HERNANDEZ:  -- so the other jurors aren't

1    listening or --

2              THE COURT:  Right.

3              MS. HERNANDEZ:  I think because of COVID, I think

4    none of the other jurors were in the courtroom at the time.

5              THE COURT:  That has been the practice at least for

6    COVID; correct.  Yeah.  So I'll think about your suggestion

7    along those lines.

8         All right.  I'll look for -- Mr. Kenerson, your hand is

9    up.

10             MR. KENERSON:  Thank you, Your Honor.

11        I just wanted to make two very brief points in response

12   to Ms. Hernandez.

13             THE COURT:  I have to give you the opportunity to do

14   that.  I think that's fair.

15             MR. KENERSON:  One is everything she cited is

16   national in scope.  I'm not going to belabor the point.  We've

17   made it.

18        But second is with respect to stuff that happens once

19   the jury has come in and starts speaking to the Court, whatever

20   that may be, whether that be release of HSC transcripts or a

21   report, whether that be additional hearings, whether that be

22   the anniversary of January 6th, will happen after the Court has

23   given these particular jurors an instruction not to view any

24   media.  And the Court can inquire of the jurors if there is a

25   media event that happens once *voir dire* begins whether anyone

1    viewed that event.

2           THE COURT:  Understood, Mr. Kenerson.

3           All right.  I'll take this under advisement.

4           I'll have the -- I'll look for that report noon on

5    Monday, and we'll go from there on that dispute.

6           And then I'll receive the parties' submissions on

7    Wednesday that were due on the 28th.

8           And I will also look into, Ms. Hernandez, the point

9    you've made about the marshals' plans for your clients and

10   where they are likely to be.

11          I do have -- just -- I think it makes sense for me to --

12   because I think we did this by minute order before.  For the

13   defense counsel who are here, if it is the case -- if -- if it

14   is the case that the marshals are not going to begin their

15   process to bring your clients here for the 12th, would not kick

16   in until after the 14th, after the 18th, the next two dates we

17   have set, what we will do -- what we will do, if that's the

18   case, is certainly try to figure out every way we can to get

19   your clients to be present either by audio or video.

20          If we cannot, is there any counsel here who would not

21   waive your client's presence on either the 14th or the 18th

22   because you'd rather have your client remain closer to you

23   during -- or where they are now at that time?

24          MR. SMITH:  Judge, so I can -- there's a couple

25   negatives there.  So are we -- what are we objecting to?

1          THE COURT:  Sure.  I'd just -- just like -- we had

2    reached out to the parties to ask before.  What I want to know

3    is if you would object to -- if it can't be arranged that your

4    client attend either the 14th or the 18th -- right? -- if it

5    can't be arranged from -- and -- and would you rather them stay

6    where they are now, even if they can't attend, as opposed to

7    being brought here to attend those proceedings in person?

8          MR. SMITH:  Judge, I think Mr. Nordean would prefer

9    to remain where he's being incarcerated for both of those

10    hearings --

11          THE COURT:  Okay.

12          MR. SMITH:  -- if he cannot attend virtually.

13          THE COURT:  Okay.  And you would -- you would agree

14    that his presence would be waived for those hearings?

15          MR. SMITH:  Yes, Your Honor.

16          THE COURT:  Okay.  That -- that's my question.  Just

17    because, again, I don't know what the marshals' plan is.  So

18    I'm not making any promises either direction.  I just want to

19    make sure that we will be able to go forward with those

20    hearings in the event that for whatever reason your client is

21    there but cannot -- cannot -- the timing doesn't work given the

22    facility, we can't have them present.

23          Mr. Pattis?

24          MR. PATTIS:  We would like Mr. Biggs brought in,

25    Judge.  He's got a right to attend critical stages of the

1    proceedings, and we'd like him there.

2              THE COURT:  He's local anyway.

3              MR. PATTIS:  Okay.  I just wanted to make sure.  I

4    don't know if he gets moved between now and then or whatever.

5              THE COURT:  You would like him present physically for

6    those days?

7              MR. PATTIS:  Yes, sir.

8              THE COURT:  Okay.  Great.

9         All right.  Until then --

10             MS. HERNANDEZ:  Your Honor, on behalf of Mr. Rehl, I

11   think he will waive -- if the Court will allow me, I'll file

12   something.  If that changes, I'll file something.

13        Also, if possible, even if not virtual, by phone would

14   be, you know, helpful.

15             THE COURT:  That's what I said.  We will do -- we

16   will make every effort, whichever way --

17             MS. HERNANDEZ:  Thank you.

18             THE COURT:  All right.  Until then, the parties are

19   dismissed.

20        Okay.  Mr. Hassan, were you -- you're muted.

21             MR. HASSAN:  Judge, I know Ms. Harris was going to

22   set us up in a breakout room.

23             THE COURT:  Okay.  So if -- Ms. Harris, if you can

24   accommodate that.

25             THE COURTROOM DEPUTY:  Yes.

1          THE COURT:  Very well.

2               (Proceedings were concluded at 11:23 a.m.)

1        CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER

2

3             I, Nancy J. Meyer, Registered Diplomate Reporter,

4    Certified Realtime Reporter, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of my

6    stenograph notes and is a full, true, and complete transcript

7    of the proceedings to the best of my ability.

8

9                     Dated this 31st day of October, 2022.

10

11                    /s/ Nancy J. Meyer
                      Nancy J. Meyer
12                    Official Court Reporter
                      Registered Diplomate Reporter
13                    Certified Realtime Reporter
                      333 Constitution Avenue Northwest
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25