UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 21-CR-175 (TJK) |
| | : | |
| ETHAN NORDEAN, et al., | : | |
| | : | |
| Defendants. | : | |

**GOVERNMENT'S SUPPLEMENTAL MEMORANDUM
REGARDING MOTIONS *IN LIMINE***

The government respectfully submits this memorandum in response to defendant Nordean's Supplemental Memorandum Regarding the Government's Proposed 404(b) Evidence, Tools Evidence, and the First Amendment Defense (ECF 547), and defendant Biggs's Supplemental Memorandum in Opposition to Government's Intention to Offer Percipient "Tools" Evidence (ECF 546). For the reasons that follow, the defendants' supplemental arguments on these issues should be rejected.

**I.    The Government's Prior Rally Evidence is Admissible**

Throughout his argument and most recent submission, Nordean has misapprehended both the import of the government's prior-rally evidence, as well as the legitimate uses the government will make of it. In short, knowledge by these defendants of violence committed by members of the Proud Boys—in service of the Proud Boys' aims—at prior rallies, including those occurring in November and December 2020, is relevant to the defendants' state of mind as they formed the conspiracy, and their intent to use force to achieve the unlawful objectives of it. That relevance permeates every facet of the conspiracy's formation: it shows, among other things, that Ministry of Self Defense (MOSD) leaders were aware that "rally boys" were willing to use force, violence

and other unlawful means to achieve the conspiracy's objectives; that these defendants celebrated and promoted that use of violence and lawlessness; and that *they knew* the men they chose for MOSD were willing to use force if needed. This evidence is not only intrinsic to the formation of the conspiracy, but also relevant to the defendants' intent in selecting certain members for MOSD, and the defendants' knowledge of the conspiracy's unlawful aims.

### A. Prior Rally Evidence is Intrinsic to the Conspiracy

As discussed more fully in prior briefing, uncharged-crime evidence is not subject to the strictures of Fed. R. Crim. P. 404(b) if it is intrinsic to the offense charged. *See*, *e.g.*, *United States v. McGill*, 815 F.3d 846, 879 (D.C. Cir. 2016). Here, the contemporaneous evidence from December 12 is intrinsic to the crimes charged and not subject to the strictures of Rule 404(b). As the D.C. Circuit has explained, intrinsic evidence is "evidence ... of an act that is part of the charged offense or of uncharged acts performed contemporaneously with the charged crime if they facilitate the commission of the charged crime." *E.g.*, *id*. (cleaned up).[1] The Third Superseding Indictment expressly alleges that the December 12 rally was part of the "background" of the charged conspiracy, ECF 380, ¶¶ 15-18, and the conspiracy counts are charged as running from in or around December 2020 through January 2021. *Id.*, ¶¶ 26, 110, 114. The December 12 rally is both part of and explains the commission of the charged crime.

---

[1] Nordean complains, as he did in prior briefing, that the government included this evidence in a 404(b) notice letter, but then took the position that the evidence was intrinsic. That notice was provided on February 11, 2022. There have been two superseding indictments since the date of the notice—including the Third Superseding Indictment, which charged the two conspiracy counts with use-of-force elements—such that the defendant's complaint boils down to having received more notice than he is entitled to under the government's view of the evidence. *See United States v. Mahdi*, 598 F.3d 883, 891 (D.C. Cir. 2010) (notice required for uncharged acts extrinsic to charged offense, but not for those intrinsic to charged offense). His complaints are of no moment to the Court's legal analysis, and the government should not be punished for erring on the side of caution in its notice correspondence with the defense.

It bears repeating that one of the elements that the government must prove beyond a reasonable doubt to establish a violation of 18 U.S.C. § 2384 is an agreement to use force. Similarly, the government must prove beyond a reasonable doubt that the conspirators agreed to use force, intimidation, or threats to establish a violation of 18 U.S.C. § 372. In this case, part of the government's theory is that the defendants used force by amassing dozens of men who were willing to both fight and to follow the commands of MOSD leadership and marching them to the Capitol, where they participated in overrunning police lines onto Capitol grounds. Regardless of whether Nordean or any other defendant personally used force on December 12 or in prior rallies, they knew that those they were recruiting to MOSD were willing to use force in support of a Proud Boys objective as a result of the force used at prior rallies. Tarrio additionally signaled that unlawful conduct in support of a Proud Boys objective was to be celebrated when he burned the #BLACKLIVESMATTER banner and subsequently dared law enforcement to come get him if they did not like it.

