IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | * |
| | * |
| v. | *   Case No.  21-CR-0175-3 (TJK) |
| | * |
| ZACHARY REHL, | * |
| Defendant. | * |
| | * |

ooOoo

### ZACHARY REHL'S MOTION TO DISMISS THE INDICTMENT AND FOR AN EVIDENTIARY HEARING

Zachary Rehl, by his undersigned counsel, hereby respectfully moves to dismiss the indictment against him for a violation of his Sixth Amendment and Due Process rights. In the alternative, an evidentiary hearing is required.

**I.      FACTUAL BACKGROUND**

The production of Jencks materials related to S/A Miller showed that FBI agents reviewed emails between Mr. Rehl and his prior counsel related to trial strategy. An agent involved in the investigation states to Miller, "this one email def indicates that [Defendant Rehl and his attorney] want to go to trial." The agent says that one of the lead prosecutors on this matter should not be alerted, "yet." Clearly, Mr. Rehl's conversation with his lawyer about whether to go to trial involves "trial strategy." Indeed, deciding whether to go to trial is one of the most fundamental issues facing a defendant in a criminal case.

Undersigned counsel first reviewed the Mr. Rehl's emails with his prior counsel this past week after the Miller Jencks was produced. The government had produced the emails in discovery on June 17, 2022, among thousands of other pages of discovery. The cover letter for the June 17,

2022 discovery production did not make reference to the emails between Mr. Rehl and his counsel but rather indicated, among other things, that "the FPD Relativity Database has been updated with additional materials" relating to 19 individuals, including Mr. Rehl. Ordinarily, the government produces case-specific discovery through USAfx.[1] As a result, Mr. Rehl located 15 such email threads dating from October 5, 2021 through October 15, 2021. At this point, counsel is concerned that not all emails between Mr. Rehl and his counsel have been produced in discovery both because of the short time period covered in the emails that have been produced, because some of the comments in the messages between FBI agents are not explicitly found in the 15 email-threads, namely the email noting that government had done things "improperly" and because there appear to be missing FBI messages. *Compare* fourth message below which appears to be responding ("nope") to an earlier email which appears to be missing:

| | |
|---|---|
| 2021-07-15 13:13:15 twang2@fbi.sgov.gov nmiller2@fbi.sgov.gov | . . . I got REHL's email from FDC, he doesnt (sic) appear to be a ticking time bomb in the emails he sent as JENKINS described him to be. |
| 2021-10-21 19:36:15 twang2@fbi.sgov.gov nmiller2@fbi.sgov.gov | … found an email thread with REHL and his attorney MOSELEY. the attorney raised some |
| 2021-10-21 19:51:59 twang2@fbi.sgov.gov nmiller2@fbi.sgov.gov | interesting points |
| 2021-10-21 19:53:31 twang2@fbi.sgov.gov nmiller2@fbi.sgov.gov | nope. he mentioned how we (GOV) did things improperly |
| 2021-10-21 19:54:02 twang2@fbi.sgov.gov nmiller2@fbi.sgov.gov | i need to find other emails, but this one email def indicates that they want to go to trial. but dont freak out jason and luke yet |
| 2021-10-21 19:54:07 twang2@fbi.sgov.gov nmiller2@fbi.sgov.gov | or urself |

---

[1] In the Gov's Discovery Status reports, it has explained that global productions were produced to Relativity while it "expect[ed] prosecutors will continue use USAfx to make productions in individual cases." Status Report (ECF 290) at 6 and n. 6.

In claiming that FBI agents did not improperly access the messages between Mr. Rehl and his attorney, the government relies on several assertions, which Mr. Rehl disputes. Accordingly, as more fully set forth below, the government's arguments raise factual issues that the Court cannot resolve on the papers submitted by the government.

First, the government argues that Mr. Rehl had waived any attorney-client privilege. It relies on a document, "Truelincs and Electronic Messaging Warning/Responsibility/Acknowledgment" attached as an exhibit (ECF 690-2), which it claims is a "banner warning [wherein] inmates are explicitly advised that "electronic messages and system activity" are subject to monitoring and retention. Gov Corrected Response to Nordean's Notice of Argument at 14 (ECF 690-1). The government's assertion is not accompanied by any sworn declarations by BOP officials nor does the exhibit contain Mr. Rehl's signature or other evidence that he in fact read or accepted such a condition. This assertion is inconsistent with a number of other documents.

