**UNITED STATES DISTRICT
COURT FOR THE
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | 1:21-cr-00175 (TJK) |
| | : | |
| V. | : | |
| | : | |
| ETHAN NORDEAN, et al. | : | JULY 5, 2023 |

## JOE BIGGS' AND ZACHARY REHL'S MOTION FOR JUDGMENT OF ACQUITTAL AND FOR A NEW TRIAL

At the close of the government's case, the defendants, Joseph Biggs and Zachary Rehl, through counsel, moved for a judgment of acquittal, pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The court reserved decision on that motion. After the jury returned a partial verdict convicting Mr. Biggs and Mr. Rehl of several counts, the court directed the parties to file any motions raising either Rule 29 or Rule 33 claims on or before June 6, 2023. Thereafter, the undersigned appeared for Mr. Rehl as well as Mr. Biggs. After a hearing to determine whether there were any conflicts precluding joint representation, the court permitted joint representation, and set a new deadline for post-trial motions as to Mssrs. Biggs and Rehl. Herewith their motions. Previous motions were filed by Mr. Nordean and Mr. Pezzola.

Mr. Biggs and Mr. Rehl seek a judgment of acquittal as to the three conspiracy counts, the obstruction of an official proceeding count, and the destruction of government property count. In addition, or, in the alternative, in the event that the motion for a judgment of acquittal is denied as to any or all counts, they seek a new trial on the counts on which they were convicted pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

1

## I.      The Legal Standards

"Under Rule 29, the court is required … to enter 'a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.' Fed. R. Crim. P. 29(a). In assessing such a motion, the court must construe the evidence in the light most favorable to the government and must uphold the jury's verdict if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' *United States v. Wahl*, 290 F.3d 370, 375, 351 U.S. App. D.C. 284 (D.C. Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). In making this assessment, the court 'presume[s] that the jury has properly carried out its functions of evaluating the credibility of witnesses, finding the facts, and drawing justifiable inferences,' *United States v. Campbell*, 702 F.2d 262, 264, 226 U.S. App. D.C. 283 (D.C. Cir. 1983), and, thus, 'a judgment of acquittal is appropriate only when there is *no* evidence upon which a reasonable juror might fairly conclude guilt beyond a reasonable doubt,'" *United States v. Weisz*, 718 F.2d 413, 438, 231 U.S. App. D.C. 1 (D.C. Cir. 1983); *accord United States v. Branham*, 515 F.3d 1268, 1273, 380 U.S. App. D.C. 45 (D.C. Cir. 2008).

"Under Rule 33, the court 'may vacate any judgment and grant a new trial if the interest of justice so requires.' Fed. R. Crim. P. 33(a). 'The rules do not define "interests of justice" and courts have had little success in trying to generalize its meaning, but the D.C. Circuit has held that 'granting a new trial is warranted only in those limited circumstances where a serious miscarriage of justice may have occurred.' *United States*

*v. Wheeler*, 753 F.3d 200, 208, 410 U.S. App. D.C. 87 (D.C. Cir. 2014) (quotation marks omitted). [A movant] … bears the burden of showing that a new trial is justified, *United States v. Mangieri*, 694 F.2d 1270, 1285, 224 U.S. App. D.C. 295 (D.C. Cir. 1982), and the court has 'broad discretion' in assessing his efforts to carry that burden, *Wheeler*, 753 F.3d at 208," *United States v. Green*, 2022 U.S. Dist. LEXIS 207509, *5-6.

## II.    The Trial

This unusually long and lengthy trial tested the government's allegations that Mssrs. Biggs and Rehl and three co-defendants, members of a loosely associated group known as the Proud Boys, engaged in nothing less than a plot to subvert democracy itself by agreeing to stop, through any means necessary, including the use of force, the peaceful transition of power from one president to another, to wit: Donald J. Trump and Joseph Biden. The focus of the trial was a brief riot that took place at the Capitol on January 6, 2021.[1]

Mr. Biggs and Mr. Rehl were charged in a nine-count superseding indictment. They were found guilty of the following six counts: conspiracy to commit seditious conspiracy in violation of 18 United States Code, hereinafter "USC," Section 2384;

---

[1] The defendant chooses to refer to the events at the Capitol as a "riot" rather than an "insurrection," and contends now, as he did at trial, that the events at the Capitol on January 6, 2021, were no more an insurrection than the arson incident to "mostly peaceful protests" in the summer of 2020 throughout the nation were the incendiary sparks of a social revolution. In this, the undersigned follows the usage in an insightful law review article written in the fall of 2021: "The Trump Riot of January 6, 2021, presents a formidable question: how ought the executive vindicate the legislature when there are riots and insurrections at the seat of government? No matter how terrifying the tumult on the grounds of a Parliament, Capitol, or statehouse might be, … fear most [not] … compel … the executive to charge inordinate offenses." Joshua T. Carback, *Charging Riots and Insurrections at the Seat of Government*, 49 Am. J. Crim. L, 1, 2 (2021).

conspiracy to obstruct an official proceeding in violation of 18 USC 1512k; obstruction of an official proceeding in violation of 18 USC 1512(c)(2),2 ; conspiracy of prevent an officer from discharging any duties in violation of 18 USC 372; civil disorder in violation of 18 USC 231(a)(3),2; and, destruction of government property in violation of 18 USC 1361,2.

Jurors could not reach a unanimous verdict as to one count of destruction of government property in violation of 18 USC 1361,2 (involving a window); and, one count of assaulting, resisting or impeding certain officers in violation of 18 USC 111(a)(1).

The jury acquitted Mr. Biggs and Mr. Rehl of one count of assaulting, resisting or impeding certain officers in violation of 18 USC 111(a)(1).

