```
                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA            CR Nos. 1:21-cr-00175-TJK-1
                                            1:21-cr-00175-TJK-2
v.                                          1:21-cr-00175-TJK-3
                                            1:21-cr-00175-TJK-5
1-ETHAN NORDEAN                             1:21-cr-00175-TJK-6
2-JOSEPH R. BIGGS
3-ZACHARY REHL                      Washington, D.C.
5-ENRIQUE TARRIO                    Tuesday, January 24, 2023
6-DOMINIC J. PEZZOLA,               9:00 a.m.
                        Defendants.
- - - - - - - - - - - - - - - - x
```

---

                    TRANSCRIPT OF JURY TRIAL - DAY 20
                       *** MORNING SESSION ***
             HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
                    UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

```
For the United States:    Jason B.A. McCullough, Esq.
                          Erik M. Kenerson, Esq.
                          Conor Mulroe, Esq.
                          Nadia Moore, Esq.
                          U.S. ATTORNEY'S OFFICE
                          555 4th Street, NW
                          Washington, DC 20530
                          (202) 252-7233

For the Defendants:       Nicholas D. Smith, Esq.
                          DAVID B. SMITH, PLLC
                          7 East 20th Street
                          Suite 4r
                          New York, NY 10003
                          (917) 902-3869

                          John D. Hull, IV, Esq.
                          HULL MCGUIRE PC
                          1420 N Street, NW
                          Washington, DC 20005
                          (202) 429-6520

                          Norman A. Pattis, Esq.
                          PATTIS & SMITH, LLC
                          383 Orange Street
                          1st Floor
                          New Haven, CT 06511
                          (203) 393-3017
```

APPEARANCES CONTINUED:

For the Defendants:        Carmen D. Hernandez, Esq.
                           7166 Mink Hollow Road
                           Highland, MD 20777
                           (240) 472-3391

                           Nayib Hassan, Esq.
                           LAW OFFICES OF NAYIB HASSAN, P.A.
                           6175 NW 153 Street
                           Suite 209
                           Miami Lakes, FL 33014
                           (305) 403-7323

                           Sabino Jauregui, Esq.
                           JAUREGUI LAW, P.A.
                           1014 West 49 Street
                           Hialeah, FL 33012
                           (305) 822-2901

                           Steven A. Metcalf, II, Esq.
                           Roger Roots, Esq.
                           METCALF & METCALF, P.C.
                           99 Park Avenue
                           6th Floor
                           New York, NY 10016
                           (646) 253-0514

Court Reporter:            Timothy R. Miller, RPR, CRR, NJ-CCR
                           Official Court Reporter
                           U.S. Courthouse, Room 6722
                           333 Constitution Avenue, NW
                           Washington, DC 20001
                           (202) 354-3111

Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

# C O N T E N T S

**WITNESS:**                                          **PAGE:**

MATTHEW GREENE:
Direct Examination by Mr. Kenerson...............5323

1              **P R O C E E D I N G S**

2              THE DEPUTY CLERK:  This is Criminal Matter 21-175,

3    United States of America v. Defendant 1, Ethan Nordean;

4    Defendant 2, Joseph R. Biggs; Defendant 3, Zachary Rehl;

5    Defendant 5, Enrique Tarrio; and Defendant 6, Dominic J.

6    Pezzola.

7              Present for the Government are Jason McCullough,

8    Erik Kenerson, Conor Mulroe, and Nadia Moore; present for

9    Defendant 1 is Nicholas Smith; present for Defendant 2 are

10   John Hull and Norman Pattis; present for Defendant 3 is

11   Carmen Hernandez; present for Defendant 5 are Nayib Hassan

12   and Sabino Jauregui; present for Defendant 6 are Steven

13   Metcalf and Roger Roots.  Also present are Defendant 1,

14   Mr. Nordean; Defendant 2, Mr. Biggs; Defendant 3, Mr. Rehl;

15   Defendant 5, Mr. Tarrio; and Defendant 6, Mr. Pezzola.

16             THE COURT:  All right.  Good morning, everyone.

17             I think the only thing -- I saw, Ms. Hernandez,

18   the email you sent, but I think the only thing we really

19   need -- what I think makes sense to do, at least before we

20   start the next witness, is talk about the limiting

21   instruction for the evidence that the jury received at the

22   end of yesterday and whether the parties have talked about

23   that, because I think I need -- to the extent there should

24   be a limiting instruction, I think it's appropriate to give

25   it first thing.  I think it was the Government's Exhibit-25

1    that was the -- what we were talking about, I think, the

2    document that was recovered from Mr. Pezzola's house.

3              And then with regard to some of these other

4    things, I -- with regard to some of the other disputes,

5    Ms. Hernandez, you've laid out -- I mean, look, I think it

6    behooves you and the Government to try to work this out by

7    the time you get to your cross, at least some of the things.

8              MS. HERNANDEZ:  I think the second point was --

9    has been resolved.  The thing on the map and the -- the

10   Government approached me this morning, and I believe -- I'll

11   take them at --

12             THE COURT:  All right.  So --

13             MS. HERNANDEZ:  I think we've resolved that.

14             THE COURT:  -- we think it's resolved.  All right.

15   Are you -- are they acceding -- just so I know ahead of

16   time, is part of what you are talking about that you're

17   going to be able to question this witness and introduce the

18   permits through this witness or --

19             MS. HERNANDEZ:  I don't know that this witness

20   will be able to talk about the permits.

21             THE COURT:  Okay.

22             MS. HERNANDEZ:  I just want to have that

23   possibility.

24             THE COURT:  All right.  So -- okay.  I'm not in

25   the business of trying to solve problems --

1             MS. HERNANDEZ:  Right.

2             THE COURT:  -- that don't exist.

3             MS. HERNANDEZ:  The 417, though -- the 417X, I

4    think that's an issue, and that comes through Ms. --

5    Officer Cooney --

6             THE COURT:  All right.  So we'll talk about that

7    in a moment.  Can we talk about the instruction -- I think

8    the first thing is to talk about the instruction.

9             Mr. Roots?

10            MR. ROOTS:  Thank you.  Roger Roots for

11   Mr. Pezzola.

12            We had a little bit of discussion, and there was

13   so much of that document that, sort of, came into evidence

14   the jury is aware of, and we think that any redactions would

15   make the jury falsely believe that their -- the redactions

16   are showing worse stuff, and so we actually do not want a

17   limiting instruction.  We just --

18            THE COURT:  Well, those are two different things;

19   right?  The redaction is one thing, and I under- -- I mean,

20   I don't know that there was a part of the document that

21   wasn't discussed by one side or the other.  So I agree.

22   That's out the door.  If you all don't want a limiting

23   instruction, that's fine.  I mean, that would, you know --

24   the only -- as I said, the only thing --

25            MR. METCALF:  Your Honor, Steven Metcalf.

```
 1              Our position for Mr. Pezzola, and Mr. Pezzola

 2    only -- because I cannot speak to other people -- is I do

 3    not want a limiting instruction with regards to that

 4    document talking about his state of mind.  So our position

 5    is we do not -- for Mr. Pezzola's purposes -- and anyone

 6    else can chime in on this based on their position -- but our

 7    request is that a limiting instruction is not given at this

 8    time.  The jury heard it plenty of times from that witness

 9    that he believed that, when he seized this document, it went

10    toward his state of mind.  We want to leave it at that.

11              THE COURT:  All right.  You did elicit a lot of

12    that from the witness.

13              MR. ROOTS:  There was no introduction of any

14    evidence that Mr. Pezzola even read the document.  So

15    maybe --

16              THE COURT:  Right.

17              MR. ROOTS:  -- you know --

18              THE COURT:  They can make --

19              MR. ROOTS:  I bet that -- the jury heard that,

20    too, I think.  So --

21              THE COURT:  Correct.  All right.  We'll -- very

22    well.  If you all don't want one, I won't --

23              MS. HERNANDEZ:  Your Honor, I know the Court

24    believes that there's no limiting instruction available to

25    the defense with respect to the letter -- the handwritten
```

1    note about his -- who he is and that type of thing.

2              THE COURT:  Right.

3              MS. HERNANDEZ:  As I understand it, that's coming

4    in as an admission, not as a co-conspirator statement, and,

5    therefore, anytime it's -- if it comes in as an admission,

6    clearly it comes in against Mr. Pezzola, but that doesn't

7    come in against us.  And so I think there's a limiting

8    instruction that says that comes in against Mr. Pezzola but

9    not necessarily against the other defendants.

10             THE COURT:  I don't think that's correct, although

11   I'll hear from any party that wants to be heard about it.

12   If it is evidence against -- well, let's put it this way.

13   Just because it doesn't come in as -- or at least no one has

14   argued that it is a co-conspirator statement.  So let's set

15   that aside.  But just because that's not the method that it

16   comes in through or that's not the hearsay exception it

17   comes in through; that, in fact, it comes in through the

18   party opponent hearsay exception, I don't think you get a

19   separate -- I mean, think about -- there's all sorts of

20   evidence that comes in that's, sort of, directly related to

21   one defendant or another in a conspiracy case having nothing

22   to do with hearsay rules that, you know, comes in -- it is

23   immediately -- most immediately relevant to Defendant A or

24   Defendant 1, but the jury can, then, use that evidence to

25   decide, if it made sense to, you know, whether their -- can

 1    make whatever sense of that evidence it would like.  And it

 2    may be that a particular piece of evidence ties one -- what

 3    if he had said -- I mean, without a better way to put it,

 4    but, like, the value of that evidence, the jury can make

 5    however -- can assign whatever it would like, and it may be

 6    that certain types of evidence -- not really particularly

 7    this one -- might tie together the -- like, might show a

 8    relationship between the defendants.  Let's just say.  This

 9    one doesn't.  I get it.  But I don't think there's a

10    freestanding obligation to instruct when the evidence is

11    just related to one co-conspirator to say, Well, you

12    couldn't consider that with regard to the other

13    co-conspirators.

14            MS. HERNANDEZ:  Well, in fact, I think the Court,

15    in its oral ruling -- I want to say around Pages 16 to 19 of

16    the transcript -- addresses the motive issue which is

17    essentially, I think, what this document would serve as.

18    It's a document that --

19            THE COURT:  Okay.

20            MS. HERNANDEZ:  -- was found at some point -- that

21    was written at some point before the search.  So I mean, I

22    don't think it's dated.  So it could have been written

23    whenever.  And I believe it comes in -- and I'm fairly

24    certain that the Court, in that -- in those passages -- and

25    I -- again, I think it's Pages 16 through 19, around there,

1    of the transcript -- does address the notion that motive

2    evidence that comes in against one person may be subject to

3    a limiting instruction.

4              THE COURT:  I don't -- now -- okay.  It depends on

5    the way the -- I think -- I believe it depends on the

6    particulars of the evidence.  So for example, let's say

7    evidence -- if 404(b) motive and intent evidence came in,

8    that is subject to a limiting instruction.  That's, kind of,

9    a different -- that's a different --

10             MS. HERNANDEZ:  But, see, because 404(b) doesn't

11   necessarily mean it's a crime.  It's other crimes, wrongs,

12   or acts.

13             THE COURT:  Or acts.  Right.  Well, this -- that's

14   right.  This is a statement, though, not an act.  I don't

15   see it -- I don't see this as --

16             MS. HERNANDEZ:  Because I don't think the -- I --

17   I'll take a look at the Court's order.  I do think the

18   Court wasn't limiting its discussion of -- I can take a look

19   at it.  It doesn't have to be done first this thing this

20   morning.

21             THE COURT:  All right.

22             MS. HERNANDEZ:  We can do it at lunchtime or

23   something.  I'll take a further --

24             THE COURT:  Fair --

25             MS. HERNANDEZ:  -- look at it, Your Honor.

 1              THE COURT:  Fair enough.  I would just focus you

 2     in on -- I mean -- on the issue of the statement coming in

 3     in this case as simply under a party opponent --

 4              MS. HERNANDEZ:  Right.

 5              THE COURT:  -- through hearsay, through that.

 6              MS. HERNANDEZ:  Right.

 7              THE COURT:  And so I don't think in that

 8     scenario -- I hadn't thought of this as really, like,

 9     another crime, wrong, or act --

10              MS. HERNANDEZ:  I mean, I --

11              THE COURT:  -- you know --

12              MS. HERNANDEZ:  Because you -- Your Honor

13     mentioned 404(b).  So I --

14              THE COURT:  Well, because clearly, limiting

15     instructions for 404(b) evidence, I think, are in play, and

16     I'm sure I said that and I think that's very common.  So you

17     can discuss it.  I mean, I'm going to give a lot of weight

18     to the fact that Mr. Pezzola doesn't want any instruction,

19     of course, but -- I mean, your instruction isn't about the

20     limited -- well, your instruction that you're proposing is

21     not about the limited type of use.  It's about, Don't use it

22     against my client.  And I --

23              MS. HERNANDEZ:  Because he said his, you know --

24              THE COURT:  Right.

25              MS. HERNANDEZ:  -- view is X doesn't mean that my

1    client --

2            THE COURT:  I know.

3            MS. HERNANDEZ:  -- adopted that or whatever.

4            THE COURT:  But I don't think that -- I don't -- I

5    think that is not appropriate.  So take a look and you can

6    let me know, but I don't think that is an appropriate --

7            MS. HERNANDEZ:  Okay.

8            THE COURT:  -- instruction.  All right.

9            MS. HERNANDEZ:  And then the -- I don't know if

10   the Government's going to introduce that particular video.

11           THE COURT:  Okay.  So why don't -- the easiest

12   thing might be on the video, Government, if you want to just

13   show me -- pull up 417 -- whatever it is --

14           MS. HERNANDEZ:  X.  That's the one they modified.

15           THE COURT:  -- I'll take a look at it and you

16   all -- we can discuss it before -- so we don't have to do

17   this in the middle of your examination.

18           MR. METCALF:  Your Honor, before we move on to

19   the video, I just listened to that following colloquy and I

20   just want to note a concern.  Hearing this -- what has been

21   marked as the Government's, I believe, Exhibit-23 or 25,

22   whichever one it is, the two-and-a-half-page handwritten

23   document that was found, and it keeps being referred to as a

24   statement: as a statement, obviously, for Mr. Pezzola.  Now,

25   on cross-examination, I elicited that it's not dated; it's

1    not noted that it's Mr. Pezzola or came from Mr. Pezzola;

2    and there's no way to authenticate his handwriting at this

3    time.  Now, totality of the circumstances does indicate

4    based on certain factors in there that it could have been

5    done from, and most likely was written by, Mr. Pezzola.  But

6    at this time, I still believe that document and that exhibit

7    should be referenced as a document and not a statement from

8    Mr. Pezzola.

9            THE COURT:  Well, for purposes of our discussion,

10   its admission and evidentiary value, we're calling it a

11   statement because that's what it was.  I take your point.

12   There's no direct evidence that he authored it.  But the

13   Government's going to argue, however within the rules they

14   can, that the inference is that your -- that it was your

15   client's statement.  So I mean, I take your point, but we're

16   just using "statement" here as a, sort of, shorthand to

17   describe it because that governs the, sort of, evidentiary

18   framework that governs it even though it's, sort of, an

19   inferred statement rather than something that we know

20   definitively to scientific certitude was written by your

21   client.

22           MR. METCALF:  Understood, Your Honor, and that's

23   why --

24           THE COURT:  Okay.

25           MR. METCALF:  -- I just wanted to note my

```
 1    concern --
 2              THE COURT:  Okay.
 3              MR. METCALF:  -- to the reference it -- to it
 4    being a statement.  I understand the inferences that can be
 5    drawn and what the Government is entitled to be able to
 6    argue.  I just want --
 7              THE COURT:  Okay.
 8              MR. METCALF:  -- to make that noted.
 9              THE COURT:  Okay.  Can we play the -- can you all
10    play for me the exhibit that Ms. Hernandez has referenced in
11    her email.
12              (Video played.)
13              THE COURT:  All right.  So Ms. Hernandez, how is
14    that different than the Government simply pausing a video
15    and, sort of, using a highlighter to highlight a particular
16    person?
17              MS. HERNANDEZ:  Well, if the Government would move
18    it -- if you could bring it to -- I think it's about the
19    20-something-second --
20              THE COURT:  I've got to say, my -- this is not --
21    I expected something far --
22              MS. HERNANDEZ:  Well --
23              THE COURT:  -- different --
24              MS. HERNANDEZ:  So --
25              THE COURT:  -- than this.
```

```
 1              MS. HERNANDEZ:  -- I've had no problems with these
 2     outlines and -- because you can, you know -- they're not --
 3     it's this one that I'm concerned with.
 4              (Brief pause.)
 5              That one, (indicating.)
 6              THE COURT:  Mm-hmm.
 7              MS. HERNANDEZ:  First of all, you can't see the
 8     person.  Second of all --
 9              THE COURT:  I --
10              MS. HERNANDEZ:  I -- my expectation is the
11     Government's going to say that's Mr. Rehl.
12              THE COURT:  Okay.
13              MS. HERNANDEZ:  The -- it -- you cannot see the
14     person.  I can show you -- first of all, I don't know --
15              Can you leave it -- go back to that --
16              THE COURT:  I can -- they have it just, I think, a
17     few seconds -- was it after or before now?  Okay.  I mean,
18     I --
19              MS. HERNANDEZ:  The one with the outline,
20     Ms. Rohde.
21              So number one, I don't know where this program
22     comes from that pulls people out and I -- we haven't
23     questioned it, as I said, because it hasn't been an issue.
24     In this video, I don't believe that's my client because he
25     had a gaiter around his neck during most of the time, but I
```

1    shouldn't have to -- I shouldn't -- they're the ones who are

2    trying to introduce evidence and claim that that's my client

3    through a witness that I don't believe knows my client.

4    She's a Metropolitan -- a Capitol Police officer who's going

5    to describe what she saw, what she experienced, or whatever.

6    She doesn't know my client.  They're going to put this -- we

7    have the same video without the correction and that's even

8    more clear, I believe, that that's not my client.  So we're

9    going to bring in this witness who cannot identify Mr. Rehl

10   and they're going to do this -- whatever it is they're

11   doing.  I don't know how, technologically, they did this.

12   They've never provided us an explanation of what program

13   they're using or whatever.  And, as I say, we haven't

14   objected because, for the most part, it's fairly clear that

15   it's one defendant or the other, but I don't believe this is

16   my client, and if --

17            Could you pull up 417, please?

18            So 417X is the one -- when they put an X behind an

19   exhibit, that's the one where they put -- the actual exhibit

20   is 417.

21            (Video played.)

22            MS. HERNANDEZ:  So you know, there are these hats

23   and these things.  It's very blurry.  I don't, you know --

24   I --

25            THE COURT:  I mean, Ms. Hernandez, I -- my

1    reaction to this is -- okay.  Here -- no.  Did we just pass

2    the --

3                MS. HERNANDEZ:  This is 417 without the --

4                THE COURT:  Yeah.  My reaction to this is you're

5    free to -- I mean, I don't know whether they're going to

6    elicit -- let me ask the Government this question.

7                Mr. Mulroe, are you -- is this witness --

8    obviously, you've highlighted particular people because you

9    think they're relevant -- in this case, they may be

10   defendants or, in other circumstances, it may be because

11   they are relevant for other reasons.  Are you -- is this

12   witness -- the witness is not in the room, I presume.

13   Are -- is the witness going to make an identification of

14   Mr. Rehl through that video --

15               MR. MULROE:  No, Your Honor, not this witness.

16               THE COURT:  Okay.  So I mean, I guess,

17   Ms. Hernandez, you're -- she -- they just said they're not

18   going to identify your client or ask -- even -- I suppose,

19   even ask about that -- I mean, maybe, they're going to say,

20   Look at that figure, whatever that figure did or didn't do.

21   If they're wrong, you're going to be able to drive a truck

22   through it.  I -- they're not going to say -- it sounds like

23   they're not going to say anything about your client --

24               MS. HERNANDEZ:  It --

25               THE COURT:  -- being linked to that.

```
 1              MS. HERNANDEZ:  But once it's in, they can argue
 2   whatever they want to the jury.  They have the same video,
 3   417, without these highlights.
 4              THE COURT:  Mm-hmm.
 5              MS. HERNANDEZ:  Go at it.
 6              THE COURT:  Well, why can't --
 7              MS. HERNANDEZ:  But I --
 8              THE COURT:  I think you can -- I mean, look, it's
 9   a highlight around a person.  You can do whatever you want
10   with this.  You can do whatever you want with the other
11   exhibit.  I -- if you want to argue on cross, at any other
12   time, Look, that's not my client, you're going to be free to
13   do it.
14              MS. HERNANDEZ:  I shouldn't have to meet evidence
15   that they haven't proved.  If they don't prove that's my
16   client, it doesn't come in with an outline saying it's my
17   client, and this witness will not be able to say that's
18   Mr. Rehl.
19              THE COURT:  And they're not -- they're saying it's
20   not going to.
21              MS. HERNANDEZ:  Well, yes, but they're introducing
22   an exhibit that highlights -- and then tomorrow or with the
23   next witness, they're going to say, That -- and it's already
24   in, so it can be played to the jury.  And so they're -- they
25   have the same exhibit without these outlines.  All this
```

1    witness is going to say is, These are -- this is what I

2    experienced.  Fine, then give the one without the outlines,

3    and then when they have a witness who can identify that as

4    my client, fine.  I don't think they're -- what is this

5    program that they're using?  They haven't told us even today

6    after I objected.

7              THE COURT:  Right.

8              MS. HERNANDEZ:  What is this program that they're

9    using that highlights?

10             THE COURT:  But, again --

11             MS. HERNANDEZ:  How did they pick out this person

12   in this crowd as my client?

13             THE COURT:  Well, they're not going to use this to

14   identify your client, though.

15             MS. HERNANDEZ:  Not today, Your Honor, but once a

16   document is in, as the Court well knows, they can do

17   whatever they want with it, including argue to the jury

18   that's my client.  So all I'm saying is if this witness is

19   not going to identify any of the defendants, they can

20   present the same exact --

21             And can you please play 417, not --

22             THE COURT:  No --

23             MS. HERNANDEZ:  -- X.

24             THE COURT:  -- I believe you.  They don't have to

25   play it.  I --

```
1              MS. HERNANDEZ:  It's a -- it's not very long.

2    It's a minute.  So they have the same exhibit but without

3    the outlines.  That's the exhibit they have to play through

4    this witness, because that's the only thing this witness is

5    competent to testify to:  This is what I saw; this is what I

6    experienced.  These outlines are demonstrative, or whatever,

7    that can come in, maybe, through another witness and then I

8    can challenge it, but I cannot -- I'm not going to be able

9    to challenge through this witness because she's going to

10   say, I don't know what that is.  She's going to say, I don't

11   know who that is because -- that's my expectation.  She

12   doesn't know any of these defendants.  So if I try to

13   confront that testimony, I will not be able to.

14              THE COURT:  All right.  Let me hear --

15              MS. HERNANDEZ:  So I think they should just not

16   introduce the one with the highlight.  And, again, Your

17   Honor, I have not objected, even though I think the whole

18   thing is objectionable because they never explained how it

19   came, but for purposes -- I'm not, you know, making a stupid

20   objection, That's not my client --

21              THE COURT:  I'm --

22              MS. HERNANDEZ:  -- when it's there, you know?

23   So --

24              THE COURT:  I'm hearing you --

25              MS. HERNANDEZ:  No --
```

1          THE COURT:  -- aren't I?

2          MS. HERNANDEZ:  -- but what I'm saying, you know,

3     why object if they're -- if it's so clear that it's -- but I

4     don't believe that's my client, as I said.  And so since

5     this -- I will not be able to confront this witness.  That's

6     my problem.

7          THE COURT:  All right.  Let me hear from the

8     Government on this.

9          MR. MULROE:  Your Honor, I think the Court's

10    initial reaction was exactly correct that what this video

11    does is not any different from what we and Mr. Smith have

12    been doing the entire trial which is pausing and circling

13    and asking questions that do not purport to identify the

14    person but ask about what that person, whomever they are,

15    was doing at the time and whether they were part of it.  And

16    so I think that this is just no different.  I'll preview

17    that with this witness, we're not even going to stop at that

18    point.  It's just going to play through.  We will stop at

19    the point where, earlier in the video, Mr. Nordean and Biggs

20    are highlighted.  And, once again, she's not going to

21    identify them as the defendants there, but she's going to

22    talk about what those people were doing based on her

23    firsthand observations.

24          So I think that the witness is well-positioned to

25    authenticate and testify about what's depicted on the

1    screen.  I expect she's going to testify that this video

2    fairly and accurately depicts exactly what she saw except

3    that it has, you know, pausing and outlines added at certain

4    points, and that's completely conventional and unprejudicial

5    and unobjectionable.  And Ms. Hernandez hasn't identified

6    any Rule of Evidence or case or any other authority that

7    would preclude us from doing this.  I just, frankly, think

8    her arguments against it don't make a lot of sense.  I mean,

9    it's the nature of the trial that the parties put in

10   evidence and then they argue about it, and this is just

11   another instance of that.

12              THE COURT:  All right.  Mr. Pattis?

13              MR. PATTIS:  It's actually far simpler than that.

14   This witness can't authenticate the document as a fair and

15   accurate representation of what she saw because she didn't

16   see the highlights that appear through a third party.  And

17   Ms. -- when Mr. Mulroe says it's no different than what he

18   and Mr. Smith have done, it's entirely different.  If

19   counsel stands in front of the jury and highlights something

20   with a circle, the jury gets to see, and it gets to see the

21   selector and it gets to put the selection within the context

22   of the questions and the arguments made.  This witness never

23   saw these highlights.  And I think the Government -- I think

24   we're entitled to show the hidden hand and the selection

25   criteria.  In Ms. Hernandez's case, you know -- it's clearly

1    Mr. Biggs.  From our perspective, we care less than

2    Ms. Hernandez does.  But if she's saying it's not the guy,

3    the Government ought not to be given the benefit of this

4    mysterious identification that comes in without explanation

5    which --

6              THE COURT:  Well, I mean --

7              MR. PATTIS:  -- this witness cannot authenticate.

8              THE COURT:  Again, they're not going to say --

9              MR. PATTIS:  It doesn't matter --

10             THE COURT:  -- today --

11             MR. PATTIS:  -- what they say.  It matters what --

12             THE COURT:  Right.

13             MR. PATTIS:  -- they do.  And it -- for a piece of

14   evidence to be introduced to the jury, it has to have an

15   adequate foundation.  If this witness didn't see those

16   highlights at the --

17             THE COURT:  Well --

18             MR. PATTIS:  -- scene, she can't authenticate it.

19             THE COURT:  Yeah, I --

20             MR. PATTIS:  And for them to say, But for those,

21   begs the question that Ms. Hernandez raises.  And in a case

22   where identification is an issue, it's critical.  The

23   Government should be able -- required to produce the manner

24   and means -- I don't care about the program technique

25   itself, but who selected that person and why.

```
 1              THE COURT:  Sure, but they can say, Well, you

 2      know -- they can say, Well, we've highlighted certain things

 3      here.  The -- obviously, that's not what you saw that day,

 4      and have -- the person can authenticate the video without

 5      the markings and all the rest.  That -- I don't think

 6      it's -- I don't think the jury will have a hard time

 7      understanding that she didn't actually see a highlighted

 8      figure at any point; right?

 9              MR. PATTIS:  I'm sure --

10              THE COURT:  I mean --

11              MR. PATTIS:  -- they won't, but in this case,

12      Ms. Hernandez, I think, rightfully claims prejudice, because

13      what you're doing is bolstering a misidentification.  And so

14      if there's an easy solution -- that is, the non-highlighted

15      video that doesn't have the mysterious editorial -- I think,

16      like, we're in Nebuchadnezzar's Palace.  We don't know who

17      put that handwriting on the wall.  Is it God or the United

18      States Government?  I mean, from the jury's perspective,

19      it's going to matter cumulatively in the end.  And I think

20      Ms. Hernandez is well within her rights to insist that the

21      rules, contrary to what Mr. Mulroe says, be followed in this

22      instance.

23              THE COURT:  But --

24              MR. PATTIS:  She's --

25              THE COURT:  -- isn't it --
```

```
 1              MR. PATTIS:  -- insisting on an adequate
 2   foundation.
 3              THE COURT:  But, Mr. Pattis, isn't it -- isn't the
 4   highlighting just a tool -- in other words, the Government
 5   is going to say, Okay.  Look at this particular person.
 6   What's -- as you all have been doing throughout this trial.
 7   What is that person doing?  What does this person appear to
 8   be doing to you?  Does this person have his hand up?  Hand
 9   down?  On the fence?  Off the fence?  It --
10              MR. PATTIS:  That's argument.  That's not
11   evidence.  That's argument.  And so --
12              THE COURT:  No, those are questions posed to a
13   witness.
14              MR. PATTIS:  That -- they can pose that question
15   to a witness, and I would suggest the appropriate way to do
16   it would be as Mr. Mulroe suggested, by the manual circling
17   of that, but to give it this, sort of, mysterious
18   imprimatur, I think, is to place too much weight on it.
19              THE COURT:  All right.  I'm going to overrule the
20   objection.
21              And, Ms. Hernandez, if you -- the question -- when
22   it comes to whether that's your client, you're going to be
23   able to argue until the cows come home that it's not.
24              MS. HERNANDEZ:  Yeah, but the point is the
25   Government will -- you will admit it.  It's evidence, which
```

1    means they can stand in front of the jury and say, That's

2    him, even though they have had no witness say that's him.

3              THE COURT:  But --

4              MS. HERNANDEZ:  It's just their argument.

5              THE COURT:  Right.

6              MS. HERNANDEZ:  If -- the point is, if she could

7    identify it, that's fine, but she's not going to be asked to

8    identify.  So this is just -- and my concern is it's in

9    evidence, Your Honor.  It's in evidence.  And once it's in

10   evidence, we can do with it whatever we want.  They can

11   argue to the jury, There, you saw it when the -- blah, blah,

12   blah.  That's him.  That's him.  And I have no way to

13   confront that.  If the witness were going to say, That's

14   him, then I'm stuck with her testimony.  I can confront her

15   testimony.  But this is -- it's not -- she will be asked, Is

16   this an accurate depiction, blah, blah, blah, before it

17   comes in.  Well, it is not, because this is not what she saw

18   that day, as Mr. Pattis indicated.  These are little circles

19   that they put in.  If they had a witness who could -- and

20   let me say -- said about Mr. Smith -- when Mr. Smith

21   had Mr. Quested on the stand, he said, Is that you?  Yes.

22   Okay.  Now, that's you.  So now, you can -- we can talk

23   about this.  And that's the way it's gone with every

24   witness.

25              THE COURT:  Well, let me just -- again, let me

1    just pose the counterpoint which is -- so let's say they

2    ultimately have no witness who will say that's your client.

3    Okay?  But, as you've said, they may argue that at -- it --

4    once it's in evidence, even if -- wait -- even if it comes

5    in, whether with the highlighting or not, right, you don't

6    disagree that if -- if they used the non-highlighted version

7    of this, right, and later on at closing, they could

8    highlight that figure and say, That's Mr., you know --

9    ladies and gentlemen, look closely.  Look at before; look at

10   after.  That's Mr. Rehl.

11          MS. HERNANDEZ:  That's their argument, and that

12   would be demonstrative.  If you let it in with the

13   highlight, it is evidence.  That's the difference.  So if

14   they want to put that before the jury and, during argument,

15   claim something, that's different because that comes in from

16   them and you're going to tell the jury argument is not

17   evidence.

18          THE COURT:  Sure.

19          MS. HERNANDEZ:  Once it comes in with the

20   highlight, it's evidence.  Again, it does not meet the

21   authentication, Rule 901.  She cannot say, Yes, this is an

22   accurate depiction of what I saw, because it is not.  It --

23   those little highlights is not an accurate depiction.

24   That's an additional demonstrative thing that can only be --

25   I mean, if the Court recalls, when I tried to introduce the

1    Government -- the Capitol permits which were produced by the

2    Government to me, they objected because they said the

3    witness didn't have sufficient basis to authenticate those

4    documents.  That's the same thing.  This witness does not

5    have sufficient evidence to authenticate the ones with

6    the circles.  And, again, I am not -- the point I'm trying

7    to make to the Court, this is not a frivolous argument.  I'm

8    not saying, Of course that's him.  No, it is not.

9            And the other -- is they have another identical

10   exhibit that they can use for the purpose of having this

11   witness describe what happened, what she experienced, what

12   was going on.  They have another demonstrative

13   experience [sic].  It's a one-minute -- and if they want to

14   stop it at different points, fine, but they cannot have this

15   witness -- they cannot -- this cannot come in as evidence

16   until they have somebody say, That's Mr. Rehl, if they're

17   going to put a highlight around it.  That's my point.  If

18   they're going to put a highlight around it, then they have

19   to have a witness who says, That's accurate, because that's

20   Mr. Rehl.

21           THE COURT:  All right.  Let me ask -- Mr. Mulroe,

22   I guess it's you responding to this.  Why not -- I mean,

23   look, I don't think this is -- let me put it this way.  I

24   think this -- I don't think this is -- I don't think it's a

25   frivolous argument, and I understand your concern.  Why

1    not -- I mean, the Government may well be able to -- if your

2    version of this that doesn't have the highlights -- if you

3    used that with this witness, of course, you'd be able to use

4    some -- you'd be able to use this document with the

5    highlights later as a demonstrative and all the rest.  Why

6    not just use your other one, pause it when you want to ask

7    questions about Mr. Biggs and Mr. -- I think it was

8    Mr. Nordean, you said, or whatever, and use the document

9    without the highlights now?

10            MR. MULROE:  Your Honor, the events that are

11    depicted in this video are chaotic.  They are fast-moving.

12    They are very, very important to the case.  And so we expect

13    to spend a lot of time and attention with this witness

14    talking about what was going on at the fence and talking

15    about what Biggs and Nordean were doing at that fence

16    which she doesn't know them by name, but she knows them by

17    appearance, and she will recognize them and discuss them

18    from the video.  So from the Government's perspective, the

19    highlighting of Biggs and Nordean in the earlier portion of

20    the video is important for the jury's understanding.  It's

21    helpful to the jury.  It is necessary for the Government to

22    make the fulsome presentation from this eyewitness about

23    what happened at the fence, you know?  The highlighting of

24    Rehl later in the video, candidly, is somewhat incidental to

25    all this, but the highlighting of Biggs and Nordean is

 1     central and important.

 2            And I want to note, Your Honor, that these

 3     exhibits with the highlighting are ones that were produced

 4     to the defense months ago as part of the trial procedures --

 5     trial scheduling order that existed for the exact purpose of

 6     litigating all these things pretrial, the form of the

 7     exhibits and how we're going to be presenting them.  So I

 8     think, you know, we're now cutting into the jury's time on

 9     an issue that could have been handled that, I think, poses

10     no prejudice to Mr. Rehl.  I think Your Honor is right that

11     this is just a variation on what always happens in trial;

12     that one party puts in evidence, then both parties end up

13     arguing about it.  And Your Honor is right that she can say

14     that's not Mr. Rehl, and if she succeeds in persuading the

15     jury that that's not Mr. Rehl, then the Government's going

16     to look awfully silly for having produced this exhibit where

17     that mysterious figure is highlighted.  But I think that at

18     this stage, there's just nothing controversial about this

19     and it's not going to cause any unfair prejudice.  It's

20     going to prejudice the Government if we are not able to use

21     this highlighted version that we produced and disclosed to

22     them months ago.  And so we ask that the objection be

23     overruled.

24            MS. HERNANDEZ:  Your Honor, I cannot cross-examine

25     this witness and point out that that's not my client because

5314

1    she will say, I don't know that person.  I can't pull it

2    out.  So it will just be -- and they'll probably object.

3    She just said she couldn't identify.  So I'm stuck with this

4    piece of evidence.

5            And this argument that they -- they produce --

6    as -- I don't want to argue over discovery and how it's come

7    in.  We're all struggling to meet the evidence that's

8    produced, so the Court well knows, and to review with our

9    clients and everything else.  That's, I think, a frivolous

10   argument.  But nonetheless, my problem is if she could even

11   identify so I could confront the testimony, but she can't.

12   She's going to say, I don't know.  And besides, if you look

13   at that video, it's so fuzzy when they put the darn thing

14   around it, nobody could see it.  And the point is, again,

15   Your Honor, they can -- they should not be able to introduce

16   evidence that's not been properly authenticated.  That's it.

17   That's the bottom line.

18           THE COURT:  All right.

19           MS. HERNANDEZ:  If they want to use the first half

20   of this video, stop it, and then go back to the old video,

21   that's fine, but I think that little -- and I'm telling you,

22   in my opinion, that is not Mr. Rehl because it's missing the

23   thing, but I can't -- I mean --

24           THE COURT:  Well, they're not -- I mean, let's --

25   again, I -- the question of whether it's Mr. Rehl, on some

```
1     level, for purposes of right now just -- they're not going

2     to be arguing that it -- they may eventually argue, but

3     they're not going to be pointing that out.  You're saying

4     you're going to go into a whole, you know, thing with this

5     witness about, Is that my client?  And, maybe, you will.  It

6     will seem strange that they haven't talked about your client

7     at all, but, like, if you want to do that, you can.

8               MS. HERNANDEZ:  Again, he -- the irony is he says

9     it's not prejudicial to my client.  Well, if it's not

10    prejudicial to my client, it's certainly not prejudicial to

11    the Government to prevent them from introducing evidence

12    that they can't link up to my client.  And, obviously, it's

13    circled around there not because it's Joe Blow from

14    Minnesota who was there.  It's circled because they want to

15    be able to the -- to argue at some point that that is my

16    client.  They cannot do that through this video and this

17    witness.  If they have another witness, fine, bring that

18    witness in.  They cannot do it through this witness.  That's

19    all I'm saying, Your Honor.  And, again, they have another

20    video which is only a minute long.  It's 417.

21              THE COURT:  All right.  All right.

22              MS. HERNANDEZ:  This is a modification.  This is a

23    modification.  This is not an accurate depiction of what

24    this officer saw, as Mr. Pattis --

25              MR. PATTIS:  Judge, briefly, just by -- as always,
```

1    in any -- at any moment in trial, there's what the Court's

2    going to do and then what an appellate court will do.  This

3    is clearly within your discretion, and within the context of

4    this case as a whole, it would be regarded as an abuse of

5    discretion if we were right and what's going to, you know --

6    and we're -- it's going to go nowhere.  Can I remind you

7    that the standard here isn't whether it prejudices the

8    Government but whether it undermines the presumption of

9    innocence, and that -- I think, unless and until the

10   Government produces competent evidence, these men are to be

11   regarded as not guilty, and I don't think the evidence is

12   competent.

13            THE COURT:  All right.

14            MR. PATTIS:  I think --

15            THE COURT:  I --

16            MR. PATTIS:  And so I join Mrs. --

17            THE COURT:  I --

18            MR. PATTIS:  -- Ms. Hernandez's remarks.

19            THE COURT:  I understand the arguments.

20            I don't think this is functionally any different

21   from stopping the -- from stopping -- from doing what we've

22   been doing the entire time: pausing these things, circling

23   the evidence, highlighting certain things, pointing them

24   out.  Obviously, the witness is not going to be able to say,

25   I saw the pausing and I saw the highlighting.  But I think

1    they are going to be able to authenticate the video.  The

2    questions of Mr. Rehl's identity are not even going to be

3    the focus of this witness.  And to the extent both sides are

4    going to argue either it is or is not Mr. Rehl, that will

5    get sorted out as things go forward.  So I'm going to

6    overrule the objection.

7            So let's -- if there's nothing --

8            MS. HERNANDEZ:  Your Honor, should I object when

9    it comes in?

10           THE COURT:  You -- you're -- I mean --

11           MS. HERNANDEZ:  No, I'm asking.  Does the Court

12   want -- I mean, I can -- if this is sufficient --

13           THE COURT:  I -- you -- I've given you all -- I

14   don't think you need to further object.  I --

15           MS. HERNANDEZ:  I just want to preserve the

16   objection.

17           THE COURT:  I understand that, for sure.  I'm

18   not -- let me put it this way.  If you feel you need to, you

19   can, and I'll simply say, Overruled.  I -- whatever you feel

20   you need to do to preserve the record.  You've certainly

21   made a record of -- right now and what you filed and through

22   what we've discussed.

23           All right.  If there's nothing further, then,

24   we'll bring in the jury.

25           MR. KENERSON:  Your Honor, we do have one more

1    preliminary matter that relates to the next witness.

2    The Government provided some information to the

3    defense last night that -- frankly, I'm not sure that we had

4    a requirement to, but we did.  Nonetheless, we are moving to

5    preclude cross-examination based on that information.  So

6    there was -- in Mr. Greene's -- one of his electronic

7    devices, the FBI found a document that had classification

8    markings on it, like, "secret," so on, so forth.  The FBI

9    had looked into it.  That document is available on public

10   websites.  That document -- and Mr. Greene does not, you

11   know -- as of the time of January 6th, 2021, did not possess

12   a security clearance.  They looked into whether it was a

13   type of document he would have had access to when he was in

14   the military, and they do not think it's likely that he

15   would have had access to that type of document when he was

16   in the military.  When asked, he said he found it in

17   open-source.  So based on all -- and the Government, as we

18   told the defense, does not plan to charge Mr. Greene with

19   that -- any violation relating to possession of a

20   material -- of a document marked "classified."  We don't

21   believe that we could, even if we were so inclined.  And so

22   based on the fact that there really is no benefit to be --

23   potentially be gained to be cross-examined about, about the

24   document --

25        THE COURT:  At least from your perspective.  I --

```
1              MR. KENERSON:  Correct.

2              THE COURT:  -- understand that.

3              (Laughter.)

4              MR. KENERSON:  I understand.  That's why we're

5     raising it.

6              THE COURT:  Right, right.  Fair enough.

7              MS. HERNANDEZ:  This is Giglio, Your Honor.  This

8     is Giglio being produced the night --

9              THE COURT:  Hold on.  Hold on.  Ms. Hernandez,

10    I'll hear from you, but you have to go up to the microphone

11    and, again -- all right.

12             Anything further, Mr. Kenerson, on this before I

13    hear from whatever defendant would like to be heard?

14             MR. KENERSON:  Just if the Court has any

15    questions, we'd be happy to answer them.

16             THE COURT:  I mean, my inclination is to --

17    given -- I mean, let's put it this way.  There are -- I take

18    your point that it is, from all the reasons you've just laid

19    out, you know, not realistically on the table that he could

20    be charged.  On the other hand, in theory, he could be at

21    least.  And I'm not sure it's the biggest point of

22    cross-examination, but it strikes me as something that, you

23    know, is reasonably in play for the defense to ask about.

24    I -- again, it's -- he can explain, No, no, this was, you

25    know -- I got it through an open-source; this is a
```

1   nothing-burger.  But, like, you know, in terms of his

2   incentives and his motivations, it strikes me, you know, not

3   of huge import but something that's fairly within the --

4   within cross.

5            But let me hear from whoever would like to address

6   this.

7            MS. HERNANDEZ:  So this is Giglio produced the

8   night before.  We had another witness last week that we had

9   to pass because we believed they were producing Giglio the

10  night before.  I asked when they noted it.  I said, Okay.

11  There must be some documentation relating to the decision

12  not to charge or whatever; right?  There must be some

13  document- -- they haven't produced that.  I understand that

14  Mr. Kenerson is saying they can't produce the doc- -- I'm

15  not sure I understand, because if I hear him correctly, this

16  is an open-source document, so it's not classified, but they

17  can't give us a copy of the document because it's classified

18  or something like that.  So it seems a little circular.

19           But, again, the night before, we're told this.  I

20  don't know -- the Court has it right.  It goes to a benefit

21  that he received from the Government or may have received,

22  because they -- they didn't -- we'd like to know when this

23  decision was made, because I will tell this -- the Court,

24  this witness is a cooperating witness.  He pled guilty.  And

25  he seems to have changed his tune.  I mean, we have multiple

1    302s.  We have a more-than-three-hour audio recorded

2    interview and then, all of a sudden, I believe the most

3    recent document from him, he's changed his tune.  When did

4    the change of tune come in connection -- in relationship to

5    this decision to not charge him?  So we don't even know when

6    the decision was made not -- when it was found out, when the

7    decision was made not to charge him, what communications

8    relating to that were made to the defendant's counsel or

9    defendant.  We've asked for that documentation.  Nothing has

10   been produced, including the document we're talking about.

11   And I -- again, I may be misunderstanding what the -- what

12   Mr. Kenerson said, but if it's classified, then his

13   explanation of why -- that it's an open-source document

14   doesn't hold water or doesn't make sense to me.  And if it's

15   not classified, why can't we have a copy of the document so

16   we can see -- I mean, is it, like, some major thing or is it

17   some minor thing?  We have nothing on it except

18   Mr. Kenerson's statement -- email last night about this.

19            THE COURT:  All right.  But -- all right.

20   Anyone -- any other defendant -- I mean, I -- again, I

21   don't -- I think, you know -- I think this is fair topic for

22   cross-examination.  I don't think it's going to be the most,

23   you know --

24            MS. HERNANDEZ:  We don't have the goods.  We don't

25   know -- I'm sorry, Your Honor.  We don't have any

1  information other than a two -- a one-and-a-half-sentence --

2  or one-and-a-half-line sentence saying, There's this

3  document.  We didn't charge him.

4          THE COURT:  I mean, as a practical matter,

5  Mr. Kenerson, I guess, the thing -- again, I'm inclined to

6  let cross-examination occur about this, but -- I mean, I

7  guess part of it is -- is it the Government, you know -- I'm

8  just trying to think about the contours right now.  The

9  document itself is classified as of this moment, even if it

10  is available in some other way?

11         MR. KENERSON:  The document itself contains

12  classification markings.  The FBI was not able to get an

13  answer as to whether it is still classified.  So the

14  Government has to treat it as classified.  So obviously,

15  leaks happen, and sometimes leaks happen and the material

16  still remains classified as a matter of whether --

17         THE COURT:  Right.

18         MR. KENERSON:  -- I can put it on my computer and

19  send it to defense counsel.

20         THE COURT:  No, I understand that.  I understand

21  that.

22         All right.  I mean, with the caveat that you have

23  the information you have, I, you know -- I think it's fair

24  to -- I'm going to allow cross-examination on it to -- as

25  far as it goes.

1          MR. KENERSON:  Understand the Court's ruling.

2     Just one thing I want to note in relation -- in response to

3     Mrs. Hernandez is that the Government -- the Government's

4     obligation under Giglio is to provide the information in

5     enough time for defense to use it.  The Court has just

6     allowed them to use it.  So to the extent that there is any

7     Giglio there which, as we said, we disagree, but

8     nonetheless, they've had the information in enough time to

9     use it.

10          THE COURT:  All right.  Very well.

11          All right.  Let's bring in the jury and start up

12     with our next witness.

13          (Brief pause.)

14          THE DEPUTY CLERK:  Jury panel.

15          (Jury returned to jury box.)

16          THE COURT:  All right.  You all may be seated.

17          Welcome back, ladies and gentlemen.

18          We will proceed with the Government's next

19     witness.

20          Mr. Kenerson?

21          MR. KENERSON:  Thank you, Your Honor.  The

22     Government calls Matthew Greene to the stand.

23          **MATTHEW GREENE, WITNESS FOR THE GOVERNMENT, SWORN**

24                    DIRECT EXAMINATION

25     BY MR. KENERSON:

1    Q.   Good morning, sir.

2    A.   Good morning.

3    Q.   And in a loud and clear voice and as close to the

4    microphone as you can, can you please introduce yourself to

5    the jury and spell your last name.

6    A.   Matthew Greene, G-R-E-E-N-E.

7    Q.   And, Mr. Greene, you don't have to tell us the exact

8    address, but what city and state do you live in?

9    A.   Syracuse, New York.

10   Q.   And do you currently work, sir?

11   A.   No.

12   Q.   Do you have any military history?

13   A.   I do.

14   Q.   Can you tell us about what your -- what years and what

15   type of military service you engaged in?

16   A.   I spent about eight years in the Army National Guard as

17   a human intelligence collector.

18   Q.   And which eight years were those?

19   A.   2008 to 2016.

20   Q.   What made you desire -- or what made you decide to join

21   the Army National Guard?

22   A.   I had been given a pretty good life and just wanted to

23   give back.

24   Q.   Now, did you do any overseas deployment as a part of

25   that service?

1    A.  I did.

2    Q.  Where was that to?

3    A.  Afghanistan.

4    Q.  What years were you in Afghanistan?

5    A.  2010 and 2011.

6    Q.  And what type of area or installation were you at in

7    Afghanistan?

8    A.  I was on an airbase.

9    Q.  Now, did you eventually leave the Army National Guard?

10   A.  I did.

11   Q.  When about was that?

12   A.  2016.

13   Q.  Were you -- was the -- other than your overseas

14   deployment, was your job with the Guard -- was that a

15   full-time job?

16   A.  No.

17   Q.  Were you doing other work?

18   A.  I was.

19   Q.  What type of other work were you doing?

20   A.  I was working in the video game industry.

21   Q.  Why did you wind up deciding to leave the Guard?

22   A.  I was looking to move to California and that would have

23   been difficult with the unit I was in.  And so I, basically,

24   realized that my Army career was getting in the way of my

25   civilian career.

1    Q.  Got it.

2            And what year was that?  Remind us.

3    A.  I moved in, I think, 2014, but officially got out in

4    2016.

5    Q.  I see.  Okay.

6            Now, were you still -- you said that while you

7    were, kind of, doing both civilian work and your service in

8    the Guard, you were working in video games; is that right?

9    A.  Yes.

10   Q.  Is that still what you were working in once you moved

11   out to California?

12   A.  Yes, when I was in California.

13   Q.  What type of work did you do in the video game industry?

14   A.  I was a technical artist.

15   Q.  And what's that?

16   A.  Basically, a translator between art and engineering

17   departments.

18   Q.  And apologies, because neither of those are my world.

19   Can you give us, in layman's terms, what that does?

20   A.  Yeah.  Basically, an artist would come to me and say,

21   Hey, I want to put this in the video game, and then I would

22   work with the engineering department to figure out how to

23   best implement that.

24   Q.  Okay.  Is that the same type of work you were doing once

25   you moved to California and were no longer affiliated with

1    the Guard?

2    A.  It was.

3    Q.  Did you eventually start your own business?

4    A.  I did.

5    Q.  When abouts was that?

6    A.  Early 2017.

7    Q.  And what type of work did that business do?

8    A.  Mostly TV and film production.

9    Q.  What types of things did that business that you started

10   do for TV and film production?

11   A.  Worked on a bunch of different TV shows.  Do you want me

12   to name specifics?

13   Q.  You don't need to name --

14   A.  TV shows and movies, you know, stuff that you've

15   probably heard of.

16   Q.  And what types of work did you do for those shows and

17   movies?

18   A.  Basically, the same thing, but just doing it for

19   Hollywood rather than video games.

20   Q.  Okay.  Did you -- were you still in California

21   physically at that point in time?

22   A.  No.

23   Q.  Where were you living at the time you were working on

24   these TV shows and films?

25   A.  Syracuse, New York.

1    Q.  Why were you back in Syracuse?

2    A.  I wanted to move back home to my family.

3    Q.  Now, at the time that you had moved to back to Syracuse

4    and were starting this company, were your politics

5    conservative, liberal, something else?

6    A.  At that point, they were pretty conservative.

7    Q.  Now, you mentioned that you worked with people in

8    Hollywood; correct?

9    A.  Yes.

10   Q.  And as someone who had conservative politics at that

11   time, was it easy, hard, something else for --

12            MR. JAUREGUI:  Objection.  Relevance, Judge.

13            THE COURT:  Overruled.

14            THE WITNESS:  It was difficult.  It was pretty

15   frustrating.

16   BY MR. KENERSON:

17   Q.  How is that?

18   A.  I could not speak about my politics at all.  People

19   could speak to, you know -- very liberal industry.  So

20   people could speak to me about their politics, but I

21   couldn't ever respond back in kind.

22   Q.  Why did you not feel like you could respond back in

23   kind?

24   A.  I knew if I was known as a conservative, I would start

25   losing contracts.  I wouldn't be able to keep working and,

1    you know, I had a lot of people working for me, so I decided

2    to keep quiet instead.

3    Q.  Were you still doing that work with your company in the

4    fall of 2020 and the first few weeks of 2021?

5    A.  I was.

6    Q.  Was your business successful?

7    A.  It was.

8    Q.  About what type of hours were you keeping during that

9    time period?

10   A.  Usually 18-hour days 7 days a week.

11   Q.  And were those hours -- keeping those types of hours

12   affecting your mental health at all?

13   A.  They were.

14   Q.  How so?

15   A.  It was starting to impact my marriage.  I was working

16   way too hard, you know, not getting enough sleep.  I was

17   traveling a lot, too.  I was constantly in California.  So

18   it just -- it was starting to really take a drain on

19   everything.

20   Q.  Did you have any sort of an outlet like friends, bowling

21   league, clubs, anything like that?

22              MR. JAUREGUI:  Objection.  Relevance.

23              THE COURT:  Overruled.

24              THE WITNESS:  Not really.

25   BY MR. KENERSON:

1    Q.  During the time that you were working those types of

2    hours and -- during the time that you were working those

3    types of hours, when you were not working or sleeping, what

4    were you generally spending your time doing?

5    A.  Either playing video games or reading about politics.

6    Q.  And where were you getting your information about

7    politics?

8    A.  Generally, from a website called TheDonald.win.

9    Q.  And could you just give us a very high-level description

10    of what the website TheDonald.win was.

11    A.  Described itself as a never-ending Trump rally.

12    Q.  Let me ask you a couple of questions about the 2020

13    election.  Did you pay attention to the 2020 election?

14    A.  I did.

15    Q.  Were you happy with the results of that election?

16    A.  I wasn't.

17    Q.  That was "not"?  Sorry.

18    A.  I -- yeah, I was not.

19    Q.  What was your personal reaction once media outlets

20    starting calling the election for Biden?

21    A.  I was pretty upset about the whole thing.

22    Q.  And were you seeking out information?

23    A.  I was.

24    Q.  What sources were you seeking that information from?

25    A.  Still on that website, TheDonald.win.  I was going to,

```
 1    you know, any official sources I could to -- President
 2    Trump's legal team that was on Twitter, a lot of the news
 3    pundits, just trying to get as much information as I could
 4    of what was going on.
 5    Q.  Thank you.
 6             Have you ever been a member, Mr. Greene, of a
 7    group known as the Proud Boys?
 8    A.  I was.
 9    Q.  Are you currently a member?
10    A.  No.
11    Q.  Why not?
12    A.  Really, after, you know, everything that happened, I had
13    a, kind of, slap in the face of, you know, where I had gone
14    in my life.
15    Q.  And when you say "everything that happened," what are
16    you referring to?
17    A.  The events of January 6th.
18    Q.  Now -- so on January 6th, 2021, were you a member of the
19    Proud Boys?
20    A.  I was.
21    Q.  When abouts, just rough estimate of date, did you join
22    the Proud Boys?
23    A.  Late December --
24    Q.  Late December --
25    A.  -- or early --
```

1    Q.   -- of what --

2    A.   -- early December 2020.

3    Q.   2020?

4    A.   Yeah.

5    Q.   Let me ask you, Mr. Greene.  How did you first hear

6    about the Proud Boys?

7    A.   I remember seeing them sometime around the 2016

8    election, you know, probably afterwards of, you know, videos

9    I had seen of street fighting happening across the nation

10   and the Proud Boys were a part of it.

11   Q.   And did anything appeal to you about the Proud Boys?

12   A.   Yeah.

13   Q.   What?

14   A.   I liked the fact that they seemed to be standing up to

15   some of the street violence, responding to people being

16   harassed on the streets.  I -- it was -- in my mind, it

17   looked like people that were defending the defenseless.

18   Q.   And did you see any particular videos that gave you that

19   impression?

20   A.   There was one that really stood out in my mind.

21   Q.   And can you just give us a description of that video

22   that you saw.

23   A.   Yeah.

24            MS. HERNANDEZ:  Objection, Your Honor.  Relevance.

25            THE COURT:  Overruled.

```
1              THE WITNESS:  It would have been sometime after
2     the November 2020 election, probably soon after, maybe,
3     like, late -- early -- or mid to late November.  There was
4     a -- the first Stop the Steal rally that happened here in
5     D.C., and there was a video of --
6              MS. HERNANDEZ:  I'm sorry, Your Honor.  May we
7     have a sidebar, please?
8              (Bench conference:)
9              MS. HERNANDEZ:  I don't know where this is going,
10    but as the Court may recall, the video that the Court
11    excluded is from November 2020, and if that's where we're
12    going, Your Honor, I would move to stop this right now.
13             THE COURT:  Mr. Kenerson, what's the -- I mean,
14    broadly speaking, he's describing why he joined the
15    organization.  I think that's perfectly within bounds.  But,
16    Mr. Kenerson, what's he going to say?
17             MR. KENERSON:  I can assure the Court it is not
18    the video that Ms. Hernandez is worried about.  He -- I
19    believe that he's going to testify that he saw a video that
20    would essentially show that members of the Proud Boys
21    stopped members of Antifa from attacking, essentially,
22    normies, conservative citizens who were out just at the
23    rally.
24             THE COURT:  Okay.
25             MR. SMITH:  Your Honor, we don't understand the --
```

 1    this is Mr. Smith for Mr. Nordean.

 2              We don't understand the relevance of his

 3    motivation -- the witness's motivations for joining the

 4    Proud Boys.  This is just general Proud Boys testimony that

 5    we're objecting to, again, here on 401 and 403 grounds.  The

 6    Government said it was not putting the Proud Boys on trial,

 7    and it is -- this is guilt by association evidence like in

 8    some of the pretrial cases we cited for the Court.

 9              THE COURT:  I'm going to overrule the objection.

10    He's just -- he's actually describing something he find- --

11    it's not at all a negative thing, and he's describing them

12    defending people.  So no, he can describe how he came to be

13    recruited into and to join the Proud Boys.

14              MR. SMITH:  This -- these are street fights, Your

15    Honor, not defense.  So the Government is --

16              THE COURT:  No, that's not --

17              MR. SMITH:  -- presenting street fights.

18              THE COURT:  That's not what Mr. Kenerson just

19    represented.  You weren't listening to him.

20              MS. HERNANDEZ:  But the defendant -- the witness

21    did say earlier that he saw street fighting.

22              THE COURT:  I understand.  I -- look, this -- the

23    overall concept of linking street fighting here, without

24    placing blame on either side, is already part of the trial

25    for different reasons.

```
 1                         Mr. Pattis?

 2                  MR. PATTIS:  I heard the Court say how he was

 3     recruited into the Proud Boys.

 4                  THE COURT:  Well --

 5                  MR. PATTIS:  I don't know that that's a

 6     characterization --

 7                  THE COURT:  Fair.

 8                  MR. PATTIS:  -- that we would adopt, and I just

 9     don't know where we're headed.  I thought I should note that

10     for what it's worth.

11                  THE COURT:  Fair.  How he came to join.  We'll put

12     it that way.

13                  MR. KENERSON:  Your Honor, while we're still here

14     on the phone -- this is Erik Kenerson -- the -- I do

15     expect -- just to clarify the street fighting, I don't

16     expect him to use that word in relation to this video, but

17     it would be the Proud Boys, kind of, being physical and

18     defending what they saw was an attack by Antifa.

19                  THE COURT:  I understand.  He can -- this is fair

20     testimony for him to explain how he wound up in the

21     situation he was in on January 6th.

22                  MS. HERNANDEZ:  Your Honor, how is that relevant

23     to the issues in this case?

24                  And, second, Your Honor, apparently, we've had

25     this issue about the jury hearing our objections.  I think
```

1    Mr. Kenerson needs to point himself more towards the other

2    side.

3            THE COURT:  All right.  Mr. Kenerson, it -- the

4    main thing is, I think, that we keep our voices down.

5            I'm going to overrule the objection.

6            (Return from bench conference.)

7            MR. KENERSON:  Thank you, Your Honor.

8    BY MR. KENERSON:

9    Q.  Mr. Greene, you were describing, I think, this video

10   that you had seen.  Can you please continue?

11   A.  All right.  I -- there was a Stop the Steal rally in

12   November during the day.  And the video basically had showed

13   that there were some women and children that had gone to --

14   gone out to dinner, and it was dark by the time they were

15   leaving the restaurants, and as they were walking back to

16   their hotels, they were being, I guess, accosted by a bunch

17   of people on the street.  And the video showed, you know --

18   I guess how I look back at it now, you know, almost, kind

19   of, like, a propaganda video of the Proud Boys coming out

20   and defending these people, responding, you know, in force

21   to the people that were harassing people who are just trying

22   to walk back to their hotel.

23   Q.  And did that appeal to you at the time?

24   A.  It did.

25   Q.  Why?

1    A.  That, kind of, fit into, you know, my idea of defending

2    the defenseless, you know?  If people couldn't walk the

3    streets of the Capital, you know, unharmed, you know, for

4    just protesting, you know, then I felt like there was

5    something wrong with that.

6    Q.  Now, you described it as propaganda video.  Did you view

7    it that way at the time?

8    A.  No.

9    Q.  So what, if any, steps did you take to try to join the

10   Proud Boys after you saw that video?

11   A.  I went to the -- I don't know the exact website, but it

12   was the -- a Proud Boy website, I guess, for the global

13   organization.  And there was a map on there of where Proud

14   Boy chapters were.  Clicked on the State of New York and

15   found there was a CNY Proud Boy group.

16   Q.  And you said CNY.  What does that stand for?

17   A.  Central New York.

18   Q.  And does that include the area of Syracuse?

19   A.  It does.

20   Q.  Did you reach out to the CNY chapter?

21   A.  I did.

22   Q.  What steps did you take to reach out to the CNY chapter?

23   A.  There was an email address on there.  I can't remember

24   if there was any specific instructions.  It just said if you

25   want to join, I think, something like that, you know, send

```
 1    this email a message.

 2    Q.  Did you do that?

 3    A.  I did.

 4    Q.  And did you hear back?

 5    A.  I did.

 6    Q.  And approximately how long did you take to hear back?

 7    Like, was it hours?  Days?  Weeks?

 8    A.  Maybe a week or two.

 9    Q.  Once you heard back -- don't tell us the exact words of

10    the email, but essentially, were you given any instructions

11    or anything like that?

12    A.  I was given a set of instructions of what to do next.

13    Q.  And can you just give us a general overview of what

14    those instructions were.

15    A.  Right.  I had to, basically, write a paragraph

16    describing why I wanted to join the Proud Boys; what I could

17    offer to the group; and I believe I also had, at that point,

18    sent a selfie video back repeating a Proud Boys mantra, I

19    guess.

20    Q.  Do you remember the exact words of that mantra?

21    A.  Something along the lines of, you know, I'm proud or

22    unashamed to be a Western chauvinist.

23    Q.  Did you do that?

24    A.  I did.

25    Q.  Did you send them the note?
```

1    A.   I did.

2    Q.   What happened after you did that?

3    A.   I heard back from them and I was -- I believe it was the

4    president of the chapter, and he had told me to download

5    Telegram.

6    Q.   And what did you understand Telegram to be?

7    A.   I guess just a -- an app on a phone with, like, chat

8    rooms and individual messaging you could do.

9    Q.   Had you used Telegram prior to that point?

10   A.   No.

11   Q.   Is it relatively intuitive, once you had it downloaded,

12   how to use it?

13   A.   It was.

14   Q.   So you download Telegram to your phone.  What happens at

15   that point?

16   A.   I had to make an account on there, and then the response

17   email I had gave me a Telegram handle to message.

18   Q.   Did you send a message to that Telegram handle?

19   A.   I did.

20   Q.   All right.  Did you have to create a Telegram handle?

21   A.   When you make the account, I believe you have to.  I

22   think I had used my real name at that point.  The message I

23   got back was, Hey, change this to something that you can't

24   be identified with, and then as soon as --

25            MS. HERNANDEZ:  Objection.  Hearsay.

```
1            THE COURT:  Overruled.
2    BY MR. KENERSON:
3    Q.  Go ahead.
4    A.  So basically, yeah, something I, you know, can't be
5    identified with, and then I -- once that was done, then I
6    was put into a prospecting channel.
7    Q.  Okay.  And the name -- you said you initially used your
8    real name; correct?
9    A.  I did.
10   Q.  What was the name that you wound up choosing that
11   couldn't be identified?
12   A.  Publius.
13   Q.  P-U-B-L-I-U-S?
14   A.  Yes.
15   Q.  Why did you choose Publius?
16   A.  I had just finished reading the Federalist Papers.
17   Q.  So you said you were put in a prospecting chat.  Can you
18   tell us what that was like.
19   A.  It was with a bunch of other people that were looking to
20   join the Proud Boys.  It was just a lot of different
21   conversations that were, you know, happening.  There was
22   definitely some people there that were a little off the wall
23   from my vantage point.
24   Q.  Now, you said your name was -- in that channel was
25   Publius; correct?
```

1    A.   Yes.

2    Q.   Other people who were in that channel, did they also

3    have names that did not -- handles that did not appear to be

4    their real name?

5    A.   Yeah.

6    Q.   So people, for example, might know you as Publius but

7    not as Matt?

8    A.   Yep.

9    Q.   And you would know people as their handles?

10   A.   Yes.

11   Q.   In -- about how many people were in this prospecting

12   channel at the same time as you?

13   A.   Maybe around 20.

14   Q.   And, at that point, were you considered to be a full

15   member of the CNY chapter of the Proud Boys?

16   A.   No.

17   Q.   What had to happen before you became a full member of

18   the CNY chapter?

19   A.   You had to go through a vetting process.

20   Q.   What did that vetting process entail?

21   A.   I believe it was three separate meetings with at least

22   two other prospects.  So three people in total.  And once

23   you had the meeting, you had to send a message to the

24   vetting coordinator -- or I can't remember what the exact

25   name was.

1    Q.  The members in this channel, I think you said it was

2    about 20 or so other people who were trying to become

3    members.  Was there anyone in this channel who was actually

4    a full member of the Proud Boys?

5    A.  There was.

6    Q.  How many?

7    A.  One to my knowledge.

8    Q.  One to your knowledge?

9    A.  Yeah.

10   Q.  What was that person's role?

11   A.  The vetting coordinator or whatever it was.

12   Q.  For the CNY chapter?

13   A.  For the CNY chapter.

14   Q.  So the 20 or so other than that one person who was the

15   vetting coordinator, was it your understanding that they

16   were also not full members of the Proud Boys at that point?

17   A.  That was my understanding.

18   Q.  Now, when you were in this prospect chat, had you, at

19   that point, been admitted to any of the Proud Boys chats

20   that existed in CNY for full members?

21   A.  No.

22   Q.  And let me ask you, were you -- prior to January 6th,

23   were you a member of any national Proud Boys chats?

24   A.  No.

25   Q.  Were you ever the member of a chat group called Ministry

1    of Self-Defense?

2    A.   No.

3    Q.   Ever a member of a chat group called Skull and Bones?

4    A.   No.

5    Q.   Are you familiar with the term "elders" as it's used by

6    the Proud Boys?

7    A.   I am.

8    Q.   Were you ever an elder?

9    A.   No.

10    Q.   Did you have any -- in the lead-up to January 6th, did

11    you have any personal contact with Proud Boys national

12    leadership?

13    A.   No.

14    Q.   Did you have any personal contact with Joe Biggs?

15    A.   No.

16    Q.   Any personal contact with Ethan Nordean?

17    A.   No.

18    Q.   Any personal contact with Zachary Rehl?

19    A.   No.

20    Q.   Any personal contact with Enrique Tarrio?

21    A.   No.

22    Q.   So far as you know, were you in any Telegram groups with

23    them in the lead-up to January 6th?

24    A.   No.

25    Q.   What about someone with the Telegram handle Noble Beard?

1    Were you in any Telegram chats with that person in the

2    lead-up to January 6th?

3    A.   No.

4    Q.   What about someone with the handle Johnny Blackbeard?

5    A.   No.

6    Q.   How about someone with the handle Aaron of the Bloody

7    East?

8    A.   No.

9    Q.   Let me ask you, did joining the Proud Boys give you any

10   sort of an outlet that you weren't getting with your work

11   schedule at that point?

12            MS. HERNANDEZ:  Objection.

13            THE COURT:  Overruled.

14            THE WITNESS:  It did.

15   BY MR. KENERSON:

16   Q.   What type?

17   A.   I was with a bunch of like-minded people.  I could speak

18   freely about politics and how I felt about the state of the

19   country without worrying about losing my career.

20   Q.   You mentioned earlier that you were upset with the

21   election results.  Did you have conversations about that

22   election in this prospecting group chat?

23   A.   I did.

24   Q.   And what was the general tenor of those conversations?

25   A.   Angry, disappointed, upset.

1    Q.   And, again, in this, kind of, November 2020 time frame,

2    were you aware that there were ongoing legal challenges to

3    the election?

4    A.   I was.

5    Q.   Were those still ongoing at the time you were, kind of,

6    in this prospecting chat?

7    A.   They were.

8    Q.   At that point, were you hopeful that the challenges

9    would resolve in President Trump's favor?

10   A.   I was.

11   Q.   Mr. Greene, did you go to a rally here in Washington,

12   D.C. in December 2020?

13   A.   I did.

14   Q.   How did you learn about that rally?

15   A.   One of the other prospects had mentioned that there was

16   going to be a big Proud Boy rally that was nationally

17   endorsed.

18   Q.   And the fact that it was nationally endorsed, did that

19   appeal to you in your quest to join the Proud Boys?

20   A.   It did.

21   Q.   How so?

22   A.   You needed to -- after the three vetting meetings, you

23   needed to go to either a local meeting or a national meeting

24   to be voted in as a first degree.

25   Q.   Is that part of the reason why you wanted to go?

1    A.   Yep.

2    Q.   Had you been to a national Proud Boys event prior to the

3    December 2020 rally?

4    A.   No.

5    Q.   Did you have an understanding one way or the other as to

6    whether that rally was related to the 2020 election?

7    A.   Yeah, it was related to the election.   It was --

8    Q.   Your understanding is that it was?

9    A.   Yeah.

10   Q.   And you went down -- who did you come to D.C. with?

11   A.   One other prospect.

12   Q.   Okay.   And at the time that you came to D.C. for this

13   rally, were you yet a full-blown member of the Proud Boys?

14   A.   No.

15   Q.   So were you in any of the CNY chats for full-fledged

16   members at that point?

17   A.   No.

18   Q.   Still just the prospect chat?

19   A.   Yes.

20   Q.   Okay.   When you were in -- and you came to D.C. with

21   this one other prospect; correct?

22   A.   Yes.

23   Q.   Did you meet other members of the Proud Boys when you

24   were here in Washington, D.C.?

25   A.   I did.

1    Q.  Did that include some members from the CNY chapter?

2    A.  It did.

3    Q.  Did you spend time with someone you came to learn as

4    named Spaz or Spazzo during December 2020?

5    A.  I did.

6    Q.  Was this rally the first time you spent significant time

7    with him?

8    A.  I believe so.  Yes.

9    Q.  At that point, what did you understand this person's

10   role in the Proud Boys to be?

11   A.  A low-level Proud Boy but pretty respected within the

12   group.

13   Q.  You said pretty respected?

14   A.  Yeah, within the group.

15   Q.  Okay.  And then after the December rally -- we'll get to

16   this in a moment -- but did you become a full-fledged member

17   of the Proud Boys at some point after the December rally?

18   A.  I did.

19   Q.  After you did, did you have opportunity to spend

20   additional time with this person who you know as Spaz or

21   Spazzo?

22   A.  I did.

23   Q.  Did you ultimately travel to Washington, D.C., with him

24   on January 6th?

25   A.  I did.

```
1   Q.  If you were to see Mr. -- this person today, would you
2   recognize him?
3   A.  Yes.
4   Q.  Do you see him in the courtroom here today?
5   A.  I do.
6   Q.  Can you point him out by where he's seated and something
7   he's wearing.
8   A.  He's in the back corner.  He has earplugs in,
9   salt-and-pepper hair.  I can't see his shirt color or --
10  Q.  Salt-and-pepper hair, you said?
11  A.  Yeah.
12          MR. KENERSON:  Your Honor, would the record
13  reflect an in-court identification of Defendant Pezzola?
14          THE COURT:  Any objection?
15          MR. METCALF:  No objection.
16          THE COURT:  All right.  Without objection, the
17  record shall reflect.
18  BY MR. KENERSON:
19  Q.  This rally that you came to in Washington in December of
20  2020, did that take place over one day or multiple days?
21  A.  I was here for two days.
22  Q.  Okay.  Let me ask you about the first day.  On the first
23  day that you were here, did you arrive in the daylight or
24  after it had already gotten dark?
25  A.  After dark.
```

1    Q.   Okay.  And did you know where to go?

2    A.   Not really.

3    Q.   Where did you wind up?

4    A.   I believe it was outside of a bar named Harry's.

5    Q.   And how did you know to go to the bar named Harry's?

6    A.   Another prospect that had been talking to other -- I

7    guess, full-fledged members of the CNY Proud Boys had said,

8    Everybody's going to be at Harry's.

9    Q.   And what was your understanding of the significance, if

10    any, of Harry's?

11    A.   That it was either --

12              MR. METCALF:  Objection, Your Honor.  Calls for an

13    opinion.

14              THE COURT:  Overruled.

15              And, sir, if you could just keep your mouth closer

16    to the microphone.  Thank you.

17              THE WITNESS:  Yes, Your Honor.

18              Either it was neutral or friendly territory.  That

19    was, kind of, my understanding.

20    BY MR. KENERSON:

21    Q.   And can you just describe for us what -- when you

22    arrived at Harry's -- you said this was after dark?

23    A.   Yes.

24    Q.   What was the scene like when you got there?

25    A.   There's a lot of people.  It was, kind of, disjointed.

1    Q.   And, kind of -- when you say "a lot of people," is this

2    inside Harry's?  Outside Harry's?  Both?

3    A.   I actually didn't go inside, but I saw a lot of people

4    outside.

5    Q.   Okay.  And were those people wearing what you've come to

6    know as colors?

7    A.   I believe so.

8    Q.   And can you describe for the jury what colors means in

9    reference to the Proud Boys?

10   A.   Black and gold.

11   Q.   So black and gold attire --

12   A.   Yeah.

13   Q.   -- essentially?

14   A.   Yep.

15   Q.   Did you participate with that group that you met up

16   wearing black and gold in any sort of a march on the evening

17   that you arrived there?

18   A.   I did.

19   Q.   What type of a march?

20   A.   I guess it was, kind of, described to me as just a

21   normal night march of walking around the city in a large

22   group.

23   Q.   Now, about how many people participated in this march?

24   Are we talking, like, five?  10?  50?  100?  Something more?

25   Something less?

1    A.  It was thousands.

2    Q.  During your experience down in D.C. in 2020, did you

3    hear the members of the group that you marched around with

4    doing any sort of chants?

5    A.  I did.

6    Q.  What types of chants did you hear?

7    A.  They were pretty varied.  There was, Fuck Antifa.  Whose

8    streets?  Our streets.  Fuck around and find out.

9    Q.  Did you -- in what context was the chant, Whose streets?

10   Our streets, generally used?

11   A.  Can you --

12              MS. HERNANDEZ:  Objection.

13              THE COURT:  Overruled.

14   BY MR. KENERSON:

15   Q.  In what context?  What were you and the group you were

16   with tending to be doing when the chant, Whose streets?  Our

17   streets, was used?

18   A.  From my perspective, where I was, it was the same reason

19   I had joined the Proud Boys, of securing the streets,

20   basically.

21              MR. HULL:  Your Honor, forgive me.  Voice up.

22   This time for counsel.

23              THE COURT:  All right.  Again, close and just

24   voice up as well, Mr. Greene.

25              THE WITNESS:  Okay.

```
 1              THE COURT:  Thank you.
 2              MR. KENERSON:  And I believe Mr. Hull was
 3    referring to me as well, and I will do my best.
 4    BY MR. KENERSON:
 5    Q.  Okay.  So did you come to learn of a phrase called --
 6    that is pronounced "uhuru" during your time down in D.C. on
 7    December 12th?
 8    A.  I did.
 9    Q.  And did you get a sense one way or the other whether
10    that phrase was associated with the Proud Boys is?
11    A.  It was associated with the Proud Boys.
12    Q.  Did you ever learn what it means?
13    A.  Not that I recall.
14    Q.  Okay.  In what context would members of the Proud Boys
15    use the chant Uhuru?
16    A.  It was, kind of, like, a rally call.  People would say
17    it, you know, if you did something good, if you -- to pump
18    people up.
19    Q.  Okay.  Now, I'm going to put my hand up into a gesture
20    here, (indicating) my thumb and fore- -- thumb and index
21    finger in a circle, three other fingers.  Do you -- up.  Do
22    you recognize this hand gesture?
23    A.  I do.
24              MS. HERNANDEZ:  Objection, Your Honor.  What --
25              THE COURT:  Can I have counsel just pick up the
```

1    telephone?

2            (Bench conference:)

3            MR. SMITH:  Your Honor, we've already moved for a

4    mistrial based on what we --

5            THE COURT:  Hold on.  Hold on.  Mr. Smith, stop

6    talking.

7            Ms. Hernandez, you lodged the objection.

8            MS. HERNANDEZ:  Right, Your Honor.  Again, we're

9    going into this territory of Proud Boys -- I understand the

10   Court has given him some leeway to describe this.  But where

11   are we going?  Is he going to --

12           THE COURT:  Well, I -- let me just ask

13   Mr. Kenerson.

14           What do you expect the answer -- I know there was

15   an unanticipated answer to this question earlier.  What do

16   you anticipate the answer to this question to be?

17           MR. KENERSON:  That he picked up from the fact

18   that everyone using it wasn't using it -- that it was a hand

19   gesture associated with the Proud Boys, but that he never

20   learned anything more than that.

21           THE COURT:  All right.  I mean --

22           MR. SMITH:  Your Honor, we move for a mistrial.

23   Again, we -- the Government is deliberately inserting this

24   inflammatory gesture to suggest racism of the defendants;

25   that this prosecutor has been warned -- admonished once that

```
 1    this was inappropriate --
 2              THE COURT:  Mr. Smith, you've got to keep your --
 3    Mr. Smith, for the last time, calm down --
 4              MR. SMITH:  Your Honor, I'm calm --
 5              THE COURT:  -- and keep your -- and keep -- no,
 6    I'm observing you and you're -- for the umpteenth time,
 7    you're having trouble controlling yourself, and keep your
 8    voice down.  I can -- I -- keep your voice down.  You may
 9    proceed.
10              MR. SMITH:  Your Honor, we are moving for a
11    mistrial because the Government is deliberately inserting
12    inflammatory testimony suggesting the defendants are racist
13    after this same prosecutor attempted this one time before.
14    The evidence was struck.  It can only be conceived of as
15    deliberate at this point.
16              THE COURT:  Oh, Mr. Smith --
17              MR. SMITH:  A mistrial --
18              THE COURT:  Mr. Smith --
19              MR. SMITH:  -- is warranted.
20              THE COURT:  All right.
21              It -- Mr. Pattis?
22              MR. PATTIS:  I would object on relevance grounds
23    at this point.  My understanding is the case is -- as to
24    these discrete activ- -- individuals for the defendant- --
25    their activities on January 6th, and I don't see the
```

```
 1    relevance of hand gestures and so forth as to the
 2    communications that I'm aware of --
 3              THE COURT:  All right.
 4              MR. PATTIS:  -- on the 6th.
 5              THE COURT:  So let me just -- is there any
 6    relevance to this, Mr. Kenerson, beyond just, sort of,
 7    linking this gentleman to the Proud Boys?
 8              MR. KENERSON:  I think the association of this
 9    symbol with the Proud Boys, having nothing to do with race,
10    is very relevant because on the 6th, I think, as
11    Mr. McCullough opened, a number of individuals who are
12    associated with the Proud Boys, including Mr. Pezzola,
13    including people who we will allege to be co-conspirators
14    and whose activities we expect to come in under the Court's
15    tools --
16              MS. HERNANDEZ:  I'm sorry, Your Honor.  People at
17    counsel table who aren't on the phone can hear Mr. Kenerson.
18    I know I've had that problem before.  So I don't know --
19              THE COURT:  All right.  So --
20              MS. HERNANDEZ:  We're back to that issue of
21    whether the jury can hear him.
22              THE COURT:  All right.  Mr. Kenerson, if you can
23    keep your voice down, please.
24              MR. KENERSON:  Sorry.  I thought I was near a
25    whisper.  I wanted to make sure you could all hear.
```

1          So a number of members of the Proud Boys,

2    including defendants in this trial -- I can think of, off

3    the top of my head, Pezzola, Biggs, Rehl, and Nordean -- all

4    used that gesture in connection to actions they took on

5    January 6th, as did a number of the people who we will be

6    alleging to be co-conspirators and tools.  So I think that

7    the -- establishing that that hand gesture is associated

8    with the Proud Boys is extremely relevant.  We also opened

9    on that without objection.

10         MR. SMITH:  And, Your Honor, if we may have a

11   response to the Government, Your Honor will recall that when

12   it last struck the exact same testimony that this prosecutor

13   attempted to elicit, the response from the witness was that

14   it was a white power symbol, Your Honor.  So to suggest now

15   that this has nothing to do with --

16         THE COURT:  Mr. Smith, I'm going to have to ask

17   you, again -- because I can hear you.  I can hear you.  I

18   don't know what to do.  You have to keep your voice down,

19   sir.  You have to keep your voice down.

20         MR. SMITH:  Your Honor, I'm going to put my hand

21   in front of the phone so that no one can hear me.

22         THE COURT:  Okay.

23         MR. SMITH:  Okay.  So Your Honor will recall

24   that -- when we had this exact same exchange before with the

25   Government, and the answer that was elicited from the

 1    Government's witness when the same prosecutor asked, it was

 2    that it's a white power symbol.  Now, several days later,

 3    the same prosecutor has represented to the Government that

 4    this has nothing to do with --

 5                 THE COURT:  All right.

 6                 MR. SMITH:  -- racism.

 7                 MR. PATTIS:  (Indicating.)

 8                 THE COURT:  Mr. Pattis, quickly.

 9                 MR. PATTIS:  Would the Court consider a break to

10    air this out?  I'm hearing some things for the first time

11    such as the use of the hand signal on January 6th.

12                 THE COURT:  Well, I don't know that it's a hand --

13    we're going to have a -- all right.  We're at a time when we

14    have to break now or within 10 minutes of now.  So we'll

15    take a quick break.  But, look, let me just say this while

16    we're on the phone.  The basis that Mr. Kenerson has

17    articulated particularly that other people other than the

18    defendants but that they will link to the defendants through

19    the -- other people who were, for example, marching with

20    them or linked with them factually that day and through

21    Proud Boys membership, that they all used that symbol on

22    that day or many of them did strikes me as making this

23    relevant testimony.

24                 MR. SMITH:  So Your Honor, because they're all

25    members of the Proud Boys and that's not in dispute, there

1    is no purpose for showing the symbol --

2                THE COURT:  No, but we --

3                MR. SMITH:  -- because they're already members of

4    the --

5                THE COURT:  We --

6                MR. SMITH:  -- Proud Boys --

7                THE COURT:  We won't know -- Mr. Smith, until the

8    particular people -- I mean, they have the ability to tie

9    them together with that evidence.  And I take your point

10   that they got an unexpected answer the last time, but I

11   don't think that means they can't elicit the testimony they

12   do anticipate.

13               So look, I'm going to -- we're going to take a

14   break.  We're going to take a break and you all can talk

15   about it, and my inclination is that this is absolutely fair

16   game.

17               (Return from bench conference.)

18               THE COURT:  All right.  Ladies and gentlemen,

19   we're going to take a quick 10-minute morning break.  We'll

20   be back in about 10.

21               (Jury returned to jury room.)

22               THE COURT:  You all may be seated.

23               Sir, you may step down, if you'd like.

24               (Witness steps down.)

25               We'll be in a 10-minute recess.  I'll wait for --

1    I guess I'll wait for Ms. Harris to say that.  There she is.

2    We'll be in a 10-minute recess.

3              THE DEPUTY CLERK:  All rise.  This Honorable Court

4    stands in recess for 10 minutes.

5              (Brief recess taken.)

6              THE DEPUTY CLERK:  Your Honor, we're back on the

7    record in Criminal Matter 21-175, United States of

8    America v. Ethan Nordean, et al.

9              MR. SMITH:  Your Honor, we would just like to put

10   into the record something very briefly.  The Court indicated

11   that -- before, when we were making an objection to the

12   Government eliciting what could be "white power" testimony,

13   the Court indicated that I had lost my temper and it was

14   being very -- so, Your Honor, I would just like to -- so I'm

15   going to have Mr. Roots, who is counsel for Mr. Pezzola,

16   speak into the record about his observations relating --

17   pertaining to this issue.

18             THE COURT:  Sure.

19             MR. ROOTS:  Yeah, I would just like to make a

20   record.

21             I'm sitting right next to Mr. Smith.  He's never

22   uncalm.  He's -- he is a serious litigator who seriously

23   objects and he is by no means uncalm or uncollected.

24             MR. SMITH:  And --

25             THE COURT:  All right.

1      MR. SMITH:  Thank you, Your Honor.  And I just
2  would like to add one more --
3      THE COURT:  No, no, I -- before you -- well, go
4  ahead.  Finish --
5      MR. SMITH:  Yeah.  So Your Honor, what I was
6  objecting to was -- I'll just say it very briefly again.
7  And on a previous day of testimony, Mr. Erik Kenerson, a
8  U.S. Attorney -- an Assistant United States Attorney for the
9  Government, elicited testimony --
10      THE COURT:  This is on the -- hold on.  Mr. Smith,
11  this is all on the record already.
12      MR. SMITH:  Yes, Your Honor.  I was just going to
13  explain why we were objecting vociferously rather than
14  heatedly to this issue.  So Your Honor, we -- our -- it is
15  true that we are taking the position that it is manifestly
16  inappropriate to elicit this testimony, and we believe that
17  it is not a close 403 call, but at no time did I want to
18  suggest to Your Honor that I have personal feelings or
19  hostility towards the Court or the Government about this
20  issue.
21      THE COURT:  All right.  Very well.  And I want to
22  just say one thing about my observations.  I did not -- by
23  saying what I said about, Mr. Smith, your -- the way you
24  were objecting, I don't -- I didn't see it, and I didn't
25  mean to suggest, that you were angry at me or angry about

```
1    anything.  I do think my -- I do think there are times when
2    you -- your voice gets raised and you -- from other noises I
3    can hear on the -- again, when we're on the microphone, that
4    you get very -- well, I'll just say you -- sometimes I'm
5    concerned about whether you can keep your voice at a volume,
6    number one, that's -- so that the jury can't hear, but
7    putting that aside, that's just simply appropriate for
8    federal court.  Whether that's anger, whatever emotion, I'm
9    not suggesting you're angry at me or anyone in particular,
10   but that's why I said what I said, because we do have to
11   maintain decorum in the courtroom, and I think there are
12   times when you appear to get very emotional.  So that's why
13   I said what I said, again, not -- based on my observations
14   not just today but throughout our trial.
15             MR. SMITH:  And thank you, Your Honor.
16             And I just want to say, if -- it's not emotion.
17   And Your Honor just pointed out that we'd like to keep
18   things in a manner that would be befitting of a federal
19   court, and we are just trying to ensure that the evidence
20   that's admitted in trial is befitting of a federal court by
21   the same token, Your Honor.
22             THE COURT:  And that is fair, and that's why I
23   hear your objections when they come in.
24             MR. KENERSON:  If I may --
25             THE COURT:  Mr. Kenerson?
```

```
 1                     MR. KENERSON:  -- respond?  I think, before we get

 2          to the substance of it, I would --

 3                     THE COURT REPORTER:  (Indicating.)

 4                     THE COURT:  The -- yeah.

 5                     MR. KENERSON:  Thank you, Mr. Court Reporter.

 6                     Before we get into the substance of it, there is

 7          one thing I would like to note.  While I am very flattered

 8          that Mr. Smith thinks I am both as good-looking and as good

 9          of a lawyer as Mr. Mulroe, Mr. Mulroe was the one who

10          directed Nick Quested's testimony.  So I would just note,

11          you know -- I understand -- I take Mr. Smith saying he was

12          not angry at the Court, not angry at the Government, but

13          what he was doing was making an argument to the Court that

14          me personally who had elicited that testimony prior was

15          doing so, again, intentionally just now.  So I understand

16          we're all the Government.  So we live with each other's

17          decisions.  We are all the Government.  I am not -- there

18          was nothing improper about Mr. Mulroe's question, there was

19          nothing improper about my question, and the insinuation that

20          it was AUSA Erik Kenerson who had done this previously and

21          was just doing it again is just completely false.

22                     THE COURT:  It's fair to put that on the record.

23          And, again, I saw Mr. -- let me just say this.  Mr. Mulroe,

24          at the time, said, That wasn't what I thought the witness

25          would say.  And I -- just based on my observations of him at
```

1    that time, I have no reason to question that he did not

2    think that that's what the witness would say.  And that's

3    why, when there was an objection here, I asked you, Well,

4    what do you think the witness would say?  You indicated what

5    it -- what the witness would say.

6              MS. HERNANDEZ:  Your Honor --

7              THE COURT:  So --

8              MS. HERNANDEZ:  I'm sorry.

9              THE COURT:  -- I, you know -- I think we can -- I

10   think we should just move forward.  Again, for the reasons I

11   already articulated, I think it is -- as long as we're

12   talking about this as a -- something associated that he --

13   at least this witness associates with the Proud Boys, I

14   think it's fair game.

15             MS. HERNANDEZ:  Your Honor, I'm sorry.  Before the

16   jury comes back, how much more of this background type of

17   evidence is the Government going to elicit from this witness

18   and the Court going to allow?  I just was --

19             THE COURT:  He -- I don't --

20             MS. HERNANDEZ:  -- trying to figure out --

21             THE COURT:  A lot of this is not even background.

22   He's talked about going -- who he was with on January 6th.

23   He's talking about the 12th.  I don't know that -- I mean,

24   it -- the Government can elicit this testimony.  I don't see

25   this as particularly controversial.  I mean --

```
1            MS. HERNANDEZ:  I thought --

2            THE COURT:  -- it may stray into something

3    controversial and you may object and I'll hear your

4    objection, but --

5            MS. HERNANDEZ:  Yeah, the beginning just seemed

6    like a lot of background, why he joined and his personal --

7            THE COURT:  Well, I think that -- I don't see

8    anything objectionable about that.

9            MS. HERNANDEZ:   Thank you, Judge.

10           THE COURT:  All right.

11           MR. SMITH:  Your Honor, the Proud Boys symbol, the

12   Government -- we're just noting for the record that the

13   Government is calling a gesture where someone makes a

14   circle -- an index finger and thumb connection with three

15   fingers raised beside it as the Proud Boys symbol.  It's a

16   matter of popular knowledge -- it's common knowledge that

17   that's associated in the public mind with white power.  So

18   we're just pointing out that what the Government is doing is

19   taking a symbol and an understanding of something that the

20   public has, which is racism, and then attaching a new label

21   to it and then saying it's relevant to this case.  So we're

22   saying the public -- the jury is -- understands what this

23   symbol means according to the jury and that's what it's

24   being used for.

25           THE COURT:  We -- look, I don't know what to say.
```

```
 1    I -- if the witness is going to say, No, I associate it with
 2    Proud Boy membership, and other witnesses will say that,
 3    too, and it links up with -- in the way Mr. Kenerson said,
 4    I think that -- I think it's fair game.  I don't know what
 5    the jury knows about what that symbol means one way or the
 6    other.
 7              MR. PATTIS:  Mr. Biggs would like to join the
 8    mistrial motion, Judge.
 9              THE COURT:  All right.
10              MR. METCALF:  As would Mr. Pezzola.
11              Your Honor, I just want to indicate one thing for
12    the record.  I don't know if it's my having one eye, but I'm
13    able -- I'm unable to discern Mr. Kenerson from
14    Mr. McCullough on a daily basis.  So I think, maybe, we
15    could identify them by an article of clothing every day and
16    that could help out, just --
17              THE COURT:  Okay.  I -- all right.  It was a joke.
18    All right.  I get it.
19              (Laughter.)
20              I --
21              MR. PATTIS:  I think what he's trying to say is we
22    take no position on aesthetics or their relative merits.
23              THE COURT:  All right.  Very well.
24              Ms. Harris, let's bring in the jury.
25              MR. HASSAN:  Judge, without -- Hassan on behalf of
```

```
 1   Tarrio.

 2               Judge, we join as well, Judge, but that's noted,

 3   Judge.

 4               THE COURT:  All right.  Very well.  I'll -- I deny

 5   that motion.

 6               (Brief pause.)

 7               And the Government may bring the witness back into

 8   the room and have him take the stand.

 9               (Brief pause.)

10               (Matthew Greene resumed the witness stand.)

11               (Brief pause.)

12               MS. HERNANDEZ:  By the way, Your Honor, on the

13   issue --

14               THE DEPUTY CLERK:  Jury panel.

15               (Jury returned to jury box.)

16               THE COURT:  All right.  You all may be seated.

17               Welcome back, ladies and gentlemen.

18               Mr. Kenerson, you may proceed.

19               MR. KENERSON:  Thank you, Your Honor.

20   BY MR. KENERSON:

21   Q.  Mr. Greene, before the break, we were talking about the

22   symbol that I had made; right?  (Indicating.)

23   A.  Yep.

24   Q.  Do you recognize that symbol?

25   A.  I do.
```

1   Q.  In -- December 12th, did you learn one way or the other

2   whether that was associated with the Proud Boys?

3   A.  I saw that it was associated with the Proud Boys.

4   Q.  When you say "saw," can you describe for us, you know,

5   how you came to see that.

6   A.  People I knew to be Proud Boys were making that hand

7   gesture.

8   Q.  Was it relatively common?

9   A.  It was.

10  Q.  So let's talk about the time frame of December -- the

11  December rally, the day that you came down.  Were you still

12  in that prospecting chat?

13  A.  Yes.

14  Q.  And I think you were talking about having discussions

15  earlier with the prospecting -- members of the prospecting

16  chat around the results of the 2020 election; right?

17  A.  Right.

18  Q.  Were you still having those conversations in December?

19  A.  I was.

20  Q.  And what was the tenor of those conversations?

21  A.  Still angry, still frustrated, still upset.

22  Q.  How did the lever -- level of anger, being upset and

23  frustration, compare to how it was in November?

24  A.  I feel like, from my perspective of the people I was

25  talking to, things were starting to get -- people were

1    getting angrier as we got closer to January.

2    Q.  Now, let me ask about -- you said when you were down in

3    Washington, D.C., you met other full members of the CNY

4    Proud Boys, including the person you came to know as Spaz;

5    correct?

6    A.  Correct.

7    Q.  While you were in D.C. with the members of the Proud

8    Boys who were at the rally, did you have similar type

9    discussions?

10   A.  I did.

11   Q.  And what was the tenor of those discussions?

12   A.  Still angry, frustrated, really just questioning what

13   was happening and what was going to happen.

14   Q.  Now, around that time, were you aware of anything going

15   on with some of those legal challenges that you discussed

16   previously to --

17   A.  I was.

18   Q.  -- the election?

19   A.  I was.

20   Q.  What were you aware was happening around that time with

21   the legal challenges?

22   A.  The Supreme Court was going to hear the Texas amicus

23   brief.

24   Q.  And around that time, do you remember whether the

25   Supreme Court decided to take that case or not?

1    A.  I believe it was the night that I got to D.C. in

2    December, I had found out that they had declared that Texas

3    had no standing.

4    Q.  Were there discussions about that?

5    A.  There was.

6    Q.  What was the tenor of those discussions?

7    A.  They were pretty heated.  I myself was personally

8    frustrated, and I was having conversations with people about

9    that.

10   Q.  Was there any discussion within the December rally, the

11   people who you spent time with in the December rally, about

12   what the -- what, if any, role the Proud Boys may have with

13   respect to the election?

14   A.  Definitely, our conversations were starting to change.

15   From the people I was talking to, we were starting to look

16   at us as being ready and willing for whatever was going to

17   happen.

18   Q.  And when you say "us," who do you mean by "us"?

19   A.  Other Proud Boys.

20   Q.  And ready/willing for anything that was going to happen.

21   Can you give us a little bit of an explanation of what you

22   mean by that.

23            MR. PATTIS:  Objection.  Relevance.  Speculative.

24            THE COURT:  Over- --

25            MR. PATTIS:  Asked and answered.

1              THE COURT:  Overruled.

2              THE WITNESS:  There was never any, you know -- a

3    concrete understanding of what that could mean, but there

4    was a lot of conversations as the Proud Boys were looking at

5    ourselves, at least the ones I was talking to, as

6    essentially a tip of the spear of being ready to react if

7    something did happen.

8    BY MR. KENERSON:

9    Q.  That term, "tip of the spear," was that a term that was

10   used in your discussions?

11   A.  It was.

12   Q.  What was your understanding of what that meant?

13   A.  Being front line.

14   Q.  Being front line?

15   A.  Yep.

16   Q.  Front line in what sense?

17   A.  Front line of, you know, whatever was really going to

18   happen.  There was a lot of conversations about the

19   devolving of the country into a civil war.

20   Q.  All right.  You mentioned going on this night march on

21   the night of, I believe it was, December the 11th.  Can you

22   talk to us a little bit about what the mood was within the

23   group during that march.

24   A.  I would describe it as antagonistic.

25              MS. HERNANDEZ:  I'm sorry.  Your Honor, my

```
 1    objection is to the vagueness of the question and the
 2    answers.  He's talking about this monolithic response to
 3    what he saw when --
 4              THE COURT:  Overruled.
 5    BY MR. KENERSON:
 6    Q.  I'm sorry, Mr. Greene.  What was the mood within the
 7    group that you were involved in on the march on the night of
 8    December 11th?
 9    A.  To me, it felt very antagonistic.
10    Q.  What about it felt antagonistic to you?
11    A.  When we were marching around, we were looking for
12    Antifa.  We were looking to try to get as close to them as
13    possible; come face to face with them; and when we
14    eventually did, we were trying to goad them.
15    Q.  Goad?  G-O-A-D?
16    A.  Yes.
17    Q.  Goad them into what?
18    A.  Responding to our verbal abuse into physical
19    confrontation.
20    Q.  What led you to believe that that was, kind of, what the
21    group was trying to accomplish?
22    A.  The screaming, the language that was happening that was
23    directed when we were face to face with a large group of
24    Antifa.
25    Q.  And were -- again, on this night march, the group you
```

1    were with, were there police out?

2    A.   There was.

3    Q.   And what were the police doing?

4    A.   They were guiding both sides around -- I believe they

5    were on bicycles and they were guiding a group of -- large

6    group of the Proud Boys one way, the group of what I

7    understood to be Antifa another way.  They never really let

8    us get any closer than, basically, a street across from each

9    other.

10   Q.   Now, the -- you mentioned the group that you believed to

11   be Antifa.  What about that group led you to believe that

12   they were Antifa?

13   A.   It was how they were dressed, what they were carrying.

14   It was everything that I had understood to be, you know, an

15   Antifa uniform, I guess, from having seen, you know, their

16   interactions on the Internet.

17   Q.   And you said how they were dressed and what they were

18   carrying.  Can you give us some examples first of how they

19   were dressed?

20   A.   The best way I've seen it described is, like, black

21   block, all black, face covered, usually wearing a hat and

22   then makeshift weapons or shields.

23   Q.   That's some of the things they were carrying?

24   A.   Yes.

25   Q.   Okay.

```
1          MS. HERNANDEZ:  I'm sorry.  I couldn't hear -- I'm
2     sorry, Your Honor.  I couldn't hear the answer.  Could you
3     repeat it?
4          THE COURT:  Could you repeat the answer, sir?
5          THE WITNESS:  Yeah.  The whole part about the --
6     okay.  They were wearing what I would describe as black
7     block.  That's the best way -- term I've seen it described.
8     It's all black, usually covered head to toe, faces covered,
9     black hats, and then usually -- and I had seen this on the
10    Internet and I had seen it that night -- makeshift weapons
11    and shields.
12    BY MR. KENERSON:
13    Q.  Okay.  And the people dressed as -- the way you just
14    described, those were the people who you understood to be
15    Antifa?
16    A.  Yes.
17    Q.  Okay.  You mentioned that, kind of, one of the goals was
18    goading this group who you believed to be Antifa into some
19    sort of a physical reaction.  Based on your, kind of,
20    conversations and being involved in the group, what was your
21    understanding as to why you were trying to provoke that?
22    A.  There was a mantra that was told to me of, essentially,
23    we don't start shit; we finish it.
24    Q.  And what does -- pardon my French, but I'm going to use
25    your words -- what does "starting shit" mean?
```

1   A.   Physical confrontation.

2   Q.   So goading someone into, would that be considered

3   starting shit in that terms?

4   A.   Not that I saw.

5   Q.   Now, you mentioned that you were seeking out a

6   particular group.  You also mentioned there were discussions

7   about the Proud Boys' role with respect to the 2020

8   election.  Can you tell us what your understanding, again,

9   based on your observations on the night of the 11th and

10  later on to the 12th were about how the group viewed Antifa

11  fitting in with the election, if at all.

12  A.   The conversations I was having, we, as the Proud Boys,

13  viewed ourselves almost as the foot soldiers of the right

14  where Antifa was the foot soldiers of the left.

15  Q.   And was there any --

16          MS. HERNANDEZ:  Objection.  Relevance to this

17  whole line of questioning about Antifa, Your Honor.

18          THE COURT:  Overruled.

19  BY MR. KENERSON:

20  Q.   You mentioned that you believed the Proud Boys were the

21  foot soldiers on the right; Antifa were the foot soldiers of

22  the left.  Was there any belief as to how Antifa being the

23  foot soldiers of the left tied into the election and

24  higher-level political situations?

25  A.   Excuse me.  There was a lot of conversation about Antifa

1    being backed by --

2                MR. JAUREGUI:  Objection.  Hearsay.

3                THE COURT:  Overruled.

4                THE WITNESS:  A lot of conversation and, you know,

5    the Proud Boys, you know -- it was, kind of, a well-known

6    fact in our head that Antifa was backed by powerful

7    left-wing politicians --

8                MR. SMITH:  Objection.  Foundation to what's known

9    in other people's heads.

10               THE COURT:  Rephrase the question, counsel.

11   BY MR. KENERSON:

12   Q.  Mr. Greene, based on what you observed and heard and saw

13   from the members of the group you were surrounded with in

14   December of 2020, did you have an understanding of how

15   people viewed Antifa's relationship to the political

16   establishment?

17               MR. SMITH:  Objection.  Vague.  People.  What

18   people?

19               THE COURT:  Overruled.

20               MR. JAUREGUI:  Objection.

21               MR. HERNANDEZ:  Your Honor --

22               MR. JAUREGUI:  Leading.

23               MS. HERNANDEZ:  -- can we have a continuing

24   objection to the Antifa line of questioning?

25               THE COURT:  Very well.

1          MS. HERNANDEZ:  Thank you.

2     BY MR. KENERSON:

3     Q.  You can answer.

4     A.  Okay.  Can you ask the question again?  I'm sorry.

5     Q.  Sure.

6          Based on what you observed, heard, saw in December

7     2020 with the group of the Proud Boys you were with, did you

8     have an understanding of what those people who you were with

9     believed in terms of Antifa's relationship to the political

10    establishment?

11    A.  Right.  Yeah.  There was definitely conversations that

12    they -- Antifa was backed by left-wing politicians and

13    powerful interest groups.

14    Q.  Now, this night march on December 11th, did the police

15    manage to generally keep the two groups apart?

16    A.  For the most part, yes.

17    Q.  Despite the goading you described?

18    A.  Yes.

19    Q.  Did you also go to events during the day on

20    December 12th?

21    A.  I did.

22    Q.  Can you describe generally what went on during the day

23    on December 12th.

24    A.  It was a little bit more organized.  We had been asked,

25    the CNY chapter, to act as security for certain speakers.  I

1    believe one of them was from Long Island Loud.  We had

2    basically stood around the stage, made sure that he had --

3    or the group had the ability to speak, and then we went back

4    to -- I'm not sure the place.  It was some plaza where there

5    was a bunch of other people speaking, and we were marching

6    around in a circle almost, again, as -- acting as security

7    so that the speakers could speak without worrying about

8    being threatened.

9    Q.  And you mentioned, I think, that on the night of

10    the 11th, there were, I think you said, thousands of people

11    out, by your perception.  How did the number of people out

12    during the day on the 12th compare to the night before?

13    A.  It was less, but it was still a large number.

14    Q.  And, again, members of the Proud Boys, were they wearing

15    colors?

16    A.  Yes.

17    Q.  Now, did you have any interactions with Spaz on the day

18    of the 12th?

19    A.  I did.

20    Q.  Were there cameras out?

21    A.  There was.

22    Q.  And was this just people with cell phones or were there,

23    kind of, more sophisticated cameras out?

24    A.  There was more sophisticated cameras out.

25    Q.  And did you see a time when Spaz was in close proximity

1    to some of those more sophisticated cameras?

2    A.  I did.

3    Q.  Can you describe what he was doing?

4    A.  There was a point where somebody with a, you know, nice

5    DLSR [sic] camera -- I'm not sure if they were wearing any

6    type of identification -- walked up to the group and Spaz

7    posed for a picture.

8    Q.  Posed?

9    A.  Yes.

10    Q.  Can you tell us how he posed?

11    A.  Kind of, arms back, chest out, and I believe he had a

12    cigar in his mouth.

13    Q.  Let me ask you, were you, at that point, trying to pose

14    for the cameras?

15    A.  No.

16    Q.  Why not?

17    A.  I knew if I was seen and identified, I would lose

18    everything I had built.

19    Q.  Referring to what?

20    A.  My company.

21    Q.  Did you wind up seeing that pose -- the photograph that

22    came from that pose you've just described anywhere after the

23    rally?

24    A.  I did.

25    Q.  Where?

1    A.   The front page of the Washington Post.

2    Q.   Now, were you able to observe one way or the other

3    whether Spaz was trying to have any sort of interaction with

4    the national leadership during this rally?

5                MR. METCALF:   Objection, Your Honor.

6                THE COURT:   Overruled.

7                THE WITNESS:   From my perspective, it seemed like

8    he was trying to get closer.

9    BY MR. KENERSON:

10   Q.   What made you say that?

11   A.   He would try to move up to the front of the group where

12   leadership was.

13   Q.   What types of things was he doing that you observed?

14   A.   I can't really name any specifics besides, you know,

15   getting closer.  That's really the only thing I can think

16   of.

17   Q.   And who did you know to be members of -- who, if anyone,

18   did you know to be members of national leadership at that

19   point?

20   A.   At that point, it was Enrique Tarrio.

21   Q.   So you observed Spaz trying to get closer to him?

22   A.   Yes.

23   Q.   Now, you mentioned there was a night march on the night

24   of December 11th.  Was there one on the 12th, as well?

25   A.   There was.

1    Q.  What happened between this march during the day that you

2    described and the night march?

3    A.  Can you -- I'm not sure --

4    Q.  Sure.  Let me rephrase the question.

5            At some point, did this -- what you described

6    during the day of, kind of, marching around and doing

7    security, did that end at some point?

8    A.  It did.

9    Q.  What did you do after that?

10   A.  Went back to the hotel; I believe we started drinking;

11   and then, basically, suited back up in what we were wearing

12   during the day and then went back out at night.

13   Q.  Okay.  And when you say "what we were wearing during the

14   day," what was that?

15   A.  For me, I -- I'm -- personally believe I had a plate

16   carrier with Level 4 plates in them.

17   Q.  Okay.  Did you wear that both during the day and at

18   night?

19   A.  I believe I did.

20   Q.  Okay.  And also, wearing colors both during the day and

21   at night?

22   A.  I believe so.

23   Q.  Why was it that you wore a plate carrier during this

24   rally?

25   A.  All the things that I had heard about from other Proud

1    Boys; things I had seen on the Internet about the dangers

2    of, you know, Antifa; heard about, you know, stabbings --

3            MR. JAUREGUI:  Judge, I'm going to object as to

4    what he heard.  It's all hearsay.

5            THE COURT:  He's -- overruled.

6            THE WITNESS:  I -- again, I had seen a lot of

7    videos.  I had heard people tell me that, you know, they

8    used knives; they throw, you know, frozen bottles; they

9    throw bricks.  So you know, if you -- if you're going to go

10   out, you know, you need to have some sort of protection.

11   BY MR. KENERSON:

12   Q.  So did you?

13   A.  Yes.

14   Q.  Now, on the night of the 12th, did -- what you all were

15   trying to engage in, did that differ at all from the night

16   of the 11th?

17   A.  Not really.  It seemed to be about the same, the --

18   Q.  Okay.

19   A.  -- antagonistic attitude.

20   Q.  Were you with other prospects and members of CNY?

21   A.  I was.

22   Q.  Did that include Spaz?

23   A.  Yes.

24   Q.  And is that also true of the 11th?

25   A.  Yes.

1    Q.  Let me ask you, these conversations that you've

2    described taking place over this rally about the Proud Boys'

3    role in the election, was Spaz part of those conversations?

4    A.  Yes.

5    Q.  This notion of trying to goad fights with Antifa, did

6    you ever see anyone that you understood to be Proud Boys

7    leadership discouraging that practice?

8    A.  No.

9    Q.  The night of the 12th, were police mostly able to do

10   their job again?

11   A.  Mostly.

12   Q.  Are you aware that on the night of December 12th, the

13   Proud Boy who goes by the handle Noble Beard was stabbed?

14   A.  I was.

15   Q.  Were you present for that?

16   A.  I was nearby but a little bit of distance away.

17   Q.  Did you see some of the aftermath?

18   A.  I did.

19   Q.  Did you ever learn one way or the other whether

20   Mr. Pezzola had any role in the aftermath of that incident?

21   A.  I did.

22   Q.  Who did you learn that from?

23   A.  Mr. Pezzola.

24   Q.  Can you tell us what Mr. Pezzola told you about his

25   involvement in that incident.

1    A.  He had said that after Noble Beard was stabbed, there

2    was somebody that was -- they believed to be Antifa -- he

3    had taken -- Mr. Pezzola had taken his motorcycle helmet and

4    cracked the guy over the head with it.

5    Q.  When Mr. Pezzola talked to you about this, what was his

6    demeanor?

7    A.  He was celebrating it.

8    Q.  In terms of other Proud Boys you had contact with, what

9    was, generally speaking, the reaction -- well, first --

10   strike that.  Let me ask you a different question first.

11            Did it became [sic] -- this -- what you just

12   relayed that Spaz told you, did that become known within the

13   Proud Boys that you spent time with?

14   A.  Yes.

15            MR. METCALF:  Objection.

16            THE COURT:  Overruled.

17   BY MR. KENERSON:

18   Q.  What was the reaction to --

19   A.  I think all of us, myself included, were, you know,

20   patting him on the back for what he had done.

21   Q.  Why were you patting him on the back?

22   A.  He --

23            MS. HERNANDEZ:  Objection.  Why?

24            THE COURT:  Overruled.

25            THE WITNESS:  I, you know -- from my perspective,

1    it was, you know -- he stood up to respond to violence.

2    That was something that, I think, everybody in -- especially

3    in the state of mind I was in at that point, was happy

4    about.

5    BY MR. KENERSON:

6    Q.  And you say the state of mind you were in at that point.

7    Can you tell us what about your state of mind, at that

8    point, led you to be happy about it.

9    A.  I was part of, you know, the group that was getting more

10   and more angry about the result of the election and I think,

11   at that point, I was pretty well convinced we were heading

12   towards a civil war.

13           MS. HERNANDEZ:  Objection as to "part of the

14   group," Your Honor.  It's such a vague description.

15           THE COURT:  Overruled.

16   BY MR. KENERSON:

17   Q.  Let me ask you, Mr. Greene.  You did -- you said you

18   were not -- you did not see the stabbing itself; is that

19   right?

20   A.  Right.

21   Q.  Did there come to be a belief amongst yourself and the

22   Proud Boys you spoke to as to what group, if any, was

23   responsible for the stabbing?

24   A.  We -- excuse me.  We all believed it to be Antifa.

25   Q.  Do you know where you got that understanding?

1    A.  I'm not sure the exact place.

2    Q.  Okay.  Anyone seem to call that into question that

3    Antifa was responsible?

4    A.  No.

5    Q.  What was Spaz's reaction to you and everyone else that

6    you've mentioned, kind of, telling him "good job" for that?

7    A.  He didn't back down from the acclaim of it.

8    Q.  Let me ask you just a couple more questions before we

9    change topics.

10        December -- the December rally was your -- I think

11   you testified it was your first Proud Boys national event;

12   is that right?

13   A.  Correct.

14   Q.  And, at that point, you were still just a prospect?

15   A.  Correct.

16   Q.  Did that event teach you anything about the hierarchical

17   nature of the Proud Boys?

18   A.  It did.

19   Q.  What did you learn about that?

20   A.  People that were higher degrees than you, there was a

21   level of respect that they had.  It -- nobody, from what I

22   could see, was wearing, you know -- in the Army, you have

23   ranks and badges.  Nobody was wearing anything like that,

24   but people were obviously stepping up to take control if

25   things were getting out of hand or people were moving in a

1    wrong direction.

2    Q.  And what about, kind of -- was there any sort of a

3    command presence on the ground while you were doing these

4    marches?

5    A.  There definitely seemed to be.

6    Q.  Can you describe what that was like.

7    A.  As we were moving, if people would stray away or would

8    try to, like, run ahead, there was usually somebody that

9    would step up and try to usually physically pull them back.

10   I saw a lot of butting heads over it and it was,

11   basically -- from my understanding of what I was seeing, if

12   you didn't back down, there was going to be a physical

13   confrontation if you didn't basically listen to whoever

14   seemed to have authority at the time.

15   Q.  Thank you.

16            And you just mentioned, I think, that there was,

17   kind of, deference to degrees above you.  What's the lowest

18   level degree of a Proud Boy member?

19   A.  I -- technically, a prospect, I assume, but for -- I

20   think to be full-fledged member, you would have to be

21   considered a first degree.

22   Q.  Okay.  So -- thank you.  I think you got to where I was

23   going.

24            Prospect is lower than first degree?

25   A.  Yes.

```
 1    Q.   And on the 12th, you were a prospect?

 2    A.   Correct.

 3    Q.   Did you ever get your first degree?

 4    A.   I did.

 5    Q.   How long after December 12th?

 6    A.   On the ride home would have been the -- December 13th, I

 7    was told I was voted into the chapter.

 8    Q.   Now, as a result of having got your full-fledged

 9    membership, first degree, did you spend more time with the

10    CNY Proud Boys, including Spaz?

11    A.   I did.

12    Q.   And you mentioned that there -- you mentioned seeing

13    this photograph in the Washington Post.  Can you tell us

14    whether Spaz was getting more or less attention as a result

15    of December 12th.

16    A.   From what I was seeing, he was getting more attention.

17    Q.   What was his reaction to that attention?

18    A.   I think there was a public -- when he was talking to the

19    group about not being happy with the attention, but I never

20    saw him back down away from it and --

21    Q.   So let me just unpack that a little bit.  You said he

22    was not happy with the attention.  At least, that's what he

23    said?

24    A.   That's what he was saying.  Yes.

25    Q.   But you also said he would not back away.  Can you
```

1    describe for us what that means.

2    A.  I look at it from my perspective.  I had some -- I --

3    there was a website that was trying to dox me after December

4    and I was terrified of, you know, being found out to be a

5    Proud Boy and associated with, you know, that group.  And so

6    I was, you know, doing everything I could to avoid cameras,

7    make sure that I wasn't seen, knowing the consequences of

8    it.  And so from my perspective, I, you know -- I knew what

9    it took to back away from the cameras, but from what I was

10   seeing from Mr. Pezzola, it didn't seem like he was making

11   the same effort as I was.

12   Q.  Okay.  Thank you.

13            You just used the term -- a word, "dox."  Can you

14   just tell us what you mean by that word.

15   A.  It's -- I think it's an Internet term of being publicly

16   identified usually by some antagonistic group to you.

17   Q.  So as we move away from the December rally and you're

18   spending more time with the CNY Proud Boys, did you have

19   discussions about the political climate as it existed at

20   that time with Spaz?

21   A.  I did.

22   Q.  And did he make any comments about what was going on in

23   the world vis-à-vis his retirement plans?

24   A.  He did.

25   Q.  And before I ask you about what those comments may have

1    been, can you tell us, kind of, the situation.  Was this in

2    person?  On a chat group?  Over the phone?

3    A.  This was in person.

4    Q.  Okay.  Can you tell us what Spaz said about that.

5              MS. HERNANDEZ:  Objection.  Hearsay as to my

6    client, Your Honor.

7              THE COURT:  Overruled.

8              THE WITNESS:  It was -- not the exact words, but

9    something along the lines of, I'm 40-something years old.  I

10   should be thinking about retirement, not fighting a civil

11   war.

12   BY MR. KENERSON:

13   Q.  Did you get the sense one way or the other as to whether

14   he believed he might be called to fight a civil war?

15             MR. METCALF:  Objection.  Your Honor, objection.

16   That goes to Mr. Pezzola's state of mind.

17             THE COURT:  Well, if the witness can articulate

18   how he got a sense -- the question was, Did you get the

19   sense?  And so I'll let the question stand if the witness

20   can explain why he got that sense.

21             MR. METCALF:  Then objection as to form.

22             THE COURT:  All right.  Overruled.

23   BY MR. KENERSON:

24   Q.  Mr. Greene, yes or no first.  Did you get a sense?

25   A.  I did.

1    Q.  Can you tell us how you got that sense.

2    A.  It was all the conversations that we were having and I

3    was a part of them, you know?  We were openly expecting a

4    civil war at that point.

5                MS. HERNANDEZ:  Objection.  Hearsay.

6                THE COURT:  Overruled.

7    BY MR. KENERSON:

8    Q.  Can I ask, going back to my original question, based on

9    the number and level of conversations you had with

10   Mr. Pezzola, what was your sense as to whether he actually

11   believed that?

12               MS. HERNANDEZ:  Objection.

13               MR. METCALF:  Objection as to other people's

14   beliefs, Your Honor.

15               THE COURT:  Overruled.

16               THE WITNESS:  We never disagreed with each other.

17   I think that's the best way I can answer it.

18   BY MR. KENERSON:

19   Q.  Did you believe it?

20   A.  I did.

21   Q.  Let me ask you about -- you mentioned, I think, during

22   the December rally that Spaz, based on your observations,

23   was trying to get close -- physically close to leadership.

24   Did you see those efforts either continue, dissipate, stay

25   flat, neutral, in the time after the December rally?

1   A.  I saw at least one opportunity for it to continue.

2   Q.  What was that?

3   A.  There was an opportunity he had to take a home-made

4   shield down to Noble Beard.

5   Q.  And can you tell us -- just give us a little background.

6   What is this home-made shield?

7   A.  One of the other CNY Proud Boys was making these wooden

8   shields, and they were pretty prominent at the December

9   rally.  I believe there were some pictures of them.  People

10  had taken notice of it.  I'm not -- I don't know how the

11  conversation happened, but I know that a shield was

12  delivered to Noble Beard.

13  Q.  And did Spaz tell you one way or the other whether he

14  had any plans to partake in the shield delivery?

15  A.  He did.

16  Q.  What did he told you?

17  A.  That he was going to be on the trip to go.

18  Q.  And what did he tell you in terms of where he was going?

19  A.  I remember it was a southern state, either it's the

20  Carolinas or Florida.

21  Q.  Okay.  Now, did you go on this trip yourself?

22  A.  I did not.

23  Q.  Was there actually a time period in -- between

24  December 12th and January 6th where Mr. Pezzola was absent

25  from things he might not -- he might otherwise be at?

1    A.  Yeah, I believe so.

2    Q.  Can you just give us a description of this shield?  I

3    think you said a wooden shield.  What else did it look like?

4    A.  It had a -- in the middle of it, a -- almost like a cat

5    food bowl or something like that, a metal cat food bowl.  It

6    was in the black and gold colors and it had, I believe, CNY

7    on it, plus, maybe, a rooster.  Just, like, Proud Boy

8    iconography was on it.

9    Q.  Okay.  And then did you see -- in the time while the

10   discussions were going on about taking the shield, did you

11   see photographs of the shield that would be taken?

12   A.  I did.

13           MR. KENERSON:  Your Honor, I'd ask if we can

14   approach the witness with Exhibit-72.

15           THE COURT:  All right.  You may approach, sir.

16   BY MR. KENERSON:

17   Q.  And, Mr. Greene, Special Agent Needler is approaching

18   you with what's been marked as Government's Exhibit-72.  Do

19   you recognize that?

20   A.  I do.

21   Q.  What is that?

22   A.  That looks like the shield that was --

23           MR. KENERSON:  A.J. -- sorry.

24           THE WITNESS:  It looked like the shield that was

25   being made and, I believe, eventually delivered.

1          MR. KENERSON:  And, Your Honor, at this point, I

2    would move for admission of Exhibit-72 and ask to publish.

3          THE COURT:  All right.  Without objection, it will

4    be admitted, and permission to publish.

5    BY MR. KENERSON:

6    Q.  Did you ever find -- did you ever see anything that

7    provided some sort of evidence to you that the shield had

8    actually been delivered?

9    A.  I did.

10   Q.  What was that?

11   A.  I'm not sure of the video.  It was on a Proud Boy

12   channel, either on Telegram or Parler, of a video with Noble

13   Beard, and there was the shield in the background.

14   Q.  During this time period, did you -- did Dominic Pezzola

15   talk about any connections he might be gaining to Proud Boys

16   leadership?

17   A.  Not that I can remember overtly outside of that,

18   traveling down there.

19   Q.  Okay.  Did he start using names of people you knew to be

20   leaders?

21   A.  I can't remember specific examples of that.

22   Q.  Okay.  Did you see any postings from Proud Boy

23   leadership that referenced Mr. Pezzola around that point in

24   time?

25   A.  I did.

1 Q.  Can you describe what you saw.

2 A.  I remember a picture was at night -- almost feels like

3 there was, like, fireworks going on in the background or,

4 like, sparks, or something like that, of -- and it was,

5 like, Dominic Pezzola was front and center of it, and I

6 believe it was posted by Enrique Tarrio.

7 Q.  Okay.  Now, did you yourself have a Parler account?

8 A.  No.

9 Q.  How did you come across that post you've just described?

10 A.  I'm not sure specifically, but it would have -- most

11 likely have been in a Telegram channel.

12 Q.  So a Telegram channel, like -- I think you mentioned

13 before you weren't in Telegram channels with Enrique Tarrio.

14 So can you just tell us how it would wind up in a Telegram

15 channel you were in.

16 A.  I was partici- -- I -- there was a group Telegram

17 channel that was public.  You couldn't generally post in it,

18 but there was a lot of Proud Boy things that would be posted

19 in there.  So it could have been in there.  I was also in

20 the CNY chat.  It could have been posted in there, as well.

21 Q.  All right.  I want to talk to you a little bit about

22 your trip to D.C. around January 6th.  You mentioned you

23 came down here; correct?

24 A.  Correct.

25 Q.  All right.  Now, did you actually go to the Capitol here

1       in D.C. on January 6th?

2       A.  I did.

3       Q.  And did you go across the fences that restricted the

4       Capitol grounds?

5       A.  I did.

6       Q.  And did you start up the stairs under the inauguration

7       scaffolding?

8       A.  I did.

9       Q.  Have you had a chance to review some videos from

10      January 6th?

11      A.  I have.

12                  MR. KENERSON:  Your Honor, if I may approach the

13      witness?

14                  THE COURT:  You may, sir.

15      BY MR. KENERSON:

16      Q.  Mr. Greene, I'm approaching you with a thumb drive.  Do

17      you recognize that thumb drive?

18      A.  I do.

19      Q.  How do you recognize that?

20      A.  I was shown it last night and it has my initials on it.

21      Q.  Did you put those initials there?

22      A.  I did.

23      Q.  All right.  And there were a number of exhibits on

24      there; correct?

25      A.  Correct.

1    Q.  In terms of the video exhibits on there, with the

2    exception of 403G, do those fairly and accurately depict the

3    events of January 6th as you perceived them?

4           MS. HERNANDEZ:  Objection, Your Honor.  We don't

5    have a copy of whatever the Government has just produced to

6    the witness.

7           MR. KENERSON:  I'm happy to read out the numbers.

8           THE COURT:  Pardon me, Mr. Kenerson?

9           MR. KENERSON:  I'm happy to read out the numbers.

10   I was going to do it in a second.

11          THE COURT:  Let's go ahead and do that, then, for

12   the benefit of the defense.

13   BY MR. KENERSON:

14   Q.  Does that that you looked at, Mr. Greene, contain

15   Exhibit-400J; 401G; 409B and C; 410A, B, C, D, E, and F;

16   412A; 412AX; 412B; 420A; 420C; 429A; 429AX; 430B; 444A;

17   444AX; 452; 464; 472; and 475?

18          MR. JAUREGUI:  Objection.  Leading.

19          THE COURT:  Overruled.

20          THE WITNESS:  Yes.

21          MR. PATTIS:  Did that include 464?  I'm sorry.

22          THE COURT:  It did.

23   BY MR. KENERSON:

24   Q.  And the -- again, the videos from January 6th that you

25   reviewed on that -- that are on that thumb drive, do those

1   fairly and accurately depict the events as you witnessed

2   them, with the exception of a couple that have some

3   highlighting added?

4   A.  They do.

5   Q.  And for the exhibits that have highlighting added, did

6   they appear to be the same other than having the

7   highlighting added?

8   A.  They did.

9   Q.  All right.  Did that also include a selfie-style video

10  featuring Mr. Pezzola that's been marked as 403G?

11  A.  I believe so.

12  Q.  Did that -- did you recognize that as something that you

13  had received on January 6th?

14  A.  It's something that I had seen.  Yes.

15  Q.  That you had seen?  Okay.

16          And does -- did that drive that you review also

17  have four audio files?

18  A.  It did.

19  Q.  Marked 1104, 1105, 1106, and 1107.  Did you recognize

20  the voice on those files?

21  A.  I did.

22  Q.  Whose voice was it?

23  A.  Dominic Pezzola.

24          MR. KENERSON:  Your Honor, I'd move for all of --

25  the admission of all of the exhibits previously read.

```
 1              THE COURT:  All right.
 2              MR. SMITH:  Your Honor --
 3              MS. HERNANDEZ:  Objection.
 4              MR. SMITH:  -- we have to no objection to
 5    authenticity; however, we object to the procedure of
 6    requiring the defense to say in advance whether dozens of
 7    exhibits that could be used for any potential use are
 8    admissible.
 9              THE COURT:  All right.  Let's just have counsel
10    have a quick sidebar.
11              (Bench conference:)
12              MR. SMITH:  So Your Honor, our objection is that
13    we have to be able to see how an exhibit is being used in
14    order to concede that it's admissible.  We don't know
15    exactly how they will be used or for what purpose.  So we
16    will have to wait and see.  But on authenticity, we have no
17    objection.
18              THE COURT:  All right.  Mr. Kenerson, do you want
19    to just give a brief preview of what, you know -- the way
20    you plan to use these exhibits.
21              MR. KENERSON:  Sure.  And, you know, we're happy
22    to actually treat this similar to how the Court treated the
23    video --
24              THE COURT:  Right.
25              MR. KENERSON:  -- exhibits we admitted similarly
```

 1    through Inspector Loyd.  I do not plan to reference all of

 2    these in Mr. Greene's testimony to -- here today, but he is

 3    authenticating them and we do plan to return to them later

 4    with other witnesses, but we're happy to take up relevance

 5    or other objections as they come.

 6         THE COURT:  Right.  I just -- why don't -- I agree

 7    with you and that was my thought of how -- about how we

 8    would proceed, but separately, as to the ones you're going

 9    to reference with this witness, will you just give the

10    defense a little heads-up as to which ones and just

11    basically what you plan to do so they can be prepared to

12    object if they need to.

13         MR. KENERSON:  Certainly.  As to the exhibits --

14    the voice exhibits, 1104 through 1107, those will be the

15    first that we come to.  I'm basically going to ask him --

16    play them in open court, ask him to ID the voice --

17         MS. HERNANDEZ:  Objection, Your Honor.

18         THE COURT:  Ms. Hernandez, let him make his

19    proffer.  I'll hear you.  I already -- we already -- I

20    nodded to you before -- you saw me -- that I would hear you

21    before we do anything.

22         MS. HERNANDEZ:  I'm sorry.  I didn't see that.

23         THE COURT:  I'm sorry.  All right.

24         MR. KENERSON:  Ask him to identify the voice.  As

25    to those where he recalls the date which is three of the

1    four -- or at least recalls the general time frame -- ask

2    him to describe the context of the statements.

3            I'm looking through the rest of my outline to see

4    which numbers are coming up in it.

5            Through -- for 4- -- 452 is a video from the black

6    fence.  I plan to play approximately 15 seconds to show what

7    went on at the black fence when Mr. Greene was there.

8            For 444AX, that is a video showing the robbery of

9    the shield by Mr. Pezzola.  I'm going to ask Mr. Greene some

10   questions about that.

11           For -- 450 shows Mr. Greene, Mr. Pezzola, and

12   Mr. Donohoe -- though I don't think Mr. Greene knows who

13   Mr. Donohoe is -- coming backwards across the plaza with the

14   shield.

15           442A shows Mr. Pezzola and Mr. Donohoe jointly

16   carrying the riot shield with Mr. Pezzola [sic] shortly

17   behind.  I'm going to ask Mr. Greene some questions about

18   that.

19           THE COURT:  The things that we're talking about --

20   the videos -- is he going to say, "I saw these things"?

21           MR. KENERSON:  Yes.  I mean --

22           THE COURT:  Okay.

23           MR. KENERSON:  Yeah.  So like, he was, at the very

24   least, close by and witnessing things around him.  I think

25   for, like, the robbery, he will say, I was there, but I was

```
 1    not looking in that specific direction when it happened, but
 2    it is -- generally fairly and accurately captures what
 3    happened.
 4                THE COURT:  All right.  Ms. Hernandez, what's your
 5    objection -- I mean, look, I think the way to proceed is,
 6    generally speaking, as we said before which is if there's a
 7    particular objection, we'll just -- I'll take it up as we
 8    go.  But what -- hearing what Mr. Kenerson has represented,
 9    what is your objection?
10                MS. HERNANDEZ:  First of all, Your Honor, if I
11    missed it, then I apologize, but I don't recall the
12    Government sending us a list of these exhibits, as we had
13    agreed would happen before a witness took the stand.
14                But, secondly, these exhibit- -- these statements
15    from Mr. Pezzola are out-of-court statements that are being
16    submitted for the truth of the matter asserted.  They're
17    hearsay statements.  Whether they meet the exception to the
18    hearsay rule may or may not be the case, whether they're
19    co-conspirator statements -- so I object on hearsay grounds.
20    I don't -- again, if I missed the list, I -- it's on me, but
21    I wasn't aware that we were going to be introducing audio
22    files of Mr. Pezzola saying I don't know what or --
23                THE COURT:  Well --
24                MS. HERNANDEZ:  -- when they were said.
25                THE COURT:  -- why aren't they, at a minimum -- I
```

1    mean, again, you can argue relevance, I suppose.  But why

2    aren't -- again, why aren't they, at a minimum, part- --

3    statements of a party opponent?

4            MS. HERNANDEZ:  Again, Your Honor, a statement of

5    a party opponent comes in against Mr. Pezzola, I agree, but

6    it doesn't come in against Mr. Rehl, and I --

7            THE COURT:  What --

8            MS. HERNANDEZ:  -- don't know what's contained in

9    these audio files.  I --

10           THE COURT:  Well --

11           MS. HERNANDEZ:  What exactly -- can the Government

12   summarize what they -- what's going to be in these files?

13           THE COURT:  But this is not -- we've talked about

14   this already, Ms. Hernandez.  This is -- there is not an

15   objection that you can lodge to this.  If you -- you've

16   argued that you should get a limiting instruction.  I have

17   said I don't think one's appropriate, but if you show me

18   authority that one is, I'll take it up.

19           MS. HERNANDEZ:  Your Honor, I can --

20           THE COURT:  You --

21           MS. HERNANDEZ:  I'm sorry.  I can always file -- I

22   can always object on hearsay grounds to a statement -- an

23   out-of-court statement by another defendant.

24           THE COURT:  I understand.  I don't mean it like

25   that.  What I meant was the question of what we do -- you

1    can.   And the Government can say, This is a statement of a

2    party opponent.   And I'd -- I don't know how you can really

3    rebut that at this point.   But the point is, even apart from

4    that, to the extent you're -- you've made this point before

5    about whether a limiting instruction is appropriate and I've

6    said I don't think one is.   So I --

7              Mr. Kenerson, what do these --

8              I don't want to take up any more time.   If we

9    can -- let me put it this way.   I'll take up -- if you have

10   objections as they go, I'll hear them.

11             But, Mr. Kenerson, what are these statements

12   about?

13             MR. KENERSON:   Sure.   I'm happy to proffer that.

14   But first, let me just note for the record that we did send

15   a list of exhibits this past Sunday, so a couple days ago at

16   this point.

17             But setting that aside, Exhibit-1104 -- and these

18   are actually exhibits that we've specifically highlighted

19   for the defense recently because they were recent additions

20   to the exhibit list.   But 1104 is Mr. Pezzola saying,

21   essentially, I've got two -- excuse my French -- down

22   fucking dudes coming from Chicago and they're fighters.

23             1105 is, I've been in touch with leadership.

24   Nothing has changed, just a change in command.

25             1106 and 1107 go together.   They were from when

1    Mr. Pezzola was running late to Mr. Greene's house.  He

2    talks about the fact that he was running late and that he

3    had to give the wife -- his wife a little attention, and

4    that -- that's message one.

5         Message two is, Yeah, they're not happy about

6    this; meaning, where he's going, is our argument.  And, I

7    keep telling her it's going to clear up in the next month or

8    so unless we're in a full-blown fucking war.

9         THE COURT:  All right.  I don't --

10         MS. HERNANDEZ:  Your Honor, again, this is late

11   production of discovery, and I recall that the Government

12   did produce something on Sunday or something.  I mean, as

13   the Court knows, there's an immense amount of discovery.  It

14   ought not to be produced on Sunday -- I don't know -- in the

15   evening or whatever for the first time.

16         THE COURT:  I've already ruled on that particular

17   piece.  I've already ruled on that, and I don't -- there's

18   no objection here that I can discern has merit.  I'll take

19   up each individual objection as they come, if there's a

20   relevance objection or anything else, but I don't -- there's

21   no world in which these statements aren't admissible.

22         MS. HERNANDEZ:  I don't -- again, I don't believe

23   that just because it's an admission of a party opponent

24   against one defendant, that they wholesale come in against

25   every defendant.

```
 1              THE COURT:  Well, again, I -- if you --
 2              MS. HERNANDEZ:  I will -- I'll look for something
 3     and --
 4              THE COURT:  It's a question of a limiting
 5     instruction, and we've talked about this before, and I don't
 6     think one's appropriate.  You show me authority one is and
 7     we'll take it up.
 8              All right.  Mr. Kenerson, you may proceed.
 9              MR. KENERSON:  Thank you, Your Honor.
10              (Return from bench conference.)
11              MR. ROOTS:  Your Honor, I have a --
12              THE COURT:  Hold -- so -- Mr. Roots, hold on one
13     second, please.  Sir, hold on one second.
14              Can we have the husher again.
15              (Bench conference:)
16              THE COURT:  Mr. --
17              MR. ROOTS:  Yeah.  Beyond the objections of
18     Ms. Hernandez -- this is Roger Roots for Mr. Pezzola -- we
19     have an objection to this shotgun approach to getting -- I
20     would echo what Mr. Smith said and extend that, just this
21     shotgun approach of getting, it looks like, two dozen
22     separate exhibits all at once just with some witness saying,
23     They look like a fair and accurate depiction of some of the
24     things that I was seeing on a particular date.  This is very
25     unusual.  This is not normal.
```

1      THE COURT:  Well, as I said, I don't think it's

2   unusual, and your -- to the extent you have an objection to

3   each, I'll take it up as each one is used.

4      MR. METCALF:  Your Honor, Steven Metcalf.

5      Then I'll make an objection for 1106 and 1107 on

6   just 403 grounds.  To --

7      THE COURT:  Okay.

8      MR. METCALF:  -- the extent that they're relevant,

9   the probative value is substantially outweighed.  We're

10  talking about specific conversations between him and his

11  common-law wife, is what she's been referred to as.

12     THE COURT:  No, no, no, it's conversations about

13  the wife, as I see Mr. Kenerson nodding.  Your objection's

14  overruled.

15     (Return from bench conference.)

16     THE COURT:  You may proceed, sir.

17     MR. KENERSON:  Thank you, Your Honor.

18  BY MR. KENERSON:

19  Q.  All right.  Mr. Greene, did you go -- well, you've

20  already said you went to D.C. around January 6th; right?

21  A.  Correct.

22  Q.  Where did you stay?

23  A.  The JW Marriott.

24  Q.  Who booked that hotel?

25  A.  I did.

1  Q.  Why did you decide to go to D.C.?

2  A.  It was a series of tweets from President Trump about a

3  rally that was happening.

4  Q.  And do you recall with, you know, any sort of level of

5  specificity what those tweets said?

6  A.  The one that really stood out was, Be there, be wild.

7  Q.  Did you wind up going with members of the CNY Proud

8  Boys?

9  A.  I did.

10  Q.  How many people did you come to D.C. with?

11  A.  Five, including myself.

12  Q.  Okay.  How did you come here?

13  A.  I drove.

14  Q.  And was it all five in one car?

15  A.  No.

16  Q.  How many cars went?

17  A.  Two.

18  Q.  And how many in your car?

19  A.  Just one person in my car.

20  Q.  So three in the other one?

21  A.  Yes.

22  Q.  Now, you mentioned that CNY Proud Boys came.  Were all

23  five of these individuals CNY Proud Boys?

24  A.  No.

25  Q.  How many were not?

5408

```
1   A.  Just one.
2   Q.  And is that the person who rode with you or in the other
3   car?
4   A.  He rode with me.
5   Q.  In the other car, was there anyone who we've been
6   talking about so far?
7   A.  Yes.
8   Q.  Who?
9   A.  Dominic Pezzola.
10              (Brief pause.)
11              MR. KENERSON:  Ms. Rohde, can we have Exhibit-1104
12  which I believe the Court just provisionally admitted.
13              (Audio played.)
14  BY MR. KENERSON:
15  Q.  Do you recognize the voice?
16  A.  I do.
17  Q.  Whose voice was that?
18  A.  Dominic Pezzola.
19  Q.  And other than recognizing the voice, do you recall at
20  this point anything about the context for that message?
21  A.  No.
22  Q.  Now, were you aware that, in the lead-up to January 6th,
23  Enrique Tarrio had been arrested?
24  A.  I was.
25  Q.  And how did you come to learn about that?
```

1    A.  I'm not sure exactly where I learned about it.

2    Q.  Okay.  Were you there physically when it happened?

3    A.  No.

4    Q.  So you learned about it secondhand somehow?

5    A.  Correct.

6    Q.  Okay.

7            MR. KENERSON:  Ms. Rohde, can we have

8    Exhibit-1105, please.

9            (Audio played.)

10   BY MR. KENERSON:

11   Q.  The -- Exhibit-1105, whose voice was that?

12   A.  Dominic Pezzola.

13   Q.  And when he's saying, Nothing's changed, just a change

14   in command, were you aware of what he was referring to?

15           MR. METCALF:  Objection, Your Honor.

16           THE COURT:  Overruled.

17           THE WITNESS:  I took that to be the arrest --

18           MR. HASSAN:  Objection, Your Honor.  Speculation.

19   They --

20           MR. METCALF:  And it also is asking what someone

21   else means.

22           THE COURT:  Overruled.  The witness can answer.

23           THE WITNESS:  I took that to be the arrest of

24   Enrique Tarrio.

25   BY MR. KENERSON:

1    Q.  And did you have an understanding as to whether there

2    would -- whether, one way or another, there would need to be

3    a change in command as a result of Mr. Tarrio's arrest?

4    A.  No.

5    Q.  Okay.  There's also a reference in that audio to being

6    in touch with leadership.  Did you hear that?

7    A.  I did.

8    Q.  Did you have an understanding as to what Mr. Pezzola --

9    what leadership Mr. Pezzola was referring to?

10   A.  It could have only been national leadership.

11   Q.  What -- why do you say that?

12   A.  CNY leadership had refused to go.  Western New York

13   leadership had decided to do no more rallies after what had

14   happened in December.  So the only leadership, at that

15   point, could have been national.

16   Q.  Now, let me ask you -- you just said Western New York,

17   which we are just, I think, hearing for the first time now.

18   Now, what's the relationship between Western New York and

19   CNY?

20   A.  They were close.  They might have been spin-offs.  I'm

21   not exactly sure.  But there was a connection between CNY

22   and Western New York.

23   Q.  And were you aware of whether Mr. Pezzola had a specific

24   relationship with Western New York?

25   A.  I believe, technically, he was a member of Western New

5411

1    York.

2    Q.  Why do you say technically?

3    A.  They had decided to not take any more prospects, but for

4    whatever reason, wanted to move forward with him.  So they

5    gave him to CNY to prospect there.

6    Q.  Okay.  And was -- you said you were from Syracuse.  Was

7    Mr. Pezzola from Syracuse?

8    A.  No.

9    Q.  What city and state was he from?

10   A.  Rochester, New York.

11   Q.  And is that more western within New York than Syracuse?

12   A.  Yes.

13   Q.  All right.  Let me talk a little bit -- or ask you a

14   little bit about the drive that you just described to

15   Washington, D.C.  You said two cars went.  You drove one of

16   them.  Did Mr. Pezzola drive the other?

17   A.  No.

18   Q.  Okay.  Where did you all meet to leave?

19   A.  My house.

20   Q.  And -- your house in Syracuse?

21   A.  Yes.

22   Q.  Was Mr. Pezzola already in Syracuse or was he coming

23   from somewhere else?

24   A.  He was coming from somewhere else.

25   Q.  What's your understanding in terms of where he was

1    coming from?

2    A.  I understood to be coming from his house.

3    Q.  In Rochester?

4    A.  Yes.

5    Q.  And was Mr. Pezzola late arriving at your house?

6    A.  He was.

7            MR. KENERSON:  Ms. Rohde, can we have

8    Exhibit-1106?

9            THE COURT:  Can I just have a bench conference

10   with counsel for one moment.

11           (Bench conference:)

12           THE COURT:  Mr. Kenerson, you indicated -- what is

13   this message going to say?  What is this one going to say?

14           MR. KENERSON:  This one is the two that will be in

15   tandem, the one about needing to give his wife some

16   attention and then a second one about a full-blown war.

17           THE COURT:  What do you mean by "attention"?

18           MR. KENERSON:  I wasn't planning to ask him that.

19   That's just what it says.

20           THE COURT:  Oh.  That's all it says?

21           MR. KENERSON:  Yeah.

22           THE COURT:  All right.  Very well.  You may

23   proceed.

24           (Return from bench conference.)

25           MR. KENERSON:  All right.  Ms. Rohde, 1106,

```
 1    please.

 2              (Audio played.)

 3              MR. KENERSON:  And can you play us --

 4    BY MR. KENERSON:

 5    Q.  Well, before we go, whose voice was that?

 6    A.  Dominic Pezzola.

 7              MR. KENERSON:  Ms. Rohde, play 1107, please.

 8              (Audio played.)

 9    BY MR. KENERSON:

10    Q.  Were those two messages related to each other?

11    A.  I believe so, yes.

12    Q.  And do you have -- do you recall whether they were sent

13    at all close or not close in time to when Mr. Pezzola was

14    supposed to be at your house?

15    A.  If I recall correctly, it was around the time he was

16    supposed to be coming to my house.

17    Q.  Okay.

18              MS. HERNANDEZ:  Objection.  Hearsay.  Relevance.

19              THE COURT:  Overruled.

20              MR. METCALF:  Your Honor, my objection

21    still remains --

22              THE COURT:  All right.  Very well.  It's

23    overruled.

24    BY MR. KENERSON:

25    Q.  Now, had you had -- leading up to Mr. -- to, I guess,
```

5414

1    Mr. Pezzola coming to your house, had you had conversations

2    with him about whether he was busy or not busy in the time

3    between December 12th and January 6th?

4    A.  Not that I recall about a -- specific time frames.

5    Q.  Did he go -- you said -- you mentioned he was -- gone on

6    this trip; correct?

7    A.  Which trip?

8    Q.  To the Carolinas or Florida.

9    A.  Yeah.

10   Q.  Okay.  Let me ask you.  The question about a full-blown

11   war -- or the statement about a full-blown war in that last

12   audio, was that an unusual sentiment for Mr. Pezzola to

13   express in the lead-up to January 6th to you?

14   A.  No, it was standard of our conversations we were having.

15   Q.  So what day did the two cars that you described drive

16   down to January 6th?  Are we talking, like, a week ahead of

17   time?  A day ahead of time?

18   A.  A day before, January 5th.

19   Q.  And was it still daylight when you got to D.C.?

20   A.  I think it had just started getting dark when we got

21   there.

22   Q.  Did you check into the hotel?

23   A.  I did.

24   Q.  All five of you who had come down, the four CNY Proud

25   Boys and one who was not a Proud Boy?

1    A.   Yes.

2             MR. JAUREGUI:   Objection.   Leading.

3             THE COURT:   Technically, sustained, I suppose.

4    BY MR. KENERSON:

5    Q.   Did you or did you not check into the hotel with your

6    group?

7    A.   I checked into the hotel, yes.

8    Q.   Who was in that group?

9    A.   Everyone I drove down with in both cars.

10   Q.   Now, on the night of January 5th, did you yourself have

11   any contact with anyone you understood to be Proud Boys

12   national leadership?

13   A.   Not that I recall.

14   Q.   Were you put into a chat called Boots on Ground?

15   A.   I was.

16   Q.   Who put you into that chat?

17   A.   Dominic Pezzola.

18   Q.   And prior to you having -- well, do you remember if that

19   was before or after you got to Washington, D.C.?

20   A.   I believe it was after I had gotten to Washington, D.C.

21   Q.   And prior to that point, had you, to your knowledge,

22   been in any sort of a national Proud Boys chat other than

23   the publicly available ones?

24   A.   To my knowledge, no.

25   Q.   Were you told what the purpose of Boots on Ground was?

1    A.  I was led to believe that it was somewhat of a

2    coordination group --

3                MS. HERNANDEZ:  Objection, hearsay.

4                THE COURT:  Overruled.

5                THE WITNESS:  I was led to believe it was some

6    sort of a coordination group for Proud Boys who were in D.C.

7    for the 6th.

8    BY MR. KENERSON:

9    Q.  Was there any discussion between yourself and

10   Mr. Pezzola about radios on the 5th?

11   A.  There was.

12   Q.  And let me back up and ask you, do you yourself have any

13   knowledge of programming radios?

14   A.  I do.

15   Q.  What level of knowledge do you have?

16   A.  I believe I have my general certification for the ham

17   license.

18   Q.  Ham license?

19   A.  Yes.

20   Q.  What is ham?

21   A.  Amateur radio.

22   Q.  Thank you.

23                What, if anything, did Mr. Pezzola say to you with

24   regard to radio programming on the night of the 5th?

25                MR. METCALF:  Objection as to hearsay.

```
 1                    THE COURT:  Overruled.

 2                    THE WITNESS:  I was told that --

 3                    MR. HASSAN:  Objection.  Hearsay, Judge.  He was

 4       told.

 5                    THE COURT:  Overruled.

 6                    THE WITNESS:  I was told that high-level Proud

 7       Boys from leadership or elders or -- I don't think I ever

 8       got the specifics of who was going to be -- was going to

 9       come to the hotel room to have their radios programmed by

10       me.

11       BY MR. KENERSON:

12       Q.  Did anyone ever -- did anyone who you understood to be

13       leadership show up to have their radio programmed in your

14       hotel room?

15       A.  To my knowledge, no.

16       Q.  Did you program some radios on the night of the 5th?

17       A.  I did.

18       Q.  Can you just tell us what -- that group that you

19       described who you traveled down with, what did you all do on

20       the night of January 5th?

21       A.  After we got settled in, we ended up putting on,

22       basically, the same type of gear we had worn in December and

23       went out on a night march with just the four of us.

24       Q.  Okay.  Was there drinking, as well?

25       A.  There was.
```

5418

1  Q.  Did anyone show up to your hotel room early on the

2  morning of January 6th?

3  A.  Yes.

4  Q.  Who was that?

5  A.  William Pepe.

6  Q.  Who is William Pepe?

7  A.  At the -- that point, he was the president of the Hudson

8  Valley Proud Boys.

9  Q.  Okay.  Did you know him prior to then?

10 A.  I knew of him.  I don't believe I had talked to him

11 before that.

12 Q.  Do you know how he showed up at your hotel room?

13 A.  We had a coordination Telegram group of Hudson Valley

14 and CNY Proud Boys who were interested in going down to D.C.

15 Q.  Okay.  And you mentioned having spent some time back in

16 December with CNY Proud Boys.  Did you also spend time with

17 HVNY Proud Boys in December?

18 A.  I did.

19 Q.  And HVNY stands for what?

20 A.  Hudson Valley, New York.

21 Q.  Hudson Valley, New York?

22 A.  Yes.

23 Q.  Let me ask you Mr. Greene, based on your experiences on

24 December 12th and December 11th with the Proud Boys, did you

25 have an understanding of what Proud Boys leadership expected

```
 1    in terms of willingness to use force on January --

 2              MS. HERNANDEZ:  Objection.

 3              MR. METCALF:  Objection.

 4              MR. PATTIS:  Objection, Judge.  That's

 5    speculative.

 6              THE COURT:  The witness can answer if he has a --

 7    if he can base it in what he observed on the 11th and the

 8    12th.

 9              MS. HERNANDEZ:  I'm sorry, Your Honor.  Could we

10    be heard?

11              THE COURT:  All right.  Let's have a sidebar.

12              (Bench conference:)

13              MS. HERNANDEZ:  Your Honor, this is a major issue

14    in this case, the use of force.  It's an element of an

15    offense.  This gentleman has indicated -- it -- a member of

16    the Proud Boys for, I don't know, a month, two months, two

17    weeks; didn't meet any leadership; had limited -- didn't

18    meet any of our clients, except Pezzola; and he's now being

19    asked to give his impression based on limited knowledge.

20    I -- it's irrelevant, what his impression was, and he

21    doesn't have a sufficient basis of knowledge to -- what --

22    he wasn't asked what his impression was but what his

23    impression of leadership was.  That's several layers of

24    inferences that have to be drawn based on very narrow

25    information.  He didn't meet any of these defendants.  He
```

1    didn't speak to any of them.  I'd just -- and it's on a

2    critical issue in the case.  It just -- it's -- there's

3    insufficient basis of knowledge for this witness to -- and

4    it's irrelevant, what his impression was.

5              THE COURT:  All right.  Here's what I'm going to

6    do.  I'm going to send -- I'm going to hear you on all this,

7    but it's a big enough issue that I think we may as well

8    pause and I may as well hear from counsel on this from both

9    sides, let you all air it out.

10             It's 12:12 -- just about 12:15.  I propose we send

11   them to -- in 15 minutes -- send them to lunch early and

12   I'll hear from you all in open court about this and we'll

13   pick it up and then you'll have an hour for lunch and we'll

14   come back and I'll resolve it.

15             MS. HERNANDEZ:  Thank you, Your Honor.

16             (Return from bench conference.)

17             THE COURT:  All right.  Ladies and gentlemen,

18   we're going to send you just a few minutes early for lunch,

19   take a quick lunch break -- take a lunch break so it will

20   be, for you all, an hour and a little bit -- hour and 15

21   minutes.  We'll come back after lunch and resume testimony

22   with the witness.

23             (Jury returned to jury room.)

24             THE COURT:  You all may be seated.

25             And, Mr. Greene, you may step down, sir.

1          (Witness steps down.)

2          THE COURT:  All right.  So let me hear from you,

3    Ms. Hernandez.  You lodged the objection.  Let me hear from

4    you and I'll hear from the Government and we will go to

5    lunch.

6          MS. HERNANDEZ:  Your Honor, first of all, his

7    impression -- this witness's impression is not relevant to

8    anything.  It -- he -- the charges -- it's not an element --

9    the Government has to prove that the defendants charged here

10   entered into a conspiracy which is a specific intent crime

11   which requires certain elements, and this gentleman's

12   impression is not relevant to that, number one.

13          Number two, this --

14          THE COURT:  Well, just before we get off --

15          MS. HERNANDEZ:  Yes, sir.

16          THE COURT:  -- number one, what about the tools

17   theory?  I mean, if he had -- I don't know -- I mean, part

18   of what I'm going to ask Mr. Kenerson is, like, what is the

19   witness going to say that he expects the answer to be here?

20   But if --

21          MS. HERNANDEZ:  Well, we know what the witness is

22   going to say.  Otherwise, they wouldn't be asking it --

23          THE COURT:  Well --

24          MS. HERNANDEZ:  -- right?

25          THE COURT:  -- we don't know what they're going to

1    say in terms of why they thought that, I guess, is part of

2    my question.  But if people who could be -- whether it's

3    Mr. Greene or anybody else -- could be considered -- who fit

4    the basic definition of what we're calling tools would say,

5    Yeah, based on X, Y, and Z, I thought this was the

6    expectation of me, why isn't that relevant?

7                MS. HERNANDEZ:  First of all, he's not saying what

8    the expectation of his -- he's saying what his impression of

9    the leadership --

10               THE COURT:  No, it was the -- what leadership

11   expected of him.

12               MS. HERNANDEZ:  I thought he said, What was his

13   impression of -- I thought the question was framed, What is

14   your impression of --

15               THE COURT:  Impression, expectation -- what --

16   he's saying what -- he's being asked about what he thought

17   leadership thought of him.

18               MS. HERNANDEZ:  Someone may have to address the

19   tools theory because, for the life of me, I don't know what

20   the tools theory is or how it fits into a legal framework of

21   the elements of the offense.

22               THE COURT:  All right.

23               MS. HERNANDEZ:  I am --

24               MR. SMITH:  Your Honor, the objection's also

25   vagueness.  Who is the leadership --

```
 1              MS. HERNANDEZ:  Wait a minute --
 2              THE COURT:  Hold on, Mr. Smith.  Gosh darn it.  I
 3     mean, you know, if I can't hear from one of you at a time,
 4     we've got a big problem --
 5              MS. HERNANDEZ:  I think the --
 6              THE COURT:  -- and I'm sorry it's raising --
 7              MS. HERNANDEZ:  Yeah.
 8              THE COURT:  -- its head again.
 9              Mr. -- Ms. Hernandez, finish.
10              MS. HERNANDEZ:  The -- and I hope other
11     defendants' counsel join in after this.
12              The defendants -- the -- this witness has a very
13     limited and narrow knowledge of the Proud Boys, although
14     he's been allowed to expound for over an hour or more.  He
15     is a -- as I understand it, he's been a member of the Proud
16     Boys for two weeks.  His limited involvement is with
17     Mr. Pezzola who's been a member -- at that point in time, is
18     a member of the Proud Boys for one month.  He claims to be a
19     first-degree person.  I believe Mr. Pezzola was
20     second degree.  As I understand the Proud Boy hierarchy,
21     you're not really a full member until you hit, like, fourth
22     degree, but -- so there's limited basis.  It's all based on
23     his conversations with one person.  He's never -- I believe
24     his testimony is he's never met any of these defendants,
25     never had a conversation with any of them, is put on to the
```

1    Boots on the Ground which is not a leadership chat.  It's
2    people on the ground on the 6th.  And he's being asked the
3    question that's the element, you know -- the key question or
4    the key element of force in this case.  I don't think
5    there's a basis of knowledge.  I don't think it's relevant,
6    what he believes his impression is.  I don't understand that
7    he is a tool.  And if, again, we're back to tools, I've
8    asked the Government to identify who these tools are so we
9    can be prepared to confront the tools.  I believe the Court
10   told them they don't have to tell us who the tools are until
11   they come in the morning before or whatever.
12              But I just -- I think relevancy, basis of
13   knowledge -- I'm sure there's 10 other objections, but I --
14   this is -- it's just mind boggling that this person who, for
15   the Court's understanding, until his -- I think, until his
16   last proffer, says he knows nothing about nothing about
17   nothing.  He wasn't here to -- he was here to be, you know,
18   a good boy and blah, blah, blah.  All of a sudden, he has
19   all this information.  I just think -- my objections are
20   relevancy and basis of knowledge.  I'm sure that
21   Mr. Pattis -- here we come -- will fill in very well and
22   Mr. Smith and everybody else.
23              THE COURT:  All right.  Mr. Pattis?
24              MR. PATTIS:  It -- my -- as I recall the
25   question --

```
 1                THE COURT REPORTER:  (Indicating.)
 2                THE COURT:  Mr. Pattis, I'm so sorry.  The court
 3     reporter just --
 4                MR. PATTIS:  I'm sorry.
 5                THE COURT:  -- indicated to me he couldn't hear
 6     you.
 7                MR. PATTIS:  I -- my -- it was off.  I guess all
 8     this talk about wives, mine turned me off.
 9                But if I understand the last question, it was,
10     Based on your experience with the Proud Boys on
11     December 11th and December 12th, had something changed in
12     their attitude about the use of force by January 6th or did
13     you have an understanding about their willingness to use
14     force by January 6th?  And my -- I join Ms. Hernandez's
15     remarks insofar as this is a critical issue in the case.  I
16     note a continuing objection that Biggs has raised.
17     Notwithstanding the fact that the Proud Boys aren't on
18     trial; notwithstanding the fact that we -- and, as we do
19     concede, that admissions of leadership are admissible
20     against one another in a conspiracy, this satisfies no
21     adequate evidentiary foundation, is entirely speculative,
22     and we're now transforming the present-sense impression and
23     an understanding developed from observations into making him
24     a sub rosa expert not just on the intentions of the group,
25     which would be damaging in and of itself in this case, but
```

1    on the intentions of individuals he's never spoken to.  So

2    the question would be altogether different, it seems to me,

3    and I would humbly re- -- suggest, had he developed an

4    impression of Pezzola's attitude, had he developed

5    Pezzola -- an impression of Biggs's attitude based on

6    percipient observations, but he's got none.  And so the

7    predicate to the question here is, Based on what you've

8    heard, did leadership -- which is presumably these guys,

9    although there's no nexus in this testimony -- have a change

10   in their attitude toward use of force?  I don't believe

11   that's appropriate under any evidentiary theory, even the

12   tools theory.

13           THE COURT:  Well, what if -- again, I just -- I

14   know this, I'm sure, won't be the evidence, but just on the

15   question of -- on just the purely legal question, if someone

16   told him -- and I acknowledge that this is unlikely to be

17   the evidence -- but if someone told him, This is what Proud

18   Boy leadership expects from -- in terms of the use of force

19   on January 6th, you would agree he could answer that

20   question?

21           MR. PATTIS:  That would be a closer question.  It

22   would depend on who the someone was, but that would be a

23   closer question, but it's not this question, and it's so far

24   removed from this question that it highlights the point I'm

25   trying to make.

1          THE COURT:  Well, it's the same question.  It's

2     just that the foundation for the question is different;

3     right?  I mean, I -- my point is --

4          MR. PATTIS:  Possibly, but the foundation is what

5     matters here, and --

6          THE COURT:  Well, okay.  I'm not disputing that on

7     some level.

8          MR. PATTIS:  And so I think that, you know -- and,

9     again, I'm not calling the balls and strikes.  You are.  I

10    respect that.  I've watched you carefully.  I can see you

11    struggling with this.  But the foundations are murky in this

12    case, and we've permitted this trial to evolve in a -- to a

13    point where we've got basically lay witnesses, on the basis

14    of limited observations, reaching conclusions about

15    leadership that may or may not include our people but will

16    suggest to the person -- the jury that it is our people

17    because our people are the leadership, and the danger for

18    prejudice at that point and misleading the jury, it -- from

19    my perspective, sir, is overwhelming.

20         THE COURT:  And you don't think the fact that you

21    would have an opportunity to cross-examine the witness and

22    say, Well, who -- number one, who do you -- when you say

23    leadership, who do you mean by leadership?  Is it any -- is

24    it my client?  Is it not my client?  And, oh, by the way,

25    how do -- why did you come to that expectation?

5428

```
1              MR. PATTIS:  But why should we --
2              THE COURT:  And if it turns out it's a flimsy,
3    right -- if it's a -- if it turns out, well, he really
4    doesn't, you know -- there isn't a basis for that, that you
5    can fillet him with that.
6              MR. PATTIS:  Well, you know, filleting is a fun
7    sport and I enjoy cross-examination as much as the next guy,
8    but I don't think that I should be inquired [sic] to cut to
9    the bone unless there's any meat that is admissible in this
10   courtroom.  And cross-examination is a remedy and a right to
11   confront is a Sixth Amendment right that we have to confront
12   admissible evidence.  I simply don't think that there is a
13   foundation that renders this anything other than
14   speculative.
15             THE COURT:  All right.  Let me hear from any other
16   defendant.
17             Mr. Smith, we'll start with you.
18             MR. SMITH:  Thank you, Your Honor.
19             So sometimes when we, the defense in this trial,
20   makes objections on relevance or 403 grounds, the response
21   we've been debating on is whether, again, we could use
22   cross-examination to point out a flaw in the Government's
23   case, but there's a -- like Mr. Pattis said, there's a
24   gatekeeping function before that -- a gating question before
25   that and it couldn't be otherwise.  If the response was, You
```

```
 1    could elicit from cross-examination that this testimony is
 2    irrelevant, is inflammatory, is character evidence, then
 3    there would be no purpose for the Federal Rules of Evidence.
 4            And so, Judge, I think there's -- just three more
 5    sentences on this issue of leadership.  Leadership either
 6    means a specific group of people or it means nothing, Your
 7    Honor.  If it means a -- if it means nothing, there's no
 8    foundation, as Mr. Pattis indicated.  If it means a specific
 9    group of people, then the prosecutor should indicate which
10    group of people he's referring to to establish a foundation
11    for the witness's testimony.  If we don't identify a
12    specific group of people, we can't even engage in the
13    foundation inquiry to determine whether he has personal
14    knowledge of this issue.
15            Thank you, Your Honor.
16            THE COURT:  All right.  Any other defense lawyer
17    want to be heard on this?
18            MS. HERNANDEZ:  Your Honor --
19            THE COURT:  Ms. Hernandez, I already -- I think I
20    already heard from you; right?
21            MR. HASSAN:  Judge, Hassan on behalf of Tarrio,
22    Judge.
23            The one thing I want to add, Judge, is most of the
24    testimony coming out from this individual, Judge, we've
25    heard these questions over and over being derived through
```

1   Mr. Greene, Judge:  What do you perceive?  What do you

2   believe?  What do you understand?  Judge, now we're asking a

3   legal foundation -- basically, a legal conclusion question

4   as far as the leadership and as far as their perception,

5   Judge.

6           THE COURT:  I mean, it --

7           MR. HASSAN:  And --

8           THE COURT:  Okay.  I take your point.  I mean,

9   but -- I take your point.  I understand your argument.  I

10  don't know that it carries the day under the federal rules,

11  but I take your argument.

12          MR. HASSAN:  Judge, just calling -- I mean, if you

13  add -- if you -- if we've been listening to the testimony

14  correctly, over and over, he's basically stating, I

15  understood what would -- this was going on as that.  I

16  perceived this to be this.  I believed this to be that.  But

17  as far as firsthand knowledge or being told or being

18  directed or anything whatsoever --

19          THE COURT:  Well --

20          MR. HASSAN:  -- any firsthand knowledge, he has

21  none.

22          THE COURT:  I don't think the -- let me put it

23  this way.  On many things he was being asked about that drew

24  an objection, they were things like, Well, did you think

25  that Mr. Pezzola really meant -- let's just take that as an

1    example.  It's perfectly appropriate for -- someone who had

2    a lot of contact with another person can say, Well, look,

3    based on all sorts of things, yeah, I think the person -- I

4    understand that there's an objection to, you know --

5    conceptually to saying what someone else believed, but

6    someone you were in close contact with, who you observed,

7    who you had discussions about the topic with, it's perfectly

8    within that person's ability to say, Oh, yeah, I really

9    think -- I didn't think they were faking it.  I thought they

10   really believed it based on all these conversations, the

11   activities, the things I observed, all the rest.  Just using

12   that as an example.  So you know, the line you're trying to

13   draw is -- I understand your argument -- this falls on the

14   other side of the line.  My only point is, conceptually, if

15   there's nothing special about someone happening to be able

16   to -- being able to say, Based on my observations and our

17   discussions, here's what I thought -- I thought that other

18   person was sincere in this belief, or not sincere or

19   whatever.

20          MS. HERNANDEZ:  Your Honor, to follow up with what

21   Mr. Hassan has said is this gentleman was allowed, over

22   objection, over and over again to testify to things that we

23   don't know where they're coming from.  He talked about

24   Hudson Valley North and CNY's coordination.  The guy's been

25   there for two weeks and we don't know where this is coming

1    from.  Over and -- so that's why I'm going to foundation.

2    Over and over again, he was asked very -- as Mr. Hassan

3    said, these perception questions, and they're -- rather

4    than, What did you hear, what did you observe, and all -- so

5    there's a serious --

6            THE COURT:  All right.

7            MS. HERNANDEZ:  -- lack of foundation, and then we

8    get to the --

9            THE COURT:  Okay.

10           MS. HERNANDEZ:  -- big bang question --

11           THE COURT:  All right.

12           MS. HERNANDEZ:  -- and --

13           THE COURT:  All right.

14           MS. HERNANDEZ:  -- I -- it's just --

15           THE COURT:  Let me let Mr. Kenerson respond.

16           MR. KENERSON:  Thank you, Your Honor.

17           So Mr. Greene's testimony about December 12th --

18   December 11th and December 12th was that there was a large

19   group of Proud Boys, numbering in the thousands, marching

20   around Washington, D.C., trying to, essentially, egg on

21   Antifa into a fight.  Leadership did not discourage this at

22   all based on his observation.  I think he would also

23   testify -- I don't recall whether he testified to this yet,

24   but I think he would, if asked to explain the answer that

25   I'm about to -- or the question that I posed to him that --

1    I'm sorry, I just lost my train of thought there -- that --

2    I am so sorry.

3              THE COURT:  You -- it's all right.  You said, I

4    don't recall whether he testified to this yet, but I think

5    he would, if asked to explain the answer --

6              MR. KENERSON:  Yeah, the idea --

7              THE COURT:  I don't know if that jogs your --

8              MR. KENERSON:  -- that was pretty emphatically

9    drilled into him by people he understood to be senior

10   members of the Proud Boys; that, We -- I think this

11   actually -- he did testify to this -- we don't start shit;

12   we finish it.  And in terms of --

13             THE COURT:  Right.  There's no suggestion -- just

14   to be very clear, none of those -- none of that was

15   regarding these defendants.

16             MR. KENERSON:  Not specifically from these

17   defendants, no.

18             THE COURT:  Right.

19             MR. KENERSON:  But I think what he would testify

20   to is -- well, what he did testify to is the hierarchical

21   nature.  I think he would also testify that on at least one

22   occasion, this egging on was happening and Tarrio was there

23   and wasn't discouraging it.  I don't think I asked him that

24   question yet, but I think if asked that question he would

25   answer it like that.

 1              And in addition, I would note that Mr. Pezzola

 2    was, in Mr. Greene's mind, also a conduit to leadership.  He

 3    was in the Ministry of Self-Defense.  Mr. Greene knew that

 4    he had contact with leadership.  And, obviously, we know on

 5    the back end that Mr. Pezzola had leadership both through

 6    the Ministry -- or had contact both through being in the

 7    Ministry of Self-Defense and through actually going to

 8    Mr. Bertino with these people.  So I think that the jury can

 9    draw the inference that whatever Mr. -- whatever

10    understanding Mr. Greene had from conversations with people

11    that included Pezzola, that that includes whoever Pezzola

12    was talking to up through leadership in terms of the Proud

13    Boys' expectation.  Again, the defense can attack that on

14    cross.  I think the Court was -- is right, I mean, on --

15    that there's no question that there's some fertile ground

16    for the defense to cross-examine on, but I don't think that

17    as a matter of strictly 401 and 403, Mr. Greene's

18    impressions based on his personal experiences are

19    inadmissible.  The -- and I think it also goes towards, I

20    think, going back to the Court's reference to the tools, and

21    I think we would take that a step further.  I know the Court

22    was using that generally to mean people who were not these

23    defendants.  I think we would allege that Mr. Greene was, at

24    the very least, a day-of co-conspirator.  I mean, he's pled

25    guilty to conspiracy.  And so what he took from the actions

1    of -- both from seeing Mr. Tarrio not discourage what was

2    going on -- what he, as a new recruit to the Proud Boys,

3    took from that and how that affected his state of mind is

4    relevant here.  I mean, there's room for cross-examination

5    on it, certainly, but I don't think it's a relevance or a

6    403 question.

7                MR. PATTIS:  Judge, may I be heard?  I mean, I

8    don't know if Mr. Kenerson has paused.  Just -- I --

9                THE COURT:  I want Mr. Kenerson to complete --

10                MR. PATTIS:  I'm sorry.  I didn't know if he was

11    done.

12                THE COURT:  I understood.

13                MR. PATTIS:  I apologize to everyone.

14                THE COURT:  I don't think he is.

15                MR. KENERSON:  The other thing I would note in

16    addition to Mr. Pezzola and MOSD is that Mr. Greene was, in

17    fact, included in Boots on Ground.  He -- that was

18    created -- he didn't necessarily know that -- but created by

19    Jeremy Bertino, one of the leaders.  Mr. Pezzola put him in

20    there.  All of that, I think, informs Mr. Greene's judgment.

21                So I'm happy to answer any other questions the

22    Court may have and I'm open to, you know, if the problem --

23    if there is a problem in the Court's mind with how that

24    specific question was crafted, I'm open to different ways to

25    word it, but I do think that, at its core, that question was

1    a fair thing to get at.

2              THE COURT:  He is -- and what -- so I -- what do

3    you expect his answer will be to that question?  I guess --

4              MR. KENERSON:  Essentially, that there -- it was

5    never explicit, but he had a general sense that if there is

6    violence that breaks out, you're not to back down.

7              THE COURT:  Okay.  Mr. Pattis, let me hear from

8    you, sir.

9              MR. PATTIS:  I believe -- and I say this with

10   respect for Mr. Kenerson.  I think he confounds the

11   witness's experience and what informs it in his state of

12   mind with argument, and the Government can't transform him

13   into an argumentative tool, no pun intended with the use of

14   the term "tool" there.  There has to be some basis in his

15   knowledge that is relevant and is a -- and based on his

16   experience to these defendants.  He's got none.  And what

17   Mr. Kenerson offered you is a bunch of reasons that he may

18   argue that it might just be possible that whatever was in

19   our client's mind trickled down, but if he doesn't know that

20   and, you know -- then there -- then he's got no foundation.

21   None.

22             THE COURT:  How do you weigh the fact that he pled

23   guilty to conspiracy and to --

24             MR. PATTIS:  You know --

25             THE COURT:  -- conspiracy with --

1          MR. PATTIS:  -- we'll address that on

2    cross-examination --

3          THE COURT:  I know --

4          MR. PATTIS:  -- and I'd like --

5          THE COURT:  Well --

6          MR. PATTIS:  -- I'd like to know from him how --

7          THE COURT:  But that's --

8          MR. PATTIS:  -- and why --

9          THE COURT:  But that's --

10         MR. PATTIS:  -- he did --

11         THE COURT:  But that's, sort of, part of my point.

12   He pled guilty to conspiring with some of these defendants.

13         MR. PATTIS:  If you look at --

14         THE COURT:  Now, again --

15         MR. PATTIS:  -- his plea --

16         THE COURT:  -- you want to --

17         MR. PATTIS:  -- agreement, Judge -- I mean,

18   you'll -- you accepted it, and you accepted it with the

19   factual foundation.  So I guess I should ask you.  How do

20   you square it based on the factual foundation that you had

21   before him?

22         THE COURT:  Well --

23         MR. PATTIS:  His belief that there was a

24   conspiracy?  It's --

25         THE COURT:  But that --

1          MR. PATTIS:  -- the same infirmity that affects

2     his testimony here.  We're not here to test people's

3     subjective beliefs.  We're here to hold the Government to

4     its burden of proof.  This man was permitted to enter into a

5     conspiracy that we take the position doesn't exist and

6     nothing in his plea colloquy or in the agreement suggests to

7     the contrary.

8          THE COURT:  So there's nothing -- as --

9          MR. PATTIS:  It's almost like a constructive

10    Alford plea.

11         THE COURT:  There's -- so a conspiracy can't be

12    implicit or implied?

13         MR. PATTIS:  It can be, but it's got to be based

14    on an admissible evidentiary foundation.  It can't be

15    speculative.

16         THE COURT:  All right.

17         MS. HERNANDEZ:  And the D.C. --

18         THE COURT:  I --

19         MS. HERNANDEZ:  -- Circuit -- D.C. Circuit law

20    does not permit Mr. Greene's plea to a conspiracy to be used

21    against the defendants in this case.  It cannot be used.

22    The fact that he pled guilty to a conspiracy cannot be

23    introduced as evidence against these defendants.  And I

24    can cite the case to the Court's -- I don't have the case at

25    my fingertips --

1          THE COURT:  Okay.

2          MS. HERNANDEZ:  -- but that's D.C. Circuit --

3          THE COURT:  I --

4          MS. HERNANDEZ:  -- case law.

5          THE COURT:  Fair enough.  I -- whatever the case

6    says, it says.

7          But I guess my point is I'm not sure

8    Mr. Pattis's -- I'm not sure the point you've made -- I

9    mean, you turned immediately to cross.  So I --

10         MR. PATTIS:  I beg your pardon, sir?  I didn't --

11         THE COURT:  You -- when I raised this, you

12   immediately said, Yes, we're going to cross him on this.  So

13   I -- all right.

14         I've heard you all.  I'll take this up over the

15   lunch hour.  And we'll come back at -- it's 12:35.  Let's

16   come back at 1:45.  Let's give an extra 10 minutes for

17   lunch.

18         THE DEPUTY CLERK:  All rise.  This Honorable Court

19   stands in recess until the return of Court at 1:45.

20         (Luncheon recess taken at 12:35 p.m.)

21              * * * * * * * * * * * *

22              CERTIFICATE OF OFFICIAL COURT REPORTER

23   I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify

24   that the above and foregoing constitutes a true and accurate

25   transcript of my stenographic notes and is a full, true and

5440

1    complete transcript of the proceedings to the best of my

2    ability, dated this 24th day of January 2023.

3                              /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                              Official Court Reporter
4                              United States Courthouse
                              Room 6722
5                              333 Constitution Avenue, NW
                              Washington, DC 20001

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**/**

/s/Timothy [1] - 5440:3

**0**

06511 [1] - 5284:25

**1**

1 [4] - 5287:3, 5287:9, 5287:13, 5291:24
1-ETHAN [1] - 5284:4
10 [6] - 5350:24, 5357:14, 5358:20, 5359:4, 5424:13, 5439:16
10-minute [3] - 5358:19, 5358:25, 5359:2
100 [1] - 5350:24
10003 [1] - 5284:18
10016 [1] - 5285:13
1014 [1] - 5285:9
1104 [3] - 5397:19, 5399:14, 5403:20
1105 [2] - 5397:19, 5403:23
1106 [4] - 5397:19, 5403:25, 5406:5, 5412:25
1107 [5] - 5397:19, 5399:14, 5403:25, 5406:5, 5413:7
11th [12] - 5370:21, 5371:8, 5374:9, 5376:14, 5377:10, 5379:24, 5381:16, 5381:24, 5418:24, 5419:7, 5425:11, 5432:18
12:12 [1] - 5420:10
12:15 [1] - 5420:10
12:35 [2] - 5439:15, 5439:20
12th [22] - 5352:7, 5363:23, 5367:1, 5374:10, 5376:20, 5376:23, 5377:12, 5377:18, 5379:24, 5381:14, 5382:9, 5382:12, 5387:1, 5387:5, 5387:15, 5391:24, 5414:3, 5418:24, 5419:8, 5425:11, 5432:17, 5432:18
13th [1] - 5387:6
1420 [1] - 5284:21

**2**

15 [3] - 5400:6, 5420:11, 5420:20
153 [1] - 5285:5
16 [2] - 5292:15, 5292:25
18-hour [1] - 5329:10
19 [2] - 5292:15, 5292:25
1:21-cr-00175-TJK-1 [1] - 5284:2
1:21-cr-00175-TJK-2 [1] - 5284:3
1:21-cr-00175-TJK-3 [1] - 5284:3
1:21-cr-00175-TJK-5 [1] - 5284:4
1:21-cr-00175-TJK-6 [1] - 5284:4
1:45 [2] - 5439:16, 5439:19
1st [1] - 5284:24

**2**

2 [3] - 5287:4, 5287:9, 5287:14
2-JOSEPH [1] - 5284:5
20 [4] - 5284:8, 5341:13, 5342:2, 5342:14
20-something-second [1] - 5297:19
20001 [2] - 5285:17, 5440:5
20005 [1] - 5284:21
2008 [1] - 5324:19
2010 [1] - 5325:5
2011 [1] - 5325:5
2014 [1] - 5326:3
2016 [4] - 5324:19, 5325:12, 5326:4, 5332:7
2017 [1] - 5327:6
202 [3] - 5284:15, 5284:22, 5285:17
2020 [18] - 5329:4, 5330:12, 5330:13, 5332:2, 5332:3, 5333:2, 5333:11, 5345:1, 5345:12, 5346:3, 5346:6, 5347:4, 5348:20, 5351:2, 5367:16, 5374:7, 5375:14, 5376:7
2021 [3] - 5318:11, 5329:4, 5331:18
2023 [2] - 5284:6, 5440:2

**3**

203 [1] - 5284:25
20530 [1] - 5284:15
20777 [1] - 5285:3
209 [1] - 5285:6
20th [1] - 5284:17
21-175 [2] - 5287:2, 5359:7
24 [1] - 5284:6
240 [1] - 5285:3
24th [1] - 5440:2
25 [1] - 5295:21
252-7233 [1] - 5284:15
253-0514 [1] - 5285:14

**3**

3 [3] - 5287:4, 5287:10, 5287:14
3-ZACHARY [1] - 5284:5
302s [1] - 5321:1
305 [2] - 5285:7, 5285:10
33012 [1] - 5285:9
33014 [1] - 5285:6
333 [2] - 5285:16, 5440:5
354-3111 [1] - 5285:17
383 [1] - 5284:24
393-3017 [1] - 5284:25

**4**

4 [2] - 5380:16, 5400:5
40-something [1] - 5389:9
401 [2] - 5334:5, 5434:17
401G [1] - 5396:15
403 [6] - 5334:5, 5360:17, 5406:6, 5428:20, 5434:17, 5435:6
403-7323 [1] - 5285:7
403G [2] - 5396:2, 5397:10
404(b [3] - 5293:7, 5293:10, 5294:15
404(b) [1] - 5294:13
409B [1] - 5396:15
410A [1] - 5396:15
412A [1] - 5396:16
412AX [1] - 5396:16
412B [1] - 5396:16
417 [8] - 5289:3, 5295:13, 5299:17, 5299:20, 5300:3, 5301:3, 5302:21, 5315:20
417X [2] - 5289:3,

5299:18
420A [1] - 5396:16
420C [1] - 5396:16
429-6520 [1] - 5284:22
429A [1] - 5396:16
429AX [1] - 5396:16
430B [1] - 5396:16
442A [1] - 5400:15
444A [1] - 5396:16
444AX [2] - 5396:17, 5400:8
450 [1] - 5400:11
452 [2] - 5396:17, 5400:5
464 [2] - 5396:17, 5396:21
472 [1] - 5396:17
472-3391 [1] - 5285:3
475 [1] - 5396:17
49 [1] - 5285:9
4r [1] - 5284:18
4th [1] - 5284:14

**5**

5 [3] - 5287:5, 5287:11, 5287:15
5-ENRIQUE [1] - 5284:6
50 [1] - 5350:24
555 [1] - 5284:14
5th [6] - 5414:18, 5415:10, 5416:10, 5416:24, 5417:16, 5417:20

**6**

6 [3] - 5287:5, 5287:12, 5287:15
6-DOMINIC [1] - 5284:6
6175 [1] - 5285:5
646 [1] - 5285:14
6722 [2] - 5285:16, 5440:4
6th [34] - 5285:13, 5318:11, 5331:17, 5331:18, 5335:21, 5342:22, 5343:10, 5343:23, 5344:2, 5347:24, 5354:25, 5355:4, 5355:10, 5356:5, 5357:11, 5363:22, 5391:24, 5394:22, 5395:1, 5395:10, 5396:3, 5396:24, 5397:13, 5406:20, 5408:22, 5414:3, 5414:13,

5414:16, 5416:7, 5418:2, 5424:2, 5425:12, 5425:14, 5426:19

**7**

7 [2] - 5284:17, 5329:10
7166 [1] - 5285:2

**8**

822-2901 [1] - 5285:10

**9**

901 [1] - 5310:21
902-3869 [1] - 5284:19
917 [1] - 5284:19
99 [1] - 5285:12
9:00 [1] - 5284:6

**A**

A.J [1] - 5392:23
a.m [1] - 5284:6
Aaron [1] - 5344:6
ability [4] - 5358:8, 5377:3, 5431:8, 5440:2
able [26] - 5288:17, 5288:20, 5297:5, 5300:21, 5301:17, 5303:8, 5303:13, 5304:5, 5306:23, 5308:23, 5312:1, 5312:3, 5312:4, 5313:20, 5314:15, 5315:15, 5316:24, 5317:1, 5322:12, 5328:25, 5365:13, 5379:2, 5382:9, 5398:13, 5431:15, 5431:16
abouts [2] - 5327:5, 5331:21
absent [1] - 5391:24
absolutely [1] - 5358:15
abuse [2] - 5316:4, 5371:18
acceding [1] - 5288:15
accepted [2] - 5437:18
access [2] - 5318:13, 5318:15
acclaim [1] - 5385:7
accomplish [1] - 5371:21

5442

according [1] -
5364:23
accosted [1] - 5336:16
account [3] - 5339:16,
5339:21, 5394:7
accurate [8] -
5305:15, 5309:16,
5310:22, 5310:23,
5311:19, 5315:23,
5405:23, 5439:24
accurately [4] -
5305:2, 5396:2,
5397:1, 5401:2
acknowledge [1] -
5426:16
act [3] - 5293:14,
5294:9, 5376:25
acting [1] - 5377:6
actions [2] - 5356:4,
5434:25
activ [1] - 5354:24
activities [3] -
5354:25, 5355:14,
5431:11
acts [2] - 5293:12,
5293:13
actual [1] - 5299:19
add [3] - 5360:2,
5429:23, 5430:13
added [4] - 5305:3,
5397:3, 5397:5,
5397:7
addition [2] - 5434:1,
5435:16
additional [2] -
5310:24, 5347:20
additions [1] -
5403:19
address [6] - 5293:1,
5320:5, 5324:8,
5337:23, 5422:18,
5437:1
addresses [1] -
5292:16
adequate [3] -
5306:15, 5308:1,
5425:21
admissible [7] -
5398:8, 5398:14,
5404:21, 5425:19,
5428:9, 5428:12,
5438:14
admission [6] -
5291:4, 5291:5,
5296:10, 5393:2,
5397:25, 5404:23
admissions [1] -
5425:19
admit [1] - 5308:25
admitted [5] -

5342:19, 5361:20,
5393:4, 5398:25,
5408:12
admonished [1] -
5353:25
adopt [1] - 5335:8
adopted [1] - 5295:3
advance [1] - 5398:6
aesthetics [1] -
5365:22
affected [1] - 5435:3
affecting [1] - 5329:12
affects [1] - 5438:1
affiliated [1] - 5326:25
Afghanistan [3] -
5325:3, 5325:4,
5325:7
aftermath [2] -
5382:17, 5382:20
afterwards [1] -
5332:8
Agent [1] - 5392:17
ago [3] - 5313:4,
5313:22, 5403:15
agree [4] - 5289:21,
5399:6, 5402:5,
5426:19
agreed [1] - 5401:13
agreement [2] -
5437:17, 5438:6
ahead [7] - 5288:15,
5340:3, 5360:4,
5386:8, 5396:11,
5414:16, 5414:17
aided [1] - 5285:19
air [2] - 5357:10,
5420:9
airbase [1] - 5325:8
al [1] - 5359:8
Alford [1] - 5438:10
allege [2] - 5355:13,
5434:23
alleging [1] - 5356:6
allow [2] - 5322:24,
5363:18
allowed [3] - 5323:6,
5423:14, 5431:21
almost [5] - 5336:18,
5374:13, 5377:6,
5392:4, 5394:2,
5438:9
altogether [1] - 5426:2
amateur [1] - 5416:21
Amendment [1] -
5428:11
AMERICA [1] - 5284:2
America [2] - 5287:3,
5359:8
amicus [1] - 5368:22
amount [1] - 5404:13

anger [2] - 5361:8,
5367:22
angrier [1] - 5368:1
angry [9] - 5344:25,
5360:25, 5361:9,
5362:12, 5367:21,
5368:12, 5384:10
answer [20] - 5319:15,
5322:13, 5353:14,
5353:15, 5353:16,
5356:25, 5358:10,
5373:2, 5373:4,
5376:3, 5390:17,
5409:22, 5419:6,
5421:19, 5426:19,
5432:24, 5433:5,
5433:25, 5435:21,
5436:3
answered [1] -
5369:25
answers [1] - 5371:2
antagonistic [5] -
5370:24, 5371:9,
5371:10, 5381:19,
5388:16
anticipate [2] -
5353:16, 5358:12
Antifa [26] - 5333:21,
5335:18, 5351:7,
5371:12, 5371:24,
5372:7, 5372:11,
5372:12, 5372:15,
5373:15, 5373:18,
5374:10, 5374:14,
5374:17, 5374:21,
5374:22, 5374:25,
5375:6, 5375:24,
5376:12, 5381:2,
5382:5, 5383:2,
5384:24, 5385:3,
5432:21
Antifa's [2] - 5375:15,
5376:9
anytime [1] - 5291:5
apart [2] - 5376:15,
5403:3
apologies [1] -
5326:18
apologize [2] -
5401:11, 5435:13
app [1] - 5339:7
appeal [3] - 5332:11,
5336:23, 5345:19
appear [5] - 5305:16,
5308:7, 5341:3,
5361:12, 5397:6
appearance [1] -
5312:17
APPEARANCES [2] -
5284:11, 5285:1

appellate [1] - 5316:2
approach [5] -
5392:14, 5392:15,
5395:12, 5405:19,
5405:21
approached [1] -
5288:10
approaching [2] -
5392:17, 5395:16
appropriate [10] -
5287:24, 5295:5,
5295:6, 5308:15,
5361:7, 5402:17,
5403:5, 5405:6,
5426:11, 5431:1
area [2] - 5325:6,
5337:18
argue [15] - 5296:13,
5297:6, 5301:1,
5301:11, 5302:17,
5305:10, 5308:23,
5309:11, 5310:3,
5314:6, 5315:2,
5315:15, 5317:4,
5402:1, 5436:18
argued [2] - 5291:14,
5402:16
arguing [2] - 5313:13,
5315:2
argument [16] -
5308:10, 5308:11,
5309:4, 5310:11,
5310:14, 5310:16,
5311:7, 5311:25,
5314:5, 5314:10,
5362:13, 5404:6,
5430:9, 5430:11,
5431:13, 5436:12
argumentative [1] -
5436:13
arguments [3] -
5305:8, 5305:22,
5316:19
arms [1] - 5378:11
Army [5] - 5324:16,
5324:21, 5325:9,
5325:24, 5385:22
arrest [3] - 5409:17,
5409:23, 5410:3
arrested [1] - 5408:23
arrive [1] - 5348:23
arrived [2] - 5349:22,
5350:17
arriving [1] - 5412:5
art [1] - 5326:16
article [1] - 5365:15
articulate [1] -
5389:17
articulated [2] -
5357:17, 5363:11

artist [2] - 5326:14,
5326:20
aside [3] - 5291:15,
5361:7, 5403:17
asserted [1] - 5401:16
assign [1] - 5292:5
Assistant [1] - 5360:8
associate [1] - 5365:1
associated [10] -
5352:10, 5352:11,
5353:19, 5355:12,
5356:7, 5363:12,
5364:17, 5367:2,
5367:3, 5388:5
associates [1] -
5363:13
association [2] -
5334:7, 5355:8
assume [1] - 5386:19
assure [1] - 5333:17
attaching [1] -
5364:20
attack [2] - 5335:18,
5434:13
attacking [1] -
5333:21
attempted [2] -
5354:13, 5356:13
attention [10] -
5312:13, 5330:13,
5387:14, 5387:16,
5387:17, 5387:19,
5387:22, 5404:3,
5412:16, 5412:17
attire [1] - 5350:11
attitude [5] - 5381:19,
5425:12, 5426:4,
5426:5, 5426:10
Attorney [2] - 5360:8
ATTORNEY'S [1] -
5284:14
audio [10] - 5321:1,
5397:17, 5401:21,
5402:9, 5408:13,
5409:9, 5410:5,
5413:2, 5413:8,
5414:12
AUSA [1] - 5362:20
authenticate [9] -
5296:2, 5304:25,
5305:14, 5306:7,
5306:18, 5307:4,
5311:3, 5311:5,
5317:1
authenticated [1] -
5314:16
authenticating [1] -
5399:3
authentication [1] -
5310:21

5443

**authenticity** [2] - 5398:5, 5398:16
**authored** [1] - 5296:12
**authority** [4] - 5305:6, 5386:14, 5402:18, 5405:6
**available** [4] - 5290:24, 5318:9, 5322:10, 5415:23
**Avenue** [3] - 5285:12, 5285:16, 5440:5
**avoid** [1] - 5388:6
**aware** [10] - 5289:14, 5345:2, 5355:2, 5368:14, 5368:20, 5382:12, 5401:21, 5408:22, 5409:14, 5410:23
**awfully** [1] - 5313:16

## B

**B.A** [1] - 5284:12
**backed** [3] - 5375:1, 5375:6, 5376:12
**background** [6] - 5363:16, 5363:21, 5364:6, 5391:5, 5393:13, 5394:3
**backwards** [1] - 5400:13
**badges** [1] - 5385:23
**balls** [1] - 5427:9
**bang** [1] - 5432:10
**bar** [2] - 5349:4, 5349:5
**base** [1] - 5419:7
**based** [28] - 5290:6, 5296:4, 5304:22, 5318:5, 5318:17, 5318:22, 5353:4, 5361:13, 5362:25, 5373:19, 5374:9, 5375:12, 5376:6, 5390:8, 5390:22, 5418:23, 5419:19, 5419:24, 5422:5, 5423:22, 5426:5, 5431:3, 5431:10, 5432:22, 5434:18, 5436:15, 5437:20, 5438:13
**Based** [3] - 5425:10, 5426:7, 5431:16
**basic** [1] - 5422:4
**basis** [12] - 5311:3, 5357:16, 5365:14, 5419:21, 5420:3, 5423:22, 5424:5, 5424:12, 5424:20,

5427:13, 5428:4, 5436:14
**Beard** [5] - 5343:25, 5382:13, 5383:1, 5391:4, 5391:12, 5393:13
**became** [2] - 5341:17, 5383:11
**become** [3] - 5342:2, 5347:16, 5383:12
**befitting** [2] - 5361:18, 5361:20
**BEFORE** [1] - 5284:9
**beg** [1] - 5439:10
**beginning** [1] - 5364:5
**begs** [1] - 5306:21
**behalf** [2] - 5365:25, 5429:21
**behind** [2] - 5299:18, 5400:17
**behooves** [1] - 5288:6
**belief** [4] - 5374:22, 5384:21, 5431:18, 5437:23
**beliefs** [2] - 5390:14, 5438:3
**believes** [2] - 5290:24, 5424:6
**bench** [7] - 5336:6, 5358:17, 5405:10, 5406:15, 5412:9, 5412:24, 5420:16
**Bench** [6] - 5333:8, 5353:2, 5398:11, 5405:15, 5412:11, 5419:12
**benefit** [4] - 5306:3, 5318:22, 5320:20, 5396:12
**Bertino** [2] - 5434:8, 5435:19
**beside** [1] - 5364:15
**best** [6] - 5326:23, 5352:3, 5372:20, 5373:7, 5390:17, 5440:1
**bet** [1] - 5290:19
**better** [1] - 5292:3
**between** [9] - 5292:8, 5326:16, 5380:1, 5391:23, 5406:10, 5410:18, 5410:21, 5414:3, 5416:9
**beyond** [2] - 5355:6, 5405:17
**bicycles** [1] - 5372:5
**Biden** [1] - 5330:20
**big** [4] - 5345:16, 5420:7, 5423:4, 5432:10

**biggest** [1] - 5319:21
**Biggs** [12] - 5287:4, 5287:14, 5304:19, 5306:1, 5312:7, 5312:15, 5312:19, 5312:25, 5343:14, 5356:3, 5365:7, 5425:16
**BIGGS** [1] - 5284:5
**Biggs's** [1] - 5426:5
**bit** [10] - 5289:12, 5369:21, 5370:22, 5376:24, 5382:16, 5387:21, 5394:21, 5411:13, 5411:14, 5420:20
**black** [11] - 5350:10, 5350:11, 5350:16, 5372:20, 5372:21, 5373:6, 5373:8, 5373:9, 5392:6, 5400:5, 5400:7
**Blackbeard** [1] - 5344:4
**blah** [9] - 5309:11, 5309:12, 5309:16, 5424:18
**blame** [1] - 5334:24
**block** [2] - 5372:21, 5373:7
**Bloody** [1] - 5344:6
**Blow** [1] - 5315:13
**blown** [5] - 5346:13, 5404:8, 5412:16, 5414:10, 5414:11
**blurry** [1] - 5299:21
**boggling** [1] - 5424:14
**bolstering** [1] - 5307:13
**bone** [1] - 5428:9
**Bones** [1] - 5343:3
**booked** [1] - 5406:24
**Boots** [4] - 5415:14, 5415:25, 5424:1, 5435:17
**bottles** [1] - 5381:8
**bottom** [1] - 5314:17
**bounds** [1] - 5333:15
**bowl** [2] - 5392:5
**bowling** [1] - 5329:20
**box** [2] - 5323:15, 5366:15
**boy** [1] - 5424:18
**Boy** [16] - 5337:12, 5337:14, 5337:15, 5345:16, 5347:11, 5365:2, 5382:13, 5386:18, 5388:5, 5392:7, 5393:11, 5393:22, 5394:18,

5414:25, 5423:20, 5426:18
**Boys** [99] - 5331:7, 5331:19, 5331:22, 5332:6, 5332:10, 5332:11, 5333:20, 5334:4, 5334:6, 5334:13, 5335:3, 5335:17, 5336:19, 5337:10, 5338:16, 5338:18, 5340:20, 5341:15, 5342:4, 5342:16, 5342:19, 5342:23, 5343:6, 5343:11, 5344:9, 5345:19, 5346:2, 5346:13, 5346:23, 5347:10, 5347:17, 5349:7, 5350:9, 5351:19, 5352:10, 5352:11, 5352:14, 5353:9, 5353:19, 5355:7, 5355:9, 5355:12, 5356:1, 5356:8, 5357:21, 5357:25, 5358:6, 5363:13, 5364:11, 5364:15, 5367:2, 5367:3, 5367:6, 5368:4, 5368:8, 5369:12, 5369:19, 5370:4, 5372:6, 5374:12, 5374:20, 5375:5, 5376:7, 5377:14, 5381:1, 5382:6, 5383:8, 5383:13, 5384:22, 5385:11, 5385:17, 5387:10, 5388:18, 5391:7, 5393:15, 5407:8, 5407:22, 5407:23, 5414:25, 5415:11, 5415:22, 5416:6, 5417:7, 5418:8, 5418:14, 5418:16, 5418:17, 5418:24, 5418:25, 5419:16, 5423:13, 5423:16, 5423:18, 5425:10, 5425:17, 5432:19, 5433:10, 5435:2
**Boys'** [3] - 5374:7, 5382:2, 5434:13
**break** [9] - 5357:9, 5357:14, 5357:15, 5358:14, 5358:19, 5366:21, 5420:19
**breaks** [1] - 5436:6
**bricks** [1] - 5381:9

**Brief** [6] - 5298:4, 5323:13, 5359:5, 5366:6, 5366:9, 5366:11
**brief** [3] - 5368:23, 5398:19, 5408:10
**briefly** [3] - 5315:25, 5359:10, 5360:6
**bring** [7] - 5297:18, 5299:9, 5315:17, 5317:24, 5323:11, 5365:24, 5366:7
**broadly** [1] - 5333:14
**built** [1] - 5378:18
**bunch** [6] - 5327:11, 5336:16, 5340:19, 5344:17, 5377:5, 5436:17
**burden** [1] - 5438:4
**burger** [1] - 5320:1
**business** [5] - 5288:25, 5327:3, 5327:7, 5327:9, 5329:6
**busy** [2] - 5414:2
**butting** [1] - 5386:10
**BY** [41] - 5323:25, 5328:16, 5329:25, 5336:8, 5340:2, 5344:15, 5348:18, 5349:20, 5351:14, 5352:4, 5366:20, 5370:8, 5371:5, 5373:12, 5374:19, 5375:11, 5376:2, 5379:9, 5381:11, 5383:17, 5384:5, 5384:16, 5389:12, 5389:23, 5390:7, 5390:18, 5392:16, 5393:5, 5395:15, 5396:13, 5396:23, 5406:18, 5408:14, 5409:10, 5409:25, 5413:4, 5413:9, 5413:24, 5415:4, 5416:8, 5417:11

## C

**California** [6] - 5325:22, 5326:11, 5326:12, 5326:25, 5327:20, 5329:17
**calm** [2] - 5354:3, 5354:4
**camera** [1] - 5378:5
**cameras** [1] - 5377:20, 5377:23, 5377:24, 5378:1, 5378:14,

5444

5388:6, 5388:9
**candidly** [1] - 5312:24
**cannot** [14] - 5290:2, 5298:13, 5299:9, 5303:8, 5306:7, 5310:21, 5311:14, 5311:15, 5313:24, 5315:16, 5315:18, 5438:21, 5438:22
**Capital** [1] - 5337:3
**Capitol** [4] - 5299:4, 5311:1, 5394:25, 5395:4
**captures** [1] - 5401:2
**car** [5] - 5407:14, 5407:18, 5407:19, 5408:3, 5408:5
**care** [2] - 5306:1, 5306:24
**career** [3] - 5325:24, 5325:25, 5344:19
**carefully** [1] - 5427:10
**Carmen** [2] - 5285:2, 5287:11
**Carolinas** [2] - 5391:20, 5414:8
**carrier** [2] - 5380:16, 5380:23
**carries** [1] - 5430:10
**carrying** [4] - 5372:13, 5372:18, 5372:23, 5400:16
**cars** [4] - 5407:16, 5411:15, 5414:15, 5415:9
**case** [26] - 5291:21, 5294:3, 5300:9, 5305:6, 5305:25, 5306:21, 5307:11, 5312:12, 5316:4, 5335:23, 5354:23, 5364:21, 5368:25, 5401:18, 5419:14, 5420:2, 5424:4, 5425:15, 5425:25, 5427:12, 5428:23, 5438:21, 5438:24, 5439:4, 5439:5
**cases** [1] - 5334:8
**cat** [2] - 5392:4, 5392:5
**caveat** [1] - 5322:22
**CCR** [3] - 5285:15, 5439:23, 5440:3
**celebrating** [1] - 5383:7
**cell** [1] - 5377:22
**center** [1] - 5394:5
**central** [1] - 5313:1
**Central** [1] - 5337:17

**certain** [8] - 5292:6, 5292:24, 5296:4, 5305:3, 5307:2, 5316:23, 5376:25, 5421:11
**certainly** [4] - 5315:10, 5317:20, 5399:13, 5435:5
**CERTIFICATE** [1] - 5439:22
**certification** [1] - 5416:16
**certify** [1] - 5439:23
**certitude** [1] - 5296:20
**challenge** [2] - 5303:8, 5303:9
**challenges** [4] - 5345:2, 5345:8, 5368:15, 5368:21
**chance** [1] - 5395:9
**change** [8] - 5321:4, 5339:23, 5369:14, 5385:9, 5403:24, 5409:13, 5410:3, 5426:9
**changed** [5] - 5320:25, 5321:3, 5403:24, 5409:13, 5425:11
**channel** [11] - 5340:6, 5340:24, 5341:2, 5341:12, 5342:1, 5342:3, 5393:12, 5394:11, 5394:12, 5394:15, 5394:17
**channels** [1] - 5394:13
**chant** [3] - 5351:9, 5351:16, 5352:15
**chants** [2] - 5351:4, 5351:6
**chaotic** [1] - 5312:11
**chapter** [10] - 5337:20, 5337:22, 5339:4, 5341:15, 5341:18, 5342:12, 5342:13, 5347:1, 5376:25, 5387:7
**chapters** [1] - 5337:14
**character** [1] - 5429:2
**characterization** [1] - 5335:6
**charge** [5] - 5318:18, 5320:12, 5321:5, 5321:7, 5322:3
**charged** [2] - 5319:20, 5421:9
**charges** [1] - 5421:8
**chat** [16] - 5339:7, 5340:17, 5342:18,

5342:25, 5343:3, 5344:22, 5345:6, 5346:18, 5367:12, 5367:16, 5389:2, 5394:20, 5415:14, 5415:16, 5415:22, 5424:1
**chats** [4] - 5342:19, 5342:23, 5344:1, 5346:15
**chauvinist** [1] - 5338:22
**check** [2] - 5414:22, 5415:5
**checked** [1] - 5415:7
**chest** [1] - 5378:11
**Chicago** [1] - 5403:22
**children** [1] - 5336:13
**chime** [1] - 5290:6
**choose** [1] - 5340:15
**choosing** [1] - 5340:10
**cigar** [1] - 5378:12
**circle** [4] - 5305:20, 5352:21, 5364:14, 5377:6
**circled** [2] - 5315:13, 5315:14
**circles** [2] - 5309:18, 5311:6
**circling** [3] - 5304:12, 5308:16, 5316:22
**Circuit** [2] - 5438:19, 5439:2
**circular** [1] - 5320:18
**circumstances** [2] - 5296:3, 5300:10
**cite** [1] - 5438:24
**cited** [1] - 5334:8
**citizens** [1] - 5333:22
**city** [3] - 5324:8, 5350:21, 5411:9
**civil** [5] - 5370:19, 5384:12, 5389:10, 5389:14, 5390:4
**civilian** [2] - 5325:25, 5326:7
**claim** [2] - 5299:2, 5310:15
**claims** [2] - 5307:12, 5423:18
**clarify** [1] - 5335:15
**classification** [2] - 5318:7, 5322:12
**classified** [9] - 5318:20, 5320:16, 5320:17, 5321:12, 5321:15, 5322:9, 5322:13, 5322:14, 5322:16

**clear** [6] - 5299:8, 5299:14, 5304:3, 5324:3, 5404:7, 5433:14
**clearance** [1] - 5318:12
**clearly** [4] - 5291:6, 5294:14, 5305:25, 5316:3
**CLERK** [6] - 5287:2, 5323:14, 5359:3, 5359:6, 5366:14, 5439:18
**clicked** [1] - 5337:14
**client** [32] - 5294:22, 5295:1, 5296:21, 5298:24, 5299:2, 5299:3, 5299:6, 5299:8, 5299:16, 5300:18, 5300:23, 5301:12, 5301:16, 5301:17, 5302:4, 5302:12, 5302:14, 5302:18, 5303:20, 5304:4, 5308:22, 5310:2, 5313:25, 5315:5, 5315:6, 5315:9, 5315:10, 5315:12, 5315:16, 5389:6, 5427:24
**client's** [2] - 5296:15, 5436:19
**clients** [2] - 5314:9, 5419:18
**climate** [1] - 5388:19
**close** [12] - 5324:3, 5351:23, 5360:17, 5371:12, 5377:25, 5390:23, 5400:24, 5410:20, 5413:13, 5431:6
**closely** [1] - 5310:9
**closer** [8] - 5349:15, 5368:1, 5372:8, 5379:8, 5379:15, 5379:21, 5426:21, 5426:23
**closing** [1] - 5310:7
**clothing** [1] - 5365:15
**clubs** [1] - 5329:21
**CNY** [30] - 5337:15, 5337:16, 5337:20, 5337:22, 5341:15, 5341:18, 5342:12, 5342:13, 5342:20, 5346:15, 5347:1, 5349:7, 5368:3, 5376:25, 5381:20, 5387:10, 5388:18, 5391:7, 5392:6,

5394:20, 5407:7, 5407:22, 5407:23, 5410:12, 5410:19, 5410:21, 5411:5, 5414:24, 5418:14, 5418:16
**CNY's** [1] - 5431:24
**co** [8] - 5291:4, 5291:14, 5292:11, 5292:13, 5355:13, 5356:6, 5401:19, 5434:24
**co-conspirator** [5] - 5291:4, 5291:14, 5292:11, 5401:19, 5434:24
**co-conspirators** [3] - 5292:13, 5355:13, 5356:6
**collector** [1] - 5324:17
**colloquy** [2] - 5295:19, 5438:6
**color** [1] - 5348:9
**colors** [5] - 5350:6, 5350:8, 5377:15, 5380:20, 5392:6
**COLUMBIA** [1] - 5284:1
**coming** [15] - 5291:3, 5294:2, 5336:19, 5400:4, 5400:13, 5403:22, 5411:22, 5411:24, 5412:1, 5412:2, 5413:16, 5414:1, 5429:24, 5431:23, 5431:25
**command** [4] - 5386:3, 5403:24, 5409:14, 5410:3
**comments** [2] - 5388:22, 5388:25
**common** [4] - 5294:16, 5364:16, 5367:8, 5406:11
**common-law** [1] - 5406:11
**communications** [2] - 5321:7, 5355:2
**company** [3] - 5328:4, 5329:3, 5378:20
**compare** [2] - 5367:23, 5377:12
**competent** [2] - 5303:5, 5316:10, 5316:12
**complete** [2] - 5435:9, 5440:1
**completely** [2] - 5305:4, 5362:21
**computer** [2] -

5445

5285:19, 5322:18
**computer-aided** [1] -
5285:19
**concede** [2] -
5398:14, 5425:19
**conceived** [1] -
5354:14
**concept** [1] - 5334:23
**conceptually** [2] -
5431:5, 5431:14
**concern** [4] - 5295:20,
5297:1, 5309:8,
5311:25
**concerned** [2] -
5298:3, 5361:5
**conclusion** [1] -
5430:3
**conclusions** [1] -
5427:14
**concrete** [1] - 5370:3
**conduit** [1] - 5434:2
**conference** [13] -
5333:8, 5336:6,
5353:2, 5358:17,
5398:11, 5405:10,
5405:15, 5406:15,
5412:9, 5412:11,
5412:24, 5419:12,
5420:16
**confounds** [1] -
5436:10
**confront** [8] -
5303:13, 5304:5,
5309:13, 5309:14,
5314:11, 5424:9,
5428:11
**confrontation** [3] -
5371:19, 5374:1,
5386:13
**connection** [4] -
5321:4, 5356:4,
5364:14, 5410:21
**connections** [1] -
5393:15
**Conor** [2] - 5284:13,
5287:8
**consequences** [1] -
5388:7
**conservative** [5] -
5328:5, 5328:6,
5328:10, 5328:24,
5333:22
**consider** [2] -
5292:12, 5357:9
**considered** [4] -
5341:14, 5374:2,
5386:21, 5422:3
**conspiracy** [11] -
5291:21, 5421:10,
5425:20, 5434:25,

5436:23, 5436:25,
5437:24, 5438:5,
5438:11, 5438:20,
5438:22
**conspirator** [5] -
5291:4, 5291:14,
5292:11, 5401:19,
5434:24
**conspirators** [3] -
5292:13, 5355:13,
5356:6
**conspiring** [1] -
5437:12
**constantly** [1] -
5329:17
**constitutes** [1] -
5439:24
**Constitution** [2] -
5285:16, 5440:5
**constructive** [1] -
5438:9
**contact** [11] - 5343:11,
5343:14, 5343:16,
5343:18, 5343:20,
5383:8, 5415:11,
5431:2, 5431:6,
5434:4, 5434:6
**contain** [1] - 5396:14
**contained** [1] - 5402:8
**contains** [1] - 5322:11
**context** [7] - 5305:21,
5316:3, 5351:9,
5351:15, 5352:14,
5400:2, 5408:20
**continue** [3] -
5336:10, 5390:24,
5391:1
**CONTINUED** [1] -
5285:1
**continuing** [2] -
5375:23, 5425:16
**contours** [1] - 5322:8
**contracts** [1] -
5328:25
**contrary** [2] - 5307:21,
5438:7
**control** [1] - 5385:24
**controlling** [1] -
5354:7
**controversial** [3] -
5313:18, 5363:25,
5364:3
**conventional** [1] -
5305:4
**conversation** [4] -
5374:25, 5375:4,
5391:11, 5423:25
**conversations** [23] -
5340:21, 5344:21,
5344:24, 5367:18,

5367:20, 5369:8,
5369:14, 5370:4,
5370:18, 5373:20,
5374:12, 5376:11,
5382:1, 5382:3,
5390:2, 5390:9,
5406:10, 5406:12,
5414:1, 5414:14,
5423:23, 5431:10,
5434:10
**convinced** [1] -
5384:11
**Cooney** [1] - 5289:5
**cooperating** [1] -
5320:24
**coordination** [4] -
5416:2, 5416:6,
5418:13, 5431:24
**coordinator** [3] -
5341:24, 5342:11,
5342:15
**copy** [3] - 5320:17,
5321:15, 5396:5
**core** [1] - 5435:25
**corner** [1] - 5348:8
**correct** [20] - 5290:21,
5291:10, 5304:10,
5319:1, 5328:8,
5340:8, 5340:25,
5346:21, 5368:5,
5368:6, 5385:13,
5385:15, 5387:2,
5394:23, 5394:24,
5395:24, 5395:25,
5406:21, 5409:5,
5414:6
**correction** [1] - 5299:7
**correctly** [3] -
5320:15, 5413:15,
5430:14
**counsel** [12] -
5305:19, 5321:8,
5322:19, 5351:22,
5352:25, 5355:17,
5359:15, 5375:10,
5398:9, 5412:10,
5420:8, 5423:11
**counterpoint** [1] -
5310:1
**country** [2] - 5344:19,
5370:19
**couple** [4] - 5330:12,
5385:8, 5397:2,
5403:15
**course** [3] - 5294:19,
5311:8, 5312:3
**court** [42] - 5290:23,
5292:14, 5292:24,
5293:18, 5302:16,
5310:25, 5311:7,

5314:8, 5316:2,
5317:11, 5319:14,
5320:20, 5320:23,
5323:5, 5333:10,
5333:17, 5334:8,
5348:13, 5353:10,
5359:10, 5359:13,
5360:19, 5361:8,
5361:19, 5361:20,
5362:5, 5362:12,
5362:13, 5363:18,
5398:22, 5399:16,
5401:15, 5402:23,
5404:13, 5408:12,
5420:12, 5424:9,
5425:2, 5434:14,
5434:21, 5435:22
**COURT** [302] - 5284:1,
5287:16, 5288:12,
5288:14, 5288:21,
5288:24, 5289:2,
5289:6, 5289:18,
5290:11, 5290:16,
5290:18, 5290:21,
5291:2, 5291:10,
5292:19, 5293:4,
5293:13, 5293:21,
5293:24, 5294:1,
5294:5, 5294:7,
5294:11, 5294:14,
5294:24, 5295:2,
5295:4, 5295:8,
5295:11, 5295:15,
5296:9, 5296:24,
5297:2, 5297:7,
5297:9, 5297:13,
5297:20, 5297:23,
5297:25, 5298:6,
5298:9, 5298:12,
5298:16, 5299:25,
5300:4, 5300:16,
5300:25, 5301:4,
5301:6, 5301:8,
5301:19, 5302:7,
5302:10, 5302:13,
5302:22, 5302:24,
5303:14, 5303:21,
5303:24, 5304:1,
5304:7, 5305:12,
5306:6, 5306:8,
5306:10, 5306:12,
5306:17, 5306:19,
5307:1, 5307:10,
5307:23, 5307:25,
5308:3, 5308:12,
5308:19, 5309:3,
5309:5, 5309:25,
5310:18, 5311:21,
5314:18, 5314:24,
5315:21, 5316:13,
5316:15, 5316:17,

5316:19, 5317:10,
5317:13, 5317:17,
5318:25, 5319:2,
5319:6, 5319:9,
5319:16, 5321:19,
5322:4, 5322:17,
5322:20, 5323:10,
5323:16, 5328:13,
5329:23, 5332:25,
5333:13, 5333:24,
5334:9, 5334:16,
5334:18, 5334:22,
5335:4, 5335:7,
5335:11, 5335:19,
5336:3, 5340:1,
5344:13, 5348:14,
5348:16, 5349:14,
5351:13, 5351:23,
5352:1, 5352:25,
5353:5, 5353:12,
5353:21, 5354:2,
5354:5, 5354:16,
5354:18, 5354:20,
5355:3, 5355:5,
5355:19, 5355:22,
5356:16, 5356:22,
5357:5, 5357:8,
5357:12, 5358:2,
5358:5, 5358:7,
5358:18, 5358:22,
5359:18, 5359:25,
5360:3, 5360:10,
5360:21, 5361:22,
5361:25, 5362:3,
5362:4, 5362:22,
5363:7, 5363:9,
5363:19, 5363:21,
5364:2, 5364:7,
5364:10, 5364:25,
5365:9, 5365:17,
5365:23, 5366:4,
5366:16, 5369:24,
5370:1, 5371:4,
5373:4, 5374:18,
5375:3, 5375:10,
5375:19, 5375:25,
5379:6, 5381:5,
5383:16, 5383:24,
5384:15, 5389:7,
5389:17, 5389:22,
5390:6, 5390:15,
5392:15, 5393:3,
5395:14, 5396:8,
5396:11, 5396:19,
5396:22, 5398:1,
5398:9, 5398:18,
5398:24, 5399:6,
5399:18, 5399:23,
5400:19, 5400:22,
5401:4, 5401:23,
5401:25, 5402:7,

5446

5402:10, 5402:13,
5402:20, 5402:24,
5404:9, 5404:16,
5405:1, 5405:4,
5405:12, 5405:16,
5406:1, 5406:7,
5406:12, 5406:16,
5409:16, 5409:22,
5412:9, 5412:12,
5412:17, 5412:20,
5412:22, 5413:19,
5413:22, 5415:3,
5416:4, 5417:1,
5417:5, 5419:6,
5419:11, 5420:5,
5420:17, 5420:24,
5421:2, 5421:14,
5421:16, 5421:23,
5421:25, 5422:10,
5422:15, 5422:22,
5423:2, 5423:6,
5423:8, 5424:23,
5425:1, 5425:2,
5425:5, 5426:13,
5427:1, 5427:6,
5427:20, 5428:2,
5428:15, 5429:16,
5429:19, 5430:6,
5430:8, 5430:19,
5430:22, 5432:6,
5432:9, 5432:11,
5432:13, 5432:15,
5433:3, 5433:7,
5433:13, 5433:18,
5435:9, 5435:12,
5435:14, 5436:2,
5436:7, 5436:22,
5436:25, 5437:3,
5437:5, 5437:7,
5437:9, 5437:11,
5437:14, 5437:16,
5437:22, 5437:25,
5438:8, 5438:11,
5438:16, 5438:18,
5439:1, 5439:3,
5439:5, 5439:11,
5439:22
**Court** [10] - 5285:15,
5285:15, 5335:2,
5357:9, 5359:3,
5368:22, 5368:25,
5439:18, 5439:19,
5440:3
**court's** [6] - 5304:9,
5355:14, 5424:15,
5434:20, 5435:23,
5438:24
**Court's** [3] - 5293:17,
5316:1, 5323:1
**Courthouse** [2] -
5285:16, 5440:4

**courtroom** [3] -
5348:4, 5361:11,
5428:10
**covered** [3] - 5372:21,
5373:8
**cows** [1] - 5308:23
**CR** [1] - 5284:2
**cracked** [1] - 5383:4
**crafted** [1] - 5435:24
**create** [1] - 5339:20
**created** [2] - 5435:18
**crime** [3] - 5293:11,
5294:9, 5421:10
**crimes** [1] - 5293:11
**Criminal** [2] - 5287:2,
5359:7
**criteria** [1] - 5305:25
**critical** [3] - 5306:22,
5420:2, 5425:15
**cross** [22] - 5288:7,
5295:25, 5301:11,
5313:24, 5318:5,
5318:23, 5319:22,
5320:4, 5321:22,
5322:6, 5322:24,
5427:21, 5428:7,
5428:10, 5428:22,
5429:1, 5434:14,
5434:16, 5435:4,
5437:2, 5439:9,
5439:12
**Cross** [1] - 5286:3
**cross-examination**
[12] - 5295:25,
5318:5, 5319:22,
5321:22, 5322:6,
5322:24, 5428:7,
5428:10, 5428:22,
5429:1, 5435:4,
5437:2
**Cross-Examination**
[1] - 5286:3
**cross-examine** [3] -
5313:24, 5427:21,
5434:16
**cross-examined** [1] -
5318:23
**crowd** [1] - 5302:12
**CRR** [3] - 5285:15,
5439:23, 5440:3
**CT** [1] - 5284:25
**cumulatively** [1] -
5307:19
**cut** [1] - 5428:8
**cutting** [1] - 5313:8

**D**

**D.C** [28] - 5284:5,
5333:5, 5345:12,

5346:10, 5346:12,
5346:20, 5346:24,
5347:23, 5351:2,
5352:6, 5368:3,
5368:7, 5369:1,
5394:22, 5395:1,
5406:20, 5407:1,
5407:10, 5411:15,
5414:19, 5415:19,
5415:20, 5416:6,
5418:14, 5432:20,
5438:17, 5438:19,
5439:2
**daily** [1] - 5365:14
**damaging** [1] -
5425:25
**danger** [1] - 5427:17
**dangers** [1] - 5381:1
**dark** [5] - 5336:14,
5348:24, 5348:25,
5349:22, 5414:20
**darn** [2] - 5314:13,
5423:2
**date** [3] - 5331:21,
5399:25, 5405:24
**dated** [3] - 5292:22,
5295:25, 5440:2
**DAVID** [1] - 5284:17
**DAY** [1] - 5284:8
**day-of** [1] - 5434:24
**daylight** [2] - 5348:23,
5414:19
**days** [7] - 5329:10,
5338:7, 5348:20,
5348:21, 5357:2,
5403:15
**DC** [4] - 5284:15,
5284:21, 5285:17,
5440:5
**debating** [1] - 5428:21
**December** [49] -
5331:23, 5331:24,
5332:2, 5345:12,
5346:3, 5347:4,
5347:15, 5347:17,
5348:19, 5352:7,
5367:1, 5367:10,
5367:11, 5367:18,
5369:2, 5369:10,
5369:11, 5370:21,
5371:8, 5375:14,
5376:6, 5376:14,
5376:20, 5376:23,
5379:24, 5382:12,
5385:10, 5387:5,
5387:6, 5387:15,
5388:3, 5388:17,
5390:22, 5390:25,
5391:8, 5391:24,
5410:14, 5414:3,

5417:22, 5418:16,
5418:17, 5418:24,
5425:11, 5432:17,
5432:18
**decide** [3] - 5291:25,
5324:20, 5407:1
**decided** [4] - 5329:1,
5368:25, 5410:13,
5411:3
**deciding** [1] - 5325:21
**decision** [5] -
5320:11, 5320:23,
5321:5, 5321:6,
5321:7
**decisions** [1] -
5362:17
**declared** [1] - 5369:2
**decorum** [1] - 5361:11
**defendant** [11] -
5291:21, 5299:15,
5319:13, 5321:9,
5321:20, 5334:20,
5354:24, 5402:23,
5404:24, 5404:25,
5428:16
**Defendant** [18] -
5287:3, 5287:4,
5287:5, 5287:9,
5287:10, 5287:11,
5287:12, 5287:13,
5287:14, 5287:15,
5291:23, 5291:24,
5348:13
**defendant's** [1] -
5321:8
**Defendants** [3] -
5284:7, 5284:16,
5285:2
**defendants** [22] -
5291:9, 5292:8,
5300:10, 5302:19,
5303:12, 5304:21,
5353:24, 5354:12,
5356:2, 5357:18,
5419:25, 5421:9,
5423:12, 5423:24,
5433:15, 5433:17,
5434:23, 5436:16,
5437:12, 5438:21,
5438:23
**defendants'** [1] -
5423:11
**defending** [5] -
5332:17, 5334:12,
5335:18, 5336:20,
5337:1
**defense** [16] -
5290:25, 5313:4,
5318:3, 5318:18,
5319:23, 5322:19,

5323:5, 5334:15,
5396:12, 5398:6,
5399:10, 5403:19,
5428:19, 5429:16,
5434:13, 5434:16
**Defense** [3] - 5343:1,
5434:3, 5434:7
**defenseless** [2] -
5332:17, 5337:2
**deference** [1] -
5386:17
**definitely** [4] -
5340:22, 5369:14,
5376:11, 5386:5
**definition** [1] - 5422:4
**definitively** [1] -
5296:20
**degree** [9] - 5345:24,
5386:18, 5386:21,
5386:24, 5387:3,
5387:9, 5423:19,
5423:20, 5423:22
**degrees** [2] - 5385:20,
5386:17
**deliberate** [1] -
5354:15
**deliberately** [2] -
5353:23, 5354:11
**delivered** [3] -
5391:12, 5392:25,
5393:8
**delivery** [1] - 5391:14
**demeanor** [1] - 5383:6
**demonstrative** [5] -
5303:6, 5310:12,
5310:24, 5311:12,
5312:5
**deny** [1] - 5366:4
**department** [1] -
5326:22
**departments** [1] -
5326:17
**depict** [2] - 5396:2,
5397:1
**depicted** [2] -
5304:25, 5312:11
**depiction** [5] -
5309:16, 5310:22,
5310:23, 5315:23,
5405:23
**depicts** [1] - 5305:2
**deployment** [2] -
5324:24, 5325:14
**DEPUTY** [6] - 5287:2,
5323:14, 5359:3,
5359:6, 5366:14,
5439:18
**derived** [1] - 5429:25
**describe** [16] -
5296:17, 5299:5,

5447

5311:11, 5334:12,
5349:21, 5350:8,
5353:10, 5367:4,
5370:24, 5373:6,
5376:22, 5378:3,
5386:6, 5388:1,
5394:1, 5400:2
**described** [15] -
5330:11, 5337:6,
5350:20, 5372:20,
5373:7, 5373:14,
5376:17, 5378:22,
5380:2, 5380:5,
5382:2, 5394:9,
5411:14, 5414:15,
5417:19
**describing** [5] -
5333:14, 5334:10,
5334:11, 5336:9,
5338:16
**description** [4] -
5330:9, 5332:21,
5384:14, 5392:2
**desire** [1] - 5324:20
**despite** [1] - 5376:17
**determine** [1] -
5429:13
**developed** [3] -
5425:23, 5426:3,
5426:4
**devices** [1] - 5318:7
**devolving** [1] -
5370:19
**differ** [1] - 5381:15
**difference** [1] -
5310:13
**different** [19] -
5289:18, 5293:9,
5297:14, 5297:23,
5304:11, 5304:16,
5305:17, 5305:18,
5310:15, 5311:14,
5316:20, 5327:11,
5334:25, 5340:20,
5383:10, 5426:2,
5427:2, 5435:24
**difficult** [2] - 5325:23,
5328:14
**dinner** [1] - 5336:14
**direct** [1] - 5296:12
**DIRECT** [1] - 5323:24
**directed** [3] - 5362:10,
5371:23, 5430:18
**direction** [2] - 5386:1,
5401:1
**directly** [1] - 5291:20
**disagree** [2] - 5310:6,
5323:7
**disagreed** [1] -
5390:16

**disappointed** [1] -
5344:25
**discern** [2] - 5365:13,
5404:18
**disclosed** [1] -
5313:21
**discourage** [2] -
5432:21, 5435:1
**discouraging** [2] -
5382:7, 5433:23
**discovery** [3] -
5314:6, 5404:11,
5404:13
**discrete** [1] - 5354:24
**discretion** [2] -
5316:3, 5316:5
**discuss** [3] - 5294:17,
5295:16, 5312:17
**discussed** [3] -
5289:21, 5317:22,
5368:15
**discussion** [5] -
5289:12, 5293:18,
5296:9, 5369:10,
5416:9
**discussions** [11] -
5367:14, 5368:9,
5368:11, 5369:4,
5369:6, 5370:10,
5374:6, 5388:19,
5392:10, 5431:7,
5431:17
**disjointed** [1] -
5349:25
**dispute** [1] - 5357:25
**disputes** [1] - 5288:4
**disputing** [1] - 5427:6
**dissipate** [1] -
5390:24
**distance** [1] - 5382:16
**DISTRICT** [3] - 5284:1,
5284:1, 5284:10
**DLSR** [1] - 5378:5
**doc** [1] - 5320:14
**document** [32] -
5288:2, 5289:13,
5289:20, 5290:4,
5290:9, 5290:14,
5292:17, 5292:18,
5295:23, 5296:6,
5296:7, 5302:16,
5305:14, 5312:4,
5312:8, 5318:7,
5318:9, 5318:10,
5318:13, 5318:15,
5318:20, 5318:24,
5320:13, 5320:16,
5320:17, 5321:3,
5321:10, 5321:13,
5321:15, 5322:3,

5322:9, 5322:11
**documentation** [2] -
5320:11, 5321:9
**documents** [1] -
5311:4
**Dominic** [9] - 5287:5,
5393:14, 5394:5,
5397:23, 5408:9,
5408:18, 5409:12,
5413:6, 5415:17
**done** [7] - 5293:19,
5296:5, 5305:18,
5340:5, 5362:20,
5383:20, 5435:11
**Donohoe** [3] -
5400:12, 5400:13,
5400:15
**door** [1] - 5289:22
**down** [31] - 5308:9,
5336:4, 5346:10,
5351:2, 5352:6,
5354:3, 5354:8,
5355:23, 5356:18,
5356:19, 5358:23,
5358:24, 5367:11,
5368:2, 5385:7,
5386:12, 5387:20,
5391:4, 5393:18,
5394:23, 5403:21,
5414:16, 5414:24,
5415:9, 5417:19,
5418:14, 5420:25,
5421:1, 5436:6,
5436:19
**download** [2] -
5339:4, 5339:14
**downloaded** [1] -
5339:11
**dox** [2] - 5388:3,
5388:13
**dozen** [1] - 5405:21
**dozens** [1] - 5398:6
**drain** [1] - 5329:18
**draw** [2] - 5431:13,
5434:9
**drawn** [2] - 5297:5,
5419:24
**dressed** [4] - 5372:13,
5372:17, 5372:19,
5373:13
**drew** [1] - 5430:23
**drilled** [1] - 5433:9
**drinking** [2] - 5380:10,
5417:24
**drive** [8] - 5300:21,
5395:16, 5395:17,
5396:25, 5397:16,
5411:14, 5411:16,
5414:15
**drove** [3] - 5407:13,

5411:15, 5415:9
**dudes** [1] - 5403:22
**during** [23] - 5298:25,
5310:14, 5329:8,
5330:1, 5330:2,
5336:12, 5347:4,
5351:2, 5352:6,
5370:23, 5376:19,
5376:22, 5377:12,
5379:4, 5380:1,
5380:6, 5380:12,
5380:13, 5380:17,
5380:20, 5380:23,
5390:21, 5393:14

## E

**early** [7] - 5327:6,
5331:25, 5332:2,
5333:3, 5418:1,
5420:11, 5420:18
**earplugs** [1] - 5348:8
**easiest** [1] - 5295:11
**East** [2] - 5284:17,
5344:7
**easy** [2] - 5307:14,
5328:11
**echo** [1] - 5405:20
**editorial** [1] - 5307:15
**effort** [1] - 5388:11
**efforts** [1] - 5390:24
**egg** [1] - 5432:20
**egging** [1] - 5433:22
**eight** [2] - 5324:16,
5324:18
**either** [10] - 5317:4,
5330:5, 5334:24,
5345:23, 5349:11,
5349:18, 5390:24,
5391:19, 5393:12,
5429:5
**elder** [1] - 5343:8
**elders** [2] - 5343:5,
5417:7
**election** [19] -
5330:13, 5330:15,
5330:20, 5332:8,
5333:2, 5344:21,
5344:22, 5345:3,
5346:6, 5346:7,
5367:16, 5368:18,
5369:13, 5374:8,
5374:11, 5374:23,
5382:3, 5384:10
**electronic** [1] - 5318:6
**element** [4] - 5419:14,
5421:8, 5424:3,
5424:4
**elements** [2] -
5421:11, 5422:21

**elicit** [8] - 5290:11,
5300:6, 5356:13,
5358:11, 5360:16,
5363:17, 5363:24,
5429:1
**elicited** [4] - 5295:25,
5356:25, 5360:9,
5362:14
**eliciting** [1] - 5359:12
**email** [7] - 5287:18,
5297:11, 5321:18,
5337:23, 5338:1,
5338:10, 5339:17
**emotion** [2] - 5361:8,
5361:16
**emotional** [1] -
5361:12
**emphatically** [1] -
5433:8
**end** [5] - 5287:22,
5307:19, 5313:12,
5380:7, 5434:5
**ended** [1] - 5417:21
**ending** [1] - 5330:11
**endorsed** [2] -
5345:17, 5345:18
**engage** [2] - 5381:15,
5429:12
**engaged** [1] - 5324:15
**engineering** [2] -
5326:16, 5326:22
**enjoy** [1] - 5428:7
**Enrique** [7] - 5287:5,
5343:20, 5379:20,
5394:6, 5394:13,
5408:23, 5409:24
**ensure** [1] - 5361:19
**entail** [1] - 5341:20
**enter** [1] - 5438:4
**entered** [1] - 5421:10
**entire** [2] - 5304:12,
5316:22
**entirely** [2] - 5305:18,
5425:21
**entitled** [2] - 5297:5,
5305:24
**Erik** [5] - 5284:12,
5287:8, 5335:14,
5360:7, 5362:20
**especially** [1] - 5384:2
**Esq** [12] - 5284:12,
5284:12, 5284:13,
5284:13, 5284:16,
5284:20, 5284:23,
5285:2, 5285:4,
5285:8, 5285:11,
5285:11
**essentially** [10] -
5292:17, 5333:20,
5333:21, 5338:10,

5448

5350:13, 5370:6,
5373:22, 5403:21,
5432:20, 5436:4
**establish** [1] -
5429:10
**establishing** [1] -
5356:7
**establishment** [2] -
5375:16, 5376:10
**estimate** [1] - 5331:21
**et** [1] - 5359:8
**Ethan** [3] - 5287:3,
5343:16, 5359:8
**evening** [2] - 5350:16,
5404:15
**event** [3] - 5346:2,
5385:11, 5385:16
**events** [5] - 5312:10,
5331:17, 5376:19,
5396:3, 5397:1
**eventually** [5] -
5315:2, 5325:9,
5327:3, 5371:14,
5392:25
**evidence** [51] -
5287:21, 5289:13,
5290:14, 5291:12,
5291:20, 5291:24,
5292:1, 5292:2,
5292:4, 5292:6,
5292:10, 5293:2,
5293:6, 5293:7,
5294:15, 5296:12,
5299:2, 5301:14,
5305:10, 5306:14,
5308:11, 5308:25,
5309:9, 5309:10,
5310:4, 5310:13,
5310:17, 5310:20,
5311:5, 5311:15,
5313:12, 5314:4,
5314:7, 5314:16,
5315:11, 5316:10,
5316:11, 5316:23,
5334:7, 5354:14,
5358:9, 5361:19,
5363:17, 5393:7,
5426:14, 5426:17,
5428:12, 5429:2,
5438:23
**Evidence** [2] - 5305:6,
5429:3
**evidentiary** [5] -
5296:10, 5296:17,
5425:21, 5426:11,
5438:14
**evolve** [1] - 5427:12
**exact** [11] - 5302:20,
5313:5, 5324:7,
5337:11, 5338:9,

5338:20, 5341:24,
5356:12, 5356:24,
5385:1, 5389:8
**exactly** [6] - 5304:10,
5305:2, 5398:15,
5402:11, 5409:1,
5410:21
**EXAMINATION** [1] -
5323:24
**Examination** [1] -
5286:3
**examination** [13] -
5295:17, 5295:25,
5318:5, 5319:22,
5321:22, 5322:6,
5322:24, 5428:7,
5428:10, 5428:22,
5429:1, 5435:4,
5437:2
**examine** [3] - 5313:24,
5427:21, 5434:16
**examined** [1] -
5318:23
**example** [5] - 5293:6,
5341:6, 5357:19,
5431:1, 5431:12
**examples** [2] -
5372:18, 5393:21
**except** [3] - 5305:2,
5321:17, 5419:18
**exception** [5] -
5291:16, 5291:18,
5396:2, 5397:2,
5401:17
**exchange** [1] -
5356:24
**excluded** [1] -
5333:11
**excuse** [3] - 5374:25,
5384:24, 5403:21
**exhibit** [14] - 5296:6,
5297:10, 5299:19,
5301:11, 5301:22,
5301:25, 5303:2,
5303:3, 5311:10,
5313:16, 5398:13,
5401:14, 5403:20
**Exhibit-1104** [2] -
5403:17, 5408:11
**Exhibit-1105** [2] -
5409:8, 5409:11
**Exhibit-1106** [1] -
5412:8
**Exhibit-23** [1] -
5295:21
**Exhibit-25** [1] -
5287:25
**Exhibit-400J** [1] -
5396:15
**Exhibit-72** [3] -

5392:14, 5392:18,
5393:2
**exhibits** [15] - 5313:3,
5313:7, 5395:23,
5396:1, 5397:5,
5397:25, 5398:7,
5398:20, 5398:25,
5399:13, 5399:14,
5401:12, 5403:15,
5403:18, 5405:22
**exist** [2] - 5289:2,
5438:5
**existed** [3] - 5313:5,
5342:20, 5388:19
**expect** [7] - 5305:1,
5312:12, 5335:15,
5335:16, 5353:14,
5355:14, 5436:3
**expectation** [7] -
5298:10, 5303:11,
5422:6, 5422:8,
5422:15, 5427:25,
5434:13
**expected** [3] -
5297:21, 5418:25,
5422:11
**expecting** [1] - 5390:3
**expects** [2] - 5421:19,
5426:18
**experience** [5] -
5311:13, 5351:2,
5425:10, 5436:11,
5436:16
**experienced** [4] -
5299:5, 5302:2,
5303:6, 5311:11
**experiences** [2] -
5418:23, 5434:18
**expert** [1] - 5425:24
**explain** [6] - 5319:24,
5335:20, 5360:13,
5389:20, 5432:24,
5433:5
**explained** [1] -
5303:18
**explanation** [4] -
5299:12, 5306:4,
5321:13, 5369:21
**explicit** [1] - 5436:5
**expound** [1] - 5423:14
**express** [1] - 5414:13
**extend** [1] - 5405:20
**extent** [6] - 5287:23,
5317:3, 5323:6,
5403:4, 5406:2,
5406:8
**extra** [1] - 5439:16
**extremely** [1] - 5356:8
**eye** [1] - 5365:12
**eyewitness** [1] -

5312:22

# F

**face** [6] - 5331:13,
5371:13, 5371:23,
5372:21
**faces** [1] - 5373:8
**fact** [15] - 5291:17,
5292:14, 5294:18,
5318:22, 5332:14,
5345:18, 5353:17,
5375:6, 5404:2,
5425:17, 5425:18,
5427:20, 5435:17,
5436:22, 5438:22
**factors** [1] - 5296:4
**factual** [2] - 5437:19,
5437:20
**factually** [1] - 5357:20
**fair** [17] - 5293:24,
5294:1, 5305:14,
5319:6, 5321:21,
5322:23, 5335:7,
5335:11, 5335:19,
5358:15, 5361:22,
5362:22, 5363:14,
5365:4, 5405:23,
5436:1, 5439:5
**fairly** [7] - 5292:23,
5299:14, 5305:2,
5320:3, 5396:2,
5397:1, 5401:2
**faking** [1] - 5431:9
**fall** [1] - 5329:4
**falls** [1] - 5431:13
**false** [1] - 5362:21
**falsely** [1] - 5289:15
**familiar** [1] - 5343:5
**family** [1] - 5328:2
**far** [9] - 5297:21,
5305:13, 5322:25,
5343:22, 5408:6,
5426:23, 5430:4,
5430:17
**fast** [1] - 5312:11
**fast-moving** [1] -
5312:11
**favor** [1] - 5345:9
**FBI** [3] - 5318:7,
5318:8, 5322:12
**featuring** [1] - 5397:10
**federal** [4] - 5361:8,
5361:18, 5361:20,
5430:10
**Federal** [1] - 5429:3
**Federalist** [1] -
5340:16
**feelings** [1] - 5360:18
**felt** [4] - 5337:4,

5344:18, 5371:9,
5371:10
**fence** [7] - 5308:9,
5312:14, 5312:15,
5312:23, 5400:6,
5400:7
**fences** [1] - 5395:3
**fertile** [1] - 5434:15
**few** [3] - 5298:17,
5329:4, 5420:18
**fight** [2] - 5389:14,
5432:21
**fighters** [1] - 5403:22
**fighting** [5] - 5332:9,
5334:21, 5334:23,
5335:15, 5389:10
**fights** [3] - 5334:14,
5334:17, 5382:5
**figure** [7] - 5300:20,
5307:8, 5310:8,
5313:17, 5326:22,
5363:20
**file** [1] - 5402:21
**filed** [1] - 5317:21
**files** [5] - 5397:17,
5397:20, 5401:22,
5402:9, 5402:12
**fill** [1] - 5424:21
**fillet** [1] - 5428:5
**filleting** [1] - 5428:6
**film** [2] - 5327:8,
5327:10
**films** [1] - 5327:24
**fine** [7] - 5289:23,
5302:2, 5302:4,
5309:7, 5311:14,
5314:21, 5315:17
**finger** [2] - 5352:21,
5364:14
**fingers** [2] - 5352:21,
5364:15
**fingertips** [1] -
5438:25
**finish** [4] - 5360:4,
5373:23, 5423:9,
5433:12
**finished** [1] - 5340:16
**fireworks** [1] - 5394:3
**first** [31] - 5287:25,
5289:8, 5293:19,
5298:7, 5298:14,
5314:19, 5329:4,
5332:5, 5333:4,
5345:24, 5347:6,
5348:22, 5357:10,
5372:18, 5383:9,
5383:10, 5385:11,
5386:21, 5386:24,
5387:3, 5387:9,
5389:24, 5399:15,

5449

5401:10, 5403:14, 5404:15, 5410:17, 5421:6, 5422:7, 5423:19
**first-degree** [1] - 5423:19
**firsthand** [3] - 5304:23, 5430:17, 5430:20
**fit** [2] - 5337:1, 5422:3
**fits** [1] - 5422:20
**fitting** [1] - 5374:11
**five** [5] - 5350:24, 5407:11, 5407:14, 5407:23, 5414:24
**FL** [2] - 5285:6, 5285:9
**flat** [1] - 5390:25
**flattered** [1] - 5362:7
**flaw** [1] - 5428:22
**fledged** [5] - 5346:15, 5347:16, 5349:7, 5386:20, 5387:8
**flimsy** [1] - 5428:22
**Floor** [2] - 5284:24, 5285:13
**Florida** [2] - 5391:20, 5414:8
**focus** [2] - 5294:1, 5317:3
**follow** [1] - 5431:20
**followed** [1] - 5307:21
**following** [1] - 5295:19
**food** [2] - 5392:5
**foot** [5] - 5374:13, 5374:14, 5374:21, 5374:23
**FOR** [2] - 5284:1, 5323:23
**force** [8] - 5336:20, 5419:1, 5419:14, 5424:4, 5425:12, 5425:14, 5426:10, 5426:18
**fore** [1] - 5352:20
**foregoing** [1] - 5439:24
**forgive** [1] - 5351:21
**form** [2] - 5313:6, 5389:21
**forth** [2] - 5318:8, 5355:1
**forward** [3] - 5317:5, 5363:10, 5411:4
**foundation** [17] - 5306:15, 5308:2, 5375:8, 5425:21, 5427:2, 5427:4, 5428:13, 5429:8, 5429:10, 5429:13,

5430:3, 5432:1, 5432:7, 5436:20, 5437:19, 5437:20, 5438:14
**foundations** [1] - 5427:11
**four** [4] - 5397:17, 5400:1, 5414:24, 5417:23
**fourth** [1] - 5423:21
**frame** [3] - 5345:1, 5367:10, 5400:1
**framed** [1] - 5422:13
**frames** [1] - 5414:4
**framework** [2] - 5296:18, 5422:20
**frankly** [2] - 5305:7, 5318:3
**free** [2] - 5300:5, 5301:12
**freely** [1] - 5344:18
**freestanding** [1] - 5292:10
**French** [2] - 5373:24, 5403:21
**friendly** [1] - 5349:18
**friends** [1] - 5329:20
**frivolous** [3] - 5311:7, 5311:25, 5314:9
**front** [10] - 5305:19, 5309:1, 5356:21, 5370:13, 5370:14, 5370:16, 5370:17, 5379:1, 5379:11, 5394:5
**frozen** [1] - 5381:8
**frustrated** [3] - 5367:21, 5368:12, 5369:8
**frustrating** [1] - 5328:15
**frustration** [1] - 5367:23
**Fuck** [1] - 5351:7
**fuck** [1] - 5351:8
**fucking** [2] - 5403:22, 5404:8
**full** [19] - 5325:15, 5341:14, 5341:17, 5342:4, 5342:16, 5342:20, 5346:13, 5346:15, 5347:16, 5349:7, 5368:3, 5386:20, 5387:8, 5404:8, 5412:16, 5414:10, 5414:11, 5423:21, 5439:25
**full-blown** [5] - 5346:13, 5404:8, 5412:16, 5414:10,

5414:11
**full-fledged** [5] - 5346:15, 5347:16, 5349:7, 5386:20, 5387:8
**full-time** [1] - 5325:15
**fulsome** [1] - 5312:22
**fun** [1] - 5428:6
**function** [1] - 5428:24
**functionally** [1] - 5316:20
**fuzzy** [1] - 5314:13

## G

**G-R-E-E-N-E** [1] - 5324:6
**gained** [1] - 5318:23
**gaining** [1] - 5393:15
**gaiter** [1] - 5298:25
**game** [6] - 5325:20, 5326:13, 5326:21, 5358:16, 5363:14, 5365:4
**games** [3] - 5326:8, 5327:19, 5330:5
**gatekeeping** [1] - 5428:24
**gating** [1] - 5428:24
**gear** [1] - 5417:22
**general** [6] - 5334:4, 5338:13, 5344:24, 5400:1, 5416:16, 5436:5
**generally** [10] - 5330:4, 5330:8, 5351:10, 5376:15, 5376:22, 5383:9, 5394:17, 5401:2, 5401:6, 5434:22
**gentleman** [3] - 5355:7, 5419:15, 5431:21
**gentleman's** [1] - 5421:11
**gentlemen** [5] - 5310:9, 5323:17, 5358:18, 5366:17, 5420:17
**gesture** [8] - 5352:19, 5352:22, 5353:19, 5353:24, 5356:4, 5356:7, 5364:13, 5367:7
**gestures** [1] - 5355:1
**Giglio** [6] - 5319:7, 5319:8, 5320:7, 5320:9, 5323:4, 5323:7
**given** [8] - 5290:7,

5306:3, 5317:13, 5319:17, 5324:22, 5338:10, 5338:12, 5353:10
**global** [1] - 5337:12
**goad** [4] - 5371:14, 5371:15, 5371:17, 5382:5
**GOAD** [1] - 5371:15
**goading** [3] - 5373:18, 5374:2, 5376:17
**goals** [1] - 5373:17
**God** [1] - 5373:17
**gold** [4] - 5350:10, 5350:11, 5350:16, 5392:6
**good-looking** [1] - 5362:8
**goods** [1] - 5321:24
**gosh** [1] - 5423:2
**government** [51] - 5287:7, 5288:6, 5295:12, 5297:5, 5297:14, 5297:17, 5300:6, 5304:8, 5305:23, 5306:3, 5306:23, 5308:4, 5308:25, 5311:1, 5311:2, 5312:1, 5312:21, 5313:20, 5316:8, 5316:10, 5318:2, 5318:17, 5320:21, 5322:7, 5322:14, 5323:3, 5323:22, 5334:6, 5334:15, 5353:23, 5354:11, 5356:11, 5356:25, 5357:3, 5359:12, 5360:19, 5362:12, 5362:16, 5363:17, 5363:24, 5364:12, 5364:13, 5366:7, 5396:5, 5401:12, 5402:11, 5403:1, 5421:4, 5421:9, 5424:8, 5436:12
**Government** [8] - 5288:10, 5307:18, 5315:11, 5360:9, 5362:17, 5364:18, 5404:11, 5438:3
**GOVERNMENT** [1] - 5323:23
**government's** [6] - 5287:25, 5312:18, 5323:3, 5323:18, 5357:1, 5428:22
**Government's** [6] - 5295:10, 5295:21,

5296:15, 5298:11, 5313:15, 5392:18
**governs** [2] - 5296:17, 5296:18
**Greene** [33] - 5318:10, 5318:18, 5323:22, 5324:6, 5324:7, 5331:6, 5332:5, 5336:9, 5345:11, 5351:24, 5366:10, 5366:21, 5371:6, 5375:12, 5384:17, 5389:24, 5392:17, 5395:16, 5396:14, 5400:7, 5400:9, 5400:11, 5400:12, 5400:17, 5406:19, 5418:23, 5420:25, 5422:3, 5430:1, 5434:3, 5434:10, 5434:23, 5435:16
**GREENE** [2] - 5286:3, 5323:23
**Greene's** [8] - 5318:6, 5399:2, 5404:1, 5432:17, 5434:2, 5434:17, 5435:20, 5438:20
**Ground** [4] - 5415:14, 5415:25, 5424:1, 5435:17
**ground** [3] - 5386:3, 5424:2, 5434:15
**grounds** [7] - 5334:5, 5354:22, 5395:4, 5401:19, 5402:22, 5406:6, 5428:20
**group** [51] - 5331:7, 5337:15, 5338:17, 5342:25, 5343:3, 5344:22, 5347:12, 5347:14, 5350:15, 5350:22, 5351:3, 5351:15, 5370:23, 5371:7, 5371:21, 5371:23, 5371:25, 5372:5, 5372:6, 5372:10, 5372:11, 5373:18, 5373:20, 5374:6, 5374:10, 5375:13, 5376:7, 5377:3, 5378:6, 5379:11, 5384:9, 5384:14, 5384:22, 5387:19, 5388:5, 5388:16, 5389:2, 5394:16, 5415:6, 5415:8, 5416:2, 5416:6, 5417:18, 5418:13, 5425:24,

5450

5429:6, 5429:9, 5429:10, 5429:12, 5432:19
**groups** [3] - 5343:22, 5376:13, 5376:15
**Guard** [7] - 5324:16, 5324:21, 5325:9, 5325:14, 5325:21, 5326:8, 5327:1
**guess** [19] - 5300:16, 5311:22, 5322:5, 5322:7, 5336:16, 5336:18, 5337:12, 5338:19, 5339:7, 5349:7, 5350:20, 5359:1, 5372:15, 5413:25, 5422:1, 5425:7, 5436:3, 5437:19, 5439:7
**guiding** [2] - 5372:4, 5372:5
**guilt** [1] - 5334:7
**guilty** [6] - 5316:11, 5320:24, 5434:25, 5436:23, 5437:12, 5438:22
**guy** [3] - 5306:2, 5383:4, 5428:7
**guys** [1] - 5426:8

## H

**hair** [2] - 5348:9, 5348:10
**half** [4] - 5295:22, 5314:19, 5322:1, 5322:2
**ham** [3] - 5416:16, 5416:18, 5416:20
**hand** [14] - 5305:24, 5308:8, 5319:20, 5352:19, 5352:22, 5353:18, 5355:1, 5356:7, 5356:20, 5357:11, 5357:12, 5367:6, 5385:25
**handle** [7] - 5339:17, 5339:18, 5339:20, 5343:25, 5344:4, 5344:6, 5382:13
**handled** [1] - 5313:9
**handles** [2] - 5341:3, 5341:9
**handwriting** [2] - 5296:2, 5307:17
**handwritten** [2] - 5290:25, 5295:22
**happy** [13] - 5319:15, 5330:15, 5384:3, 5384:8, 5387:19,

5387:22, 5396:7, 5396:9, 5398:21, 5399:4, 5403:13, 5404:5, 5435:21
**harassed** [1] - 5332:16
**harassing** [1] - 5336:21
**hard** [3] - 5307:6, 5328:11, 5329:16
**Harris** [2] - 5359:1, 5365:24
**Harry's** [7] - 5349:4, 5349:5, 5349:8, 5349:10, 5349:22, 5350:2
**Hassan** [6] - 5285:4, 5287:11, 5365:25, 5429:21, 5431:21, 5432:2
**HASSAN** [8] - 5285:5, 5365:25, 5409:18, 5417:3, 5429:21, 5430:7, 5430:12, 5430:20
**hat** [1] - 5372:21
**hats** [2] - 5299:22, 5373:9
**Haven** [1] - 5284:25
**head** [5] - 5356:3, 5373:8, 5375:6, 5383:4, 5423:8
**headed** [1] - 5335:9
**heading** [1] - 5384:11
**heads** [3] - 5375:9, 5386:10, 5399:10
**heads-up** [1] - 5399:10
**health** [1] - 5329:12
**hear** [40] - 5291:11, 5303:14, 5304:7, 5319:10, 5319:13, 5320:5, 5320:15, 5332:5, 5338:4, 5338:6, 5351:6, 5351:17, 5355:21, 5355:25, 5356:17, 5356:21, 5361:3, 5361:6, 5361:23, 5364:3, 5368:22, 5373:1, 5373:2, 5399:19, 5399:20, 5403:10, 5410:6, 5420:6, 5420:8, 5420:12, 5421:2, 5421:3, 5421:4, 5423:3, 5425:5, 5428:15, 5432:4, 5436:7
**heard** [21] - 5290:8,

5290:19, 5291:11, 5319:13, 5327:15, 5335:2, 5338:9, 5339:3, 5375:12, 5376:6, 5380:25, 5381:2, 5381:4, 5381:7, 5419:10, 5426:8, 5429:17, 5429:20, 5429:25, 5435:7, 5439:14
**hearing** [6] - 5295:20, 5303:24, 5335:25, 5357:10, 5401:8, 5410:17
**hearsay** [17] - 5291:16, 5291:18, 5291:22, 5294:5, 5339:25, 5375:2, 5381:4, 5389:5, 5390:5, 5401:17, 5401:18, 5401:19, 5402:22, 5413:18, 5416:3, 5416:25, 5417:3
**heated** [1] - 5369:7
**heatedly** [1] - 5360:14
**HELD** [1] - 5284:9
**helmet** [1] - 5383:3
**help** [1] - 5365:16
**helpful** [1] - 5312:21
**hereby** [1] - 5439:23
**HERNANDEZ** [137] - 5288:8, 5288:13, 5288:19, 5288:22, 5289:1, 5289:3, 5290:23, 5291:3, 5292:14, 5292:20, 5293:10, 5293:16, 5293:22, 5293:25, 5294:4, 5294:6, 5294:10, 5294:12, 5294:23, 5294:25, 5295:3, 5295:7, 5295:9, 5295:14, 5297:17, 5297:22, 5297:24, 5298:1, 5298:7, 5298:10, 5298:13, 5298:19, 5299:22, 5300:3, 5300:24, 5301:1, 5301:5, 5301:7, 5301:14, 5301:21, 5302:8, 5302:11, 5302:15, 5302:23, 5303:1, 5303:15, 5303:22, 5303:25, 5304:2, 5308:24, 5309:4, 5309:6, 5310:11, 5310:19, 5313:24, 5314:19,

5315:8, 5315:22, 5317:8, 5317:11, 5317:15, 5319:7, 5320:7, 5321:24, 5332:24, 5333:6, 5333:9, 5334:20, 5335:22, 5339:25, 5344:12, 5351:12, 5352:24, 5353:8, 5355:16, 5355:20, 5363:6, 5363:8, 5363:15, 5363:20, 5364:1, 5364:5, 5364:9, 5366:12, 5370:25, 5373:1, 5374:16, 5375:21, 5375:23, 5376:1, 5383:23, 5384:13, 5389:5, 5390:5, 5390:12, 5396:4, 5398:3, 5399:17, 5399:22, 5401:10, 5401:24, 5402:4, 5402:8, 5402:11, 5402:19, 5402:21, 5404:10, 5404:22, 5405:2, 5413:18, 5416:3, 5419:2, 5419:9, 5419:13, 5420:15, 5421:6, 5421:15, 5421:21, 5421:24, 5422:7, 5422:12, 5422:18, 5422:23, 5423:1, 5423:5, 5423:7, 5423:10, 5429:18, 5431:20, 5432:7, 5432:10, 5432:12, 5432:14, 5438:17, 5438:19, 5439:2, 5439:4
**Hernandez** [25] - 5285:2, 5287:11, 5287:17, 5288:5, 5297:10, 5297:13, 5299:25, 5300:17, 5305:5, 5306:2, 5306:21, 5307:12, 5307:20, 5308:21, 5319:9, 5323:3, 5333:18, 5353:7, 5399:18, 5401:4, 5402:14, 5405:18, 5421:3, 5423:9, 5429:19
**Hernandez's** [3] - 5305:25, 5316:18, 5425:14
**Hialeah** [1] - 5285:9
**hidden** [1] - 5305:24

**hierarchical** [2] - 5385:16, 5433:20
**hierarchy** [1] - 5423:20
**high** [2] - 5330:9, 5417:6
**high-level** [2] - 5330:9, 5417:6
**higher** [2] - 5374:24, 5385:20
**higher-level** [1] - 5374:24
**Highland** [1] - 5285:3
**highlight** [8] - 5297:15, 5301:9, 5303:16, 5310:8, 5310:13, 5310:20, 5311:17, 5311:18
**highlighted** [9] - 5300:8, 5304:20, 5307:2, 5307:7, 5307:14, 5310:6, 5313:17, 5313:21, 5403:18
**highlighter** [1] - 5297:15
**highlighting** [11] - 5308:4, 5310:5, 5312:19, 5312:23, 5312:25, 5313:3, 5316:23, 5316:25, 5397:3, 5397:5, 5397:7
**highlights** [12] - 5301:3, 5301:22, 5302:9, 5305:16, 5305:19, 5305:23, 5306:16, 5310:23, 5312:2, 5312:5, 5312:9, 5426:24
**himself** [1] - 5336:1
**history** [1] - 5324:12
**hit** [1] - 5423:21
**hmm** [2] - 5298:6, 5301:4
**hold** [11] - 5319:9, 5321:14, 5353:5, 5360:10, 5405:12, 5405:13, 5423:2, 5438:3
**Hollow** [1] - 5285:2
**Hollywood** [2] - 5327:19, 5328:8
**home** [5] - 5308:23, 5328:2, 5387:6, 5391:3, 5391:6
**home-made** [2] - 5391:3, 5391:6
**Honor** [105] - 5289:25, 5290:23, 5293:25,

5451

5294:12, 5295:18,
5296:22, 5300:15,
5302:15, 5303:17,
5304:9, 5309:9,
5312:10, 5313:2,
5313:10, 5313:13,
5313:24, 5314:15,
5315:19, 5317:8,
5317:25, 5319:7,
5321:25, 5323:21,
5332:24, 5333:6,
5333:12, 5333:25,
5334:15, 5335:13,
5335:22, 5335:24,
5336:7, 5348:12,
5349:12, 5349:17,
5351:21, 5352:24,
5353:3, 5353:8,
5353:22, 5354:4,
5354:10, 5355:16,
5356:10, 5356:11,
5356:14, 5356:20,
5356:23, 5357:24,
5359:6, 5359:9,
5359:14, 5360:1,
5360:5, 5360:12,
5360:14, 5360:18,
5361:15, 5361:17,
5361:21, 5363:6,
5363:15, 5364:11,
5365:11, 5366:12,
5366:19, 5370:25,
5373:2, 5374:17,
5375:21, 5379:5,
5384:14, 5389:6,
5389:15, 5390:14,
5392:13, 5393:1,
5395:12, 5396:4,
5397:24, 5398:2,
5398:12, 5399:17,
5401:10, 5402:4,
5402:19, 5404:10,
5405:9, 5405:11,
5406:4, 5406:17,
5409:15, 5409:18,
5413:20, 5419:9,
5419:13, 5420:15,
5421:6, 5422:24,
5428:18, 5429:7,
5429:15, 5429:18,
5431:20, 5432:16
**Honorable** [2] -
5359:3, 5439:18
**HONORABLE** [1] -
5284:9
**hope** [1] - 5423:10
**hopeful** [1] - 5345:8
**hostility** [1] - 5360:19
**hotel** [10] - 5336:22,
5380:10, 5406:24,

5414:22, 5415:5,
5415:7, 5417:9,
5417:14, 5418:1,
5418:12
**hotels** [1] - 5336:16
**hour** [6] - 5321:1,
5420:13, 5420:20,
5423:14, 5439:15
**hours** [6] - 5329:8,
5329:11, 5330:2,
5330:3, 5338:7
**house** [9] - 5288:2,
5404:1, 5411:19,
5411:20, 5412:2,
5412:5, 5413:14,
5413:16, 5414:1
**Hudson** [5] - 5418:7,
5418:13, 5418:20,
5418:21, 5431:24
**huge** [1] - 5320:3
**Hull** [3] - 5284:20,
5287:10, 5352:2
**HULL** [2] - 5284:20,
5351:21
**human** [1] - 5324:17
**humbly** [1] - 5426:3
**husher** [1] - 5405:14
**HVNY** [2] - 5418:17,
5418:19

# I

**iconography** [1] -
5392:8
**ID** [1] - 5399:16
**idea** [2] - 5337:1,
5433:6
**identical** [1] - 5311:9
**identification** [5] -
5300:13, 5306:4,
5306:22, 5348:13,
5378:6
**identified** [6] - 5305:5,
5339:24, 5340:5,
5340:11, 5378:17,
5388:16
**identify** [15] - 5299:9,
5300:18, 5302:3,
5302:14, 5302:19,
5304:21, 5304:21,
5309:7, 5309:8,
5314:3, 5314:11,
5365:15, 5399:24,
5424:8, 5429:11
**identity** [1] - 5317:2
**II** [1] - 5285:11
**immediately** [4] -
5291:23, 5439:9,
5439:12
**immense** [1] - 5404:13

**impact** [1] - 5329:15
**implement** [1] -
5326:23
**implicit** [1] - 5438:12
**implied** [1] - 5438:12
**import** [1] - 5320:3
**important** [3] -
5312:12, 5312:20,
5313:1
**impression** [17] -
5332:19, 5419:19,
5419:20, 5419:22,
5419:23, 5420:4,
5421:7, 5421:12,
5422:8, 5422:13,
5422:14, 5422:15,
5424:6, 5425:22,
5426:4, 5426:5
**impressions** [1] -
5434:18
**imprimatur** [1] -
5308:18
**improper** [2] -
5362:18, 5362:19
**IN** [1] - 5284:1
**in-court** [1] - 5348:13
**inadmissible** [1] -
5434:19
**inappropriate** [2] -
5354:1, 5360:16
**inauguration** [1] -
5395:6
**incentives** [1] - 5320:2
**incident** [2] - 5382:20,
5382:25
**incidental** [1] -
5312:24
**inclination** [2] -
5319:16, 5358:15
**inclined** [2] - 5318:21,
5322:5
**include** [6] - 5337:18,
5347:1, 5381:22,
5396:21, 5397:9,
5427:15
**included** [3] -
5383:19, 5434:11,
5435:17
**includes** [1] - 5434:11
**including** [8] -
5302:17, 5321:10,
5355:12, 5355:13,
5356:2, 5368:4,
5387:10, 5407:11
**index** [2] - 5352:20,
5364:14
**indicate** [3] - 5296:3,
5365:11, 5429:9
**indicated** [8] -
5309:18, 5359:10,

5359:13, 5363:4,
5412:12, 5419:15,
5425:5, 5429:8
**indicating** [6] -
5298:5, 5352:20,
5357:7, 5362:3,
5366:22, 5425:1
**individual** [3] -
5339:8, 5404:19,
5429:24
**individuals** [4] -
5354:24, 5355:11,
5407:23, 5426:1
**industry** [3] - 5325:20,
5326:13, 5328:19
**inference** [2] -
5296:14, 5434:9
**inferences** [2] -
5297:4, 5419:24
**inferred** [1] - 5296:19
**infirmity** [1] - 5438:1
**inflammatory** [3] -
5353:24, 5354:12,
5429:2
**information** [12] -
5318:2, 5318:5,
5322:1, 5322:23,
5323:4, 5323:8,
5330:6, 5330:22,
5330:24, 5331:3,
5419:25, 5424:19
**informs** [2] - 5435:20,
5436:11
**initial** [1] - 5304:10
**initials** [2] - 5395:20,
5395:21
**innocence** [1] -
5316:9
**inquired** [1] - 5428:8
**inquiry** [1] - 5429:13
**inserting** [2] -
5353:23, 5354:11
**inside** [2] - 5350:2,
5350:3
**insinuation** [1] -
5362:19
**insist** [1] - 5307:20
**insisting** [1] - 5308:1
**insofar** [1] - 5425:15
**Inspector** [1] - 5399:1
**installation** [1] -
5325:6
**instance** [2] -
5305:11, 5307:22
**instead** [1] - 5329:2
**instruct** [1] - 5292:10
**instruction** [19] -
5287:21, 5287:24,
5289:7, 5289:8,
5289:17, 5289:23,

5290:3, 5290:7,
5290:24, 5291:8,
5293:3, 5293:8,
5294:18, 5294:19,
5294:20, 5295:8,
5402:16, 5403:5,
5405:5
**instructions** [5] -
5294:15, 5337:24,
5338:10, 5338:12,
5338:14
**insufficient** [1] -
5420:3
**intelligence** [1] -
5324:17
**intended** [1] - 5436:13
**intent** [2] - 5293:7,
5421:10
**intentionally** [1] -
5362:15
**intentions** [2] -
5425:24, 5426:1
**interaction** [1] -
5379:3
**interactions** [2] -
5372:16, 5377:17
**interest** [1] - 5376:13
**interested** [1] -
5418:14
**Internet** [4] - 5372:16,
5373:10, 5381:1,
5388:15
**interview** [1] - 5321:2
**introduce** [7] -
5288:17, 5295:10,
5299:2, 5303:16,
5310:25, 5314:15,
5324:4
**introduced** [2] -
5306:14, 5438:23
**introducing** [3] -
5301:21, 5315:11,
5401:21
**introduction** [1] -
5290:13
**intuitive** [1] - 5339:11
**involved** [2] - 5371:7,
5373:20
**involvement** [2] -
5382:25, 5423:16
**irony** [1] - 5315:8
**irrelevant** [3] -
5419:20, 5420:4,
5429:2
**Island** [1] - 5377:1
**issue** [18] - 5289:4,
5292:16, 5294:2,
5298:23, 5306:22,
5313:9, 5335:25,
5355:20, 5359:17,

5452

5360:14, 5360:20, 5366:13, 5419:13, 5420:2, 5420:7, 5425:15, 5429:5, 5429:14
**issues** [1] - 5335:23
**itself** [6] - 5306:25, 5322:9, 5322:11, 5330:11, 5384:18, 5425:25
**IV** [1] - 5284:20

**J**

**January** [36] - 5284:6, 5318:11, 5331:17, 5331:18, 5335:21, 5342:22, 5343:10, 5343:23, 5344:2, 5347:24, 5354:25, 5356:5, 5357:11, 5363:22, 5368:1, 5391:24, 5394:22, 5395:1, 5395:10, 5396:3, 5396:24, 5397:13, 5406:20, 5408:22, 5414:3, 5414:13, 5414:16, 5414:18, 5415:10, 5417:20, 5418:2, 5419:1, 5425:12, 5425:14, 5426:19, 5440:2
**Jason** [2] - 5284:12, 5287:7
**Jauregui** [2] - 5285:8, 5287:12
**JAUREGUI** [9] - 5285:8, 5328:12, 5329:22, 5375:2, 5375:20, 5375:22, 5381:3, 5396:18, 5415:2
**Jeremy** [1] - 5435:19
**job** [4] - 5325:14, 5325:15, 5382:10, 5385:6
**Joe** [2] - 5315:13, 5343:14
**jogs** [1] - 5433:7
**John** [2] - 5284:20, 5287:10
**Johnny** [1] - 5344:4
**join** [14] - 5316:16, 5324:20, 5331:21, 5334:13, 5335:11, 5337:9, 5337:25, 5338:16, 5340:20, 5345:19, 5365:7, 5366:2, 5423:11,

5425:14
**joined** [3] - 5333:14, 5351:19, 5364:6
**joining** [2] - 5334:3, 5344:9
**jointly** [1] - 5400:15
**joke** [1] - 5365:17
**Joseph** [1] - 5287:4
**Judge** [15] - 5328:12, 5364:9, 5365:8, 5366:2, 5366:3, 5417:3, 5419:4, 5429:4, 5429:22, 5429:23, 5429:24, 5430:1, 5430:5, 5437:17
**JUDGE** [1] - 5284:10
**judge** [7] - 5315:25, 5365:25, 5381:3, 5429:21, 5430:2, 5430:12, 5435:7
**judgment** [1] - 5435:20
**Jury** [4] - 5323:15, 5358:21, 5366:15, 5420:23
**jury** [41] - 5287:21, 5289:14, 5289:15, 5290:8, 5290:19, 5291:24, 5292:4, 5301:2, 5301:24, 5302:17, 5305:19, 5305:20, 5306:14, 5307:6, 5309:1, 5309:11, 5310:14, 5310:16, 5312:21, 5313:15, 5317:24, 5323:11, 5323:14, 5323:15, 5324:5, 5335:25, 5350:8, 5355:21, 5358:21, 5361:6, 5363:16, 5364:22, 5364:23, 5365:5, 5365:24, 5366:14, 5366:15, 5420:23, 5427:16, 5427:18, 5434:8
**JURY** [1] - 5284:8
**jury's** [3] - 5307:18, 5312:20, 5313:8
**JW** [1] - 5406:23

**K**

**keep** [16] - 5328:25, 5329:2, 5336:4, 5349:15, 5354:2, 5354:5, 5354:7, 5354:8, 5355:23, 5356:18, 5356:19,

5361:5, 5361:17, 5376:15, 5404:7
**keeping** [2] - 5329:8, 5329:11
**keeps** [1] - 5295:23
**KELLY** [1] - 5284:9
**KENERSON** [93] - 5317:25, 5319:1, 5319:4, 5319:14, 5322:11, 5322:18, 5323:1, 5323:21, 5323:25, 5328:16, 5329:25, 5333:17, 5335:13, 5336:7, 5336:8, 5340:2, 5344:15, 5348:12, 5348:18, 5349:20, 5351:14, 5352:2, 5352:4, 5353:17, 5355:8, 5355:24, 5361:24, 5362:1, 5362:5, 5366:19, 5366:20, 5370:8, 5371:5, 5373:12, 5374:19, 5375:11, 5376:2, 5379:9, 5381:11, 5383:17, 5384:5, 5384:16, 5389:12, 5389:23, 5390:7, 5390:18, 5392:13, 5392:16, 5392:23, 5393:1, 5393:5, 5395:12, 5395:15, 5396:7, 5396:9, 5396:13, 5396:23, 5397:24, 5398:21, 5398:25, 5399:13, 5399:24, 5400:21, 5400:23, 5403:13, 5405:9, 5406:17, 5406:18, 5408:11, 5408:14, 5409:7, 5409:10, 5409:25, 5412:7, 5412:14, 5412:18, 5412:21, 5412:25, 5413:3, 5413:4, 5413:7, 5413:9, 5413:24, 5415:4, 5416:8, 5417:11, 5432:16, 5433:6, 5433:8, 5433:16, 5433:19, 5435:15, 5436:4
**Kenerson** [38] - 5284:12, 5287:8, 5319:12, 5320:14, 5321:12, 5322:5, 5323:20, 5333:13, 5333:16, 5334:18,

5335:14, 5336:1, 5336:3, 5353:13, 5355:6, 5355:17, 5355:22, 5357:16, 5360:7, 5361:25, 5362:20, 5365:3, 5365:13, 5366:18, 5396:8, 5398:18, 5401:8, 5403:7, 5403:11, 5405:8, 5406:13, 5412:12, 5421:18, 5432:15, 5435:8, 5435:9, 5436:10, 5436:17
**Kenerson's** [1] - 5321:18
**Kenerson................ 5323** [1] - 5286:3
**key** [2] - 5424:3, 5424:4
**kind** [26] - 5293:8, 5326:7, 5328:21, 5328:23, 5331:13, 5335:17, 5336:18, 5337:1, 5345:1, 5345:5, 5349:19, 5349:25, 5350:1, 5350:20, 5352:16, 5371:20, 5373:17, 5373:19, 5375:5, 5377:23, 5378:11, 5380:6, 5385:6, 5386:2, 5386:17, 5389:1
**knives** [1] - 5381:8
**knowing** [1] - 5388:7
**knowledge** [20] - 5342:7, 5342:8, 5364:16, 5415:21, 5415:24, 5416:13, 5416:15, 5417:15, 5419:19, 5419:21, 5420:3, 5423:13, 5424:5, 5424:13, 5424:20, 5429:14, 5430:17, 5430:20, 5436:15
**known** [5] - 5328:24, 5331:7, 5375:5, 5375:8, 5383:12
**knows** [8] - 5299:3, 5302:16, 5312:16, 5314:8, 5365:5, 5400:12, 5404:13, 5424:16

**L**

**label** [1] - 5364:20
**lack** [1] - 5432:7

**ladies** [5] - 5310:9, 5323:17, 5358:18, 5366:17, 5420:17
**laid** [2] - 5288:5, 5319:18
**Lakes** [1] - 5285:6
**language** [1] - 5371:22
**large** [5] - 5350:21, 5371:23, 5372:5, 5377:13, 5432:18
**last** [11] - 5318:3, 5320:8, 5321:18, 5324:5, 5354:3, 5356:12, 5358:10, 5395:20, 5414:11, 5424:16, 5425:9
**late** [8] - 5331:23, 5331:24, 5333:3, 5404:1, 5404:2, 5404:10, 5412:5
**laughter** [2] - 5319:3, 5365:19
**LAW** [2] - 5285:5, 5285:8
**law** [3] - 5406:11, 5438:19, 5439:4
**lawyer** [2] - 5362:9, 5429:16
**lay** [1] - 5427:13
**layers** [1] - 5419:23
**layman's** [1] - 5326:19
**lead** [5] - 5343:10, 5343:23, 5344:2, 5408:22, 5414:13
**lead-up** [5] - 5343:10, 5343:23, 5344:2, 5408:22, 5414:13
**leaders** [2] - 5393:20, 5435:19
**leadership** [41] - 5343:12, 5379:4, 5379:12, 5379:18, 5382:7, 5390:23, 5393:16, 5393:23, 5403:23, 5410:6, 5410:9, 5410:10, 5410:12, 5410:13, 5410:14, 5415:12, 5417:7, 5417:13, 5418:25, 5419:17, 5419:23, 5422:9, 5422:10, 5422:17, 5422:25, 5424:1, 5425:19, 5426:8, 5426:18, 5427:15, 5427:17, 5427:23, 5429:5, 5430:4, 5432:21, 5434:2, 5434:4, 5434:5,

5453

5434:12
**leading** [4] - 5375:22, 5396:18, 5413:25, 5415:2
**league** [1] - 5329:21
**leaks** [2] - 5322:15
**learn** [9] - 5345:14, 5347:3, 5352:5, 5352:12, 5367:1, 5382:19, 5382:22, 5385:19, 5408:25
**learned** [3] - 5353:20, 5409:1, 5409:4
**least** [14] - 5287:19, 5288:7, 5291:13, 5318:25, 5319:21, 5341:21, 5363:13, 5370:5, 5387:22, 5391:1, 5400:1, 5400:24, 5433:21, 5434:24
**leave** [5] - 5290:10, 5298:15, 5325:9, 5325:21, 5411:18
**leaving** [1] - 5336:15
**led** [5] - 5371:20, 5372:11, 5384:8, 5416:1, 5416:5
**leeway** [1] - 5353:10
**left** [5] - 5374:14, 5374:22, 5374:23, 5375:7, 5376:12
**left-wing** [2] - 5375:7, 5376:12
**legal** [8] - 5331:2, 5345:2, 5368:15, 5368:21, 5422:20, 5426:15, 5430:3
**less** [4] - 5306:1, 5350:25, 5377:13, 5387:14
**letter** [1] - 5290:25
**Level** [1] - 5380:16
**level** [12] - 5315:1, 5330:9, 5347:11, 5367:22, 5374:24, 5385:21, 5386:18, 5390:9, 5407:4, 5416:15, 5417:6, 5427:7
**lever** [1] - 5367:22
**liberal** [2] - 5328:5, 5328:19
**license** [2] - 5416:17, 5416:18
**life** [3] - 5324:22, 5331:14, 5422:19
**like-minded** [1] - 5344:17
**likely** [3] - 5296:5,

5318:14, 5394:11
**limited** [8] - 5294:20, 5294:21, 5419:17, 5419:19, 5423:13, 5423:16, 5423:22, 5427:14
**limiting** [15] - 5287:20, 5287:24, 5289:17, 5289:22, 5290:3, 5290:7, 5290:24, 5291:7, 5293:3, 5293:8, 5293:18, 5294:14, 5402:16, 5403:5, 5405:4
**line** [10] - 5314:17, 5322:2, 5370:13, 5370:14, 5370:16, 5370:17, 5374:17, 5375:24, 5431:12, 5431:14
**lines** [2] - 5338:21, 5389:9
**link** [2] - 5315:12, 5357:18
**linked** [2] - 5300:25, 5357:20
**linking** [2] - 5334:23, 5355:7
**links** [1] - 5365:3
**list** [4] - 5401:12, 5401:20, 5403:15, 5403:20
**listen** [1] - 5386:13
**listened** [1] - 5295:19
**listening** [2] - 5334:19, 5430:13
**litigating** [1] - 5313:6
**litigator** [1] - 5359:22
**live** [2] - 5324:8, 5362:16
**living** [1] - 5327:23
**LLC** [1] - 5284:23
**local** [1] - 5345:23
**lodge** [1] - 5402:15
**lodged** [1] - 5353:7, 5421:3
**Look** [1] - 5301:17
**look** [28] - 5288:5, 5293:17, 5293:18, 5293:25, 5295:5, 5295:15, 5300:20, 5301:8, 5308:5, 5310:9, 5311:23, 5313:16, 5314:12, 5334:22, 5336:18, 5357:15, 5358:13, 5364:25, 5369:15, 5388:2, 5392:3, 5401:5, 5405:2, 5405:23, 5431:2,

5437:13
**looked** [5] - 5318:9, 5318:12, 5332:17, 5392:24, 5396:14
**looking** [8] - 5325:22, 5340:19, 5362:8, 5370:4, 5371:11, 5371:12, 5400:3, 5401:1
**looks** [2] - 5392:22, 5405:21
**lose** [1] - 5378:17
**losing** [2] - 5328:25, 5344:19
**lost** [2] - 5359:13, 5433:1
**loud** [1] - 5324:3
**Loud** [1] - 5377:1
**low** [1] - 5347:11
**low-level** [1] - 5347:11
**lower** [1] - 5386:17
**lowest** [1] - 5386:17
**Loyd** [1] - 5399:1
**lunch** [9] - 5420:11, 5420:13, 5420:18, 5420:19, 5420:21, 5421:5, 5439:15, 5439:17
**Luncheon** [1] - 5439:20
**lunchtime** [1] - 5293:22

## M

**machine** [1] - 5285:18
**main** [1] - 5336:4
**maintain** [1] - 5361:11
**major** [2] - 5321:16, 5419:13
**makeshift** [2] - 5372:22, 5373:10
**man** [1] - 5438:4
**manage** [1] - 5376:15
**manifestly** [1] - 5360:15
**manner** [2] - 5306:23, 5361:18
**mantra** [3] - 5338:18, 5338:20, 5373:22
**manual** [1] - 5308:16
**map** [2] - 5288:9, 5337:13
**march** [13] - 5350:16, 5350:19, 5350:21, 5350:23, 5370:20, 5370:23, 5371:7, 5371:25, 5376:14, 5379:23, 5380:1, 5380:2, 5417:23

**marched** [1] - 5351:3
**marches** [1] - 5386:4
**marching** [5] - 5357:19, 5371:11, 5377:5, 5380:6, 5432:19
**marked** [5] - 5295:21, 5318:20, 5392:18, 5397:10, 5397:19
**markings** [3] - 5307:5, 5318:8, 5322:12
**marriage** [1] - 5329:15
**Marriott** [1] - 5406:23
**material** [2] - 5318:20, 5322:15
**Matt** [1] - 5341:7
**Matter** [2] - 5287:2, 5359:7
**matter** [8] - 5306:9, 5307:19, 5318:1, 5322:4, 5322:16, 5364:16, 5401:16, 5434:17
**matters** [2] - 5306:11, 5427:5
**MATTHEW** [2] - 5286:3, 5323:23
**Matthew** [3] - 5323:22, 5324:6, 5366:10
**McCullough** [4] - 5284:12, 5287:7, 5355:11, 5365:14
**MCGUIRE** [1] - 5284:20
**MD** [1] - 5285:3
**mean** [70] - 5288:5, 5289:19, 5289:23, 5291:19, 5292:3, 5292:21, 5293:11, 5294:2, 5294:10, 5294:17, 5294:19, 5294:25, 5296:15, 5298:17, 5299:25, 5300:5, 5300:16, 5300:19, 5301:8, 5305:8, 5306:6, 5307:10, 5307:18, 5310:25, 5311:22, 5312:1, 5314:23, 5314:24, 5317:10, 5317:12, 5319:16, 5319:17, 5320:25, 5321:16, 5321:20, 5322:4, 5322:6, 5322:22, 5333:13, 5353:21, 5358:8, 5360:25, 5363:23, 5363:25, 5369:16, 5369:22, 5370:3, 5373:25, 5388:14,

5400:21, 5401:5, 5402:1, 5402:24, 5404:12, 5412:17, 5421:17, 5423:3, 5427:3, 5427:23, 5430:6, 5430:8, 5430:12, 5434:14, 5434:22, 5434:24, 5435:4, 5435:7, 5437:17, 5439:9
**meaning** [1] - 5404:6
**means** [15] - 5306:24, 5309:1, 5350:8, 5352:12, 5358:11, 5359:23, 5364:23, 5365:5, 5388:1, 5409:21, 5429:6, 5429:7, 5429:8
**meant** [3] - 5370:12, 5402:25, 5430:25
**meat** [1] - 5428:9
**media** [1] - 5330:19
**meet** [9] - 5301:14, 5310:20, 5314:7, 5346:23, 5401:17, 5411:18, 5419:17, 5419:18, 5419:25
**meeting** [3] - 5341:23, 5345:23
**meetings** [2] - 5341:21, 5345:22
**member** [19] - 5331:6, 5331:9, 5331:18, 5341:15, 5341:17, 5342:4, 5342:23, 5342:25, 5343:3, 5346:13, 5347:16, 5386:18, 5386:20, 5410:25, 5419:15, 5423:15, 5423:17, 5423:18, 5423:21
**members** [25] - 5333:20, 5333:21, 5342:1, 5342:3, 5342:16, 5342:20, 5346:16, 5346:23, 5347:1, 5349:7, 5351:3, 5352:14, 5356:1, 5357:25, 5358:3, 5367:15, 5368:3, 5368:7, 5375:13, 5377:14, 5379:17, 5379:18, 5381:20, 5407:7, 5433:10
**membership** [3] - 5357:21, 5365:2, 5387:9
**men** [1] - 5316:10
**mental** [1] - 5329:12

5454

mentioned [22] - 5294:13, 5328:7, 5344:20, 5345:15, 5370:20, 5372:10, 5373:17, 5374:5, 5374:6, 5374:20, 5377:9, 5379:23, 5385:6, 5386:16, 5387:12, 5390:21, 5394:12, 5394:22, 5407:22, 5414:5, 5418:15
merit [1] - 5404:18
merits [1] - 5365:22
message [9] - 5338:1, 5339:17, 5339:18, 5339:22, 5341:23, 5404:4, 5404:5, 5408:20, 5412:13
messages [1] - 5413:10
messaging [1] - 5339:8
met [3] - 5350:15, 5368:3, 5423:24
metal [1] - 5392:5
Metcalf [4] - 5285:11, 5287:13, 5289:25, 5406:4
METCALF [23] - 5285:12, 5289:25, 5295:18, 5296:22, 5296:25, 5297:3, 5297:8, 5348:15, 5349:12, 5365:10, 5379:5, 5383:15, 5389:15, 5389:21, 5390:13, 5406:4, 5406:8, 5409:15, 5409:20, 5413:20, 5416:25, 5419:3
method [1] - 5291:15
Metropolitan [1] - 5299:4
Miami [1] - 5285:6
microphone [4] - 5319:10, 5324:4, 5349:16, 5361:3
mid [1] - 5333:3
middle [2] - 5295:17, 5392:4
might [10] - 5292:7, 5295:12, 5341:6, 5389:14, 5391:25, 5393:15, 5410:20, 5436:18
military [4] - 5318:14, 5318:16, 5324:12, 5324:15
MILLER [1] - 5439:23

Miller [2] - 5285:15, 5440:3
mind [15] - 5290:4, 5290:10, 5332:16, 5332:20, 5364:17, 5384:3, 5384:6, 5384:7, 5389:16, 5424:14, 5434:2, 5435:3, 5435:23, 5436:12, 5436:19
minded [1] - 5344:17
mine [1] - 5425:8
minimum [2] - 5401:25, 5402:2
Ministry [4] - 5342:25, 5434:3, 5434:6, 5434:7
Mink [1] - 5285:2
Minnesota [1] - 5315:14
minor [1] - 5321:17
minute [4] - 5303:2, 5311:13, 5315:20, 5423:1
minutes [6] - 5357:14, 5359:4, 5420:11, 5420:18, 5420:21, 5439:16
misidentification [1] - 5307:13
misleading [1] - 5427:18
missed [2] - 5401:11, 5401:20
missing [1] - 5314:22
mistrial [5] - 5353:4, 5353:22, 5354:11, 5354:17, 5365:8
misunderstanding [1] - 5321:11
modification [2] - 5315:22, 5315:23
modified [1] - 5295:14
moment [5] - 5289:7, 5316:1, 5322:9, 5347:16, 5412:10
monolithic [1] - 5371:2
month [3] - 5404:7, 5419:16, 5423:18
months [3] - 5313:4, 5313:22, 5419:16
mood [2] - 5370:22, 5371:6
Moore [2] - 5284:13, 5287:8
more-than-three-hour [1] - 5321:1
MORNING [1] - 5284:9
morning [8] - 5287:16,

5288:10, 5293:20, 5324:1, 5324:2, 5358:19, 5418:2, 5424:11
MOSD [1] - 5435:16
most [9] - 5291:23, 5296:5, 5298:25, 5299:14, 5321:2, 5321:22, 5376:16, 5394:10, 5429:23
mostly [3] - 5327:8, 5382:9, 5382:11
motion [2] - 5365:8, 5366:5
motivation [1] - 5334:3
motivations [2] - 5320:2, 5334:3
motive [3] - 5292:16, 5293:1, 5293:7
motorcycle [1] - 5383:3
mouth [2] - 5349:15, 5378:12
move [12] - 5295:18, 5297:17, 5325:22, 5328:2, 5333:12, 5353:22, 5363:10, 5379:11, 5388:17, 5393:2, 5397:24, 5411:4
moved [5] - 5326:3, 5326:10, 5326:25, 5328:3, 5353:3
movies [2] - 5327:14, 5327:17
moving [5] - 5312:11, 5318:4, 5354:10, 5385:25, 5386:7
MR [226] - 5289:10, 5289:25, 5290:13, 5290:17, 5290:19, 5295:18, 5296:22, 5296:25, 5297:3, 5297:8, 5300:15, 5304:9, 5305:13, 5306:7, 5306:9, 5306:11, 5306:13, 5306:18, 5306:20, 5307:9, 5307:11, 5308:1, 5308:10, 5308:14, 5312:10, 5315:25, 5316:14, 5316:16, 5316:18, 5317:25, 5319:1, 5319:4, 5319:14, 5322:11, 5322:18, 5323:1, 5323:21, 5323:25, 5328:12, 5328:16, 5329:22,

5329:25, 5333:17, 5333:25, 5334:14, 5334:17, 5335:2, 5335:5, 5335:8, 5335:13, 5336:7, 5336:8, 5340:2, 5344:15, 5348:12, 5348:15, 5348:18, 5349:12, 5349:20, 5351:14, 5351:21, 5352:2, 5352:4, 5353:3, 5353:17, 5353:22, 5354:4, 5354:10, 5354:17, 5354:19, 5354:22, 5355:4, 5355:8, 5355:24, 5356:10, 5356:20, 5356:23, 5357:6, 5357:7, 5357:9, 5357:24, 5358:3, 5358:6, 5359:9, 5359:19, 5359:24, 5360:1, 5360:5, 5360:12, 5361:15, 5361:24, 5362:1, 5362:5, 5364:11, 5365:7, 5365:10, 5365:21, 5365:25, 5366:19, 5366:20, 5369:23, 5369:25, 5370:8, 5371:5, 5373:12, 5374:19, 5375:2, 5375:8, 5375:11, 5375:17, 5375:20, 5375:21, 5375:22, 5376:2, 5379:5, 5379:9, 5381:3, 5381:11, 5383:15, 5383:17, 5384:5, 5384:16, 5389:12, 5389:15, 5389:21, 5389:23, 5390:7, 5390:13, 5390:18, 5392:13, 5392:16, 5392:23, 5393:1, 5393:5, 5395:12, 5395:15, 5396:7, 5396:9, 5396:13, 5396:18, 5396:21, 5396:23, 5397:24, 5398:2, 5398:4, 5398:12, 5398:21, 5398:25, 5399:13, 5399:24, 5400:21, 5400:23, 5403:13, 5405:9, 5405:11, 5405:17, 5406:4, 5406:8, 5406:17, 5406:18, 5408:11, 5408:14, 5409:7,

5409:10, 5409:15, 5409:18, 5409:20, 5409:25, 5412:7, 5412:14, 5412:18, 5412:21, 5412:25, 5413:3, 5413:4, 5413:7, 5413:9, 5413:20, 5413:24, 5415:2, 5415:4, 5416:8, 5416:25, 5417:3, 5417:11, 5419:3, 5419:4, 5422:24, 5424:24, 5425:4, 5425:7, 5426:21, 5427:4, 5427:8, 5428:1, 5428:6, 5428:18, 5429:21, 5430:7, 5430:12, 5430:20, 5432:16, 5433:6, 5433:8, 5433:16, 5433:19, 5435:7, 5435:10, 5435:13, 5435:15, 5436:4, 5436:9, 5436:24, 5437:1, 5437:4, 5437:6, 5437:8, 5437:10, 5437:13, 5437:15, 5437:17, 5437:23, 5438:1, 5438:9, 5438:13, 5439:10
MS [136] - 5288:8, 5288:13, 5288:19, 5288:22, 5289:1, 5289:3, 5290:23, 5291:3, 5292:14, 5292:20, 5293:10, 5293:16, 5293:20, 5293:25, 5294:4, 5294:6, 5294:10, 5294:12, 5294:23, 5294:25, 5295:3, 5295:7, 5295:9, 5295:14, 5297:17, 5297:22, 5297:24, 5298:1, 5298:7, 5298:10, 5298:13, 5298:19, 5299:22, 5300:3, 5300:24, 5301:1, 5301:5, 5301:7, 5301:14, 5301:21, 5302:8, 5302:11, 5302:15, 5302:23, 5303:1, 5303:15, 5303:22, 5303:25, 5304:2, 5308:24, 5309:4, 5309:6, 5310:11, 5310:19, 5313:24, 5314:19, 5315:8,

5455

5315:22, 5317:8,
5317:11, 5317:15,
5319:7, 5320:7,
5321:24, 5332:24,
5333:6, 5333:9,
5334:20, 5335:22,
5339:25, 5344:12,
5351:12, 5352:24,
5353:8, 5355:16,
5355:20, 5363:6,
5363:8, 5363:15,
5363:20, 5364:1,
5364:5, 5364:9,
5366:12, 5370:25,
5373:1, 5374:16,
5375:23, 5376:1,
5383:23, 5384:13,
5389:5, 5390:5,
5390:12, 5396:4,
5398:3, 5399:17,
5399:22, 5401:10,
5401:24, 5402:4,
5402:8, 5402:11,
5402:19, 5402:21,
5404:10, 5404:22,
5405:2, 5413:18,
5416:3, 5419:2,
5419:9, 5419:13,
5420:15, 5421:6,
5421:15, 5421:21,
5421:24, 5422:7,
5422:12, 5422:18,
5422:23, 5423:1,
5423:5, 5423:7,
5423:10, 5429:18,
5431:20, 5432:7,
5432:10, 5432:12,
5432:14, 5438:17,
5438:19, 5439:2,
5439:4
**MULROE** [3] -
5300:15, 5304:9,
5312:10
**Mulroe** [10] - 5284:13,
5287:8, 5300:7,
5305:17, 5307:21,
5308:16, 5311:21,
5362:9, 5362:23
**Mulroe's** [1] - 5362:18
**multiple** [2] - 5320:25,
5348:20
**murky** [1] - 5427:11
**must** [2] - 5320:11,
5320:12
**mysterious** [4] -
5306:4, 5307:15,
5308:17, 5313:17

---

## N

**Nadia** [2] - 5284:13,

---

5287:8
**name** [12] - 5312:16,
5324:5, 5327:12,
5327:13, 5339:22,
5340:7, 5340:8,
5340:10, 5340:24,
5341:4, 5341:25,
5379:14
**named** [3] - 5347:4,
5349:4, 5349:5
**names** [2] - 5341:3,
5393:19
**narrow** [2] - 5419:24,
5423:13
**nation** [1] - 5332:9
**National** [3] - 5324:16,
5324:21, 5325:9
**national** [11] -
5342:23, 5343:11,
5345:23, 5346:2,
5379:4, 5379:18,
5385:11, 5410:10,
5410:15, 5415:12,
5415:22
**nationally** [2] -
5345:16, 5345:18
**nature** [3] - 5305:9,
5385:17, 5433:21
**Nayib** [2] - 5285:4,
5287:11
**NAYIB** [1] - 5285:5
**near** [1] - 5355:24
**nearby** [1] - 5382:16
**Nebuchadnezzar's** [1]
- 5307:16
**necessarily** [3] -
5291:9, 5293:11,
5435:18
**necessary** [1] -
5312:21
**neck** [1] - 5298:25
**need** [9] - 5287:19,
5287:23, 5317:14,
5317:18, 5317:20,
5327:13, 5381:10,
5399:12, 5410:2
**needed** [2] - 5345:22,
5345:23
**needing** [1] - 5412:15
**Needler** [1] - 5392:17
**needs** [1] - 5336:1
**negative** [1] - 5334:11
**neutral** [2] - 5349:18,
5390:25
**never** [15] - 5299:12,
5303:18, 5305:22,
5330:11, 5353:19,
5359:21, 5370:2,
5372:7, 5387:19,
5390:16, 5423:23,

---

5423:24, 5423:25,
5426:1, 5436:5
**never-ending** [1] -
5330:11
**New** [17] - 5284:18,
5284:25, 5285:13,
5324:9, 5327:25,
5337:14, 5337:17,
5410:12, 5410:16,
5410:18, 5410:22,
5410:24, 5410:25,
5411:10, 5411:11,
5418:20, 5418:21
**new** [2] - 5364:20,
5435:2
**news** [3] - 5331:2
**next** [9] - 5287:20,
5301:23, 5318:1,
5323:12, 5323:18,
5338:12, 5359:21,
5404:7, 5428:7
**nexus** [1] - 5426:9
**nice** [1] - 5378:4
**Nicholas** [2] -
5284:16, 5287:9
**Nick** [1] - 5362:10
**night** [34] - 5318:3,
5319:8, 5320:8,
5320:10, 5320:19,
5321:18, 5350:21,
5369:1, 5370:20,
5370:21, 5371:7,
5371:25, 5373:10,
5374:9, 5376:14,
5377:9, 5377:12,
5379:23, 5380:2,
5380:12, 5380:18,
5380:21, 5381:14,
5381:15, 5382:9,
5382:12, 5394:2,
5395:20, 5415:10,
5416:24, 5417:16,
5417:20, 5417:23
**NJ** [3] - 5285:15,
5439:23, 5440:3
**NJ-CCR** [3] - 5285:15,
5439:23, 5440:3
**Noble** [6] - 5343:25,
5382:13, 5383:1,
5391:4, 5391:12,
5393:12
**nobody** [3] - 5314:14,
5385:21, 5385:23
**noises** [1] - 5361:2
**non** [2] - 5307:14,
5310:6
**non-highlighted** [2] -
5307:14, 5310:6
**none** [6] - 5426:6,
5430:21, 5433:14,

---

5436:16, 5436:21
**nonetheless** [3] -
5314:10, 5318:4,
5323:8
**NORDEAN** [1] -
5284:4
**Nordean** [11] - 5287:3,
5287:14, 5304:19,
5312:8, 5312:15,
5312:19, 5312:25,
5334:1, 5343:16,
5356:3, 5359:8
**normal** [2] - 5350:21,
5405:25
**Norman** [2] - 5284:23,
5287:10
**normies** [1] - 5333:22
**North** [1] - 5431:24
**Nos** [1] - 5284:2
**note** [13] - 5291:1,
5295:20, 5296:25,
5313:2, 5323:2,
5335:9, 5338:25,
5362:7, 5362:10,
5403:14, 5425:16,
5434:1, 5435:15
**noted** [4] - 5296:1,
5297:8, 5320:10,
5366:2
**notes** [1] - 5439:25
**nothing** [21] -
5291:21, 5313:18,
5317:7, 5317:23,
5320:1, 5321:9,
5321:17, 5355:9,
5356:15, 5357:4,
5362:18, 5362:19,
5403:24, 5424:16,
5424:17, 5429:6,
5429:7, 5431:15,
5438:6, 5438:8
**nothing's** [1] -
5409:13
**nothing-burger** [1] -
5320:1
**notice** [1] - 5391:10
**noting** [1] - 5364:12
**notion** [2] - 5293:1,
5382:5
**notwithstanding** [2] -
5425:17, 5425:18
**November** [6] -
5333:2, 5333:3,
5333:11, 5336:12,
5345:1, 5367:23
**nowhere** [1] - 5316:6
**number** [13] -
5298:21, 5355:11,
5356:1, 5356:5,
5361:6, 5377:11,

---

5377:13, 5390:9,
5395:23, 5421:12,
5421:13, 5421:16,
5427:22
**numbering** [1] -
5432:19
**numbers** [3] - 5396:7,
5396:9, 5400:4
**NW** [5] - 5284:14,
5284:21, 5285:5,
5285:16, 5440:5
**NY** [2] - 5284:18,
5285:13

---

## O

**object** [11] - 5304:3,
5314:2, 5317:8,
5317:14, 5354:22,
5364:3, 5381:3,
5398:5, 5399:12,
5401:19, 5402:22
**objected** [4] -
5299:14, 5302:6,
5303:17, 5311:2
**objecting** [4] - 5334:5,
5360:6, 5360:13,
5360:24
**objection** [76] -
5303:20, 5308:20,
5313:22, 5317:6,
5317:16, 5328:12,
5329:22, 5332:24,
5334:9, 5336:5,
5339:25, 5344:12,
5348:14, 5348:15,
5348:16, 5349:12,
5351:12, 5352:24,
5353:7, 5356:9,
5359:11, 5363:3,
5364:4, 5369:23,
5371:1, 5374:16,
5375:2, 5375:8,
5375:17, 5375:20,
5375:24, 5379:5,
5383:15, 5383:23,
5384:13, 5389:5,
5389:15, 5389:21,
5390:5, 5390:12,
5390:13, 5393:3,
5396:4, 5396:18,
5398:3, 5398:4,
5398:12, 5398:17,
5399:17, 5401:5,
5401:7, 5401:9,
5402:15, 5404:18,
5404:19, 5404:20,
5405:19, 5406:2,
5406:5, 5409:15,
5409:18, 5413:18,
5413:20, 5415:2,

5456

5416:3, 5416:25, 5417:3, 5419:2, 5419:3, 5419:4, 5421:3, 5425:16, 5430:24, 5431:4, 5431:22
**objection's** [2] - 5406:13, 5422:24
**objectionable** [2] - 5303:18, 5364:8
**objections** [8] - 5335:25, 5361:23, 5399:5, 5403:10, 5405:17, 5424:13, 5424:19, 5428:20
**objects** [1] - 5359:23
**obligation** [2] - 5292:10, 5323:4
**observation** [1] - 5432:22
**observations** [11] - 5304:23, 5359:16, 5360:22, 5361:13, 5362:25, 5374:9, 5390:22, 5425:23, 5426:6, 5427:14, 5431:16
**observe** [2] - 5379:2, 5432:4
**observed** [7] - 5375:12, 5376:6, 5379:13, 5379:21, 5419:7, 5431:6, 5431:11
**observing** [1] - 5354:6
**obviously** [8] - 5295:24, 5300:8, 5307:3, 5315:12, 5316:24, 5322:14, 5385:24, 5434:4
**occasion** [1] - 5433:22
**occur** [1] - 5322:6
**OF** [5] - 5284:1, 5284:2, 5284:8, 5285:5, 5439:22
**offense** [2] - 5419:15, 5422:21
**offer** [1] - 5338:17
**offered** [1] - 5436:17
**OFFICE** [1] - 5284:14
**officer** [2] - 5299:4, 5315:24
**Officer** [1] - 5289:5
**OFFICES** [1] - 5285:5
**OFFICIAL** [1] - 5439:22
**official** [1] - 5331:1
**Official** [2] - 5285:15, 5440:3

**officially** [1] - 5326:3
**offs** [1] - 5410:20
**old** [2] - 5314:20, 5389:9
**once** [15] - 5301:1, 5302:15, 5304:20, 5309:9, 5310:4, 5310:19, 5326:10, 5326:24, 5330:19, 5338:9, 5339:11, 5340:5, 5341:22, 5353:25, 5405:22
**one** [91] - 5289:19, 5289:21, 5290:22, 5291:13, 5291:21, 5292:2, 5292:7, 5292:9, 5292:11, 5293:2, 5295:14, 5295:22, 5298:3, 5298:5, 5298:19, 5298:21, 5299:15, 5299:18, 5299:19, 5302:2, 5303:16, 5311:13, 5312:6, 5313:12, 5317:25, 5318:6, 5322:1, 5322:2, 5323:2, 5332:20, 5342:7, 5342:8, 5342:14, 5345:15, 5346:5, 5346:11, 5346:21, 5348:20, 5352:9, 5354:13, 5356:21, 5360:2, 5360:22, 5361:6, 5362:7, 5362:9, 5365:5, 5365:11, 5365:12, 5367:1, 5372:6, 5373:17, 5377:1, 5379:2, 5379:24, 5382:19, 5389:13, 5391:1, 5391:7, 5391:13, 5402:18, 5403:6, 5404:4, 5404:24, 5405:6, 5405:12, 5405:13, 5406:3, 5407:6, 5407:14, 5407:19, 5407:20, 5408:1, 5410:2, 5411:15, 5412:10, 5412:13, 5412:14, 5412:15, 5412:16, 5414:25, 5421:12, 5421:16, 5423:3, 5423:18, 5423:23, 5425:20, 5427:22, 5429:23, 5433:21, 5435:19
**one's** [2] - 5402:17, 5405:6

**one-and-a-half-line** [1] - 5322:2
**one-and-a-half-sentence** [1] - 5322:1
**one-minute** [1] - 5311:13
**ones** [7] - 5299:1, 5311:5, 5313:3, 5370:5, 5399:8, 5399:10, 5415:23
**ongoing** [2] - 5345:2, 5345:5
**open** [8] - 5318:17, 5319:25, 5320:16, 5321:13, 5399:16, 5420:12, 5435:22, 5435:24
**open-source** [4] - 5318:17, 5319:25, 5320:16, 5321:13
**opened** [2] - 5355:11, 5356:8
**openly** [1] - 5390:3
**opinion** [2] - 5314:22, 5349:13
**opponent** [6] - 5291:18, 5294:3, 5402:3, 5402:5, 5403:2, 5404:23
**opportunity** [4] - 5347:19, 5391:1, 5391:3, 5427:21
**oral** [1] - 5292:15
**Orange** [1] - 5284:24
**order** [3] - 5293:17, 5313:5, 5398:14
**organization** [2] - 5333:15, 5337:13
**organized** [1] - 5376:24
**original** [1] - 5390:8
**otherwise** [3] - 5391:25, 5421:22, 5428:25
**ought** [2] - 5306:3, 5404:14
**ourselves** [2] - 5370:5, 5374:13
**out-of-court** [2] - 5401:15, 5402:23
**outlet** [2] - 5329:20, 5344:10
**outlets** [1] - 5330:19
**outline** [3] - 5298:19, 5301:16, 5400:3
**outlines** [6] - 5298:2, 5301:25, 5302:2, 5303:3, 5303:6, 5305:3

**outside** [4] - 5349:4, 5350:2, 5350:4, 5393:17
**outweighed** [1] - 5406:9
**overall** [1] - 5334:23
**overrule** [4] - 5308:19, 5317:6, 5334:9, 5336:5
**Overruled** [1] - 5317:19
**overruled** [31] - 5313:23, 5328:13, 5329:23, 5332:25, 5340:1, 5344:13, 5349:14, 5351:13, 5370:1, 5371:4, 5374:18, 5375:3, 5375:19, 5379:6, 5381:5, 5383:16, 5383:24, 5384:15, 5389:7, 5389:22, 5390:6, 5390:15, 5396:19, 5406:14, 5409:16, 5409:22, 5413:19, 5413:23, 5416:4, 5417:1, 5417:5
**overseas** [2] - 5324:24, 5325:13
**overtly** [1] - 5393:17
**overview** [1] - 5338:13
**overwhelming** [1] - 5427:19
**own** [2] - 5327:3

**P**

**P.A** [2] - 5285:5, 5285:8
**P.C** [1] - 5285:12
**p.m** [1] - 5439:20
**page** [2] - 5295:22, 5379:1
**PAGE** [1] - 5286:2
**Pages** [2] - 5292:15, 5292:25
**Palace** [1] - 5307:16
**panel** [2] - 5323:14, 5366:14
**Papers** [1] - 5340:16
**paragraph** [1] - 5338:15
**pardon** [2] - 5373:24, 5396:8, 5439:10
**Park** [1] - 5285:12
**Parler** [2] - 5393:12, 5394:7
**part** [20] - 5288:16, 5289:20, 5299:14,

5304:15, 5313:4, 5322:7, 5324:24, 5332:10, 5334:24, 5345:25, 5373:5, 5376:16, 5382:3, 5384:9, 5384:13, 5390:3, 5402:2, 5421:17, 5422:1, 5437:11
**partake** [1] - 5391:14
**partici** [1] - 5394:16
**participate** [1] - 5350:15
**participated** [1] - 5350:23
**particular** [12] - 5292:2, 5295:10, 5297:15, 5300:8, 5308:5, 5332:18, 5358:8, 5361:9, 5374:6, 5401:7, 5404:16, 5405:24
**particularly** [3] - 5292:6, 5357:17, 5363:25
**particulars** [1] - 5293:6
**parties** [3] - 5287:22, 5305:9, 5313:12
**party** [9] - 5291:11, 5291:18, 5294:3, 5305:16, 5313:12, 5402:3, 5402:5, 5403:2, 5404:23
**pass** [2] - 5300:1, 5320:9
**passages** [1] - 5292:24
**past** [1] - 5403:15
**patting** [2] - 5383:20, 5383:21
**Pattis** [15] - 5284:23, 5287:10, 5305:12, 5308:3, 5309:18, 5315:24, 5335:1, 5354:21, 5357:8, 5424:21, 5424:23, 5425:2, 5428:23, 5429:8, 5436:7
**PATTIS** [57] - 5284:23, 5305:13, 5306:7, 5306:9, 5306:11, 5306:13, 5306:18, 5306:20, 5307:9, 5307:11, 5307:24, 5308:1, 5308:10, 5308:14, 5315:25, 5316:14, 5316:16, 5316:18, 5335:2, 5335:5, 5335:8,

5457

5354:22, 5355:4,
5357:7, 5357:9,
5365:7, 5365:21,
5369:23, 5369:25,
5396:21, 5419:4,
5424:24, 5425:4,
5425:7, 5426:21,
5427:4, 5427:8,
5428:1, 5428:6,
5435:7, 5435:10,
5435:13, 5436:9,
5436:24, 5437:1,
5437:4, 5437:6,
5437:8, 5437:10,
5437:13, 5437:15,
5437:17, 5437:23,
5438:1, 5438:9,
5438:13, 5439:10
**Pattis's** [1] - 5439:8
**pause** [8] - 5298:4,
5312:6, 5323:13,
5366:6, 5366:9,
5366:11, 5408:10,
5420:8
**paused** [1] - 5435:8
**pausing** [5] - 5297:14,
5304:12, 5305:3,
5316:22, 5316:25
**pay** [1] - 5330:13
**PC** [1] - 5284:20
**people** [75] - 5290:2,
5298:22, 5300:8,
5304:22, 5328:7,
5328:18, 5328:20,
5329:1, 5332:15,
5332:17, 5334:12,
5336:17, 5336:20,
5336:21, 5337:2,
5340:19, 5340:22,
5341:2, 5341:6,
5341:9, 5341:11,
5341:22, 5342:2,
5344:17, 5349:25,
5350:1, 5350:3,
5350:5, 5350:23,
5352:16, 5352:18,
5355:13, 5355:16,
5356:5, 5357:17,
5357:19, 5358:8,
5367:6, 5367:24,
5367:25, 5369:8,
5369:11, 5369:15,
5373:13, 5373:14,
5375:15, 5375:17,
5375:18, 5376:8,
5377:5, 5377:10,
5377:11, 5377:22,
5381:7, 5385:20,
5385:24, 5385:25,
5386:7, 5391:9,

5393:19, 5407:10,
5422:2, 5424:2,
5427:15, 5427:16,
5427:17, 5429:6,
5429:9, 5429:10,
5429:12, 5433:9,
5434:8, 5434:10,
5434:22
**people's** [3] - 5375:9,
5390:13, 5438:2
**Pepe** [2] - 5418:5,
5418:6
**pepper** [2] - 5348:9,
5348:10
**perceive** [1] - 5430:1
**perceived** [2] -
5396:3, 5430:16
**perception** [3] -
5377:11, 5430:4,
5432:3
**percipient** [1] - 5426:6
**perfectly** [3] -
5333:15, 5431:1,
5431:7
**period** [3] - 5329:9,
5391:23, 5393:14
**permission** [1] -
5393:4
**permit** [1] - 5438:20
**permits** [3] - 5288:18,
5288:20, 5311:1
**permitted** [2] -
5427:12, 5438:4
**person** [31] - 5293:2,
5297:16, 5298:8,
5298:14, 5301:9,
5302:11, 5304:14,
5306:25, 5307:4,
5308:5, 5308:7,
5308:8, 5314:1,
5342:14, 5344:1,
5347:20, 5348:1,
5368:4, 5389:2,
5389:3, 5407:19,
5408:2, 5423:19,
5423:23, 5424:14,
5427:16, 5431:2,
5431:3, 5431:18
**person's** [3] -
5342:10, 5347:9,
5431:8
**personal** [10] -
5330:19, 5343:11,
5343:14, 5343:16,
5343:18, 5343:20,
5360:18, 5364:6,
5429:13, 5434:18
**personally** [3] -
5362:14, 5369:7,
5380:15

**perspective** [11] -
5306:1, 5307:18,
5312:18, 5318:25,
5351:18, 5367:24,
5379:7, 5383:25,
5388:2, 5388:8,
5427:19
**persuading** [1] -
5313:14
**pertaining** [1] -
5359:17
**Pezzola** [70] - 5287:6,
5287:15, 5289:11,
5290:1, 5290:14,
5291:6, 5291:8,
5294:18, 5295:24,
5296:1, 5296:5,
5296:8, 5348:13,
5355:12, 5356:3,
5359:15, 5365:10,
5382:20, 5382:23,
5382:24, 5383:3,
5383:5, 5388:10,
5390:10, 5391:24,
5393:14, 5393:23,
5394:5, 5397:10,
5397:23, 5400:9,
5400:11, 5400:15,
5400:16, 5401:15,
5401:22, 5402:5,
5403:20, 5404:1,
5405:18, 5408:9,
5408:18, 5409:12,
5410:8, 5410:9,
5410:23, 5411:7,
5411:16, 5411:22,
5412:5, 5413:6,
5413:13, 5414:1,
5414:12, 5415:17,
5416:10, 5416:23,
5419:18, 5423:17,
5423:19, 5426:5,
5430:25, 5434:1,
5434:5, 5434:11,
5435:16, 5435:19
**PEZZOLA** [1] - 5284:6
**Pezzola's** [4] - 5288:2,
5290:5, 5389:16,
5426:4
**phone** [7] - 5335:14,
5339:7, 5339:14,
5355:17, 5356:21,
5357:16, 5389:2
**phones** [1] - 5377:22
**photograph** [2] -
5378:21, 5387:13
**photographs** [1] -
5392:11
**phrase** [2] - 5352:5,
5352:10

**physical** [5] - 5335:17,
5371:18, 5373:19,
5374:1, 5386:12
**physically** [4] -
5327:21, 5386:9,
5390:23, 5400:22
**pick** [3] - 5302:11,
5352:25, 5420:13
**picked** [1] - 5353:17
**picture** [2] - 5378:7,
5394:2
**pictures** [1] - 5391:9
**piece** [4] - 5292:2,
5306:13, 5314:4,
5404:17
**place** [5] - 5308:18,
5348:20, 5377:4,
5382:2, 5385:1
**placing** [1] - 5334:24
**plan** [6] - 5318:18,
5398:20, 5399:1,
5399:3, 5399:11,
5400:6
**planning** [1] - 5412:18
**plans** [2] - 5388:23,
5391:14
**plate** [2] - 5380:15,
5380:23
**plates** [1] - 5380:16
**play** [12] - 5294:15,
5297:9, 5297:10,
5302:21, 5302:25,
5303:3, 5304:18,
5319:23, 5399:16,
5400:6, 5413:3,
5413:7
**played** [7] - 5297:12,
5299:21, 5301:24,
5408:13, 5409:9,
5413:2, 5413:8
**playing** [1] - 5330:5
**plaza** [2] - 5377:4,
5400:13
**plea** [4] - 5437:15,
5438:6, 5438:10,
5438:20
**pled** [5] - 5320:24,
5434:24, 5436:22,
5437:12, 5438:22
**plenty** [1] - 5290:8
**PLLC** [1] - 5284:17
**plus** [1] - 5392:7
**point** [71] - 5288:8,
5292:20, 5292:21,
5296:11, 5296:15,
5304:18, 5304:19,
5307:8, 5308:24,
5309:6, 5311:6,
5311:17, 5313:25,
5314:14, 5315:15,

5319:18, 5319:21,
5327:21, 5328:6,
5336:1, 5338:17,
5339:9, 5339:15,
5339:22, 5340:23,
5341:14, 5342:16,
5342:19, 5344:11,
5345:8, 5346:16,
5347:9, 5347:17,
5348:6, 5354:15,
5354:23, 5358:9,
5378:4, 5378:13,
5379:19, 5379:20,
5380:5, 5380:7,
5384:3, 5384:6,
5384:8, 5384:11,
5385:14, 5390:4,
5393:1, 5393:23,
5403:3, 5403:4,
5403:16, 5408:20,
5410:15, 5415:21,
5418:7, 5423:17,
5426:24, 5427:3,
5427:13, 5427:18,
5428:22, 5430:8,
5430:9, 5431:14,
5437:11, 5439:7,
5439:8
**pointed** [1] - 5361:17
**pointing** [3] - 5315:3,
5316:23, 5364:18
**points** [2] - 5305:4,
5311:14
**Police** [1] - 5299:4
**police** [4] - 5372:1,
5372:3, 5376:14,
5382:9
**political** [4] - 5374:24,
5375:15, 5376:9,
5388:19
**politicians** [2] -
5375:7, 5376:12
**politics** [7] - 5328:4,
5328:10, 5328:18,
5328:20, 5330:5,
5330:7, 5344:18
**popular** [1] - 5364:16
**portion** [1] - 5312:19
**pose** [5] - 5308:14,
5310:1, 5378:13,
5378:21, 5378:22
**posed** [5] - 5308:12,
5378:7, 5378:8,
5378:10, 5432:25
**poses** [1] - 5313:9
**position** [6] - 5290:1,
5290:4, 5290:6,
5360:15, 5365:22,
5438:5
**positioned** [1] -

5458

5304:24
**possess** [1] - 5318:11
**possession** [1] -
5318:19
**possibility** [1] -
5288:23
**possible** [2] -
5371:13, 5436:18
**possibly** [1] - 5427:4
**post** [2] - 5394:9,
5394:17
**Post** [2] - 5379:1,
5387:13
**posted** [3] - 5394:6,
5394:18, 5394:20
**postings** [1] - 5393:22
**potential** [1] - 5398:7
**potentially** [1] -
5318:23
**power** [4] - 5356:14,
5357:2, 5359:12,
5364:17
**powerful** [2] - 5375:6,
5376:13
**practical** [1] - 5322:4
**practice** [1] - 5382:7
**preclude** [2] - 5305:7,
5318:5
**predicate** [1] - 5426:7
**prejudice** [5] -
5307:12, 5313:10,
5313:19, 5313:20,
5427:18
**prejudices** [1] -
5316:7
**prejudicial** [3] -
5315:9, 5315:10
**preliminary** [1] -
5318:1
**prepared** [2] -
5399:11, 5424:9
**presence** [1] - 5386:3
**present** [10] - 5287:7,
5287:8, 5287:9,
5287:10, 5287:11,
5287:12, 5287:13,
5302:20, 5382:15,
5425:22
**present-sense** [1] -
5425:22
**presentation** [1] -
5312:22
**presenting** [2] -
5313:7, 5334:17
**preserve** [2] -
5317:15, 5317:20
**President** [3] - 5331:1,
5345:9, 5407:2
**president** [2] - 5339:4,
5418:7

presumably [1] -
5426:8
**presume** [1] - 5300:12
**presumption** [1] -
5316:8
**pretrial** [2] - 5313:6,
5334:8
**pretty** [11] - 5324:22,
5328:6, 5328:14,
5330:21, 5347:11,
5347:13, 5351:7,
5369:7, 5384:11,
5391:8, 5433:8
**prevent** [1] - 5315:11
**preview** [2] - 5304:16,
5398:19
**previous** [1] - 5360:7
**previously** [3] -
5362:20, 5368:16,
5397:25
**probative** [1] - 5406:9
**problem** [8] - 5304:6,
5314:10, 5355:18,
5423:4, 5435:22,
5435:23
**problems** [2] -
5288:25, 5298:1
**procedure** [1] - 5398:5
**procedures** [1] -
5313:4
**proceed** [7] - 5323:18,
5354:9, 5366:18,
5399:8, 5401:5,
5405:8, 5406:16,
5412:23
**proceedings** [1] -
5440:1
**Proceedings** [1] -
5285:18
**process** [2] - 5341:19,
5341:20
**produce** [4] - 5306:23,
5314:5, 5320:14,
5404:12
**produced** [12] -
5285:19, 5311:1,
5313:3, 5313:16,
5313:21, 5314:8,
5319:8, 5320:7,
5320:13, 5321:10,
5396:5, 5404:14
**produces** [1] -
5316:10
**producing** [1] -
5320:9
**production** [3] -
5327:8, 5327:10,
5404:11
**proffer** [3] - 5399:19,
5403:13, 5424:16

**program** [6] - 5298:21,
5299:12, 5302:5,
5302:8, 5306:24,
5417:16
**programmed** [2] -
5417:9, 5417:13
**programming** [2] -
5416:13, 5416:24
**prominent** [1] -
5391:8
**pronounced** [1] -
5352:6
**proof** [1] - 5438:4
**propaganda** [2] -
5336:19, 5337:6
**properly** [1] - 5314:16
**propose** [1] - 5420:10
**proposing** [1] -
5294:20
**prosecutor** [6] -
5353:25, 5354:13,
5356:12, 5357:1,
5357:3, 5429:9
**prospect** [10] -
5342:18, 5346:11,
5346:18, 5346:21,
5349:6, 5385:14,
5386:19, 5386:24,
5387:1, 5411:5
**prospecting** [8] -
5340:6, 5340:17,
5341:11, 5344:22,
5345:6, 5367:12,
5367:15
**prospects** [4] -
5341:22, 5345:15,
5381:20, 5411:3
**protection** [1] -
5381:10
**protesting** [1] -
5337:4
**Proud** [118] - 5331:7,
5331:19, 5331:22,
5332:6, 5332:10,
5332:11, 5333:20,
5334:4, 5334:6,
5334:13, 5335:3,
5335:17, 5336:19,
5337:10, 5337:12,
5337:13, 5337:15,
5338:16, 5338:18,
5340:20, 5341:15,
5342:4, 5342:16,
5342:19, 5342:23,
5343:6, 5343:11,
5344:9, 5345:16,
5345:19, 5346:2,
5346:13, 5346:23,
5347:10, 5347:11,
5347:17, 5349:7,

5350:9, 5351:19,
5352:10, 5352:11,
5352:14, 5353:9,
5353:19, 5355:7,
5355:9, 5355:12,
5356:1, 5356:8,
5357:21, 5357:25,
5358:6, 5363:13,
5364:11, 5364:15,
5365:2, 5367:2,
5367:3, 5367:6,
5368:4, 5368:7,
5369:12, 5369:19,
5370:4, 5372:6,
5374:7, 5374:12,
5374:20, 5375:5,
5376:7, 5377:14,
5380:25, 5382:2,
5382:6, 5382:13,
5383:8, 5383:13,
5384:22, 5385:11,
5385:17, 5386:18,
5387:10, 5388:5,
5388:18, 5391:7,
5392:7, 5393:11,
5393:15, 5393:22,
5394:18, 5407:7,
5407:22, 5407:23,
5414:24, 5414:25,
5415:11, 5415:22,
5416:6, 5417:6,
5418:8, 5418:14,
5418:16, 5418:17,
5418:24, 5418:25,
5419:16, 5423:13,
5423:15, 5423:18,
5423:20, 5425:10,
5425:17, 5426:17,
5432:19, 5433:10,
5434:12, 5435:2
**proud** [1] - 5338:21
**prove** [2] - 5301:15,
5421:9
**proved** [1] - 5301:15
**provide** [1] - 5323:4
**provided** [3] -
5299:12, 5318:2,
5393:7
**provisionally** [1] -
5408:12
**provoke** [1] - 5373:21
**proximity** [1] -
5377:25
**public** [6] - 5318:9,
5364:17, 5364:20,
5364:22, 5387:18,
5394:17
**publicly** [2] - 5388:15,
5415:23
**publish** [2] - 5393:2,

5393:4
**Publius** [4] - 5340:12,
5340:15, 5340:25,
5341:6
**PUBLIUS** [1] -
5340:13
**pull** [4] - 5295:13,
5299:17, 5314:1,
5386:9
**pulls** [1] - 5298:22
**pump** [1] - 5352:17
**pun** [1] - 5436:13
**pundits** [1] - 5331:3
**purely** [1] - 5426:15
**purport** [1] - 5304:13
**purpose** [6] - 5311:10,
5313:5, 5358:1,
5398:15, 5415:25,
5429:3
**purposes** [4] - 5290:5,
5296:9, 5303:19,
5315:1
**put** [32] - 5291:12,
5292:3, 5299:6,
5299:18, 5299:19,
5305:9, 5305:21,
5307:17, 5309:19,
5310:14, 5311:17,
5311:18, 5311:23,
5314:13, 5317:18,
5319:17, 5322:18,
5326:21, 5335:11,
5340:6, 5340:17,
5352:19, 5356:20,
5359:9, 5362:22,
5395:21, 5403:9,
5415:14, 5415:16,
5423:25, 5430:22,
5435:19
**puts** [1] - 5313:12
**putting** [3] - 5334:6,
5361:7, 5417:21

# Q

**quest** [1] - 5345:19
**Quested** [1] - 5309:21
**Quested's** [1] -
5362:10
**questioned** [1] -
5298:23
**questioning** [3] -
5368:12, 5374:17,
5375:24
**questions** [13] -
5304:13, 5305:22,
5308:12, 5312:7,
5317:2, 5319:15,
5330:12, 5385:8,
5400:10, 5400:17,

5459

5429:25, 5432:3,
5435:21
**quick** [4] - 5357:15,
5358:19, 5398:10,
5420:19
**quickly** [1] - 5357:8
**quiet** [1] - 5329:2

## R

**race** [1] - 5355:9
**racism** [3] - 5353:24,
5357:6, 5364:20
**racist** [1] - 5354:12
**radio** [3] - 5416:21,
5416:24, 5417:13
**radios** [4] - 5416:10,
5416:13, 5417:9,
5417:16
**raised** [4] - 5361:2,
5364:15, 5425:16,
5439:11
**raises** [1] - 5306:21
**raising** [2] - 5319:5,
5423:6
**rallies** [1] - 5410:13
**rally** [29] - 5330:11,
5333:4, 5333:23,
5336:11, 5345:11,
5345:14, 5345:16,
5346:3, 5346:6,
5346:13, 5347:6,
5347:15, 5347:17,
5348:19, 5352:16,
5367:11, 5368:8,
5369:10, 5369:11,
5378:23, 5379:4,
5380:24, 5382:2,
5385:10, 5388:17,
5390:22, 5390:25,
5391:9, 5407:3
**ranks** [1] - 5385:23
**rather** [4] - 5296:19,
5327:19, 5360:13,
5432:3
**re** [1] - 5426:3
**reach** [2] - 5337:20,
5337:22
**reaching** [1] - 5427:14
**react** [1] - 5370:6
**reaction** [9] - 5300:1,
5300:4, 5304:10,
5330:19, 5373:19,
5383:9, 5383:18,
5385:5, 5387:17
**read** [4] - 5290:14,
5396:7, 5396:9,
5397:25
**reading** [2] - 5330:5,
5340:16

**ready** [2] - 5369:16,
5370:6
**ready/willing** [1] -
5369:20
**real** [3] - 5339:22,
5340:8, 5341:4
**realistically** [1] -
5319:19
**realized** [1] - 5325:24
**really** [22] - 5287:18,
5292:6, 5294:8,
5318:22, 5329:18,
5329:24, 5331:12,
5332:20, 5349:2,
5368:12, 5370:17,
5372:7, 5379:14,
5379:15, 5381:17,
5403:2, 5407:6,
5423:21, 5428:3,
5430:25, 5431:8,
5431:10
**reason** [4] - 5345:25,
5351:18, 5363:1,
5411:4
**reasonably** [1] -
5319:23
**reasons** [5] - 5300:11,
5319:18, 5334:25,
5363:10, 5436:17
**rebut** [1] - 5403:3
**received** [4] - 5287:21,
5320:21, 5397:13
**recent** [2] - 5321:3,
5403:19
**recently** [1] - 5403:19
**recess** [6] - 5358:25,
5359:2, 5359:4,
5359:5, 5439:19,
5439:20
**recognize** [10] -
5312:17, 5348:2,
5352:22, 5366:24,
5392:19, 5395:17,
5395:19, 5397:12,
5397:19, 5408:15
**recognizing** [1] -
5408:19
**record** [13] - 5317:20,
5317:21, 5348:12,
5348:17, 5359:7,
5359:10, 5359:16,
5359:20, 5360:11,
5362:22, 5364:12,
5365:12, 5403:14
**recorded** [2] -
5285:18, 5321:1
**recovered** [1] - 5288:2
**recruit** [1] - 5435:2
**recruited** [2] -
5334:13, 5335:3

**redaction** [1] -
5289:19
**redactions** [2] -
5289:14, 5289:15
**reference** [6] - 5297:3,
5350:9, 5399:1,
5399:9, 5410:5,
5434:20
**referenced** [3] -
5296:7, 5297:10,
5393:23
**referred** [2] - 5295:23,
5406:11
**referring** [6] -
5331:16, 5352:3,
5378:19, 5409:14,
5410:9, 5429:10
**reflect** [2] - 5348:13,
5348:17
**refused** [1] - 5410:12
**regard** [4] - 5288:3,
5288:4, 5292:12,
5416:24
**regarded** [2] - 5316:4,
5316:11
**regarding** [1] -
5433:15
**regards** [1] - 5290:3
**REHL** [1] - 5284:5
**Rehl** [19] - 5287:4,
5287:14, 5298:11,
5299:9, 5300:14,
5301:18, 5310:10,
5311:16, 5311:20,
5312:24, 5313:10,
5313:14, 5313:15,
5314:22, 5314:25,
5317:4, 5343:18,
5356:3, 5402:6
**Rehl's** [1] - 5317:2
**related** [5] - 5291:20,
5292:11, 5346:6,
5346:7, 5413:10
**relates** [1] - 5318:1
**relating** [4] - 5318:19,
5320:11, 5321:8,
5359:16
**relation** [2] - 5323:2,
5335:16
**relationship** [6] -
5292:8, 5321:4,
5375:15, 5376:9,
5410:18, 5410:24
**relative** [1] - 5365:22
**relatively** [2] -
5339:11, 5367:8
**relayed** [1] - 5383:12
**relevance** [5] -
5328:12, 5329:22,
5332:24, 5334:2,

5354:22, 5355:1,
5355:6, 5369:23,
5374:16, 5399:4,
5402:1, 5404:20,
5413:18, 5428:20,
5435:5
**relevancy** [2] -
5424:12, 5424:20
**relevant** [15] -
5291:23, 5300:9,
5300:11, 5335:22,
5355:10, 5356:8,
5357:23, 5364:21,
5406:8, 5421:7,
5421:12, 5422:6,
5424:5, 5435:4,
5436:15
**remains** [2] - 5322:16,
5413:21
**remarks** [2] - 5316:18,
5425:15
**remedy** [1] - 5428:10
**remember** [10] -
5332:7, 5337:23,
5338:20, 5341:24,
5368:24, 5391:19,
5393:17, 5393:21,
5394:2, 5415:18
**remind** [2] - 5316:6,
5326:2
**removed** [1] - 5426:24
**renders** [1] - 5428:13
**repeat** [2] - 5373:3,
5373:4
**repeating** [1] -
5338:18
**rephrase** [2] -
5375:10, 5380:4
**REPORTER** [3] -
5362:3, 5425:1,
5439:22
**Reporter** [4] -
5285:15, 5285:15,
5362:5, 5440:3
**reporter** [1] - 5425:3
**representation** [1] -
5305:15
**represented** [3] -
5334:19, 5357:3,
5401:8
**request** [1] - 5290:7
**required** [1] - 5306:23
**requirement** [1] -
5318:4
**requires** [1] - 5421:11
**requiring** [1] - 5398:6
**resolve** [2] - 5345:9,
5420:14
**resolved** [3] - 5288:9,
5288:13, 5288:14

**respect** [6] - 5290:25,
5369:13, 5374:7,
5385:21, 5427:10,
5436:10
**respected** [2] -
5347:11, 5347:13
**respond** [5] - 5328:21,
5328:22, 5362:1,
5384:1, 5432:15
**responding** [4] -
5311:22, 5332:15,
5336:20, 5371:18
**response** [7] - 5323:2,
5339:16, 5356:11,
5356:13, 5371:2,
5428:20, 5428:25
**responsible** [2] -
5384:23, 5385:3
**rest** [4] - 5307:5,
5312:5, 5400:3,
5431:11
**restaurants** [1] -
5336:15
**restricted** [1] - 5395:3
**result** [4] - 5384:10,
5387:8, 5387:14,
5410:3
**results** [3] - 5330:15,
5344:21, 5367:16
**resume** [1] - 5420:21
**resumed** [1] - 5366:10
**retirement** [2] -
5388:23, 5389:10
**Return** [6] - 5336:6,
5358:17, 5405:10,
5406:15, 5412:24,
5420:16
**return** [2] - 5399:3,
5439:19
**returned** [4] - 5323:15,
5358:21, 5366:15,
5420:23
**review** [3] - 5314:8,
5395:9, 5397:16
**reviewed** [1] - 5396:25
**ride** [1] - 5387:6
**rightfully** [1] - 5307:12
**rights** [1] - 5307:20
**riot** [1] - 5400:16
**rise** [2] - 5359:3,
5439:18
**Road** [1] - 5285:2
**robbery** [2] - 5400:8,
5400:25
**Rochester** [2] -
5411:10, 5412:3
**rode** [2] - 5408:2,
5408:4
**Roger** [5] - 5285:11,
5287:13, 5289:10,

5460

5405:18
**Rohde** [6] - 5298:20, 5408:11, 5409:7, 5412:7, 5412:25, 5413:7
**role** [6] - 5342:10, 5347:10, 5369:12, 5374:7, 5382:3, 5382:20
**Room** [2] - 5285:16, 5440:4
**room** [9] - 5300:12, 5358:21, 5366:8, 5417:9, 5417:14, 5418:1, 5418:12, 5420:23, 5435:4
**rooms** [1] - 5339:8
**rooster** [1] - 5392:7
**roots** [3] - 5289:9, 5359:15, 5405:12
**Roots** [4] - 5285:11, 5287:13, 5289:10, 5405:18
**ROOTS** [7] - 5289:10, 5290:13, 5290:17, 5290:19, 5359:19, 5405:11, 5405:17
**rosa** [1] - 5425:24
**rough** [1] - 5331:21
**RPR** [3] - 5285:15, 5439:23, 5440:3
**Rule** [2] - 5305:6, 5310:21
**rule** [1] - 5401:18
**ruled** [2] - 5404:16, 5404:17
**rules** [4] - 5291:22, 5296:13, 5307:21, 5430:10
**Rules** [1] - 5429:3
**ruling** [2] - 5292:15, 5323:1
**run** [1] - 5386:8
**running** [2] - 5404:1, 5404:2

**S**

**Sabino** [2] - 5285:8, 5287:12
**salt** [2] - 5348:9, 5348:10
**salt-and-pepper** [2] - 5348:9, 5348:10
**satisfies** [1] - 5425:20
**saw** [32] - 5287:17, 5299:5, 5303:5, 5305:2, 5305:15, 5305:23, 5307:3, 5309:11, 5309:17,

5310:22, 5315:24, 5316:25, 5332:22, 5333:19, 5334:21, 5335:18, 5337:10, 5350:3, 5362:23, 5367:3, 5367:4, 5371:3, 5374:4, 5375:12, 5376:6, 5386:10, 5387:20, 5391:1, 5394:1, 5399:20, 5400:20
**scaffolding** [1] - 5395:7
**scenario** [1] - 5294:8
**scene** [2] - 5306:18, 5349:24
**schedule** [1] - 5344:11
**scheduling** [1] - 5313:5
**scientific** [1] - 5296:20
**screaming** [1] - 5371:22
**screen** [1] - 5305:1
**search** [1] - 5292:21
**seated** [5] - 5323:16, 5348:6, 5358:22, 5366:16, 5420:24
**second** [8] - 5288:8, 5298:8, 5335:24, 5396:10, 5405:13, 5412:16, 5423:20
**secondhand** [1] - 5409:4
**secondly** [1] - 5401:14
**seconds** [2] - 5298:17, 5400:6
**secret** [1] - 5318:8
**securing** [1] - 5351:19
**security** [4] - 5318:12, 5376:25, 5377:6, 5380:7
**see** [38] - 5293:10, 5293:15, 5298:7, 5298:13, 5305:16, 5305:20, 5306:15, 5307:7, 5314:14, 5321:16, 5326:5, 5332:18, 5348:1, 5348:4, 5348:9, 5354:25, 5360:24, 5363:24, 5364:7, 5367:5, 5377:25, 5382:6, 5382:17, 5384:18, 5385:22, 5390:24, 5392:9, 5392:11, 5393:6, 5393:22, 5398:13, 5398:16, 5399:22,

5400:3, 5406:13, 5427:10
**seeing** [8] - 5332:7, 5378:21, 5386:11, 5387:12, 5387:16, 5388:10, 5405:24, 5435:1
**seeking** [3] - 5330:22, 5330:24, 5374:5
**seem** [3] - 5315:6, 5385:2, 5388:10
**seized** [1] - 5290:9
**selected** [1] - 5306:25
**selection** [2] - 5305:21, 5305:24
**selector** [1] - 5305:21
**Self** [3] - 5343:1, 5434:3, 5434:7
**Self-Defense** [3] - 5343:1, 5434:3, 5434:7
**selfie** [2] - 5338:18, 5397:9
**selfie-style** [1] - 5397:9
**send** [10] - 5322:19, 5337:25, 5338:25, 5339:18, 5341:23, 5403:14, 5420:6, 5420:10, 5420:11, 5420:18
**sending** [1] - 5401:12
**senior** [1] - 5433:9
**sense** [16] - 5287:19, 5291:25, 5292:1, 5305:8, 5321:14, 5352:9, 5370:16, 5389:13, 5389:18, 5389:19, 5389:20, 5389:24, 5390:1, 5390:10, 5425:22, 5436:5
**sent** [3] - 5287:18, 5338:18, 5413:12
**sentence** [2] - 5322:1, 5322:2
**sentences** [1] - 5429:5
**sentiment** [1] - 5414:12
**separate** [3] - 5291:19, 5341:21, 5405:22
**separately** [1] - 5399:8
**series** [1] - 5407:2
**serious** [2] - 5359:22, 5432:5
**seriously** [1] - 5359:22
**serve** [1] - 5292:17

**service** [3] - 5324:15, 5324:25, 5326:7
**SESSION** [1] - 5284:9
**set** [2] - 5291:14, 5338:12
**setting** [1] - 5403:17
**settled** [1] - 5417:21
**several** [2] - 5357:2, 5419:23
**shall** [1] - 5348:17
**shield** [15] - 5391:4, 5391:6, 5391:11, 5391:14, 5392:2, 5392:3, 5392:10, 5392:11, 5392:22, 5392:24, 5393:7, 5393:13, 5400:9, 5400:14, 5400:16
**shields** [1] - 5372:22, 5373:11, 5391:8
**shirt** [1] - 5348:9
**shit** [4] - 5373:23, 5373:25, 5374:3, 5433:11
**shorthand** [2] - 5285:18, 5296:16
**shortly** [1] - 5400:16
**shotgun** [2] - 5405:19, 5405:21
**show** [10] - 5292:7, 5295:13, 5298:14, 5305:24, 5333:20, 5400:6, 5402:17, 5405:6, 5417:13, 5418:1
**showed** [3] - 5336:12, 5336:17, 5418:12
**showing** [3] - 5289:16, 5358:1, 5400:8
**shown** [1] - 5395:20
**shows** [6] - 5327:11, 5327:14, 5327:16, 5327:24, 5400:11, 5400:15
**sic** [4] - 5378:5, 5383:11, 5400:16, 5428:18
**sic]** [1] - 5311:13
**side** [4] - 5289:21, 5334:24, 5336:2, 5431:14
**sidebar** [3] - 5333:7, 5398:10, 5419:11
**sides** [3] - 5317:3, 5372:4, 5420:9
**signal** [1] - 5357:11
**significance** [1] - 5349:9
**significant** [1] -

5347:6
**silly** [1] - 5313:16
**similar** [2] - 5368:8, 5398:22
**similarly** [1] - 5398:25
**simpler** [1] - 5305:13
**simply** [5] - 5294:3, 5297:14, 5317:19, 5361:7, 5428:12
**sincere** [1] - 5431:18
**sitting** [1] - 5359:21
**situation** [2] - 5335:21, 5389:1
**situations** [1] - 5374:24
**Sixth** [1] - 5428:11
**Skull** [1] - 5343:3
**slap** [1] - 5331:13
**sleep** [1] - 5329:16
**sleeping** [1] - 5330:3
**Smith** [23] - 5284:16, 5287:9, 5304:11, 5305:18, 5309:20, 5334:1, 5353:5, 5354:2, 5354:3, 5354:16, 5354:18, 5356:16, 5358:7, 5359:21, 5360:10, 5360:23, 5362:8, 5362:11, 5405:20, 5423:2, 5424:22, 5428:17
**SMITH** [32] - 5284:17, 5284:23, 5333:25, 5334:14, 5334:17, 5353:3, 5353:22, 5354:4, 5354:10, 5354:17, 5354:19, 5356:10, 5356:20, 5356:23, 5357:6, 5357:24, 5358:3, 5358:6, 5359:9, 5359:24, 5360:1, 5360:5, 5360:12, 5361:15, 5364:11, 5375:8, 5375:17, 5398:2, 5398:4, 5398:12, 5422:24, 5428:18
**soldiers** [5] - 5374:13, 5374:14, 5374:21, 5374:23
**solution** [1] - 5307:14
**solve** [1] - 5288:25
**someone** [16] - 5328:10, 5343:25, 5344:4, 5344:6, 5347:3, 5364:13, 5374:2, 5409:20, 5422:18, 5426:15,

5461

5426:17, 5426:22,
5431:1, 5431:5,
5431:6, 5431:15
**sometime** [2] -
5332:7, 5333:1
**sometimes** [3] -
5322:15, 5361:4,
5428:19
**somewhat** [2] -
5312:24, 5416:1
**somewhere** [2] -
5411:23, 5411:24
**soon** [2] - 5333:2,
5339:24
**sophisticated** [3] -
5377:23, 5377:24,
5378:1
**sorry** [24] - 5321:25,
5330:17, 5333:6,
5355:16, 5355:24,
5363:8, 5363:15,
5370:25, 5371:6,
5373:1, 5373:2,
5376:4, 5392:23,
5396:21, 5399:22,
5399:23, 5402:21,
5419:9, 5423:6,
5425:2, 5425:4,
5433:1, 5433:2,
5435:10
**sort** [21] - 5289:13,
5291:20, 5296:16,
5296:17, 5296:18,
5297:15, 5308:17,
5329:20, 5344:10,
5350:16, 5351:4,
5355:6, 5373:19,
5379:3, 5381:10,
5386:2, 5393:7,
5407:4, 5415:22,
5416:6, 5437:11
**sorted** [1] - 5317:5
**sorts** [2] - 5291:19,
5431:3
**sounds** [1] - 5300:22
**source** [4] - 5318:17,
5319:25, 5320:16,
5321:13
**sources** [2] - 5330:24,
5331:1
**southern** [1] - 5391:19
**sparks** [1] - 5394:4
**Spaz** [17] - 5347:4,
5347:20, 5368:4,
5377:17, 5377:25,
5378:6, 5379:3,
5379:21, 5381:22,
5382:3, 5383:12,
5387:10, 5387:14,
5388:20, 5389:4,

5390:22, 5391:13
**Spaz's** [1] - 5385:5
**Spazzo** [2] - 5347:4,
5347:21
**speakers** [2] -
5376:25, 5377:7
**speaking** [4] -
5333:14, 5377:5,
5383:9, 5401:6
**spear** [2] - 5370:6,
5370:9
**Special** [1] - 5392:17
**special** [1] - 5431:15
**specific** [11] -
5337:24, 5393:21,
5401:1, 5406:10,
5410:23, 5414:4,
5421:10, 5429:6,
5429:8, 5429:12,
5435:24
**specifically** [3] -
5394:10, 5403:18,
5433:16
**specificity** [1] - 5407:5
**specifics** [3] -
5327:12, 5379:14,
5417:8
**speculation** [1] -
5409:18
**speculative** [5] -
5369:23, 5419:5,
5425:21, 5428:14,
5438:15
**spell** [1] - 5324:5
**spend** [5] - 5312:13,
5347:3, 5347:19,
5387:9, 5418:16
**spending** [2] - 5330:4,
5388:18
**spent** [5] - 5324:16,
5347:6, 5369:11,
5383:13, 5418:15
**spin** [1] - 5410:20
**spin-offs** [1] - 5410:20
**spoken** [1] - 5426:1
**sport** [1] - 5428:7
**square** [1] - 5437:20
**stabbed** [2] - 5382:13,
5383:1
**stabbing** [2] -
5384:18, 5384:23
**stabbings** [1] - 5381:2
**stage** [2] - 5313:18,
5377:2
**stairs** [1] - 5395:6
**stand** [8] - 5309:1,
5309:21, 5323:22,
5337:16, 5366:8,
5366:10, 5389:19,
5401:13

**standard** [2] - 5316:7,
5414:14
**standing** [2] -
5332:14, 5369:3
**stands** [4] - 5305:19,
5359:4, 5418:19,
5439:19
**start** [9] - 5287:20,
5323:11, 5327:3,
5328:24, 5373:23,
5393:19, 5395:6,
5428:17, 5433:11
**started** [3] - 5327:9,
5380:10, 5414:20
**starting** [9] - 5328:4,
5329:15, 5329:18,
5330:20, 5367:25,
5369:14, 5369:15,
5373:25, 5374:3
**State** [1] - 5337:14
**state** [12] - 5290:4,
5290:10, 5324:8,
5344:18, 5384:3,
5384:6, 5384:7,
5389:16, 5391:19,
5411:9, 5435:3,
5436:11
**statement** [18] -
5291:4, 5291:14,
5293:14, 5294:2,
5295:24, 5296:7,
5296:11, 5296:15,
5296:16, 5296:19,
5297:4, 5321:18,
5402:4, 5402:22,
5402:23, 5403:1,
5414:11
**statements** [8] -
5400:2, 5401:14,
5401:15, 5401:17,
5401:19, 5402:3,
5403:11, 5404:21
**STATES** [3] - 5284:1,
5284:2, 5284:10
**States** [6] - 5284:12,
5287:3, 5307:18,
5359:7, 5360:8,
5440:4
**stating** [1] - 5430:14
**stay** [2] - 5390:24,
5406:22
**Steal** [2] - 5333:4,
5336:24
**stenographic** [1] -
5439:25
**step** [4] - 5358:23,
5386:9, 5420:25,
5434:21
**stepping** [1] - 5385:24
**steps** [1] - 5337:9,

5337:22, 5358:24,
5421:1
**Steven** [4] - 5285:11,
5287:12, 5289:25,
5406:4
**still** [21] - 5296:6,
5322:13, 5322:16,
5326:6, 5326:10,
5327:20, 5329:3,
5330:25, 5335:13,
5345:5, 5346:18,
5367:11, 5367:18,
5367:21, 5368:12,
5377:13, 5385:14,
5413:21, 5414:19
**stood** [4] - 5332:20,
5377:2, 5384:1,
5407:6
**stop** [6] - 5304:17,
5304:18, 5311:14,
5314:20, 5333:12,
5353:5
**Stop** [2] - 5333:4,
5336:11
**stopped** [1] - 5333:21
**stopping** [2] - 5316:21
**strange** [1] - 5315:6
**stray** [2] - 5364:2,
5386:7
**Street** [6] - 5284:14,
5284:17, 5284:21,
5284:24, 5285:5,
5285:9
**street** [9] - 5332:9,
5332:15, 5334:14,
5334:17, 5334:21,
5334:23, 5335:15,
5336:17, 5372:8
**streets** [9] - 5332:16,
5337:3, 5351:8,
5351:9, 5351:10,
5351:16, 5351:17,
5351:19
**strictly** [1] - 5434:17
**strike** [1] - 5383:10
**strikes** [4] - 5319:22,
5320:2, 5357:22,
5427:9
**struck** [2] - 5354:14,
5356:12
**struggling** [2] -
5314:7, 5427:11
**stuck** [2] - 5309:14,
5314:3
**stuff** [2] - 5289:16,
5327:14
**stupid** [1] - 5303:19
**style** [1] - 5397:9
**sub** [1] - 5425:24
**subject** [2] - 5293:2,

5293:8
**subjective** [1] - 5438:3
**submitted** [1] -
5401:16
**substance** [1] -
5362:2, 5362:6
**substantially** [1] -
5406:9
**succeeds** [1] -
5313:14
**successful** [1] -
5329:6
**sudden** [2] - 5321:2,
5424:18
**sufficient** [4] - 5311:3,
5311:5, 5317:12,
5419:21
**suggest** [7] - 5308:15,
5353:24, 5356:14,
5360:18, 5360:25,
5426:3, 5427:16
**suggested** [1] -
5308:16
**suggesting** [2] -
5354:12, 5361:9
**suggestion** [1] -
5433:13
**suggests** [1] - 5438:6
**Suite** [2] - 5284:18,
5285:6
**suited** [1] - 5380:11
**summarize** [1] -
5402:12
**Sunday** [3] - 5403:15,
5404:12, 5404:14
**suppose** [3] -
5300:18, 5402:1,
5415:3
**supposed** [2] -
5413:14, 5413:16
**Supreme** [2] -
5368:22, 5368:25
**surrounded** [1] -
5375:13
**sustained** [1] - 5415:3
**SWORN** [1] - 5323:23
**symbol** [12] - 5355:9,
5356:14, 5357:2,
5357:21, 5358:1,
5364:11, 5364:15,
5364:19, 5364:23,
5365:5, 5366:22,
5366:24
**Syracuse** [10] -
5324:9, 5327:25,
5328:1, 5328:3,
5337:18, 5411:6,
5411:7, 5411:11,
5411:20, 5411:22

5462

## T

**table** [2] - 5319:19, 5355:17
**talks** [1] - 5404:2
**tandem** [1] - 5412:15
**Tarrio** [12] - 5287:5, 5287:15, 5343:20, 5366:1, 5379:20, 5394:6, 5394:13, 5408:23, 5409:24, 5429:21, 5433:22, 5435:1
**TARRIO** [1] - 5284:6
**Tarrio's** [1] - 5410:3
**teach** [1] - 5385:16
**team** [1] - 5331:2
**technical** [1] - 5326:14
**technically** [4] - 5386:19, 5410:25, 5411:2, 5415:3
**technique** [1] - 5306:24
**technologically** [1] - 5299:11
**Telegram** [17] - 5339:5, 5339:6, 5339:9, 5339:14, 5339:17, 5339:18, 5339:20, 5343:22, 5343:25, 5344:1, 5393:12, 5394:11, 5394:12, 5394:13, 5394:14, 5394:16, 5418:13
**telephone** [1] - 5353:1
**temper** [1] - 5359:13
**tending** [1] - 5351:16
**tenor** [4] - 5344:24, 5367:20, 5368:11, 5369:6
**term** [7] - 5343:5, 5370:9, 5373:7, 5388:13, 5388:15, 5436:14
**terms** [13] - 5320:1, 5326:19, 5374:3, 5376:9, 5383:8, 5391:18, 5396:1, 5411:25, 5419:1, 5422:1, 5426:18, 5433:12, 5434:12
**terrified** [1] - 5388:4
**territory** [2] - 5349:18, 5353:9
**test** [1] - 5438:2
**testified** [3] - 5385:11, 5432:23, 5433:4
**testify** [10] - 5303:5,

5304:25, 5305:1, 5333:19, 5431:22, 5432:23, 5433:11, 5433:19, 5433:20, 5433:21
**testimony** [27] - 5303:13, 5309:14, 5309:15, 5314:11, 5334:4, 5335:20, 5354:12, 5356:12, 5357:23, 5358:11, 5359:12, 5360:7, 5360:9, 5360:16, 5362:10, 5362:14, 5363:24, 5399:2, 5420:21, 5423:24, 5426:9, 5429:1, 5429:11, 5429:24, 5430:13, 5432:17, 5438:2
**Texas** [2] - 5368:22, 5369:2
**THE** [331] - 5284:1, 5284:1, 5284:9, 5287:2, 5287:16, 5288:12, 5288:14, 5288:21, 5288:24, 5289:2, 5289:6, 5289:18, 5290:11, 5290:16, 5290:18, 5290:21, 5291:2, 5291:10, 5292:19, 5293:4, 5293:13, 5293:21, 5293:24, 5294:1, 5294:5, 5294:7, 5294:11, 5294:14, 5294:24, 5295:2, 5295:4, 5295:8, 5295:11, 5295:15, 5296:9, 5296:24, 5297:2, 5297:7, 5297:9, 5297:13, 5297:20, 5297:23, 5297:25, 5298:6, 5298:9, 5298:12, 5298:16, 5299:25, 5300:4, 5300:16, 5300:25, 5301:4, 5301:6, 5301:8, 5301:19, 5302:7, 5302:10, 5302:13, 5302:22, 5302:24, 5303:14, 5303:21, 5303:24, 5304:1, 5304:7, 5305:12, 5306:6, 5306:8, 5306:10, 5306:12, 5306:17, 5306:19, 5307:1, 5307:10, 5307:23, 5307:25, 5308:3,

5308:12, 5308:19, 5309:3, 5309:5, 5309:25, 5310:18, 5311:21, 5314:18, 5314:24, 5315:21, 5316:13, 5316:15, 5316:17, 5316:19, 5317:10, 5317:13, 5317:17, 5318:25, 5319:2, 5319:6, 5319:9, 5319:16, 5321:19, 5322:4, 5322:17, 5322:20, 5323:10, 5323:14, 5323:16, 5323:23, 5328:13, 5328:14, 5329:23, 5329:24, 5332:25, 5333:1, 5333:13, 5333:24, 5334:9, 5334:16, 5334:18, 5334:22, 5335:4, 5335:7, 5335:11, 5335:19, 5336:3, 5340:1, 5344:13, 5344:14, 5348:14, 5348:16, 5349:14, 5349:17, 5351:13, 5351:23, 5351:25, 5352:1, 5352:25, 5353:5, 5353:12, 5353:21, 5354:2, 5354:5, 5354:16, 5354:18, 5354:20, 5355:3, 5355:5, 5355:19, 5355:22, 5356:16, 5356:22, 5357:5, 5357:8, 5357:12, 5358:2, 5358:5, 5358:7, 5358:18, 5358:22, 5359:3, 5359:6, 5359:18, 5359:25, 5360:3, 5360:10, 5360:21, 5361:22, 5361:25, 5362:3, 5362:4, 5362:22, 5363:7, 5363:9, 5363:19, 5363:21, 5364:2, 5364:7, 5364:10, 5364:25, 5365:9, 5365:17, 5365:23, 5366:4, 5366:14, 5366:16, 5369:24, 5370:1, 5370:2, 5371:4, 5373:4, 5373:5, 5374:18, 5375:3, 5375:4, 5375:10, 5375:19, 5375:25, 5379:6, 5379:7, 5381:5,

5381:6, 5383:16, 5383:24, 5383:25, 5384:15, 5389:7, 5389:8, 5389:17, 5389:22, 5390:6, 5390:15, 5390:16, 5392:15, 5392:24, 5393:3, 5395:14, 5396:8, 5396:11, 5396:19, 5396:20, 5396:22, 5398:1, 5398:9, 5398:18, 5398:24, 5399:6, 5399:18, 5399:23, 5400:19, 5400:22, 5401:4, 5401:23, 5401:25, 5402:7, 5402:10, 5402:13, 5402:20, 5402:24, 5404:9, 5404:16, 5405:1, 5405:4, 5405:12, 5405:16, 5406:1, 5406:7, 5406:12, 5406:16, 5409:16, 5409:17, 5409:22, 5409:23, 5412:9, 5412:12, 5412:17, 5412:20, 5412:22, 5413:19, 5413:22, 5415:3, 5416:4, 5416:5, 5417:1, 5417:2, 5417:5, 5417:6, 5419:6, 5419:11, 5420:5, 5420:17, 5420:24, 5421:2, 5421:14, 5421:16, 5421:23, 5421:25, 5422:10, 5422:15, 5422:22, 5423:2, 5423:6, 5423:8, 5424:23, 5425:1, 5425:2, 5425:5, 5426:13, 5427:1, 5427:6, 5427:20, 5428:2, 5428:15, 5429:16, 5429:19, 5430:6, 5430:8, 5430:19, 5430:22, 5432:6, 5432:9, 5432:11, 5432:13, 5432:15, 5433:3, 5433:7, 5433:13, 5433:18, 5435:9, 5435:12, 5435:14, 5436:2, 5436:7, 5436:22, 5436:25, 5437:3, 5437:5, 5437:7, 5437:9, 5437:11, 5437:14, 5437:16, 5437:22,

5437:25, 5438:8, 5438:11, 5438:16, 5438:18, 5439:1, 5439:3, 5439:5, 5439:11, 5439:18
**TheDonald.win** [3] - 5330:8, 5330:10, 5330:25
**theory** [6] - 5319:20, 5421:17, 5422:19, 5422:20, 5426:11, 5426:12
**therefore** [1] - 5291:5
**they've** [2] - 5299:12, 5323:8
**thinking** [1] - 5389:10
**thinks** [1] - 5362:8
**third** [1] - 5305:16
**thousands** [3] - 5351:1, 5377:10, 5432:19
**threatened** [1] - 5377:8
**three** [9] - 5321:1, 5341:21, 5341:22, 5345:22, 5352:21, 5364:14, 5399:25, 5407:20, 5429:4
**throughout** [2] - 5308:6, 5361:14
**throw** [2] - 5381:8, 5381:9
**thumb** [6] - 5352:20, 5364:14, 5395:16, 5395:17, 5396:25
**tie** [2] - 5292:7, 5358:8
**tied** [1] - 5374:23
**ties** [1] - 5292:2
**TIMOTHY** [2] - 5284:9, 5439:23
**Timothy** [1] - 5285:15
**tip** [2] - 5370:6, 5370:9
**today** [7] - 5302:5, 5302:15, 5306:10, 5348:1, 5348:4, 5361:14, 5399:2
**toe** [1] - 5373:8
**together** [3] - 5292:7, 5358:9, 5403:25
**token** [1] - 5361:21
**tomorrow** [1] - 5301:22
**took** [7] - 5356:4, 5388:9, 5401:13, 5409:17, 5409:23, 5434:25, 5435:3
**tool** [4] - 5308:4, 5424:7, 5436:13, 5436:14
**tools** [12] - 5355:15,

5356:6, 5421:16, 5422:4, 5422:19, 5422:20, 5424:7, 5424:8, 5424:9, 5424:10, 5426:12, 5434:20

**top** [1] - 5356:3
**topic** [2] - 5321:21, 5431:7
**topics** [1] - 5385:9
**total** [1] - 5341:22
**totality** [1] - 5296:3
**touch** [2] - 5403:23, 5410:6
**toward** [2] - 5290:10, 5426:10
**towards** [4] - 5336:1, 5360:19, 5384:12, 5434:19
**train** [1] - 5433:1
**transcript** [5] - 5285:18, 5292:16, 5293:1, 5439:25, 5440:1
**TRANSCRIPT** [1] - 5284:8
**transcription** [1] - 5285:19
**transform** [1] - 5436:12
**transforming** [1] - 5425:22
**translator** [1] - 5326:16
**travel** [1] - 5347:23
**traveled** [1] - 5417:19
**traveling** [2] - 5329:17, 5393:18
**treat** [2] - 5322:14, 5398:22
**treated** [1] - 5398:22
**trial** [15] - 5304:12, 5305:9, 5308:6, 5313:4, 5313:5, 5313:11, 5316:1, 5334:6, 5334:24, 5356:2, 5361:14, 5361:20, 5425:18, 5427:12, 5428:19
**TRIAL** [1] - 5284:8
**trickled** [1] - 5436:19
**tried** [1] - 5310:25
**trip** [5] - 5391:17, 5391:21, 5394:22, 5414:6, 5414:7
**trouble** [1] - 5354:7
**truck** [1] - 5300:21
**true** [4] - 5360:15, 5381:24, 5439:24, 5439:25

**Trump** [2] - 5330:11, 5407:2
**Trump's** [2] - 5331:2, 5345:9
**truth** [1] - 5401:16
**try** [7] - 5288:6, 5303:12, 5337:9, 5371:12, 5379:11, 5386:8, 5386:9
**trying** [24] - 5288:25, 5299:2, 5311:6, 5322:8, 5331:3, 5336:21, 5342:2, 5361:19, 5363:20, 5365:21, 5371:14, 5371:21, 5373:21, 5378:13, 5379:3, 5379:8, 5379:21, 5381:15, 5382:5, 5388:3, 5390:23, 5426:25, 5431:12, 5432:20
**Tuesday** [1] - 5284:6
**tune** [3] - 5320:25, 5321:3, 5321:4
**turned** [2] - 5425:8, 5439:9
**turns** [2] - 5428:2, 5428:3
**TV** [5] - 5327:8, 5327:10, 5327:11, 5327:14, 5327:24
**tweets** [2] - 5407:2, 5407:5
**Twitter** [1] - 5331:2
**two** [20] - 5289:18, 5295:22, 5322:1, 5338:8, 5341:22, 5348:21, 5376:15, 5403:21, 5404:5, 5405:21, 5407:17, 5411:15, 5412:14, 5413:10, 5414:15, 5419:16, 5421:13, 5423:16, 5431:25
**two-and-a-half-page** [1] - 5295:22
**type** [17] - 5291:1, 5294:21, 5318:13, 5318:15, 5324:15, 5325:6, 5325:19, 5326:13, 5326:24, 5327:7, 5329:8, 5344:16, 5350:19, 5363:16, 5368:8, 5378:6, 5417:22
**types** [8] - 5292:6, 5327:9, 5327:16, 5329:11, 5330:1, 5330:3, 5351:6,

5379:13

## U

**U.S** [3] - 5284:14, 5285:16, 5360:8
**uhuru** [1] - 5352:6
**Uhuru** [1] - 5352:15
**ultimately** [2] - 5310:2, 5347:23
**umpteenth** [1] - 5354:6
**unable** [1] - 5365:13
**unanticipated** [1] - 5353:15
**unashamed** [1] - 5338:22
**uncalm** [2] - 5359:22, 5359:23
**uncollected** [1] - 5359:23
**under** [7] - 5289:19, 5294:3, 5323:4, 5355:14, 5395:6, 5426:11, 5430:10
**undermines** [1] - 5316:8
**understood** [11] - 5296:22, 5372:7, 5372:14, 5373:14, 5382:6, 5412:2, 5415:11, 5417:12, 5430:15, 5433:9, 5435:12
**unexpected** [1] - 5358:10
**unfair** [1] - 5313:19
**unharmed** [1] - 5337:3
**uniform** [1] - 5372:15
**unit** [1] - 5325:23
**UNITED** [3] - 5284:1, 5284:2, 5284:10
**United** [6] - 5284:12, 5287:3, 5307:17, 5359:7, 5360:8, 5440:4
**unless** [3] - 5316:9, 5404:8, 5428:9
**unlikely** [1] - 5426:16
**unobjectionable** [1] - 5305:5
**unpack** [1] - 5387:21
**unprejudicial** [1] - 5305:4
**unusual** [3] - 5405:25, 5406:2, 5414:12
**up** [57] - 5295:13, 5299:17, 5308:8, 5313:12, 5315:12, 5319:10, 5323:11,

5325:21, 5332:14, 5335:20, 5340:10, 5343:10, 5343:23, 5344:2, 5349:3, 5350:15, 5351:21, 5351:24, 5352:18, 5352:19, 5352:21, 5352:25, 5353:17, 5365:3, 5378:6, 5378:21, 5379:11, 5380:11, 5384:1, 5385:24, 5386:9, 5394:14, 5395:6, 5399:4, 5399:10, 5400:4, 5401:7, 5402:18, 5403:8, 5403:9, 5404:7, 5404:19, 5405:7, 5406:3, 5407:7, 5408:22, 5413:25, 5414:13, 5416:12, 5417:13, 5417:21, 5418:1, 5418:12, 5420:13, 5431:20, 5434:12, 5439:14
**upset** [5] - 5330:21, 5344:20, 5344:25, 5367:21, 5367:22

## V

**vague** [2] - 5375:17, 5384:14
**vagueness** [2] - 5371:1, 5422:25
**Valley** [5] - 5418:8, 5418:13, 5418:20, 5418:21, 5431:24
**value** [3] - 5292:4, 5296:10, 5406:9
**vantage** [1] - 5340:23
**variation** [1] - 5313:11
**varied** [1] - 5351:7
**verbal** [1] - 5371:18
**version** [3] - 5310:6, 5312:2, 5313:21
**vetting** [6] - 5341:19, 5341:20, 5341:24, 5342:11, 5342:15, 5345:22
**Video** [2] - 5297:12, 5299:21
**video** [49] - 5295:10, 5295:12, 5295:19, 5297:14, 5298:24, 5299:7, 5300:14, 5301:2, 5304:10, 5304:19, 5305:1, 5307:4, 5307:15, 5312:11, 5312:18,

5312:20, 5312:24, 5314:13, 5314:20, 5315:16, 5315:20, 5317:1, 5325:20, 5326:8, 5326:13, 5326:21, 5327:19, 5330:5, 5332:21, 5333:5, 5333:10, 5333:18, 5333:19, 5335:16, 5336:9, 5336:12, 5336:17, 5336:19, 5337:6, 5337:10, 5338:18, 5393:11, 5393:12, 5396:1, 5397:9, 5398:23, 5400:5, 5400:8
**videos** [6] - 5332:8, 5332:18, 5381:7, 5395:9, 5396:24, 5400:20
**view** [2] - 5294:25, 5337:6
**viewed** [2] - 5374:10, 5374:13, 5375:15
**violation** [1] - 5318:19
**violence** [3] - 5332:15, 5384:1, 5436:6
**vis-à-vis** [1] - 5388:23
**vociferously** [1] - 5360:13
**voice** [20] - 5324:3, 5351:21, 5351:24, 5354:8, 5355:23, 5356:18, 5356:19, 5361:2, 5361:5, 5397:20, 5397:22, 5399:14, 5399:16, 5399:24, 5408:15, 5408:17, 5408:19, 5409:11, 5413:5
**voices** [1] - 5336:4
**volume** [1] - 5361:5
**voted** [2] - 5345:24, 5387:7

## W

**wait** [5] - 5310:4, 5358:25, 5359:1, 5398:16, 5423:1
**walk** [2] - 5336:22, 5337:2
**walked** [1] - 5378:6
**walking** [2] - 5336:15, 5350:21
**wall** [2] - 5307:17, 5340:22
**wants** [1] - 5291:11
**war** [9] - 5370:19,

5464

5384:12, 5389:11, 5389:14, 5390:4, 5404:8, 5412:16, 5414:11
**warned** [1] - 5353:25
**warranted** [1] - 5354:19
**Washington** [16] - 5284:5, 5284:15, 5284:21, 5285:17, 5345:11, 5346:24, 5347:23, 5348:19, 5368:3, 5379:1, 5387:13, 5411:15, 5415:19, 5415:20, 5432:20, 5440:5
**watched** [1] - 5427:10
**water** [1] - 5321:14
**ways** [1] - 5435:24
**weapons** [2] - 5372:22, 5373:10
**wear** [1] - 5380:17
**wearing** [12] - 5348:7, 5350:5, 5350:16, 5372:21, 5373:6, 5377:14, 5378:5, 5380:11, 5380:13, 5380:20, 5385:22, 5385:23
**website** [6] - 5330:8, 5330:10, 5330:25, 5337:11, 5337:12, 5388:3
**websites** [1] - 5318:10
**week** [4] - 5320:8, 5329:10, 5338:8, 5414:16
**weeks** [5] - 5329:4, 5338:7, 5419:17, 5423:16, 5431:25
**weigh** [1] - 5436:22
**weight** [2] - 5294:17, 5308:18
**welcome** [2] - 5323:17, 5366:17
**well-known** [1] - 5375:5
**well-positioned** [1] - 5304:24
**West** [1] - 5285:9
**Western** [6] - 5338:22, 5410:16, 5410:18, 5410:22, 5410:24, 5410:25
**western** [2] - 5410:12, 5411:11
**whatsoever** [1] - 5430:18
**whichever** [1] - 5295:22

**whisper** [1] - 5355:25
**white** [4] - 5356:14, 5357:2, 5359:12, 5364:17
**whole** [6] - 5303:17, 5315:4, 5316:4, 5330:21, 5373:5, 5374:17
**wholesale** [1] - 5404:24
**wife** [5] - 5404:3, 5406:11, 5406:13, 5412:15
**wild** [1] - 5407:6
**William** [2] - 5418:5, 5418:6
**willing** [1] - 5369:16
**willingness** [2] - 5419:1, 5425:13
**wind** [5] - 5325:21, 5349:3, 5378:21, 5394:14, 5407:7
**wing** [2] - 5375:7, 5376:12
**WITNESS** [23] - 5286:2, 5323:23, 5328:14, 5329:24, 5333:1, 5344:14, 5349:17, 5351:25, 5370:2, 5373:5, 5375:4, 5379:7, 5381:6, 5383:25, 5389:8, 5390:16, 5392:24, 5396:20, 5409:17, 5409:23, 5416:5, 5417:2, 5417:6
**witness** [86] - 5287:20, 5288:17, 5288:18, 5288:19, 5290:8, 5290:12, 5299:3, 5299:9, 5300:7, 5300:12, 5300:13, 5300:15, 5301:17, 5301:23, 5302:1, 5302:3, 5302:18, 5303:4, 5303:7, 5303:9, 5304:5, 5304:17, 5304:24, 5305:14, 5305:22, 5306:7, 5306:15, 5308:13, 5308:15, 5309:2, 5309:13, 5309:19, 5309:24, 5310:2, 5311:3, 5311:4, 5311:11, 5311:15, 5311:19, 5312:3, 5312:13, 5313:25, 5315:5, 5315:17,

5315:18, 5316:24, 5317:3, 5318:1, 5320:8, 5320:24, 5323:12, 5323:19, 5334:20, 5356:13, 5357:1, 5358:24, 5362:24, 5363:2, 5363:4, 5363:5, 5363:13, 5363:17, 5365:1, 5366:7, 5366:10, 5389:17, 5389:19, 5392:14, 5395:13, 5396:6, 5399:9, 5401:13, 5405:22, 5409:22, 5419:6, 5420:3, 5420:22, 5421:19, 5421:21, 5423:12, 5427:21
**Witness** [1] - 5421:1
**witness's** [4] - 5334:3, 5421:7, 5429:11, 5436:11
**witnessed** [1] - 5397:1
**witnesses** [3] - 5365:2, 5399:4, 5427:13
**witnessing** [1] - 5400:24
**wives** [1] - 5425:8
**women** [1] - 5336:13
**wooden** [2] - 5391:7, 5392:3
**word** [4] - 5335:16, 5388:13, 5388:14, 5435:25
**words** [5] - 5308:4, 5338:9, 5338:20, 5373:25, 5389:8
**wore** [1] - 5380:23
**world** [3] - 5326:18, 5388:23, 5404:21
**worn** [1] - 5417:22
**worried** [1] - 5333:18
**worrying** [2] - 5344:19, 5377:7
**worse** [1] - 5289:16
**worth** [1] - 5335:10
**wound** [2] - 5335:20, 5340:10
**write** [1] - 5338:15
**written** [4] - 5292:21, 5292:22, 5296:5, 5296:20
**wrongs** [1] - 5293:11

## Y

**year** [1] - 5326:2
**years** [5] - 5324:14,

5324:16, 5324:18, 5325:4, 5389:9
**yesterday** [1] - 5287:22
**York** [16] - 5284:18, 5285:13, 5324:9, 5327:25, 5337:14, 5337:17, 5410:12, 5410:16, 5410:18, 5410:22, 5410:24, 5411:1, 5411:10, 5411:11, 5418:20, 5418:21
**yourself** [8] - 5324:4, 5354:7, 5384:21, 5391:21, 5394:7, 5415:10, 5416:9, 5416:12

## Z

**Zachary** [2] - 5287:4, 5343:18