Additionally, Nordean himself has evinced both a willingness to have used the Proud Boys as tools for force against the police on December 12 and the need to use force against police and government officials who, in Nordean's view, have broken the law. On December 28, 2020, in an episode of his podcase, Nordean relayed an incident where he threatened to storm the police line if they did not let him through:

> [W]hen I was in D.C., this "line," right, that they were putting up was like mostly females, right? About like 120-pound women. And I'm 260 pounds, okay? And I'm a pretty big guy, and I've got J.B., I've got a lot of the guys – just monsters front line, right? And behind them is like 800 Proud Boys. And so they're like "sorry sir, you're not allowed to pass." And I'm furious because I've got people over there – like there's like two Proud Boys' wives on the other side, just like 50 yards away from us. And we can see Antifa messing with them. And I'm like "I'm gonna storm this line if you don't let me through there and get those people through." So the Commander hears me and he's like "Uh, yeah, I'll walk you around. You can get them out." And I'm like "yeah that was a good decision, man.

> Because, because I don't wanna have to do that, but you're putting me in a position as a leader with almost 1,000 people that I'm responsible for behind me.

Three days later, on December 31, on another episode of the same podcast, Nordean endorsed violence against the police and government officials if he believed those people were breaking the law:

> When police officers go after criminals, they use force. Which is aka violence. Okay? So, when police officers or government officials are breaking the law, what are we supposed to do as the people? Discourse? What are we supposed to – debate? No, you have to use force. This is the organized militia part of our freaking constitution here. Um, this is something that we need to get back ingrained in our heads and desensitize our-ourselves from this stuff that we've been taught. That, you know, you never use violence. We'll I'm sorry, that's literally the foundation of every prominent country is force.

The prior acts of violence the men Nordean and others recruited to join MOSD and march to the Capitol on January 6 is relevant to the defendants' intent to join the conspiracy's unlawful goals, as well as their knowledge thereof. This evidence is especially relevant where Nordean intends to argue that the government has proven no more than that the defendants intended to engage in First Amendment-protected activity.

At the hearing on November 17, 2022, and again in his most recent submission, *see* ECF 547 at 2-3, defendant Nordean repeatedly pressed the claim that the December 12 rally could not provide direct evidence of the charged conspiracy because the January 6 rally had not yet been planned. This is of no moment—or slicing the bologna too thin—because the conspiracy charged had as its purpose opposing "the lawful transfer of presidential power by force." ECF 380, ¶ 27. Contrary to the defendants' arguments, the conspiracy charged is not a conspiracy to "storm the Capitol" on January 6. They certainly did so as one of the manner and means of the conspiracy, but the charged conspiracy is not so limited. Both the November and December 2020 rallies were

4

organized and billed as election protests,[2] and as the defendants, their co-conspirators, and their tools got further from the election and closer to Inauguration, the language they used to discuss the transfer of power became more desperate and more reflective of a willingness to take matters into their own hands. *See* Ex. 1 (proposed trial exhibit referenced at 11/18 hearing, with Proud Boys "elder" counseling: "I'm pro violence but don't blow your load too soon."). The conspirators may not have settled on January 6 as their target date by December 12, but their willingness to do whatever it took, up to and including the use of force, to stop the transfer of power, was already extant.[3]  The escalation of both violence and violent rhetoric among the Proud Boys from November through January is not only highly probative to the charged conspiracy, it cannot be separated therefrom. After the Ministry of Self Defense was approved as a chapter, the defendants in leadership set about hand-selecting other individuals to join the group. In deciding who to admit, the defendants drew on their knowledge and experience with them at prior rallies. The fact that some of the recruits came into the chat and nearly immediately made references to violence, without rebuke by Nordean or any other leader, is additional evidence both (1) why they were chosen for MOSD, and (2) what they had come to understand about MOSD's purpose based on

---

[2]     Nordean has argued that "[t]here's no evidence in the record" that the December 12 rally "had something to do with the 2020 election." 11/17/22 Trans. at 193-94. But the rally was overtly election-related, as alleged in the indictment, ECF 380 at 5, ¶ 15, and as proven by exhibits proffered by the government in response to Nordean's argument. *See* Ex. 12 hereto (government's proposed trial exhibits shown at 11/18 hearing). These exhibits, and all others attached hereto, were provided to Nordean and the other defendants on November 11.