For one, the emails themselves contain no warnings that they are being monitored. The Philadelphia FDC "Inmate Admission & Orientation Handbook does not indicate that emails will be monitored:

> Trulincs will be utilized should you choose to participate in the limited inmate communication system. This allows you to electronically communicate with your contacts. If an email address is entered for a contact, TRULINCS sends a system generated message to the contact directing them to www.corrlinks.com to accept or reject email contact with the inmate prior to receiving any messages from the inmates.

Inmate Handbook at 38.[2] The Trulincs procedures provides for designating a contact as an attorney. Invariably, Mr. Moseley's emails to Mr. Rehl included a notice that "ATTORNEY-CLIENT

---

[2] https://www.bop.gov/locations/institutions/phl/phl_ao_handbook_011322.pdf

PRIVILEGED COMMUNICATION" or similar designation. A search of Truelincs on the BOP website does not reveal any indication that email communications with attorneys are monitored.[3]

The facts in this case distinguish the cases cited by the government involving telephone conversations made from detention facilities. In each of those cases, the detainee as well as the person receiving the phone call are made aware that the calls are being monitored by a voice message at the start of the call. No such notice was present in the emails. And the other facts set out above undermine any argument that Mr. Mosely and Mr. Rehl were on notice. Moreover, to the extent that the reason for monitoring communications is legitimate security concerns that justification is absent once it becomes known that the detainee is communicating with his counsel.

## II. THE LAW

### A. Basic Principles

> The Fifth Amendment enjoins that no person be deprived of life, liberty or property without due process of law. Such due process includes the right of one accused of crime to have the effective and substantial aid of counsel. *Neufield v. United States*, 118 F.2d 375, 383 (D.C. Cir. 1941). Moreover, the Sixth Amendment provides that 'In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence.'
>
> It is well established that an accused does not enjoy the effective aid of counsel if he is denied the right of private consultation with him. . . .
> [T]he Fifth and Sixth Amendments . . unqualifiedly guard the right to assistance of counsel, without making the vindication of the right depend upon whether its denial resulted in demonstrable prejudice. . . . . "The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial."
>
> We think it is further true that the right to have the assistance of

---

[3] https://www.bop.gov/inmates/trulincs.jsp

> counsel is so fundamental and absolute that its denial invalidates the trial at which it occurred and requires a verdict of guilty therein to be set aside, regardless of whether prejudice was shown to have resulted from the denial. In the *Glasser* case, having held that the trial court 'denied Glasser his right to have the effective assistance of counsel, guaranteed by the Sixth Amendment', the Supreme Court said: 'This error requires that the verdict be set aside and a new trial ordered as to Glasser.'

*Coplon v. United States*, 191 F.2d 749, 757, 759-60 (D.C. Cir. 1951), *quoting Glasser v. United States*, 315 U.S. 60, 76, (1942), *cert. denied*, 342 U.S. 926 (1952). In *Coplon*, the D.C. Circuit found a Sixth Amendment violation where government agents listened in on telephone conversations between the defendant and her attorney.

The Sixth Amendment right to counsel has been the cornerstone of our criminal justice system since before the adoption of the Constitution and the Bill of Rights. *Powell v. Alabama*, 287 U.S. 45, 61-64 (1932). It is a right which "[t]ime has not eroded" because it is "fundamental." *United States v. Cronic*, 466 U.S. 648, 653 & n. 8 (1984). Counsel are of paramount importance for the simple reason that "they are the means through which the other rights of the person on trial are secured." *Cronic*, 466 U.S. at 653. "Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have." *Id.* at 654 (citation omitted). *Accord Powell*, 287 U.S. at 68-69; *Gideon v. Wainwright*, 372 U.S. 335 (1963).

Counsel play such an important role in our system of criminal justice because of the adversarial nature of that system. "The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." *Herring v. New York*, 422 U.S. 853, 862 (1975). Through

counsel, a defendant is permitted to put the government's case through "the crucible of meaningful adversarial testing." *Cronic*, 466 U.S. at 656. *See also Ferri v. Ackerman*, 444 U.S. 193, 204 (1979) (observing that "an indispensable element of the effective performance of [defense counsel's] responsibilities is the ability to act independently of the Government and to oppose it in adversary litigation").

Our adversarial system, however, is subject not to the law of the jungle but rather is constrained by both the rule of law and rules of professional and ethical conduct. If prosecutors and law enforcement agents working under their supervision operate under a win-at-all-costs or ends-justify-the-means mentality, they undermine rather than serve the cause of justice. *See Cheney v. U.S. Dist. Court for the Dist. of Columbia*, 542 U.S. 367, 386 (2004) (noting that criminal procedure differs from civil litigation because prosecutor operates "under an ethical obligation, not only to win and zealously to advocate for his client but also to serve the cause of justice."); *Berger v. United States*, 295 U.S. 78, 88 (1935) (prosecution's interest "in a criminal prosecution is not that it shall win a case, but that justice shall be done.").