**A. The Evidence at Trial Was Insufficient to Support Convictions of Any of the Conspiracy Charges, The Charge of Obstructing an Official Proceeding, and the Destruction of Property Count of Conviction**

**1. The Use of Protected to Speech to Prove a Conspiracy Formed in an Instant**

In the absence of competent evidence or a coherent theory of when a conspiracy was formed by the defendants, the government resorted to what can most charitably be called a dart board argument – "we don't know when the conspiracy was formed, but there had to be one – the defendants' conduct proves it; you, ladies and gentlemen of the jury, decide when it was formed, we just don't know." The result is a case that chills protected speech in precisely the manner in which the United States Supreme Court warned against in its recent decision involving true threats, *Counterman v. Colorado*, 600 U.S. ___ 2023) (published June 27, 2023) ("efforts to prosecute incitement [must] not bleed over, either directly or through a chilling effect, to dissenting speech at the First Amendment's core." *Counterman*, slip op. p. 13,

At closing argument, after 80-plus days of proceedings, the government asserted the following; it was a startling concession of the government's failure to meet its burden of proof:

> Now, three things to keep in mind. First, a conspiracy can be unspoken. It doesn't have to be in writing, hashed out around a table, or even in words. It can be unspoken; it can be implicit; I can be a mutual understanding reached with a wink and a nod, *or even just suddenly acting in concert together toward a common goal*. Unspoken or implicit conspiracies are still conspiracies.
> Second, there is no specific time requirement for when the conspiracy begins. Now, the indictment alleges a time frame of December 2020 through January of 2021, but there's no magic date within that time frame that you need to find that this agreement started. So long as you find that a defendant joined that agreement at any point within that time frame, that is enough, even if it's not until the day of January 6th*, even it's not until those barricades at Peace Circle have already come down*.
> Third, a conspiracy does not require an agreement as to all of the details. That's why 'plan' is really not the right word for what this case is about…. These defendants are charged with an agreement with an objective. And the essential nature of that agreement was to stop the certification of the election and to do so by any means necessary, including force.

Trial Transcript, April 24, 2023, pp.19715-19716 (emphasis added).

It is beyond dispute that as a matter of law conspiracy can be proven by circumstantial evidence, and that conduct is powerful direct evidence from which intent can be inferred. In a typical criminal case involving illegal conduct, intent is often inferred from action. *United States v. Shan Shi,* 991 F.3d 198, 205 (D.C. Cir., 2021); *United States v. Morris*, 836 F.2d 1371, 1373 (D.C. Cir., 1988). "[S]ince a conspiracy is by nature secret, the jury may fairly infer the existence of the agreement through either direct or circumstantial evidence."  *Shan Shi*, 991 F.3d at 207.

Thus, in a drug case in which narcotics are exchanged, phone calls about the sale of otherwise innocent goods can be decoded to demonstrate that the coded terms really

refer to contraband. So, too, when bank robbers meet at a bank; recent comments about hatred of banks can easily shed light on intent.

In this case, the government relied upon thousands of text messages and other electronic communications to show that what took place at the Capitol on January 6, 2022, was evidence of a conspiracy. The texts were filled with violent rhetoric and innuendo. But not one text was actionable in and of itself. There were no true threats, no solicitations of acts of violence – none of the communications had the imminent connection to potential acts of violence sufficient to make them criminal at the time they were uttered. In isolation, each and every text was, at worst, a mere abstract call to violence at some future date, and therefore protected speech under First Amendment. "As we said in *Noto v. United States*, 367 U.S. 290, 297-298 (1961), 'the mere abstract teaching … of the moral propriety or even necessity for a resort to force and violence, is not the same as preparing a group for violent action and telling it to such action.'" *Brandenburg v. Ohio*, 395 U.S. 444, 448 (1969).

Obviously, the *Counterman* decision was a "true threats" case and not an incitement case, but the rationale supporting the *Counterman* decision applies even more forcefully in a case involving incitement and political speech.

In *Counterman*, the Court concluded that proof of a true threat must involve some subjective understanding on the part of a person uttering the comment that the speech is, in fact, threatening. While rejecting a requirement of a specific intent to threaten, the Court concluded that a subjective awareness of recklessness was required. As the Court noted, "[T]he First Amendment … still demand[s] a subjective mental-state requirement shielding some true threats from liability. The reasons related to what is often called a

chilling effect. Prohibitions on speech have the potential to chill, or deter, speech outside their boundaries." *Counterman*, slip. op., p. 6.   "Like threats, incitement inheres in particular words used in particular contexts: Its harm can arise even when a clueless speaker fails to grasp the expression's nature and consequences. But still, the First Amendment precludes punishment, whether civil or criminal, unless the speakers' words were 'intended' (not just likely) to produce imminent disorder. *Hess v. Indiana*, 414 U.S. 105, 106 (1973) (per curiam); see *Brandenburg*, 395 U.S. at 447; *NAACP v. Clairborne Hardware Co.*, 458 U.S. 886, 927-929 (1982). That rule helps prevent a law from deterring 'mere advocacy' of illegal acts – a kind of speech falling within the First Amendment's core. *Brandenburg*, 395 U.S. at 449." *Counterman*, slip. op., p. 8.

Obviously, innocent speech can take on a sinister cast depending on the surroundings. Thus, the sale of a can of "tuna" looks different when, with a wink and a nod, a kilogram of contraband changes hands. So, too, does talk of liberating dead presidents when standing in the lobby of a bank holding a gun amid a robbery. But there is the distinction with a constitutionally significant difference, a distinction this court failed to grapple with in a pretrial ruling, *United States v. Nordean*, 2022 U.S. Dist. LEXIS 222712 (December 11, 2022); there is **never** a circumstance in which it is permissible to withdraw money from a bank at gun point or to sell cocaine on a street corner. In those cases, context drives the conclusion that the speech explains the prohibited event. "[The seditious conspiracy statute] 'proscribes speech only when it constitutes an agreement to use force against the United States.'" *Nordean* * 49, citing, *United States v. Rahman*, 189 3d. 88, 114 (2d Cir. 1999). In the typical conspiracy case, speech is used to explain the conduct, often to defeat a claim of mere presence by demonstrating criminal intent.