[3]     The government disputes the defendant's characterization, which comes without a citation to the transcript, that the government acknowledged that the opportunity to later attempt to stop the certification was not conceived by December 12. While the specifics may not have been in place, the idea that the defendants may have had to have taken matters into their own hand certainly was. Similarly, the government disputes the defendant's characterization that the government had proffered that Jeremy Bertino would testify that the Proud Boys instigated violence on December 12.

their prior communications with the defendants and other leaders of the conspiracy.[4] *See* Ex. 3 (proposed trial exhibits comprising messages from MOSD recruits upon joining group, expressing (1) willingness to "log into Minecraft"; (2) shared experience of previous "seek and destroy" mission in DC "where we had a target which was Black Lives Matter plaza"; (3) expectation that members were going to need "a lot of bail money"; (4) understanding that "protest time" means "punch 'em in the face"; and (5) appreciation that "to be in this group, you need to . . . be able to fucking kick ass if you need to kick the fuck ass.").

It is both relevant and extremely probative that in a case where the conspiracy is alleged to involve the use of force and unlawful activity in support of its objectives, the defendants were selecting as members those who they know to have shown a willingness to use force and unlawful activity. The proposed trial exhibits shown during the 11/18 hearing demonstrate that the events of December 12 were at top of the defendants' minds when they selected their recruits, as well as when they outfitted themselves with armor and discussed their future intentions. *See* Ex. 4 at 1 (co-conspirator: "I've got one first[-degree] I want to get he was fantastic in dc"); 2 (Rehl: "I didn't have issues personally in DC, just heard some others say they did"); 3 (co-conspirator: "We could have ran them the fuck over in DC and they wouldn't have been able to do shit.". . . Biggs: "I'm ready to just be the Zamboni. And roll over mother fuckers."); *see also* Ex. 4; *see also* Ex. 5 (Pezzola Parler post regarding Dec. 12).

---

[4] Nordean claims that the messages the government showed at the pretrial conference were "collected after making its argument," ECF 547 at 4, but he ignores that they were taken from the final trial exhibits provided to him on November 11, a week prior to that hearing, and that had previously been provided to him in discovery. The government has already argued why those statements are relevant, regardless of whether they are co-conspirator statements, and it will not belabor that point again in response to Nordean's filing.

B. <u>Prior Rally Evidence Validly Proves Intent, Motive, and Knowledge.</u>

Even if the Court were to disagree that the evidence of prior rallies is intrinsic to the conspiracy, the evidence would still be admissible for valid Rule 404(b) purposes including intent, motive, and knowledge. *See*, *e.g.*, *McGill*, 815 F.3d at 879. And, in an abundance of caution, the government so timely noticed defense of this alternate theory of admissibly. Starting with intent, Nordean's arguments are based on an understanding of "intent evidence" that is unreasonably narrow in at least two respects.

First, Nordean is simply wrong to argue that evidence of intent cannot predate the immediate circumstances of an offense's commission. *See* ECF 547 at 3 ("Those acts could not inform the Defendants' 'intent' in this case as the rally in D.C. on January 6 had not even been planned by December 12, 2020.") An analogy shows why. Imagine a drug dealer who announces, "I'll shoot anyone who tries to steal my territory." A month later, a competitor begins selling in the same area and is promptly shot by the defendant. On Nordean's theory, the earlier statement would be irrelevant to the question of intent because the perpetrator did not yet know of the victim's existence. This is not how relevance, or circumstantial evidence, works. That is, the evidence of intent of which Nordean complains, while resting on events occurring before January 6, is in fact evidence to relevant prove the crime charged – stopping the peaceful transfer of power. Nordean's argument, if adopted, would essentially swallow the 404(b) rule, as many prior crimes admitted under that rule occur prior to the charged crime having been conceived.