For this reason, the Sixth Amendment not only ensures that a defendant will have counsel but creates a zone of privacy or protection around the relationship, immunizing it from government interference and attack under all but extraordinary circumstances. "[A]t the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *Maine v. Moulton*, 474 U.S. 159, 168-69 (1985). As privacy is vital to effective representation and to the development of the attorney-client relationship itself, the government is forbidden from eavesdropping or planting agents to hear or disrupt counsels of the defense. *See, e.g., United States v. Henry*, 447 U.S. 264 (1980).

> The defendant has the right to prepare in secret, seeing and inviting those he deems loyal or those with whom he is willing to risk consultation. The prosecution's secret intrusion offends both the Fifth and Sixth Amendment.

*In re Terkeltoub*, 256 F. Supp. 683, 685 (S.D.N.Y. 1966) (citations omitted). Indeed, the principle is well established that surreptitious invasions by the government into meetings between attorneys and their clients or witnesses are forbidden, as is any attempt to stealthily uncover the defense's trial strategy.

The conduct of the prosecution team, which includes the FBI agents in this case is a violation of the right to counsel that merits dismissal of this case. In *Black v. United States*, 385 U.S. 26 (1966), and *O'Brien v. United States*, 386 U.S. 345 (1967), the Supreme Court invalidated convictions when it was learned that conversations between the defendant and his attorney were overheard through use of electronic listening devices installed by government agents on the defendants' telephones. In *Hoffa v. United States*, 385 U.S. 293, 306 (1966), the Supreme Court characterized similar conduct as a governmental intrusion of "the grossest kind," citing with approval *Caldwell v. United States*, 204 F.2d 879 (D.C. Cir. 1953), *cert. denied*, 342 U.S. 926 (1952), and *Coplon v. United States*, 191 F.2d 749 (D.C. Cir. 1951), *cert. denied*, 342 U.S. 926 (1952). More recently, in *United States v. Terzado-Madruga*, 879 F.2d 1099, 1110 (11th Cir. 1990), the Eleventh Circuit found a Sixth Amendment violation when the government sent an undercover informant to tape record conversations with the defendant. *See also United States v. Levy*, 577 F.2d 200 (3rd Cir. 1978) (dismissing indictment where government allowed attorney for defendant to also represent undercover informant who learned defense strategies); *United States v. Rispo*, 460 F.2d 965, 977-78 (3rd Cir. 1972) (characterizing as "shocking" and reversing defendant's conviction where government

informant posed as a sham co-defendant and participated in conferences with defendant's attorney and with other defense counsel).[4]

To obtain relief for the constitutional violations resulting from the government's invasion of the defense camp, a defendant need only show that the unlawfully intercepted, but otherwise privileged, materials or communications "were used in any . . . way" to the "substantial detriment" of the defense. *Weatherford v. Bursey*, 429 U.S. 545, 554 (1977). In this case, at a minimum it appears that the government used information related in Mr. Moseley's email to Mr. Rehl (10/5/21 at 9:18 am) in opposing Mr. Rehl's release from pretrial detention.

Moreover, the "substantial detriment" requirement encompasses far more than simply the introduction of the questioned evidence at trial. *Weatherford*, 429 U.S. at 556. Indeed, courts have identified the following factors to consider in determining whether the requisite amount of prejudice needed to establish a Sixth Amendment violation is present: (1) whether the government's intrusion was intentional; (2) whether the prosecution obtained confidential information pertaining to trial preparations and defense strategy as a result of the intrusion; and (3) whether the information obtained produced, directly or indirectly, any evidence used at trial, or was used in some other way to the defendant's substantial detriment. *United States v. Noriega*, 764 F.Supp. 1480, 1489 (S. D. Fla. 1991). "Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation." *United States v. Morrison*, 449 U.S. 361, 364 (1981). In this case, the government's conduct satisfied all of the criteria and the government's effective concealment of its activities through much of the trial made

---

[4] Moreover, the Due Process Clause of the Fifth Amendment protects a defendant against governmental misconduct that is so outrageous that it is "shocking to the universal sense of justice." *United States v. Russell*, 411 U.S. 423, 432 (1976).

a narrowly tailored remedy impossible.