In this case, conduct was used to explain the speech; arguably using mere presence and protected speech to prove criminal intent. This distinction is critical because of the danger that merely being present at the scene of a riot will be construed as proof of a conspiracy to engage in violence if one engaged in what was, at the time of the utterance, a mere abstract call for violence at some future time. This is the very danger against which *Counterman* warns. "The speaker's fear of mistaking whether a statement is a threat; his fear of the legal system getting the judgment wrong; his fear, in any event, of incurring legal costs – all this may lead him to swallow words that are in fact not true threats." *Counterman*, slip. op., p. 9. Distinguishing true threats from the sort of speech at issue here – incitement and co-conspiratorial statements, the *Counterman* Court notes the centrality of protecting the First Amendment. "[S]peech on the other side of the true-boundary line – as compared with the advocacy addresses in our incitement decisions – is neither so central to the theory of the First Amendment nor so vulnerable to government prosecutions." *Id*. at 13.

In the instant case, the defendants appeared at the Capitol in response to a call from the President to "stop the steal." They had every right peacefully to assemble, to speak out and to petition for the redress of grievances. There was nothing unlawful about appearing at the Capitol with the hope that their voices would be sufficient to stop what they regarded as a fraudulent transfer of power, no matter how mistaken their belief might have been. Neither was there anything unlawful in their engaging in the sort of vitriolic bluster that typifies so much of so-called political discourse on social media in these

divided times.[2] But in the absence of "a call for violence" – "[t]he [indictment] charges Rehl and his codefendants with 'conspir(ing) to use force, not just to *advocate* the use of force", *Nordean* \*49 – the evidence in this case of necessity makes use of protected speech to prove a crime.

It bears noting that in the instant case, the trial court rejected a motion to dismiss the indictment, before seeing the evidence. Accepting the allegations of indictment for purposes of evaluating the prospective prosecution, this court undoubtedly expected the government to come forward with competent evidence of a conspiracy. Surely, in a case in which five men worked together to rally hundreds, if not thousands, of individuals to storm the Capitol in order to stop the counting of electoral votes there would be more than conjecture, insinuation and surmise to support a conviction? More was not forthcoming; even Jeremy Bertino, a cooperator, could point to nothing other than an unstated "understanding." What's more, a confidential source told the FBI, and the jury, that at the point of the first breach, it appeared as if the action of the rioters was spontaneous.

Mssrs. Biggs and Rehl are not contending that the government may never use speech, even protected speech, to prove intent to engage in criminal conduct. Selling tuna will, presumably, always be lawful; sale of contraband remains unlawful. But in this case, where all that was offered was protected speech and the government resorted to arguing an instantaneously formed "implicit" conspiracy there is an overwhelming danger that folks merely present and engaging in core First Amendment protected activity – assembly, petitioning for redress of grievance, protest – were overcharged and their

---

[2] Arthur C. Brooks aptly refers to the "outrage industrial complex" in current American media. *Love Your Enemies: How Decent People Can Save America from the Culture of Contempt*, (Broadside Books, 2019), p. 29.

protected speech was effectively criminalized when the protest turned into a riot.[3] The government may not have been required to prove more than it pled to survive a motion to dismiss, but, given the centrality of the First Amendment and the importance of political speech in the American tradition, the government was required to prove more than it did to warrant getting the case to a jury. There is a reason sedition conspiracy is rarely charged in the United States, and, until the January 6 cases, had almost never been used against domestic protestors. Every intemperate attendee who attends a rally that turns violent now stands to fear prosecution. The result chills either speech or the right to assembly. Both results are anathema. At the very least, in a conspiracy relying on First Amendment protected speech and activity to prove intent, the government should be required to rely on more than the protected activity as circumstantial evidence of intent. On the law as applied here, every Black Lives Matter marcher who chanted "No Justice, No Peace" at a march could be charged, and arguably convicted, of conspiracy to commit arson should a fire be set by a person they never met at the site of a rally.

---

[3] In the context of the law of treason, overcharging based on otherwise protected conduct is known as "constructive treason." It is one of the reasons the Founders took pains to define treason, the only offense specifically defined in the Constitution at Art. III, sec.3. The fear was the mere speech would be criminalized as a crime against the state, as it was in England since Edward III in the 1300s. "By locating this clause under Article III, or the powers pertaining to the judiciary, the framers denied to the Congress the power to change the parameters of treason through legislation." An explicit goal was to avoid criminalization of "dissent and political opposition." William A. Blair, *With malice Toward Some: Treason and Loyalty in the Civil War Era,* (University of North Carolina Press, 2016), pp.15-16.

**2.    An Instantaneously Formed Conspiracy is Indistinguishable from Commission of the Substantive Offense.**

Even if the Court rejects the argument that the evidence was insufficient as to conspiracy, it must reckon with the fact that the case presented and argued by the government carries with it a very real potential for a violation of the double jeopardy clause of the Fifth Amendment. The law draws a clear distinction between conspiracy accounts and substantive counts. As to the claim arising under 18 U.S.C. 1512, the government has charged both conspiracy and the commission of the offense. As to conspiracy, the crime is the agreement; as to the crime itself, it is acting with the requisite intent. On the government's argument, if the agreement to act occurs concurrently, or at the same time, as the decision to act is reached, there is no principled distinction between the conspiracy and the substantive charge. In that case, the same conduct is arguably punished twice. This alone is a separate ground for dismissal of the conspiracy count as related to 18 USC Section 1512.