Second, Nordean also is wrong to assert that the only "intent" that is relevant at trial is the specific intent to commit the charges offenses. *See* 11/17/22 Tr. at 80 ("It's not intent, because intent is intent to commit the elements of an offense.") Putting aside for the moment that the disputed evidence is evidence of intent to commit an element of the charged offense, the prior act

7

evidence goes to the numerous questions the jury will consider of intent that are subsidiary to, but which directly inform, the ultimate *mens rea* determination.  The government will prove that the defendants committed various acts in furtherance of the conspiracy, and the defendants will certainly argue each of these were innocently motivated.  At each step, the jury will need to consider things like:  Did the defendants form MOSD to pursue the objective of reversing the election, or only to better organize themselves at peaceful rallies?  Did they outfit themselves in armor because they anticipated the proactive use of violence, or because they feared ambush by Antifa?  Why did they issue the "no colors" directive? All of these are important questions of intent that contribute to, but are distinct from, the ultimate question of guilt.

A prototypical example of this type of evidence was upheld in *United States v. Straker*, 800 F.3d 570, 590 (D.C. Cir. 2015).  The defendants in *Straker* were charged with conspiracy to commit a hostage taking of a U.S. citizen in Trinidad and Tobago, as well as hostage taking resulting in death.  *Id.* at 581-82.  The District Court in that case admitted evidence of three other uncharged hostage takings that many of the defendants had participated in during the four months prior to the charged kidnapping, as "the background of the conspiracy and how the relationships between the participants developed, as well as defendants' motive, intent, knowledge, preparation, and plan." *Id.* at 588.  The D.C. Circuit affirmed that decision, noting, among other things, that the evidence of prior uncharged hostage takings "helped to explain how [the defendants] knew they could rely on one another during the [charged] hostage taking" and that it established "how the defendants in this case formed the [charged] hostage-taking conspiracy." *Id.* at 590.

*Straker* is on all fours with this case.  The permissible uses there—explanation of how the defendants knew they could "rely on" those they recruited to MOSD and how they formed the conspiracy—are precisely how the government plans to rely on the prior rally evidence in this

case. These defendants have each participated in prior rallies at which violence occurred, and those who were in the MOSD Leaders chat specifically discussed the violence that occurred at the December 12 rally with respect to recruitment for January 6. This knowledge is intrinsic to the formation of the conspiracy, but even if it is not, it is relevant to the defendants' intent to join the charged conspiracy, knowledge of its unlawful aims, and the lack of mistake or accident, e.g., by getting "swept up in the moment" on January 6.[5]

*Straker* is far from the only D.C. Circuit to explicitly allow use of other-crimes evidence in the way the government proposes here. *See, e.g.*, *McGill*, 815 F.3d at 882 ("Also admissible as intrinsic to the conspiracy itself was evidence of violence committed during the course of the conspiracy and involving multiple individuals linked to the conspiracy"); *United States v. Crowder*, 141 F.3d 1202, 1208 (D.C. Cir. 1998) ("A defendant's hands on experience in the drug trade cannot alone prove that he possessed drugs on any given occasion. But it can show that he knew how to get drugs, what they looked like, where to sell them and so forth. Evidence of a defendant's experience in dealing drugs — evidence that is, of his 'bad acts' — thus may be a 'brick' in the 'wall' of evidence needed to prove possession"); *United States v. Manner*, 887 F.2d 317, 322 (D.C. Cir. 1989) (subsequent drug transactions relevant to intent on charged drug conspiracy). The government has cited many of these binding cases previously, and no defendant

---

[5] At the November 17 hearing, Nordean accused the government of arguing that the prior rally evidence would be used to "show they're more willing to use violence," in violation of Fed. R. Evid. 404(b). But as the Court noted in questioning Nordean's counsel, the government's offer of that evidence is not to prove character in conformity therewith, but the defendants' intent and their knowledge. *See* 11/17/22 Tr. at 80:21-81:2 (Court inquiring whether counsel thinks an increased willingness to use force against the police is relevant to intent). That knowledge and that intent is intrinsic to the formation of the conspiracy, but even if they were not, they are permissible uses of evidence under Rule 404(b).

has made any attempt to distinguish them, nor any of the other D.C. Circuit cases cited by the government.[6] The government moreover expects the defendants to argue—as counsel for defendant Rehl has done repeatedly and as recently as the November 18 hearing, that MOSD was created solely for self-defense. The government of course disputes that self-defense was the true purpose of MOSD, and the proffered evidence regarding those members of the Proud Boys these defendants selected to be in the rally chapter, as well as the Proud Boys' actions at prior rallies, are relevant to disprove any suggestion by the defendants that MOSD was strictly a reaction to having been "victimized" on December 12. Nonetheless, this is a fact question for the jury, which the prior acts evidence directly bears upon.