Federal courts must "protect[] the judicial process from the stigma of illegal or unfair government conduct." *United States v. Linton*, 502 F. Supp. 861, 865-66 (D. Nev. 1980). Such misconduct can take several forms. The most serious illegal or unfair government conduct is "outrageous" misconduct that "shocks the conscience" and is so intolerable that it violates the defendant's due process rights under the Fifth Amendment. *See United States v. Chapman*, 524 F.3d 1073, 1084 (9 Cir. 2008) ("a district court may dismiss an indictment on the ground of outrageous government conduct if the conduct amount to a due process violation"); *United States v. Wang*, 1999 WL 138930, at *37 (S.D.N.Y. Mar. 15 1999) (dismissing indictment due to the government's failure to provide defense counsel with "material information" until the "eve of trial"); *United States v. Lyons*, 352 F. Supp. 2d 1231, 1251-52 (M.D. Fla. 2004) (dismissing indictment to the government's multiple violations); *United States v. Sabri*, 973 F. Supp. 134, 147 (W.D.N.Y. 1996) (dismissing part of indictment where government obtained evidence against defendant from his civil lawyer); *United States v. Marshank*, 777 F. Supp. 1507, 1524 (N.D. Cal. 1991) (dismissing indictment where government interfered in the attorney-client relationship by using his former attorney to obtain incriminating information).

Even where government misconduct is not sufficiently "outrageous" to violate due process, the Court under its supervisory powers may impose various sanctions, including dismissal. *Chapman*, 524 F.3d at 1084 (affirming dismissal pursuant to the court's supervisory powers due to government's violation of discovery obligations and flagrant misrepresentations to court). Such a sanction is mandated here not only because of the invasion of the sanctity of the attorney-client communications and defense strategy but because it is impossible at this stage to determine how the

9

FBI agents used their knowledge of the defense strategy in tailoring their investigation.

### III. Government's Access to Mr. Rehl's Emails with Counsel Likely Violated Federal Rules of Criminal Procedure Rule 17(c)

The government has not disclosed how it obtained Mr. Rehl's emails with his counsel from FDC Philadelphia.[5] To the extent that the prosecution obtained Mr. Rehl's emails through the use of subpoenas suggesting that the materials were required for trial or court hearings, when in fact no proceedings were scheduled in this case on the dates indicated, such subpoenas would violate Rule 17 of the Federal Rules of Criminal Procedure. In such a case, the prosecution intended to use the emails, if at all, either at trial or as a means for developing investigative leads which would lead to evidence producible at trial, and the return dates on the subpoenas were selected not to reflect actual court dates but rather to enable the prosecution to examine these emails prior to trial in order to obtain additional discovery against the defendant.

Rule 17(c), which covers subpoenas for documents and other materials, is not a discovery device. *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951). It is merely an aid for obtaining relevant and evidentiary materials which the moving party plans to use at trial or in some other court proceeding. *United States v. Cuthbertson*, 630 F.2d 139, 144 (3rd Cir.1980), *cert. denied*, 449 U.S. 1126 (1981). *See also United States v. Nixon*, 418 U.S. 683, 699-700 (1974). Enforcement of a Rule 17(c) subpoena depends on whether the subpoena reflects a genuine effort to obtain identifiable and relevant evidence or instead constitutes a broad "fishing expedition" which seeks to use the Rule as a means for obtaining additional discovery. *Cuthbertson*, 630 F.2d at 144; *Bowman Dairy Co. v. United States*, 341 U.S. at 220–21. If the moving party cannot reasonably

---

[5] It appears that the government also obtained from FPD Philadelphia Mr. Rehl's emails with his wife and other persons.

specify the information contained or believed to be contained in the documents sought but merely hopes that something useful will turn up, this is a sure sign that the subpoena is being misused.

In this case, it appears that the prosecution simply hoped to find something of possible value which might bolster its case against Mr. Rehl. If so, the subpoenas constituted a broad dragnet aimed at bringing in anything and everything contained in the emails regardless of their identifiable or foreseeable significance to the charges at issue. This is precisely the kind of unwarranted expedition which Rule 17(c) does not permit. Even assuming that as the government argues the monitoring of emails by FDC Philadelphia was premised on legitimate security needs, the use of a Rule 17(c) subpoena in this case transformed the BOP policy into a freewheeling and open-ended discovery for the prosecution. That the monitoring by the BOP may itself have been appropriate, it did not thereby grant the prosecution license to rummage through Mr. Rehl's conversations at will. Nor was there any justification for the examination of Mr. Rehl's conversations without prior court knowledge and authorization. Rule 17(c) unambiguously states that materials subject to subpoena are producible prior to the time they are to be offered in evidence only if the court so directs. This is to ensure that subpoenas are not used for impermissible discovery, which is more likely to be the case when advance production of materials is sought instead of the usual production at time of trial or other proceeding in which they are to be used in evidence. The provision leaving advance production to the court's discretion "is no mere technicality. It is a vital protection against misuse or improvident use of such subpoenas duces tecum." *United States v. Ferguson*, 37 F.R.D. 6, 8 (D.D.C.1965).