**B.    There Is No Evidence That Mr. Biggs or Mr. Rehl Acted with a Corrupt Purpose or Otherwise Violated 18 U.S.C. Section 1512(c)(2)**

On January 6, 2021, Mr. Biggs and Mr. Rehl were among thousands of Americans gathered in Washington, D.C., to protest a stolen election, as direct a threat to our democratic traditions as a foreign invasion. They were inspired to attend and to protest by the president of the United States, Donald J. Trump, who, in the aftermath of the November 2020 election, contended the election was stolen to the benefit of then president-elect Joseph Biden. Mr. Trump urged people to come to Washington, D.C., on January 6, 2021, to "stop the steal." It was the day Congress was statutorily obliged to certify the results of the votes of the Electoral College. When it became apparent that

11

Vice President Mike Pence, the presiding officer of the joint session of Congress responsible for certifying the results, would not act to stop certification, Mr. Trump urged the thousands milling about on Washington's Mall and at the Ellipse, where he was speaking, to head to the Capitol and to "fight like hell" lest they "no longer have a country." The president told people the republic was under attack and that ordinary people needed to save it.

Mssrs. Biggs and Rehl attended the protests. They were convicted of corrupt obstruction of an official proceeding when the event turned into a riot in which they participated.

This use of a statute intended to combat alteration of records, intimidation of witnesses and conduct aimed at disrupting investigative and adjudicatory proceedings is an example of prosecutorial overcharging, using a statute designed for one purpose in a manner at odds and inconsistent with Congressional intent and the plain meaning of the statute. Such a use necessarily chills anyone considering attending a public protest or appearing outside a building at which an official proceeding is set to commence. Will they, too, be charged with a felony if the event turns violent? The government's use of this statute in this case violates the prohibition against "breathtaking" application of a statute. *Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021).

1. **The Fischer Decision is Not Controlling as the Government Did Not Prove Assault on a Police Officer by Either Mssrs. Rehl or Biggs**

Just before the instant case was submitted to the jury, the United States Court of Appeals for the D.C. Circuit issued a decision on the application of Section 1512(c)(2)[4] to

---

[4] Title 18 Section 1512(c)(1) and (2) provides in pertinent part:

(c) Whoever corruptly –

cases involving assault of a police officer in the course of the January 6 riot. *United States v. Fischer*, 64 F.4th 329 (D.C. Cir. 2023); rehearing denied, 2023 LEXIS 12753 (D.C. Cir., May 23, 2023). In a split decision with little in the way of a unifying holding, a statute passed to enhance the government's ability to prosecute individuals interfering with the evidentiary integrity of official proceedings was permitted to support a prosecution for any unlawful conduct. Closing "Arthur Anderson's loophole" resulted in the creation of a noose for those engaged in activity protected by the First Amendment.

The term "otherwise," with which Section 2 begins, was held as a portal to encompass a range of activity limited only by the imagination of the government. Thus Section 2 is untethered to the activities on which Section 1 focuses: the alteration, destruction, or concealment of a record, document, or other object, with the intent to impair the object's use in an official proceeding. Judge Pan, writing for the court, but without support either from the concurrence or the dissent, also concluded that a "corrupt" *mens rea* encompassed any unlawful purpose. Judge Pan's reading of 18 U.S.C. Section 1512(c)(2) renders the statute a club of seemingly infinite uses by federal prosecutors. *Id*. at 337.

Writing in concurrence, Judge Walker construed corrupt purpose more narrowly, to wit: to act "with the intent to procure an unlawful benefit to either for himself or some other person." *Id*. at 352. In this case, the beneficiary, by reason of highly attenuated

---

      (1)  alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for the use in an official proceeding; or

      (2)  otherwise obstructs, influences or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

reasoning, was President Trump. Because use of force against a police officer in the performance of his or her duties is always unlawful, when the defendants acted with an intent that their actions might benefit Mr. Trump, the statute fit the alleged crime, according to Judge Walker. Significantly, Judge Walker thought it necessary to do what Judge Pan thought unnecessary – define what "corruptly" meant.

Writing in dissent, Judge Katsas wrote in favor of an "evidence-based" limitation on the applicability of 18 U.S.C. Section 1512(c)(2). Because assault on an officer does not pertain to evidence used in an official proceeding, the statute was misapplied in this case, in a manner suggesting that the sort of "breathtaking" application the Supreme Court warned against. *Id*. at 381.

Of critical importance here is that neither Mr. Biggs nor Mr. Rehl were convicted of assaulting a police officer. In *Fischer*, a case decided on the basis of the government's interlocutory appeal of the District Court's dismissal of a case based on the allegations of three indictments – three cases were consolidated for appeal – the court assumed as proven that which was never proven here, to wit: assault on an officer. In the instant cases, the government failed to prove such an assault. As a result, *Fischer* is limited to the facts presented to the Court, facts involving an assault, and this court is not required to accept as binding Judge Pan's opinion that "otherwise" encompasses an unlimited array of criminal conduct. Indeed, two of the three panelists, Judge Walker and Judge Katsas, rejected Judge Pan's reasoning, with Judge Walker concurring only because an assault satisfied the purposes of the statute. Again, there was no assault here. Put another way, *Fischer's* holding applies to facts simply not present here.

The *Fischer* court's rendering of 18 U.S.C. Section 1512(c)(2) transforms a nuanced statutory scheme requiring use of a scalpel to distinguish various forms of culpable conduct into an invitation to use a sledgehammer to wallop anyone convicted of obstruction with a 20-year sentence.