The prior acts of violence of the men Nordean and others recruited to join MOSD and march to the Capitol on January 6 are relevant to these defendants' motive, their knowledge that the conspiracy would involve the use of force, their intent to use the force those members would provide, and the fact that they did not show up at 12:53 at the Peace Circle by mistake and accidentally wind up being among the first to breach and storm the Capitol grounds.

Likewise, the government's motive evidence should not be limited to evidence of a belief in a stolen election as Nordean has argued, *e.g.*, 11/17/22 Tr. at 144:20-25; ECF 547 at 2-3 (arguing

---

[6] Nordean's reliance on *Huddleston v. United States*, 485 U.S. 681 (1988), *see* ECF 498 at 5-6, is misplaced. That case involved a single defendant charged with selling stolen goods in interstate commerce. *Huddleston*, 485 U.S. at 682. The only issue at trial is whether the defendant knew the goods were stolen, and the Court held that, under Rules 404 and 401, there must be some evidence that he knew prior goods the defendant had offered for sale were stolen. *Id.* at 685. As explained above and in its prior filings, the government has much wider latitude in conspiracy cases to present the background of the conspiracy and how the conspirators entered into their illegal agreement. "In conspiracy prosecutions, the prosecution is usually allowed considerable leeway in offering evidence of other offenses 'to inform the jury of the background of the conspiracy charged . . . and to help explain to the jury how the illegal relationship between the participants in the crime developed." *United States v. Machado-Erazo*, 47 F.4th 721, 728 (D.C. Cir. 2022) (cleaned up, citing *United States v. Mathis*, 216 F.3d 18, 26 (D.C. Cir. 2000)).

10

that the defendant's hostility towards the police is irrelevant).  The increasing hostility towards police, including the belief that they would not back the Proud Boys, animated the conspiracy, heightened the need for violent action by the Proud Boys since the police could not be counted on, and contributed to its success.  As an example, any plan to illegally enter Capitol grounds on January 6 would necessarily involve the defeat of police defenses and would have been impossible had the participants not been willing to physically overwhelm those defenses.  This hostility is evident, as the government noted at the November 17 hearing, on the march between the Washington Monument and the Capitol, when Nordean and Biggs used Tarrio's arrest and the events of December 12 on multiple occasions to rally their charges and denounce the police, shortly before leading the charge through multiple police lines.

The evidence regarding increased hostility towards law enforcement, and the defendants' belief that the government did not adequately respond to perceived violence committed by Black Lives Matter and Antifa is additionally relevant to the defendants' state of mind, as they formed a conspiracy that would challenge the lawmakers in the Capitol who they saw as responsible for those policies and for certifying an allegedly stolen election.

Finally, a core part of the government's theory is that the defendants recruited subordinates whom they knew were willing and able to use force and violence.  "Knowledge" is a bedrock Rule 404(b) purpose, and the defendants' knowledge on this point could only have been formed, and can only be proven, based on prior performance.  Arguing "the defendants chose their co-conspirators because they saw them act violently in the past and expected them to act violently in the future" is not the same as arguing "the conspirators acted violently in the past, therefore they have a propensity for violence and should be found guilty on that basis."  Nordean seeks to erase the distinction, but his attempts to do so are irreconcilable with binding precedent affirming that

11

past conduct is "particularly probative" in conspiracy cases for the very same uses the government proffers here. *See, e.g.*, *Straker*, 800 F.3d at 590 (quoting *Mathis*, 216 F.3d at 26).[7]

## II.   Tools

Nordean and Biggs each offer supplemental briefing in opposition to the government's arguments about the relevance of conduct by third-party "tools" of the conspiracy. Nordean wrongly asserts that the government "will try to contend that" actions of third parties are relevant "even absent any causal relationship" with defendants' conduct. ECF 547 at 8. Biggs attacks the same strawman when he implies the government is seeking to "argue that acts of third parties are the legal responsibility of criminal defendants" based on "mere proximity and shared political views." ECF 546 at 4. That is not the government's argument, as the Court already knows. As the government's reply brief on this topic explained, "[t]he limiting principle is whether, on the evidence at trial, a jury could reasonably find a factual nexus between the actions of the conspirators and the actions of the tools." ECF 522; *see also* 11/18/22 Tr. at 89 ("MR. NICHOLAS SMITH: But then if we're saying this isn't about responsibility, then what is relevance? THE COURT: It's a causal relationship.").