If the emails were obtained pursuant to a Grand Jury subpoena, the "investigatory powers of the grand jury are nevertheless not unlimited." *See Branzburg v. Hayes*, 408 U.S. 665, 688 (1972);

*United States v. Calandra*, 414 U.S. 338, 346 and n.4 (1974) ("the grand jury's subpoena power is not unlimited. It may consider incompetent evidence, but it may not itself violate a valid privilege, whether established by the Constitution, statutes, or the common law."). Grand juries are not licensed to engage in arbitrary fishing expeditions, nor may they select targets of investigation out of malice or an intent to harass. *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 299 (1991). Thus, even if obtained pursuant to a grand jury subpoena, the emails between Mr. Rehl and his counsel should not have been procured by the government.

### IV.     In the Alternative, an Evidentiary Hearing Is Requested

If the Court is not prepared to dismiss the indictment on this record, Mr. Rehl respectfully request that the Court conduct an evidentiary hearing to allow the defense to establish prejudice. To satisfy the *Weatherford* standard of prejudice, a defendant is entitled to an evidentiary hearing if the allegations of a defense camp invasion "are sufficient to warrant further factual inquiry." *United States v. Kelly*, 790 F.2d 130, 134 (D.C. Cir. 1986) (remanding for an evidentiary hearing on claim that FBI invaded the defense camp); *see also United States v. Noriega*, 764 F.Supp. 1480 (S.D.Fla. 1991) (holding an evidentiary hearing on Gen. Noriega's claim that the government invaded the defense camp by listening to his prison recordings with his lawyer); *United States v. Boffa*, 89 F.R.D. 523, 528 (D. Del. 1981) (ordering an evidentiary hearing on allegation that the government intruded into the defendants' attorney-client relationships when some of the defendants and their attorneys had conversations with an informant concerning defense strategy). Here, an evidentiary hearing is required to determine what use the prosecution team made of the 15 or more email communications between Mr. Rehl and his counsel, which one agent referred to as disclosing . Vento. Agent Wells admits that he listened to at least one recording two months before the commencement of trial. An

evidentiary hearing would also bring to light whether Agent Wells has engaged in a pattern of intimidation of witnesses, similar to his twisting of Courtney Tucker's words during a pretrial interview. *United States v. Scheer*, 168 F.3d 445 (11th Cir. 1999) (noting that district court held an evidentiary hearing on claim that prosecutor had intimidated a key prosecution witness). A hearing is also required because the government's concealment of its misconduct violated its disclosure obligations under *Brady* and the Jencks Act. *United States v. Espinosa-Hernandez*, 918 F.2d 911, 913-14 (11th Cir. 1990) (remanding for an evidentiary hearing on non-disclosure of agent's misconduct). Given the disclosures to date, the government's representations should be made under oath and subject to cross-examination.

In the absence of dismissal, the government's explanation for its invasion of the defense camp warrants closer scrutiny and adversarial testing to factual questions. At a minimum, the Court must require the government to explain by affidavit or sworn declarations how it obtained these emails and what the FBI agents did after reviewing the emails. Accordingly, if the Court is not prepared to dismiss the case based on the already available record, this Court should conduct an evidentiary hearing to further investigate the facts of the government's improper conduct and determine the appropriate remedy.

Mr. Rehl adopts the arguments made by Mr. Nordean Response to the Government's Motion to Preclude Cross-Examination (ECF 691).

## IV. CONCLUSION

WHEREFORE , Mr. Rehl respectfully requests that the Court dismiss the Indictment against Mr. Rehl or for an evidentiary hearing on this motion.

Respectfully submitted,

/s/ *Carmen D. Hernandez*
**Carmen D. Hernandez**
Bar No. MD 03366
7166 Mink Hollow Rd
Highland, MD 20777
240-472-3391
chernan7@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that the instant notice was served on all counsel of record 13th day of March, 2023 on all counsel of record via ECF.

/s/ *Carmen D. Hernandez*
**Carmen D. Hernandez**