As Judge Katsas noted in dissent in *Fischer*:

> [T]he government's interpretation of section 1512(c) injects a significant structural anomaly into Chapter 73 because of its 20-year maximum penalty…. For example, picketing, parading or using a sound truck to influence a proceeding carries a one-year maximum penalty. 18 U.S.C. Section 1507. Using threats or force generally carries a maximum penalty of either 5 or 10 hears, depending on whether the proceeding is before a Court, an agency, or Congress. Id., Sections 1503(b), 1505. And destroying, manipulating, or falsifying evidence carries a maximum penalty of 20 years. Id., Sections 1512(c), 1519. This scheme ties the penalty to the sophistication of the obstruction and the kind of proceeding targeted. Rudimentary forms of obstruction, such as picketing, receive the lowest penalty…. The government's interpretation would collapse all of this, making any form of obstructing an official proceeding a 20-year felony.

*Fischer* at 376.

That the government has made a policy decision to broaden the application of this statute in an effort to over-penalize those who participated in the riots on January 6, 2021 is beyond doubt. "[U]ntil the prosecutions arising from the January 6 riot, it was uniformly treated as an evidence-impairment crime…. [U]ntil the January 6 prosecutions, courts had no occasion to consider whether it sweeps more broadly, because all of the caselaw had involved conduct plainly intended to hinder the flow of truthful evidence to a proceeding." *Id.* at 377.

The one counterexample relied upon by the *Fischer* majority involves falsification of a court document and its use to persuade another party to withdraw a court filing. *United States v. Reich*, 479 F.3d 179 (2d.Cir. 2007). In *United States v. Burge*, 711 F.3d

803 (7th Cir. 2013), the Court reasoned that the term "otherwise" linked sections 1 and 2 reflecting a Congressional intention that "the same type of … misconduct that might 'otherwise' obstruct a proceeding beyond simple document destruction." *Id.* at 808. This narrowing interpretation was also followed in *United States v. Petruk*, 781 F.3d 438, 445 n.2 (8th Cir. 2015) (approving a jury instruction that directed that a defendant must "contemplate" some official proceeding in which "testimony, record[s], document[s], or other object[s] might be material"); see also, *United States v. Volpendesto*, 746 F.3d 273, 287 (7th Cir. 2014) (evidence sufficient to convict when shown defendant intended to "influence what evidence came before a grand jury"); and, *United States v. Desposito*, 704 F.3d 221, 231 (2d. Cir. 2013) (defendant planned to "create fraudulent evidence").

The use of a statute fashioned to respond to manipulation of official proceedings by means of influencing the integrity of the evidence in the context of the January 6 riot prosecutions is the sort of "improbably broad" interpretation of a criminal statute of which the Supreme Court disapproved in *Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021) (use of computer fraud statute "would attach criminal penalties to a breathtaking amount of commonplace computer activity). See also, *McDonnell v. United States*, 579 U.S. 550, 574-76 (2016) (rejecting "expansive interpretation" of bribery statute); and, *Bond v. United States*, 572 U.S. 844, 863 (2014) (rejecting transformation of chemical weapons statute in an "anti-poisoning regime that reaches simple assaults"). As Judge Katsas noted in dissent in *Fischer*, "[T]he government's interpretation would make section 1512(c)(2) both improbably broad and unconstitutional in many of its applications." *Fischer* at 378.

In the instant case, protestors turned out en masse to engage in protected activity: they petitioned for the redress of grievances and they assembled. Some engaged in vitriolic, hyperbolic speech, both on the day of the protests and in the days and weeks preceding it. When the demonstration turned into a riot, some of the protestors turned to violence and trespassed. There was no need to create a new and novel application of a statute to capture the crimes that took place that day; existing statutes were sufficient to assign criminal liability.

Unsatisfied with the penalties the violation of these statutes might impose, and desiring to broadcast a louder and more compelling general deterrent message, the government transformed Section 1512(c)(2) into something well beyond what Congress had in mind when it passed a law intended to punish interference with the integrity of evidentiary proceedings. This statute not only carries with it a significant penalty – up to 20 years in prison – it sends a chilling message to anyone contemplating attendance at a political rally: Stay home. If things go wrong, you could face charges of corruptly obstructing an official proceeding.

### 1. There is no Evidence that Either Mr. Biggs or Mr. Rehl Acted with a Corrupt Purpose on January 6, 2021.

A defendant must act "corruptly" to be guilty of a violation of Section 1512(c)(2). It requires more than mere intent, or even specific intent. If the term is more than mere surplusage, and given its location in the statute, it is most assuredly not surplus - it defines an element of the offense. The D.C. Circuit's decision skirted this issue in its highly unusual, and fractured opinion, resulting in a jurisprudence more likely to confound than it is to assure the just resolution of cases charging the statute.

Writing for the court, Judge Pan skirted the issue of just what a corrupt purpose was. Judge Pan rejected the defendants' contention that Section 1512(c)(2) was limited to evidence-based obstruction and declined even to consider the meaning of corrupt purpose, concluding that the issue had not been adequately briefed by the parties. In Judge Pan's view, there were no limitations on what could be prosecuted under this obstruction of justice statute; Section 2's use of the term "otherwise" opened the door to a vast new world of prosecutorial discretion, a world welcoming Alice in Wonderland to the Justice Department. That was all the Court decided in *Fischer.*

The fair notice requirement of criminal law requires that a person of ordinary intelligence be placed on notice of what the law proscribes. As Justice Oliver Wendell Holmes, Jr. wrote in *McBoyle v. United States,* 283 U.S. 25 (1931), fair notice requires that the line distinguishing what is prohibited and what is permitted be clear "in language that the common world will understand." Otherwise, the criminal code becomes a tool of oppressive government misconduct, with prosecutors, and courts, free to import esoteric meanings into statutes, prosecuting the unwitting and unaware for crimes they could not imagine having committed. Such vagueness makes a mockery of the law's role in creating settled expectations between and among strangers, and setting limits on what the government can do in the name of the law. In this case, a law intended to criminalize tampering with evidence related to official proceedings is being used to cudgel unwary defendants. It is unnecessary surplusage in a case in which the alleged misconduct is already covered by a number of other statutes. Indeed, it sets a dangerous precedent, tempting prosecutors and judges alike to use an overbroad definition of "corruptly" to criminalize conduct that very well be protected by the First Amendment.