Biggs likewise misapprehends the government's theory when he says it involves the tools' "transform[ation] into . . . zombies" or the operation of "Stockholm Syndrome." ECF 546 at 3, 4. The government has never suggested that the defendants' followers lost all personal agency when they joined in the attack on the Capitol. The point, instead, is that a person can participate in a collective endeavor without necessarily grasping the ultimate purposes toward which it is directed.

---

[7]   The out-of-circuit cases Nordean cites—*United States v. Commanche*, 577 F.3d 1261, 1267 (10th Cir. 2009) and *United States v. Himelwright*, 42 F.3d 777, 782 (3d Cir. 1992)—are not contrary authority because they do nothing more than restate the rule against propensity evidence. They bear no factual resemblance to this case and, most importantly, did not involve any conspiracy offenses.

12

This concept does not require expert testimony. Take, as an example, a conspiracy to kidnap and murder. If two co-conspirators kidnap and kill the decedent and place her body in the trunk of a car, then convince an unwitting third party to transport that car out of state. The actions of that third party are undeniably relevant to the charged conspiracy, but absent additional evidence demonstrating he had entered into an agreement to achieve a criminal objective, driving the car out of state would not convert the unwitting third party to a co-conspirator.

To be clear, the government does not plan to argue that every member of the crowd on January 6 was a tool of the defendants' conspiracy. The tools will consist primarily of those Proud Boys members and affiliates whom the defendants recruited and led to the Capitol as part of their marching group. As the government explained, many of these individuals would also qualify as co-conspirators who shared a criminal objective with the defendants (even if, as far as the followers understood, that objective was only to commit assault). *See* 11/18/22 Tr. at 66 ("[W]e would argue, first, that these people are co-conspirators."); 119 ("[P]art of what the tools theory does is says, even if these people were just signed up to commit violence without knowing why or against whom it would be directed, that's still relevant."). In some other instances, of course, the tools will be apparent strangers whose conduct nonetheless has a causal relationship with the defendants. For example, video evidence at trial will show that numerous rioters surged toward the Capitol as a result of Nordean, Biggs, and others destroying a black metal fence that was obstructing the crowds' progress. Video will likewise show that many rioters entered the Capitol through a window that Pezzola smashed. All these facts lend credence to Tarrio's own evaluation of the causal relationship at work: "Make no mistake, we did this."

### III.   First Amendment

The government will keep its response here brief, as this ground has been well trod. The defendant argues that because 18 U.S.C. § 1512 can apply to conduct occurring outside the Capitol building—as opposed to outside the restricted area—he is entitled to a First Amendment instruction. The defendant's reliance on *Jeanette Rankin Brigade* in inapplicable here, where the grounds were closed on January 6. The defendant's reading of that case, if adopted, would attach a First Amendment right to parade on Capitol grounds on, for example, Inauguration Day. For the reasons the government outlined previously, that case is inapplicable to the areas that were temporarily closed on January 6. Defendant has not meaningfully engaged with that fact in his citations to *Jeanette Rankin Brigade*. At best, the Court should consider an instruction at the close of evidence and should not permit the defendants to open on any First Amendment defense.[8]

---

[8] The defendant's reference to an as-applied challenge gets him no closer to a jury instruction or the ability to argue the First Amendment to the jury. *See* ECF 547 at 13. Defendant has cited no case holding that a jury—as opposed to a judge ruling as a matter of law—may decide whether a First Amendment as-applied challenge has merit.

## CONCLUSION

For the foregoing reasons, the Court should reject the supplemental arguments raised by Biggs and Nordean.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By: */s/ Jason McCullough*
JASON B.A. MCCULLOUGH
NY Bar No. 4544953
ERIK M. KENERSON, OH Bar No. 82960
NADIA E. MOORE, NY Bar No. 4826566
  On Detail to the District of Columbia
Assistant United States Attorneys
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7233 //
jason.mccullough2@usdoj.gov


By: */s/ Conor Mulroe*
CONOR MULROE, NY Bar No. 5289640
Trial Attorney
U.S. Department of Justice, Criminal Division
1301 New York Ave. NW, Suite 700
Washington, D.C. 20530
(202) 330-1788
Conor.Mulroe@usdoj.gov