Judge Walker, concurred with Judge Pan that Section 1512(c)(2) applies to assaultive conduct, but disagreed with Judge Pan about corrupt purpose. In Judge Walker's view, the issue was adequately briefed and argued before the Circuit Court. *Fischer* at 352 n.1. Deciding whether an assault of a peace officer in the context of the January 6, 2021 riot was a corrupt act was necessary, Judge Walker reasoned. He concluded that a corrupt purpose had "its long-standing meaning, … 'an intent to procure an unlawful benefit either for himself of some other person.' *Marinello v. United States*, 138 S. Ct. 1101, 114 (2018)." *Fischer* at 352. The third-party beneficiary, in Judge Walker's view, was Mr. Trump, who would have retained office if the riot stopped the electoral vote count – although how a mere pause in the proceedings would accomplish that result was left unstated -- and since assaulting a police officer is always wrong, the element of unlawful purpose was satisfied.

Judge Katsas, in dissent, noted that the consequence of the lead opinion's refusal to address the meaning of "corruptly" yields a statute without "significant guardrails" capable of application in contexts that encroach on core freedoms, including the freedom to assemble. "Decades ago, we observed that a statute reaching conduct that is not 'decent, upright, good, or right' 'affords an almost boundless area for individual assessment of the morality of another's behavior.' *Ricks v. District of Columbia*, 414 F.2d 1097, 1006 (D.C. Cir. 1968). Under such a vague standard, mens rea would denote little more than a jury's subjective disapproval of the conduct at issue." *Fischer* at 379. The result of *Fischer*, Judge Katsas correctly observes, is that "it posits that the Corporate Fraud Accountability Act extended the harsh penalties of obstruction-of-justice law to new realms of advocacy, protest, and lobbying." *Fischer* at 381.

Judge Katsas, preferring a definition of "corruptly" more in keeping with that of Judge Walker, sought to sidestep issue by opining that 18 U.S.C. Section 1512(c)(2) was applicable only in evidence-based contexts and was not therefore properly used in a case involving assaultive conduct. In effect, the residual clause of section 2, prohibiting a person from "otherwise" obstructing an official proceeding was inapplicable to an assault on a police officer.

As a result, the Circuit judges exchanged opinions about what definition of "corruptly" is the law of the Circuit, with Judge Walker suggesting that, under *Marks v. United States*, 430 U.S. 188 (1997), his opinion about the term's meaning might bind future panels in the D.C. Circuit.  *Fischer* at 362 n.10. Judge Pan disagreed in a lengthy footnote. *Fischer* at 341 n.5. The liberty interest of scores, if not hundreds, of defendants, are now strained through arcane positions asserted in the footnotes of contrasting opinions. Surely, liberty is entitled to more consideration that warring footnotes.

Judge Walker's opinion illustrates what's at stake without an authoritative decision about the meaning of the term "corruptly." "An innovatively broad definition of 'corruptly' could raise serious concerns that Section 1512(c)(2) is a vague provision with a breathtaking scope. For example, if 'corruptly' requires proof only that a defendant acted with a 'wrongful purpose,' then (c)(2) might criminalize many lawful attempts to 'influence[]' congressional proceedings ---." *Fischer* at 360.  Judge Walker urged the Circuit court to give the term a narrow reading so as to avoid the Supreme Court's having to "repeat itself" about the dangers of courts "assign[ing] federal criminal statutes a 'breathtaking' scope when a narrower reading is reasonable." *Id.* at 361, citing *United*

*States v. Dubin*, 27 F.4th 1021, 1041 (5th Cir. 2022) (Costa, J., dissenting) (quoting *Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021).

Judge Katsas raised another significant concern. The *Fischer* decision countenances application of 18 U.S.C. Section 1512(c)(2) in a manner that easily affects protected political speech. "[A]dvocacy, lobbying, and protest before the political branches is political speech that the First Amendment squarely protects. *E.g., Edwards v. South Carolina*, 372 U.S. 229, 235-236 (1963). Thus, "to assert that all endeavors to influence, obstruct, or impede the proceedings of congressional committees are, as a matter of law, corrupt would undoubtedly criminalize some innocent behavior. *United States v. North*, 910 F.2d 842, 882 (D.C. Cir. 1990)." *Fischer* at 378.

## C.    Destruction of the Fence

Both Mr. Biggs and Mr. Rehl were convicted of one count of destruction of government property, in violation of 18 USC 1361. The allegation pertained to a certain crowd control fence on Capitol grounds. The fence was destroyed when a surging crowd was forced forward. The evidence as to Mr. Biggs reflects a video of him with his hand atop the fence in the moments before the crowd forced him forward, apparently toppling the fence. Mr. Rehl was merely in the vicinity of the toppled fence.

The government appeared to proceed on a theory of direct liability as to Mr. Biggs, and a theory of *Pinkerton* liability as to Mr. Rehl. See, *Pinkerton v. United States*, 328 U.S. 640 (1946). Both theories fail.

There simply is no evidence that Mr. Rehl came into contact with the fence in the moments immediately preceding its fall and destruction. He was, at most, in the area, doing what all of the others present were doing – protesting. Whether he was guilty of a

misdemeanor offense is not a question the government dared put to the jury. The government sought a political spectacle in this case, overcharging at every opportunity, the better to send a message to be heard coast-to-coast in this extraordinary prosecution – appear at protests at your peril; should someone violate the law, all will be guilty of the most serious crimes possible. It was almost as though the prosecution was designed with the 2024 elections in mind: Whatever the outcome, whatever controversies may arise in deeply divided and contentious times, do not appear and protest. Mr. Rehl contends that the absence of any substantive evidence relating to his contact with the fence compels the conclusion that the evidence was insufficient to support a conviction.

Mr. Biggs was observed with one hand on the railing of the fence at the front ranks of a surging crowd as the crowd's momentum caused a surging movement in the crowd. Yet even here, there is no evidence that Mr. Biggs intended to cause the fence's destruction. He was present at the front ranks of a crowd. Like Mr. Rehl, he was arguably in violation of a misdemeanor offense for being unlawfully present on Capitol grounds. It is a leap to go from the observations recorded on the video evidence to the conclusion that Mr. Biggs intentionally destroyed government property. Mr. Biggs contends that there was no such evidence, and that the evidence was insufficient to support a conviction.

As to the various theories of inchoate liability asserted by the government, there was no effort extended in this case other than the introduction of social media communications to suggest that the defendants were doing anything other than protesting on Capitol Grounds on January 6. For the reasons argued previously, and in light of the teaching of the Supreme Court in *Counterman,* mere presence at the site of a protest, even a protest unlawfully on Capitol grounds, should be regarded as insufficient as a

matter of law to sustain a conviction on theories of either aiding and abetting or conspiracy. At most, Mssrs. Biggs and Rehl were present as part of an unruly crown; when the crown surged forward, it trampled the fence. They no more evinced an intent to join a conspiracy, or to aid and abet an effort to destroy government property than did each and every other member of the crowd. The felony charges here are window dressing, part of an effort to make an example of high-profile defendants so as to chill others in the exercise of core First Amendment rights.

III.    **There Was No Necessity to Try This Case While a Congressional Committee Released A Report Damning the Defendants and the Incumbent President Of The United States Decided to Use Film Footage of the Events on January 6, 2021, to Announce His Re-Election Campaign: In Effect, Two Branches of the United States Government Declared the Defendants' Guilty While a Third Branch Held a Trial**

Although the trial was not marred by the sort of "carnival atmosphere" in the courtroom that led to a new trial in *Sheppard v. Maxwell*, 384 U.S.333, 358 (1966), the trial was marred by repeated interruptions and secret proceedings as the defendants fought, with only partial success, to learn just how deeply embedded cooperating witnesses were with the defendants, while the parties contended with the government's mistaken delivery to counsel of purportedly classified material – again taken up in secret and out of public view despite the defendants' rights to a speedy and public trial, and, critically, at least as to Mr. Rehl, while unresolved questions remain as to whether the government unlawfully listened in to conversations between he and his counsel. Even more, at one point, secret proceedings as to whether the jury had been intimidated or tampered with were mistakenly broadcast to the media room, while the courtroom remained closed. The publicity incident to Congress' report on the events at the Capitol

on January 6, and the President's toxic evocation of the Proud Boys, and the repeated use of secret proceedings during trial served as distractions warranting a new trial, even in the absence of any particular showing of prejudice.

The publicity surrounding this case was unique and fostered by both the House of Representatives and the President of the United States, both principal agents of the very party – the United States of America -- which brought the case against the defendants. The unprecedented nature of the incident at the Capitol, referred to as an "attack" by many, led to media coverage that could not help but to taint the proceedings. *Nebraksa Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976).

The House Select Committee on the Invasion of the Capitol published its report just as jury selection began, TT, December 19, 2022, pp. 4-11. The report damns the Proud Boys, naming them as one of the primary agents through which then President Donald J. Trump tried unlawfully to retain power. Congress announced as fact in the Report of the Select Committee to Investigate the January 6th Attack on the United States Capitol what the government was required to prove as the jury was being selected:

> For the Proud Boys – described in more detail below – and their leader, Henry "Enrique" Tarrio, President Trump's tweet set in motion a chain of events that led directly to the attack on the U.S. Capitol. In the days that followed, the Proud Boys reorganized their hierarchy, imposed a stricter chain-of-command, and instructed followers to go "incognito" on January 6th.... They wanted to blend in. They wanted to plan something big.

*The January 6th Report: The report (sic) of the Select Committee to Investigate the January 6th Attack on the United States Capitol*, hereinafter, "*Committee Report*," (Celadon Books, 20023), at 499-500.

An entire section of the *Committee Report* is devoted to the Proud Boys. See, Section 6.2 The Proud Boys: "[Y]ou Want to Storm the Capitol." *Committee Report* at 507-512.  Among its contents, an uncritical report of the so-called "Winter Palace" document as a template for the attack. *Id.* at 510-511. It uncritically reports the antagonism between the Proud Boys and Antifa as an example of the Proud Boys' violent tendencies. *Id.* at 509. The Committee Report also reports on damaging statements made by Charles Donohoe, a witness the government dared not call lest he be cross-examined, that on January 4th Donohoe was "aware that members of the MOSD leadership were discussing the possibility of storming the Capitol." Donohoe is further reported to have said that on January 6th "[Another Proud Boy] and Joe Biggs – 'were searching for an opportunity to storm the Capitol.'" *Id.* at 512. Finally, the Committee Report published as truth something even the prosecutors in this case know to be untrue, and something this jury was forbidden to hear: "[Ryan] Samsel … claimed that Biggs encouraged him to push through the barricades and, when Samsel hesitated to follow through, Biggs 'flashed a gun, questioned his manhood, and repeated his demand' to move to the front and 'challenge the police.'" *Id.* at 645.

Congress showed no regard for the fair trial rights of the defendants, seeking, instead, to bathe in the partisan light of a report rushed to print before the House leadership changed party hands. It was a shameful and despicable performance.

These were statements from a Congressional committee, widely publicized and reported on, during the actual proceedings in this case. As a coordinate branch of the same government prosecuting Mssrs. Biggs and Nordean, the statements are the functional equivalent of a party, or a party's representative, commenting on the guilt or

innocence of a defendant, including highly inculpatory statements made by a non-testifying defendant about a party. When Congress speaks about a matter of such importance, presumably the people listen. The media certainly did. Mssrs. Biggs and Rehl contend that the historic nature of these proceedings, and the unprecedented nature of the Committee Report released during the trial, are sufficient to rebut any presumption that a properly instructed jury followed the law. This Court should - indeed, it must - use its inherent power to assure that what happened here never happens again: one branch of a government condemns defendants and broadcasts its opinion about their guilt to the world, while another branch prosecutes them. This is the closest this nation has ever come to a show trial.

On the eve of closing arguments, President Joe Biden announced his bid for re-election to the presidency, unfolding on national television a dramatic television advertisement with jarring images of violence at the Capitol as he reminded voters that he was prepared to save the republic, if but re-elected. The ad had video images of the Capitol under siege on January 6, 2021, as the President reminded viewers that he was engaged in a "battle for the soul of America" against "MAGA extremists." The chief executive of the very government prosecuting the Proud Boys spoke on national television, even as his prosecutors were laboring to finish presenting the government's case to the jury. See, video, www.youtube.com/watch?v+ChjinXOUzU (Broadcast on April 25, 2023, last viewed on July 3, 2023.) In no other context would a court tolerate as blatant an effort to influence a jury pool on behalf of the chief spokesman of a party during trial. The separation of powers doctrine cannot paper over the harm done by the president's decision to unveil his election campaign with images that could just as easily

be exhibits in a criminal trial. President Biden's actions promote a profound disrespect for the law.

As if this were not enough, on April 23, 2023, the television news show 60 Minutes ran a feature debunking claims that Ray Epps was a government agent; by this time the jury had seen images of Epps at the barricades, as it were. See, video, https://www.youtube.com/watch?v=QHEEGxQKg20 (Broadcast on April 23, 2023; last viewed on July 3, 2023). The piece was replete with hostile comments about the Proud Boys and other January 6 protestors.

 Buttressed by a supplemental opening statement from the House of Representatives, a closing argument by the President, and a chorus of inculpatory intonations by the media, the jury considered this case. The defendants were left to try this case armed with nothing but the presumption that a properly instructed jury follows the law. The extensive coverage of this case and the activities of the President and Congress overcome that presumption.

The media saturation dwarfed even that of the Enron case in Houston. See, *Skilling v. United States*, 561 U.S. 358 (2010). In the instant case both the House of Representatives and the President of the United States denounced the Proud Boys by name during the pendency of the proceedings. Mr. Biggs contends that when Congress declares a defendant guilty and a president openly announces a campaign for re-election with images steeped in assertions of a defendant's guilt, any presumption that jury has followed the law and ignored the coverage of these statements should be eliminated.

It is no exaggeration to say this was an extreme case. As the government told the jury, the defendants here tried to do something that had never been done before in

American history – stop the peaceful transfer of power from one president to another. Democracy itself was at issue, or so the government's rhetoric suggested. This is the sort of extreme case to which a presumption of prejudice attends. *Irvin* v. *Dowd*, 366 U.S. 7. 17, 728 (1960) (repeated adverse publicity undermines fair trial right). Thus, in *Rideau v. Louisiana*, 373 U.S. 723 (1963), repeated broadcast of a confession overcame the presumption that a properly instructed jury can follow the law in all cases. See also, *Murphy v. Florida*, 421 U.S. 794, 798-1799 (1975) (prejudicial news accounts alone cannot overcome presumption, but are a factor the court should weigh).

In this case, it took 12 days to select the jury. Not one juror attended a "stop the steal" rally, despite three such rallies taking place in Washington, D.C. from November 2020 to January 2021. Yet most jurors had attended, or knew someone who had attended, rallies of a more left-leaning nature, and many jurors knew about the Proud Boys before the trial even began, with none expressing a positive opinion of the group. The defendants contend that this case presents an even greater danger of jury bias than was evident in the *Skilling* case, which resulted in a divided Court upholding the conviction, *Skilling v. United States*, 561 U.S. 358 (2010).

What distinguishes this case is the fact that Congress issued its finding concluding that the Proud Boys were guilty during the proceedings, and the President then show-cased the threat the defendants posed to democracy in his publicity announcing his run for re-election. This was no mere loss of a community's sense of well-being, the font of hostility in the Enron case involving Mr. Skilling's trial in Houston: at stake here was the future of democracy itself, or so the government contends.

This court should not remain blind to the obvious.

## IV.     Conclusion

Mssrs. Rehl and Biggs adopt such arguments as were made by their co-defendants as to a motion for a judgment of acquittal and for a new trial.

For all the reasons stated herein, the defendants request that this Court enter a judgment of acquittal as the conspiracy counts, the substantive 18 U.S.C. Section 1512(c)(2) count and the destruction of property count.

In the alternative, the defendants request a new trial.

By: /s/ NORMAN A. PATTIS /s/
NORMAN A. PATTIS
PATTIS & SMITH, LLC
383 Orange Street
New Haven, CT
06511
Ct13120
T: 203.393.3017
F: 203.393.9745
npattis@pattisandsmith.com

## CERTIFICATION OF SERVICE

The undersigned hereby certifies that, on the above-captioned date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties of record by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's system.

/s/  NORMAN A. PATTIS /s/
NORMAN A. PATTIS